**FILED**

JUN 2 8 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TIMOTHY D. LAURENT**                        :

**On behalf of himself and on**              :
**behalf of all others similarly situated,**  :
:
:
**Plaintiff,**                                :

v.                                            

CASE NUMBER  1:05CV01291

**PRICEWATERHOUSECOOPERS LLP,**
1177 Avenue of the Americas
New York, New York 10036.

JUDGE: Paul L. Friedman

DECK TYPE: Labor/ERISA (non-employment)

DATE STAMP: 06/28/2005

**PRICEWATERHOUSECOOPERS LLP**
**BOARD OF PARTNERS AND PRINCIPALS,**  :
1177 Avenue of the Americas
New York, New York 10036.                     :
:
**THE RETIREMENT BENEFIT**                    :
**ACCUMULATION PLAN FOR EMPLOYEES**  :
**OF PRICEWATERHOUSECOOPERS LLP,**  :
c/o National Benefits Administration          :
3109 West Dr. Martin Luther King Blvd         :
Tampa, FL 33607-6215.                         :
:
**THE SAVINGS PLAN FOR EMPLOYEES**  :
**AND PARTNERS OF**                           :
**PRICEWATERHOUSECOOPERS LLP**  :
c/o National Benefits Administration          :
3109 West Dr. Martin Luther King Blvd         :
Tampa, FL 33607-6215.                         :
:
**THE SAVINGS PLAN FOR EMPLOYEES OF**  :
**PRICEWATERHOUSECOOPERS LLP,**  :
c/o National Benefits Administration          :
3109 West Dr. Martin Luther King Blvd         :
Tampa, FL 33607-6215.                         :
:
**THE ADMINISTRATIVE COMMITTEE TO**  :
**THE RETIREMENT BENEFIT**                    :
**ACCUMULATION PLAN FOR EMPLOYEES**  :
**OF PRICEWATERHOUSECOOPERS LLP,**  :

**Civil Action No.  05-**

**Class Action**

c/o National Benefits Administration
3109 West Dr. Martin Luther King Blvd
Tampa, FL 33607-6215.                            :

**THE ADMINISTRATIVE COMMITTEE TO**            :
**THE SAVINGS PLAN FOR EMPLOYEES**             :
**AND PARTNERS OF**                            :
**PRICEWATERHOUSECOOPERS LLP,**                :
c/o National Benefits Administration           :
3109 West Dr. Martin Luther King Blvd
Tampa, FL 33607-6215.                          :

**THE ADMINISTRATIVE COMMITTEE TO**            :
**THE SAVINGS PLAN FOR EMPLOYEES**             :
**AND PARTNERS OF**                            :
**PRICEWATERHOUSECOOPERS LLP,**                :
c/o National Benefits Administration           :
3109 West Dr. Martin Luther King Blvd          :
Tampa, FL 33607-6215.                          :
                                               :
**LAWRENCE H. ANDERSON,**                      :
Palm Beach Gardens, FL.                        :
                                               :
**JOHN J. BARRY,**                             :
Wyckoff, NJ.                                   :
                                               :
**WILLIAM L. BAX,**                            :
Glenview, IL.                                  :
                                               :
**MICHAEL J. BOBERSCHMIDT,**                   :
Miami Beach, FL.                               :
                                               :
**W. KEITH BOOTH,**                            :
Houston, TX.                                   :
                                               :
**DAVID J. BREEN,**                            :
Grosse Pointe Blank, MI.                       :
                                               :
**WILLARD W. BRITTAIN,**                       :
Princeton, NJ.                                 :
                                               :
**JAY D. BRODISH,**                            :
Doylestown, PA.                                :
                                               :
**J. FRANK BROWN,**                            :
Rye, NY.                                       :

THOMAS CHAMBERLAIN,
Deceased.

PHILIP J. CLEMENTS,
Chester, NJ.

IRA COHEN,
Boynton Beach, FL.

MARSHA R. COHEN,
Boston, MA.

MICHAEL S. COLLINS,
Darien, CT.

BRIAN L. CORNELL,
Hingham, MA.

JAMES E. DALEY,
Plano, TX.

G. WILLIAM DAUPHINAIS,
Scottsdale, AZ.

JONATHAN J. DAVIES,
San Francisco, CA.

SHERRY T. DAVIS,
Newton, MA.

BARRY L. DE MARTINI,
Deceased.

SAMUEL A. DIPIAZZA,
New York, NY.

ROBERT B. DUBNER,
Southampton, NY.

JOHN R. DUNLEAVY,
Palm Coast, FL.

J. CHRISTOPHER EVERETT,
Baltimore, MD.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**IRIS D. GOLDFEIN,**
Lincolnwood, IL.

**ROBERT H. HERZ,**
South Orange, NJ.

**ROGER C. HINDMAN,**
Carbondale, CO.

**STEPHEN D. HIGGINS,**
Sugar Land, TX.

**CRAIG M. JACOBSEN,**
Salt Lake City, UT.

**EUGENE S. KATZ,**
Menlo Park, CA.

**SCOTT W. KAUFMAN,**
LaQuinta, CA.

**RICHARD P. KEARNS,**
East Williston, NY.

**PETER KELLY,**
Darien, CT.

**RICHARD R. KILGUST,**
Dallas, TX.

**WENDY L. KORNREICH,**
New York, NY.

**JAMES P. KOVACS,**
New Vernon, NJ.

**FREDRIC L. LAUGHLIN,**
Sandy Spring, MD.

**D. LEON LEONHARDT,**
Fallston, NC.

**KEITH D. LEVINGSTON,**
McLean, VA.

**DENNIS J. LUBOZYNSKI,**

Simsbury, CT.                                    :
                                                 :
**RONALD T. MAHEU,**                             :
Boston, MA.                                      :
                                                 :
**PHILIP P. MANNINO,**                           :
Allendale, NJ.                                   :
                                                 :
**ANTHONY F. MARTIN,**                           :
Englewood, NJ.                                   :
                                                 :
**JAMES L. MCDONALD,**                           :
Old Greenwich, CT.                               :
                                                 :
**DONALD A. MCGOVERN, JR.,**                     :
Los Altos, CA.                                   :
                                                 :
**JAMES P. MCNALLY,**                            :
Scottsdale, AZ.                                  :
                                                 :
**NICHOLAS G. MOORE,**                           :
Los Altos Hills, CA.                             :
                                                 :
**ROBERT C. MORRIS, JR.,**                       :
Washington, D.C.                                 :
                                                 :
**DENNIS M. NALLY,**                             :
New Canaan, CT.                                  :
                                                 :
**DONALD T. NICOLAISEN,**                        :
Califon, NJ.                                     :
                                                 :
**ELDON OLSON,**                                 :
New York, NY.                                    :
                                                 :
**SHAUN F. O'MALLEY,**                           :
Philadelphia, PA.                                :
                                                 :
**MATTHEW O'ROURKE,**                            :
Naples, FL.                                      :
                                                 :
**GARY PELL,**                                   :
Atlanta, GA.                                     :
                                                 :
**LAWRENCE F. PORTNOY,**                         :
Meadow Vista, CA.                                :

**WALTER G. RICCIARDI,**
Ridgewood, NJ.

**LOUISE A. ROOT,**
N. Bethesda, MD.

**ERIC C. RULIFFSON,**
Deceased.

**DENIS J. SALAMONE,**
Ridgewood, NJ.

**ROBERT M. SARSANY,**
Paradise Valley, AZ.

**FRANK V. SCALIA,**
Huntington, NY.

**JAMES J. SCHIRO,**
Princeton, NJ.

**CHRISTINE G. SNYDER,**
Hunt Valley, MD.

**GARRETT L. STAUFFER,**
Bedminster, NJ.

**GEORGE G. STRONG JR.,**
La Canada, CA.

**PAUL J. SULLIVAN,**
Canton, MA.

**ROBERT P. SULLIVAN,**
Darien, CT.

**ANN M. THORNBURG,**
Boston, MA.

**RANDELL S. VALLEN,**
La Canada Flintridge, CA.

**FRANCIS J. VAN KIRK,**
Bryn Mawr, PA.

**PEGGY M. VAUGHN,**                    :
Dallas, TX.
                                       :

                                       :

**GARY W. VAN WAGNEN,**                :
St. Louis, MO.
                                       :

                                       :

**GERALD M. WARD,**                    :
Wilton, CT.
                                       :

                                       :

**ROBERT K. WATERS,**                  :
Sanibel, FL.
                                       :

                                       :

**BRETT D. YACKER,**                   :
New York, NY.
                                       :

                                       :

**GEORGE J. YOST III,**                :
Wellesley, MA.,
                                       :

                                       :

                    **Defendants.**    :

                                       :

---

### CLASS ACTION COMPLAINT[1]

Plaintiff, by and through his counsel, alleges as follows:

### NATURE AND SUMMARY OF THIS ACTION

1.      This is an action under ERISA[2] challenging the legality of the design and

operation of three ERISA-governed employee benefit plans (the "Plans") sponsored by

Defendant PricewaterhouseCoopers LLP ("PwC" or the "Firm").[3]

---

[1] This action was originally filed on November 5, 2005, in the District Court for the Southern District of Illinois (Civil Action No. 04-809 GPM), because, among other reasons, the named plaintiff in the suit resides in Illinois. The complaint was subsequently dismissed without prejudice for lack of proper venue by an order of the Court dated May 20, 2005, with an invitation by the Court to re-file in an appropriate jurisdiction of Plaintiff's choice. This is that re-filing.

[2] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.*

[3] All references to "PwC" or the "Firm" include its predecessors, including Price Waterhouse LLP and Coopers & Lybrand LLP. The acts, omissions and/or circumstances alleged to cause or result in the violations of law identified herein occurred throughout the relevant time (June 30, 1994 to the present) and are ongoing. To avoid awkward sentence construction, the past tense includes the present and vice versa; the singular includes the plural and vice versa; the terms "and" and "or" are both conjunctive and disjunctive; and including means "including but not limited to."

2.      Defendant The Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP ("RBAP") is a "cash balance" defined benefit pension plan covering the Firm's partner and non-partner employee-participants.

3.      Defendant The Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP (the "401(k) Plan" or the "Savings Plan") and Defendant The Savings Plan for Employees of PricewaterhouseCoopers LLP (the "Segregated 401(k) Plan") are defined contribution plans, one covering partners and certain non-partner employees, the other covering only those employees that the Firm individually selected for inclusion in a "separate but equal" version of the 401(k) Plan that the Firm saw as integral to the income discrimination scheme alleged herein.

4.      PwC, which refers to itself as the "world's largest professional services firm," *see* www.pwc.com, has long held itself out as an expert in the design and implementation of cash balance pension plans and has a reputation for having some of the most "innovative" cash balance plan designs in the marketplace. *See, e.g., Pensions & Investments*, "Employee Directed: Consulting Firm Practices What it Preaches on Cash Balance," May 17, 1999 (PwC "has been pushing the envelope on innovative cash balance pension plan designs for its clients").

5.      "Innovative" in this context typically refers to cash balance plans that finesse or sidestep ERISA and Internal Revenue Code ("Code" or "IRC") rules and allow employers to cut pension expenses without rank-and-file workers realizing that their benefits have been reduced. *See, e.g., Wall Street Journal*, "Actuaries Become Red-Faced Over Recorded Pension Talk," May 5, 1999 (quoting a PwC actuary who told other actuaries at a 1998 conference that use of a cash balance format provides employers

2

with "an advantage as it masks a lot of the changes . . . There is very little comparison that can be done between the two plans [the prior traditional defined benefit plan and a subsequent cash balance plan]").

6.      So innovative were PwC's cash balance plan designs that at one point, in 1998, the Firm marketed a design with a feature under which the employer would convert employees' individual 401(k) plan accounts into cash balance pension plan benefits and take participants' former 401(k) plan assets, commingle them with the cash balance plan's assets and seek to generate arbitrage profits with the use of (what had been) participants' money. Of all the sponsors to whom PwC marketed this design, however, only one employer, Bank of America Corporation, actually implemented it. *See, e.g., Pothier et al. v. Bank of America Corp., et al.*, 05-238 (W.D.N.C., pending). Confirming one of the central contentions plaintiffs make in that case (in which PwC is also a defendant), the IRS has informed Bank of America that it has concluded that the PwC-designed $3 billion asset transfer indeed violated the ERISA and Code's "anti-cutback" rule, ERISA § 204(g), 29 U.S.C. § 1054(g), and 26 U.S.C. ("IRC") § 411(d)(6). *See* Bank of America Corp. SEC 10-K, March 2005 at 134.

7.      This suit contends that PwC and its partners were recommending for their clients nothing that they were not bold enough to attempt themselves. The Complaint alleges that from 1994 to the present, PwC and the PwC-related entities and individual PwC partners named as defendants herein (collectively, the "PwC Defendants") designed and administered the RBAP and the two 401(k) Plans in such a way as to violate most of ERISA's central tenets and core participant protections.

8.    These violations can be grouped into the following four categories:

### (i)    Unlawful Benefits Calculations and Related Violations.

Violations of ERISA's core defined benefit pension plan standards, including violations of settled law governing the calculation of participants' accrued benefits under a cash balance plan, whether distributed as a lump-sum or an annuity. To sidestep these rules – particularly the settled "cash-out" (or "whipsaw") rule -- Defendants claim to have a found a loophole in the Code and ERISA that almost no one else has before or since:   they use an admittedly fictitious definition of "normal retirement age" -- a definition under which all participants are deemed to reach normal retirement age after only five (5) years of work, regardless of their age -- to cause participants to forfeit tens of millions of dollars of vested and accrued benefits.   The result is not just illegal forfeitures on a massive scale but also systematic age discrimination and excessively "backloaded" benefit accruals.[4]

### (ii)    Contributions-and-Benefits Discrimination.

Violations of the standards established by the Code and applicable regulations, as incorporated by reference by the Plans, that prohibit discrimination in the amounts of contributions and benefits that the RBAP and 401(k) Plans provide to PwC partners versus PwC's non-partner employees.[5]   These rules prohibit tax qualified retirement plans like the Plans from discriminating in favor of highly compensated employees by guaranteeing lower-paid workers contributions and benefits that are more or less

---

[4] *See infra* Count One (forfeiture of accrued benefits); Counts Two-Three (age discrimination); Count Four (violation of the prohibition against excessively backloaded benefit accruals); and Count Five (forfeiture of normal retirement benefits).   ERISA and the Code's anti-backloading rules are designed "to prevent the employer from defeating the vesting section." *See Jones v. UOP*, 16 F.3d 141 (7th Cir. 1994) (Posner, J.).

[5] Failure to comply with otherwise lawful plan terms is itself a violation of ERISA which requires fidelity to plan terms except in limited circumstances not relevant here.   *See* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   References to violations of the RBAP's and 401(k) Plans' terms are to be read as alleging violations of ERISA.

4

proportional to compensation. The undeniable facts show that the RBAP and the two 401(k) Plans were deliberately designed to evade and were used to evade these rules. In fact, the evidence is unmistakable that Defendants meticulously structured the Plans precisely to maximize benefits-and-contributions discrimination in favor of the highly-paid partners. The sole reason for existence of the Segregated Plan was that it was seen as an aide to discrimination maximization.[6]

(iii)    **"Participant-Directed"-Related Violations.**

Violations stemming from the RBAP's virtually unique 401(k)-style "participant directed" design, under which Defendants maintain control over a key aspect of participants' pension benefit formula -- *i.e.*, the menu of hypothetical investment options among which Defendants require participants to select if they wish to receive interest or investment credits greater than the very low yielding "default" option. This plan design, as implemented by Defendants:

(A) Violates the "definitely determinable" benefits standard requiring that the plan state its formula objectively and in a way that precludes employer discretion;

(B) Violates ERISA's anti-cutback rule because Defendants have often replaced the RBAP's hypothetical investment options (which serve as the Plan's actuarial assumptions) with lower yielding measures without ensuring that participants' benefits are at least equivalent to what they would have been had the investment options not changed; and

(C) Violates fiduciary standards because the individual partner-Defendants do not and cannot act solely and exclusively in the best interests of participants in exercising their near-absolute discretion over the RBAP's investment measures since, in zero-sum fashion, the higher the return and lower the expense ratio for the RBAP's hypothetical investment options,

---

[6] *See infra* Count Six (failure to abide by the Plan terms prohibiting the Plans from discriminating against non-partner participants as to plan contributions and benefits); Count Seven (intentional failure to abide by these same nondiscrimination standards in violation of ERISA § 510, 29 U.S.C. § 1140).

the greater the Firm's and individual partners' liability to fund the Plan and the smaller the profit for distribution to individual partners.[7]

**(iv)    Plan Asset Investment Violations**.

Violations of ERISA's fiduciary standards in the investment of RBAP and 401(k) Plan assets that have cost the already underfunded RBAP and the individual account 401(k) Plans tens of millions of dollars in losses or lost investment opportunity.[8]

9.      Plaintiff is a former PwC employee and participant in the Plans who brings this action on behalf of himself, on behalf of the Plans, and, under Federal Rule of Civil Procedure 23, a proposed class (the "Class") of all persons who participated in any of the Plans at any time and their beneficiaries (collectively referred to herein as "participants"), with the exception of all current PwC partners and all former PwC partners who are liable to Plaintiff, the Class or the Plans according to the allegations made herein.

**JURISDICTION**

10.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

11.      This Court has personal jurisdiction over the Defendants because they reside in, do business in, or have significant contacts with, this District or the United

---

[7] *See infra* Count Eight (violations of the Plan because the Plan provisions express benefits under a formula that is subject to employer discretion when the "definitely determinable" benefits standards that requires that benefits be expressed in a manner that precludes employer discretion); Count Nine (violations of the anti-cutback rule whenever change of investment return benchmarks reduces benefits); Count Ten (fiduciary breaches committed in implementing the flawed plan design).

[8] *See infra* Count Eleven (fiduciary and co-fiduciary breaches).

States, and because ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## VENUE

12.    Venue is proper in this district, under ERISA § 502(e), 29 U.S.C. § 1132(e), because this district is where the Plans are administered, where some of the breaches took place, where one or more defendants reside and/or where one or more defendants may be found.

13.    The Plans are administered here and some of the breaches took place here because the unlawful plan designs challenged here and methods for implementing these designs were conceived and drafted in substantial part in this district. Additionally, one or more Defendants participating in the breaches did so while residing or working in this district.

14.    All of the entity Defendants (PwC, the Plans, the Board, the Administrative Committees, as defined below) reside here because they each have minimum contacts with the nation as a whole and/or because the Court has personal jurisdiction over them via ERISA's nationwide service of process provision by which the entity defendants can and will be served. One or more individual defendants also reside in this district, including but not limited to Robert C. Morris, Jr., Lawrence F. Portnoy and Louise A. Root.

15.    All of the Defendants may be found here because they each have minimum contacts with this district. PwC has three offices in this district, including the headquarters of its national tax practice. All individual Defendants may be found here by virtue of the fact that PwC is found here. Additionally, one or more individual

7

Defendants reside or do business in this district on a regular basis and/or transact Plan-related business in this district. PwC, the Board, the Committees, the Committee Members and the Trustees may also be found in this district because many of the Plans' participants live or work in this district, earn some or all of their Plan benefits in this district, or receive some or all of their Plan benefits in this district. PwC, the Committees, the Trustees and the Plans may also be found here by virtue of the Firm's and the Plans' highly interactive websites (https://www2.benefitsweb.com/pwc.html) which come into this district on a continuous basis for the purpose of transacting Firm and Plan business with residents of this district.

## EXHAUSTION OF REMEDIES

16.    Plaintiff should be deemed excused from any otherwise applicable requirement to exhaust plan remedies for one or more of the following reasons. First, this suit raises questions of law or statutory interpretation as to which the exhaustion doctrine does not apply or should not apply. Defendants demonstrated their agreement with this principle by failing to raise exhaustion as a defense to this suit as originally filed on November 5, 2004 in the Southern District of Illinois (and pending there until May 20, 2005, *see supra* n. 1). Second, Plaintiff raises no claim as to which it would be appropriate to defer to the Plan Administrator of either Plan. Third, the Plans do not provide any meaningful claims process as would be required by ERISA § 503, 29 U.S.C. § 1133, for challenges to the legality of Plan design or the implementation such as those contained in this suit. Fourth, Defendants' conduct in the previously filed suit demonstrated that it would be futile under the circumstances presented or that would necessarily be presented here for Plaintiff to attempt to seek redress for his grievances.

8

Defendants were presented with detailed explications of Plaintiff's contentions and at no time stated any willingness to reconsider their view that their Plan design or implementation was or is unlawful. Fifth, any remedy provided under the terms of the Plans for the violations asserted would be inadequate.

## THE PARTIES

17.    Plaintiff Timothy D. Laurent of Inverness, Illinois, a former non-partner PwC employee, was a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the RBAP and the Savings Plan. In 2002, after terminating employment with PwC, he requested a single lump sum distribution of his entire accrued benefit from both the RBAP and the 401(k) Plan.

18.    Defendant The Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP ("RBAP") is a "cash balance" pension plan covering PwC partners and principals ("partners"), directors, and employees. The RBAP is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and more precisely a "defined benefit plan," *see* RBAP at 1-2, within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35), and IRC § 414(j), and a "pension plan" within the meaning of IRC § 401(a) and Treas. Reg. § 1.401-1(b)(1)(i). The RBAP as of June 30, 2004 had approximately 40,000 participants and approximately $2 billion in assets.[9]

---

[9] "RBAP" refers, as the case may be, to the RBAP in its entirety or the document commonly referred to as the "RBAP plan document." The RBAP plan document is an "AGREEMENT" between, among others, PwC and "the Trustees" "amend[ed] and restate[d]" effective July 1, 1995. References to the RBAP plan document are to that AGREEMENT together with all amendments, exhibits, appendices, supplements, and agreements or side letters or special annual memoranda to partners, the entirety of which, as updated to the present, is incorporated herein by reference. The "401(k) Plan" or the "Savings Plan" refers, as the case may be, to the 401(k) Plan in its entirety or the document commonly referred to as the "401(k) Plan plan document." References to the RBAP include the RBAP plan document and other RBAP plan documents such as the Summary Plan Description ("SPD"), all of which are also incorporated herein by reference.

9

19.    Defendant The Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP (the "401(k) Plan"), is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34) that includes a cash-or-deferred arrangement described in Code § 401(k) covering PwC partners, directors, and employees. The 401(k) Plan is also an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The 401(k) Plan as of September 30, 2003 had approximately 40,000 participants and approximately $1.6 billion in assets. The 401(k) Plan is identified in the Plan's Summary Plan Description ("SPD")'s and on IRS 5500 filings as Plan No. 004.

20.    Defendant The Savings Plan for Employees of PricewaterhouseCoopers LLP (the "Segregated 401(k) Plan") is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34) that includes a cash-or-deferred arrangement described in Code § 401(k). It covers only certain PwC non-partner employees. The Segregated 401(k) Plan, identified in the Plan's SPDs and on IRS 5500 filings as Plan No. 196, has terms that are identical to the primary 401(k) Plan (Plan No. 004) in all respects except for purposes of identifying eligible participants.

21.    PricewaterhouseCoopers LLP ("PwC") (EIN 13-4008324) is a Delaware limited liability partnership organized and existing pursuant to the PwC Partners and Principals Agreement (incorporated herein by reference). PwC is part of a worldwide organization called PricewaterhouseCoopers Global ("PwC Global"). PwC Global and

---

The 401(k) Plan plan document is an "AGREEMENT" between, among others, PwC and "the Trustees" "amend[ed] and restate[d]" effective October 1, 1995. References to the 401(k) Plan document are to that AGREEMENT together with all amendments, exhibits, appendices, supplements, and agreements or side letters or special annual memoranda to partners, the entirety of which, as updated to the present, is incorporated herein by reference. References to the 401(k) Plan include the 401(k) Plan plan document and other RBAP plan documents such as its SPD, all of which are also incorporated herein by reference.

its affiliated offices do business throughout the world. PwC Global employs approximately 122,000 individuals worldwide, and during the fiscal year ended June 30, 2004, had gross revenues of $17.6 billion. Net revenues for the period were $16.3 billion, or $2.1 million per partner. PwC employs more than 23,000 individuals in the United States, with more than 2,000 partners and employees in the Washington D.C. Metropolitan area, the Firm's second largest concentration of workers in the United States.

22.    PwC is the sponsor of the Plans within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B) and is an "employer" within the meaning of ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1). RBAP §§ 2.22, 2.27; 401(k) Plan §§ 2.16, 2.27. Additionally, PwC is "named fiduciary" of the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a) and a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) under each of the tests applicable thereunder.[10]

23.    PwC is also a fiduciary because it has or exercises responsibility or discretion with respect to the Plans. PwC is also a fiduciary because the Plan instruments specifically provide that PwC at all times retains authority, responsibility or control of the investment of Plans' assets, *see* RBAP § 11.2; 401(k) Plan § 12.1, and PwC exercises that authority, responsibility or control. PwC is also a fiduciary because it has or exercises responsibility for selecting, appointing, monitoring and removing the Plans' other fiduciaries from their positions of authority. These other fiduciaries include: (a) the

---

[10] Thus, PwC is a fiduciary because it (a) exercises or exercised discretionary authority or discretionary control respecting management of the Plans or exercises or exercised authority or control respecting management or disposition of the Plans' assets, (b) renders or rendered investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plans, or has or had authority or responsibility to do so, and/or (c) has and/or had discretionary authority or discretionary responsibility in the administration of the Plans. *See* RBAP §§ 2.26, 2.36, 10.1, 10.4; 401(k) Plan §§ 2.21, 11.4, 12.1, 16.2. All allegations made in this Complaint are made without limitation to those contained elsewhere in the Complaint.

partners who comprise or comprised the Board of Partners and Principals (formerly known, before July 1, 1998, as the "Policy Board"); (b) the partners serving or acting as Trustees; and (c) the partners serving or acting as Members of the Plans' Administrative Committee(s). *Id.,* RBAP §§ 2.5, 2.26, 2.36, 10.1, 10.4; 401(k) Plan §§ 2.3, 2.34, 11.1, 11.4, 12.19.

24.     PwC is also a fiduciary because it has or exercises responsibility for communicating directly or indirectly with participants about the Plans and Plan benefits.[11]

25.     Defendant PwC Board of Partners and Principals ("Board") is PwC's highest decision-making body. The Board serves at the pleasure of the Firm and its partners. It is the means by and through which the Firm acts. References to the "Board" or "Board Members" are references to either or both boards or any or all Board members. The Board's composition is determined by the Firm as a whole, by vote of all partners with voting authority. It is comprised solely of PwC partners and principals whose profit distributions are directly affected by the level of benefits paid by the RBAP and the level of employer contributions made to the 401(k) Plans.

---

[11] PwC acts as a fiduciary in all of the various ways in which it has that status through certain PwC partners, principals, directors, employees, attorneys and agents, some of whom are identified herein but some of whose identities are currently unknown. All of these persons are, as a result of their actions or inactions on behalf of PwC as fiduciary in the exercise of its fiduciary authority or control or as a result of their having discretionary authority or discretionary responsibility in the administration of the Plans, fiduciaries to that same extent. They are thus as liable for such acts, omissions, breaches and co-fiduciary breaches as is PwC. PwC is a fiduciary to the Plans to the extent that the Board and its Members have fiduciary status with respect to the Plans because PwC directly or indirectly had or exercised responsibility for selecting, appointing, monitoring and removing the Board and its Members from such position of authority. Additionally, PwC is a fiduciary to the same extent the Board and its Members are insofar as the Board acts with respect to the Plans through PwC and its partners, principals, directors, employees, attorneys and agents. Similarly, the Board and its Members are fiduciaries to the extent PwC is because PwC acts as a Plan fiduciary in whole or in part through the Board and its partners, principals, directors, agents and attorneys.

26.    Current or former Members of the Board include the following individually named Defendants herein:

    a.    Lawrence H. Anderson

    b.    John J. Barry

    c.    William L. Bax

    d.    Michael J. Boberschmidt

    e.    W. Keith Booth

    f.    David J. Breen

    g.    Willard W. Brittain

    h.    Jay Brodish

    i.    J. Frank Brown

    j.    Philip J. Clements

    k.    Michael S. Collins

    l.    Brian L. Cornell

    m.    James E. Daley (also a Committee member)

    n.    G. William Dauphinais

    o.    Jonathan J. Davies

    p.    Barry L. De Martini

    q.    Samuel A. DiPiazza

    r.    Robert B. Dubner

    s.    John R. Dunleavy

    t.    J. Christopher Everett (also a Trustee and Committee member)

    u.    Iris D. Goldfein

13

| | |
|---|---|
| v. | Robert H. Herz (also a Trustee) |
| w. | Stephen D. Higgins |
| x. | Craig M. Jacobsen |
| y. | Eugene S. Katz |
| z. | Scott W. Kaufman |
| aa. | Richard R. Kilgust (also a Trustee) |
| bb. | Fredric L. Laughlin |
| cc. | Keith D. Levingston |
| dd. | Dennis J. Lubozynski |
| ee. | Ronald T. Maheu |
| ff. | Philip P. Mannino |
| gg. | Anthony F. Martin (also a Trustee) |
| hh. | James L. McDonald |
| ii. | Donald A. McGovern |
| jj. | Nicholas G. Moore |
| kk. | Robert C. Morris, Jr. (also a Trustee) |
| ll. | Dennis M. Nally (also a Trustee) |
| mm. | Donald T. Nicolaisen |
| nn. | Shaun F. O'Malley |
| oo. | Gary Pell |
| pp. | Walter G. Ricciardi |
| qq. | Eric C. Ruliffson |
| rr. | Denis J. Salamone |

14

| ss. | Robert M. Sarsany |
|-----|-------------------|
| tt. | James J. Schiro |
| uu. | Christine G. Snyder |
| vv. | Garrett L. Stauffer |
| ww. | George G. Strong Jr. |
| xx. | Paul J. Sullivan |
| yy. | Robert P. Sullivan (also a Trustee) |
| zz. | Ann M. Thornburg |
| aaa. | Peggy M. Vaughn |
| bbb. | Francis J. Van Kirk |
| ccc. | Gary W. Van Wagnen |
| ddd. | Gerald M. Ward |
| eee. | Robert K. Waters |
| fff. | Brett D. Yacker (also a Trustee and a Committee member) |
| ggg. | George J. Yost III |

27.     The Board and its Members are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (each test stated thereunder) and named fiduciaries under ERISA § 402(a), 29 U.S.C. § 1102(a).  They are also fiduciaries insofar as they have or exercise responsibility for selecting, appointing, monitoring or removing the Plans' fiduciaries, including the Plans' Trustees or the Members of the Plans' Administrative Committees.  *See* RBAP §§ 2.5, 10.4, 11.18; 401(k) Plan §§ 2.3, 2.32, 12.19.

15

28.    The Administrative Committee to the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "Administrative Committee" or "Committee") is the RBAP's Administrator within the meaning of ERISA 3(16)(A), 29 U.S.C. § 1002(16)(A). RBAP § 10.4. The Administrative Committee to the Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP is the Savings Plan's Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). 401(k) Plan § 11.4.[12] The Administrative Committee to the Savings Plan for Employees of PricewaterhouseCoopers LLP is the Segregated 401(k) Plan's Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

29.    Each Committee is comprised of three to six individuals who need not be but have always been PwC partners. They serve at the pleasure of the Board of Partners and Principals. RBAP § 2.5; 401(k) Plan § 2.3. The membership of the RBAP and 401(k) Plan Committees is identical: all members of one Committee are members of the others.

30.    The Committee members include the following PwC current or former partners who are separately and specifically named as Defendants herein:

    a.    Thomas Chamberlain.

    b.    Ira Cohen.

    c.    James E. Daley (also a Board Member, *see* below).

    d.    J. Christopher Everett (also a Board Member and a Trustee).

    e.    Richard P. Kearns (also a Trustee).

    f.    James P. Kovacs (also a Trustee).

---

[12] After the Plans became effective but prior to the appointment of the Administrative Committees, PwC was the Administrator. *See* RBAP § 10.4; 401(k) Plan § 11.4.

16

g.    D. Leon Leonhardt (also a Trustee).

h.    James P. McNally.

i.    Eldon Olson.

j.    Lawrence F. Portnoy (also a Trustee).

k.    Randal S. Vallen (also a Trustee).

l.    Brett D. Yacker (also a Board Member and a Trustee).

31.    The Committees are named fiduciaries of their respective Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a) and are otherwise fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (under each test stated thereunder). Moreover, in his or her own right each Committee member is a fiduciary under ERISA § 3(16)(A), 29 U.S.C.§ 1002(16)(A) (administrator), under ERISA § 402(a), 29 U.S.C. § 1102(a) (named fiduciary) and under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (fiduciary within the meaning of each test stated thereunder).

32.    Each Committee member's profit distributions from the Firm are directly affected by the level of benefits paid by the RBAP and the level of employer contributions made to 401(k) Plans. RBAP § 2.5; 401(k) Plan § 2.3.

33.    Each Plan has a Trustee that is a trustee of each Plan within the meaning of ERISA § 403, 29 U.S.C. § 1103. The Trustee of each Plan consists of current or former PwC partners, each termed a Trustee. The identities of the RBAP Trustees and the 401(k) Plan Trustees are identical: each Trustee of the RBAP is also a Trustee of the 401(k) Plans and vice versa.

34.    Each Trustee is a fiduciary to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (each test thereunder). Each Trustee also is a

17

named fiduciary with respect to the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), and a fiduciary insofar as he or she assumed some or all of the functions of one or more of the Administrative Committees or Administrative Committee members.    Each Trustee is responsible for the management and control of the assets of the Plans. *See, e.g.,* RBAP § 11.15; 401(k) Plan, § 12.

35.    The partner-Trustees' profit distributions from the Firm are directly affected by the level of benefits paid by the RBAP and the level of employer contributions made to 401(k) Plans.

36.    The partner-Trustees include:

a.    Marsha R. Cohen.

b.    Sherry T. Davis.

c.    J. Christopher Everett (also a Board Member and a Committee member).

d.    Robert H. Herz (also a Board Member).

e.    Roger C. Hindman.

f.    Richard P. Kearns (also a Committee member).

g.    Peter Kelly.

h.    Richard R. Kilgust (also a Board member).

i.    Wendy L. Kornreich.

j.    James Kovacs (also a Committee member).

k.    D. Leon Leonhardt (also a Committee member).

l.    Anthony F. Martin (also a Board Member).

m.    Robert C. Morris, Jr. (also a Board Member).

18

n.    Dennis M. Nally (also a Board Member).

o.    Lawrence F. Portnoy (also a Committee member).

p.    Matthew O'Rourke.

q.    Louise A. Root.

r.    Frank V. Scalia.

s.    Robert P. Sullivan (also a Board Member).

t.    Randal S. Vallen (also a Committee member).

u.    Brett D. Yacker (also a Committee member).


## ADDITIONAL FACTS

### I.    RBAP and 401(k) Plan Background.

37.    Prior to July 1, 1994, the RBAP's effective date, Price Waterhouse LLP, a predecessor of PwC, maintained for its employees a traditional defined benefit plan, known as the Retirement Plan for Employees of Price Waterhouse LLP.  Effective June 30, 1994, Price Waterhouse LLP froze benefit accruals under that plan, effectively replacing it with the RBAP, which became effective July 1, 1994.

38.    Prior to July 1, 1994, Price Waterhouse LLP also maintained a 401(k) Plan for employees, known as the Savings Plan for Employees and Partners of Price Waterhouse LLP.  That Plan was first effective October 1, 1985.  On October 1, 1994, after the RBAP became effective, the 401(k) Plan was restated and amended.  The Segregated 401(k) Plan also became effective October 1, 1994.

39.    On July 1, 1998, Price Waterhouse LLP and Coopers & Lybrand LLP merged to create PwC.  On that same date, Coopers & Lybrand LLP's traditional defined

19

benefit plan, the Coopers & Lybrand Retirement Plan, was amended to provide for a cash balance formula substantially identical to the RBAP. The two plans merged into the Coopers & Lybrand Retirement Plan one year later, on July 1, 1999, and the merged plan was amended and restated as the amended and restated RBAP. (Accordingly, all references to the RBAP herein should be read to include Coopers & Lybrand Retirement Plan from July 1, 1998 until July 1, 1999).

40.     The Kwasha Lipton Retirement Plan also was amended to merge into the Coopers & Lybrand Retirement Plan and became part of the amended and restated RBAP as of July 1, 1999, pending receipt of a determination letter from the Internal Revenue Service approving the plan merger. The IRS so far has refused to approve the merger. If the IRS does approve the merger and the merger becomes effective as of July 1, 1999, all references to the RBAP should be read to include the Kwasha Lipton Retirement Plan from the date of its merger with and into the amended and restated RBAP.

41.     On July 1, 1998, PwC adopted the renamed 401(k) Plans and on April 1, 1999, the Coopers & Lybrand Multi-investment Accumulation Plan and the Kwasha Lipton Savings Plan were merged into the primary 401(k) Plan. All references to the 401(k) Plan should be read to include those two plans from the date of their merger with and into the amended and restated 401(k) Plan.

## II.     The RBAP and the 401(k) Plans Incorporate the Internal Revenue Code's Employee Benefit Plan Qualification Standards.

42.     The RBAP, the 401(k) Plan, and the Segregated 401(k) Plan are broad-based retirement plans that cover partners and rank-and-file PwC employees. As such, the Plans are subject to Title I of ERISA. *See* ERISA § 4, 29 U.S.C. § 1003.

20

43.     All Defendant Plans must also comply with the terms of the Internal Revenue Code (Title II of ERISA, as originally enacted and subsequently amended and codified in 26 U.S.C. § 401 *et seq.*) because the Plans incorporate by reference the Code's terms that are required for the Plans to maintain tax-qualified status. Code incorporation was a voluntary choice by PwC, acting as Plan sponsor: broad-based retirement plans are not *required* by law to comply with the Code. PwC caused the Plans to "opt in" to the Code's regulatory scheme to enable PwC and its partners and employees to enjoy the favorable income tax treatment that is available only to employee benefit plans that voluntarily submit to the Code's regulatory regime.

44.     Thus, the RBAP and 401(k) Plans prominently and explicitly state that they are intended to meet the requirements of the Code: "it is intended that this Plan meet the requirements of Sections 401 and 501 of the Internal Revenue Code of 1986, as amended." RBAP at 1-2; 401(k) Plan at 1-2.[13]  Additionally, the RBAP instructs in § 16.6(b) that: "It is intended that the Plan meet the requirements of ERISA and the Code and the Plan shall be interpreted and construed, wherever possible, to comply with the terms of ERISA, the Code, and regulations and rulings thereunder." In § 16.1(b)(2), the RBAP again repeats that: "This Plan is intended to comply with the provisions of Section 401 and 501(a) of the Code." Moreover, the Plan states: "In the event the Plan fails to initially achieve qualification under said sections of the Code, the Plan shall be *null and void* as of the Effective Date." *Id.* (emphasis added). The 401(k) Plan includes identical language at §§ 17.9(b) and 17.1(b)(2).[14]

---

[13] Code § 401 contains almost all of the Code's benefit plan protections for participants – including all of the protections at issue in this case.

[14] As indicated above, the Segregated 401(k) Plan has similar language. Any reference herein to provisions of the 401(k) Plan should be read to include the similar provision in the Segregated 401(k) Plan. More

45.     As a result of the Plans' incorporation of these Code standards, the Plans are required to comply with those standards as a matter of ERISA law, not just as a matter of tax law.[15]  On the premise that the Plans are tax-qualified retirement plans that comply with Code § 401, other provisions of the Code and applicable Treasury regulations, PwC has taken billions of dollars in tax deductions for contributions made into the Plans' trusts since 1994.  PwC has also claimed for the trust a complete exemption from federal income taxation under Code § 501; PwC partners have deferred reporting the Firm's contributions into the Plan on their behalf as income to them; and PwC has used the Plan and participants' ability to accumulate benefits under it on a tax-deferred basis in its recruitment and retention efforts[16] -- all on the premise that the Plans are Code-compliant.

## III.    The RBAP and the 401(k) Plans Violate the Code's Nondiscrimination Standards and Hence Their Own Terms and ERISA.

46.     Among the Code provisions incorporated by reference into all three Plans is Code § 401(a)(4) and the applicable Treasury regulations thereunder, Treas. Reg. § 1.401(a)(4)-1, et seq.  These rules prohibit tax qualified retirement plans like the Plans from discriminating in favor of highly compensated employees by guaranteeing lower-

---

generally, any allegations of fact or unlawful actions committed by the 401(k) Plan or fiduciaries of that Plan should be read as applying equally with respect to the Segregated 401(k) Plan.

[15] See ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan" with exceptions not relevant here); see also ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (giving participants the right to bring an action to "enjoin any act or practice which violates . . . the terms of the plan," or to obtain other equitable relief "to enforce any provisions of . . . the terms of the plan"); ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) ("to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan").

[16] See, e.g., www.pwc.com ("What makes PricewaterhouseCoopers a Great Place to Work?  Part of the answer is our comprehensive, flexible and market-competitive benefits program . . . . [that] reflects our philosophy of shared responsibility").

22

paid workers contributions and benefits that are more or less proportional to compensation.

47.    Specifically, Code § 401(a)(4) provides that "contributions or benefits under the plan [may] not discriminate in favor of highly compensated employees." Treasury regulations repeat this mandate, and clarify that the nondiscrimination standards "must be interpreted in a reasonable manner consistent with the purpose of preventing discrimination in favor of HCEs [*i.e.*, highly-compensated employees]." Treas. Reg. § 1.401(a)(4)-1(c)(2).  This income non-discrimination requirement was imposed by Congress as a condition of the generous tax subsidy provided to qualified pension plans, which historically has been the largest in the Code. The concern was that, absent strict income non-discrimination standards, pension plans might be used as tax shelters for executives and partners rather than as a means to provide broad-based retirement savings for employees.

48.    Accordingly, the law is clear that this is one area where mere technical compliance is necessary but will never be sufficient: "The regulations under 401(a)(4) set forth various objective criteria for determining whether the nondiscrimination rules of the Code are satisfied, but the regulations also provide that they must be interpreted in a reasonable manner consistent with the purpose of preventing this discrimination.  Thus, the regulations cannot be interpreted to permit an unreasonable disparity in the benefits paid to highly compensated employees over those paid to nonhighly compensated employees." Memorandum from Director, Employee Plans: "Short Service Employees and Other Meaningful Benefit Schemes and Abuses," October 22, 2004, *reprinted in* BNA Daily Tax Reporter, Nov. 5, 2004 ("IRS Discrimination Scheme Mem."). *See also*

23

Treas. Reg. § 1.401(a)(4)-1(c)(2) (The nondiscrimination regulations "must be interpreted in a reasonable manner consistent with the purpose of preventing discrimination in favor of HCEs [highly compensated employees]").

49.    The RBAP and the 401(k) Plans emphasize their intent to comply with these particular standards.   In addition to the Plan language quoted above that incorporates *all* provisions of Code § 401 that are required for tax qualification, the Plans specifically incorporate the provisions and standards of Code § 401(a)(4).  Thus, for example RBAP § 15.6 provides that in the event of termination of the Plan, the benefit of any highly compensated employee is limited to a benefit that is nondiscriminatory under Code § 401(a)(4).  RBAP § 2.13 provides a minimum benefit of $7,000 to all non-partner participants for the sole purpose of allowing PwC to take the position (wrongly, Plaintiff asserts) that partner benefits satisfy Code § 401(a)(4).[17]  And RBAP § 16.7 instructs that no discretionary acts may be taken under the Plan by PwC, or by the plan administrator or trustee, that are discriminatory under the Code.  The 401(k) Plan includes similar provisions.  *See* 401(k) Plan § 4.5 (applying the contribution nondiscrimination test required under Code § 401(a)(4)), § 4.4, and § 17.10 (which includes language identical to the nondiscrimination provision in RBAP § 16.7).

50.    However, Defendants purposefully designed the RBAP and 401(k) Plans to discriminate in favor of high-paid PwC partners and to deprive rank-and-file

---

[17] *See, e.g.,* IRS Discrimination Scheme Mem. ("We have become aware of certain schemes which . . . attempt to satisfy the requirements of various Code sections (*e.g.* sections 401(a)(4) . . . ) by allocating amounts to the sponsor's lowest paid employees which, while perhaps significant relative to the employee's compensation, are actually small in amount because of the employees' small amount of compensation. Thus, these plans provide little or no actual benefits to these employees. . . . [Plan] sponsors further contend that the qualification requirements of the Code and the regulations are satisfied even though the dollar amounts actually accrued by the lowest paid employees are nominal and even though these employees may never vest in their benefit. As discussed in this memorandum, these plans may violate the nondiscrimination requirements of the Code even though they ostensibly satisfy certain provisions in the nondiscrimination regulations").

24

employees a roughly comparable level of benefits. Knowing what they were doing was wrong, they carefully attempted to conceal it. But, sleights of hand exposed, the discrimination under both sets of Plans is glaringly obvious.

## IV.    401(k) Plan Discrimination and 401(k) Plan Shell-Games.

51.    Under the 401(k) Plans, PwC makes matching contributions to the Plans on behalf of participants who make contributions of their own. But the matching rates for partners and non-partner employees are vastly different: For partners, the Firm match is an unusually high 200% of each partner's savings. For non-partners, the Firm makes a matching contribution equal to 25% of each employee's own savings, with one telling exception: PwC matches 200% of non-partner savings for the first *month* after an employee first joins the Plans.[18]

52.    PwC also allows non-partner employees to defer up to 100% of their salary for the first month of participation. The Firm does this because it efficiently (from the Firm's standpoint) drives up the non-partner employee average contribution rate (as well as help drive up the average match rate) – because PwC thinks it allows them to say, for nondiscrimination testing purposes, that employees are permitted to defer up to 100% of their salary for their first *year* when in fact that "year" is only one month long.

53.    To further ensure that the partners could receive the maximum 401(k) contributions allowed by law but without paying the price of making roughly equivalent

---

[18] *See* 401(k) Plan § 4.4(i); 401(k) SPD at 1. To take advantage of a perceived loophole in IRS nondiscrimination regulations, discussed below, the Plan states that the 200% match for non-partners lasts for each participant's first *year* in the Plans. Only by reading the fine print would one ever learn that this first "year" is really only one *month* long. PwC prevents new employees from joining the 401(k) Plans until the last month of the Plan year in which they are hired. In PwC's heads-they win, tails-they win way of thinking, this allows the Firm to test the 401(k) Plan for discrimination as though the Plan offers the 200% match to all employees during their first *year* of participation, even though the first "year" is only one month long. *See* 401(k) Plan § 4.4 (200% match for non-partners applies for first Plan Year), § 2.33 (defining Plan Year as the twelve month period ending September 30 each year), and § 2.18 (defining Entry Date as September 1 following the date of hire).

contributions on behalf of non-highly compensated employees, Defendants created a kind of "shadow" or "mirror" 401(k) Plan into which they dumped some of the Firm's very lowest paid employees and those least likely to contribute significant amounts to the (primary) 401(k) Plan. Rejecting the notion that "[t]he poor you will always have with you" need concern them, *see* Matthew 26:11, Defendants simply off-loaded -- and then walled-off -- these employees into a new plan created solely for that purpose (the Segregated 401(k) Plan) to make it *look* as though the primary 401(k) Plan provides more generous benefits to non-partner employees than it really does. *See* 401(k) Plan §§ 3.4(4), 3.5 (excluding non-highly compensated employees in staff classifications 60 or 92 or C99 and transferring them to the Segregated 401(k) Plan).[19] This was nothing but a cynical ploy to make the primary 401(k) Plan seem to provide roughly "equal" contributions for partners and employees by concealing the fact that, for PwC, some employees simply don't count.

54.    The data starkly show how wide the economic gap is between the average 401(k) Plan participant and the average Segregated 401(k) Plan participant. According to the 401(k) and Segregated 401(k) Plans' 5500 filings for 1999-2003, the average account balance for participants in the Segregated 401(k) Plan was $7,781.28. The average account balance for participants in the primary 401(k) Plan, on the other hand, was $35,585.93, *or 457% larger.*

55.    Only by airbrushing these low-paid, low-contributing Segregated Plan participants out of the 401(k) Plan picture entirely, and then by deceptively portraying a

---

[19] PwC determines which particular employees fall into these staff classifications, and is thus effectively able to hand pick those employees that it considers a drag on the primary 401(k) Plan and who it therefore wishes to transfer to the Segregated 401(k) Plan. This discretion to select which employees are able to participate in each of the Plans violates Code § 410(b) and the regulations thereunder, which the Plans incorporate by reference.

single month as an entire year of contributions on behalf of those participants who remained, could Defendants hope to justify the large sums they were paying themselves, with taxpayers' help, through this heavily tax-subsidized Plan. Whatever the mathematical proofs may show, Defendants engaged in invidious income discrimination in violation of the Plans and the Code, callously shunting aside precisely the kind of participants most in need of ERISA's protections.

## V.    Three Card Monte: Discrimination and the RBAP.

56.    PwC also used its cash balance pension plan, the RBAP, to maximize, instead of prevent, discrimination in favor of the partners, following another two-tier strategy. Similar to the primary 401(k) Plan, the RBAP is not what PwC pretends it is. The RBAP is not a unified cash balance plan for partners and employees alike, employing a common benefit formula. Rather, it has two separate and very unequal benefit formulas, one for partners and another for everyone else. And just like with the 401(k) Plans, the Firm went to extraordinary lengths to make it difficult for non-partner employees and regulators to realize what was happening.

57.    Similar to other cash balance plans, rank-and-file participants receive hypothetical periodic "pay credits" to their cash balance "accounts" equal to 5-7% of each participant's compensation.[20]   These pay credits are then increased (or decreased) each month by hypothetical "investment credits" (or debits) ("Deemed Investment Credit Allocations") – the RBAP's "innovative" version of the more typical cash balance "interest credits." Unlike virtually any other cash balance plan, participants in the RBAP

---

[20]More specifically, called "Deemed Payroll Period Allocations," the pay credits are 5% of compensation for non-partner rank-and-file participants and 7% of compensation for non-partner Directors, increased to 8% for Managing Directors, effective October 1, 2004.

are forced to choose among a PwC-selected menu of "investment experience choices" (referred to here more simply as investment measures or options), which can actually result in a *negative* benefit accrual during any period in which a participant's "investment" selections suffer a loss.

58.     Thus, according to the RBAP (as written), after the pay credits are issued, nothing is guaranteed. The rank-and-file participant's pension benefit under the Plan -- which is a defined benefit pension plan -- is essentially equal to that described by any defined *contribution* plan: the balance of the participant's account at retirement, based on the "contributions" (pay credit) made to the "account," plus or minus the account's investment experience.

59.     The partner benefit, on the other hand, works more like a traditional defined benefit pension plan formula – or more accurately, a traditional defined benefit formula that is disguised to *look* like a cash balance plan formula. Under the partner formula, PwC makes periodic pay credits to partners' accounts just as under the rank-and-file formula. But the partner formula does not call for pay credits based on any fixed percentage of partners' current compensation, with benefits then based on whatever the account balance happens to be at retirement, plus or minus the account's investment experience. The partners have given themselves a benefit at retirement that is both designed to bring them as close as possible to the maximum tax-sheltered retirement benefit permitted by law -- PwC pays rank-and-file benefits nowhere near as generous -- *and* is effectively guaranteed against the risk of loss -- also something that PwC does not offer ordinary workers.

28

60.    The partners' RBAP benefit formula is in fact not just unusual - it is unique in the annals of defined benefit cash balance plans. The formula takes as its starting point a **target benefit** equal to the maximum permitted by law for each partner at age 60. Each partner's annual pay credit is then determined by working *backwards* from this target to determine the annual "contribution" necessary to get the partner to the target maximum.[21]

61.    Specifically, the annual credit called for under the RBAP on behalf of each partner effectively is the amount necessary to generate a benefit for each partner at retirement that is the actuarial equivalent of a $170,000 (indexed) per year beginning at age 65 – which is the maximum permitted by law under Code § 415(b). This is obviously a separate and very unequal benefit compared to rank-and-file benefits.

62.    Knowing the RBAP to be discriminatory and unlawful, Defendants hid the partner formulas from non-partner employees and regulators. For one thing, the RBAP plan document states the partner formula in an excessively complicated, almost impenetrably obtuse way that was obviously intended to conceal the document's true import. For good measure, the RBAP plan document buries the partner formula in a

---

[21] The partner formula appears to have been modified almost every year since 1994 for this purpose whereas the rank-and-file formula has remained substantially unchanged since 1995. *See* RBAP § 2.15. Moreover, while the formula makes reference to pay credits, those pay credits, except in one notable instance, are not a function of compensation at all. For example, until 1998, pay credits were a function of the ratio of what all Partners earned in those years compared to 1995 – making the formula seem far more like a defined contribution profit-sharing plan (with a much lower annual benefit limit) than a defined benefit plan. Indeed, to the extent the Partners' pay credits are based on unknown factors extraneous to the RBAP such as the aggregate of all partners' earnings, the target benefit formula does not meet one of the first requirements of a defined benefit plan, *i.e.*, that the benefits be "definitely determinable." *See* Code § 401(a)(25); Treas. Reg. § 1.401(a)-1(b)(1)(i) ("The determination of the amount of retirement benefits and the contributions to provide such benefits [cannot be] dependent upon profits"). For years after June 1999, the formula is similarly *ad hoc,* but always in an attempt to reverse-engineer for each partner the maximum defined benefit amount allowed by law. Indeed, the sole instance where pay credits have anything to do with compensation is where the pay credit will be reduced to the extent necessary to increase the partner's earnings to the Compensation Limit for the year ($210,000 in 2005).

29

completely out-of-the-way location within the already lengthy and complicated document under intentionally misleading headings. The partner formula is found not under a heading entitled "Partner Formula" or something similarly clear but in two interior sections of an Article titled "*Limitations* on Benefits"; although one follows right after the other, each of those sections is labeled without differentiation, "Definitions." RBAP, Art. 7, § 7.3 ("Definitions"); § 7.4 ("Definitions"). The partner formula is not only exceedingly well-camouflaged, it is also over 50 pages away from the RBAP's basic plan benefit definitions that appear to apply to all participants without qualification. Needless to say, Defendants also omit the partners' very differently calculated (and disproportionately generous) formula from the Plan's SPDs.

63.    The fiduciary-Defendants were duty-bound to disregard the discriminatory Plan provision in favor of the Plans' more basic nondiscrimination and Code-compliance commands. *See* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan *insofar [only] as such documents and instruments are consistent with the provisions of [ERISA]*") (emphasis added). Fidelity to those nondiscrimination commands was required not just because they were plan terms but because failure to comply with them risked disqualifying the Plan.[22] However, none of the fiduciary-Defendants did what the law required of them: disregard the illegal Plan designs and

---

[22] The effects of plan disqualification fall most harshly on plan participants. Participants would be taxed on any contribution made by an employer during the time the trust is disqualified (even though the employee may have no right to receive the value of the contribution in cash) and they may lose all or a part of the beneficial tax treatment available for distributions from qualified plans. On the other hand, "in contrast to the unquestioned tax disasters which befall a participating employee, employers may escape plan disqualification with only minor injuries, or no injury at all." John D. Colombo, "Paying for Sins of the Master: An Analysis of the Tax Effects of Pension Plan Disqualification and a Proposal for Reform," 34 Ariz. L. Rev. 53, 73 (1992).

implement the Plans in such a way as to make the contributions and benefits provided under the Plans to non-partner participants roughly comparable to those provided the highly-compensated partners.

## VI. Violations of Participants' Rights Caused By the Design and Implementation of the RBAP's "Participant-Directed" Investment Crediting Rate Feature.

64.    As noted, yet another "innovation" Defendants ushered in via the RBAP is its "participant-directed" 401(k)-style investment crediting or debiting feature, under which each participant is required to direct the allocation of the "assets" in his or her account among a menu of "investment" options, as in a typical 401(k) plan. The results of these "deemed" investments are credited to participants' accounts each month for as long as a participant leaves his or her benefits in the Plan.

65.    The RBAP was the first such participant-directed or "second generation" cash balance plan in the country -- it is also just about the *only* such plan still in existence. That is because PwC's efforts to market similar second-generation cash balance plans to other plan sponsors was a failure. There are no other large plan sponsors (plans with more than $50 million in assets) besides PwC and Bank of America operating participant-directed cash balance plans today.[23]

66.    This is true despite the fact that there are hundreds of cash balance plans which were sold to employers and participants precisely on the basis that they mimic 401(k) plans. Indeed, for rank-and-file employees, a participant-directed plan like the RBAP mimics the features of defined contribution plans even more than the typical cash balance plan since its interest credits are seemingly the results of participants' elections

---

[23] *Compare Pensions and Investments*, "Employee Directed: Consulting Firm Practices What it Preaches on Cash Balance" May 17, 1999 ("participant-directed cash balance plans . . . have been adopted by fewer than six employers").

31

of different "investment" options, as opposed to the (single) index used to credit participants' accounts under the typical cash balance plan.

67.    There is no anomaly, however. The reason PwC was unable to convince clients to adopt a plan like the RBAP (or the NationsBank Cash Balance Plan) is that those plan sponsors understood that the five-years-of-service normal retirement age upon which the plan is necessarily designed is an invalid fiction that, when employed, makes an employer's compliance with a whole host of pension and tax laws optional — and thus, if for no other reason than that, the plan design must be unlawful.

68.    Sponsors rejecting the participant-directed design also presumably saw what was obvious to PwC as well -- that as designed and administered by Defendants the RBAP's participant-directed feature (A) violates the Code requirement, incorporated into the RBAP by its terms, that the Plan "provide systematically for the payment of definitely determinable benefits"; (B) violates ERISA and the Code's anti-cutback rule, ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6), because the Plan frequently changes plan actuarial assumptions (*i.e.,* the investment options) in a way that inevitably leads to reductions in participants' accrued benefits; and (C) will almost always result in the Plan's fiduciaries violating ERISA's fiduciary standards.

### A.    <u>Failure to Provide an Objective Benefit Formula.</u>

69.    To be tax-qualified, a pension plan has to "provide systematically for the payment of definitely determinable benefits." Treas. Reg. § 1.401(a)-1(b)(1)(i); *accord* Rev. Rul. 79-90, 1979-1 CB 155. Congress codified Rev. Rul. 79-90 in 1984 in IRC § 401(a)(25) which provides that "actuarial assumptions . . .[must be] specified in the plan in a way which precludes employer discretion."

32

70.    In a cash balance plan, the interest crediting rate is the key actuarial assumption and, as the IRS has explained, "[i]f the interest rate is subject to the discretion of the employer, it is highly unlikely that the plan would be able to satisfy the requirement that benefits be definitely determinable." *See, e.g.,* Private Letter Ruling 9645031 (Nov. 8, 1996).

71.    The RBAP, as designed and implemented, suffers from this basic defect. The RBAP states that a participant's "Accrued Benefit" is "For any Participant as of any date, the Participant's Deemed Account Balance credited to that date." RBAP § 2.1. The "Deemed Account Balance" is defined as the amount equal to the annual compensation-based credits to the "account" made by the plan sponsor (the "Deemed Payroll Period Allocations"), plus or minus the participant's deemed or imputed "investment" returns or losses ("Deemed Investment Experience"). *Id.* §§ 2.13, 2.14. The Deemed Investment Experience is the hypothetical return the participant "earns" (or loses) "investing" his hypothetical account balance in the investment options ("investment experience choices") offered to him. *Id.* § 2.14.

72.    In this way, the "investment experience choices" – or the menu of investment measures or options – serve as actuarial assumptions, like the interest credits in a typical cash balance plan. But unlike in virtually every other cash balance plan, the actuarial assumptions in the RBAP are not fixed by the terms of the Plan or by reference to objective criteria or any independent third party. Rather, the RBAP provides that the investment measures among which participants are required to select (if they wish to avoid being defaulted to a low-yielding stable value fund) are chosen by the

Administrative Committee, RBAP § 2.14, with no objective constraints imposed on or to guide them.

73.    The lack of any written standards gave and gives Defendants discretion over a critical piece of the pension formula: the menu of investment options that determines the investment crediting rate under the RBAP.    It violates the Code requirement, incorporated into the RBAP by its terms, that the RBAP "provide systematically for the payment of definitely determinable benefits." Code § 401(a)(25). It also violates the ERISA requirement that the RBAP may not give PwC discretion over the amount of benefits accrued by participants under the Plan.  ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4).

### B.    Anti-Cutback Violations.

74.    Throughout the relevant time period, Defendants on numerous occasions exercised discretion to eliminate previously designated investment benchmarks that functioned as RBAP actuarial assumptions.  Numerous times and over numerous periods of time the replacement benchmarks yielded lower returns than the benchmarks they replaced.  However, ERISA and the Code's "anti-cutback" rule, ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6) and the regulations promulgated thereunder forbid sponsors or fiduciaries from changing plan actuarial assumptions in a way that reduces participants' accrued benefits.    To ensure that these changes to the Plan's actuarial assumptions did not result in a prohibited cutback, the Plan was required to use one of two acceptable methods as set forth in Rev. Rul. 81-12, 1981-1 C.B. 228, which is directly enforceable under ERISA § 204(g), 29 U.S.C. § 1054(g). *See* ERISA § 3002(c), 29 U.S.C. § 1202(c), and ERISA Reg. § 2530.200a-2.

34

75.    Under Rev. Rul. 81-12, the RBAP had to either keep track of how participants would have done in the "old" benchmark compared to the new one (the "wearaway" method), or it had to calculate the benefit accrued under the old benchmark until the time it was discontinued and make sure that value was added to the benefit accrued under the new benchmark, calculated on a going forward basis (the "A + B" method). *See* Rev. Rul. 81-12. The RBAP and its fiduciaries did neither, in violation of ERISA § 204(g), 29 U.S.C. § 1054(g), Treas. Reg. § 1.411(d)-4, Q&A-4 and Rev. Rul. 81-12.

### C.    Fiduciary Breaches in the Selection and De-Selection of Investment Experience Choices.

76.    The RBAP's participant-directed design as implemented also violates fiduciary standards. As shown above, PwC as plan sponsor effectively delegated to the RBAP's fiduciaries (according to the Plan document, the RBAP Administrative Committee) its responsibility to determine a key aspect of the Plan's benefit formula -- the RBAP's actuarial assumptions, *i.e.,* the investment measures offered. When PwC transformed the setting of the Plan's benefit formula into a fiduciary act, it placed that fiduciary decision-making authority into irreconcilably conflicted hands: PwC's partners serving as Plan Committee Members, Trustees, Members of the Board, and/or representatives of PwC itself had a direct, personal conflict of interest in selecting, monitoring and de-selecting those investment options because they benefit directly – in the form of saved contributions and resulting higher partner profits – to the extent they can open a gulf between participants' "investments" and the actual investment of RBAP assets, which was the "exclusive responsibility" of the Trustees. RBAP § 11.15. That is

35

because the partners' profit distributions are directly affected by the level of benefits paid by the RBAP and the 401(k) Plans.

77.    The conflict taints every level of the process:  the partners responsible for appointing, monitoring and removing the selecting fiduciaries also have a direct personal and professional conflict of interest in the matter.

78.    The fiduciary breaches are inevitable here.    The individual partner-Defendants do not and cannot act solely and exclusively in the best interests of participants in exercising their near-absolute discretion over the RBAP's investment measures because the selection and de-selection of investment options for the RBAP pits partners v. participants in zero-sum fashion:  the higher the return and lower the expense ratio for the RBAP's hypothetical investment options, the greater the Firm's and individual partners' liability to fund the Plan and the smaller the profit for distribution to individual partners.    Moreover, the RBAP contains no required or even suggested standards to guide or limit the discretion of the Plan fiduciaries. Defendants are free to change the investment option menu at any time entirely at their discretion -- and they have done so over the years repeatedly -- based on standards that they may or may not adopt.

79.    In point of fact, Defendants acted contrary to the best interests of participants and contrary to their obligations as the participants' fiduciaries in selecting and de-selecting the investment measures.  Defendants knowingly or negligently used, and knowingly or negligently permitted those they were required to supervise use, high-priced investment measures -- primarily mutual funds -- as benchmarks, when they were under no constraints whatsoever to do so.  Whether intentional or not, this had the effect

of needlessly reducing participants' benefits. It also kept PwC's pension costs down and partners' take home pay up. Smaller benefit payments translate into lower funding costs, which means larger net profits for PwC partners to split among themselves.

80.    Had the relevant fiduciaries acted with due diligence and in good faith, they would have employed very different benchmarks and participants would have had significantly higher benefits.

81.    PwC, the Board and Board members were responsible to appoint, monitor, and, when appropriate, remove the Administrative Committee Members and Trustees to ensure that they were conducting themselves as prudent and loyal fiduciaries. Instead of fulfilling this duty in the interest of the Plans, PwC, the Board and the Board's Members enabled and affirmatively encouraged the misconduct of the Trustees by deliberately permitting them to continue in their conflicted positions as fiduciaries.

82.    According to numerous participant communications and statements made in filings in the litigation in the Southern District of Illinois, *see infra* n.1, the Trustees were in fact the persons who selected and de-selected the RBAP's investment measures -- and not, as the RBAP plan document explicitly requires, the Administrative Committee. RBAP § 2.14. According to the defense, the Committee was "dissolved" on June 30, 1998 and is "no longer in existence."[24] Defendants, however, do not explain why the Committee is no longer in existence or pursuant to what authority the Committee was "dissolved." (No reason is stated for why or pursuant to what authority the Committees were dissolved.) Unless there are pre-existing formal plan instruments that amended or

---

[24] *Laurent, supra* n. 1, Doc. 23, Hindman Decl. ¶ 4 ("The Administrative Committee of the RBAP was dissolved on June 30, 1998. When the Committee was in existence, its meetings were held in New York City"); Burnham Decl. ¶ 3 ("The Administrative Committee of the RBAP no longer exists").

otherwise altered the RBAP's terms in this regard, "dissolv[ing]" the Committee and supplanting them with the Trustees violated the terms of the Plan and forms an independent basis for liability. *See* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). The Plan document entitled participants to the considered judgment of a specifically defined Committee, with at least 3 members. By contrast, the RBAP refers generally to only one "Trustee" – as does its statutory cognate. Selection and de-selection of investment experience choices by the Trustees was *ultra vires* and a *per se* breach of fiduciary duty whether otherwise a breach or not.

## VII.    The RBAP's Fictitious 5 Year Retirement Age.

83.    ERISA and the Internal Revenue Code define "normal retirement age" identically as the earlier of –

> (A) the time a plan participant attains normal retirement age under the plan, or
>
> (B) the later of (i) the time a plan participant attains age 65, or (ii) the 5th anniversary of the time a plan participant commenced participation in the plan.

ERISA § 3(24), 29 U.S.C. § 1002(24); IRC § 411(a)(8).

84.    The RBAP defines "Normal Retirement Age" as meaning: "The *earlier* of the date a Participant attains age 65 *or completes five (5) Years of Service.*" *Id.* § 2.32 (emphasis added). This means that RBAP participants are deemed to reach their normal retirement age after completing 5 years of service with the Firm, regardless of their age, with the relatively rare exception of the person who starts work for the Firm after age 60. This definition also means, for example, that copy-room clerks straight out of high school reach their "normal" retirement age at age 23. Plaintiff himself reached his "normal" retirement age at age 30 – quite unbeknownst to him because Defendants hide this "fact"

38

from participants.[25] Not coincidentally, this is the same date each participant vests in his or her benefits under the Plan, RBAP § 6.1, and thus the first date any participant could become entitled to a lump sum distribution.

85.    The vast majority of large defined benefit pension plans and virtually all large cash balance plans specify a normal retirement age of age 65. The RBAP was the first cash balance plan – in fact, the first pension plan of *any* type – to directly or indirectly define the term or concept of "normal retirement age" as the age an employee happens to be after 5 years of employment (or some such equivalent or similarly low "age" or short period of service). Today, apart from the NationsBank/Bank of America cash balance plan, the RBAP is the only large defined benefit plan using a 5 year retirement "age."

86.    The RBAP's purported "normal retirement age" of 5 years of service regardless of age plainly fails to satisfy the law's requirement that the normal retirement age be no lower than the real, customary age at which the Firm's workforce normally retires.[26] These are office workers and accountants, not circus acrobats. Participants in the RBAP may change employers after a few years, but they do not normally withdraw from full-time work and live on their savings and/or pension after 5 years of employment, regardless of their age.

87.    As if to prove this, the RBAP itself has consistently reported on its annual IRS Form 5500 information return to the IRS and the Department of Labor that, for

---

[25] It should be clear why PwC might not want to disclose to employees in their 20's or 30's that they had reached "normal retirement age." Less clear is why PwC represented to them in the RBAP's SPDs that *age 65* is normal retirement age. *See infra.*

[26] As Plaintiff will demonstrate elsewhere, the law is clear that by "normal retirement age" the statute means age 65 or a lower age, as long as that age is not younger than the age at which the sponsor's covered workforce typically retires and so long as the sponsor has not set the normal retirement age so low as to evade pension plan rules or standards.

actuarial and financial accounting purposes, the assumed retirement age of employees
who participate in the RBAP is age 60 for partners and age 65 for everyone else. (Under
the Firm's partnership agreement, partners generally are required to retire at age 60 – *i.e.*,
their normal retirement age is age 60.) Actuarial and accounting rules require actuaries
and accountants to base their assumptions on their best estimate of when retirement will
*in fact* typically occur, focusing on substance rather than form. IRC § 412(c)(3)(B); FAS
87 ("Employers' Accounting for Pensions") ¶¶ 39, 43. Thus, the retirement age
assumptions in the IRS Form 5500s represent an admission by PwC and the RBAP that
the true "normal" retirement age of RBAP participants is age 60 for partners and age 65
for non-partners.

88.    A further admission (by conduct) that 5 years of service is not a true
normal retirement age under the RBAP is that when RBAP participants reach "Normal
Retirement Age" they are not informed by the Plan or PwC of that "fact." Indeed, as
noted below, the RBAP's Summary Plan Descriptions at least since 1999 (1999, 2001,
2003 and 2004) state that normal retirement age is *age 65*. At the completion of 5 years
of service, participants do not receive a "suspension of benefits notice" informing them
that by continuing to work past normal retirement age, the economic value of their
"normal retirement benefit" may erode. Such a notice is required at normal retirement
age unless a plan provides for actuarial adjustment of the normal retirement benefit,
which the RBAP does not do. *See* 29 C.F.R. § 2530.203-3(b)(4).

89.    As shown below, moreover, PwC itself admitted in a September 1999
letter to the IRS that its 5 year retirement age is not a "'normal'" normal retirement age
and is in fact "well below" that typical age.

40

### VIII.  The Fictitious 5 Year Retirement Age's Role in the RBAP's Illegal Calculation of Benefits.

90.    Although the RBAP illegally calculates benefits in several ways whether the 5 years of service normal retirement age is deemed illegitimate by the Court or not, *see infra* Count One, the central role the fictitious 5 year retirement rule plays in depriving RBAP participants of their rights bears emphasis because an annuity commencing at normal retirement age is the benefit lens through which all defined benefits must be viewed, including cash balance plans.

91.    Under ERISA and the Code, a participant's defined benefit pension benefit must be expressed in the form of an annuity commencing at normal retirement age and benefits paid must have an actuarial value that is no less than that projected benefit. ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), and Code § 411(c)(3). But because, unlike a conventional defined benefit plan, a hypothetical account-based cash balance plan does not, by its own formula, define a projected benefit, the amount of a participant's deferred benefit due under a hypothetical account-based cash balance plan (providing for annual or monthly pay credits and annual or monthly interest credits) cannot be known with certainty until the participant reaches normal retirement age. So, the law requires that the departing employee's accrued benefit be projected out to an annuity commencing at normal retirement age (or later, if the plan provides interest credits to some later date, as the RBAP does) using the plan's then-prevailing interest crediting rate, and then discounted back to present value to determine the appropriate lump sum to be paid using the Code § 417(e) interest rate (currently, the 30-year Treasury bond).

41

92.    Under this "cash-out" rule, if the plan's interest crediting rate is the Code

§ 417(e) rate, the present value of the normal retirement age annuity will be the same as

the hypothetical account balance.  However, as each of the three Federal Circuit Court of

Appeals which have decided cash balance cases have confirmed, there will have been an

impermissible forfeiture of benefits under ERISA § 203(a), 29 U.S.C. § 1053(a), and

Code § 411(a), if the plan's interest (or investment) crediting rate is higher than the Code

§ 417(e) rate and only the account balance is paid.[27]  Where the present value of the

normal retirement age annuity - and the amount of any lump sum distribution - is greater

than the hypothetical account balance, that is the accrued benefit and that is the amount

that must be paid.[28]

93.    Cash balance plan sponsors refer to the cash-out rule pejoratively as

"whipsaw."[29]  PwC is no exception but the Firm was not content to criticize the rule - it

decided to evade it with the fictitious 5 year retirement age.   By deeming every

---

[27] *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003); *Esden v. Bank of Boston*, 229 F.3d 154, 168 (2d Cir. 2000); *Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1251 (11th Cir. 2000).

[28] A departing participant may also elect to receive his benefit in the form of an immediate annuity.  The "cash-out" rule applies equally in this context, except that the benefit is not distributed all at once in a lump sum.

[29] Plaintiffs see a different whipsaw:  The cash-out rule is merely one of many rules with which PwC voluntarily said it would comply in exchange for lucrative Federal tax deductions, exemptions and income deferrals.  If anyone, it is cash balance *sponsors* like PwC who want to whipsaw the Federal government and the taxpaying public by accepting the generous tax subsidies provided to such plans – $100 billion annually for qualified retirement plans maintained by U.S. employers, the Internal Revenue Code's *single largest* tax subsidy, outpacing even the cost to the fisc of the home mortgage interest deduction, Joint Committee on Taxation, Estimates of Federal Tax Expenditures for Fiscal years 2005-2009 (JCS-1-05), January 12, 2005 – but not uphold their end of the bargain. The tax subsidy is premised on the idea that cash balance and other pension plans provide an alternative source of retirement income to rank and file employees that "reduces pressure on the social security system."  Joint Committee on Taxation, Present-Law Tax Rules Relating to Qualified Pension Plans (JCS-9-90), March 22, 1990, at 62-63 ("The policy rationale for [the] tax expenditure is that the tax benefits for qualified plans encourage employers to provide retirement benefits for their employees.  This reduces the need for public assistance and reduces pressure on the social security system.").  Permitting employers to establish a patently false "retirement" age under such plans runs directly contrary to this policy because it allows employers to undermine retirement security in precisely the ways that ERISA was designed to stop.  Surely, this is not what Congress had in mind.

participant to have reached "normal retirement age" after 5 years, the date that benefits first vest, lump sums are *never* paid before "normal retirement age." This, according to PwC, eliminates the need to include the value of projected interest credits in pre-retirement lump sum distributions. The theory was that if every participant with vested benefits was deemed to have attained "normal retirement age," no projection to normal retirement age would ever be required – everyone was already there.

94.    But PwC knew this was not an even remotely valid theory. Thus, neither before or after the RBAP's effective date of July 1994, or before marketing the 5 year retirement age concept to third-party clients, did PwC seek to alert the Department of Treasury or the IRS National Office of its view (and seek some form of ruling, in the form of a revenue ruling or private letter ruling) that it was possible to define 5 years of employment, regardless of age, as the RBAP's normal retirement age. PwC wrote regulators in September 1999 about the matter only after the practice of using a 5-year retirement age was exposed in the pension press in a series of embarrassing articles -- including one in which one expert aptly said the 5 year rule "guts" the statute -- that reported that regulators were concerned and might investigate and take action to halt the practice.[30]

---

[30] *See* "Employee Directed: Consulting Firm Practices What it Preaches on Cash Balance," *Pensions & Investments,* May 17, 1999 (PwC "has been pushing the envelope on innovative cash balance pension plan designs for its clients . . . [and] has . . . its own: a second-generation plan covering Pricewaterhouse employees that was set up in the mid-1990s"); "Pension Downsizing, Continued," *Tax Notes,* May 24, 1999 ("now something has come along that even the slightly embarrassed Treasury may not be able to ignore. Pension advisers, emboldened by a decade of improvidently granted determination letters and reliance on a reassuring sentence in a preamble to an otherwise irrelevant regulation, have begun playing fast and loose with retirement ages in cash balance plans. . . . Retire in Five Years? . . . .[NationsBank's] new plan takes a hyper-technical approach to the question of what constitutes a normal retirement age . . . PricewaterhouseCoopers, which designed the NationsBank plan, put the same retirement age provision in its own plan"; "[t]he backloading rules of section 411(b), which cause complications for cash balance plans, are also believed to be avoided by the NationsBank definition of normal retirement age" because after normal retirement age the sponsor can "backload as much as it wants"); "Cash Balance: Trouble for Bank Plans? IRS Scrutinizes Shortened Retirement Ages," *Pensions & Investments,* May 31, 1999 ("'The

95.    Although PwC had sought a determination letter for the RBAP sometime after it went into effect and eventually received one, PwC did nothing to draw the attention of the IRS field agent assigned to review the application to the existence of this one-of-a-kind normal retirement age provision.  In fact, PwC wrote the RBAP in a purposefully misleading fashion to trick regulators into thinking the Firm was *complying* with the cash-out rule when in fact the Firm was simply drafting around it.

96.    The RBAP states that a Plan participant's "Normal Retirement Benefit" "shall be an amount equal to the Actuarial Equivalent (calculated by projecting the Deemed Account Balance to Normal Retirement Age using the Deemed Plan Interest Rate) of his or her Deemed Account Balance." RBAP § 5.1. The "Deemed Plan Interest Rate" is defined as the annual rate of interest equal to the interest rate on 30-year Treasury securities, as specified by the IRS for the month of February immediately preceding the plan year in which the calculation is made.  RBAP § 2.16.

97.    This definition of "Normal Retirement Benefit" is clearly designed to obscure the true nature of the RBAP's illegal benefit calculation formula.  Given the Plan's Normal Retirement Age definition, it will never be necessary to "*project[]* the Deemed Account Balance *to* Normal Retirement Age" because under no circumstance will a participant be entitled to a benefit prior to Normal Retirement Age: any participant who has a vested benefit will already have attained Normal Retirement Age because that

---

five-year normal retirement age looks like a contrivance to get around rules,' said an expert who did not wish to be identified"; "[o]fficials from the Treasury Department and IRS have been scrutinizing plans like NationsBank's that have defined 'normal' retirement as occurring . . . after 5 years' tenure. . . . Such shortened retirement ages short-circuit various pension rules pegged to the more conventional retirement ages of 60 and 65," including the rule against anti-backloading;  "A short retirement age 'guts' the Employee Retirement Income Security Act, said a cash balance plan expert who declined to be identified. 'Twenty-eight is not a normal retirement age.'"; "Other plans with short normal retirement ages could face the same scrutiny. They include PricewaterhouseCoopers LLP"; "What's more, an inordinately short retirement age also renders ERISA's anti-backloading rules meaningless").

is the first date at which a participant may become vested. As a result, the Normal Retirement Benefit will always be precisely the current Deemed Account Balance – not the *projected* account balance, as the definition implies.[31]

98.    Thus, when the RBAP provides that "[t]he amount of any lump sum payment to a Participant or Beneficiary shall not be less than the Actuarial Equivalent of the Participant's Normal Retirement Benefit," RBAP § 5.4(b), it really means a lump sum payment will always simply be a participant's current "account" balance. Put that way, however, the provision's invalidity is readily apparent: a participant's defined benefit pension benefit cannot be defined as the participant's account balance; only a defined contribution plan's benefit may be defined in that manner. ERISA § 3(23)(A)-(B), 29 U.S.C. § 1002(23)(A)-(B), and Code § 411(a)(7)(A)(i)-(ii).

99.    The RBAP's definitions of "Normal Retirement Benefit" and "Accrued Benefit" mean that *all* benefits paid under the Plan before or after normal retirement age are calculated unlawfully. Recall that benefits paid under a defined benefit cash balance plan must have an actuarial value that is no less than the projected benefit at normal retirement age. ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), and Code § 411(c)(3). The RBAP, by providing that benefits will be the actuarial equivalent of a participant's *current* Deemed Account Balance – not the *projected* benefit at normal retirement age, or the actuarially adjusted normal retirement benefit for benefits paid after normal

---

[31] Ironically, if it were any other way – *i.e.,* if the calculation of the RBAP's Normal Retirement Benefit did in fact require a projection – the definition would be unlawful on its face. This is because the RBAP purports to calculate the Normal Retirement Benefit based on an interest rate – the "Deemed Plan Interest Rate" – that is different from, and often less than, the rate that is used to calculate a participant's Accrued Benefit under the Plan, which is based on a participant's Deemed Investment Experience. This is *per se* unlawful under ERISA and the Code: It is by now settled law that a participant's normal retirement benefit under a cash balance plan is the participant's account balance projected to normal retirement age based on the interest crediting rate *that is used to determine the periodic additions to each participant's account balance* – which here, is each participant's Deemed Investment Experience.

45

retirement age – fails on its face to satisfy this requirement. *See, e.g.,* RBAP §§ 2.1, 2.39, 2.8 (qualified joint and survivor annuity shall be the Actuarial Equivalent of the Participant's Deemed Account Balance); § 5.4(c) (single life annuity shall be the Actuarial Equivalent of the Participant's Deemed Account Balance).

100.   In Plaintiff's case, the Plan determined the amount of his lump-sum distribution without projecting his hypothetical account balance to age 65 (or any other age). It also did not figure Plaintiff's Normal Retirement Benefit by "calculat[ing] the Actuarial Equivalent" of his Deemed Account Balance to determine his Normal Retirement Benefit. It simply determined his Deemed Account Balance and paid it to him, without making any effort to also pay him an amount equal to the value of the Plaintiff's accrued right to continue to earn investment credits to age 65 and beyond.[32]

101.   If Plaintiff's benefit had been projected to age 65 using an appropriate investment crediting rate, converted to a life annuity (taking into account the value of the continued right to earn investment credits even after age 65), and then discounted back to his then current age at the interest rate(s) required by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), and Code § 417(e)(3), as implemented by Treas. Reg. § 1.417(e)-l(d), Plaintiff would have received a larger lump sum distribution than the amount paid to him.

---

[32] Even assuming the RBAP validly states a normal retirement age of 5 years of service, Defendants still improperly calculated Plaintiff's accrued benefit.  A participant such as Plaintiff (and most other participants) with a Deemed Account Balance in excess of $5,000 is permitted to leave his or her benefits in the RBAP, and continue to receive Deemed Investment Experience credits, even after normal retirement age, through at least age 70½. SPD at 13 ("If the value of your benefit is more than $5,000 and you are less than age 70½, you can elect to defer distribution."); RBAP § 5.6(b) (benefit in excess of $5000 distributed at a Participant's election); RBAP § 5.1(b) (benefit must commence no later than April 1 following year in which Participant attains age 70½); RBAP §§ 2.13(b), 2.14(a) (Deemed Investment Experience is credited to a participant's account each month for as long as his or her benefits remain in the Plan). Although PwC was not required to write the Plan in precisely this fashion, *see, e.g.,* Treas. Reg. § 1.411(a)-11(c)(4) (permitting forced benefit distributions after the later of normal retirement age or age 62), it did.  By doing so, PwC thus defined Plaintiff's and the proposed Class members' statutorily protected accrued benefit, which Defendants improperly calculated whether or not the Court finds the Plan's fictitious normal retirement age invalid.

46

IX.     **PwC Admits Its 5-Years-of-Service Retirement "Age" is Both Fictitious and Meant to Evade the Statutorily Required Cash-Out Rules.**

102.    Once PwC's 5-year retirement rule was exposed in the pension press as a concoction to evade the law, PwC apparently decided that its best defense was a good offense and that it better offer some sort of explanation for its actions.[33]

103.    The September 1999 letter PwC sent to Treasury and the IRS was signed by PwC partner Ira Cohen, the principal designer of the RBAP and the NationsBank Cash Balance Plan and the IRS' former Chief Actuary. *See* Ex. 1, Letter from Ira Cohen, PricewaterhouseCoopers LLP, to IRS Commissioner Charles O. Rossotti and Deputy Assistant Secretary for Tax Policy Jonathan Talisman, dated Sept. 30, 1999, *reprinted in* Tax Notes Today, Nov. 18, 1999.[34]

104.    In the letter, PwC admits that 5 years-of-work retirement rule -- which it euphemistically dubbed "a low normal retirement age" -- is "a retirement age that is defined in the plan document that is *well below th[e] actual typical retirement age.*" *Id.* It further admits that the 5 year "age" cannot be considered a "'normal' normal retirement age," such as age 65. *Id.* But PwC says that *the IRS* is to blame for PwC's use of a fictitious normal retirement age, calling it "a necessary result of poor rulemaking by the Treasury Department." *Id.* The letter says that the IRS created the "dreaded Whipsaw Effect" (*i.e.,* the cash-out rule) by issuing IRS Notice 96-8 in 1996.[35] The letter argues

---

[33] PwC also had to do something along these lines because it had sold NationsBank on the 5 year retirement age concept. The Firm's potential liability to the Bank for having counseled it to engage in this abusive definition of "retirement" was obviously also on PwC partners' minds.

[34] Mr. Cohen is a defendant in this matter as, among other things, a former member of the Plan Administrative Committee. He retired from PwC in approximately 2002, having attained a legitimate retirement age.

[35] This contention is the central conceit of the letter, but in fact the cash-out rule is statutory and dates back to *1984.* It is based on Code § 417(e) and formally binding notice-and-comment regulations first issued in 1986 (on which Mr. Cohen worked while in the government) that became final in 1988. Indeed, cash balance plan sponsors sought and were denied relief from the cash-out rule in 1991 precisely because

that the fictitious normal retirement age had to be permitted to restore the natural order but once the government "needlessly" published unreasonable rules, the government should have anticipated such an "equal and opposite" reaction. *Id.*

105.    Thus, PwC admits that the whole point of the 5-year retirement age was to side-step the cash-out rule. According to the letter, while "the IRS was absolutely correct" that Treasury regulations require "all type of defined benefit plans" to calculate lump sums based on the value of the projected normal retirement benefit, the IRS should not enforce the regulations as applied to *cash balance* type defined benefit plans because the regulations are "inconsistent with their basic design [and] rational pension policy." In other words, the IRS should disregard its own regulations because, in PwC's view, the regulations don't make sense as applied to cash balance plans. Indeed, PwC put the IRS on notice that ***"until such time as the IRS" accepts this obvious truth*** and takes action to exempt cash balance plans from the regulations, the only "logical reaction" by cash balance sponsors is to resort to self-help via use of the low normal retirement age because "the low normal retirement age avoids the Whipsaw Effect." *Id.* (emphasis added).[36]

106.    PwC acknowledged that the 5-year retirement age is capable "of manipulation as a means of avoiding the Anti-Backloading Rules," which is "clearly

---

Treasury said the rule was statutory, *see* 56 Fed. Reg. 47524, 47528 (1991), a point that IRS Chief Counsel Stuart L. Brown confirmed in congressional testimony approximately a week before PwC sent its September 1999 letter. Prepared Testimony of Chief Counsel for the Internal Revenue Service Stuart L. Brown Before the United States Senate Committee on Health, Education, Labor and Pensions, Hearing on Hybrid Pension Plans, September 21, 1999.

[36] As PwC colorfully explained it, "Sir Isaac Newton's third law of motion states that for every action there is an opposite and equal reaction." PwC's opposite and "equal" reaction (apparently PwC's designs carry the same weight as full-force-of-law, notice-and-comment Treasury rulemakings) to Treasury's unreasonable rulemaking was to define a normal retirement age "well below the actual typical retirement age" to counter the effect of the government's rule, rendering it harmless. "It is only through the strength and wisdom of our hero in this saga (the low normal retirement age) that the pension policy dragon . . . created by the IRS has been foiled."

undesirable." *Id.*[37] But PwC asked that the focus not be on the role its fictitious retirement age plays in permitting the abuse, but on what it called the "Law Flaw" in the backloading rule – *i.e.*, Congress' failure to prohibit backloading *after* normal retirement age. *Id.* PwC conceded, however, that it was unaware of any actual post-retirement-age backloading abuses by plans that had adopted a typical normal retirement age of 65. *Id.*[38]

107.    PwC urged that instead of "kill[ing] off our hero" the "low normal" retirement age, the IRS should work to fix the backloading Law Flaw and ask Congress to enact *a new law* to limit backloading after retirement age. *Id.* PwC had no suggestion to offer as to what should be done pending the enactment of such recommended legislation (which has not been enacted or even introduced) – even though it acknowledged that until the law was changed, its definition would permit unlimited backloading. PwC did not disclose that virtually the only other plan sponsor other than itself using a 5 year retirement "age" – its client Bank of America – had already used the "low normal" retirement age to backload benefit accruals in its cash balance plan – backloading that would otherwise be unlawful had the Bank adopted a more typical retirement age of 65 (or even 60 or 55).[39]

---

[37] In fact, because the anti-backloading rules cease to operate at normal retirement age, *see* ERISA § 204(b), 29 U.S.C. § 1054(b), Code § 411(b), this core ERISA and Code protection has also been effectively rendered inoperative by PwC's definition of normal retirement age, if accepted as valid.

[38] PwC predicted, however, that because it had now shone the "spotlight" on it, such abuses are likely to follow.

[39] *See* Hubert V. Forcier, *Guide to Cash Balance Plans*, 9-2, 11-2, 3 (Aspen 2003 & 2004 Supp.) (133-1/3% antibackloading rule only one of the three available anti-backloading standards for a cash balance plan to satisfy; showing with graphs and data that "[i]f the 133-1/3 percent antibackloading rule . . . applied to [the Bank of America] formula on the assumption that normal retirement age was age 65, the rule would be failed"). PwC also did not address the fact that its 5-year retirement age "innovation" would make in-service withdrawals from a pension plan possible well before true retirement age, contrary to law, and that the RBAP expressly permits such withdrawals. RBAP § 5.4(a). Nor did PwC disclose that its 5-year rule and other provisions of the RBAP would permit these participants to roll their distributions into a 401(k) plan to avoid the limits Congress set in Code § 415(c) on the amount of tax-favored contributions that can be made to a defined contribution plan. These types of rollovers are permitted when an employee changes

49

**X.    If the RBAP Purports to Define Normal Retirement Age as 5 Years of Service, that Definition is Invalid and the Plan's Resulting Normal Retirement Age is Age 65.**

108.    As shown below, the RBAP taken as a whole should be construed as *not* purporting to state a 5 year normal retirement age but assuming it does, that "age" is plainly invalid. If invalid, the Plan's resulting normal retirement age is age 65 for any of the following three reasons. First, under RBAP § 2.32, "Normal Retirement Age" is age 65 if five years of service can never be the normal retirement age. Second, age 65 is the RBAP's stated normal retirement age according to the RBAP Summary Plan Descriptions 1999-2004. *See* RBAP 1999 SPD at 14, 2000 SPD at 21, 2003 SPD at 24, 2004 SPD at 24.[40] Third, in the absence of any stated normal retirement age, the RBAP's normal retirement age would still be age 65 because age 65 is the statutory default normal retirement age. ERISA § 3(24), 29 U.S.C. § 1002(34); IRC § 411(a)(8); Treas. Reg. § 1.411(a)-7(b)(1).

**XI.    The RBAP States a Normal Retirement Age of Age 65.**

109.    While the RBAP Plan document purports to define a "Normal Retirement Age," *see* RBAP § 2.32, it actually does not:  5 years of service is not an age and, as a criterion, 5 years of service can be satisfied or not satisfied regardless of age. A normal retirement age defined by reference to a date should be rejected as ineffective - a date is not an "age," which is what the statute expressly requires.

---

jobs, but absent a fictitious definition of "retirement age" are not permitted otherwise. *See* Rev. Rul. 71-24, 1971-1, C.B. 114.

[40] As previously explained, the RBAP is more than just the RBAP Plan document. There are other RBAP Plan documents, including the RBAP Summary Plan Description. An SPD is a "plan document" at least to the same extent as the document that formally describes the terms of the plan. It is almost always the only plan document participants are ever provided and ever see. Such is the case here where neither Plaintiff nor virtually any other non-partner participant (if any) was ever provided with a copy of the RBAP Plan document.

110.    As noted, Defendants repeatedly represented to participants, and are *currently* representing to participants that *age 65* is the RBAP normal retirement age. The RBAP SPDs for 1999-2004 state that "normal retirement age" under the RBAP is age 65, not the completion of 5 years of service. *See* RBAP 1999 SPD at 14, 2000 SPD at 21, 2003 SPD at 24, 2004 SPD at 24. Whether the RBAP is deemed to state a contrary normal retirement age (*e.g.,* five years of service) or no normal retirement age at all (because it does not state an "age" at all), the SPD should govern. Accordingly, the Court should declare that the RBAP's normal retirement age has, since the Plan's inception, been age 65.[41]

111.    Absent a valid definition of "normal retirement age" in the plan, ERISA requires that age 65 be used as the default normal retirement age. *See* ERISA § 3(24), 29 U.S.C. § 1002(34), IRC § 411(a)(8), and Treas. Reg. § 1.411(a)-7(b)(1).

## XII.    Plan Asset Investments.

112.    Throughout the relevant time period, including up to the present time, the RBAP and 401(k) Plans' Administrative Committees and Trustees and all other Defendants with direct or indirect responsibility for the investment of plan assets caused the Plans to pay tens of millions of dollars in excessive and/or unnecessary fees and expenses in connect with the Plans' asset investments.

113.    Defendants, who hold themselves out as experts in investment management, failed to adequately investigate or obtain on behalf of the Plans the

---

[41] This is consistent with the way PwC itself defines "Normal Retirement Age" in the "Glossary" on its RBAP website for Plan participants -- in a way that makes clear that 5 years of service is not a legitimate normal retirement age. The website glossary defines "Normal Retirement Age (NRA)" as: "The age, as established by the plan, at which retirement *normally* occurs." The RBAP's fictitious age -- conceded by PwC as not a "normal" normal retirement age that is in fact "well below" that age -- is by definition *not* the age at which retirement normally occurs.

substantial and readily available discounts that large investors routinely receive for placing large sums of money with advisors to manage. Instead, Defendants invested and reinvested billions of dollars of Plan assets in what are retail-priced mutual funds (and other retail-priced investment vehicles) when the identical investment managers' services were available to the Plans via separately managed accounts at a fraction of the cost of the mutual funds had the Plans instead contracted for direct management of their assets and/or been assessed fees which reflected the Plans' true purchasing power as multi-billion dollar institutional investors. The fiduciaries could easily have insisted that the Plans' large asset pools (including the partners' Profit Sharing Plan which has another several hundred million dollars also inappropriately invested in high-priced mutual funds) be managed according to tiered, declining fee schedules which effectively rebate to such large investors some of the economies of scale the manager realizes when investing an increasing amount of assets according to a single discipline.

114.    If Defendants had undertaken the same degree of inquiry as a similarly situated hypothetical prudent fiduciary, they would have learned that they could indeed have obtained comparable or superior investment management services for the Plans at far lower cost by using investment vehicles other than the mutual funds in which they invested. Mutual funds charge for a myriad of services, ranging from daily valuation and liquidity to the creation and distribution of fund prospectuses, that were and are entirely irrelevant to the needs of the Plans, especially the RBAP. No properly administered pension plan the size of these Plans, especially not the RBAP, would have invested in mutual funds, especially funds as expensive as those selected by Defendants.

115.    If Defendants had undertaken the same degree of inquiry as a similarly situated hypothetical prudent fiduciary, they also would have learned that for large investors like the Plans there were several distinct disadvantages to using mutual funds which were designed to be marketed to smaller investors, as opposed to separately managed account management competitively priced for institutional investors.    For example, the operation of a mutual fund is governed by a typically broadly worded prospectus that permits managers to depart from the fund's supposed "style" virtually at will, providing investors far less control over the investment policies of their managers than dedicated, separately managed accounts where the investment manager is at all times directly accountable to the investor.

116.    Indeed, had the fiduciary Defendants undertaken a prudent, disinterested inquiry, they would have learned that the manner in which they invested Plan assets, particularly the RBAP's assets, was far outside the mainstream of large plan investing.

117.    PwC, the Board and individual Board members were responsible to appoint, monitor, and, when appropriate, remove Administrative Committee members and Trustees to ensure that they were conducting themselves as prudent and loyal fiduciaries.    But PwC, the Board and the individual Board members breached their fiduciary responsibility under ERISA § 404(a), 29 U.S.C. § 1104(a), to prudently appoint and monitor and remove Administrative Committee members and Trustees who were investing Plan assets so improperly.    PwC also has co-fiduciary liability under ERISA § 405(a), 29 U.S.C. § 1105(a), because by failing in its own duty to prudently appoint, monitor and remove the fiduciaries who were breaching their fiduciary duties, PwC

53

enabled those breaches or knew about them and failed to take reasonable steps to correct them.

## CLAIMS FOR RELIEF

## COUNT ONE

### UNLAWFUL BENEFIT CALCULATION UNDER THE RBAP

118.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

119.    Plaintiff brings this claim on behalf of himself and the proposed Class.

120.    ERISA § 203(a)(2), 29 U.S.C. § 1053(a)(2), and Code § 411(a)(2) provide that a participant who has satisfied a plan's vesting requirements has a nonforfeitable right to 100% of the employee's "accrued benefit" derived from employer contributions. The RBAP provides that a participant is fully vested upon the completion of five (5) years of service with PwC or a related employer.

121.    A participant's "accrued benefit" under a defined benefit plan is the benefit defined under the terms of the plan and, except as provided in ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), expressed in the form of a life annuity beginning at "normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A). Thus, regardless of the manner in which a plan by its terms calculates or expresses the benefit payable thereunder, the "accrued benefit" for purposes of determining whether the plan complies with ERISA's benefit standards is the plan-defined benefit expressed in the form of an annual payment beginning at normal retirement age.

122.    Thus, under ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3) and Code 411(c)(3), if a plan provides for benefits in a form other than an annual payment

54

beginning at normal retirement age – for example, as an early retirement benefit or lump sum payment – the plan can only provide these alternative forms (or "optional forms of benefit") on the condition that the alternative form be no less valuable than (*i.e.*, the "actuarial equivalent of") the accrued benefit expressed in the normal form – *i.e.*, as a life annuity beginning at normal retirement age. ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3); Code § 411(c)(3).

123.    In the case of a cash balance plan, a participant's accrued benefit is calculated by projecting the participant's hypothetical account balance to normal retirement age using the plan's interest or investment crediting rate, then converting the projected account balance to a life annuity using reasonable actuarial factors expressed under the terms of the plan.

124.    If the optional form of benefit is paid as a lump sum, ERISA § 205(g), 29 U.S.C. § 1055(g), and Code § 417(e), as implemented by Treasury Regulation § 1.417(e)-1(d), specify the precise actuarial assumptions that must be used to prove compliance with this requirement. These assumptions often are referred to as the "GATT factors."

125.    If the optional form of benefit is paid as a non-decreasing life annuity, ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), Code § 411(c)(3), and the regulations thereunder give a plan more latitude, requiring only that the actuarial assumptions used to prove compliance with the equivalent value requirement be reasonable and be specified in the plan in a manner that precludes employer discretion. *See* Code § 401(a)(25). However, the actuarial assumptions the RBAP uses for this purpose are the same GATT factors used for purposes of proving compliance with ERISA § 204(c)(3) when benefits are paid in the form of a lump sum. RBAP § 2.2.

126.    Plaintiff was fully vested by the time he terminated employment with PwC.

127.    As required by ERISA § 205(c), 29 U.S.C. § 1055(c), Code § 417, the regulations thereunder, and the terms of the RBAP, *see* RBAP §§ 5.3 and 5.4, Plaintiff was provided with an explanation of the alternative forms of benefit available to him under the RBAP and their relative values. But Plaintiff was given an explanation that presented him with inaccurate benefit calculations, depriving him of the opportunity to which he was entitled to make a fully informed election based on complete and accurate information provided by the Plan.

128.    Plaintiff elected from among the available forms to receive his benefit in the form of a single sum distribution. Plaintiff received a lump sum payment on May 20, 2002. The payment was $24,432.65, an amount equal to the nominal balance in Plaintiff's cash balance account.

129.    As set forth above, the normal retirement age under the RBAP is in fact age 65, *not* the date the RBAP plan document purports to state as the normal retirement age.

130.    In determining the amount of the alternative forms of benefit available to Plaintiff, in violation of law, the RBAP did not (a) calculate Plaintiff's "accrued benefit" by projecting his hypothetical account balance to age 65 using the RBAP's investment crediting rate and expressing this projected balance in the form of a life annuity, and then (b) determine the alternative forms available to Plaintiff based on this accrued benefit, using the GATT factors to determine actuarial equivalence as required under ERISA, the Code, and the terms of the RBAP. The Plan's failure to conduct these required

56

calculations and pay benefits accordingly caused Plaintiff to forfeit a significant portion of his vested, accrued benefits.[42]

131.    Defendants caused another or an additional forfeiture of Plaintiff's vested, accrued benefits – whatever the effect of the RBAP Plan document's purported definition of "Normal Retirement Age" – by failing to calculate and pay Plaintiff benefits taking into account the value of Plaintiff's right to leave his account balance in the Plan even after attaining age normal retirement age and continue to receive investment credits indefinitely. As noted above, a participant with an account balance in excess of $5,000 is permitted to leave his or her benefits in the RBAP through at least age 70½. Under ERISA, this right to continue to receive investment credits is recognized as part of a participant's "accrued benefit" and the value of the right must be factored into any benefit distribution. This is the case even though the continued interest credits are purportedly conditioned on a participant leaving his benefits in the plan. *See, e.g.,* ERISA §§ 3(23)(A) and 203(a), 29 U.S.C. §§ 1002(23)(A) and 1053(a); Treas. Reg. § 1.411(a)-4T(a).

132.    If Plaintiff's benefit had been calculated in the manner required under the Plan, ERISA and the Code, Plaintiff would have received a far larger lump sum distribution than the amount paid to him. Additionally, Plaintiff would have been presented with an election to take his benefit in the form of a life annuity that was far

---

[42] Defendants have no argument that the RBAP could have paid the same lump sum amount even had the Plaintiff's normal retirement age been age 65, because the terms of the RBAP call for the Plan to project a participant's current account balance to normal retirement age based on the Deemed Interest Rate, and then discount back to the present using the same rate. It would have been unlawful to use the Deemed Interest Rate to project Plaintiff's current Deemed Account Balance to age 65. As confirmed by every appellate court that has considered the issue, ERISA would require such projections to be based on the Plan's Deemed Investment Experience, not another rate defined solely for purposes of making the required projection. *See, e.g.,* ERISA §§ 3(23)(A) and 203(a), 29 U.S.C. §§ 1002(23)(A) and 1053(a); Treas. Reg. § 1.411(a)-4T(a).

larger than the annuity in fact made available to him – which larger annuity he may have elected instead of a lump sum had he received accurate information.

## COUNT TWO

### AGE DISCRIMINATION UNDER ERISA § 204(b)(1)(G)

133.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

134.    Plaintiff brings this claim on behalf of himself and the proposed Class.

135.    The benefit formula used to compute participants' accrued benefits under the RBAP violates the age discrimination rules contained in ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), and Code § 411(b)(1)(G), because participants' accrued benefits are unlawfully reduced on account of increases in their age.

136.    This result follows inescapably when the benefit under the RBAP is expressed in terms of a life annuity commencing at normal retirement age, which is the basis on which ERISA and the Code require a defined benefit plan participant's "accrued benefit" to be tested for compliance with ERISA and Code accrued benefit standards. ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A), and Code § 411(a)(7)(A)(i).  As alleged above, the normal retirement age under the RBAP is age 65, notwithstanding certain provisions of the Plan that purport to provide otherwise.

137.    In the case of a cash balance plan, a participant's accrued benefit is required to be calculated by projecting the participant's hypothetical account balance to normal retirement age using the plan's investment crediting rate, then converting the projected account balance to a life annuity.  For example, if a participant's nominal account balance is $100, the participant's "accrued benefit" is not $100, but rather the

participant's projected balance at normal retirement age, expressed in the form of a lifetime annuity commencing as of that age. To illustrate numerically, if the participant is 30 years old, the interest crediting rate under the plan is 5%, and normal retirement age is age 65, the participant's projected nominal balance[43] at normal retirement age is $100 x $(1.05)^{35}$ = $551.60. The participant's "accrued benefit" is this projected balance expressed as a lifetime annuity that begins at age 65 – for example, $55.16/yr for life, if an annuity factor of 10 is assumed (*i.e.*, $551.60 divided by 10 = $55.61).

138.    Under a cash balance plan that provides interest credits based on a fixed interest rate (such as the one in the example) or a variable rate pegged to Treasury securities or a similar debt instrument, a participant's benefit will not decrease merely because the participant grows older. To continue the example above, assume a year passes and the participant turns age 31. His account balance would have increased to $105, because the plan would have credited his account balance an amount to reflect interest at a rate of 5%, but he would be one year closer to age 65, leaving only 34 years of compounding ahead. Plugging these new facts into the benefit projection formula, the participant's projected nominal account balance at age 65 would now be $105 x $(1.05)^{34}$ = $551.60. This is exactly the same amount as the projected balance when the participant was age 30. The larger starting account balance at age 31 offset the loss of a year of compounding, avoiding an impermissible reduction in the projected age 65 balance. This will always be the case under a plan that guarantees a positive interest crediting rate that is the same rate used to project the current balance to normal retirement age – a

---

[43] For simplicity, the example focuses solely on the participant's nominal account balance and ignores the value of the continued right to earn investment credits even after normal retirement age.

participant's account balance will always grow just enough to offset the lost value of a year of compounding as he grows older.

139.    Now, take the same participant under the RBAP. The RBAP does not have a guaranteed positive interest crediting rate like the one in the example, but rather has a variable "investment" crediting rate. The crediting rate for a given period might be higher or lower than the rate used to project the current balance to normal retirement age, and could even be (and under the RBAP, often has been) *negative*. Assume the appropriate projection rate under the RBAP is 10%, which is the approximate cumulative blended rate of return from 1926 to 2000 on a portfolio invested 70% in stocks and 30% in bonds. In that case, our 35-year-old participant's projected age-65 balance would be $100 \times (1.1)^{35} = \$2,810.24$.

140.    The following year, when he is age 31, his account balance may have dropped in value (*i.e.*, because he suffered "investment" losses), it may have remained unchanged at $100, or it may have grown at a rate of say 5%, less than the 10% projection rate. Assume it remained unchanged (a generous assumption over the past several years of stock market declines) and that the participant's account balance remains $100. This would mean the participant's projected age 65 account balance would now, at age 31, be $100 \times (1.1)^{34} = \$2,554.76$. This amount is obviously less than the amount of the projected age 65 annuity calculated when he was age 30. So the amount of his projected age-65 annuity (the account balance divided by 10 in this example) – his "accrued benefit" – would have dropped. The drop is not attributable to investment losses or some other factor – it drops solely because the exponent in the projection

60

formula was reduced from 35 to 34, which occurred solely because he had a birthday and was now one year closer to age 65 – *i.e.*, it dropped "on account of age."

141.    Stated more generally, a participant's accrued benefit under the RBAP is reduced in any period in which the investment credit posted to the participant's account for the period is less than the projection rate required to be used under ERISA §§ 3(23)(A) and 204(c)(3), 29 U.S.C. §§ 1002(23)(A) and 1054(c)(3), and Code § 411(c)(3), to calculate the participant's accrued benefits under the Plan.

142.    As a result of this flaw in the RBAP's design, Plaintiff and other members of the Class experienced impermissible reductions in their accrued benefits during various periods over the course of their participation in the Plans.[44]

### COUNT THREE

### AGE DISCRIMINATION UNDER ERISA § 204(b)(1)(H)

143.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

144.    Plaintiff brings this claim on behalf of himself and the proposed Class.

145.    The benefit formula used to compute participants' accrued benefits under the RBAP violated and violates the age discrimination rules contained in ERISA § 204(b)(1)(H) 29 U.S.C. § 1054(b)(1)(H), and Code § 411(b)(1)(H), because RBAP benefits accrue at a rate that is reduced because of age or the attainment of any age.

---

[44] Even if "normal retirement age" under the RBAP is not age 65 but is some other age, the benefit formula used to compute Plaintiff's accrued benefit under the RBAP, when expressed in the form of an annual benefit commencing at normal retirement age, violated and violates the age discrimination rules contained in ERISA § 204(b)(1)(G)-(H), 29 U.S.C. § 1054(b)(1)(G)-(H). For example, benefit accruals during a participant's first 5 years of participation violate the accrual rules even if normal retirement age is the age at which participants become vested in their benefits.

61

146.    This result follows inescapably when the benefit under the RBAP is expressed in terms of a life annuity commencing at normal retirement age, which is the basis on which ERISA and the Code require a defined benefit plan participant's "rate of benefit accrual" to be tested for compliance with ERISA and Code accrued benefit standards. ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A), and Code § 411(a)(7)(A)(i). As alleged above, the normal retirement age under the RBAP is age 65, notwithstanding certain provisions of the Plan that purport to provide otherwise.

147.    The benefit that a participant accrues under the RBAP each pay period is equal to the sum of (i) the participant's pay credit for the period *plus* (ii) the value of the RBAP's promise that investment credits with respect to that pay credit will continue to be credited for as long as the participant leaves his benefits in the RBAP. As the participant grows older, the promise of continued investment credits becomes less valuable because the number of years until expected retirement and withdrawal of benefits (or death) becomes shorter. This means that the rate of benefit accrual (*i.e.*, the rate at which benefits accrue) under the RBAP will necessarily drop unless the participant's periodic pay credit increases by an amount necessary to offset the reduced value of the promised investment credits. But RBAP pay credits do not increase with age, which means that the rate of benefit accrual under the RBAP is reduced because of age or the attainment of any age, in violation of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), and IRC § 411(b)(1)(H). This problem is systematic, and affects the Plaintiff and all other members of the Class.

148.    A simple example illustrates the point. Take the 35-year-old participant from the example in Count Two above (call him "Mr. Y"). Assume that Mr. Y is a non-

partner employee who has an annual salary of $30,000. His annual pay credit under the RBAP would be 5% of $30,000, or $1,500. Under ERISA, Mr. Y's $1,500 "pay credit" must be expressed in the form of an equivalent benefit payable at age 65 (35 years hence) for purposes of assessing compliance with ERISA's accrued benefit standards. Mr. Y's projected benefit at age 65 is $1,500 x $(1.1)^{35}$ = $42,153.65. In other words, in the eyes of ERISA, Mr. Y accrued a benefit of $42,153.65 for the year, not a $1,500 "pay credit."

149.    Now take an older employee ("Mr. O") who has the same characteristics as Mr. Y, except that he is age 55. Mr. O's annual pay credit is also 5% of $30,000, or $1,500. Mr. O's $1,500 "pay credit" when expressed in the form of an equivalent benefit payable at age 65 (10 years hence), is $1,500 x $(1.1)^{10}$ = $3,890.61. In other words, in the eyes of ERISA, Mr. O accrued a benefit of $3,890.61 for the year, not a $1,500 "pay credit."

150.    Comparing the benefits accrued for the year by Mr. Y and Mr. O, it is clear that the RBAP discriminates against older participants. The two participants are identical in every respect except age. Thus, age is the only factor that explains the vastly different benefit accrual rates for the two participants: $42,153.65 for the younger Mr. Y, and $3,890.61 for the older Mr. O.

151.    As a result of the RBAP's discriminatory design, Plaintiff and other RBAP participants accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Code standards.

63

## COUNT FOUR

### UNLAWFUL BACKLOADING UNDER THE RBAP

152.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

153.    Plaintiff brings this claim on behalf of himself and the proposed Class.

154.    ERISA requires that benefits that accrue under a pension plan become partially vested after no more than 5 years, and fully vested after no more than 7 years. ERISA § 203(a), 29 U.S.C. § 1053(a) and IRC § 411(a). Congress wrote this into the law to ensure that employees with many years of employment would not lose anticipated retirement benefits merely because they did not work until full retirement age.[45]

155.    ERISA's vesting rules generally addressed this problem. But Congress realized there was a potential loophole. As PwC helpfully explained in its 1999 letter to the IRS:

> Under the minimum vesting standards, a person's vested benefit is the product of (1) the benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage.  If an employer did not want to provide early vesting, the employer could provide negligible accruals until the point that employer desires to provide vesting; after all vesting 100% vesting [sic] in an accrued benefit of zero is not different from not vesting at all.  The fundamental problem was accruing large amounts in later years relative to small amounts in earlier years ("Backloading").[46]  Therefore, Congress provided a floor of protection by enacting the Anti-Backloading Rules. . . . These rules are designed to prevent plans from providing for the accrual of

---

[45] *See ERISA* § 2, Findings and Declarations of Policy ("The Congress finds . . . that despite the enormous growth in [retirement] plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans. . . . It is hereby . . . declared to be the policy of this Act to protect . . . the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service.")

[46] "As an example, a requirement that benefits be vested after 5 years of service (one of the Code's standards) would be meaningless if a participant might accrue a benefit of only $1 per year for 19 years, and a benefit of $30,000 in the 20[th] year." Brown Stmt., *supra* n. 35.

most of a participant's benefits later in his or her career, thereby circumventing the minimum, vesting rules.[47]

156.    The ERISA anti-backloading rules, codified at ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and IRC § 411(b)(1)(A)-(C), apply to benefits that accrue under a defined benefit plan through normal retirement age. The rules require that benefits accrue roughly pro rata over the course of an employee's career, rather than being heavily back weighted.

157.    The pattern of benefit accruals under the RBAP does not satisfy any of the three anti-backloading standards. For example, partners and directors accrue benefits under the RBAP at a rate that in many cases far exceeds the rate of benefit accrual for regular employees. The result is that for participants who are promoted to partner, benefits accruals are heavily back weighted – precisely what the anti-backloading rules are intended to prevent. Providing higher accrual rates to employees who have been promoted to an employee classification that is correlated with greater service and/or age – such as "directors" or "partners" – is a classic method used by plan sponsors to disguise unlawful backloading. PwC followed this script.

158.    In addition, as part of PwC's scheme to discriminate in favor of highly-compensated partners, the RBAP provides a minimum benefit of $7,000 to specified participants. This minimum benefit accrues in these employees' first year of participation in the RBAP. Thereafter, the employees nominally accrue pay and investment credits under the Plan, but the pay and investment credits do not increase a participant's accrued benefit until the participant's account balance exceeds $7,000 (plus

---

[47] PwC 1999 IRS letter, Ex 1. *See also* H.R. Rep. 93-807 (1974), at 2 ("How much protection is actually afforded to employees under the minimum vesting provision[s] depends not only on the minimum vesting percentages . . . , but also in the case of defined benefits on the accrued benefit to which these minimum vesting percentages are applied.").

65

investment credits thereon), which in many cases is years later. The net result is that these employees have a zero rate of accrual beginning in their second year of participation and for a number of years thereafter. When their normal pay and investment credits finally exceed $7,000, these employees' accrual rate becomes positive again. The result of many years of zero accruals followed by a positive rate of accrual violates the anti-backloading benefit accrual standards.

159. More generally, the benefit that a participant accrues under the RBAP each pay period is equal to the sum of (i) the participant's pay credit for the period *plus* (ii) the value of the RBAP's promise that investment credits with respect to that pay credit will continue to be credited for as long as the participant leaves his benefits in the RBAP. While generally this will result in a rate of benefit accrual that decreases over time (which would not cause a backloading violation), the backloading rules require that the Plan be able to prove compliance with the anti-backloading rules every year. Because of the nature of the RBAP's "innovative" investment credits, the value of future investment credits that accrue with each pay credit is unpredictable and varies from time to time. As a result, it is impossible for the RBAP to prove that the benefits that accrue under the Plan will satisfy the anti-backloading standards in every year.

160. As alleged above, the normal retirement age under the RBAP is age 65, notwithstanding certain provisions of the Plan that purport to provide otherwise. Therefore, the unlawful backloading of benefit accruals described in this Count occur not merely with respect to benefits that accrue in the first 5 years of each affected participant's participation in the RBAP, but to benefits that accrue under the RBAP through age 65.

161.    As a result of the violations described in this Count, Plaintiff and other RBAP participants accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Code benefit accrual standards.

### COUNT FIVE

### FORFEITURE OF RBAP NORMAL RETIREMENT BENEFITS

162.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

163.    Plaintiff brings this claim on behalf of himself and the proposed Class.

164.    A participant's "normal retirement benefit" under a cash balance or other defined benefit pension plan generally is his accrued benefit under the plan commencing as of normal retirement age. ERISA § 3(22), 29 U.S.C. § 1002(22), and IRC § 411(a)(9). Under ERISA, any benefit paid *after* normal retirement age must have an actuarial value that is no less than the actuarial value of this normal retirement benefit. *See* ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), IRC § 411(c)(3), and Proposed Treasury Regulations §§ 1.411(b)-2 and 1.411(c)-1. *See also* Treas. Reg. § 1.401(a)(9)-6, Q&A-9; IRS Revenue Ruling 81-140. In other words, the snapshot actuarial value of a participant's accrued benefit payable as of his normal retirement age must be locked in – no benefit paid after the normal retirement age can have an actuarial value of less than this benefit, absent an applicable exception. *Id.*

165.    The RBAP failed and fails on its face, and in actual administration, to satisfy this requirement because it did not and does not actuarially increase a participant's benefit after normal retirement age. This is the case regardless of whether the normal

retirement age under the RBAP is the date a participant completes 5 years of service, as the RBAP Plan document purportedly defines it, or age 65, as Plaintiff asserts, or some other age.

166.    The RBAP does continue to provide investment credits after normal retirement age. But unlike ordinary cash balance plans that provide continued *interest* credits after normal retirement age, the RBAP's *investment* credits are not a substitute or an adequate substitute for the actuarial adjustment required under ERISA § 204(c)(3). The investment credits under the RBAP are different from the interest credits provided under ordinary cash balance plans because the investment credits can and do vary significantly from one period to the next – and in some periods actually result in losses that *reduce* a participant's nominal account balance. The investment credits thus cannot be reliably used to maintain the actuarial value of the normal retirement benefit.

167.    As a result of this flaw in the RBAP, Plaintiff's and other participants' vested normal retirement benefits under the RBAP were unlawfully reduced during periods over which investment returns actually credited (or debited) to their accounts were less than the actuarial adjustment required to maintain the value of their normal retirement benefits.

168.    Neither the Plaintiff nor any other affected participant received a "suspension of benefits" notice within the meaning of ERISA § 203(a)(3)(B), 29 U.S.C. § 1053(a)(3)(B), and the regulations thereunder. Therefore, no exception applies that would excuse such forfeitures. *Id.*; Code § 411(a)(3)(B).

169.    As a result of the violations described in this Count, Plaintiff and other RBAP participants accrued benefits under the Plan that were less than the benefits they would have accrued had the Plan complied with ERISA and Code standards.

## COUNT SIX

### FAILURE TO FOLLOW THE RBAP AND 401(K) PLANS' TERMS PROHIBITING DISCRIMINATION AGAINST NON-PARTNER EMPLOYEES IN BENEFITS AND CONTRIBUTIONS UNDER THE PLANS

170.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

171.    Plaintiff brings this claim on behalf of himself and the Class.

172.    As described above, the contribution formula under the 401(k) Plans, and the benefit formula under the RBAP, violate the Code's nondiscrimination standards. By extension, these formulas also violate the terms of the respective Plans that require compliance with the Code's nondiscrimination standards.

173.    As a result of these violations, Plaintiff and other non-partner participants in the Plans received (or were credited with) contributions and benefits under the Plans that were less than the contributions and benefits they would have received (or been credited with) had the Plans complied with the Code nondiscrimination standards which they incorporate.

## COUNT SEVEN

### INTERFERENCE WITH THE ATTAINMENT OF PENSION RIGHTS

174.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

175.    Plaintiff brings this claim on behalf of himself and the Class.

69

176.    ERISA § 510, 29 U.S.C. § 1140, provides that it is "unlawful for any person to . . . discriminate against a participant or beneficiary for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this title."

177.    Defendants violated this prohibition when they designed, adopted, failed to amend (to remove the offending provisions), and now administer separate and discriminatory contribution and benefit structures for partners and non-partner employees under the 401(k) Plans and the RBAP. These separate structures were designed, adopted, maintained, and administered for the sole purpose of preventing non-partner employee/participants from accruing rights to retirement plan benefits at the level that would otherwise have been required for the Plans to satisfy the Code's nondiscrimination standards, which standards the Plans by their terms specifically incorporate by reference.

178.    The separate benefit structures explicitly target a particular group of participants – namely non-partner employees – for discriminatory treatment. The separate benefit structures and continuing maintenance and administration of such structures are specifically intended to curtail the rights of some employees (non-partners) vis-à-vis other employees (partners) for a discriminatory purpose. This is one of the types of behavior ERISA § 510, 29 U.S.C. § 1140, prohibits.

179.    As a result of the violations described in this Count, Plaintiff and other RBAP participants received benefits and benefit accruals under the Plan that were less than the benefits and benefit accruals they would have received (or been credited with) had the Plan complied with ERISA and Code standards.

70

## COUNT EIGHT

## FAILURE TO PROVIDE AN OBJECTIVE BENEFIT FORMULA UNDER THE RBAP

180.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

181.    Plaintiff brings this claim on behalf of himself and the proposed Class.

182.    Under Internal Revenue Code § 401(a)(25), incorporated by reference into the RBAP, "a defined benefit plan shall not be treated as providing definitely determinable benefits unless, whenever the amount of benefits is to be determined on the basis of actuarial assumptions, such assumptions are specified in the plan in a way which precludes employer discretion."    Under Treasury Regulations, a pension plan must "provide systematically for the payment of definitely determinable benefits."  Treas. Reg. § 1.401-1(b)(1)(i).

183.    IRS Revenue Ruling 79-90 explains that a plan will not be considered to provide definitely determinable benefits if the benefit formula depends on actuarial or other factors that are within the control of the employer.  A plan formula that includes factors not definitely and objectively identified in the plan document that remain subject to the discretion of the employer does not "provide systematically for the payment of definitely determinable benefits."

184.    In a cash balance plan, the interest crediting rate is the key actuarial assumption.  Benefits payable under a cash balance plan are based on each participant's "account balance" at the time of termination or retirement.  A participant's account balance consists of the annual "contributions" or credits to the account made by the plan sponsor, plus imputed interest.  As the IRS has explained, "[i]f the interest rate is subject

71

to the discretion of the employer, it is highly unlikely that the plan would be able to satisfy the requirement that benefits be definitely determinable." PLR 9645031 (Nov. 8, 1996).[48]

185.    The RBAP's design, as implemented by the fiduciary-Defendants, suffers from this basic defect. A participant's RBAP account balance consists of the annual "contributions" or credits to the account made by the plan sponsor, plus imputed "investment" returns instead of interest. Investment returns are based on participant investments in the investment options offered to participants. The menu of investment options is not fixed by the terms of the RBAP, but is chosen by the Plan fiduciaries without any guidelines provided in the RBAP. The menu is changed from time to time entirely at the discretion of PwC or one or more of the other Defendants acting for PwC or the RBAP Administrative Committee or the Trustees.

186.    This design gives PwC discretion over a critical piece of the pension formula: The menu of investment options that determines the investment crediting rate under the RBAP. This violates the Code requirement, incorporated into the RBAP by its terms, that the RBAP "provide systematically for the payment of definitely determinable benefits."

187.    As a result of the violations described in this Count, Plaintiff and other RBAP participants received benefits and benefit accruals under the Plan that were less than the benefits and benefit accruals they would have received (or been credited with) had the Plan complied with ERISA and Code standards.

---

[48] *Accord* Rev. Rul. 78-403, 1978-2 CB 153 (a defined benefit pension plan, under which participant receives not only the defined benefit but the balance in his individual account which is based on excess earnings derived from trust assets, does not qualify under IRC § 401(a) because the amount of excess interest allocation to the defined contribution portion of the plan is not definitely determinable).

## COUNT NINE

### CUTBACK OF ACCRUED BENEFITS
### UNDER THE RBAP

188.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

189.    Plaintiff brings this claim on behalf of himself and the proposed Class.

190.    Under ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6), the accrued benefit of a participant under a plan may not be eliminated or decreased by an amendment to the plan (except in specific situations not relevant here).    The implementing regulations, which apply with equal force for purposes of ERISA and the Code, *see* ERISA § 3002(c), 29 U.S.C. § 1202(c), and ERISA Reg. § 2530.200a-2, are at Treas. Reg. § 1.411(d)-1.    According to these regulations, "a plan that permits the employer, either directly or indirectly, *through the exercise of discretion*, to deny a participant a section 411(d)(6) protected benefit provided under the plan for which the employee is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6)." Treas. Reg. § 1.411(d)-4, Q&A-4 (emphasis added).

191.    The investment benchmarks the RBAP uses to determine future investment credits constitute an actuarial assumption that, once specified, cannot be changed in way that reduces participants' accrued benefits, per the "anti-cutback" rule, ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6) and the regulations promulgated thereunder. *See, e.g.,* PLR 9645031 (Nov. 8, 1996).

192.    Throughout the relevant time period, Defendants on numerous occasions exercised discretion to eliminate previously designated investment benchmarks that functioned as RBAP actuarial assumptions.    Numerous times and over numerous periods

73

of time the replacement benchmarks yielded lower returns than the benchmarks they replaced.

193.    To ensure that these changes to the Plan's actuarial assumptions did not result in a prohibited cutback, the Plan was required to use one of two acceptable methods as set forth in Rev. Rul. 81-12, 1981-1 C.B. 228, which is directly enforceable under ERISA § 204(g), 29 U.S.C. § 1054(g).

194.    Under Rev. Rul. 81-12, the RBAP had to either keep track of how participants would have done in the "old" benchmark compared to the new one (the "wearaway" method), or it had to calculate the benefit accrued under the old benchmark until the time it was discontinued and make sure that value was added to the benefit accrued under the new benchmark, calculated on a going forward basis (the "A + B" method). *See* Rev. Rul. 81-12. The RBAP and its fiduciaries did neither, in violation of ERISA § 204(g), 29 U.S.C. § 1054(g), Treas. Reg. § 1.411(d)-4, Q&A-4 and Rev. Rul. 81-12.

195.    As a result of the violations described in this Count, Plaintiff and other RBAP participants received benefits and benefit accruals under the Plan that were less than the benefits and benefit accruals they would have received (or been credited with) had the Plan complied with ERISA and Code standards.

## COUNT TEN

### FIDUCIARY AND CO-FIDUCIARY BREACHES WITH RESPECT TO THE SELECTION AND DE-SELECTION OF THE RBAP'S INVESTMENT EXPERIENCE CHOICES

196.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

197.    Plaintiff brings this claim on behalf of himself and the proposed Class.

198.    ERISA § 404(a)(1)(A), (a)(1)(B) and (a)(1)(D), 29 U.S.C. § 1104(a)(1)(A), (a)(1)(B) and (a)(1)(D), require that a fiduciary shall discharge his duties with respect to a plan (A) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries, (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the Plan and the statute insofar as such documents are consistent with the provisions of ERISA.

199.    ERISA § 405(a), 29 U.S.C. § 1105(a), provides that a fiduciary shall not (1) knowingly participate in, or knowingly undertake to conceal, the acts or omissions of other fiduciaries, knowing such act or omission to have been a breach; (2) enable another fiduciary to commit a breach; or (3) have knowledge of a breach that he does make reasonable efforts to remedy.

200.    The RBAP Administrative Committee, the RBAP Administrative Committee Members and the RBAP Trustees Defendants breached their fiduciary and co-fiduciary duties by selecting investment measures to serve as the Plan's actuarial assumptions that failed to optimize benefits to the extent permissible under the RBAP which contained no settlor design restrictions on the nature of the investment experience choices to be made available to participants.

201.    PwC, the Board and individual Board members breached their fiduciary responsibility under ERISA § 404(a), 29 U.S.C. § 1104(a), to prudently appoint and

75

monitor and remove Administrative Committee members and Trustees who selecting and de-selecting investment experience choices so improperly. PwC, the Board and individual Board members also have co-fiduciary liability under ERISA § 405(a), 29 U.S.C. § 1105(a), because by failing in their own duty to prudently appoint, monitor and remove the fiduciaries who were breaching their fiduciary duties, these Defendants enabled those breaches or knew about them and failed to take reasonable steps to correct them.

202.    All Defendants are additionally liable as fiduciaries and co-fiduciaries for failing to follow the terms of the RBAP which required the Administrative Committee and not the Trustees to select and de-select the investment experience choices.

### COUNT ELEVEN

### FIDUCIARY AND CO-FIDUCIARY BREACHES REGARDING THE INVESTMENT OF THE RBAP'S AND THE 401(k) PLANS' ASSETS

203.    Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

204.    Plaintiff brings this claim on behalf of himself, on behalf of the RBAP and the two 401(k) Plans, and the proposed Class.

205.    The three Administrative Committees and their Members and the Trustees breached their fiduciary and co-fiduciary duties by investing Plan assets in inappropriate and excessively costly investment vehicles and by enabling other Plan fiduciaries to commit such breaches or, having knowledge of them, failing to make reasonable efforts to remedy them.

206.    PwC, the Board and individual Board members breached their fiduciary

76

responsibility under ERISA § 404(a), 29 U.S.C. § 1104(a), to prudently appoint and

monitor and remove Administrative Committee members and Trustees who were

investing plan assets so improperly. PwC, the Board and individual Board members also

have co-fiduciary liability under ERISA § 405(a), 29 U.S.C. § 1105(a), because by failing

in their own duty to prudently appoint, monitor and remove the fiduciaries who were

breaching their fiduciary duties, these Defendants enabled those breaches or knew about

them and failed to take reasonable steps to correct them.

## CLASS ACTION ALLEGATIONS

207.    Plaintiff brings suit on behalf of himself and on behalf of all other

participants and beneficiaries similarly situated under the provisions of Rule 23 of the

Federal Rules of Civil Procedure with respect to violations alleged herein.

208.    The proposed Class is defined as:

> All persons participating in the Retirement Benefit Accumulation Plan for
> Employees of PricewaterhouseCoopers LLP ("RBAP"), the Savings Plan
> for Employees and Partners of PricewaterhouseCoopers LLP (the "401(k)
> Plan") or the Savings Plan for Employees of PricewaterhouseCoopers LLP
> (the "Segregated 401(k) Plan") (collectively, the "Plans") at any time after
> June 30, 1994, and the beneficiaries and estates of such persons, who at
> any point became vested or may become vested in their benefits under one
> of those Plans; but excluding any Defendant and excluding any partner (or
> beneficiary thereof) who would be liable under any form of injunctive,
> declaratory or monetary order, relief or award that might result from the
> instant suit.

209.    The requirements for maintaining this action as a class action under Fed.

R. Civ. P. 23(a) are satisfied in that there are too many Class members for joinder of all

of them to be practicable. There are tens of thousands of members of the proposed Class

dispersed among many states.

77

210. The claims of the Class members raise numerous common questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2). Every issue concerning liability is common to all Class members because all such issues concern their entitlement to benefits calculated in a manner other than that calculated thus far and their or the Plans' entitlement to relief from harm caused by the violations of law and/or plan terms, rather than any action taken by Plaintiff or any Class member. In addition, every issue concerning relief is also common to the Class for the same reason.

211. Plaintiff's claims are typical of the claims of the Class members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3). He does not assert any claims in addition to or different than those of the Class.

212. Plaintiff is an adequate representative of the Class, and therefore satisfies the requirements of Fed. R. Civ. P. 23(a)(4). The interests of Plaintiff are identical to those of the Class. Defendants have no unique defenses against him that would interfere with his representation of the Class. Plaintiff has engaged counsel with considerable ERISA class action litigation experience.

213. Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

214. Alternatively, all of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that Defendants' actions affected all Class members in the same manner

78

making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that

A.    An order be entered certifying this action a class action and undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23;

B.    Judgment be entered against Defendants and on behalf of Plaintiff, the RBAP, and/or the Class; and

C.    An order be entered awarding, declaring or otherwise providing Plaintiff, the RBAP and the Class all other such relief to which Plaintiff, the RBAP and the Class are or may be entitled whether or not specified herein.[49]

The relief Plaintiff seeks includes but is not limited to:

D.    An order declaring that:

(1) Defendants violated and are violating ERISA's accrued benefit standards in the specific manners alleged in Counts One through Five and otherwise;

(2) The RBAP and the 401(k) Plans unlawfully discriminated and discriminate in the amount of contributions and benefits they provided and provide to PwC partners versus PwC's non-partner employees in the specific manners alleged in Counts Six and Seven and otherwise;

(3) The RBAP failed and fails to define its benefit formula in a sufficiently objective manner to meet the Plan's "definitely determinable" standard,

---

[49] Plaintiff and putative class counsel reserve the right to withdraw or reduce the scope of the specific requests for relief sought herein or otherwise limit the scope of the Complaint's overall request for relief.

Defendants cut back participants' protected benefits when they changed the "investment" options available to RBAP participants, and that Defendants engaged and are engaging in prohibited transactions and breaches of fiduciary and co-fiduciary duty in the manner in which they are purporting to set participants' benefit levels, as alleged in Counts Eight and Nine and otherwise; and

(4) Defendants have breached their fiduciary and co-fiduciary duties in the investment of RBAP plan assets, causing the Plan large losses or lost investment return, as alleged in Count Ten and otherwise;

E.      An order enjoining Defendants from continuing to violate the law and the terms of the Plans in manner alleged or referenced in this Complaint, reforming the Plans, and compelling Defendants to bring the terms and administration of the Plans into compliance with ERISA or the lawful provisions of the Plans *nunc pro tunc*;

F.      An order requiring Defendants to re-calculate the contributions and benefit amounts due under the terms of the Plans in accordance with the requirements of ERISA, and for the Plans to pay the difference, plus interest, to or on behalf of all Class members who received less in contributions and benefits or benefit accruals than the amount to which they are entitled;

G.      An order compelling the non-Plan Defendants to make the RBAP and the 401(k) Plans whole for all losses or lost investment return resulting from their breaches or prohibited transactions, and disgorgement of any benefit they received which is traceable to such breaches, restitution, and such other equitable or remedial or other relief as the Court may deem appropriate.

H.      An order awarding pre- and post-judgment interest.

80

I.    An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiff's election), along with the reimbursement of the expenses incurred in connection with this action.

By:

Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
Phone: (202) 243-1000
Fax:     (202) 243-1001

Attorney for the Plaintiff and the proposed Class

Dated:  June 27, 2005

82

Exhibit 1 to June 27, 2005 Complaint

*Laurent v. PricewaterhouseCoopers LLP, et. al,* (D.D.C.)

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Page 1

LEXSTAT 1999 TNT 222-20

Copyright © 1999 Tax Analysts
Tax Notes Today

NOVEMBER 18, 1999 THURSDAY

**DEPARTMENT:** Official Announcements, Notices, and News Releases; Treasury Tax Correspondence

**CITE:** *1999 TNT 222-20*

**LENGTH:** 3843 words

**HEADLINE:** 1999 TNT 222-20 BLAME FOR CASH BALANCE PLAN CONTROVERSY BELONGS WITH IRS GUIDANCE, PricewaterhouseCOOPERS SAYS. (Section 411 -- Minimum Vesting;) (Release Date: SEPTEMBER 30, 1999) (Doc 1999-36542 (8 original pages))

**CODE:** *Section 411 -- Minimum Vesting;*
*Section 414(j) -- Defined Benefit Plans*

**ABSTRACT:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury.

**SUMMARY:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury. Cohen argues that IRS guidance has created a "whipsaw effect" that "perversely" causes cash balance participants to receive earnings credits below market rates. To avoid that effect, cash balance plans use a retirement age that is below the actual typical retirement age to determine plan benefits. If the IRS and Treasury want to eliminate the controversy over cash balance plans, he says, they should eliminate the "whipsaw effect."

**AUTHOR:** Cohen, Ira
PricewaterhouseCoopers LLP

**GEOGRAPHIC:** United States

**INDEX:** pension plans, vesting standards, minimum;
pension plans, benefits, defined

**REFERENCES:** Subject Area:
  Individual income taxation;
  Benefits and pensions
Cross Reference:
  For a summary of IR-1999-79, see Tax Notes, Oct. 25, 1999, p. 449;
  for the full text, see *1999 TNT 202-17*, Doc 1999-33676 (1 original
  page), or H&D, Oct. 20, 1999, p. 707.

**TEXT:**

Release Date: SEPTEMBER 30, 1999

September 30, 1999

Mr. Charles O. Rossotti
Commissioner

05 1291

FILED

JUN 2 8 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Internal Revenue Service
1111 Constitution Avenue, N.W.,
Room 3000
Washington, D.C. 20224

Mr. Jonathan Talisman
Deputy Assistant Secretary for Tax Policy
U.S. Department of The Treasury
Main Treasury, Office of the Assistant Secretary for Tax Policy
1500 Pennsylvania Avenue, N.W.
Room 1334
Washington, D.C. 20020

Dear Commissioner Rossotti and Mr. Talisman:

[1] I am writing to you to explain why one element of the current controversy over cash balance plans -- a low normal retirement age in a qualified defined benefit plan, -- has been a necessary result of poor rulemaking by the Treasury Department and is not a devious attempt by taxpayers to circumvent reasonable rules. (By a low normal retirement age, I mean a retirement age that is defined in the plan document that is well below that actual typical retirement age -- the low retirement age might be as low as the age at five years of participation in the plan.) I urge you to consider the merits of the low normal retirement age in this context -- as a hero rather than a villain. If the IRS eliminates the use of the low normal retirement age, the IRS should also revise Notice 96-8 to correct the pension policy disaster fostered by that Notice.

I. The Whipsaw Effect

[2] The policy problem created by the Treasury Department and IRS regulations has to do with the dreaded "whipsaw effect" and rules requiring payment of minimum lump sums from qualified defined benefit plans that offer the lump sum form of distribution. Review of the minimum lump sum rules under *section 417(e) of the Internal Revenue Code* of 1986, as amended (the "Code") and the guidance relating to the "whipsaw effect" will be helpful in fully understanding the problem.

A. IRS Rules Regarding Minimum Lump Sums

[3] Let's briefly review the economic conditions prevailing when the minimum lump sum rules were first created. In the late 1970's and early 1980's, interest rates were at an all time high, often as high as 15%. In this time of high interest rates, employers frequently terminated qualified defined benefit plans with surplus assets to gain access to the surplus. The high interest rates had the effect of inflating the amount available for reversion, because pension liabilities are generally calculated as if the liability were due when the plan participants retire -- some time in the future. If a plan terminates today, the present value of that future liability in a high interest rate environment is relatively small. Therefore, when plans terminate in a high interest rate environment, plan assets required to satisfy liabilities to plan participants are relatively smaller, increasing the plan assets available for reversion.

[4] On plan termination, benefits may be settled either by purchasing an annuity contract or paying a lump sum. In the era of abnormally high interest rates, like 15% per annum, the surplus reverting to the employer upon plan termination was significantly larger if lump sums were paid than if annuities were purchased. (This resulted because the price of annuity contracts reflected the fact that annuity payments commence some time in the future, so the present value discounting required when lump sums were paid would not occur or would be performed over a shorter period of time.) Indeed, some oversight committee testimony in that era showed that some companies wanted to maximize their surplus badly enough to provide their executives with an additional bonus depending on the percentage of the executives' subordinate employees who could be induced to take a lump sum on plan termination. Plan participants, like most small investors, were typically unable to obtain those high interest rates in savings accounts or purchases of debt instruments. Consequently, participants electing lump sums received less long-term economic value than those electing annuities.

[5] Congress sought to change this result by defining minimum lump sums in terms of a maximum. interest rate, so that the effect of present valuing the pension due at retirement age would be regulated by adding *Section 417(e) of the Code. Section 417(e)* was modified several times. At present, *Section 417(e)* states:

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

. . . . "(3) Determination of present value.

(A)  In general.

(i)  Present Value. Except as provided in subparagraph

(B), for purposes of paragraphs (1) and (2), the
present value shall not be less than the present
value calculated by using the applicable
mortality table and the applicable interest rate.

(ii) Definitions. For purposes of clause (i) --

(I)  Applicable mortality table. The term "applicable
mortality table" means the table prescribed by
the Secretary. Such table shall be based on the
prevailing commissioners' standard table
(described in *section 807(d)(5)(A)*) used to
determine reserves for group annuity contracts
issued on the date as of which present value is
being determined (without regard to any other
subparagraph of *section 807(d)(5)*).

(II) Applicable interest rate. The term "applicable
interest rate" means the annual rate of interest
on 30 year Treasury securities for the month
before the date of distribution or such other
time as the Secretary may by regulations
prescribe."

[6] The Treasury Regulations (the "Regulations") implementing the minimum lump sum legislation state that that lump sum may never be less than the present value of the annuity payable at a participant's normal retirement date at a mandated interest rate. *Section 1.417(e)-1(d)(l) of the Regulations* states:

. . . . "The present value of any optional form of benefit
cannot be less than the present value of the normal retirement
benefit determined in accordance with the preceding
sentence". . . .

[7] This regulatory requirement is neither mandated nor suggested by the law or the legislative history. In fact, it ignores a key element of the problem the rule was designed to address. Participants in terminating plans are allowed to take annuities or lump sums IMMEDIATELY UPON PLAN TERMINATION, even if they are still employed (if the plan design allows). The rule does, however, represent a vital regulatory step hurling cash balance plans into the jaws of the dreaded "whipsaw effect." As we will see, absent this requirement, the "whipsaw effect" would be eliminated because a plan could define the lump sum as the present value of the immediate annuity -- a more accurate reflection of the design options available to plan sponsors in terminating and ongoing plans.

D. Cash Balance Plans and the "Whipsaw Effect"

[8] In simple economic terms, a cash balance plan provides a benefit in the form of an account. This notional account is credited with pay credits each year and is adjusted periodically according to an earnings index. This earnings rate is usually a predetermined independent index (such as 5-year Treasury bills or the S&P 500), or the earnings rate may be a fixed interest rate such as 5%; in some designs, participants may choose among different earnings indices which mimic actual investments such as those available in the plan sponsor's 401(k) plan. Cash balance plans generally offer a lump sum and an immediate annuity upon termination of employment, and our experience with cash balance plans suggests that nearly all participants will take the lump sum form of distribution.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[9] Because the fundamental benefit is an account balance, these plans -- unlike traditional defined benefit plans -- should not save the employer money (at times of higher interest rates) when the employee takes a lump sum. After all, the account should be the account regardless of the interest rate. However, that elegant equation -- the account equals the account -- is not in the IRS's current mathematical repertoire.

[10] The IRS has created the "whipsaw problem," on the basis of its regulations relating to minimum lump sums. Because these regulations mandate that the minimum lump sum relates to the benefit at normal retirement age, the IRS required cash balance plans develop a normal retirement age annuity benefit by projecting the account balance to normal retirement age using an interest rate reflective of the investment adjustments (the "Projection Rate"), then converting that amount to an annuity. Then, in order to comply with the minimum lump sum rules, that benefit at normal retirement age needs to be discounted to the benefit commencement date. If the projection rate is greater than the discount rate, the plan could be "whipsawed" into paying a lump sum that is greater than a participant's account. Although seemingly reasonable when viewed separately, the minimum lump sum rate and the Projection Rate therefore combine to create the "Whipsaw Effect." This phenomenon was described in Notice 96-8.

[11] However, under that Notice, the Projection Rate to be used is not defined, nor is it defined elsewhere in any applicable IRS authority. Reasonable people can differ as to what Projection Rate is appropriate -- particularly for those that are adjusted according to an equity-based index, such as the Dow Jones Industrial Average. The example below illustrates the Whipsaw Effect. Consider two participants A and B, both age 40, whose accounts earn 4%, a sub-market rate, and 8%, a market rate, respectively. Also assume that the discount rate for minimum lump sums under *section 417(e)* is 6%. Assume A and B each have $ 1,000 in their accounts.

|  | A | B |
|---|---|---|
| 1) Account Balance -- Beginning of year | $ 1,000 | $ 1,000 |
| 2) Investment Credit | 4% | 8% |
| 3) Account Balance -- End of Year | $ 1,040 | $ 1,080 |
| 4) Years to age 65 | 24 | 24 |
| 5) Line 3 projected to age 65 | $ 2,666 | $ 6,848 |
| 6) Present Value of (5) at | $ 658 | $ 1,691 |
| 7) Lump sum Greater of (3/or/6) | $ 1,040 | $ 1,691 |

C. Impact of the Whipsaw Effect

[12] In the above example, the employer would like to provide the account balance as improved for earnings ($ 1,040 for A and $ 1,080 for B). Because the employer had the audacity to provide B with an earnings rate that better reflected the market, the minimum lump sum increased from $ 1,080, which was all that was promised, to $ 1,691 (a 57% increase). Consequently, employers, unwilling to be gouged by the relentless teeth of the Whipsaw, provide less than a market rate of return to employee accounts. Do these rules benefit anyone? The IRS rules go out of their way to severely punish employers who credit true market related investment adjustments. These IRS rules truly assure that no good deed goes unpunished.

D. Some Conclusions Regarding the Whipsaw Effect

[13] This discussion is meant to suggest that because cash balance plans do not benefit in high interest rate environments by offering lump sums in the form of accounts, the law requiring minimum lump sums has no meaning in cash balance plans. Application of the minimum lump sum rate to lump sum distributions from cash balance plans therefore makes no sense in light of the legislative background. The IRS rules are like a solution hunting for a problem.

[14] The major problem inherent in the Whipsaw Effect is that the IRS pigeonholes cash balance plans in a manner that is fundamentally inconsistent with their basic design or rational pension policy. In the case of a traditional pension plan, an annuity is promised. If a lump sum is provided and if the amount of the lump sum is below market equivalence, the employer or the plan realizes profit on every such lump sum election. Thus employers have a financial interest to encourage lump sums. Employees are not actuaries. They rarely seek actuarial advice. In a high interest rate environment in the absence of protective legislation, many would nonetheless take an inferior lump sum. As stated earlier, Congress passed the minimum lump sum law to avoid that situation.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[15] In the case of cash balance plans where a lump sum is the fundamental promise, the economics are reversed. Notice 96-8 first operates to reduce the earnings credit by applying the minimum lump sum rules in a way that does not acknowledge that the promise to employees in a cash balance plan is essentially different from the promise in a traditional defined benefit plan. Notice 96-8 also provides that a cash balance plan cannot subsidize the rates at which the account is converted to an annuity (to avoid an end-run around the rules that create the whipsaw problem). Thus rules designed to increase benefits in the traditional defined benefit plan tend to depress benefits in cash balance plans. Thus the rules tend to reduce employer costs in a cash balance plan at the expense of employee benefits. Although some employers may enjoy that result, many employers would prefer to credit a greater rate of return. What kind of policy precludes market rates of return from being applied to cash balance accounts or reducing the amount that may be paid as annuities? It is hard to explain such a policy.

[16] The IRS, however, would contend that its position is sound in that it requires the same mathematical relationship of annuity pensions to lump sum distributions in all type of defined benefit plans. Measured by that yardstick, the IRS is absolutely correct. This reasoning, however, is analogous to treating a nosebleed of a person by firmly applying a tourniquet around that person's neck. It works. The bleeding will stop. But like the IRS rules, the side effects are most unpleasant.

II. The Low Normal Retirement Age

[17] Sir Isaac Newton's third law of motion states that for every action there is an opposite and equal reaction. The IRS regulations needlessly created the Whipsaw Effect (the action). The Whipsaw Effect, however, disappears once a participant reaches his or her normal retirement age (because there is no longer a need to project into the future -- the minimum lump sum rules require projection only until normal retirement age). Interestingly, the logical reaction to the IRS's action is to reduce the normal retirement age (the reaction) because the Whipsaw Effect would disappear at that point. Indeed, most cash balance plans with a low normal retirement age do provide earnings credits based on equity indices. Our belief is that the Whipsaw Effect should not be protected by legislation or further IRS guidance because the low normal retirement age, created by ERISA, /1/ should move the ever grinding teeth of the Whipsaw Effect away from harming plans and their participants.

[18] Rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages. Any such rules would, in our opinion, require legislation. The IRS simply does not have the authority to eliminate the low normal retirement age.

[19] *Section 411(a)(8) of the Internal Revenue Code* as added by ERISA defines the normal retirement age as the earlier of (1) the time a plan participant attains the normal retirement age under the plan and (2) the later of age 65 or the 5th anniversary of plan participation. Clearly, Clause 1 permits a plan to define the normal retirement age as low as it pleases.

[20] *Revenue Ruling 78-120* permitting unrestricted use of low normal retirement ages was adopted contemporaneously with the ERISA regulations. It clearly permits the use of a low normal retirement age, based on *Section 411(a)(8) of the Code.*

III. Recommendation: IRS Elimination of the Whipsaw

[21] The IRS has the authority to eliminate the "Whipsaw Effect" by use of logic instead of blindly following technical rote in a model that the IRS itself created.

[22] The Congress provided an interest rate that must be used in computing minimum lump sums. What does that signify? If a participant received the lump sum, invested the distribution at the rate specified and withdrew assets ratably in equal installments, and if the participant was considerate enough to die precisely where the mortality table indicates, then the lump sum would accumulate sufficient funds to provide the precise annuity. To reach this conclusion, Congress concluded that this specified minimum lump sum interest rate is the rate of return participants are likely on average to obtain on a long-term investment of amounts received in the lump sum distribution. Otherwise, there would be no actuarial equivalence. This assumes that employees receiving lump sums would, of course, have unlimited access to investment markets.

[23] Cash balance plans, however, either with or without investment choice, generally limit participants' abilities to obtain market rate earnings credits prior to the time they take a final distribution. Any limitation on rates of earnings credits available in a cash balance plan would result in lower investment returns than would otherwise be possible, not raise them. Thus as long as the available earnings credit rates do not exceed investment grade rates, the Whipsaw Effect

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Page 6

could be eliminated by assuming that the Projected Rate is equal to the minimum lump sum rate. The IRS should issue guidance updating Notice 96-8 that articulates this principle; then plan sponsors would not be required to rely on a low normal retirement age to implement what is fundamentally sound pension policy.

IV. The Law Flaw in the Anti-Backloading Rules

[24] The IRS may be concerned about the use of low normal retirement ages for another reason. The rules against "backloading" the accrual of benefits in a defined benefit plan apply only to the accrual of benefits up to a participant's "normal retirement age." These rules are designed to prevent plans from providing for the accrual of most of a participant's benefits later in his or her career, thereby circumventing the minimum, vesting rules.

[25] The anti-backloading rules came into the law in 1974 as part of the minimum vesting standards. Under the minimum vesting standards, a participant must vest in a percentage of his or her benefit no less rapidly than under one of several statutory vesting schedules. Under the minimum vesting standards, a person's vested benefit is the product of (1) the benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage. If an employer did not want to provide early vesting, the employer could provide negligible accruals until the point that employer desires to provide vesting; after all vesting 100% vesting in an accrued benefit of zero is not different from not vesting at all.

[26] The fundamental problem was accruing large amounts in later years relative to small amounts in earlier years ("Backloading"). Therefore, Congress provided a floor of protection by enacting the Anti-Backloading Rules. The floor, however, was flawed. The Anti-Backloading Rules provide protection against backloading for the period from plan entry to the normal retirement age. As a matter of law, benefits accrued subsequent to the normal retirement age are not subject to anti-backloading requirements (the "Law Flaw"). This flaw is clearly undesirable, but will not be cured by trying to eliminate the low normal retirement age. The Law Flaw will still exist as applied to benefits accruing after a "normal" normal retirement age.

[27] The Law Flaw has existed for many years, but has not received significant attention until recently. The spotlight on the Law Flaw is likely to mean that the Law Flaw will be exploited in previously unimagined ways, even if the use of the low normal retirement age is inhibited through new IRS guidance. As a result, we would recommend legislation to fix the Law Flaw. Such legislation would essentially limit post-normal retirement age accrual rates to some reasonable percentage of pre-normal retirement age accrual rates. With such legislation in place, the low normal retirement age would be incapable of manipulation as a means of avoiding the Anti- Backloading Rules.

V. Conclusions

[28] The IRS has needlessly created the Whipsaw Effect, which perversely causes cash balance participants to receive earnings credits below market rates. The IRS could eliminate the Whipsaw Effect in several different ways, but until such time as the IRS does so, the low normal retirement age avoids the Whipsaw Effect. The IRS may be thinking about changing its position on low normal retirement ages, thereby strengthening the Whipsaw Effect. The IRS does not have authority to change the definition in the statute, If administratively, however, the IRS were to be successful, then participants in cash balance plans will receive less than a market return because of the IRS-created Whipsaw Effect. It is only through the strength and wisdom of our hero in this saga (the low normal retirement age) that the pension policy dragon (the Whipsaw Effect) created by the IRS has been foiled. If the IRS decides to kill off our hero, it should slay the dragon as well -- otherwise, it will be inhibiting the development of the only type of qualified defined benefit plan that provides a reasonable alternative to a private pension system that is dominated by the 401(k) plan.

Sincerely,

Ira Cohen
PricewaterhouseCoopers LLP
Teaneck, NJ

*************** End of Document ****************