Exhibit 1 to July 5, 2005 First Amended Class Action Complaint

*Laurent v. PricewaterhouseCoopers LLP et al.,* 05-1291 (D.D.C.) (PLF)

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Page 1

LEXSTAT 1999 TNT 222-20

Copyright © 1999 Tax Analysts
Tax Notes Today

NOVEMBER 18, 1999 THURSDAY

**DEPARTMENT:** Official Announcements, Notices, and News Releases; Treasury Tax Correspondence

**CITE:** *1999 TNT 222-20*

**LENGTH:** 3843 words

**HEADLINE:** 1999 TNT 222-20 BLAME FOR CASH BALANCE PLAN CONTROVERSY BELONGS WITH IRS GUIDANCE, PricewaterhouseCOOPERS SAYS. (Section 411 -- Minimum Vesting;) (Release Date: SEPTEMBER 30, 1999) (Doc 1999-36542 (8 original pages))

**CODE:** *Section 411* -- Minimum Vesting;
*Section 414(j)* -- Defined Benefit Plans

**ABSTRACT:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury.

**SUMMARY:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury. Cohen argues that IRS guidance has created a "whipsaw effect" that "perversely" causes cash balance participants to receive earnings credits below market rates. To avoid that effect, cash balance plans use a retirement age that is below the actual typical retirement age to determine plan benefits. If the IRS and Treasury want to eliminate the controversy over cash balance plans, he says, they should eliminate the "whipsaw effect."

**AUTHOR:** Cohen, Ira
PricewaterhouseCoopers LLP

**GEOGRAPHIC:** United States

**INDEX:** pension plans, vesting standards, minimum;
pension plans, benefits, defined

**REFERENCES:** Subject Area:
 Individual income taxation;
 Benefits and pensions
Cross Reference:
 For a summary of IR-1999-79, see Tax Notes, Oct. 25, 1999, p. 449;
 for the full text, see *1999 TNT 202-17*, Doc 1999-33676 (1 original
 page), or H&D, Oct. 20, 1999, p. 707.

**TEXT:**

Release Date: SEPTEMBER 30, 1999

September 30, 1999

Mr. Charles O. Rossotti
Commissioner

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Internal Revenue Service
1111 Constitution Avenue, N.W.,
Room 3000
Washington, D.C. 20224

Mr. Jonathan Talisman
Deputy Assistant Secretary for Tax Policy
U.S. Department of The Treasury
Main Treasury, Office of the Assistant Secretary for Tax Policy
1500 Pennsylvania Avenue, N.W.
Room 1334
Washington, D.C. 20020

Dear Commissioner Rossotti and Mr. Talisman:

[1] I am writing to you to explain why one element of the current controversy over cash balance plans -- a low normal retirement age in a qualified defined benefit plan, -- has been a necessary result of poor rulemaking by the Treasury Department and is not a devious attempt by taxpayers to circumvent reasonable rules. (By a low normal retirement age, I mean a retirement age that is defined in the plan document that is well below that actual typical retirement age -- the low retirement age might be as low as the age at five years of participation in the plan.) I urge you to consider the merits of the low normal retirement age in this context -- as a hero rather than a villain. If the IRS eliminates the use of the low normal retirement age, the IRS should also revise Notice 96-8 to correct the pension policy disaster fostered by that Notice.

I. The Whipsaw Effect

[2] The policy problem created by the Treasury Department and IRS regulations has to do with the dreaded "whipsaw effect" and rules requiring payment of minimum lump sums from qualified defined benefit plans that offer the lump sum form of distribution. Review of the minimum lump sum rules under *section 417(e) of the Internal Revenue Code* of 1986, as amended (the "Code") and the guidance relating to the "whipsaw effect" will be helpful in fully understanding the problem.

A. IRS Rules Regarding Minimum Lump Sums

[3] Let's briefly review the economic conditions prevailing when the minimum lump sum rules were first created. In the late 1970's and early 1980's, interest rates were at an all time high, often as high as 15%. In this time of high interest rates, employers frequently terminated qualified defined benefit plans with surplus assets to gain access to the surplus. The high interest rates had the effect of inflating the amount available for reversion, because pension liabilities are generally calculated as if the liability were due when the plan participants retire -- some time in the future. If a plan terminates today, the present value of that future liability in a high interest rate environment is relatively small. Therefore, when plans terminate in a high interest rate environment, plan assets required to satisfy liabilities to plan participants are relatively smaller, increasing the plan assets available for reversion.

[4] On plan termination, benefits may be settled either by purchasing an annuity contract or paying a lump sum. In the era of abnormally high interest rates, like 15% per annum, the surplus reverting to the employer upon plan termination was significantly larger if lump sums were paid than if annuities were purchased. (This resulted because the price of annuity contracts reflected the fact that annuity payments commence some time in the future, so the present value discounting required when lump sums were paid would not occur or would be performed over a shorter period of time.) Indeed, some oversight committee testimony in that era showed that some companies wanted to maximize their surplus badly enough to provide their executives with an additional bonus depending on the percentage of the executives' subordinate employees who could be induced to take a lump sum on plan termination. Plan participants, like most small investors, were typically unable to obtain those high interest rates in savings accounts or purchases of debt instruments. Consequently, participants electing lump sums received less long-term economic value than those electing annuities.

[5] Congress sought to change this result by defining minimum lump sums in terms of a maximum. interest rate, so that the effect of present valuing the pension due at retirement age would be regulated by adding *Section 417(e) of the Code*. *Section 417(e)* was modified several times. At present, *Section 417(e)* states:

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

. . . . "(3) Determination of present value.

   (A) In general.

   (i) Present Value. Except as provided in subparagraph

   (B), for purposes of paragraphs (1) and (2), the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate.

   (ii) Definitions. For purposes of clause (i) --

   (I) Applicable mortality table. The term "applicable mortality table" means the table prescribed by the Secretary. Such table shall be based on the prevailing commissioners' standard table (described in *section 807(d)(5)(A)*) used to determine reserves for group annuity contracts issued on the date as of which present value is being determined (without regard to any other subparagraph of *section 807(d)(5)*).

   (II) Applicable interest rate. The term "applicable interest rate" means the annual rate of interest on 30 year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe."

[6] The Treasury Regulations (the "Regulations") implementing the minimum lump sum legislation state that that lump sum may never be less than the present value of the annuity payable at a participant's normal retirement date at a mandated interest rate. *Section 1.417(e)-1(d)(I) of the Regulations* states:

. . . . "The present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit determined in accordance with the preceding sentence". . . .

[7] This regulatory requirement is neither mandated nor suggested by the law or the legislative history. In fact, it ignores a key element of the problem the rule was designed to address. Participants in terminating plans are allowed to take annuities or lump sums IMMEDIATELY UPON PLAN TERMINATION, even if they are still employed (if the plan design allows). The rule does, however, represent a vital regulatory step hurling cash balance plans into the jaws of the dreaded "whipsaw effect." As we will see, absent this requirement, the "whipsaw effect" would be eliminated because a plan could define the lump sum as the present value of the immediate annuity -- a more accurate reflection of the design options available to plan sponsors in terminating and ongoing plans.

   D. Cash Balance Plans and the "Whipsaw Effect"

[8] In simple economic terms, a cash balance plan provides a benefit in the form of an account. This notional account is credited with pay credits each year and is adjusted periodically according to an earnings index. This earnings rate is usually a predetermined independent index (such as 5-year Treasury bills or the S&P 500), or the earnings rate may be a fixed interest rate such as 5%; in some designs, participants may choose among different earnings indices which mimic actual investments such as those available in the plan sponsor's 401(k) plan. Cash balance plans generally offer a lump sum and an immediate annuity upon termination of employment, and our experience with cash balance plans suggests that nearly all participants will take the lump sum form of distribution.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[9] Because the fundamental benefit is an account balance, these plans -- unlike traditional defined benefit plans -- should not save the employer money (at times of higher interest rates) when the employee takes a lump sum. After all, the account should be the account regardless of the interest rate. However, that elegant equation -- the account equals the account -- is not in the IRS's current mathematical repertoire.

[10] The IRS has created the "whipsaw problem," on the basis of its regulations relating to minimum lump sums. Because these regulations mandate that the minimum lump sum relates to the benefit at normal retirement age, the IRS required cash balance plans develop a normal retirement age annuity benefit by projecting the account balance to normal retirement age using an interest rate reflective of the investment adjustments (the "Projection Rate"), then converting that amount to an annuity. Then, in order to comply with the minimum lump sum rules, that benefit at normal retirement age needs to be discounted to the benefit commencement date. If the projection rate is greater than the discount rate, the plan could be "whipsawed" into paying a lump sum that is greater than a participant's account. Although seemingly reasonable when viewed separately, the minimum lump sum rate and the Projection Rate therefore combine to create the "Whipsaw Effect." This phenomenon was described in Notice 96-8.

[11] However, under that Notice, the Projection Rate to be used is not defined, nor is it defined elsewhere in any applicable IRS authority. Reasonable people can differ as to what Projection Rate is appropriate -- particularly for those that are adjusted according to an equity-based index, such as the Dow Jones Industrial Average. The example below illustrates the Whipsaw Effect. Consider two participants A and B, both age 40, whose accounts earn 4%, a sub- market rate, and 8%, a market rate, respectively. Also assume that the discount rate for minimum lump sums under *section 417(e)* is 6%. Assume A and B each have $ 1,000 in their accounts.

|  | A | B |
|---|---|---|
| 1) Account Balance -- Beginning of year | $ 1,000 | $ 1,000 |
| 2) Investment Credit | 4% | 8% |
| 3) Account Balance -- End of Year | $ 1,040 | $ 1,080 |
| 4) Years to age 65 | 24 | 24 |
| 5) Line 3 projected to age 65 | $ 2,666 | $ 6,848 |
| 6) Present Value of (5) at | $ 658 | $ 1,691 |
| 7) Lump sum Greater of (3/or/6) | $ 1,040 | $ 1,691 |

### C. Impact of the Whipsaw Effect

[12] In the above example, the employer would like to provide the account balance as improved for earnings ($ 1,040 for A and $ 1,080 for B). Because the employer had the audacity to provide B with an earnings rate that better reflected the market, the minimum lump sum increased from $ 1,080, which was all that was promised, to $ 1,691 (a 57% increase). Consequently, employers, unwilling to be gouged by the relentless teeth of the Whipsaw, provide less than a market rate of return to employee accounts. Do these rules benefit anyone? The IRS rules go out of their way to severely punish employers who credit true market related investment adjustments. These IRS rules truly assure that no good deed goes unpunished.

### D. Some Conclusions Regarding the Whipsaw Effect

[13] This discussion is meant to suggest that because cash balance plans do not benefit in high interest rate environments by offering lump sums in the form of accounts, the law requiring minimum lump sums has no meaning in cash balance plans. Application of the minimum lump sum rate to lump sum distributions from cash balance plans therefore makes no sense in light of the legislative background. The IRS rules are like a solution hunting for a problem.

[14] The major problem inherent in the Whipsaw Effect is that the IRS pigeonholes cash balance plans in a manner that is fundamentally inconsistent with their basic design or rational pension policy. In the case of a traditional pension plan, an annuity is promised. If a lump sum is provided and if the amount of the lump sum is below market equivalence, the employer or the plan realizes profit on every such lump sum election. Thus employers have a financial interest to encourage lump sums. Employees are not actuaries. They rarely seek actuarial advice. In a high interest rate environment in the absence of protective legislation, many would nonetheless take an inferior lump sum. As stated earlier, Congress passed the minimum lump sum law to avoid that situation.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[15] In the case of cash balance plans where a lump sum is the fundamental promise, the economics are reversed. Notice 96-8 first operates to reduce the earnings credit by applying the minimum lump sum rules in a way that does not acknowledge that the promise to employees in a cash balance plan is essentially different from the promise in a traditional defined benefit plan. Notice 96-8 also provides that a cash balance plan cannot subsidize the rates at which the account is converted to an annuity (to avoid an end-run around the rules that create the whipsaw problem). Thus rules designed to increase benefits in the traditional defined benefit plan tend to depress benefits in cash balance plans. Thus the rules tend to reduce employer costs in a cash balance plan at the expense of employee benefits. Although some employers may enjoy that result, many employers would prefer to credit a greater rate of return. What kind of policy precludes market rates of return from being applied to cash balance accounts or reducing the amount that may be paid as annuities? It is hard to explain such a policy.

[16] The IRS, however, would contend that its position is sound in that it requires the same mathematical relationship of annuity pensions to lump sum distributions in all type of defined benefit plans. Measured by that yardstick, the IRS is absolutely correct. This reasoning, however, is analogous to treating a nosebleed of a person by firmly applying a tourniquet around that person's neck. It works. The bleeding will stop. But like the IRS rules, the side effects are most unpleasant.

II. The Low Normal Retirement Age

[17] Sir Isaac Newton's third law of motion states that for every action there is an opposite and equal reaction. The IRS regulations needlessly created the Whipsaw Effect (the action). The Whipsaw Effect, however, disappears once a participant reaches his or her normal retirement age (because there is no longer a need to project into the future -- the minimum lump sum rules require projection only until normal retirement age). Interestingly, the logical reaction to the IRS's action is to reduce the normal retirement age (the reaction) because the Whipsaw Effect would disappear at that point, Indeed, most cash balance plans with a low normal retirement age do provide earnings credits based on equity indices. Our belief is that the Whipsaw Effect should not be protected by legislation or further IRS guidance because the low normal retirement age, created by ERISA, /1/ should move the ever grinding teeth of the Whipsaw Effect away from harming plans and their participants.

[18] Rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages. Any such rules would, in our opinion, require legislation. The IRS simply does not have the authority to eliminate the low normal retirement age.

[19] *Section 411(a)(8) of the Internal Revenue Code* as added by ERISA defines the normal retirement age as the earlier of (1) the time a plan participant attains the normal retirement age under the plan and (2) the later of age 65 or the 5th anniversary of plan participation. Clearly, Clause 1 permits a plan to define the normal retirement age as low as it pleases.

[20] *Revenue Ruling 78-120* permitting unrestricted use of low normal retirement ages was adopted contemporaneously with the ERISA regulations. It clearly permits the use of a low normal retirement age, based on *Section 411(a)(8) of the Code*.

III. Recommendation: IRS Elimination of the Whipsaw

[21] The IRS has the authority to eliminate the "Whipsaw Effect" by use of logic instead of blindly following technical rote in a model that the IRS itself created.

[22] The Congress provided an interest rate that must be used in computing minimum lump sums. What does that signify? If a participant received the lump sum, invested the distribution at the rate specified and withdrew assets ratably in equal installments, and if the participant was considerate enough to die precisely where the mortality table indicates, then the lump sum would accumulate sufficient funds to provide the precise annuity. To reach this conclusion, Congress concluded that this specified minimum lump sum interest rate is the rate of return participants are likely on average to obtain on a long-term investment of amounts received in the lump sum distribution. Otherwise, there would be no actuarial equivalence. This assumes that employees receiving lump sums would, of course, have unlimited access to investment markets.

[23] Cash balance plans, however, either with or without investment choice, generally limit participants' abilities to obtain market rate earnings credits prior to the time they take a final distribution. Any limitation on rates of earnings credits available in a cash balance plan would result in lower investment returns than would otherwise be possible, not raise them. Thus as long as the available earnings credit rates do not exceed investment grade rates, the Whipsaw Effect

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

could be eliminated by assuming that the Projected Rate is equal to the minimum lump sum rate. The IRS should issue guidance updating Notice 96-8 that articulates this principle; then plan sponsors would not be required to rely on a low normal retirement age to implement what is fundamentally sound pension policy.

### IV. The Law Flaw in the Anti-Backloading Rules

[24] The IRS may be concerned about the use of low normal retirement ages for another reason. The rules against "backloading" the accrual of benefits in a defined benefit plan apply only to the accrual of benefits up to a participant's "normal retirement age." These rules are designed to prevent plans from providing for the accrual of most of a participant's benefits later in his or her career, thereby circumventing the minimum, vesting rules.

[25] The anti-backloading rules came into the law in 1974 as part of the minimum vesting standards. Under the minimum vesting standards, a participant must vest in a percentage of his or her benefit no less rapidly than under one of several statutory vesting schedules. Under the minimum vesting standards, a person's vested benefit is the product of (1) the benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage. If an employer did not want to provide early vesting, the employer could provide negligible accruals until the point that employer desires to provide vesting; after all vesting 100% vesting in an accrued benefit of zero is not different from not vesting at all.

[26] The fundamental problem was accruing large amounts in later years relative to small amounts in earlier years ("Backloading"). Therefore, Congress provided a floor of protection by enacting the Anti-Backloading Rules. The floor, however, was flawed. The Anti-Backloading Rules provide protection against backloading for the period from plan entry to the normal retirement age. As a matter of law, benefits accrued subsequent to the normal retirement age are not subject to anti-backloading requirements (the "Law Flaw"). This flaw is clearly undesirable, but will not be cured by trying to eliminate the low normal retirement age. The Law Flaw will still exist as applied to benefits accruing after a "normal" normal retirement age.

[27] The Law Flaw has existed for many years, but has not received significant attention until recently. The spotlight on the Law Flaw is likely to mean that the Law Flaw will be exploited in previously unimagined ways, even if the use of the low normal retirement age is inhibited through new IRS guidance. As a result, we would recommend legislation to fix the Law Flaw. Such legislation would essentially limit post-normal retirement age accrual rates to some reasonable percentage of pre-normal retirement age accrual rates. With such legislation in place, the low normal retirement age would be incapable of manipulation as a means of avoiding the Anti- Backloading Rules.

### V. Conclusions

[28] The IRS has needlessly created the Whipsaw Effect, which perversely causes cash balance participants to receive earnings credits below market rates. The IRS could eliminate the Whipsaw Effect in several different ways, but until such time as the IRS does so, the low normal retirement age avoids the Whipsaw Effect. The IRS may be thinking about changing its position on low normal retirement ages, thereby strengthening the Whipsaw Effect. The IRS does not have authority to change the definition in the statute, If administratively, however, the IRS were to be successful, then participants in cash balance plans will receive less than a market return because of the IRS-created Whipsaw Effect. It is only through the strength and wisdom of our hero in this saga (the low normal retirement age) that the pension policy dragon (the Whipsaw Effect) created by the IRS has been foiled. If the IRS decides to kill off our hero, it should slay the dragon as well -- otherwise, it will be inhibiting the development of the only type of qualified defined benefit plan that provides a reasonable alternative to a private pension system that is dominated by the 401(k) plan.

Sincerely,

Ira Cohen
PricewaterhouseCoopers LLP
Teaneck, NJ

*************** End of Document ***************