completed at least sixty months of Service, shall not be less than the Actuarial Equivalent of his "Vested Rights" as set forth in Article II, Sections 5(1) and (2) of the Froggatt Plan.

(5)    Payment of Benefits to Certain Former Employees of Froggatt:

Any benefits that would have been payable currently or in the future under the Froggatt Plan, if it continued in effective after July 20, 1972, with respect to persons who did not become Employees of the Employer shall be paid from the Plan in accordance with the terms and provisions of the Froggatt Plan as in effect on July 20, 1972; provided, however, that effective on July 1, 1975, retirement benefits payable with respect to any such person shall be increased in accordance with the provisions of this Section 14(a) hereof as though he were a Participant.

(b)    Special Provisions Applicable to Former Employees of Daniels, Turnbull & Freeman

(1)    Date of Acquisition: July 1, 1973

(2)    Definitions:

(a)    "DT&F" means Daniels, Turnbull & Freeman.

(b)    "DT&F Plan" means the Daniels, Turnbull & Freeman Employees Pension Trust as adopted effective October 1, 1966 and as amended subsequent thereto.

(c)    "DT&F Employee" means any employee of DT&F who became an Employee as of June 1, 1973.

(3)    Amount of Annual Retirement Income:

Notwithstanding anything in Appendix or Plan to the contrary, the portion of the annual retirement income of a DT&F Employee computed in accordance with Section 1 of this Appendix which is based on Service prior to June 1, 1973 shall not be less than the Actuarial Equivalent of the normal retirement benefit accrued by such DT&F Employee under Section 4.1 of the DT&F Plan as of June 1, 1973.

148

(c)   <u>Special Provisions Applicable to Former Partners and Employees of Siskin, Shapiro & Company</u>

    (1)   <u>Date of Acquisition</u>: October 1, 1982

    (2)   <u>Definition</u>:

        (a)   "SS & Co." means Siskin, Shapiro & Company.

        (b)   "SS & Co. Employee" means any employee of SS & Co. who became an Employee as of October 1, 1982.

        (c)   "SS & Co. Partner" means any partner of SS & Co. who became a Partner as of October 1, 1982.

        (d)   "SS & Co. Plan" means the Siskin, Shapiro & Company HR-10 Plan.

        (e)   "SS & Co. Plan Balance" means the individual account balance of each employee in the SS & Co. Plan, as of the date the accounts are transferred to the Plan.

        (f)   "Plan Account" means the separate account established for each SS & Co. Employee under the Plan, and transferred to the Coopers & Lybrand Multi-Investment Accumulation Plan ("MAP") effective October 1, 1989.

    (3)   <u>Transfer of SS & Co. Plan Assets</u>:

        (a)   All assets of the SS & Co. Plan attributable to the SS & Co. Employees shall be transferred to the Trustee of the Plan as soon as practicable after October 1, 1982. Such assets shall be credited to each SS & Co. Employee's Plan Account in an amount equal to the market value of such account including any accrued contributions and investment income on the transfer date. The balance of each SS & Co. Employee's Plan Account shall be invested and reinvested upon the instructions of the Employee in one of the investment funds in accordance with the provisions of MAP. All earnings, losses and other expenses attributable to assets held for each such Plan Account shall be reflected therein exclusively, in accordance with such accounting procedures as the

149

Committee shall approve. No assets of any other such Plan Account nor any general assets, earnings or losses of the Trust Fund shall be credited to or charged against any such separate account.

(b)     The value of each SS & Co. Employee's Plan Account established in accordance with Section 14(c)(3)(a) of this Appendix shall be determined no less frequently than annually, and at such other times as the Administrative Committee, in agreement with the Trustee of MAP, shall establish.

(c)     The withdrawal provisions of MAP shall not be applicable to the Plan Accounts established in accordance with this Section 14(c)(3), and distribution of Plan Accounts shall be governed solely by the terms of this Section 14(c)(3).

(4)     <u>Annual Retirement Income of SS & Co. Employees</u>

Notwithstanding anything in this Appendix or Plan to the contrary, the annual retirement income of an SS & Co. Employee shall be the sum of (a) and (b) below:

(a)     The annual retirement income determined under Section 1 of this Appendix for such Employee offset by the annual retirement income for life commencing on the first day of the calendar month beginning with or next following the date on which the C&L Participant has attained the age of 65 and completed at least sixty months of Service which is the actuarial equivalent of such employee's SS & Co. Plan Balance.

(b)     The annual retirement income for life commencing on the first day of the calendar month beginning with or next following the date on which the C&L Participant has attained the age of 65 and completed at least sixty months of Service which is the actuarial equivalent of the Single Sum Payment of the Plan Account as determined in Section 14(c)(6) of this Appendix. For purposes of determining the vested amount of an SS & Co. Employee's retirement income, such Employee shall have at all times a 100% percent non-

150

forfeitable interest in the benefit described in this Section 14(c)(4)(b).

The basis for actuarial equivalent in this Section 14(c)(4) shall be as follows:

Mortality: 1971 Group Annuity mortality Table (Male) without projection, set back 6 years of Females.

Interest:   6% per annum, compounded annually.

(5)    Annual Retirement Income of SS & Co. Partners

Notwithstanding anything in this Appendix to the contrary, for purposes of determining the annual retirement income under Section 2 of this Appendix, Service with SS & Co. Partner shall not be included in determining Credited Service, but shall constitute Service for purposes of determining eligibility and vesting.

(6)    Single Sum Payment of Plan Account

In lieu of the benefit described in Section 14(c)(4)(b) of this Appendix, the SS & Co. Employee may elect at the time of his retirement or other termination of employment to receive a Single Sum Payment of his Plan Account. An SS & Co. Employee's Single Sum Payment shall be the greater of:

(a)    the value of such Employee's SS & Co. Plan Balance increased by interest at 6% per annum, compounded annually to retirement or other termination of employment; or

(b)    the balance to the credit to the SS & Co. Employee is his Plan Account as of the Employee's retirement or other termination of employment.

Such amount will be paid in a single sum to the Employee, as soon as practicable after his retirement or other termination of employment; provided, however, that if the SS & Co. Employee elects a Single Sum Payment of his Plan Account, the annual retirement income of such Employee shall be limited to the benefit described Section 14(c)(4)(a) of this Appendix.

151

Any Single Sum Payment on or after October 1, 1989, shall be made from MAP, rather than from the Plan.

(7)     Death Benefits

If an SS & Co. Employee dies before the commencement of retirement income payments, his Beneficiary shall receive a Single Sum Payment equal to his Plan Account as determined in accordance Section 14(c)(6) of this Appendix, plus any benefits payable in accordance with Section 11 of this Appendix based on retirement benefits defined under Section 14(c)(4)(a) of this Appendix.

If an SS & Co. Employee dies after the commencement of retirement income payments, his Beneficiary shall receive any benefits payable in accordance with the Employee's election under Section 9 of this Appendix.

(8)     Cash-Out of Retirement Income

When an election is made by an SS & Co. Employee under Section 14(c)(6) of this Appendix, total retirement income for purposes of the Plan includes only the annual retirement income described in Section 14(c)(4)(a) of this Appendix, and not the retirement benefit described in Section 14(c)(4)(b) of this Appendix.

(d)     Special Provisions Applicable to Former Partners and Employees of Shaye, Lutz, Schwartz & King, P.C.

(1)     Date of Acquisition: October 1, 1982.

(2)     Definitions:

(a)     "SLSK" means Shaye, Lutz, Schwartz & King, P.C.

(b)     "SLSK Employee" means any employee or shareholder of SLSK who became an employee as of October 1, 1982.

(c)     "SLSK Plan" means the Shaye, Lutz, Schwartz & King, P.C. Pension Plan.

(3)     Amount of Annual Retirement Income:

152

Notwithstanding anything in this Appendix or Plan to the contrary, for purposes of determining the annual retirement income under Section 1 of this Appendix, except as noted in Section 14(d)(4) of this Appendix, Credited Service for an SLSK Employee (other than Ira Rosen) shall not include service with SLSK, but for an SLSK Employee (including Ira Rosen) such service shall constitute Service for purposes of determining eligibility and vesting.

    (4)    <u>Transfer of SLSK Plan Assets</u>:

As soon as practicable after the acquisition date, each of Virginia Keating, Anna Thompson, Elizabeth Turner and Harold Dornburg will be given the option to elect to have the portion of assets of the SLSK plan attributable to their accrued benefits transferred to the Plan. Any such individual electing to transfer such amounts to the Plan shall have service with SLSK included in the determination of Credited Service for the purpose of calculating annual retirement income under Section 1 of this Appendix.

    (e)    <u>Special Provisions Applicable to Former Partners and Employees of J.B. Friedman & Co.</u>

        (1)    <u>Date of Acquisition</u>: December 1, 1982.

        (2)    <u>Definitions</u>:

            (a)    "JBFCo." means J.B. Friedman & Company

            (b)    "JBFCo. Employee" means any employee or partner of JBFCo. who became an Employee as of; October 1, 1982.

        (3)    <u>Amount of Annual Retirement Income</u>:

Notwithstanding anything in this Appendix or Plan to the contrary, Service for a JBFCo. Employee shall not include service with JBFCo.

    (f)    <u>Special Provisions Applicable to Former Partners and Employees of Katz, Zuckerman</u>

        (1)    <u>Date of Acquisition</u>: September 1, 1980.

153

(2)     <u>Definitions</u>:

    (a)    "KZ" means Katz, Zuckerman & Co.

    (b)    "KZ Employee" means any employee or partner of KZ who became an Employee on September 1, 1990.

(3)     <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for a KZ Employee shall include service with KZ before September 1, 1990.

(g)    <u>Special Provisions Applicable to Former Employees of Matsumoto and Yamada Accountancy Corporation</u>

(1)     <u>Date of Acquisition</u>: July 1, 1983.

(2)     <u>Definitions</u>:

    (a)    "MYAC" means Matsumoto and Yamada Accountancy Corporation.

(3)     <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Fujima Matsumoto shall not be eligible to participate in the Plan, and the Plan Earnings of George Yamada shall be the amounts described in Section 10 of the merger agreement between MYAC and the Firm dated June 29, 1983.

(h)    <u>Special Provisions Applicable to Former Employees of Ford, Hickman, Gibbs & Massinger Accountants, Incorporated</u>

(1)     <u>Date of Acquisition</u>: August 1, 1983.

(2)     <u>Definitions</u>:

    (a)    "FHGM" means Ford, Hickman, Gibbs & Massinger Accountants, Incorporated.

(b)    "FHGM Employee" means any employee or partner of FHGM who became an Employee on August 1, 1983.

(3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Mr. David H. Gibbs shall not be eligible to participate in or accrue benefits under the Plan. Also, for FHGM Employees, Plan Earnings and Service shall not include earnings and service with FHGM, except that service with FHGM shall constitute service under the Plan for purposes of participation.

(i)    Special Provisions Applicable to Former Partners and Employees of Utterback, Duncan, Carameros & Curlin

(1)    Date of Acquisition: August 1, 1983.

(2)    Definitions:

(a)    "UDCC" means Utterback, Duncan, Carameros & Curlin Accountants, Incorporated.

(b)    "UDCC Employee" means any employee or partner of UDCC who became an Employee on August 1, 1983.

(c)    "UDCC Partner" means any partner of UDCC who became a Partner on August 1, 1983.

(3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Service for an UDCC Employee or UDCC Partner shall not include any period prior to August 1, 1983, and Plan Earnings for a UDCC Employee and UDCC Partner shall not include earnings prior to August 1, 1983. In addition, with respect to UDCC Partners, Plan Earnings shall not include payments pursuant to Section 9 of the merger agreement between UDCC and the Firm dated July 1983.

(j)    Special Provisions Applicable to Former Partners and Employees of Sorkin, Thayer & Co.

(1)    Date of Acquisition: December 1, 1983.

155

(2)    <u>Definitions</u>:

   (a)    "STC" means Sorkin, Thayer & Co.

   (b)    "STC Partner" means any partner of STC who became a Partner as of December 1, 1983.

(3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, for purposes of determining eligibility, vesting and the computation of annual retirement income under Section 2 of this Appendix, Service and Plan Earnings for an STC Partner shall include the service and compensation amounts described in Attachments C and E to the Agreement dated November 30, 1983 between the Firm and STC with respect to periods prior to December 1, 1983. Notwithstanding anything in this Appendix or Plan to the contrary with respect to Acquired Employees, eligibility to participate in the Plan shall be restricted pursuant to Attachment D to the Agreement dated November 30, 1983 between the Firm and STC.

(k)    <u>Special Provisions Applicable to Former Employees and Partners of Trott & Company</u>

(1)    <u>Date of Acquisition</u>: May 1, 1984.

(2)    <u>Definitions</u>:

   (a)    "TCO" means Trott & Company.

   (b)    "TCO Employees" means any employee of TCO who became an Employee as of May 1, 1984.

(3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Plan Earnings and Service for a TCO Employee shall not include earnings and service with TCO.

(l)    <u>Special Provisions Applicable to Former Employees of Turigliatto, Collins, Bitner & Palm, P.C.</u>

156

(1)    Date of Acquisition: December 1, 1984.

(2)    Definitions:

    (a)    "TCBP" means Turigliatto, Collins, Bitner & Palm, P.C.

    (b)    "TCBP Employee" means any employee of TCBP who became an Employee as of December 1, 1984.

    (c)    "TCBP Partner" means any employee or partner of TCBP who became a Partner as of December 1, 1984.

(3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Plan Earnings and Service for TCBP Employees and TCBP Partners shall not include earnings or service with TCBP.

(m)    Special Provisions Applicable to Former Employees of SysteCon, Inc.

(1)    Date of Acquisition: December 1, 1984.

(2)    Definitions:

    (a)    "SI" means SysteCon, Inc.

    (b)    "SI Employee" means any employee of SI who became an Employee as of December 1, 1984.

    (c)    "SI Principal" means any employee of SI who became a Partner or Principal as of December 1, 1984.

(3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Service and Plan Earnings for an SI Employee and SI Principals shall not include service and earnings prior to December 1, 1984.

(n)    Special Provisions Applicable to Former Employees of Gottfried Consultants, Inc.

(1)    Date of Acquisition: February 1, 1985.

157

    (2)    <u>Definitions</u>:

        (a)    "GCI" means Gottfried Consultants, Inc.

        (b)    "GCI Employee" means any employee of GCI who became an Employee as of February 1, 1985.

        (c)    "GCI Principal" means any employee of GCI who became a Principal as of February 1, 1985.

    (3)    <u>Amount of Annual Retirement Income</u>

    Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for a GCI Employee and GCI Principal shall include service with GCI from June 1, 1964 to February 1, 1985.

(o)    <u>Special Provisions Applicable to Former Employees of Hanson, Raun & Hanson.</u>

    (1)    <u>Date of Acquisition</u>: December 1, 1981.

    (2)    <u>Definitions</u>:

        (a)    "HRH" means Hanson, Raun & Hanson.

        (b)    "HRH Employee" means any employee or partner of HRH who became an Employee as of December 1, 1981.

    (3)    <u>Amount of Annual Retirement Income</u>

    Notwithstanding anything in this Appendix or Plan to the contrary, Service for an HRH Employee shall not include service with HRH.

(p)    <u>Special Provisions Applicable to Former Employees of Charles Mihaylo Accountancy Corporation</u>

    (1)    <u>Date of Acquisition</u>: October 1, 1984.

    (2)    <u>Definitions</u>:

        (a)    "MAC" means Charles Mihaylo Accountancy Corporation.

   (b) "MAC Employee" means any employee of MAC who became an Employee on August 1, 1983.

  (3) <u>Amount of Annual Retirement Income</u>

   Notwithstanding anything in this Appendix or Plan to the contrary, Service for a MAC Employee shall not include any period prior to October 1, 1984, and Plan Earnings for a MAC Employee shall not include earnings prior to October 1, 1984.

 (q) <u>Special Provisions Applicable to Cox, Wacker and Vogel</u>

  (1) <u>Date of Acquisition</u>: December 1, 1985.

  (2) <u>Definitions</u>:

   (a) "CAWV Partner" means Albert Cox, John Wacker, and James Vogel, former partners of Cox, Armstrong, Wacker Vogel & Co., who became Partners on December 1, 1985.

  (3) <u>Amount of Annual Retirement Income</u>

   Notwithstanding anything in this Appendix or Plan to the contrary, Service for a CAWV Partner shall not include any period prior to December 1, 1985, and Plan Earnings for a CAWV Partner shall not include earnings prior to December 1, 1985.

 (r) <u>Special Provisions Applicable to Former Partners and Employees of Robinson & Company</u>

  (1) <u>Date of Acquisition</u>: January 1, 1986.

  (2) <u>Definitions</u>:

   (a) "R&C" means Robinson & Company.

   (b) "R&C Employee" means any employee or partner of R&C who became an Employee as of January 1, 1986.

  (3) <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Plan Earnings and Service for R&C Employees shall not include earnings and service with R&C.

(s)    Special Provisions Applicable to Former Partners and Employees of Colley, Trumbower & Howell

    (1)    Date of Acquisition: December 1, 1986.

    (2)    Definitions:

        (a)    "CT&H" means Colley, Trumbower & Howell.

        (b)    "CT&H Partners" means any partner of CT&H who become a Partner as of December 1, 1986.

        (c)    "CT&H Employees" means any employee of CT&H who became an Employee on December 1, 1986.

    (3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Plan Earnings and Service for CT&H Employees shall include earnings and service with CT&H before December 1, 1986. Notwithstanding anything in the Plan to the contrary, Plan Earnings and Service for CT&H Partners shall not include earnings or service with CT&H before December 1, 1986.

(t)    Special Provisions Applicable to Former Partners and Employees of Daughtrey & Company

    (1)    Date of Acquisition: December 1, 1984.

    (2)    Definitions:

        (a)    "D&C" means Daughtrey & Company.

        (b)    "D&C Employees" means employees of D&C.

    (3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Plan Earnings and Service for D&C Employees shall not include earnings or service with D&C prior to December 1, 1984.

(u)    <u>Special Provisions Applicable to Former Employees of Herman Smith Associates</u>

    (1)    <u>Date of Acquisition</u>: February 1, 1988.

    (2)    <u>Definitions</u>:

        (a)    "HSA" means Herman Smith Associates.

        (b)    "HSA Employee" means any employee or partner of HSA who became an Employee as of February 1, 1988.

        (c)    "HSA Principal" means any partner or principal of HSA who became a Principal as of February 1, 1988.

    (3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, for purposes of benefit accrual under the Plan Service and Plan Earnings for an HSA Employee and HSA Principal shall not include service and earnings with HSA. Also, the compensation amounts described in Section 4.5 of the merger agreement between HSA and the Firm dated January 29, 1988 shall not be included as Plan Earnings for the HSA Principals.

(v)    <u>Special Provisions Applicable to Former Employees of Tyler, Ellis, Tuffly & Co.</u>

    (1)    <u>Date of Acquisition</u>: December 1, 1988

    (2)    <u>Definitions</u>:

        (a)    "TET&C" means Tyler, Ellis, Tuffly & Co.

        (b)    "TET&C Employee" means any employee of TET&C who became an Employee on December 1, 1988.

    (3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service for a TET&C Employee shall not include any period prior to December 1, 1988, and Plan Earnings for a TET&C Employee shall not include earnings prior to December 1, 1988.

(w)     Special Provisions Applicable to Former Partners and Employees of Gelfand, Rennert & Feldman

   (1)     Date of Acquisition: December 1, 1989

   (2)     Definitions:

       (a)     "GRF" means Gelfand, Rennert & Feldman.

       (b)     "GRF Employee" means any employee or partner of GRF who became an Employee as of December 1, 1989.

       (c)     "GRF Partner" means any employee or Partner of GRF who became a Partner or Principal as of December 31, 1989.

   (3)     Eligibility

   Each GRF Employee shall be treated as a new Employee as of December 31, 1989, and shall participate in the Plan upon satisfaction of its eligibility provisions.

   Each GRF Partner shall be treated as a new Partner on December 1, 1989 and shall be eligible to participate in the Plan upon satisfaction of its eligibility provisions.

   (4)     Amount of Annual Retirement Income

   Notwithstanding anything in this Appendix or Plan to the contrary, Plan Earnings and Service for GRF Employees and GRF Partners shall not include earnings and service with GRF prior to December 1, 1989.

(x)     Special Provisions Applicable to Former Employees of Computer Assistance, Inc.

162

Employees of Computer Assistance, Inc. became employees of the Firm on April 1, 1989 in connection with the Firm's purchase of the assets of Computer Assistance, Inc., but were not initially eligible to participate in the Plan.

Effective January 1, 1994, salaried employees of the Computer Assistance division (also known as the Solutions through Technology group) of the Firm shall become C&L Participants of the Plan, and shall be credited with Service for periods of employment with Computer Assistance, Inc. and with the Computer Assistance division of the Firm. Credited Service shall be determined as if employment with Computer Assistance, Inc. were employment with the Firm, and as if employees of the Computer Assistance division were never an excluded class of employees.

Plan Earnings shall include compensation paid by Computer Assistance, Inc. and by the Computer Assistance division of the Firm.

(y)    Special Provisions Applicable to Former Employees of Harbridge House

    (1)    Date of Acquisition: October 1, 1993

    (2)    Definitions:

        (a)    "HH" means Harbridge House.

        (b)    "HH Employee" means any employee of HH who became an Employee on October 1, 1993.

    (3)    Amount of Annual Retirement Income

        Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for an HH Employee shall include service with HH before October 1, 1993.

(z)    Special Provisions Applicable to Employees of Manufacturers' Appraisal Company

    (1)    Date of Acquisition:  September 1, 1994

    (2)    Definitions:

        (a)    "MAC" means Manufacturers' Appraisal Company and any entity under common control (a defined in Section 414(b) or (c) of the Code) with  Manufacturers Appraisal Company.

      (b)    "MAC Employee" means any employee of MAC who became an Employee on September 1, 1994.

      (c)    "MAC Partner" means any employee or partner of MAC who became a Partner or Principal on September 1, 1994.

  (3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service for a MAC Employee or MAC Partner shall not include service with MAC before September 1, 1994.

(aa)  <u>Special Provisions Applicable to Employees of Coppi Associates, Inc.</u>

  (1)    <u>Date of Acquisition</u>:  March 1, 1995

  (2)    <u>Definitions</u>:

      (a)    "Coppi" means Coppi Associates, Inc. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Coppi Associates, Inc.

      (b)    "Coppi Employee" means any employee of Coppi who became an Employee on March 1, 1995.

      (c)    "Coppi Partner" means any employee or partner of Coppi who became a Partner or Principal on March 1, 1995.

  (3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for a Coppi Employee or Coppi Partner shall include service with Coppi before March 1, 1995.

(bb)  <u>Special Provisions Applicable to Employees of L. W. Ellwood & Company.</u>

  (1)    <u>Date of Acquisition</u>:  October 31, 1996

  (2)    <u>Definitions</u>:

    (a)    "Ellwood" means L. W. Ellwood & Company, Inc. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with L. W. Ellwood & Company, Inc..

    (b)    "Ellwood Employee" means any employee of Ellwood who became an Employee on October 31, 1996.

    (c)    "Ellwood Partner" means any employee or partner of Ellwood who became a Partner or Principal on October 31, 1996.

(3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for an Ellwood Employee or Ellwood Partner shall include service with Ellwood before October 31, 1996.

(cc)    <u>Special Provisions Applicable to Employees of Compo Consulting Group, Inc.</u>

(1)    <u>Date of Acquisition</u>:  December 31, 1996

(2)    <u>Definitions</u>:

    (a)    "Compo" means Compo Consulting Group, Inc. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with  Compo Consulting Group, Inc.

    (b)    "Compo Employee" means any employee of Compo who became an Employee on December 31, 1996.

    (c)    "Compo Partner" means any employee or partner of  Compo who became a Partner or Principal on December 31, 1996.

(3)    <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for a Compo Employee or Compo Partner shall include service with Compo before December 31, 1996.

(dd)    Participation By Affiliated Employers

Name of Affiliated Employer        Effective Date of Plan Participation

Coopers & Lybrand Global Services (U.S.), Inc.        January 1, 1997

Coopers & Lybrand Securities L.L.C.        January 1, 1998

(ee)    Special Provisions Applicable to Former Employees of Kwasha Lipton and Kwasha Lipton, L.L.C. Formerly working at Kwasha Lipton

All employees of Kwasha Lipton (the assets and business of which was acquired by the Firm on January 24, 1997) and participants of Kwasha Lipton, L.L.C. who were employed at Kwasha Lipton on January 24, 1997, and employees and participants who received employment letters from Kwasha Lipton on or before January 24, 1997 but began work at Kwasha Lipton within 30 days after January 24, 1997, shall be eligible to participate in the Kwasha Lipton Retirement Plan (the "KL Plan") (and shall not be treated as C&L Participants for purposes of this Appendix), subject to the terms and conditions of the KL Plan, until the date the KL Plan is merged into this Plan. All other employees hired at the former Kwasha Lipton operations who were hired after January 24, 1997, including former employees of Kwasha Lipton rehired after January 24, 1997, shall be eligible to participate in this Plan (and shall not be eligible to participate in the KL Plan), and, with respect to such employees, a period of employment or service with Kwasha Lipton or with Kwasha Lipton, L.L.C. working at Kwasha Lipton shall be deemed employment with the Firm for purposes of determining Service hereunder; provided, however, that such an individual's Service under this Plan shall not be less than his service under the KL Plan.

(ff)    Special Provisions Applicable to Employees of Property Tax Specialists, Inc. and Storage Tax Specialists, Inc.

(1)    Date of Acquisition: April 22, 1997

(2)    Definitions:

(a)    "PTS" and "STP" means Property Tax Specialists, Inc. and Storage Tax Specialists, Inc.. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Property Tax Specialists, Inc. and Storage Tax Specialists, Inc..

166

        (b)    "PTS or STP Employee" means any employee of PTS or STP who became an Employee on April 22, 1997.

        (c)    "PTS or STP Partner" means any employee or partner of PTS or STP who became a Partner or Principal on April 22, 1997.

    (3)    Amount of Annual Retirement Income

        Notwithstanding anything in this Appendix or Plan to the contrary, Service for an PTS or STP Employee or PTS or STP Partner shall not include service with PTS or STP before April 22, 1997.

(gg)    Special Provisions Applicable to Employees of Autofacts, Inc.

    (1)    Date of Acquisition:  May 1, 1997

    (2)    Definitions:

        (a)    "Autofacts" means Autofacts, Inc. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Autofacts, Inc.

        (b)    "Autofacts Employee" means any employee of Autofacts who became an Employee on May 1, 1997.

        (c)    "Autofacts Partner" means any employee or partner of Autofacts who became a Partner or Principal on May 1, 1997

    (3)    Amount of Annual Retirement Income

        Notwithstanding anything in this Appendix or Plan to the contrary, Service (but not Credited Service) for an Autofacts Employee or Autofacts Partner shall include service with Autofacts before May 1, 1997.

(hh)    Special Provisions Applicable to Employees of Applied Business Systems, Inc.

    (1)    Date of Acquisition:  June 1, 1998

    (2)    Definitions:

(a)  "ABS" means Applied Business Systems, Inc. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Applied Business Systems, Inc.

(b)  "ABS Employee" means any employee of ABS who became an Employee on June 1, 1998.

(c)  "ABS Partner" means any employee or partner of ABS who became a Partner or Principal on June 1, 1998.

(3)  <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service for an ABS Employee or ABS Partner shall not include service with ABS before June 1, 1998.

(ii)  <u>Special Provisions Applicable to Employees of Shattuck Hammond Partners Inc..</u>

(1)  <u>Date of Acquisition:</u>  April 2, 1998

(2)  <u>Definitions:</u>

(a)  "SHP" means Shattuck Hammond Partners, Inc. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Shattuck Hammond Partners, Inc.

(b)  "SHP Employee" means any employee of SHP who became an Employee on April 2, 1998.

(c)  "SHP Partner" means any employee or partner of SHP who became a Partner or Principal on April 2, 1998.

(3)  <u>Amount of Annual Retirement Income</u>

Notwithstanding anything in this Appendix or Plan to the contrary, Service for an SHP Employee or SHP Partner shall not include service with SHP before April 2, 1998.

(jj)  <u>Special Provisions Applicable to Employees of Leatherwood & Ward</u>

(1)  <u>Date of Acquisition:  January 1, 1974</u>

168

(2)    Definitions:

    (a)    "L&W" means Leatherwood & Ward and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Leatherwood & Ward.

    (b)    "L&W Employee" means any employee of L&W who became an Employee on January 1, 1974

    (c)    "L&W Partner" means any employee or partner of L&W who became a Partner or Principal on January 1, 1974.

(3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Service and Credited Service for a L&W Employee or L&W Partner shall include service with L&W before January 1, 1974.

(kk)    Special Provisions Applicable to Herzinger, Porter, Addison & Blind

(1)    Date of Acquisition: May 1, 1974

(2)    Definitions:

    (a)    "HPA&B" means Herzinger, Porter, Addison & Blind and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Herzinger, Porter, Addison & Blind.

    (b)    "HPA&B Employee" means any employee of HPA&B who became an Employee on May 1, 1974

    (c)    "HPA&B Partner" means any employee or partner of HPA&B who became a Partner or Principal on May 1, 1974.

(3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Service and Credited Service for a HPA&B Employee or HPA&B Partner shall include service with HPA&B before May 1, 1974.

169

(ll)    Special Provisions Applicable to Durham, Martin, Jenkins & Co.

    (1)    Date of Acquisition:  August 1, 1990

    (2)    Definitions:

        (a)    "DMJ" means Durham, Martin Jenkins & Co. and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Durham, Martin Jenkins & Co..

        (b)    "DMJ Employee" means any employee of DMJ who became an Employee on August 1, 1990

        (c)    "DMJ Partner" means any employee or partner of DMJ who became a Partner or Principal on August 1, 1990.

    (3)    Amount of Annual Retirement Income

    Notwithstanding anything in this Appendix or Plan to the contrary, Service and Credited Service for a DMJ Employee or HPA&B Partner shall include service with DMJ before August 1, 1990.

(mm)    Special Provisions Applicable to Hildenbrand & Tulin

    (1)    Date of Acquisition:  December 7, 1988

    (2)    Definitions:

        (a)    "H&T" means Hildenbrand & Tulin and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Hildenbrand & Tulin.

        (b)    "H&T Employee" means any employee of H&T who became an Employee on December 7, 1988.

        (c)    "H&T Partner" means any employee or partner of H&T who became a Partner or Principal on December 7, 1988.

    (3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Service for an H&T Employee or H&T Partner shall not include service with H&T before December 7, 1988.

(nn)    Special Provisions Applicable to Utterback, Duncan, Carameros & Curlin.

    (1)    Date of Acquisition:  August 1, 1983

    (2)    Definitions:

        (a)    "UDC&C" means Utterback, Duncan, Carameros & Curlin and any entity under common control (a defined in Section 414(b) or (c) of the Code) with Utterback, Duncan, Carameros & Curlin

        (b)    " UDC&C Employee" means any employee of UDC&C who became an Employee on August 1, 1983.

        (c)    " UDC&C Partner" means any employee or partner of UDC&C who became a Partner or Principal on August 1, 1983.

    (3)    Amount of Annual Retirement Income

Notwithstanding anything in this Appendix or Plan to the contrary, Service for an UDC&C Employee or UDC&C Partner shall not include service with UDC&C before August 1, 1983.

# APPENDIX C

## Special Provisions Applicable to Participants who are CVC Participants

Notwithstanding any other provision of the Plan to the contrary, the provisions of this Appendix C shall apply to any Participant (a "CVC Participant") who terminated employment from, or ceased to be active with, the Firm and commenced employment with The McGraw-Hill Companies, Inc. in connection with the Agreement For The Purchase And Sale Of Assets By And Between The McGraw-Hill Companies, Inc. As Buyer And PricewaterhouseCoopers LLP As Seller, dated as of August 2, 2001. Unless modified in this Appendix C, the general provisions of the Plan shall apply to a CVC Participant.

1.  For purposes of Section 2.29 of the Plan, an Hour of Service of a CVC Participant shall include continuous and uninterrupted employment of the CVC Participant by The McGraw-Hill Companies, Inc. that commenced immediately upon the CVC Participant's termination of employment from, or ceasing to be active with, the Firm to the CVC Participant's termination of employment from The McGraw-Hill Companies, Inc. 95 Hours of Service shall be credited to a CVC Participant for each semimonthly payroll period of the Firm during any part of which the CVC Participant is employed by The McGraw-Hill Companies.

2.  For purposes of Section 5.6(a) of the Plan and Section 8(e) of Appendix B to the Plan, upon a CVC Participant's termination of employment from, or ceasing to be active with, the Firm, a Benefit that does not then exceed $5,000 shall be distributed to the CVC Participant without a requirement for the consent of the CVC Participant or his Spouse, but if the CVC Participant's vested amount is zero he shall not be deemed to receive a distribution of such vested amount. Upon a CVC Participant's termination of employment from The McGraw-Hill Companies, Inc., a Benefit that does not then exceed $5,000 shall be distributed to the CVC Participant without a requirement for the consent of the CVC Participant or his Spouse, and if the CVC Participant's vested amount is zero he shall be deemed to receive a distribution of such vested amount.

3.  For purposes of Section 6.1(b) of the Plan, a 1-Year Break in Service of a CVC Participant shall not include a Year of Service that is credited to the CVC Participant after the application of Section 1 of this Appendix C.

4.  For purposes of Appendix B to the Plan, continuous and uninterrupted employment of a C&L Participant, who is also a CVC Participant, by The McGraw-Hill Companies, Inc., that commenced immediately upon his termination of employment from the Firm in connection with the CVC Transaction, to his termination of employment from The McGraw-Hill Companies, Inc. shall be considered employment by the Firm for the purposes of determining whether the C&L Participant:

    1.  Is employed by the Firm upon his attainment of age 53,

172

2. ·Has at least sixty months of Service (as determined under Section 12(p)(1) of Appendix B) for the determination of a C&L Participant's Early Retirement Date under Section 12(g) of Appendix B, and

3. Has at least 360 months of Service (as determined under Section 12(p)(1) of Appendix B) for the requirement described in the second sentence of Section 4(b) of Appendix B;

provided, however, that if the C&L Participant's Benefit is distributed prior to the earlier of his termination of employment from The McGraw-Hill Companies, Inc. or April 1 following the calendar year during which he attains age 70 1/2, then his age and Service shall be determined without regard to any such employment by The McGraw-Hill Companies, Inc. The C&L Participant will be credited with a full month of Service if he is employed by The McGraw-Hill Companies, Inc. for at least one day in a month. The amount of the annual retirement income of the CVC Participant shall be determined without regard to his employment (other than as provided for by this Section 4) with, and compensation paid by, The McGraw-Hill Companies, Inc.

5. For purposes of this Appendix C, The McGraw-Hill Companies, Inc. shall include all corporations that are members of the controlled group of corporations (within the meaning of Section 414(b) of the Code) of which The McGraw-Hill Companies, Inc. is a member, and any trade or business (whether or not incorporated) which is under common control (within the meaning of Section 414(c) of the Code) with The McGraw-Hill Companies, Inc.

## APPENDIX D

### Special Provisions Applicable to Participants who are Unifi Participants

Notwithstanding any other provision of the Plan to the contrary, the provisions of this Appendix D shall apply to any Participant (a "Unifi Participant") who terminated employment from, or ceased to be active with, the Firm and commenced employment with Buck Consultants, Inc. in connection with the Asset Purchase Agreement by and between Buck Consultants, Inc., Buyer, PricewaterhouseCoopers LLP, Seller, and UNIFI Network, LLC dated as of November 28, 2001. Unless modified in this Appendix D, the general provisions of the Plan shall apply to a Unifi Participant.

1. For purposes of Section 2.29 of the Plan, an Hour of Service of a Unifi Participant shall include continuous and uninterrupted employment of the Unifi Participant by Buck Consultants, Inc. that commenced immediately upon the Unifi Participant's termination of employment from, or ceasing to be active with, the Firm to the earlier of the Unifi Participant's termination of employment from Buck Consultants, Inc. or distribution to the Unifi Participant of his Benefit (or any portion thereof) under the Plan. 95 Hours of Service shall be credited to a Unifi Participant for each semimonthly payroll period of the Firm during any part of which the Unifi Participant is employed by Buck Consultants, Inc.

2. For purposes of Section 5.6(a) of the Plan and Section 8(e) of Appendix B to the Plan, upon a Unifi Participant's termination of employment from, or ceasing to be active with, the Firm, a 100% vested Benefit that does not then exceed $5,000 shall be distributed to the Unifi Participant as soon as practical, without a requirement for the consent of the Unifi Participant or his Spouse, but if the Unifi Participant's vested amount is zero he shall not be deemed to receive a distribution of such vested amount. Upon a Unifi Participant's termination of employment from Buck Consultants, Inc., a Benefit that does not then exceed $5,000 shall be distributed to the Unifi Participant without a requirement for the consent of the Unifi Participant or his Spouse, and if the Unifi Participant's vested amount is zero he shall be deemed to receive a distribution of such vested amount.

3. For purposes of Section 6.1(b) of the Plan, a 1-Year Break in Service of a Unifi Participant shall not include a Year of Service that is credited to the Unifi Participant after the application of Section 1 of this Appendix D.

4. For purposes of Appendix B to the Plan, continuous and uninterrupted employment of a C&L Participant, who is also a Unifi Participant, by Buck Consultants, Inc., that commenced immediately upon his termination of employment from the Firm in connection with the Unifi Transaction, to his termination of employment from Buck Consultants, Inc. shall be considered employment by the Firm for the purposes of determining whether the C&L Participant:

   1. Is employed by the Firm upon his attainment of age 53,

174

2. Has at least sixty months of Service (as determined under Section 12(p)(1) of Appendix B) for the determination of a C&L Participant's Early Retirement Date under Section 12(g) of Appendix B, and

3. Has at least 360 months of Service (as determined under Section 12(p)(1) of Appendix B) for the requirement described in the second sentence of Section 4(b) of Appendix B;

provided, however, that if the C&L Participant's Benefit is distributed prior to the earlier of his termination of employment from Buck Consultants, Inc. or April 1 following the calendar year during which he attains age 70 1/2, then his age and Service shall be determined without regard to any such employment by Buck Consultants, Inc. The C&L Participant will be credited with a full month of Service if he is employed by Buck Consultants, Inc. for at least one day in a month. The amount of the annual retirement income of the Unifi Participant shall be determined without regard to his employment (other than as provided for by this Section 4) with, and compensation paid by, Buck Consultants, Inc.

5. For purposes of this Appendix D, Buck Consultants, Inc. shall include all corporations that are members of the controlled group of corporations (within the meaning of Section 414(b) of the Code) of which Buck Consultants, Inc. is a member, and any trade or business (whether or not incorporated) which is under common control (within the meaning of Section 414(c) of the Code) with Buck Consultants, Inc.

## RESOLUTONS ADOPTED
## BY THE FINANCE COMMITTEE OF THE BOARD OF
## PARTNERS AND PRINCIPALS OF PRICEWATERHOUSECOOPERS LLP

**WHEREAS,** PricewaterhouseCoopers LLP (the "Firm") sponsors the Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP (the "Employee and Partner Plan"), Savings Plan for Employees of PricewaterhouseCoopers LLP (the "Employee Plan"), and Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "RBAP") for its employees, partners and principals; and

**WHEREAS,** each of the Employee and Partner Plan, Employee Plan and RBAP provides that it may be amended by the Finance Committee of the Board of Partners and Principals (the "Finance Committee") of the Firm; and

**WHEREAS,** the Finance Committee desires to amend the Employee and Partner Plan, Employee Plan and RBAP.

**NOW, THEREFORE, be it:**

**RESOLVED,** that, amendments to the Employee and Partner Plan, to facilitate the employment policies of PricewaterhouseCoopers Securities LLC for its Directors and Managing Directors and increase flexibility in distributions of benefits, be and hereby are adopted in the form attached hereto as Exhibit 1, with such changes, consistent with the intent and purposes of such amendments, thereto as John F. Carter, U.S. Partner Affairs Leader of the Firm, and Roger C. Hindman, a partner of the Firm, or any one of them, may approve, their (his) signature(s) on such changes being final and conclusive evidence of the adoption of any such changes; and

**RESOLVED,** that, amendments to the Employee Plan, to increase flexibility in distributions of benefits, be and hereby are adopted in the form attached hereto as Exhibit 2, with such changes, consistent with the intent and purposes of such amendments, thereto as John F. Carter and Roger C. Hindman, or any one of them, may approve, their (his) signature(s) on such changes being final and conclusive evidence of the adoption of any such changes; and

**RESOLVED,** that, amendments to the RBAP, to facilitate the employment policies of the Firm for its Directors and Managing Directors, be and hereby are adopted in the form attached hereto as Exhibit 3, with such changes, consistent with the intent and purposes of such amendments, thereto as John F. Carter and Roger C. Hindman, or any one of them, may approve, their (his) signature(s) on such changes being final and conclusive evidence of the adoption of any such changes; and

**RESOLVED,** that, John F. Carter and Roger C. Hindman, or any one of them, be and hereby are (is) authorized to execute such other documents and perform such acts as they (he) may deem necessary or appropriate to carry out the intent and purposes of the amendments to the Employee and Partner Plan, Employee Plan and RBAP made by the foregoing Resolutions.

Exhibit 3

**Retirement Benefit Accumulation Plan for Employees of
PricewaterhouseCoopers LLP**

**Statement of Amendment**

The Plan is amended by adding the following before the first sentence of Section 2.15, effective October 1, 2004:

For Participants other than Partners or Principals, an amount equal to five percent (5%) of the Compensation paid to a Participant on a monthly, semi-monthly, biweekly, weekly or other periodic basis in accordance with the Participant's payroll period, except that: (1) a Participant who was a Director on October 1, 2004 shall be allocated an amount equal to seven (7%) (but if such Director shall terminate employment and, thereafter, be rehired by the Employer, then such Director shall upon such rehire be allocated an amount equal to five percent (5%)); and (2) a Participant who is a Managing Director shall be allocated an amount equal to 8%.

G:\TLS\Common\rnacron001\PwC Ret Plans\PwC Plan Resolutions 07 27 04.doc

4

Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP

Statement of Amendment

**Whereas,** on November 8, 2002, the Finance Committee (the "Finance Committee") of the Board of Partners and Principals of PricewaterhouseCoopers LLP ("PwC") amended the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "Plan"), by adding an Appendix E thereto, in connection with the divestiture by PricewaterhouseCoopers LLP of PwC Consulting (the "Transaction") pursuant to a certain Master Stock and Asset Purchase Agreement among PricewaterhouseCoopers Internal Limited and various PricewaterhouseCoopers affiliated parties and International Business Machines Corporation ("IBM"), dated as of July 22, 2002, the U.S. Local Structure Term Sheet thereto, and other related agreements; and

**Whereas,** Appendix E to the Plan provides for the treatment of participants ("PwCC Participants") in the Plan who severed employment from PwC and commenced employment with IBM in connection with the Transaction; and

**Whereas,** the Finance Committee authorized and directed Roger C. Hindman, a partner of PwC, to make any changes to Appendix E as may be necessary to carry out its intent and purposes; and

**Whereas,** a change to Appendix E is appropriate to carry out its intent and purposes.

**Now, Therefore, Be It Resolved,** that Appendix E is changed by adding the following to the first paragraph thereof:

Employees who severed employment from the Firm pursuant to the Scholars Program (the "Program") of PwC Consulting and who are hired by International Business Machines Corporation upon conclusion of their participation in the Program shall have their employment with International Business Machines Corporation credited according to, and subject to the terms of, this Appendix E and be treated as PwCC Participants; provided, however, that Hours of Service shall not be credited for participation in the Program prior to employment with International Business Machines Corporation.

_____
Roger C. Hindman

_____
July 19, 2004
Date

## RESOLUTIONS ADOPTED
## BY THE FINANCE COMMITTEE OF THE BOARD OF
## PARTNERS AND PRINCIPALS OF PRICEWATERHOUSECOOPERS LLP

**WHEREAS**, PricewaterhouseCoopers LLP ("PwC") sponsors the Retirement Plan for Employees of PricewaterhouseCoopers LLP (the "Retirement Plan"), Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "RBAP"), and Profit Sharing Plan for Partners of PricewaterhouseCoopers LLP (the "Profit Sharing Plan") (together, the "Plans"); and

**WHEREAS**, PwC, on June 24, 2002, applied to the Internal Revenue Service ("IRS") for letters of determination that the Plans, as amended to comply with the Uruguay Round Agreements Act, Uniformed Services Employment and Reemployment Rights Act of 1994, Small Business Job Protection Act of 1996, Taxpayer Relief Act of 1997, Internal Revenue Service Restructuring and Reform Act of 1998 and Community Renewal Tax Relief Act of 2000, are tax qualified under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and that the trusts established and maintained thereunder are exempt from income tax under section 501(a) of the Code; and

**WHEREAS**, the IRS, by letters dated February 6, 2004, required, in connection with its consideration of the applications for letters of determination, that certain amendments be made to the Plans; and

**WHEREAS**, PwC, by letters dated February 27, 2004, submitted proposed amendments to the Plans to the IRS; and

**WHEREAS**, the IRS issued favorable letters of determination on the tax qualification of the Plans, dated March 22, 2004, conditioned upon the adoption by PwC of the proposed amendments submitted to the IRS; and

**WHEREAS**, the Plans provide that they may be amended by the Finance Committee of the Board of Partners and Principals of PwC (the "Finance Committee"); and

**WHEREAS,** the Finance Committee desires to amend the Plans, as required by the letters of determination.

**NOW, THEREFORE, be it:**

**RESOLVED,** that, amendments, attached hereto as Exhibit I, to the Retirement Plan be and hereby are adopted; and

**RESOLVED,** that, amendments, attached hereto as Exhibit II, to the RBAP, be and hereby are adopted; and