# Ex. H

Civil Action No. 05-1291

(PLF)

27 Fed.Appx. 100                                                                                                          **Page   1**
27 Fed.Appx. 100, 2002 WL 90976 (3rd Cir.(Del.)), 27 Employee Benefits Cas. 1720,
Pens. Plan Guide (CCH) P 23977U
(Cite as: 27 Fed.Appx. 100, 2002 WL 90976 (3rd Cir.(Del.)))
**H**

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
John V. RYAN,
v.
ASBESTOS WORKERS UNION LOCAL 42
PENSION FUN; Asbestos Workers Union Local 42
Pension Plan; Trustees of Pension Plan, as Plan
Administrator of Local 42
Pension Plan, Appellants.
Nos. 00-2813, 00-2891.

Argued Nov. 26, 2001.
Jan. 24, 2002.

Pension plan participant brought action against pension fund, pension plan, and plan trustees, alleging participant's accrued benefits were reduced in violation of the Employee Retirement Income Security Act (ERISA). The United States District Court for the District of Delaware, Gregory M. Sleet, J., 2000 WL 1800530, granted summary judgment in favor of participant, but denied his motion for attorneys' fees. On parties' cross-appeals, the Court of Appeals, Roth, Circuit Judge, held that: (1) ERISA prohibited retroactive reduction of participant's accrued benefits by operation of trustees' plan amendment, and (2) District Court erred in determining that participant was not entitled to attorneys' fees without setting forth its analysis.

Vacated and remanded.

West Headnotes

[1] Labor and Employment ⇐ 708
231Hk708 Most Cited Cases
    (Formerly 296k88)

[1] Labor and Employment ⇐ 709
231Hk709 Most Cited Cases
    (Formerly 296k143)
A district court must articulate certain aspects of its reasoning in exercising or refusing to exercise its fee-setting discretion under ERISA. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1).

[2] Labor and Employment ⇐ 554
231Hk554 Most Cited Cases
    (Formerly 296k122)
Pension plan participant's benefits were "accrued benefits" rather than "early retirement benefits," and thus ERISA prohibited retroactive reduction of participant's accrued benefits by operation of plan trustees' amendment to plan, although participant retired at age 60 before reaching retirement age, where plan language set forth normal retirement age at any age before 65 for participants who had earned 25 years credited service. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1).

[3] Labor and Employment ⇐ 687
231Hk687 Most Cited Cases
    (Formerly 296k139)
Under an arbitrary and capricious standard of review, courts need not defer to ERISA plan administrators' determinations which are without reason, unsupported by substantial evidence, or erroneous as a matter of law. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[4] Labor and Employment ⇐ 711
231Hk711 Most Cited Cases
    (Formerly 296k143, 296k88)
In each instance in which the district court exercises its fee-setting discretion under ERISA, it must articulate its considerations, its analysis, its reasons, and its conclusions, touching upon the following five factors: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ex. H
Civil Action No. 05-1291
(PLF)

effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1).

[5] Labor and Employment 708
231Hk708 Most Cited Cases
    (Formerly 296k143)
District Court failed to sufficiently set forth its analysis of factors for fee-setting discretion under ERISA, and thus it erred in determining that pension plan participant was not entitled to attorneys' fees in his action against pension fund, pension plan, and plan trustees, where District Court did not mention factors in order refusing to award fees and costs, but rather completely disregarded them. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1).

[6] Federal Courts 945
170Bk945 Most Cited Cases

[6] Labor and Employment 709
231Hk709 Most Cited Cases
    (Formerly 296k143)

[6] Labor and Employment 722
231Hk722 Most Cited Cases
    (Formerly 296k88)
The discretion to set attorney's fees under ERISA is allocated to the district courts and not the courts of appeals, and thus even when a district court judgment is vacated by a court of appeals and remanded for further proceedings, it is the district court which possesses the authority to exercise fee-setting discretion. Employee Retirement Income Security Act of 1974, § 502(g)(1), 29 U.S.C.A. § 1132(g)(1).

*101 Appeal from the United States District Court for the District of Delaware, (D.C. Civil Action No. 97-cv-00604) District Judge: Honorable Gregory M. Sleet.

John M. Stull, Esquire (Argued) John V. Ryan, Jr., Esquire, for Cross-Appellant.

Francis J. Trzuskowski, Esquire, (Argued) William L. Doerler, Esquire, Wilmington, DE, for Appellants/Cross-Appellees.

Before ROTH, FUENTES and WEIS, Circuit Judges.

OPINION

ROTH, Circuit Judge.

**1 Defendants Asbestos Workers Union Local 42 Pension Fund, Asbestos Workers Union Local 42 Pension Plan (Plan), and *102 the trustees of the Plan (Trustees) appeal the District Court's grant of summary judgment in favor of plaintiff John V. Ryan, Jr. Defendants challenge the District Court's conclusion that they violated 204(g) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., by impermissibly reducing Ryan's accrued benefits. On cross-appeal, Ryan challenges the District Court's refusal to award attorney's fees pursuant to ERISA § 502(g)(1). For the reasons stated below, we will affirm the District Court's order granting summary judgment to Ryan. We will, however, vacate the District Court's order, denying attorney's fees, and remand this case to the District Court for further consideration of the fee application.

I. Facts

Ryan is a former member of Asbestos Workers Union Local 42 and a participant in the Local's Pension Plan. The Plan entitles Ryan to receive fixed, periodic pension payments in an amount based upon his Credited Service. The first page of the Summary Plan Description (SPD) states that the Plan provides each participant with "[n]ormal retirement at age 65 if you have less than 25 years of Credited Service and have reached the 5th anniversary date of your participation in the Plan, or at any earlier age that you have 25 years of Credited Service." At page nine, the SPD states that "[i]f you are a participant and have reached your Normal Retirement Date, you may retire and become eligible for a normal retirement pension." "Normal Retirement Date" is defined on page 8 of the SPD as "the date you complete 25 years of Credited Service."

Between 1955 and 1996, Ryan worked in the trade as a member of Local 42 for two different periods. During these periods of employment, he earned a total of 25 years of Credited Service. Ryan earned 14 years of Credited Service between 1955 and

1969, and 11 years of Credited Service from 1984 until his retirement in 1996. Between 1970 and 1983, Ryan worked outside the trade and thus experienced a 13 year "break in service." (In 1983, Ryan returned to work in the trade but did not work long enough to earn any Credited Service during that year.)

Prior to 1983, plan participants could join periods of service for the purpose of pension benefits if the period of service before the break-in-service exceeded the period of the break-in-service. Pursuant to this arrangement, Ryan for example could join a second period of service to his initial 1955-69 period of service if his break-in-service did not exceed 14 years.

In 1983, however, the Plan adopted an amendment which created a two-tier benefit scheme for those participants who experience more than a 10-year break-in-service. As amended, Section 6.01(c) of the Plan states that:

> If a participant has more than one date that he ceased to be an Active Participant a different pension level may apply to each period of active participation in accordance with (b) above. However, if the participant again becomes an Active Participant before he has 10 consecutive One-Year Breaks in Service and has at least 1,000 Hours of Service in each of two Calendar Years after returning to Covered Employment his previous pension level(s) will be disregarded and the pension level in effect when he again ceases to be an Active Participant will be applied to the Credited Service he earned during each period of his active participation.

**2 The parties agree that, given the timing of the amendment, Ryan could not have taken steps to limit his break in service to less than 10 years in order to avoid the two-tiered benefit scheme.

When Ryan retired at age 60, he applied for benefits under the Plan, claiming benefits *103 corresponding to his total 25 years of Credited Service. The Trustees calculated Ryan's benefits under the two-tiered scheme set out in amended Section 6.03(c) because Ryan had experienced a 13-year break-in-service. Under the two-tier benefit scheme, Ryan receives one level of benefits calculated at a rate of $8.50 per month for his first 14 years of Credited Service and another level of benefits calculated at $69.00 per month for his last 11 years of Credited Service. Consequently, Ryan receives a total monthly pension of approximately $855. Ryan appealed this decision, arguing that the higher rate of $69.00 per month should apply to all of his years of Credited Service. Accordingly, Ryan contends that he is entitled to a minimum monthly pension of $1,725 (in addition to other supplemental benefits recently provided to all retired plan participants). Citing amended Section 6.01(c), the defendants disagree.

II. Procedural History

Ryan initiated this action on November 12, 1997, by filing a two count complaint with the United States District Court for the District of Delaware. The complaint alleged that Section 6.01(c) is an illegal rule insofar as it violates the Department of Labor's Rule of Parity, 29 C.F.R. § 2530.210(g) (2001).

On November 6, 1998, defendants filed a motion to dismiss the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), and Ryan filed a cross-motion for summary judgment. After the parties briefed these motions, the District Court requested supplemental briefs addressing whether the application of the amended Section 6.01(c) retroactively decreased Ryan's accrued benefits in violation of ERISA § 204(g)(1). See 29 U.S.C. § 1054(g)(1). After considering the supplemental briefs and oral argument, the District Court denied defendants' motion to dismiss and granted Ryan's motion for summary judgment. See *Ryan v. Asbestos Workers Union Local 42 Pension Fund, et al.*, 2000 WL 1800530 (D.Del. Apr.4, 2000).

Having based its decision on the theory that the granting of a two-tiered pension for Ryan pursuant to the provisions of amended § 6.01(c) violated ERISA § 204(g)(1), the District Court granted Ryan leave to amend his complaint to include this theory of liability. Consequently, on April 18, 2000, Ryan filed an amended complaint, adding the § 204(g)(1) theory of liability as "Count III."

On April 17, 2000, defendants filed a motion for reconsideration which the District Court denied. At the same time, the District Court entered an order declining to award counsel fees in favor of Ryan. Both the defendants and Ryan filed timely appeals.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 Fed.Appx. 100                                                                                                                      **Page   4**
(Cite as: 27 Fed.Appx. 100, *103, 2002 WL 90976, **2 (3rd Cir.(Del.)))

III. Jurisdiction and Standard of Review

The District Court had federal question jurisdiction over the instant case, as the action arose under ERISA. See 28 U.S.C. § 1331. Because the District Court's judgment is final and disposes of all of the parties' claims, we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

**\*\*3** The District Court's grant of summary judgment for Ryan is subject to plenary review. *See, e.g., Reform Party v. Allegheny County Dept. of Elections,* 174 F.3d 305, 312 (3d Cir.1999) (citing *American Med. Imaging Corp. v. St. Paul Fire & Marine Ins. Co.,* 949 F.2d 690, 692 (3d Cir.1991)). In our review of the grant of summary judgment, we apply the same test that the District Court should have applied initially, viewing inferences from the evidence in the light most favorable to the non-moving party. See, e.g., *Goodman v. Mead Johnson & Co.,* 534 F.2d **\*104** 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We will affirm the District Court's grant of summary judgment if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

[1] While ERISA § 502(g)(1) clearly places an award of attorneys' fees within a district court's discretion, Third Circuit precedent makes our review more complex than an "abuse of discretion" review. Compare 29 U.S.C. § 1132(g)(1) with *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983) and *Anthuis v. Colt Industries Operating Corp.,* 971 F.2d 999, 1012 (3d Cir.1992). As explained more fully below, a district court must articulate certain aspects of its reasoning in exercising or refusing to exercise its ERISA § 502(g)(1) fee-setting discretion.

IV. Discussion

A. Grant of Summary Judgment in favor of Ryan

ERISA § 204(g)(1) prohibits the retroactive reduction of "accrued benefits" by operation of a plan amendment. See 29 U.S.C. § 1054(g)(1) (2001); see also *Hoover v. Cumberland Maryland Area Teamsters Pension Fund,* 756 F.2d 977, 984 (3d Cir.1985) ("Section 204(g) of ERISA protects all accrued benefits from reduction by plan amendment, vested or not, and without regard to whether benefits are currently being paid to a participant who has already retired."). The parties agree that the Trustees' amendment to and subsequent application of Section 6.01(c) of the Plan reduced Ryan's benefits. Consequently, the sole issue raised by defendants on appeal is whether Ryan's benefits are "accrued benefits" as defined in ERISA and protected by § 204(g)(1).

[2] Citing the clear language of the SPD, the District Court found that Ryan's benefits are accrued benefits. We agree with the District Court's conclusion. Section 3(23) of ERISA defines "accrued benefit" as "the individual's accrued benefit determined under the plan ... expressed in the form of an annual benefit commencing at normal retirement age...." 29 U.S.C. § 1002(23)(A). In Ryan's case, the term "normal retirement age" means the earlier of "the time [Ryan] attains normal retirement age under the [P]lan, or ... the time [Ryan] attains age 65...." *Id.* at 1002(24). Ryan was younger than 65 when he started receiving his benefits. Therefore, his benefits are accrued benefits only if he began receiving them at an earlier "normal retirement age" set forth in the Plan.

**\*\*4** The defendants contend that Ryan's benefits are in fact early retirement benefits and for that reason are not protected by § 204(g). Defendants contend that the District Court erred by confusing retirement date with retirement age-and since Ryan had not reached the retirement age of 65, his retirement was an early one.

We conclude, however, that Ryan did not take early retirement and that the District Court correctly determined that his accrued benefits were protected by § 204(g).

The SPD language quoted above provides each participant with "[n]ormal retirement ... at any earlier age that [he or she has] 25 years of Credited Service." The District Court, therefore, correctly found that the Plan set forth a normal retirement age at any age before 65 for participants who have earned 25 years Credited Service and correctly concluded that Ryan's benefits are accrued benefits.

This result is supported by our decision in *Geib v. New York State Teamsters Conference Pension &*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Retirement Fund,* 758 F.2d 973 (3d Cir.1985). In Geib, we addressed the issue whether ERISA § 203(a) protects pensioners from the suspension of *105 benefit payments received before normal retirement age. See 758 F.2d at 976.

Answering this question in the negative, we found that the plan at issue in Geib failed to set forth a normal retirement age earlier than age 65 as permitted by ERISA § 3(24). See *id.* at 976-77. The Geib court distinguished *Nichols v. Board of Trustees of the Asbestos Workers Local 24 Pension Plan,* 1 E.B.C. (BNA) 1868 (D.D.C.1979), on which plaintiffs relied, noting that the language of the plan at issue in Nichols did set forth 25 years of credited service as a normal retirement age. See 758 F.2d at 976. The plan language in Nichols was substantively identical to the SPD language quoted above. It read:

> An employee shall be eligible to receive a Normal Pension if he retires after:
> a) he has been credited with twenty-five (25) years of credited service at any age, or b) he has attained the age of sixty-five (65) and has been credited with a minimum of five (5) years of credited service.
> Nichols, 1 E.B.C. (BNA) at 1868. Geib's conclusion regarding the plan at issue in Nichols supports the conclusion that the Plan here sets an alternative normal retirement age at the time that a participant attains 25 years of Credited Service.

We note moreover that Ryan's retirement benefits have not been actuarily reduced to award to him at age 60 the present value of his age 65 benefits. If in fact his benefits had been considered by the Trustees to be early retirement benefits, they would have been so reduced.

[3] Defendants contend nevertheless that the Trustees did not act arbitrarily and capriciously when they awarded benefits to Ryan under the two tier system. We have, however, determined as a matter of law that the two tier system does not apply under the undisputed facts of Ryan's situation. Under an arbitrary and capricious standard of review, we need not defer to the Trustees' decisions which are "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Courson v. Bert Bell NFL Player Retirement Plan,* 214 F.3d 136 (3d Cir.2000) (emphasis added). See also *Skretvedt v. E.I. DuPont de Nemours and Co.,* 268 F.3d 167, 2001 WL 1185796 (3d Cir.2001); *Abnathya v. Hoffmann-La Roche, Inc.,* 2 F.3d 40 (3d Cir.1993).

**5 We will therefore affirm the summary judgment in favor of Ryan.

B. Denial of Attorney's Fees

[4] In deciding whether to award attorney's fees pursuant to ERISA § 502(g)(1), a district court must consider the following five factors: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position. See *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983). See also *McPherson v. Employees' Pension Plan of American Re Insurance Co.,* 33 F.3d 253 (3d Cir.1994) (expounding the first, third and fifth Ursic factors). Furthermore, "in each instance in which the district court exercises its fee-setting discretion, it must articulate its considerations, its analysis, its reasons and its conclusions touching on each of the five factors delineated in Ursic." *Anthuis v. Colt Industries Operating Corp.,* 971 F.2d 999, 1012 (3d Cir.1992).

[5] That the District Court failed to sufficiently set forth its analysis of the five Ursic factors is plain from the face of its order accompanying Ryan II. In refusing to award fees and costs, the District Court wrote only "[i]n its discretion, the court *106 will decline to award counsel fees in favor of the Plaintiff." Significantly, the District Court did not mention any of the Ursic factors. Such a complete disregard of Ursic fails to satisfy our requirements. See Anthuis, 971 F.2d at 1012 (holding the district court's recitation of two of the five Ursic factors without analysis insufficient).

[6] It would not be appropriate for this Court to analyze the Ursic factors and make a determination regarding Ryan's request for attorneys' fees on appeal. As Judge Weis stated in Ursic, "the discretion to set attorney's fees is allocated to the district courts and not the courts of appeals. Even when a district court judgment is vacated by this court and remanded for further proceedings ... it is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

27 Fed.Appx. 100 **Page 6**
(Cite as: 27 Fed.Appx. 100, *106, 2002 WL 90976, **5 (3rd Cir.(Del.)))

the district court, and not this court, which possesses the authority to exercise fee setting discretion." *Ursic*, 719 F.2d at 674 (citations omitted). Accordingly, we will vacate the District Court's order denying Ryan's request for attorneys' fees and remand this matter to the District Court for further consideration of this issue.

27 Fed.Appx. 100, 2002 WL 90976 (3rd Cir.(Del.)), 27 Employee Benefits Cas. 1720, Pens. Plan Guide (CCH) P 23977U

Briefs and Other Related Documents (Back to top)

. 00-2891   (Docket)
(Oct. 11, 2000)

. 00-2813   (Docket)
(Sep. 29, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 1
1989 WL 37154 (D.D.C.)
(Cite as: 1989 WL 37154 (D.D.C.))

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Betty Jo MAYESKE, et al., Plaintiffs,
v.
The INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, et al., Defendants.
CIV. A. No. 86-3283(RCL).

March 30, 1989.

MEMORANDUM OPINION

LAMBERTH, District Judge.

*1 Plaintiffs, former staff members of the federally funded Open Learning Fire Service Program ("OLFSP"), brought this action under section 502(a) of the Employee Retirement Income Security Act ("ERISA") of 1974, *as amended,* 29 U.S.C. § 1132(a) (1982), [FN1] under section 410(b) of the Internal Revenue Code, as third party beneficiaries under a contract between defendant International Association of Fire Fighters ("IAFF"), and for accumulated vacation pay, leave time, and severance pay. The action is brought against three employee pension plans, the organizational sponsor of those plans--the International Association of Fire Fighters, trustees of the plans, and various officers of the IAFF, alleging that plaintiffs were improperly excluded from participation in the pension plans, and that defendants retaliated against plaintiffs for attempting to exercise their ERISA rights under the plans. Plaintiffs seek injunctive relief, compensatory and punitive damages, and fines imposable under ERISA [FN2] for failure to provide copies of the pension plan documents to plaintiffs upon request. Finally, plaintiffs allege that defendants improperly charged the federal government, in funding proposals for OLFSP, for pension plan contributions that were never made on behalf of the OLFSP employees, and that as putative third party beneficiaries of the contract between the government and defendants, plaintiffs are entitled to those improperly charged amounts. The matter is currently before this Court on several motions and cross-motions, including defendants' joint motion for summary judgment and in the alternative to strike plaintiffs' demand for punitive damages and a jury trial, plaintiffs' cross-motion for partial summary judgment on their complaint, plaintiffs' unopposed motion for leave to amend the complaint, plaintiffs' motion for substitution of a deceased party plaintiff, and defendants' motion for leave to file an amended answer.

*I. FACTS*
The essential facts in this case are straightforward and largely undisputed. Defendant International Association of Fire Fighters is a Washington, D.C. based labor organization, representing some 170,000 paid fire fighters throughout the United States and in Canada. As a condition of membership, all members pay monthly dues, which are used in part to fund the salaries of the union president and secretary-treasurer as well as the expenses of the sixteen IAFF vice presidents, who receive, in lieu of salary, per diem and expenses while on assignment for the IAFF. The two IAFF principal officers and sixteen vice presidents make up the IAFF Executive Board. In addition to this executive board, the IAFF employs support staff for its headquarters office and staff representatives, who work in the field assisting IAFF local union affiliates. The salaries for both the support staff and staff representatives are financed through member dues.

Defendant John A. Gannon is currently, as he has been since 1980, the president and highest elected officer of the IAFF. Defendant Alfred K. Whitehead is currently, and has been since 1982, the secretary-treasurer of the IAFF. The other named defendants, Elliott Hastings, James McGowan, and Daniel Eberhart, are trustees and fiduciaries of the various IAFF pension plans, and Hastings and McGowan serve as IAFF vice presidents as well.

*2 The IAFF maintains [FN3] three pension plans--covering separate groups of officers and employees--each of which is named a defendant in this action: the IAFF Officers Retirement Plan (covering the president and secretary-treasurer), the IAFF Staff Representatives (covering staff representatives who are members of the IAFF Staff Union and certain IAFF department heads and managerial employees for whom the Staff Union negotiates pension benefits), and the IAFF Employees Plan (covering, primarily, dues paying members of the Office and Professional Employees International Union, Local 2, the exclusive bargaining agent for IAFF non-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-18    Filed 07/29/2005    Page 9 of 14

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *2 (D.D.C.))

Page 2

supervisory office employees; managerial employees; and the secretaries to the two principal IAFF officers). With the exception of the IAFF Officers Plan, each of the plans is noncontributory-- the participants make no contributions, rather, contributions are made on their behalf by the IAFF. Moreover, each of the plans has been in existence for many years, the oldest plan being the Employees plan, which was initially effective on August 1, 1957, with subsequent revisions effective on July 1, 1976 and July 1, 1985.

In 1977, defendant IAFF was awarded a federal grant for a one year study to develop higher education opportunities for fire fighters. Plaintiff Betty Jo Mayeske was retained to conduct the study. Following the study, in 1978, IAFF was awarded a follow-on federal grant to develop the Open Learning Fire Service Program, designed to enable fire fighters to earn college credits and baccalaureate degrees through correspondence and independent study courses. The project grant, which required annual approval and funding from the Federal Emergency Management Agency's ("FEMA") National Fire Academy and its predecessor agencies, was initially planned to last only through a five-year developmental stage. Plaintiff Mayeske was continued by the IAFF as the Project Director for the OLFSP.

As the project director, Mayeske interviewed and hired the other plaintiff staff members for clerical and administrative positions within the OLFSP core staff. Plaintiff Betty Morrison was hired in December 1980 as a secretary-bookkeeper, and was subsequently promoted by Mayeske to the position of production coordinator. Plaintiff Shavanna King was hired by Mayeske in August 1981 as a clerk-typist, and was later promoted to secretary. Plaintiff Charles David Martin [FN4] was hired in September 1985 as an administrative assistant. Both Mayeske and the other plaintiffs concede that they were specifically informed and understood that their employment was subject to the annual availability of federal funds. More significantly, each was specifically informed at the start of his or her employment that as "federal grant employees," members of the project staff were not covered by any pension plan. (Mayeske Deposition, pp. 59-60; Morrison Deposition, p. 19; King Deposition, p. 16; Martin Deposition, pp. 37-38).

While the OLFSP was sponsored by defendant IAFF from 1977 through November 1986, it remained largely autonomous. To begin with the OLFSP was funded almost exclusively by FEMA and its predecessor agencies, with IAFF contributing only a nominal amount for supplies and other non-personnel related costs. Additionally, the OLFSP staff maintained offices separate from, though physically collocated with, the IAFF offices. Third, as discussed above, plaintiff Mayeske interviewed and hired the other plaintiff OLFSP staff members. Lastly, the OLFSP program objectives and requirements required government approval and were set forth in a detailed, annual request for federal assistance--funding proposal-- which Mayeske and her staff prepared. Although the IAFF president signed the proposal and resulting agreement as "grantee/contractor" and had general oversight responsibility for the OLFSP, he did not exercise day to day control over the project staff. Rather, Mayeske, as the Project Director and "Recipient Program Manager," acted as the "principal official of the Recipient involved in the project.... [,] responsible for assuring performance of tasks outlined in [the] Cooperative Agreement [with FEMA] and compliance with all of its provisions." Fiscal Year 1986 Application for Federal Assistance and Cooperative Agreement, Plaintiffs' Exhibit 170 at 70. The remaining plaintiffs occupied various core staff and administrative positions within the OLFSP, and under plaintiff Mayeske's direction, administered the program according to the federally approved operational parameters.

*3 Each Spring between 1978 and 1986, plaintiff Mayeske and her staff would prepare draft program objectives and a proposed program budget, for submission, under the signature of the president of the IAFF, to the federal funding agency. The draft budgets included, among other things, the salaries and fringe benefits for OLFSP core staff positions held by plaintiffs. In preparing these annual funding proposals, plaintiffs were instructed by the IAFF to use specified overhead and fringe benefit rates prepared by the IAFF accounting department and which had previously been negotiated between the IAFF and the federal funding agency. The parties agree that while the overhead and fringe benefit rates may have varied somewhat from year to year, the accounting methodology and proposed budget format remained unchanged, and from 1982

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR   Document 9-18   Filed 07/29/2005   Page 10 of 14

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *3 (D.D.C.))

Page 3

until 1986 took the form of a cooperative agreement. In June 1983, IAFF's then president Gannon sent each of the IAFF grant program directors [FN5] written instructions for determining the overhead and fringe benefit rates to be included in funding proposals to the federal government. Plaintiffs' Exhibit 156. Notably, an attachment to that memorandum expressly defined fringe benefits as "annual leave earned, sick leave *used,* holidays, F.I.C.A., unemployment compensation, workmen's compensation, health insurance, and life insurance," *id.* (emphasis in original), but did not include in the definition pension costs. Neither the funding proposals nor resulting cooperative agreements themselves defined fringe benefits, but merely included the pre-negotiated percentage rates. The parties disagree as to whether those rates used in the annual funding proposals in fact included pension costs within the term "fringe benefits."

Plaintiffs' first indication that they may have been included in, or eligible to participate in, one of the IAFF pension plans came in June 1986 when three of the plaintiffs were solicited by the IAFF to form a union of grant employees for the purpose of bargaining with the IAFF about fringe benefits. Unbeknownst to plaintiffs at the time, the IAFF officers had previously been advised in early 1985, by their pension plan actuary and advisor, Elizabeth Poston, that should the Internal Revenue Service ("IRS") conclude that the grant employees were IAFF "employees" within the meaning of the Internal Revenue Code ("IRC") section 410(b)(1), [FN6] the plans would not meet the nondiscriminatory coverage requirements of the Code and would therefore lose their tax exempt status. Defendants were thus faced with a number of options, both direct and indirect, for dealing with the potential tax problem. To begin with, defendants could have confronted the employee characterization issue directly by requesting an IRS determination that the plans, excluding grant employees, were not discriminatory (presumably because the grant employees were not IAFF employees within meaning of the IRC). [FN7] However, defendants considered, and initially attempted, the more indirect solution of assuming the grant employees would be considered IAFF employees, but making pension plans be a subject of negotiation with the grant employees so that those employees could continue to be excluded from the plans without running afoul of the IRC nondiscriminatory requirements. With that admitted ulterior purpose in mind, defendants approached plaintiffs with a document creating a grant employee bargaining unit to negotiate "additional fringe benefits." [FN8] Plaintiffs' Exhibit 103, "Agreement Establishing the Association of IAFF Grant Employees." While not knowing the background details or specifics of the ulterior motive, plaintiffs were nonetheless suspicious enough of defendants' offer to refuse to sign the document and collectively seek legal advice. Shortly thereafter, on June 27, 1986, plaintiffs' newly retained attorneys hand-delivered a letter to IAFF President Gannon, which explained that they had been retained "to represent your employees in the Open Learning Fire Service Center" regarding "their participation rights in the [unspecified IAFF] pension plan, and a proposal currently being circulated to form an association of grant employees." In addition, the letter requested a copy of the IAFF Officers Retirement Plan and related documents. Rather than responding to the letter, Gannon confronted Mayeske, and reiterated the IAFF position that she had no pension rights. Thereafter, plaintiffs' attorneys made another written request, this time to the IAFF General Counsel, Thomas Woodley, for copies of plan documents for all three IAFF pension plans and the latest annual reports for each plan. Woodley responded in writing the following day, refusing the request and explaining that because the OLFSP staff members were neither participants nor beneficiaries of any of the pension plans they were not legally entitled to obtain plan documents. The same day, unbeknownst to defendants, plaintiffs' attorneys sent letters to both the IRS and Department of Labor, complaining that one or more of the IAFF pension plans were discriminatory, and requesting Labor to conduct an investigation of allegedly retaliatory actions being taken by the IAFF against their clients.

*4 Relations between the IAFF and OLFSP were, perhaps not surprisingly, less than cordial throughout the summer months of 1986. Plaintiffs characterize the sequence of events that summer as a "program of retaliation," Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute at 20, while defendants insist that "a number of issues and concerns arose regarding OLFSP," Defendants' Statement of Facts as to Which There is No Genuine Dispute at 12. First,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
(Cite as: 1989 WL 37154, *4 (D.D.C.))

defendants decided not to allow plaintiffs Mayeske and Morrison to represent the OLFSP at the IAFF's annual convention, despite the fact that the OLFSP had been represented in previous years, and despite the fact that it had been scheduled to appear that year. N.L.R.B. Testimony of Betty Jo Mayeske at 278-80. While defendants explain that their decision was based on the fact that FEMA funding for the following year was unlikely, and representation at the convention would therefore be somewhat futile, they nonetheless ultimately compromised, allowing reduced representation. Plaintiffs' Exhibit 96, July 17, 1986 Memorandum from Gannon to Mayeske. Later, defendants decided to step up the enforcement of parking rules, limiting the underground, most convenient, spaces to IAFF directors, thereby allegedly "revoking" plaintiff Mayeske's parking privileges. Defendants, on the other hand, insist that they simply insisted that the OLFSP staff not use more than the one space to which they were entitled, and that Mayeske never had to pay for parking in any event. Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 20. Finally, during its September 1986 meeting, the IAFF Executive Board voted to discontinue IAFF sponsorship of the OLFSP. In a letter of notification to the Director of FEMA on September 30, 1986, defendant Gannon, on behalf of the IAFF Executive Board, suggested "that the National Fire Academy would probably be the best educational arm of the fire service to handle this project and we are highly recommending that the program be moved to Emmitsburg, MD." Defendants' Statement of Facts as to Which There is no Genuine Dispute at Tab 23. The IAFF affiliation with the OLFSP thus ended in November 1986 at the conclusion of the existing cooperative agreement. Contemporaneously, because FEMA was unprepared to assume direct control and administration of the OLFSP, the employment of the OLFSP staff was terminated. Plaintiffs brought this action on November 28, 1986. [FN9]

II. DISCUSSION
A. Plaintiffs' ERISA Claims

1. Statute of Limitations

In their amended answer, for which leave to file was sought after cross motions for summary judgment, and on the eve of the dispositive motions hearing before this Court, defendants raised the affirmative defense of a limitations period having run on plaintiffs' ERISA claims. While defendants first raised the limitations defense in their motion for summary judgment, it was not until plaintiffs' memorandum in opposition--pointing out that under Rule 8(c) of the Federal Rules of Civil Procedure, defendants had waived any affirmative defenses not raised in their answer--that defendants attempted to correct the procedural defect in their pleadings. Rule 15(a) allows amendment of a party's pleadings, by leave of the court, and provides that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Moreover, the Federal Rules are not intended to be a procedural trap for the unwary. *Cf., SEC v. National Student Marketing Corp.*, 73 F.R.D. 444, 447 (D.D.C.1977) (allowing SEC to conform pleadings to evidence five years after complaint filed, where opposing party was not taken by surprise and was fully prepared to litigate). Although plaintiffs assert that "permitting amendment here would undermine rather than serve the ends of justice," because plaintiffs were not apprised of the defense in time to "prepare to defend against it," Plaintiffs' Opposition to Defendants' Motion for Leave to File an Amended Answer at 5-6, plaintiffs have not shown that they would, or could, have prepared their case any differently had defendants not been dilatory in correcting their pleadings. Indeed, all of the necessary facts are, and were, already a matter of record. Hence, plaintiffs' reliance on *Anderson v. U.S. Air, Inc.*, 619 F.Supp. 1191, 1198 (D.D.C.1985), aff'd., 818 F.2d 49, 57 (D.C.Cir.1987), is misplaced. Here, unlike in *Anderson,* there is no delay necessitated by allowing the amendment. Moreover, as is further discussed below, defendants' limitations defense is unavailing in any event.

*5 Both plaintiffs and defendants agree on the appropriate statute of limitations period applicable to each part of plaintiffs' ERISA claims. First, plaintiffs' claim for pension plan benefits is brought under ERISA section 502(a)(1)(B) [FN10], which has no express statute of limitations. Because the statute does not provide a specified limitation period, the Court must necessarily turn to the limitation period from the most closely analogous state law cause of action. *Richards v. Mileski,* 662 F.2d 65, 68 (D.C.Cir.1981) (where Congress has not provided express limitation period, court must use local statutes of limitation). Courts in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *5 (D.D.C.))

Page 5

circuit have consistently held that the applicable limitation period for a claim for benefits under ERISA section 502(a)(1)(B) is three years, consistent with the District of Columbia limitation period for actions sounding in contract. *Estate of Grant v. U.S. News and World Report, Inc.,* 639 F.Supp. 342, 347-48 (D.D.C.1986) (reasoning that "[c]ourts have generally likened a claim for benefits due to a suit on a contract," court applied D.C.Code Ann. § 12-301(7)). Second, plaintiffs' claim for breach of fiduciary duty in excluding them from coverage under the pension plans is brought under ERISA section 404, which does have an express limitations period. Specifically, ERISA section 413 provides a six year limitations period from the date of the last act or omission constituting a breach of fiduciary duty, unless the plaintiff knew or should have known of the breach or violation, in which case the limitations period is reduced to three years from the date of that actual or imputed notice. [FN11] Plaintiffs and defendants disagree, however, on the time at which the two limitation periods began to run. Defendants argue, somewhat disingenuously, that because plaintiffs were expressly told, in their initial employment interviews, that they were not covered by any of the IAFF pension plans, both limitation periods began to run at that point. On the other hand, plaintiffs correctly note that it was not until the summer of 1986 that they had any indication that they may have been covered by, or eligible to participate in, the IAFF plans. In other words, assuming for the moment that plaintiffs are entitled to rights and benefits under one or more of the IAFF plans, then defendants could not trigger the limitation period by lying to the plaintiffs and then withholding the only information that would give plaintiffs reason to question what defendants had told them. Indeed, ERISA section 413 specifically addresses this very issue, and tolls the limitations period "in the case of fraud or concealment." ERISA § 413(a), 29 U.S.C. § 1113(a); *supra* n. 11. The same rule obtains in plaintiffs' section 504 claim for benefits. Under federal common law, as applied to ERISA actions, [FN12] the limitation period does not begin to run until plaintiffs knew or should have known the facts underlying a cause of action. *See Richards v. Mileski,* 662 F.2d at 68-71 (where defendant fraudulently concealed facts giving rise to plaintiff's claim, limitation period is tolled until plaintiff discovers or reasonably could have discovered those concealed facts). As the Supreme Court explained in an analogous case dealing with Social Security claimants who had been denied benefits on the basis of an undisclosed internal policy of the Social Security Administration, while plaintiffs may have known that they had lost or been denied benefits, they had no way of knowing "that those adverse decisions had been made on the basis of a systemic procedural irregularity that rendered them subject to court challenge," and thus it is not until plaintiffs have had a reasonable opportunity to discover that "systemic procedural irregularity" that the statute of limitations begins to run. *Bowen v. City of New York,* 476 U.S. 467, 480-81 (1986) (quoting from the opinion of the Second Circuit Court of Appeals, 742 F.2d 729, 738). Here, as in *Bowen,* plaintiffs had no way of knowing that they were being denied benefits *improperly,* if in fact the denial was improper, until they had been given the plan documents or otherwise put on notice that they may have been eligible to participate in the plans. It was not until defendants' actions during the summer months of 1986 that plaintiffs had any reason to believe that defendants had misrepresented plaintiffs' status under the IAFF plans. Plaintiffs certainly did not sit on their rights at that point, but rather, filed suit within a matter of months after defendants first approached them with the ill-fated plan to organize the grant employees into a bargaining unit. Hence, even considering defendants' late-filed limitations defense--by allowing defendants leave to amend their answer-- defendants have not shown that plaintiffs' ERISA claims are time-barred.

*6 2. Plaintiffs' Claim of Entitlement to Coverage Under the IAFF Plans

To maintain a claim under ERISA section 502(a) for benefits due under one of the IAFF pension plans, or to clarify or enforce rights under any of those plans, plaintiffs must first show that they come within one of the classes granted standing under the ERISA remedial scheme. That is, plaintiffs must each qualify as either a participant, beneficiary, or fiduciary of one of the plans. ERISA § 502(a), 29 U.S.C. § 1132(a); *supra* n. 1. Plaintiffs do not claim to be beneficiaries [FN13] or fiduciaries of any of the IAFF plans. Rather, plaintiffs argue that they were employees of the IAFF and therefore eligible to participate, if not actually participants, in at least one of the IAFF pension plans.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *6 (D.D.C.))

Page 6

"Participant" within the statutory scheme of ERISA is a subset of the term "employee." The Act defines a participant as an "employee or former employee of an employer ... who is or may be eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer...." 29 U.S.C. § 1002(7). The Act unhelpfully defines "employee" as "any individual employed by an employer." 29 U.S.C. § 1002(6). Because "[t]he statutory definition thus provides little or no guidance," *Holt v. Winpisinger,* 811 F.2d 1532, 1538 (D.C.Cir.1987), this Circuit has recently explained that to determine employee status "one must look to common-law rules of agency status," *Holt,* 811 F.2d at 1538; [FN14] *but see Darden v. Nationwide Mutual Insurance Co.,* 796 F.2d 701, 706 (4th Cir.1986) (concluding that "the common-law test for the relationship of master and servant is not the appropriate standard for application" in determining employee status under ERISA; rather, the term "employee" must be "considered 'in the light of the mischief to be corrected [by ERISA] and the end to be attained' "). [FN15]

i. Plaintiffs Status as "Employees"

In applying the common-law standard, "the right of one party to control not only the result to be achieved by the other, but also the means and manner of performing the task assigned, is the most critical factor in ascertaining whether an employment relationship exists." *Holt,* 811 F.2d at 1539 (citations omitted). Although in some circumstances "the right-to-control test alone might be dispositive," the common-law also looks to other factors to help "differentiat[e] between an employee and an independent contractor." *Id.* at 1540, n. 54. In particular, the Restatement (Second) of Agency § 220(2) (1958), cited with approval in *Holt,* 811 F.2d at 1540 n. 54, lists the following factors which indicate the existence of an employment relationship:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

*7 (d) the skill required in the particular occupation;

(e) whether the employer or workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2) (1958).

Applying these factors to the facts at hand, the Court finds as a matter of law that plaintiffs were independent contractors and not employees of defendant IAFF. First, and of primary significance, defendants had limited, if any, control over the details, or day to day operations, of plaintiffs' work. The details and itemized tasks to be accomplished each year were proposed by plaintiffs, and approved by the federal funding agency. While defendants had general oversight responsibility, it was plaintiff Mayeske, as director of the OLFSP, who had the responsibility for ensuring compliance with the cooperative agreements. Moreover, the other factors set forth in the Restatement (Second) of Agency overwhelmingly indicate that no employment relationship existed. The OLFSP was almost entirely funded through federal funds, and was not integrally related to the primary business of the IAFF, which is to promote and secure improved wages, hours and working conditions of fire fighters through collective bargaining and legislative lobbying. Performance of the OLFSP work called for the sort of specialized skill for which employers would normally hire independent contractors-- indeed, the OLFSP itself was a direct follow-on to a year-long, independent study conducted by plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *7 (D.D.C.))

Page 7

Mayeske. The OLFSP offices were functionally, though not physically, separate from those of the IAFF. The plaintiffs were employed for a specific project, operation of the OLFSP, and understood that their employment was on a year to year basis, subject to the continued availability of federal funds. Indeed, of the factors set forth in the Restatement (Second) of Agency, only one, the fact that plaintiffs were paid a salary, weighs in favor of finding an employment relationship. Finally, even if the Court were to conclude that *Darden* broadened the definition of employee, plaintiffs' position is not improved. First, plaintiffs have not shown that defendants did anything to lead them to believe that they were covered by a pension plan. Indeed, just the opposite is true. Defendants told plaintiffs that they were "grant employees," and as such, were not only subject to yearly uncertainty about continued employment, but were not covered by any of the IAFF pension plans. Second, plaintiffs do not meet the second prong of the *Darden* test. Plaintiffs have not shown that they relied on an expectation of pension benefits, or worked "long years" for the IAFF, foregoing other retirement preparations such that they are harmed by the sudden lack of IAFF pension benefits. *Darden,* 796 F.2d at 706. In sum, under either the traditional common-law test, or the test set forth in *Darden,* plaintiffs cannot properly be considered employees of the IAFF within the meaning of ERISA.

ii. Plaintiffs' Status as "Participants"

*8 Because plaintiffs were not IAFF "employees" within the meaning of ERISA, it follows that they were not "participants" either. Hence, plaintiffs have no ERISA-related entitlements or protections with respect to any of the IAFF plans. Indeed, plaintiffs do not even have standing under ERISA to maintain this action, and defendants' motion for summary judgment on plaintiffs' ERISA claims can properly be granted for that reason alone. However, defendants argue, and the Court agrees, that even if plaintiffs were considered "employees" of the IAFF within the meaning of ERISA, they would still not qualify as "participants."

A participant under ERISA is one who, in addition to being an "employee," also "is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer...." 29 U.S.C. § 1002(7); *supra* at 18. The Supreme Court, in *Firestone Tire & Rubber Co. v. Bruch,* No. 87-1054 (U.S. Feb. 21, 1989) (available on 1989 U.S. LEXIS 599), interpreted the ERISA term "participant" to "mean either 'employees in, or reasonably expected to be in, currently covered employment' ... or former employees who 'have ... a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits...." *Firestone Tire & Rubber,* No. 87-1054, slip op. at 11 (citations omitted). In sum, the Court held that for a claimant "to establish that he 'may become eligible for benefits,' [he] must have a colorable claim that (1) he will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.*

Plaintiffs argue that under the "plain and simple language" of the IAFF pension plan documents, all of the OLFSP employees were participants in at least one plan. Specifically, they point to the fact that the Employees Plan, in effect from 1976 until June, 1986, stated that it covered

> any person, excluding officers, excluding staff representatives, and excluding supervisory employees not subject to collective bargaining, who is employed by the Employer.

IAFF Employees Plan (1976). [FN16] In addition, they argue that while Mayeske and Morrison, who were supervisory employees not subject to collective bargaining, may not have come within the broad language of the Employees Plan, they nonetheless were covered by the equally broad language of the 1975 Staff Representatives Plan, which by its own terms covered

> any person who, on or after the effective date of the Plan, is employed by the Employer as either a staff representative or a supervisory employee not covered by a collective bargaining agreement.

IAFF Staff Representative Plan (1975). Read together, plaintiffs argue, the two plans covered all of the OLFSP employees, and the defendant plan trustees therefore breached their fiduciary duty to plaintiffs by refusing to allow plaintiffs to participate in the plans.

In reviewing the trustees' decision to exclude plaintiffs from coverage under the pension plans, the Court applies a *de novo* standard of review.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.