Case 1:05-cv-01291-JR   Document 9-19   Filed 07/29/2005   Page 1 of 16

Not Reported in F.Supp.  
(Cite as: 1989 WL 37154, *8 (D.D.C.))

Page 8

*Firestone Tire & Rubber Co.*, No. 87-1054, slip op. at 10. [FN17] To find that defendant trustees improperly excluded plaintiffs from coverage, plaintiffs must have had a "colorable claim" that they were eligible to receive benefits or would have fulfilled any eligibility requirements in the future. As is often the case, the validity of plaintiffs' claims turns on the interpretation of the terms in the plan themselves. *Firestone Tire & Rubber Co.*, No. 87-1054, slip op. at 10. Here, the key terminology, in both plans at issue, is the phrase, "who is employed by the Employers." Defendant trustees could quite reasonably have determined, and indeed this Court does so determine *de novo*, that the grant employees were not "employed" by the IAFF within the meaning of the IAFF plans.

*9 In fact, many of the same factors which led the Court to conclude that plaintiffs were not "employees" of the IAFF within the meaning and protection of ERISA, *supra* at 22-23, apply equally as well to the interpretation of "employed by the Employer." Principally, the grant employees were not similarly situated with other IAFF employees; unlike other IAFF employees, the grant employees were not "permanent"--they were hired on a yearly basis for particular projects--and their salaries were not paid by the IAFF. Moreover, the Court's conclusion is buttressed by the fact that the same interpretation was applied consistently. Plaintiffs do not dispute the fact that none of the various grant employees involved in any of the IAFF-sponsored programs over the years has been covered under any IAFF pension plan during his or her tenure with the program. Nor does the fact that the plans were subsequently changed--to make more explicit the exclusion of the grant employees--strengthen plaintiffs' argument. Indeed, those plan amendments, coupled with the undisputed fact that defendant IAFF officers never even considered the option of including the grant employees in any of the pension plans, supports defendant trustees' interpretation that plaintiffs were intended to be excluded by the original plan documents. That is, the plan amendments clarified rather than modified the terms of the original plans.

Finally, plaintiffs' argument that defendants have defeated the intent of ERISA by denying them coverage is simply incorrect. While ERISA protects participants from losing accrued benefits, it does not *require* employers to provide pension plan coverage to its employees in the first place. *Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees*, 740 F.2d 454, 456 (6th Cir.1984), *cert. denied*, 469 U.S. 1109 (1985) ("[A]n employer has no affirmative duty to provide employees with a pension plan. H.Rep. No. 93-807, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 4670, 4677.); *Phillips v. Amoco Oil Co.*, 614 F.Supp. 694, 709 (S.D.Ala.1985), *aff'd*, 799 F.2d 1464 (11th Cir.1986), *cert. denied*, 481 U.S. 1016 (1987) ("ERISA does not require that employers provide employee benefits at all; does not confer a general right to continued employment in order to earn vested retirement benefits or to become eligible for other benefits; and does not mandate level or amount of such benefits."). Rather, it was designed to ensure that employee pension expectations, *once established*, would not be defeated. *Darden*, 796 F.2d at 706 ("Congress was concerned that 'many employees with long years of employment are losing anticipated retirement benefits.' "); *see also, Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981) ("Congress through ERISA wanted to ensure that 'if a worker has been promised a defined pension benefit upon retirement--and if he has fulfilled whatever conditions are required to obtain a vested benefit-- ... he acually receives it.' ") (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375 (1980)). That is, as the United States Court of Appeals for the Fourth Circuit found in *Darden*, the Act was intended to protect employees who had been led to expect pension benefits, and who relied on those expectations to their detriment by continuing to serve the employer for many years, only to have their employment terminated prior to the vesting of pension benefits. *Darden*, 796 F.2d at 706. Plaintiffs, as discussed above, were never led to believe that they would be covered by a pension plan. Nor is there any evidence that they otherwise expected to be covered, much less relied on that expectation.

*10 3. Plaintiffs' Claims of Retaliation and Denial of Access to Plan Documents

Aside from plaintiffs' lack of evidence of a retaliatory motive behind any of defendants' actions during the summer months of 1986, for which defendants have provided adequate non-retaliatory explanations, [FN18] because plaintiffs were neither

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-19    Filed 07/29/2005    Page 2 of 16

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *10 (D.D.C.))

Page 9

employees nor participants within the context of ERISA, they had no "ERISA rights" to exercise. Hence, the defendant IAFF officers can hardly be said to have violated ERISA section 510, [FN19] by retaliating against plaintiffs "for exercising any right to which [they were] entitled" under the provisions ERISA or an employee benefit plan, 29 U.S.C. § 1140, when plaintiffs had no such rights to exercise. Nor, for that matter, could the defendant trustees have breached their fiduciary duties under section 404 of the Act by engaging in retaliatory acts, or attempting to exclude plaintiffs from participation, 29 U.S.C. § 1104, because they owed no fiduciary duty to plaintiffs in the first place. On the other hand, while plaintiffs' complaint of unfair labor practices, made to the Department of Labor, would be protected conduct under the second part of ERISA section 510, [FN20] notwithstanding the fact that plaintiffs were neither participants nor beneficiaries of any of the IAFF plans, there is no evidence that defendants took any action against plaintiffs because of plaintiffs' complaint. Indeed, defendants did not even know of plaintiffs' allegations to the Department of Labor until well after all of the allegedly retaliatory acts took place. Finally, defendants had no legal obligation to provide plaintiffs with copies of the IAFF pension plan documents, because plaintiffs were neither participants nor beneficiaries of any of the plans. ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4); *supra* n. 2; *see also, Firestone Tire & Rubber Co.*, No. 87-1054, slip op. at 10-12 (rejecting lower court's holding that a "participant" entitled to plan documents "is any person who claims to be" entitled to plan benefits). Thus, defendants are not liable for the fine, imposable under section 502(c) of ERISA, 29 U.S.C. § 1132(c), for failing to furnish plaintiffs copies of the plan documents upon request.

4. Plaintiffs' Claim of Entitlement to IAFF Pension Plan Coverage by Virtue of Internal Revenue Code § 410(b)

Plaintiffs' argument that because defendants may have violated the nondiscrimination provision of Internal Revenue Code section 410(b)(1)(A), 26 U.S.C. § 410(b)(1)(A), which plaintiffs maintain, "prohibits discrimination against employees," plaintiffs are therefore entitled to IAFF pension plan coverage is wrong as a matter of law. The Internal Revenue Code does not "prohibit" discrimination against employees. It merely provides tax incentives for businesses that provide employee benefits on a nondiscriminatory basis; pension plans which meet specified participation standards, and do not discriminate in favor of officers, shareholders, or highly compensated employees, are considered "qualified" plans, and thereby gain a favored tax status. The fact that one or more of the IAFF plans should not be considered "qualified," even if true, does not create any substantive rights, ERISA or otherwise, for plaintiffs. *Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 631 (7th Cir.1986), *cert. denied*, --- U.S. ----, 107 S.Ct. 2180 (1987) ( " 'There is no basis ... in ERISA, to find that the provisions of IRC § 401--which relate solely to the criteria for tax qualification under the Internal Revenue Code--are imposed on pension plans by the substantive terms of ERISA.' "  Nor, the court held, does IRC § 401 give an implied cause of action under ERISA.) (quoting from the opinion of the lower court); *Weisner v. Romo Paper Products Corp.*, 514 F.Supp. 289, 291 n. 2 (E.D.N.Y.1981) (IRC nondiscrimination provisions "do not create a substantive right that a beneficiary, participant or fiduciary could enforce.").

*11 5. The Standards Governing Entry of Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that upon a timely made motion for summary judgment, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, Rule 56(e) goes on to state that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the party." Fed.R.Civ.P. 56(e). The Advisory Committee notes that the "very mission of the summary judgment procedures is to pierce the pleadings and to assess the proof to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e), Advisory Committee Note.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-19    Filed 07/29/2005    Page 3 of 16

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *11 (D.D.C.))

Page 10

Three Supreme Court cases decided in 1986 confirm this view, and highlight the usefulness of summary judgment in disposing of cases, such as this, that need not go to a jury. *See generally, Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986) (court should not send case to jury "unless evidence is of such a character that it would warrant a jury in finding a verdict in favor of that party"); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-89 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.")

Here, in order for plaintiffs' ERISA claims to survive defendants' motion for summary judgment, plaintiffs unquestionably bear the jurisdictional burden of showing that they were "participants" of at least one of the IAFF pension plans, within the meaning of ERISA. Plaintiffs have failed to meet that burden. Thus, as the Supreme Court held in *Celotex,* the entry of summary judgment for defendants on plaintiffs' ERISA claims is appropriate, because despite having had "adequate time for discovery," plaintiffs still "fail[ ] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322. Moreover, the few *factual* disputes in the case at bar are irrelevant to the outcome--plaintiffs simply lack standing to bring their ERISA claims--and thus do not preclude entering summary judgment. As the Supreme Court explained in *Anderson v. Liberty Lobby,*

*12 the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.... Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in original).

B. Plaintiffs' Common Law Claims

Plaintiffs' unopposed motion to amend their complaint was orally granted by this Court on February 23, 1988. In their amended complaint, plaintiffs ventured beyond their original ERISA claims to add the allegation that the IAFF improperly charged FEMA, in funding proposals, for pension plan contributions never made on behalf of plaintiffs, and to include two local, common-law based counts. First, in count X, plaintiffs seek accrued fringe benefits, including severance pay and unused annual leave. Second, in count XI, plaintiffs seek to recover, as putative third party beneficiaries of the cooperative agreements between the IAFF and FEMA, the amounts defendant IAFF purportedly overcharged FEMA. Defendants urge this Court to decline to exercise its pendent jurisdiction over either of plaintiffs' local, common-law claims. In the alternative, defendants argue that plaintiffs local law claims should be dismissed in any event, because they are preempted by ERISA. While not wholly embracing the rationale advanced by defendants, the Court does agree with the net result defendants urge, that is, that both of plaintiffs' local law claims should be dismissed.

Although this Court clearly has the constitutional power to exercise pendent jurisdiction over plaintiffs' local, common-law claims, because those claims derive from the same nucleus of operative facts as the federal ERISA claims, *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966), there are a number of prudential considerations militating against the exercise of that pendent jurisdiction. First and foremost, because of the Court's disposition of plaintiffs' ERISA claims, there no longer remains any viable federal law claim. That factor alone is a sufficient, and appropriate, reason for this Court to decline its pendent jurisdiction. As the Supreme Court explained in *Gibbs,*

Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

383 U.S. at 726; *accord, Sanchez-Espinoza v. Reagan,* 770 F.2d 202, 210 (D.C.Cir.1985)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *12 (D.D.C.))

Page 11

(holding that district court properly dismissed state law claims where federal claims supporting pendent jurisdiction were dismissed).

*13 Second, the local law issues involved in plaintiffs' common-law claims are not at all straight forward. Indeed, plaintiffs' claims appear tenuous at best, and are, thus far, largely unsupported by the evidence of record. For example, plaintiffs' third party beneficiary claims obviously hinge on a determination that plaintiffs were indeed third party beneficiaries of the cooperative agreements between FEMA and the IAFF. As defendants quite accurately point out, the cooperative agreements were for the benefit of the firefighters, and plaintiffs were only incidental beneficiaries. [FN21] In other words, if defendants did indeed overcharge FEMA, it is not at all clear that plaintiffs, instead of FEMA, are entitled to those overcharges. Moreover, plaintiffs have not shown that defendants improperly charged FEMA for pension contributions on behalf of plaintiffs. [FN22] Plaintiffs have merely shown (1) that the percentage used for fringe benefit costs in the funding proposals--for OLFSP salaries--was *similar* to the fringe benefit percentage used--for IAFF permanent employees' salaries, which expressly included pension plan contributions--in the labor union's annual financial disclosure statement, and (2) that applicable Office of Management and Budget regulations governing cooperative agreements with organizations like defendant IAFF allow, but do not require, pension plan costs. Plaintiffs overlook the fact that the two percentage figures were not calculated in the same manner, and that the listed fringe benefits in the financial disclosure statement included expenses, such as entertainment expenses, not included in the OLFSP funding proposal. Given the murky factual and legal questions involved in plaintiffs' local, common-law claims, deferral to the courts of the District of Columbia is particularly appropriate. *See, Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 768 (D.C.Cir.1982) (concluding that the district court abused its discretion in exercising pendent jurisdiction over "novel and difficult issues of local law"). Thus, for the foregoing reasons, the Court declines to exercise its pendent jurisdiction over plaintiffs' local, common-law claims.

Finally, plaintiffs' third party beneficiary claim is also eviscerated by ERISA itself, which, by the terms of the Act, preempts "any and all State laws as they may now or hereafter relate to any employee benefit plan...." ERISA § 514(a), 29 U.S.C. § 1144(a). [FN23] The Supreme Court has broadly interpreted the Act's "relate to" terminology, explaining that Congress intended to "establish pension plan regulation as exclusively a federal concern," *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523 (1981), and concluding that state law is preempted "if it has a connection with or reference to such a plan" even if the state law was not "specifically designed to affect employee benefit plans," *Shaw v. Delta Airlines,* 463 U.S. 85, 97- 98 (1983). Lower courts have applied the Supreme Court's broad interpretation to dismiss state law claims for, among other things, denial of benefits, wrongful termination, intentional infliction of emotional distress, breach of contract, unfair labor practices, and fraud. *See, Howard v. Parisian, Inc.,* 807 F.2d 1560, 1563-64 (11th Cir.1987) and cases cited therein. Although, in the case at hand, the Court does not find that plaintiffs' local law claim for accrued benefits--excluding, significantly, pension benefits--is preempted by ERISA, it does find that plaintiffs' third party beneficiary claim is preempted. In essence, plaintiffs seek to recover, through quasi-contract, benefits to which they are not entitled under ERISA. To allow such a claim would "upset the uniform regulation of plan benefits intended by Congress." *Howard v. Parisian, Inc.,* 807 F.2d at 1565. Hence, count XI of the amended complaint is properly dismissed both because the Court declines its pendent jurisdiction and because it is preempted by ERISA in any event.

*14 C. Motion for Substitution of a Party Plaintiff

Rule 25(a)(1) of the Federal Rules of Civil Procedure provides that "if a party dies and the claim is not *thereby* extinguished, the court may order substitution of the proper parties." Fed.R.Civ.P. 25(a)(1) (emphasis added). In other words, substitution is proper--assuming the original, now deceased party had a valid claim--if the claim was not extinguished by death. *Asklar v. Honeywell, Inc.,* 95 F.R.D. 419, 29 F.Supp. 1596 (D.Conn.1982). Because the Court has found that plaintiff Martin, like the other plaintiffs, did not have a valid ERISA claim, it is unnecessary to decide whether the claim, if valid, would have survived Martin's death. Furthermore, because the Court has declined to exercise its pendent jurisdiction over plaintiffs' common-law claims, it is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
(Cite as: 1989 WL 37154, *14 (D.D.C.))

Page 12

unnecessary for the Court to decide, under District of Columbia law, if Martin's contract law and quasi-contract law claims, if valid, survived his death. That question, being inextricably connected as it is to the plaintiffs' common-law claims, is properly left to the courts of the District of Columbia.

D. Defendants' Alternative Motion to Strike Plaintiffs' Claim for Punitive Damages and Request for Jury Trial

In light of the Court's disposition of plaintiffs' federal and state law claims, it is unnecessary to consider defendants' alternative motions to strike plaintiffs' demand for punitive damages and request for a jury trial.

### III. Conclusion

For the reasons set forth above, the Court shall on this date enter the accompanying Order and Judgment.

### ORDER

1. Upon consideration of the plaintiffs' unopposed motion for leave to amend the complaint, and the first amended complaint, in accordance with Rule 15(a) of the Federal Rules of Civil Procedure, this Court having orally granted such motion on February 23, 1988, it is hereby

ORDERED, that plaintiffs' motion is hereby granted *nunc pro tunc*, and the First Amended Complaint shall be deemed filed and served as of March 17, 1988, the date it was lodged with the Clerk of Court.

2. Upon consideration of defendants' motion for leave to file an amended answer, the opposition and reply memoranda thereto, oral argument for both sides, and the entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motion for leave to amend answer be granted; and it is further

ORDERED, that the amended answer attached to defendants' motion, and previously served on plaintiffs, be deemed properly filed and served, *nunc pro tunc*, on February 22, 1988, and it is further

ORDERED, that the answer to the First Amended Complaint, lodged with the Clerk of Court on April 6, 1988, shall be deemed properly filed and served, *nunc pro tunc*.

3. Upon consideration of defendants' motion for summary judgment on the complaint, the opposition and reply memoranda thereto, oral argument on both sides, and the entire record herein; and for the reasons set for th in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motion for summary judgment on the complaint be granted in part and denied in part; and it is

ORDERED, that counts I through IX, inclusive, and count XI, of the amended complaint be dismissed with prejudice; but that it is further

ORDERED, that count X of the amended complaint be dismissed without prejudice, the Court having declined to exercise its pendent jurisdiction over that local, common-law claim, but not having found that claim preempted by ERISA, 29 U.S.C. § 1144(a).

5. Upon consideration of defendants' alternative motion to strike plaintiffs' jury demand, the opposition and reply memoranda thereto, oral argument for both sides, and entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motion to strike be denied as moot, the Court having dismissed plaintiffs' amended complaint in its entirety.

6. Upon consideration of defendants' alternative motion to dismiss plaintiffs' claim for punitive damages, the opposition and reply memoranda thereto, oral argument for both sides, and entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that defendants' motion to dismiss plaintiffs' claim for punitive damages be denied as moot, the Court having dismissed plaintiffs' amended complaint in its entirety.

7. Upon consideration of plaintiffs' cross-motion for partial summary judgment of the complaint, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
(Cite as: 1989 WL 37154, *14 (D.D.C.))

Page 13

opposition and reply memoranda thereto, oral argument for both sides, and the entire record herein; and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that plaintiffs' cross-motion for partial summary judgment be denied.

8. Upon consideration of the plaintiffs' motion for substitution of Charles Liner in place of plaintiff Charles David Martin, deceased, and for the reasons set forth in the Court's Memorandum Opinion of this date, it is hereby

ORDERED, that plaintiffs' motion for substitution be denied as moot, the Court having dismissed plaintiffs' amended complaint in its entirety.

SO ORDERED.

JUDGMENT

It is the JUDGMENT of the Court that plaintiffs take nothing, and that judgment is hereby entered on behalf of defendants, for the reasons set forth in the Court's Memorandum Opinion and Order entered this date.

SO ORDERED.

> FN1. Section 502(a) of ERISA provides a civil cause of action as follows:
> A civil action may be brought--
> (1) by a participant or beneficiary--
> (A) for the relief provided in subsection (c) of this section, or
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]
> 29 U.S.C. § 1132(a).

FN2. Section 104 of ERISA, 29 U.S.C. § 1024 grants participants and beneficiaries the right to review and receive copies of pension plan documents. ERISA section 502(c), 29 U.S.C. § 1132(c) then allows the court to impose a fine of up to $100 per day for each day beyond thirty days that a pension plan administrator fails to provide documents requested by a participant or beneficiary.

FN3. The IAFF is the "administrator" and "plan sponsor" of all three plans as defined in ERISA sections 3(16)(A), (B), 29 U.S.C. §§ 1002(16)(A), (B).

FN4. Mr. Martin died testate on January 3, 1988, after this action was filed. Plaintiffs have moved to substitute Charles Liner, the appointed personal representative of Martin's estate, as a party plaintiff. See discussion *infra* at 38-39.

FN5. In addition to the OLFSP, the IAFF has operated a number of other federally funded programs, including the Minority Recruitment, New Directions, Women in Fire Service, and National Apprenticeship programs. The only IAFF grant programs in existence at the time this action arose were the OLFSP and National Apprenticeship program.

FN6. IRC § 410(b)(1) provides that for a pension plan to be "qualified" it must not discriminate in favor of officers, shareholders, or highly compensated employees and must benefit a specified percentage of employees. However, § 410(b)(3) excludes from the count of employees those included in an employee bargaining unit which is covered by a collective bargaining agreement negotiated in good faith between such unit and the employer. I.R.C. §§ 410(b)(1), (6), 26 U.S.C. §§ 410(b)(1), (6).

FN7. Defendants were required in any event, under recently amended provisions of the Internal Revenue Code, to file a request for determination of tax qualification of their pension plans with the Internal Revenue Service by June 30, 1986. I.R.S. Notice 86-3, I.R.B. 1986-9, 21 *as amended by* Announcement 86-60, I.R.B. 1986-1917.

FN8. Interestingly, defendants first asked Local 2 of the Office and Professional Employees International Union to represent plaintiffs solely for the purpose of negotiating fringe benefits such as pensions. In a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-19    Filed 07/29/2005    Page 7 of 16

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *14 (D.D.C.))

Page 14

parallel proceeding before the National Labor Relations Board, *infra* n. 9, the shop steward of Local 2, Cheryl Gannon, testified that she refused defendants' sudden overtures, and found them suspicious because defendants had consistently resisted efforts to organize the grant employees in the past. National Labor Relations Board Testimony of Cheryl Gannon at 62-65.

FN9. One month later, plaintiff Betty Ann Morrison lodged an unfair labor practice complaint against defendant IAFF with the National Labor Relations Board, alleging that the IAFF violated several provisions of the National Labor Relations Act by "having unlawfully assisted in the formation of a labor organization to represent certain of its employees and soliciting those employees to join that organization; by discriminatorily terminating the employment of Charging Party Morrison, David Martin and Shivanna King because they did not join and because they concertedly sought legal counseling regarding their rights; and by discriminatorily terminating the employment of supervisor Betty Jo Mayeske." N.L.R.B. Division of Judges, Case No. 5-CA-18553 (January 29, 1988). The case, including extensive testimony by all of the parties herein, was heard before an administrative law judge during September and October 1987. The administrative law judge, in his written recommendation to the NLRB, concluded that the NLRB should not assert its statutory jurisdiction over the IAFF as employer of the plaintiffs, because FEMA rather than the IAFF "had final say over the OLFSP compensation levels." N.L.R.B. Division of Judges, Case No. 5-CA-18553 at 14. On February 10, 1989 a three member panel of the NLRB remanded the case to the administrative law judge for a full determination on the merits, concluding, contrary to the judge's findings, that the IAFF "had sufficient authority over the compensation and conditions of employment of the OLFSP employees to engage in meaningful bargaining with them...." 292 NLRB No. 114 at 7 (February 10, 1989).
Two points are worth noting about the decision of the NLRB panel. First, the decision has no precedential value in this Court. Second, the decision is inapposite in any event. Although the NLRB found that the OLFSP employees were "employed" by the IAFF, seemingly contrary to what this Court finds, *infra* at 21-23, the NLRB focused on one aspect of the common law definition of agency--that of control over compensation and salary--and based its decision on that factor. In other words, the NLRB panel applied a different definition of "employed" for purposes of NLRB jurisdiction than this Court must apply for purposes of standing under ERISA.

FN10. *Supra* n. 1; 29 U.S.C. § 1132(a)(1)(B).

FN11. ERISA section 413 provides as follows:
(a) * No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date
(A) on which the plaintiff had actual knowledge of the breach or violation, or
(B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this subchapter;
except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
* So in original. No subsec. (b) has been enacted.
29 U.S.C. § 1113.

FN12. Although the statute of limitations applicable to an ERISA claim for benefits is adopted from local law, the events which trigger or toll the limitations period are found in federal common law. *Richards v. Mileski,* 662 F.2d 65, 68 (D.C.Cir.1981) (citing *Fitgerald v. Seamans,* 553 F.2d 220, 228 (D.C.Cir.1977)).

FN13. Arguably, the claim of deceased plaintiff Charles David Martin, sought to be made by the personal representative of Martin's estate, is more appropriately characterized as the claim of a "beneficiary" than of a "participant." However, the claim of plaintiff Martin, if it survives at all, is necessarily premised on a finding that Martin himself was a participant in one of the IAFF plans.

FN14. In *Holt,* the standard for determining

Not Reported in F.Supp.                                                                 Page 15
(Cite as: 1989 WL 37154, *14 (D.D.C.))

employee status--as opposed to application of that standard--was not actually an issue on appeal. *Holt,* 811 F.2d at 1538. The district court had held that the appropriate standard was the common-law test of agency and on appeal both parties agreed. *Id.* However, the circuit court noted that "[i]n this approach we fully concur," and considered it "plain[ ] enough" that in drafting ERISA, "Congress intended the Secretary of Treasury and the Secretary of Labor, who were administrators of various ERISA provisions, to continue their practice of defining 'employee' in terms of common-law agency principles." *Id.* at 1538, n. 44. Moreover, the court found that the "cases generally agree." *Id.* at 1535 n. 20.

FN15. Plaintiffs criticize defendants' reliance on *Darden,* arguing that defendants turn the case on its head. While plaintiffs are correct that the court in *Darden,* on the facts of that particular case, found the common-law standard too restrictive--ultimately concluding that despite the fact that plaintiff was properly characterized under the common-law test as an independent contractor he was nonetheless an employee within the meaning and protection of ERISA--the court did not reject the common-law standard on that basis. *Darden,* 796 F.2d at 706. Instead, the court rejected the common-law standard as simply being inappropriate, and held that the proper approach was to first ascertain the congressional purpose and then fashion a standard accordingly. The resulting standard defined employees as "persons whose retirement benefits were 'anticipated' " and who had "relied on that expectation by remaining for 'long years,' or a substantial period of time, in the 'employer's' service, and by foregoing other significant means of providing for their retirement." *Id.* It was "that category of persons--those for whom the forfeiture of accrued employee benefits results in financial hardship during retirement," the court reasoned, "that was the focus of congressional concern." *Id.* This Circuit, in a more recent case than *Darden,* continued to apply the common-law standard of agency, holding that the intent of the parties was but "one of a number of factors[ ] that the common law weighs in distinguishing an employee from an independent contractor." *Holt,* 811 F.2d at 1538-39; *supra* n. 14.

FN16. Interestingly enough, plaintiffs ignore the fact that the IAFF Employee Pension Plan goes on to state that a participant "will not receive any benefit if [he or she] terminate[s] employment before age 62 with less than 10 years of service." IAFF Employee Pension Plan at 7. None of the plaintiffs had the requisite years of service or had reached age 62 at the time their employment was terminated.

FN17. The *de novo* standard of review applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co.,* No. 87-1054, slip op. at 10. Neither the IAFF Employees Plan nor the IAFF Staff Representatives Plan gave the plan administrator such discretionary authority.

FN18. See discussion *supra* at 11-12.

FN19. ERISA section 510 provides, in pertinent part, that
[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a *participant* or *beneficiary* for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such *participant* may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter....
29 U.S.C. § 1140 (emphasis added).

FN20. See n. 19 *supra.*

FN21. Notably, in *Honey v. George Hyman Construction Co.,* the District Court for the District of Columbia held that under District of Columbia law
[i]n order to qualify as a third-party beneficiary, an individual must have been intended by the contracting parties at the time of contracting to be a beneficiary of their contract. An unintended or incidental beneficiary has no right as a stranger to the contract to enforce its provisions or collect damages for its breach.
63 F.R.D. 443, 450 (D.D.C.1974).

FN22. Defendants point out that the IAFF is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-19    Filed 07/29/2005    Page 9 of 16

Not Reported in F.Supp.
(Cite as: 1989 WL 37154, *14 (D.D.C.))

Page 16

involved in lengthy, still ongoing negotiations with FEMA over FEMA's attempt to recoup costs from the IAFF as a result of a 1986 audit of the OLFSP, which concluded that a number of the OLFSP's indirect costs, fringe benefit costs, and some direct costs, for years beginning with fiscal year 1982, did not comply with the applicable Office of Management and Budget regulations. Defendants' Supplemental Statement of Facts at 8.

FN23. The Act goes on to define "State law" as "all laws, decisions, rules, regulations, or other state action having the effect of law, of any State." ERISA § 514(c)(1), 29 U.S.C. § 1144(c)(1). Hence, the preemptive provisions of the Act cover state common law as well as statutory law.

1989 WL 37154 (D.D.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 1993-99 Page 1
T.C. Memo. 1993-99, 1993 WL 80580 (U.S.Tax Ct.), 16 Employee Benefits Cas. 2001,
65 T.C.M. (CCH) 2127, T.C.M. (RIA) 93,099, 1993 RIA TC Memo 93,099
(Publication page references are not available for this document.)
C

United States Tax Court
MILLS, MITCHELL & TURNER, a Kentucky
Partnership, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE,
Respondent.
No. 15628-9OR.

March 23, 1993.
Alan N. Shovers and John E. Hegeman, for petitioner.

Eric B. Jorgensen, for respondent.

MEMORANDUM OPINION

RAUM, Judge:

The Commissioner determined that the defined benefit pension plan operated by petitioner, Mills, Mitchell & Turner (MMT) does not meet the requirements of section 401 [FN1] for the plan years 1985 through 1987, and that the trust that constitutes a part of the plan is consequently not tax-exempt under section 501(a) for those years. The Commissioner also ruled in a companion determination that the plan did meet those requirements for the years beginning after December 31, 1987. The earlier years alone are involved herein.

Petitioner has invoked the jurisdiction of this Court under section 7476 to obtain a declaratory judgment as to whether the plan and the trust meet the requirements of sections 401 and 501(a), [FN2] respectively, for the years 1985-1987. The case has been submitted on the basis of a stipulated administrative record.

The issues relate to the timeliness of amendments made to petitioner's plan as they affected 1985 through 1987 in order to bring the plan into compliance with the requirements for tax-qualified status contained in section 401(a), as amended by the Tax Reform Act of 1984 (TRA), Pub.L. 98-369, 98 Stat. 494, enacted July 18, 1984, and the Retirement Equity Act of 1984 (REA), Pub.L. 98-397, 98 Stat. 1426, enacted August 23, 1984. [FN3]

Petitioner is a law partnership; its principal place of business was in Madisonville, Kentucky, at the time it filed the petition herein. In 1984, petitioner formed the Mills, Mitchell & Turner pension plan and trust, a defined benefit pension plan. The plan was adopted by petitioner on June 29, 1984, effective as of January 1, 1984.

On August 30, 1984, Trustee Maubert R. Mills filed a Form 5300, Application for Determination for Defined Benefit Plan, for the MMT plan and trust. On February 28, 1985, the Commissioner issued a favorable determination letter (First Determination Letter) for the plan. However, the determination was made subject to petitioner's adoption of a proposed amendment previously submitted by petitioner to the Commissioner in a letter dated January 17, 1985. On or about January 25, 1985, petitioner adopted that proposed amendment (First Amendment). The Commissioner's determination letter also explicitly reserved determination as to whether the plan met the requirements of REA and TRA.

During the plan years ended December 31, 1985, 1986, and 1987, petitioner's plan consultant was Gogerty & Company, Inc. (Gogerty), located in Indianapolis, Indiana. In December of 1987, petitioner engaged a new plan consulting firm, Lexington Plan Administrators, Inc. (Lexington), located in Gold River, California. Lexington suggested amendments to petitioner's plan which were subsequently adopted on January 19, 1988. The plan as thus amended was dated January 19, 1988, and was signed by the three name partners as trustees and by one of them on behalf of petitioner as employer. It was sent to the IRS by Lexington for petitioner by letter dated January 27, 1988, requesting a determination as to whether the amended plan thus submitted met the requirements of section 401(a) as modified by TRA and REA. Although we have not made an exhaustive study of that amended plan, it does appear to have addressed the qualification requirements of TRA and REA. [FN4]

The Commissioner thereafter on December 1, 1988, issued to petitioner a favorable determination letter (Second Determination Letter) with regard to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 1993-99                                                                                              Page   2
**(Publication page references are not available for this document.)**

plan submitted on January 27, 1988, but it was limited to plan years beginning after December 31, 1987.

However, on December 1, 1988, the Commissioner also advised petitioner by letter that the IRS proposed to revoke the favorable determination letter dated February 28, 1985, i.e., the First Determination Letter, and to disqualify the plan as not meeting the requirements under section 401(a) for the plan years ending December 31, 1985, 1986, and 1987, thus causing the trust to lose its tax exempt status for the trust years ending with or within the affected plan years. On April 11, 1990, the Commissioner issued the final revocation letter for the years 1985 through 1987, revoking the favorable determination letter of February 28, 1985, because the "plan was not timely amended to comply with * * * [TRA] and * * * [REA]." As indicated *supra* note 4, we sustain the Commissioner.

The Commissioner's determination as to the years 1985-1987 was based upon petitioner's failure to amend its plan prior to the expiration of the deadlines fixed by Notice 85-5, 1985-1 C.B. 427, and Notice 86-3, 1986-1 C.B. 388, as revised by Announcement 86-60, 1986-19 I.R.B. 17. The Commissioner advised petitioner that such deadlines were as follows: The compliance date for the plan year ended December 31, 1985, was June 30, 1986; the compliance date for the plan year ended December 31, 1986, was December 31, 1986; and the compliance date for the plan year ended December 31, 1987, was December 31, 1987. Since petitioner did not in fact adopt the amendments required to bring the plan into compliance with section 401(a), as revised by TRA and REA, until January 19, 1988, the Commissioner determined that the plan was not timely amended for these three years. Petitioner has not challenged the validity of the IRS rulings which established the deadlines.

The issues before us are: (1) Whether the Commissioner is barred by law from retroactively revoking the tax-qualified status of petitioner's pension plan under section 401(a) for the years 1985-1987; and (2) if the Commissioner is not so barred, whether he should nonetheless be equitably estopped from retroactively revoking the plan's qualified status for each of those tax years. On each of these issues, we find in favor of the Commissioner.

1. *Whether the retroactive revocation was erroneous under the statute, regulations, or other legal principles.* TRA and REA both substantially changed the requirements for qualification under section 401(a). Section 521 of TRA changed requirements relating to plan distributions made to beneficiaries of deceased participants. 98 Stat. 865-868. Section 524 of TRA altered the method of determining whether a plan was "top heavy". 98 Stat. 872. [FN5]

REA also made numerous changes to the requirements for tax qualification. Several of those changes were set forth in section 202 of REA, which lowered certain age limits relating to minimum participation in qualified plans, lowered certain other age limits relating to the determination of nonforfeitable percentages, and made various changes relating to "breaks in service". 98 Stat. 1436-1440.

TRA and REA were effective, at least to the extent relevant here, for tax years beginning after December 31, 1984. TRA, secs. 521-529, 98 Stat. 865-877; REA, sec. 302(a), 98 Stat. 1451. However, because each of those Acts required extensive amendments to existing plans, the IRS has at various times extended the deadlines for making the required amendments.

Notice 85-5, 1985-1 C.B. 427, provided that in order for plans to comply with TRA and REA, they had to be amended by the last day of the first plan year that began on or after January 1, 1985. The IRS has in addition from time-to-time granted further extensions of the deadline for making amendments to comply with TRA and REA. [FN6] And as finally extended, the deadlines for compliance with respect to the 1985, 1986, and 1987 plan years were June 30, 1986, December 31, 1986, and December 31, 1987, respectively. Notice 86-3, 1986-1 C.B. 388; Announcement 86-60, 1986-19 I.R.B. 17.

Since petitioner did not amend its plan to comply with the TRA and REA requirements until at least January 19, 1988, it missed each of the deadlines noted above. Petitioner's plan must, therefore, obviously be disqualified for each of those plan years. Nevertheless, petitioner contends in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-19    Filed 07/29/2005    Page 12 of 16

T.C. Memo. 1993-99                                                                                         Page   3
(Publication page references are not available for this document.)

substance that the changes were *retroactively* effective to meet the deadlines, relying upon certain relief provisions in the statute, regulations, judicial decisions, and administrative practice.

a. *Retroactive relief under section 401(b) of the Code and section 1.401(b)-1, Income Tax Regs.* First, in its petition to the Court, petitioner cites section 401(b) as authority supporting its position that plan amendments made on January 19, 1988, retroactively qualified the plan for the plan years 1985 through 1987. [FN7] The text of section 401(b) is highly confusing. [FN8] However, the regulations issued under section 401(b) undertake to explain the operation of the statute. Sec. 1.401(b)-1(a), Income Tax Regs., provides in pertinent part as follows:

> Under section 401(b) a * * * pension * * * plan which does not satisfy the requirements of section 401(a) on any day solely *as a result of a disqualifying provision* * * * shall be considered to have satisfied such requirements on such date if, on or before the last day of the remedial amendment period * * *, all provisions of the plan which are necessary to satisfy all requirements of sections 401(a) * * * are in effect and have been made effective for all purposes for the whole of such period. * * * [Emphasis supplied.]

Thus, a condition for the retroactive relief provided by section 401(b) of the Code is that the failure to meet the requirements of section 401(a) must be *solely* the result of a "disqualifying provision", and the term "disqualifying provision" is defined in section 1.401(b)-1(b)(1) and (2), Income Tax Regs., as set forth in the margin. [FN9] Section 1.401(b)-1(b)(1) of the regulations is concerned with provisions relating to new plans and amendments to existing plans that otherwise disqualify the plan under the requirements of section 401(a) of the Code that were applicable to the plan as of the date the plan first became effective. No such provisions or amendments are present in this case. Section 1.401(b)-1(b)(2) of the regulations is concerned with a "plan provision which results in the failure of the plan to satisfy the qualification requirements of the Code by reason of a change in such requirements effected by the Employee Retirement Income Security Act of 1974 * * * [ERISA] or by * * * 'TEFRA' ". But petitioner's failure to satisfy the requirements of section 401(a) of the Code is due to changes required by TRA and REA, neither of which is included in the definition

of "disqualifying provision", for which retroactive relief is authorized. Plainly, petitioner's failure to meet the demands of TRA and REA is not covered by the retroactive relief provisions of section 401(b) of the Code as explained in the regulations.

To be sure, section 1.401(b)-1(b)(2) of the regulations was amended August 5, 1988, T.D. 8217, 1988-2 C.B. 67, 71-72, *after* the tax years involved herein. Although this amendment was stated to be "*generally* effective for plan years which begin after December 31, 1979", petitioner would not be entitled to relief even under the amendment. (Emphasis supplied.) In defining the meaning of "disqualifying provision", the amendment enlarged the category of statutory enactments that might result in failure to satisfy the qualification requirements of the Code, and thus form the basis for relief. But none of the additional statutory enactments specified in the amendment are applicable or operative here, since none of them involve TRA or REA. [FN10]

b. *Judicial decision.* As petitioner correctly points out, section 401(b) is not the exclusive means by which plan amendments are given retroactive effect for purposes of determining whether the plan qualifies under section 401(a). This Court has previously held that section 401(b) "was intended merely as a 'safe harbor' provision"; and that where a taxpayer initiated a request for an IRS determination within 6 months after the plan was adopted, and thereafter amended the plan within approximately 2 months after it was informed of the Service's objection to certain provisions, the amendments were to be given retroactive effect for the years in dispute. *Aero Rental v. Commissioner*, 64 T.C. 331, 339, 341-342 (1975).

Subsequent cases have, however, made clear that "our *Aero Rental* holding is not to be expansively construed", *D.J. Powers Co. v. Commissioner*, T.C.Memo.1981-622, 42 T.C.M. (CCH) 1524, 1533 (1981), 50 P-H T.C.Memo. par. 81,622, and that two requirements must be met in order for plan amendments to be given retroactive effect in accordance with *Aero Rental*. First, no circumstances must have arisen which call into operation the objectionable provisions of the plan. Second, the employer must have exercised "reasonable diligence" in attempting to obtain a favorable determination letter from the IRS.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 1993-99                                                                                                                    Page   4
(Publication page references are not available for this document.)

*Bolinger v. Commissioner*, 77 T.C. 1353, 1360 (1981); *Oakton Distributors, Inc. v. Commissioner*, 73 T.C. 182, 190 (1979); *Jack R. Mendenhall Corp. v. Commissioner*, 68 T.C. 676, 681 (1977).

Petitioner did not apply for its second determination letter, i.e., the determination letter pertaining to the plan amendments required by TRA and REA, until approximately three and one-half years after the enactment of TRA and REA. We have recently held that a delay of such length in attempting to conform the plan to the TRA and REA requirements "indicates a lack of anything [even] approaching reasonable diligence." *Stark Truss Co. v. Commissioner*, T.C.Memo.1991-329, 62 T.C.M. (CCH) 169, 173 (1991), 60 RIA T.C.Memo. par. 91,329. See also *Kollipara Rajsheker, M.D., Inc. v. Commissioner*, T.C.Memo.1992-628 ("nearly 4 years" from plan adoption to submission of an application for determination of exemption in sufficient detail to enable the IRS to consider it). Indeed, we have stated in other cases involving different plan requirements that delays of even shorter duration fall short of the reasonable diligence requirement. See *D.J. Powers Co. v. Commissioner, supra,* (3-year interval between plan adoption and request for determination letter did not constitute reasonable diligence); *Dr. Erol Bastug, Inc. v. Commissioner*, T.C.Memo.1989-262 (dictum) (interval of approximately two and one-half years between adoption of the plan and request for determination letter was not reasonable diligence). Indeed, in *Aero Rental v. Commissioner*, 64 T.C. at 339, 342, it was stated that the 6-month period there involved was "subject to criticism", although it passed muster as "still within the realm of reason."

We hold that petitioner did not use reasonable diligence in attempting to obtain a favorable determination letter from the IRS, and that the plan amendments which petitioner made in 1988 may not be treated as retroactively qualifying the plan for the plan years ending December 31, 1985, 1986, and 1987.

c. *Retroactive relief at the administrative level- EPCAPP.* Petitioner next argues that it is entitled to relief under the IRS Employee Plans Closing Agreements Pilot Program (EPCAPP). [FN11] In accordance with that program, "*key district offices* " were given "the *discretion* to enter into closing agreements as an alternative to plan disqualification"

primarily in certain areas, including failure to amend a plan timely to comply with TRA and REA. [FN12] (Emphasis supplied.) And it was made clear that equities would play a role in determining the key district office's position. [FN13]

Petitioner's position in respect of EPCAPP is fatally flawed for a number of reasons. We mention only several of them. EPCAPP was merely a "pilot program", and was limited to certain "key district offices". We have no way of knowing whether any of those districts included petitioner. Moreover, EPCAPP was a completely discretionary program. Not only is entering into a closing agreement by its very nature entirely within the discretion of the parties, but the pilot program itself was based upon the discretionary application of certain guidelines by the key district offices. Moreover, it is "well settled that a court may not order an agency to perform a discretionary act." *Capitol Federal Savings & Loan v. Commissioner*, 96 T.C. 204, 212 (1991). See also *Buzzetta Construction Corp. v. Commissioner*, 92 T.C. 641, 648 (1989); *Oakton Distributors, Inc. v. Commissioner*, 73 T.C. 182, 188 (1979); *Perlmutter v. Commissioner*, 44 T.C. 382, 398 (1965), affd. 373 F.2d 45 (10th Cir.1967).

Finally, aside from the fact that EPCAPP relief is a matter within the Commissioner's discretion, EPCAPP was simply not available as an alternative to disqualification at the time that petitioner's plan was disqualified. The program was established *after* the qualified status of petitioner's plan had been revoked by both the IRS District Director and the Appeals Office, and indeed even after petitioner filed its petition with this Court. [FN14] It is, therefore, difficult to understand how the key district office could have been expected to apply EPCAPP to petitioner's plan when that program did not even exist at the time the plan was reviewed by the IRS.

2. *Whether the Commissioner should be equitably estopped from retroactively disqualifying petitioner's plan.* Petitioner argues that even if the Commissioner is not barred by law from retroactively disqualifying the plan for each of the years at issue, the Commissioner should nonetheless be equitably estopped from retroactively disqualifying petitioner's plan. *Petitioner argues that even if the Commissioner is not barred by law*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-01291-JR    Document 9-19    Filed 07/29/2005    Page 14 of 16

T.C. Memo. 1993-99                                                                                          Page   5
(Publication page references are not available for this document.)

*from retroactively disqualifying the plan for each of the years at issue, the Commissioner should nonetheless be equitably estopped from retroactively applying the sanction of disqualification. Petitioner cites no authority in support of this contention; it merely lists a number of sympathetic circumstances, none of which find support in the administrative record. [FN15] Moreover, even if such circumstances were documented in the administrative record (or were otherwise agreed to by the parties), they would still not provide sufficient grounds for invoking equitable estoppel principles. Cf.* Hamlin Development Co. v. Commissioner, *T.C.Memo.1993-89.*

It has been held that each of the following requirements must be met for equitable estoppel: (1) There must be a false representation or wrongful misleading silence; (2) the error must originate in a statement of fact, not in an opinion or a statement of law; (3) the one claiming the benefits of estoppel must not know the "true" facts and must reasonably rely on the false statement; and (4) that such person must be adversely affected by the acts or statements of the one against whom an estoppel is claimed. *Lignos v. United States,* 439 F.2d 1365, 1368 (2d Cir.1971); *Kronish v. Commissioner,* 90 T.C. 684, 695-697 (1988); *Century Data Systems, Inc. v. Commissioner,* 86 T.C. 157, 165 (1986). Petitioner has not alleged, and certainly has not established, the requisite false representation or wrongful misleading silence on the part of the Commissioner. Nor for that matter have any of the other requirements listed above been proven or even asserted.

We have time and again stated that equitable estoppel is to be applied against the Commissioner only with "the utmost caution and restraint." *Boulez v. Commissioner,* 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C.Cir.1987); *Estate of Emerson v. Commissioner,* 67 T.C. 612, 617 (1977) ; *Mortenson Roofing Co. v. Commissioner,* T.C.Memo.1992-112, 63 T.C.M. (CCH) 2186, 2188, 93 RIA T.C.Memo. par. 92,112; see also *Schuster v. Commissioner,* 312 F.2d 311, 317 (9th Cir.1962); *Guenzel's Estate v. Commissioner,* 258 F.2d 248, 253 (8th Cir.1958). Under the circumstances of this case, equitable estoppel principles are clearly not applicable here.

We have found each of petitioner's arguments against the Commissioner's retroactive disqualification of its plan for the plan years 1985 through 1987 to be unpersuasive.

*Decision will be entered for respondent.*

FN1. Except as otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years at issue.

FN2. Petitioner does not present any separate argument with respect to sec. 501(a), and there is no dispute that exemption of the trust under sec. 501(a) would follow automatically in this case from qualification of the plan under sec. 401.

FN3. TRA was the first of two divisions of the Deficit Reduction Act of 1984 (DEFRA), Pub.L. 98-369, 98 Stat. 494, enacted July 18, 1984. TRA made various amendments to the Internal Revenue Code of 1954. The other division of DEFRA, the Spending Reduction Act of 1984, is not relevant to this case. The parties in their briefs and in various documents in the administrative record have referred to DEFRA and TRA interchangeably, even though the amendments to sec. 401(a) that are the subject of this controversy were more specifically part of TRA.

FN4. The waters have been muddied by MMT's subsequent submission of another plan in July 1988 signed at that time, purporting to be the only executed plan meeting the requirements of TRA and REA. The plan thus submitted was in response to the Commissioner's request in an undated letter to petitioner for information as to whether the plan was timely amended so as to satisfy the requirements of TRA and REA. That submission was made in an enclosure accompanying a letter of July 19, 1988, signed on behalf of MMT by one of its partners. The letter stated that MMT had relied on Gogerty, its former plan administrator, to provide it with any amendments necessary to keep the plan in compliance, and that Gogerty "must have failed to properly perform its duties if the plan was allowed to fall out of technical compliance." The letter further stated that petitioner "searched * * * [its] records" and asked its former plan administrator [Gogerty] to "search the records", that petitioner has been "unable to locate a signed and dated document amending the previous plan", that the "previous administrator has provided us with a document which was neither signed nor dated", and that "I have signed this and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 1993-99     Page 6
(Publication page references are not available for this document.)

enclose it herewith." The enclosed plan was captioned "Second Amendment" and was not dated. Why the IRS made this request of petitioner is somewhat of a mystery since it already had the amended plan submitted by Lexington in January 1988. Perhaps it was aware of the Lexington plan, which it regarded as untimely, and was inquiring merely to learn whether there was some other amendment which had been adopted prior to the Lexington plan that was qualifying and timely as to all years. Further adding to the confusion is the implied suggestion in petitioner's letter of July 19, 1988, that there had not been any prior signed qualifying amendment to its plan to meet the TRA and REA requirements, apparently ignoring the Lexington plan, and that it was submitting such an amendment for the first time. The writer of that letter would seem to have been wholly unaware of the signed amended plan submitted by Lexington with its letter of January 27, 1988. Although that amended plan turned out to be timely for the years beginning after December 31, 1987, it was untimely as to the years 1985 through 1987, as we hold hereinafter.

FN5. The top-heavy concept was introduced as part of a series of provisions contained in the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. 97-248, 96 Stat. 324, enacted September 3, 1982. These provisions denied qualification under sec. 401 where certain employees received too large a share of the benefits, and they also imposed additional requirements for vesting and minimum benefits with respect to top-heavy plans. Sec. 240 of TEFRA, 96 Stat. at 514-520.

FN6. The chronology of the various deadline extensions announced by the IRS is set forth in our opinion in *Stark Truss Co. v. Commissioner*, T.C. Memo.1991-329 n. 3, discussed *infra*.

FN7. Although sec. 401(b) is relied upon in the petition, the point is not developed on brief.

FN8. Sec. 401(b) reads as follows:
(b) CERTAIN RETROACTIVE CHANGES IN PLAN.--A stock bonus, pension, profit-sharing, or annuity plan shall be considered as satisfying the requirements of subsection (a) for the period beginning with the date on which it was put into effect, or for the period beginning with the earlier of the date on which there was adopted or put into effect any amendment which caused the plan to fail to satisfy such requirements, and ending with the time prescribed by law for filing the return of the employer for his taxable year in which such plan or amendment was adopted (including extensions thereof) or such later time as the Secretary may designate, if all provisions of the plan which are necessary to satisfy such requirements are in effect by the end of such period and have been made effective for all purposes for the whole of such period.

FN9. Sec. 1.401(b)-1(b):
Disqualifying provisions. For purposes of this section, with respect to a plan described in paragraph (a) of this section, the term "disqualifying provision" means:
(1) A provision of a new plan, the absence of a provision from a new plan, or an amendment to an existing plan, which causes such plan to fail to satisfy the requirements of the Code applicable to qualification of such plan as of the date such plan or amendment is first made effective, or
(2) A plan provision which results in the failure of the plan to satisfy the qualification requirements of the Code by reason of a change in such requirements effected by the Employee Retirement Income Security Act of 1974 (Pub.L. 93-406, 88 Stat. 829), hereafter referred to as "*ERISA*", or by the Tax Equity and Fiscal Responsibility Act of 1982 (Pub.L. 97-248, 96 Stat. 324), hereafter referred to as "*TEFRA*". For purposes of this subparagraph, a disqualifying provision includes the absence from a plan of a provision required by such change if the plan was in effect on the date such change became effective with respect to such plan. [Emphasis supplied.]

FN10. Thus, the amendment adds to the list of statutory enactments the Tax Reform Act of 1986 (to be sharply distinguished from TRA, the Tax Reform Act of 1984) and the Omnibus Budget Reconciliation Acts of 1986 and 1987, but significantly does not refer to TRA or REA. And the amendment also adds another type of "disqualifying provision" to cover changes in the law "[e]ffected by amendments to the Code that are designated by the Commissioner, at his discretion." However, as noted in *Kollipara Rajsheker, M.D., Inc. v. Commissioner*, T.C. Memo.1992-628, the Commissioner has not designated TRA or REA as statutory enactments within this category.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

T.C. Memo. 1993-99                                                                                              Page    7
(Publication page references are not available for this document.)

FN11. EPCAPP is explained in an interview of IRS representatives, a copy of the transcript of which is included in petitioner's opening brief as "attachment 4".

FN12. See page 2 of "attachment 4" referred to *supra* note 11.

FN13. See page 4 of "attachment 4" referred to *supra* note 11.

FN14. Petitioner's opening brief indicates that EPCAPP was first implemented by the IRS in December of 1990. See petitioner's opening brief, p. 13. As indicated earlier, the IRS Appeals Office issued a final revocation letter on April 11, 1990, determining that petitioner's pension did not meet the requirements of sec. 401(a) for the plan years ended December 31 of 1985, 1986, and 1987; and petitioner filed its amended petition with this Court on September 10, 1990.

FN15. Petitioner contends, inter alia, that the plan had no operational defects and that none of the participants were, therefore, disadvantaged by the late amendment; that when MMT changed plan administrators, the defects were immediately discovered and corrected; that it relied on the presumed expertise of the former plan administrator (Gogerty) who gave repeated assurances that the plan was doing everything necessary to remain in compliance with sec. 401(a); that the former plan administrator shielded itself from legal liability by not listing himself as a named fiduciary; and that the former plan administrator is judgment proof in any event, because he is uninsured. See petitioner's reply brief, pp. 3-4.

T.C. Memo. 1993-99, 1993 WL 80580 (U.S.Tax Ct.), 16 Employee Benefits Cas. 2001, 65 T.C.M. (CCH) 2127, T.C.M. (RIA) 93,099, 1993 RIA TC Memo 93,099

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.