# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TIMOTHY D. LAURENT** | : | |
| | : | |
| **On behalf of himself and all others similarly situated,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.  05-1291 (PLF)** |
| **v.** | : | |
| | : | |
| **PRICEWATERHOUSECOOPERS LLP,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER COUNTS ONE THROUGH FOUR OF THE FIRST AMENDED CLASS ACTION COMPLAINT

Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
Phone: (202) 243-1000
Fax:    (202) 243-1001

August 11, 2005                    Attorney for the Plaintiff and the proposed Class

# TABLE OF CONTENTS

**Introduction** ...................................................................................................... 1

**Summary of Argument** ...................................................................................... 3

      The Prohibition Against Forfeiture of Vested Benefits ................................... 7

      The Prohibition Against Excessive "Backloading" .......................................... 8

      The Prohibition Against Age Discrimination .................................................. 8

**Standards Governing This Motion** ...................................................................... 10

**Statement of Materials Facts as to Which
There is No Genuine Issue** ................................................................................ 10

**Argument** ............................................................................................................ 17

  **I.**  **The RBAP's 5-Year "Normal Retirement Date" Does Not State a Valid
"Normal Retirement Age"** ......................................................................... 17

    **A.**  **A Cash Balance Plan is a Defined Benefit Plan and Must Satisfy
Defined Benefit Plan Standards** ............................................................ 19

        1.  Only Two Types of Plans:  Defined Contribution and Defined
Benefit ................................................................................................ 19

        2.  Two Very Different Definitions of the "Accrued Benefit" under the
Plan ..................................................................................................... 21

        3.  Lump Sum Distributions under Defined Benefit Plans .......................23

        4.  Defined Benefit Plans with a "Cash Balance" Formula ..................... 24

        5.  Defined Benefit Plan Standards Applied to a Cash Balance Plan ..........................26

        6.  Implications for the Instant Motion .....................................................28

    **B.**  **The 5-Years of Work Date is Invalid as a "Normal Retirement Age"
Because a Date is Not an Age**……….…………………………………......…... 30

**C. Even Assuming a Date May Be Used as an Age, 5 Years of Work Does Not State a Valid Normal Retirement Age UnderThe RBAP**…………………………..31

1. The 5-year Age Violates the Statute's Plain Language Even if a Date Can Be Used in Place of an Age……………………………………………………31

2. The 5-year Retirement Age Cannot Be Reconciled with ERISA's Core Participant Protections………..….....……………………………………………34

    a. ERISA is Concerned with Form Only if it Protects Substance - Form Cannot Defeat Substance…………………………..…35

    b. PwC's Definition Permits Unlimited Backloading Which Would Strike at the Heart of the Statute……………………………..………………37

    c. The 5-Year Age is Incompatible With the Nature of a True Retirement Plan…………………………………………..……....……37

3. The Legislative History Confirms Plaintiff's Plain Meaning Reading…...…………38

4. PwC's Position Has No Support .................................................................41

5. PwC's Interpretation is Otherwise at Odds with the Law ...........................................44

**Conclusion** .................................................................................................46

**Certificate of Service** ...............................................................................47

**Appendix of Statutory and other relevant authorities** ...........................................48

# INTRODUCTION

The First Amended Class Action Complaint (Doc. 3) (hereinafter "Complaint" or "Compl.") challenges the legality under ERISA[1] of the design and operation of three ERISA-governed employee benefit plans (the "Plans") – one defined benefit "cash balance" pension plans and two defined contribution savings plans – sponsored by Defendant PricewaterhouseCoopers LLP ("PwC" or the "Firm"). This motion seeks a declaration in Plaintiff's favor on a question of law concerning the cash balance pension plan, the Retirement Benefit Accumulation Plan ("RBAP" or the "Plan"), which expressly states and PwC agrees is a "defined benefit" pension plan. That question is: **Is the "normal retirement age" of employees covered by the Plan the date each employee completes 5 years of employment with the Firm, merely because PwC _says_ it is** – even if this allows PwC to avoid complying with several key provisions of ERISA and the Internal Revenue Code?

The Court's ruling on this question may be the single most important decision it makes in this case. An early ruling promises to significantly streamline the remainder of the case – dramatically so, if decided in Plaintiff's favor.[2] A ruling for Plaintiff would almost inevitably lead to the restoration of tens of millions of dollars of retirement benefits owed now and in the future to thousands of PwC employees and former employees.

*    *      *

ERISA-governed retirement plans come in only two basic varieties: a plan is either a "defined contribution" plan or a "defined benefit" plan. A _defined contribution_ plan is a plan that provides for an individual account for each participant and calculates benefits for each participant

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, _et seq._

[2] If decided in Plaintiff's favor, the RBAP's liability under Counts One (improper lump sum calculations; forfeiture of vested benefits) is all but inevitable. As to Counts Two and Three (age discrimination) and Count Four (excessive backloading), although PwC does advance arguments for why the Plan might still avoid liability, Plaintiff submits and shows separately in his forthcoming opposition to PwC's motion to dismiss (Doc. 9) that its contentions lack merit. As to Count Five, Plaintiff also notes that if normal retirement age is age 65 and not 5 years of service, an aspect of that count will have been mooted.

based solely upon the amounts contributed to the participant's account, plus or minus any income, gains, or losses.  A *defined benefit* plan, on the other hand, is a plan that defines a benefit payable upon retirement by reference to an objective formula set out in the plan.   The characterization of a plan as a defined benefit or defined contribution plan is important because of the very different manner in which ERISA defines and regulates the benefits that accrue under each type of plan.  The "accrued benefit" under a defined contribution plan is simply the balance of the individual's account at any given time. ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B), and 26 U.S.C. ("IRC") § 411(a)(7)(A)(ii).[3]  The "accrued benefit" under a defined benefit plan, on the other hand, is explicitly quite different:  it is the benefit determined under the formula set forth in the plan and "expressed in the form of an annual benefit commencing at *normal retirement age*."  ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A); IRC § 411(a)(7)(A)(i) (emphasis added).

ERISA and the Internal Revenue Code (the "Code") define **"normal retirement age"** identically as the earlier of –

   (A) the time a plan participant attains normal retirement age under the plan, or

   (B) the later of (i) the time a plan participant attains age 65, or (ii) the 5th
        anniversary of the time a plan participant commenced participation in the plan.

ERISA § 3(24), 29 U.S.C. § 1002(24), and IRC § 411(a)(8).  "Normal retirement age" for the vast majority of defined benefit pension plans – and virtually all defined benefit plans with a "cash

---

[3] Plaintiff's Appendix to this memorandum reproduces some of the statutory and regulatory provisions relevant here. Plaintiff typically cites to both ERISA and the Code throughout his submissions because, while suit is brought under ERISA, many of the provisions of Title I of ERISA that are relevant here, regarding the vesting and accrual of benefits codified at 29 U.S.C. 1001 *et seq.,* were duplicated in ERISA's Title II and are now codified in parallel provisions of the Code, 26 U.S.C. ("IRC") § 401 *et seq.*  ERISA continues to be administered by three agencies -- Labor, Treasury and the Pension Benefit Guaranty Corporation.  However, in 1978, under Reorganization Plan No. 4 of 1978, § 101, 43 Fed. Reg. 47713, 47713, the IRS was given primary jurisdiction and rulemaking authority over ERISA's funding, participation, benefit accrual and vesting provisions.  ERISA § 3002(c), 29 U.S.C. § 1202(c) specifically adopts Treasury regulations promulgated under IRC §§ 410(a), 411 and 412.  *See also* 29 C.F.R. § 2530.200a-2 ("Regulations prescribed by the Secretary of the Treasury [under IRC §§ 410 and 411] shall apply for purposes of sections 202 through 204 of the Act").  Hence, Treasury regulations will often have direct application to the claims asserted and arguments made here.

balance"-style formula – is age 65.  That is either because the plan sponsor expressly identified the "normal retirement age under the plan" as age 65, or because the sponsor accepted the statutory default of age 65.

**This case is about PwC's attempt, under the guise of a fictitious "normal retirement age," to effectively convert a "defined benefit" plan into a "defined contribution" plan and thereby avoid having to pay out tens of millions of dollars in retirements benefits otherwise required by law.**

## SUMMARY OF ARGUMENT

The RBAP plan instrument ("RBAP") defines "Normal Retirement Age" as meaning:  "The *earlier* of the date a Participant attains age 65 or completes five (5) Years of Service."  RBAP § 2.32 (emphasis added).[4]  Under this definition – assumed to be the operative definition for present purposes – this means that all RBAP participants are deemed to reach their normal retirement age after completing 5 years of working for the Firm, *regardless of their age* – with the exception of a small handful of people who start work for the Firm after age 60.[5]  Full vesting of accrued benefits occurs no later than a participant's Normal Retirement Age – *i.e.,* for virtually everyone, also upon completion of 5 years of working for the Firm.  *Id.* § 6.1.

Thus, the file-room clerk straight out of high school will reach normal retirement age in his early-20's, the entry level accountant will reach hers in her mid-to-late 20's, and Plaintiff  Timothy Laurent, a CRM (customer relationship management) consultant, reached his normal retirement age at

---

[4] The parties use "RBAP" to refer both to *the employee benefit plan* known as The Retirement Benefit Accumulation Plan of PricewaterhouseCoopers LLP, and *the RBAP written plan instrument* referenced in the Complaint and attached as attached to PwC's motion to dismiss as Ex. C (incorporated by reference here as "RBAP plan instrument").  The employee benefit plan known as RBAP is "established," "maintained" and "operated" within the meaning of ERISA under more than just the RBAP plan instrument.  ERISA §§ 104(b)(2), (b)(4), 402(a), 29 U.S.C. §§ 1024(b)(2), (b)(4), 1102(a).  There is, among other things, a separate trust instrument and, critically important and discussed below, the statutorily required "summary plan description" (or "SPD").  ERISA § 102, 29 U.S.C. § 1024.

[5] The number is so small apparently that PwC, in its motion to dismiss arguing for the definition's validity, never mentions any such participants.

age 30 – unbeknownst to any of them because PwC does not inform participants of this "fact." There are some 30,000 defined benefit plans in the United States (*see* www.pbgc.gov), including hundreds of cash balance plans. **PwC will be unable to point to even a single other major plan sponsor that purports to define normal retirement age in this way** – except for PwC's client Bank of America Corporation ("Bank of America" or the "Bank"), which is now in litigation over this and other issues in the Western District of North Carolina.[6]

The reason PwC stands alone (along with client Bank of America) in attempting to define 5 years of work as normal retirement age is because it violates both common sense and the plain language of the statute to do so – but also because the other cash balance plan sponsors PwC approached with this idea had the sense enough to stay away from something that sounded too good to be true. Indeed, to adopt PwC's approach, to allow "normal retirement age" to be defined as the completion of 5 years of work, would make compliance with ERISA core defined benefit plan requirements optional whenever a plan sponsor decided it did not want to comply with them, reducing the law to little more than a farce. As one expert aptly put it when PwC's unorthodox definition first came to light, the 5-years-of-work normal retirement age PwC wrote into its Plan simply "guts" the statute.[7]

---

[6] *Pothier v. Bank of America Corp.*, Civ. No. 05-238 (W.D.N.C.) (motion to dismiss, plaintiffs' motion for summary judgment pending). PwC also convinced the Bank to adopt another one-of-a-kind innovation that the Firm was unsuccessful in convincing any other plan sponsor to attempt, according to that suit (in which undersigned counsel represents plaintiffs and the proposed classes). This innovation consisted of the employer's converting employees' individual 401(k) plan accounts into cash balance pension plan benefits and then taking participants' former 401(k) plan assets, commingling them with the cash balance plan's assets and then seeking to generate "arbitrage" profits with the use of what had been participants' money. According to the IRS, this was not one of PwC's better ideas: the IRS recently informed the Bank that it has concluded that in converting $3 billion of participants' assets from the defined contribution to the defined benefit form, the Bank violated ERISA and Code's "anti-cutback" rule, ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6), and the rights of tens of thousands of participants. *See* Bank of America Corp. SEC 10-K, March 2005 at 134.

[7] Exhibit ("Ex.") 1, "Cash Balance: Trouble for Bank Plans? IRS Scrutinizes Shortened Retirement Ages," *Pensions & Investments,* May 31, 1999. All exhibits are attached to the Declaration of Eli Gottesdiener, accompanying this motion.

PwC's definition fails any plain meaning or plain language test. "[T]he *date* a Participant . . . completes five (5) Years of Service" is not an "age" – it is, as the Plan states, *a "date"* (of assumed relevance) *regardless of age.*[8]  Moreover, it is not even remotely "normal" for PwC employees to "*retire*" after only working for 5 years.  Participants in the Plan may change employers after a few years, but they do not normally withdraw from full-time work and live on their savings and/or pension after 5 years of employment without regard to their age.  Perhaps for certain professional athletes or some other extremely specialized occupations, but 5 years of work is not a "normal retirement age" for accountants, financial consultants and office workers.  Indeed, PwC *agrees* that 5 years of work is not a "'*normal* normal retirement age" and is "well below" the "actual typical retirement age" for the Plan.  *See infra* Statement of Material Facts as to Which There is No Genuine Issue ("Stmt.") ¶ 14.  It could hardly maintain otherwise, since it consistently reports in required federal tax filings that Firm employees normally retire at *age 65*.  *See* Stmt. ¶ 11.[9]

Justice Scalia has famously said that "the acid test of whether a word can reasonably bear a particular meaning is whether you could use the word in that sense at a cocktail party without having people look at you funny."  *Johnson v. United States*, 529 U.S. 694, 718 (2000) (Scalia, J., dissenting).  Here, PwC's equating 5 years of work with the attainment of "normal retirement age" fails this basic, common sense test.

---

[8] The more honest formulation of "Normal Retirement Date" was used in the RBAP-look-alike cash balance plan adopted in 1998 by PwC's client, the Bank of America (the NationsBank Corporation).  *See* Ex. 2 (extract of plan instrument containing definition of "Normal Retirement Date" as the earlier of age 65 or "the date the Participant completes sixty (60) months of Vesting Service").

[9] Partners (which include non-CPA "principals") are a very small percentage of the Plan's participants and normally retire at age 60.  That, however, is solely due the Firm's mandatory partnership retirement policy and partnership agreement.  (The legality of that age 60 cut-off has being challenged as age discriminatory on the grounds that non-partners approaching age 60 who wish to continue working and still have the opportunity of making partner are unable to do both solely on account of their age.  *E.g., Murphy v. PricewaterhouseCoopers, LLP,* 05-1054 (RJL) (ADEA and DCHRA complaint).

But the more basic reason PwC's definition does not work is that _ERISA does not work_ if "normal retirement age" can be defined as any date of a plan sponsor's choosing, no matter how counterfactual. PwC's reading of the statute leads to absurd results – ones fundamentally at odds with ERISA's basic purposes. If a plan's "normal retirement age" need not be "real," several of ERISA's key requirements for defined benefit pension plans – the main focus of ERISA – effectively become optional, and the provisions embodying them reduced effectively to just words on a page. As Hubert Forcier, a cash balance plan practitioner who represents employers and edits the leading treatise on cash balance plans, agrees: "A [5-years-of-service] normal retirement age (**if recognized as proper**) permits a number of design features that would otherwise violate minimum standards under the Internal Revenue Code and the Employee Retirement Income Security Act of 1974." Ex. 3, Hubert V. Forcier, _Guide to Cash Balance Plans_, 11-1 (Aspen 2003 & 2005 Supp.) (emphasis added) (hereinafter "Forcier Treatise").

PwC also agrees that a 5-years-of-work retirement age lets it side-step ERISA's minimum standards: its current motion to dismiss relies heavily (or in the case of Count One, _exclusively_) on its ability to use a 5-year retirement age as the basis for its motion to dismiss the alleged violations of ERISA's minimum standards set out in Count One (improper calculation of lump sum distributions; forfeiture of vested benefits) and Counts Two and Three (age discrimination). _See_ PwC Mtn. at 2 ("Counts One, Two, and Three all fail" because PwC can use any definition of normal retirement age it wants). In PwC's prior, February 2005 motion to dismiss for failure to state a claim in the Southern District of Illinois (before Plaintiff's suit, commenced in November 2004, was dismissed for lack of venue in May 2005, _see generally Laurent v. PricewaterhouseCoopers LLP_, 04-809 (S.D. Ill.), PwC also relied almost exclusively on the 5-year retirement age to avoid liability under Count Four

(backloading) and should be assumed to be making the same argument here, although for tactical reasons it does not explicitly do so.[10]

Thus, the "minimum standards" that PwC's Plan violates but that PwC argues the 5-year retirement age relieves it from honoring include:

- **The prohibition against forfeiture of vested benefits**, *see* ERISA § 203(a), 29 U.S.C. § 1053(a), and IRC § 411(a).  All three Federal Circuit Courts of Appeal that have considered the issue have concluded that when a participant terminates employment before retirement age and requests a cash-out (or "lump-sum distribution") of his benefits under a cash balance plan, the plan must pay the participant an amount no less than the present value of his or her *projected retirement benefit* at normal retirement age, usually age 65.  It is not enough for a cash balance plan to simply pay the amount in the participant's "account," as if he were in a defined contribution plan.  Yet this is precisely what the RBAP does:  it pays departing participants only the value of their current account balances, causing employees to forfeit a significant portion of their nonforfeitable accrued benefits. *See* Count One.  According to PwC, the **sole** reason the Plan can do this is because it defines each employee's "normal retirement age" as the completion of 5 years of work.  PwC Mtn. at 2; PwC Mem. at 14-17.

---

[10] As discussed below, ERISA's "anti-backloading" rules that are designed to ensure that benefits accrue at a relatively uniform rate over a participant's entire career, thus ensuring that employers cannot undermine ERISA's mandated vesting regime.  *See* ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), IRC § 411(b)(1)(A)-(C). These rules go to the heart of ERISA and why it was enacted in the first place.  But consistent with their rationale, these rules apply up to but not beyond normal retirement age -- that is, after normal retirement age an employer can backload as much it wants.  (This is one of the many reasons why Congress can never have intended employers to fictionalize "normal retirement age" and reduce it to some brief time period like 5 years of work.)  In its first motion to dismiss, PwC said that its 5 year age was "fatal" to Plaintiff's backloading claim.  Ex. 4, PwC Feb. 2005 Mem. at 18-19.  PwC is correct:  the 5 year age does in effect repeal the backloading rules.  But after reading Plaintiff's opposition (filed in April) argue precisely that, PwC realized, belatedly, what should have been obvious and will to this Court be obvious: **its argument *proves too much***.  That is the sole reason why the Court will not see it explicitly made here. But because PwC does not disclaim reliance on this argument and it necessarily follows from the argument that normal retirement age is whatever PwC says it is, Plaintiff will assume it is made here as well.

- **<u>The prohibition against excessive backloading.</u>** Congress enacted the anti-backloading rules as part of ERISA because it believed they were essential to the proper functioning of the ERISA vesting rules, the need for which is one of the key reasons Congress enacted ERISA in the first place. See ERISA § 2(a), 29 U.S.C. § 1002(a). *See supra* n.10. But these rules cease to operate at normal retirement age. *Id.* If PwC is correct that a plan sponsor can designate *any* age or date as the "normal retirement age," then a plan sponsor would have the power to exempt itself from the anti-backloading rules altogether (as PwC has done). This would permit unlimited backloading of benefit accruals, not only in cash balance plans but in *all* defined benefit plans – precisely the loophole Congress intended to close by adopting the anti-backloading rules. As noted, for tactical reasons only, PwC is not now affirmatively seeking dismissal on this basis – but it will later if the 5-year retirement age is upheld.

- **<u>The prohibition against age discrimination,</u>** a prohibition that Congress significantly expanded in 1986, after the first cash balance plan arrived on the scene. ERISA § 204(b)(1)(G)-(H), 29 U.S.C. § 1054(b)(1)(G)-(H), and IRC § 411(b)(1)(G)-(H) forbid reducing a participant's accrued benefit or decreasing the rate of benefit accruals on account of age or the attainment of any age.[11] When measured by reference to each participant's projected retirement benefit at age 65, the RBAP violates these prohibitions because participants' accrued benefits are in some cases reduced, and the rate at which participants' benefits accrue under the Plan decreases as they grow older. *See* Counts Two and Three. PwC claims that this is the wrong standard – that the RBAP is not required to satisfy ERISA's age discrimination standards by reference to each participant's projected retirement benefit at

---

[11] ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H) was added to ERISA in 1986. The sequence is worth a brief mention because, as discussed more fully below, a standard theme one hears from cash balance plan sponsors trying to avoid application of the statute's plain language to their plans is the notion that these defined benefit plans should not be required to comply with all of the statute's defined benefit plan standards because the Congress that enacted ERISA did not know about cash balance plans. That may be true of the 1974 Congress that enacted the original set of vesting and accrual rules. But the Congress that supplemented the accrual rules with ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H) either knew about cash balance plans or must be presumed to have known about them because the first such plan, designed by a former PwC affiliate, was already on the scene and had been announced with great fanfare in 1985. *See* Stmt. ¶ 4.

age 65 – again, because of the way the Plan defines the "normal retirement age" of Plan participants. *See* 17-19.

*    *    *

It is self-evident that Congress could not possibly have intended to give employers such a simple means of evading ERISA's core strictures. ERISA was enacted to establish minimum standards that were to be mandatory, not optional. ERISA § 2, 29 U.S.C. § 1001 (Congressional findings). Thus, PwC's reading of "normal retirement age" is self-refuting because it necessarily ascribes to Congress the irrational desire to embed into the heart of this "comprehensive and reticulated" remedial statute, *Nachman Corp. v. Pension Benefit Guarantee Corp.*, 446 U.S. 359, 361 (1985), an almost effortless way of avoiding its core precepts. *See, e.g., Morales v. TWA*, 504 U.S. 374, 386 (1992) (rejecting argument that statute contains an "utterly irrational loophole"). PwC's "interpretation" is not serious - it is sleight of hand.

Each of the three Federal Circuit Court of Appeals that have issued substantive rulings in cash balance pension plan cases rejected similar attempts by cash balance plan sponsors to draft their way around ERISA. The employers (Xerox, Georgia-Pacific and Bank of Boston) argued that they had inserted terminology into their plans that effectively overrode the statute. All three courts ruled in favor of plan participants. As the Second Circuit explained:

> The Plan is correct that a pension benefit is defined according to the terms of the plan; but ERISA is quite explicit that *those terms are circumscribed by statutory requirements and restrictions.* **The Plan cannot contract around the statute.** *See* ERISA § 404(a)(1)(D) (documents and instruments governing plan may only be enforced insofar as they "are consistent with the provisions of [ERISA Titles I and IV]").

*Esden v. Bank of Boston,* 229 F.3d 154, 173 (2d Cir. 2000) (emphasis added). *Accord Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755, 762-63 (7th Cir. 2003) (Posner, J.);

*Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1251 (11th Cir. 2000).

The question this motion presents is, in the end, controlled by this simple principle. Employers cannot use plan language to rewrite ERISA to suit their convenience – especially not when, as here, the result is to violate key statutory rights of thousands of employees.

## STANDARDS GOVERNING THIS MOTION

A party is entitled to summary judgment "forthwith" under Fed. R. Civ. P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56 specifically envisions motions for partial summary judgment such as the one Plaintiff has filed here, seeking judgment or a declaration on a discrete issue of importance to claim or defense.  *See* Fed. R. Civ. P. 56(c).

## STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

1.      Defendant PricewaterhouseCoopers LLP ("PwC") was and is the sponsor of the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers, LLP ("RBAP") covering the employees, principals and partners of PwC.  *See* RBAP plan instrument at 1-2. The Plan had an effective date of July 1, 1994.  *Id.*  "PwC" is defined for purposes of this motion to include Price Waterhouse, LLP, a predecessor to PwC.

2.      Plaintiff Timothy D. Laurent is a former non-partner employee of PwC and participant in the RBAP, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).  In 2002, after terminating employment with PwC, he requested a single lump sum distribution of his benefits.

3.      The RBAP is a "defined benefit pension plan," RBAP 1-2, a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35), and IRC § 414(j), and a "pension plan"

within the meaning of IRC § 401(a) and Treas. Reg. § 1.401-1(b)(1)(i).  According to its most recent IRS Form 5500 filing, the RBAP as of June 30, 2004 had approximately 40,000 participants and approximately $2 billion in assets.

4.      PwC was the RBAP's designer and designs or assists in the design of cash balance plans for third-party clients.  *E.g.,* Ex. 5, "Cash Balance Notes," Pricewaterhouse Coopers May 2000 ("We at PricewaterhouseCoopers (PwC) find most of the assertions [of self-interested employer motivation and adverse financial impact on employees] to be inconsistent with our experience designing and implementing these plans ever since Kwasha Lipton (now part of PwC) developed the first one in 1985"); Ex. 6, Declaration of Richard J. Dorazil ¶¶ 17, 19 (explaining PwC's role in the Bank of America, then NationsBank Corporation, cash balance plan conversion and design process).[12]

5.      The RBAP plan instrument further states that a participant's "Accrued Benefit" is "For any Participant as of any date, the Participant's Deemed Account Balance credited to that date." RBAP § 2.1.  The "Deemed Account Balance" is defined as the amount equal to the annual compensation-based credits to the "account" made by the plan sponsor (the "Deemed Payroll Period Allocations"), plus or minus the participant's deemed or imputed "investment" returns or losses ("Deemed Investment Experience").  *Id.* §§ 2.13, 2.14.[13]  The Deemed Investment Experience is the hypothetical return that the participant "earns" (or loses) "investing" his hypothetical account balance in the investment options ("investment experience choices") the Plan offers to him.  *Id.* § 2.14.

---

[12] The Dorazil Declaration was submitted by the Bank in *Pothier v. Bank of America Corp.* on February 9, 2005 as Ex. A to Doc. 68 as part of motion to transfer that PwC joined the same day via Doc. 72.  As the Bank, joined by PwC, explains, citing to Dorazil Decl. ¶¶ 15-19, "[t]he genesis of the decision to convert the Pension Plan to a cash balance plan dates from 1995, when representatives of NationsBank began meeting with representatives of PwC in Charlotte, North Carolina to discuss the design and possible conversion of NationsBank's existing plan to a cash balance formula."  Doc. 68 at 4.

[13] The partners' formula under the Plan is quite different from the formula for rank-and-file employees, as the Complaint details at ¶¶ 51, 56-63 (citing relevant provisions of the RBAP plan instrument).

6.       As noted, the RBAP plan instrument defines "Normal Retirement Age" as meaning: "The earlier of the date a Participant attains age 65 or completes five (5) Years of Service." *Id.* § 2.32. Full vesting of accrued benefits occurs no later than a participant's Normal Retirement Age. *Id.* § 6.1.

7.       The RBAP plan instrument states that a Plan participant's "Normal Retirement Benefit" "shall be an amount equal to the Actuarial Equivalent (calculated by projecting the Deemed Account Balance to Normal Retirement Age using the Deemed Plan Interest Rate) of his or her Deemed Account Balance."  RBAP § 5.1.  Assuming application of § 2.32's 5 years of service completion date, there will never be any reason to or basis for "calculat[ing] the Actuarial Equivalent" of a participant's Deemed Account Balance to determine the Normal Retirement Benefit, because the Normal Retirement Benefit is always the "amount equal to . . . [the] Deemed Account Balance."  It will also never be possible to "project[] the Deemed Account Balance <u>to</u> Normal Retirement Age" because under no circumstance will a participant be entitled to a Normal Retirement Benefit prior to Normal Retirement Age since because the participant does not vest in whole or in part in his Accrued Benefit until Normal Retirement Age.

8.       In Mr. Laurent's case, the Plan determined the amount of his lump-sum distribution without projecting his hypothetical account balance to age 65 or any other legitimate normal retirement age.  It also did not figure Mr. Laurent's Normal Retirement Benefit by "calculat[ing] the Actuarial Equivalent" of his Deemed Account Balance to determine his Normal Retirement Benefit.  It simply determined his Deemed Account Balance and paid it to him, without making any effort to also pay him an amount equal to the value of the Plaintiff's accrued right to continue to earn investment credits to age 65.

9.       The RBAP had an affirmative legal duty to state the Plan's normal retirement age in its Summary Plan Description ("SPD") no later than July 1, 2002.  *See* 29 C.F.R. § 2520.102-3(l)

(SPD must "also include a statement describing the plan's normal retirement age, as that term is

defined in section 3(24) of the Act") Amendments to Summary Plan Description Regulations, 65 FR

70226, 70241 (Nov. 21, 2000).  At no time since the promulgation of the 1999 SPD has the Plan's

SPD ever stated that its normal retirement age was the earlier of age 65 or 5 years of service.  Instead,

the SPDs for 1999 to the present all state that "normal retirement age" under the RBAP is simply "**age

65**," *not* the completion of 5 years of service, and not the earlier of those two "ages."  *See* RBAP 1999

SPD at 14 (otherwise undated) (attached to PwC's motion to dismiss as Ex. D); 2000 SPD at 21

(revision as of July 1, 2001) (attached to PwC's motion to dismiss as Ex. E); 2003 SPD at 24 (July 1,

2003); 2004 SPD at 24 (July 1, 2004).[14]

> 10.    The RBAP's website for participants, known as Benefits Express, provides

participants with a glossary of terms, including the term "normal retirement age."  The glossary

defines "Normal Retirement Age (NRA)" as: "The age, as established by the plan, at which retirement

normally occurs."  Ex. 7 (emphasis added).

> 11.    Since its inception, the RBAP has consistently reported on its annual IRS Form 5500

information returns that the actual retirement age of non-partner employees for funding and actuarial

purposes is age 65.  *See* Ex. 8 (extracts from recent filings).

> 12.    When participants have completed 5 years of work for the Firm they are not informed

by PwC or the RBAP that they have attained normal retirement age under the Plan.  *See, e.g.* Exs. D

and E to PwC motion to dismiss, and the Benefits Express website, *passim,* referred to therein.  Nor do

participants receive a "suspension of benefits notice" informing them that by continuing to work past

---

[14] If necessary, Plaintiff will move for summary judgment at a later time on the basis of the SPDs' statements of the
normal retirement age of RBAP as age 65.

the date of completion of 5 years of service, the economic value of their "normal retirement benefit" may erode. *Id.*[15]

13.      In a September 30, 1999 letter addressed to the Treasury Department and Internal Revenue Service, PwC, wrote to defend the use of what it called "a low normal retirement age" – an example of which it said was "five years of participation in the plan."  Ex. 9, Letter from Ira Cohen, PricewaterhouseCoopers LLP, to IRS Commissioner Charles O. Rossotti and Deputy Assistant Secretary for Tax Policy Jonathan Talisman, Sept. 30, 1999, *reprinted in* Tax Notes Today, Nov. 18, 1999.  PwC's stated reason for writing was that "rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages . . . [and that] the IRS [may] decide[] to [prohibit the practice]."  *Id.* at 5-6.  PwC was referring to a series of press articles that disclosed PwC's and Bank of America's use of a 5-year retirement age in their cash balance plans.  These stories reported that many in the pension community questioned the wisdom and legality of the practice and that officials at the Treasury Department and the IRS were concerned and might take action.[16]

---

[15] Such a notice is required at normal retirement age unless a plan provides for actuarial adjustment of the normal retirement benefit, which the RBAP does not do.    See 29 C.F.R. § 2530.203-3(b)(4).

[16] The following articles, all pre-dating the PwC letter, are not offered for the truth of the matters asserted therein but simply for the fact that they appeared and contained the content they did:    *See* Ex. 10, "Employee Directed: Consulting Firm Practices What it Preaches on Cash Balance," *Pensions & Investments,* May 17, 1999 (PwC "has been pushing the envelope on innovative cash balance pension plan designs for its clients . . . [and] has . . . its own: a second-generation plan covering Pricewaterhouse employees that was set up in the mid-1990s"); Ex. 11, "Pension Downsizing, Continued," *Tax Notes,* May 24, 1999 ("now something has come along that even the slightly embarrassed Treasury may not be able to ignore. Pension advisers, emboldened by a decade of improvidently granted determination letters and reliance on a reassuring sentence in a preamble to an otherwise irrelevant regulation, have begun playing fast and loose with retirement ages in cash balance plans. . . . Retire in Five Years? . . . . [NationsBank's] new plan takes a hyper-technical approach to the question of what constitutes a normal retirement age . . . PricewaterhouseCoopers, which designed the NationsBank plan, put the same retirement age provision in its own plan"; "[t]he backloading rules of section 411(b), which cause complications for cash balance plans, are also believed to be avoided by the NationsBank definition of normal retirement age" because after normal retirement age the sponsor can "backload as much as it wants"); Ex. 1, "Cash Balance: Trouble for Bank Plans? IRS Scrutinizes Shortened Retirement Ages," *Pensions & Investments,* May 31, 1999 ("'The five-year normal retirement age looks like a contrivance to get around rules,' said an expert who did not wish to be identified"; "[o]fficials from the Treasury Department and IRS have been scrutinizing plans like NationsBank's that have defined 'normal' retirement as occurring . . . after 5 years' tenure. . . . Such shortened retirement ages short-circuit various pension rules pegged to the more conventional retirement ages of 60 and 65," including the rule against anti-backloading; "A short retirement age 'guts' the Employee Retirement Income Security Act, said a cash balance plan expert who declined to be identified.

14.    In describing the 5-year retirement age, the PwC letter says that it is "well below th[e] actual typical retirement age" and not a "'normal' normal retirement age." *Id.* at 2.  However, the letter blames the IRS for its use of the fictional retirement age, calling the fiction "a necessary result of poor rulemaking by the Treasury Department." *Id.*  Once the government "needlessly" published unreasonable rules, the government should have anticipated such an "equal and opposite" reaction. *Id.*

15.    Specifically, the letter accuses the IRS of having created the "dreaded whipsaw effect" (*i.e.,* the cash-out rule) by issuing IRS Notice 96-8 in 1996. *Id.* at 2-3.[17]

16.    The letter explains that the "low normal" retirement age is needed so cash balance plans do not have to make otherwise required "whipsaw" payments to participants -- *i.e.,* payments in excess of the "account balance" -- that PwC claims are "harming plans and their participants." *Id.* at 5.

17.    PwC explains says that the purpose of using the low normal retirement age is to "foil[]" the rules "created by the IRS" (sic, n.17) requiring these whipsaw payments. *Id.* at 6.

18.    PwC contends in the letter that while "the IRS was absolutely correct" that Treasury regulations require "all type of defined benefit plans" to calculate lump sums based on the value of the projected normal retirement benefit, the IRS should not enforce the regulations as applied to *cash balance* type defined benefit plans because the regulations are "inconsistent with their basic design [and] rational pension policy." *Id.* at 4-5.  The letter says that "until such time as the IRS" accepts this obvious truth and takes action to exempt cash balance plans from the regulations, the only "logical

---

'Twenty-eight is not a normal retirement age.'"; "Other plans with short normal retirement ages could face the same scrutiny. They include PricewaterhouseCoopers LLP"; "What's more, an inordinately short retirement age also renders ERISA's anti-backloading rules meaningless").

[17] The cash-out rule is not merely regulatory but statutory as well and dates back to 1984.  It is based on IRC § 417(e) and formally binding notice-and-comment regulations first issued in 1986 that became final in 1988.  Cash balance plan sponsors sought and were denied relief from the cash-out rule in 1991.  The Treasury Department and the IRS denied such relief on the basis that the rule was statutory. *See* 56 Fed. Reg. 47524, 47528 (1991).  IRS Chief Counsel Stuart L. Brown confirmed that this was the IRS' view in congressional testimony approximately a week before PwC sent its September 1999 letter.  Prepared Testimony of Chief Counsel for the Internal Revenue Service Stuart L. Brown Before the United States Senate Committee on Health, Education, Labor and Pensions, Hearing on Hybrid Pension Plans, September 21, 1999.

reaction" by cash balance sponsors is to resort to self-help via use of the low normal retirement age

because "the low normal retirement age avoids the Whipsaw Effect." *Id.* at 4-6 (emphasis added).[18]

19.    The letter says that PwC recognizes that "[t]he IRS may be concerned about the use

of low normal retirement ages" because "[t]he rules against 'backloading' the accrual of benefits in a

defined benefit plan apply only to the accrual of benefits up to a participant's 'normal retirement

age.'" *Id.* at 6.  The letter explains:

> These rules are designed to prevent plans from providing for the accrual of most of a
> participant's benefits later in his or her career, thereby circumventing the minimum vesting
> rules.  The anti-backloading rules came into the law in 1974 as part of the minimum vesting
> standards.  Under the minimum vesting standards, a participant must vest in a percentage of
> his or her benefit no less rapidly than under one of several statutory vesting schedules.
> Under the minimum vesting standards, a person's vested benefit is the product of (1) the
> benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage.  If an
> employer did not want to provide early vesting, the employer could provide negligible
> accruals until the point the employer desires to provide vesting; after all vesting 100%
> vesting in an accrued benefit of zero is not different from not vesting at all.  The fundamental
> problem was accruing large amounts in later years relative to small amounts in earlier years
> ("Backloading").  Therefore, Congress provided a floor of protection by enacting the Anti-
> Backloading Rules. . . . The Anti-Backloading Rules provide protection against backloading
> for the period from plan entry to the normal retirement age.  As a matter of law, benefits
> accrued subsequent to the normal retirement age are not subject to anti-backloading
> requirements.

*Id.* at 6.

20.    PwC thus acknowledges that the 5-year retirement age is capable "of manipulation as

a means of avoiding the Anti-Backloading Rules," which is "clearly undesirable."  *Id.*  But PwC asks

that the focus not be on the abuses the 5-year retirement age permits but on what it calls the "Law

Flaw" in the backloading rule – *i.e.,* Congress' failure to prohibit backloading *after* normal retirement

age.  *Id.*  PwC concedes, however, that it is unaware of any actual post-retirement-age backloading

---

[18] As PwC explained it, "Sir Isaac Newton's third law of motion states that for every action there is an opposite and
equal reaction." *Id.* at 5.  PwC's opposite and "equal" reaction to Treasury's unreasonable rulemaking was to define a
normal retirement age "well below the actual typical retirement age" to counter the effect of the government's rule,
rendering it harmless.  "It is only through the strength and wisdom of our hero in this saga (the low normal retirement
age) that the pension policy dragon . . . created by the IRS has been foiled."  *Id.* at 6.

abuses by plans that had adopted a typical normal retirement age of 65. *Id.* PwC urges that instead of prohibiting use of a 5-year normal retirement age the IRS should work to fix the backloading "Law Flaw" and ask Congress to enact *a new law* to limit backloading after retirement age, whether a low normal retirement age or a "'normal normal retirement age." *Id.* at 6.

21.    PwC offered no suggestion, pending the enactment of such recommended legislation (which has not been either enacted or introduced), as to what should be done given that under its definition backloading without limits is permissible after 5 years. *Id.*

## ARGUMENT

**I.    THE RBAP'S 5-YEAR "NORMAL RETIREMENT AGE" DOES NOT STATE A VALID "NORMAL RETIREMENT AGE."**

### INTRODUCTION

The Court is being asked to decide in this motion whether the "normal retirement age" of employees covered by the PwC cash balance plan is the date each employee completes 5 years of employment with PwC. PwC says this is the "normal retirement age" because that is how PwC defines it in the RBAP plan document. Plaintiff counters that defining it that way in a plan instrument does not make it so – that ERISA and the Internal Revenue Code cannot be so easily manipulated, nor its core provisions so easily defeated. That, in a nutshell, is the dispute.

In Part A below Plaintiff sketches in more detail the legal landscape, and the statutory wall dividing defined benefit plans and defined contribution plans that PwC has tried to breach with its 5-year retirement "age" to help demonstrate how thoroughly at odds PwC's definition of normal retirement age is with the statutory scheme as well as the plain language and legislative history of the text.

In Part B, Plaintiff shows that the Court would be on solid ground were it to decline as a threshold matter to give the RBAP's 5-years-of-service retirement "age" the effect PwC wishes it to

17

have, on the grounds that the *date* a participant completes 5 years of work regardless of age is not an

"*age*," which is what the statute expressly requires.  The result of such a ruling would be that the

Plan's normal retirement age is age 65 either by virtue of the Plan's own default (*i.e.*, RBAP § 2.32

already states that age 65 is the normal retirement age under some circumstances) or the statutory

default, *see* ERISA § 3(24)(B), 29 U.S.C. § 1002(24)(B).

Finally, in Part C, Plaintiff demonstrates that even assuming a date can be used as an age,

PwC's 5-year normal retirement "age" must be declared invalid.  It is basic to our law that form cannot

be elevated over substance where the effect is to defeat the will of Congress.  *See Bay Ridge Operating

Co., Inc. v.*  334 U.S. 446, 488 (1948) (Frankfurter, J., dissenting) ("We have again and again pierced

through such deceptive forms").  Here, that principle is especially important to enforce because PwC

has admitted it uses the 5-year age with specific intent to "foil[]" the law.  Stmt. ¶ 17.

As is plain on its face, ERISA requires of an employer seeking to exercise the privilege of

specifying a "normal retirement age" age lower than age 65 for its plan's covered workforce, that the

alternative normal retirement age must be:  (1) an *age* (2) at which it is *normal* (3) for the plan's

participants to take *retirement.*  The RBAP's 5-years of work definition meets none of these standards.

Even if a *date* can be used in place of an *age* despite the plain language of the statute, the completion

of 5 years of work is indisputably not an age, date or time at which it is *normal* for a PwC employee to

take *retirement*.  This plain reading of the statute alone is enough to resolve the issue in Plaintiff's

favor.  *See, e.g., United States v. Turkette*, 452 U.S. 576, 580 (1981) ("If the statutory language is

unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language

must ordinarily be regarded as conclusive").

However, even if the plain meaning were not enough, the invalidity of the 5-year normal

retirement "age" is confirmed by other provisions of ERISA, its structure, legislative history, and the

absurd results and statute-crippling consequences  that would follow a ruling sustaining the use of

PwC's "definition."

      A.      **A CASH BALANCE PLAN IS A DEFINED BENEFIT PLAN AND MUST SATISFY DEFINED BENEFIT PLAN STANDARDS.**

      1.      **Only Two Types of Plans:  Defined Contribution and Defined Benefit.**

As the Supreme Court has admonished, "it is essential to recognize the difference between

defined contribution plans and defined benefit plans."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432,

439 (1999).  Indeed, ERISA-governed retirement plans come in only those two basic varieties:  a plan

is either a "defined contribution" plan or a "defined benefit" plan – there is no middle ground.  So

clearly – and rigidly – does the law distinguish between the two that it explicitly states that any plan

that does not qualify as a defined contribution plan *is* a defined benefit plan.  ERISA §§ 3(34), (35), 29

U.S.C. §§ 1002(34), (35); IRC §§ 414 (i), (j); *Concrete Pipe and Products of Calif., Inc., v. Constr.

Laborers Pension Trust for South. Calif.*, 508 U.S. 602, 607 (1993).

The chief distinction between a defined contribution plan and a defined benefit plan is the

way the plans determine and express benefits.  A *defined contribution* plan (or "individual account"

plan) "does not specify benefits to be paid, but instead establishes an individual account for each

participant to which employer contributions are made."  *Connolly v. PBGC*, 475 U.S. 211, 230 (1986)

(O'Connor, J., concurring).  The statute thus defines such a plan as one "which provides for *an

individual account for each participant*" and calculates benefits for each participant "based *solely

upon the amounts contributed to the participant's account*, [plus or minus] any income, expenses,

gains, losses, and any forfeitures of accounts of other participants which may be *allocated to each

participant's account*."  ERISA § 3(34), 29 U.S.C. § 1002(34); IRC § 414(i) (emphasis added).

The benefit an employee receives under a defined contribution plan is indeed "defined" by

the contributions made to his or her account, plus or minus their investment or earnings experience.

*Alabama Power Co. v. Davis*, 431 U.S. 581, 593 n.18 (1977).  Employees in a defined contribution plan "are promised only that they will receive the balances in their individual accounts."  *PBGC v. LTV Corp.*, 496 U.S. 633, 637 n.1 (1990).  "[U]nder such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits."  *Nachman*, 446 U.S. at 364 n.5.  Familiar examples of defined contribution plans include profit-sharing plans and 401(k) plans.  Benefits are usually payable in a lump sum, with other optional forms often available.

A *defined benefit* plan is different.  As its name implies, the benefit under a defined benefit plan is "defined" not by the contributions made to an account and the earnings and losses thereon, but by an objective formula set out in the plan.  *Mead Corp. v. Tilley*, 490 U.S. 714, 717 (1989) ("A defined benefit plan is one which sets forth a fixed level of benefits").  The formula must render the benefit "definitely determinable" – and not subject to ongoing employer discretion.[19]

A common formula under a traditional defined benefit plan provides that a participant's benefit will be an annual benefit commencing at age 65 equal to the participant's years of service multiplied by the average of the participant's highest five years of compensation, times a stated percentage, such as 2%.  Employer contributions to a defined benefit plan are calculated on the basis of a number of actuarial assumptions about such things as employee turnover, mortality rates, compensation increases, and the expected rate of return on invested plan assets.

In a defined benefit plan, no individual or separate accounts are maintained and the participant's benefit is unaffected by the amount of earnings on the money held under the plan.  *Hughes Aircraft*, 525 U.S. at 439 (a defined benefit plan "consists of a general pool of assets rather than individual dedicated accounts").  Unlike defined contribution plans, defined benefit plans need

---

[19] IRC § 401(a)(25) ("A defined benefit plan shall not be treated as providing definitely determinable benefits unless, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, such ssumptions are specified in the plan in a way which precludes employer discretion"); Treas. Reg. § 1.401-1(b)(1)(i) (defined benefit pension plan must "provide systematically for the payment of definitely determinable benefits").

not be, and often are not, fully funded – as evidenced by current news accounts about the growing

financial peril of the government's pension insurer, the Pension Benefit Guaranty Corporation.

> **2.    Two Very Different Definitions of the "Accrued Benefit" under the Plan.**

While all of the foregoing defined benefit-defined contribution plan distinctions are

important, the distinction most relevant to this case is *the diametrically opposed* way in which the

statute describes the legally protected benefit a participant accrues under each type of plan.

ERISA defines an employee's "accrued benefit" under a plan as:

> (A)    in the case of a *defined benefit* plan, the individual's accrued benefit determined under the plan and, except as provided in [ERISA] § 204(c)(3), expressed in the form of an annual benefit commencing at normal retirement age, or

> (B)    in the case of a plan which is an individual account plan [*i.e.*, a *defined contribution* plan], the balance of the individual's account. . . .

ERISA § 3(23), 29 U.S.C. § 1002(23); IRC § 411(a)(7) (emphasis added).

As the Supreme Court observed in *Hughes Aircraft*:

> Th[e] term ["accrued benefit"], for purposes of a defined benefit plan, is defined as "the individual's accrued benefit determined under the plan [and ordinarily is] expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A). **By contrast**, an "accrued benefit" for purposes of defined contribution plans means "the balance of the individual's account." ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B).

*Hughes Aircraft,* 525 U.S. at 439 (emphasis added, footnote omitted).

The contrast between the two definitions is stark. The accrued benefit under a defined

contribution plan is simply "the balance of the individual's account" at any given time. It is always a

*current* benefit – the amount accumulated to date based on the amount contributed to the account plus

(or minus) actual investment results – not a *projected* retirement benefit based on a formula.

The accrued benefit under a defined benefit plan, on the other hand, can never be defined as the balance of the participant's account. Indeed, a defined benefit participant *has* no "individual account." Rather, the accrued benefit is "determined under the plan" – *i.e.*, defined by the formula set forth in the plan – and "expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A); IRC § 411(a)(7)(A)(i).[20]

The defined benefit "accrued benefit" definition does not dictate the amount or even the manner in which the amount of the benefit must be determined: that is essentially a matter of private contract. *Alessi v. Raybestos-Manhattan, Inc.* 451 U.S. 504, 511 (1981). For example, a defined benefit might measure benefits by a formula based on years of service, by establishing a fixed dollar amount payable at retirement, or by reference to a *hypothetical* account balance (as under many cash balance plans, discussed below). **But the statute provides that no matter how the amount of benefits under a plan is determined, the benefit, once calculated, must be *expressed as* an annual benefit commencing at normal retirement age – *i.e.*, as a normal retirement annuity.** This is black letter law.

The reason the statute requires the accrued benefit under a defined benefit to always be expressed in the form of a normal retirement annuity is two-fold. First, that is how Congress intended pensioners to "normal[ly]" receive their defined benefit pension benefits (to complement social security benefits).[21] Second, it is the format Congress decided to establish as the standard against which the statute's minimum requirements would be applied, most notably, the benefit accrual standards set forth in ERISA § 204, 29 U.S.C. § 1054. Rather than write rules that address every conceivable distribution format, Congress decided it made sense to require that benefit formulas be

---

[20] The annual benefit commencing at normal retirement age is often referred to as the normal retirement annuity or normal retirement benefit. ERISA §§ 3(22), (24), 29 U.S.C. §§ 1002 (22), (24), Code §§ 411(a)(8), (9).

[21] Hence, a defined benefit, unlike a defined contribution plan, is always required to offer the benefit to participants in the form of an annuity. ERISA § 205(b)(1)(A), 29 U.S.C. § 1055(b)(1)(A), IRC § 401(a)(11)(B)(i).

"normalized" so that a defined benefit formula would always express the benefits that accrued under the plan in terms of an annual benefit commencing at normal retirement age.

### 3.  Lump Sum Distributions under Defined Benefit Plans.

While ERISA requires that a defined benefit plan must *express* the benefits that accrue under the plan in the form of a normal retirement annuity, it does not require that benefits can only be *paid* in that form.  For instance, many traditional defined benefit plans permit participants upon termination of employment to cash-out their benefits in single lump sum distributions.   This explains why the statutory "accrued benefit" definition quoted above provides that the accrued benefit under a defined benefit plan must be expressed in the form of an annual benefit commencing at normal retirement age "except as provided in [ERISA] § 204(c)(3)."  ERISA § 204(c)(3) explains what happens when the accrued benefit is paid in a form other than a normal retirement annuity.  It provides: "If an employee's accrued benefit is to be determined as an amount *other than* an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit" (emphasis added).  ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), IRC § 411(c)(3).

In plain English, this means that a defined benefit plan can offer other forms of payment as alternatives to an annual benefit commencing at normal retirement age – **but only if those alternatives are the actuarial equivalent of the normal retirement annuity.**  This is to protect plan participants; to ensure they do not forfeit benefits to which they are lawfully entitled merely because they elect to accept payment in a form other than a normal retirement annuity.

To prove that a particular distribution complies with ERISA § 204(c)(3), a plan must always *first* determine what a participant's benefit would be if paid in the form of an annuity commencing at normal retirement age.  Otherwise, it would be impossible to demonstrate that the payment was the

"actuarial equivalent" of the normal retirement annuity. This confirms the fundamental principle embodied in the ERISA definition of "accrued benefit" (discussed in section 2 above) that every defined benefit plan must express the benefits accrued thereunder in the form of an annuity commencing at normal retirement age.

Because "actuarial equivalence" can be in the eye of the beholder (or the beholder's actuary), ERISA requires a plan to specify the interest rate and mortality assumptions used to determine actuarial equivalence with the normal retirement benefit. Moreover, since 1984, ERISA §§ 203(e) and 205(g), and their Code analogues, IRC §§ 411(a)(11) and 417(e), have eliminated the ability of plans to select unreasonably high discount rates to calculate lump sum present values, by specifying the precise actuarial assumptions that must be used.

### 4.    <u>Defined Benefit Plans with a "Cash Balance" Formula</u>.

Where do "cash balance" pension plans of the type maintained by PwC fit into the equation? Cash balance plans like the RBAP are designed to have the look and "feel" to participants of a defined contribution plan. The typical cash balance plan describes its benefits not as an annuity but by reference to the amount of a participant's notional "account balance." The employer periodically credits the participant's "account" with "pay credits" determined under a formula selected by the employer and set forth in the plan -- typically equal to a percentage of each participant's salary or wage -- and the account balance then grows via "interest credits" typically pegged to the rate paid by Treasury securities. These notional "allocations" and "earnings" are designed to mimic the allocations of actual contributions and actual earnings to an employee's account that would occur under a defined contribution plan.

But in fact, cash balance plans are not defined contribution plans. They are defined benefit plans, because they do not satisfy the statutory definition for defined contribution plans: the

participants' accounts are not real; there are no gains, losses, income, expenses or forfeitures of accounts of other participants that are ever allocated to the participant's account; and participants' benefits are not "based solely" upon the amounts contributed to their accounts.[22]

Once it is recognized that a cash balance plan is a defined benefit plan, it follows that such plans must satisfy ERISA standards that are applicable to defined benefit plans.  It is not enough (nor even relevant) for a cash balance plan to satisfy the standards applicable to defined contribution plans. *See, e.g.*, *Esden*, 229 F.3d at 159 ("However 'hybrid' in design a cash balance plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary").  That is simply an application of the rule that defined contribution plans must comply with standards that govern defined contribution plans, and defined benefit plans must comply with standards that govern defined benefit standards -- something which the statute literally and emphatically commands.  *See, e.g.*, ERISA § 204(b), 29 U.S.C. § 1054(b) (setting forth accrual rules that specifically distinguish between the two types of plans, explicitly providing that defined benefit plans must satisfy one set of accrual standards and defined contribution plans another set of standards).[23]

There is simply no basis in ERISA, the Code, or the regulations for allowing a defined benefit plan with a cash balance formula to demonstrate compliance with ERISA by satisfying the standards applicable to defined contribution standards.  *See, e.g., Cooper v. IBM Personal Pension*

---

[22] As Judge Posner said in *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, *supra*:  "The reason for our scare quotes in our description of the cash balance plan is that the employee has no actual account, the employer makes no contributions to an employee account, and so there is no account balance to which interest might be added." *Id.* at 758.  *Accord Esden*, 229 F.3d at 162-63 ("notwithstanding that cash balance plans are designed to imitate some features of defined contribution plans, they are nonetheless defined benefit plans under ERISA.").

[23] See also IRS Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996) (reproduced in the Appendix), Sec. III.A ("A cash balance plan is a defined benefit plan, not a defined contribution plan, because the benefits provided are not based solely on actual contributions and forfeitures allocated to an employee's account and the actual investment experience and expenses of the plan allocated to the account. Section 411(a)(7) defines an employee's accrued benefit differently for defined benefit plans than for defined contribution plans. Also, defined benefit plans are subject to a number of statutory provisions that do not apply to defined contribution plans. These include the rules of section 411(b)(1) that limit "backloading" of accruals; the valuation rules of section 417(e); and the definitely determinable benefits requirement of section 401(a)(25). These provisions limit the extent to which a cash balance plan can mimic the benefit and accrual structure of a defined contribution plan.")

*Plan*, 274 F.Supp.2d 1010, 1021 (S.D. Ill. 2003) ("It is settled that a cash balance plan . . . is held to the same requirements regarding vesting and accrual of benefits as any defined benefit plan.").  No amount of plan language can change that statutory fact of life.  *See, e.g., Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*, 980 F.2d 465, 468 (7th Cir. 1992) (employer cannot evade statutory requirements with labels); *Laurenzano v. Blue Cross and Blue Shield of Mass., Inc. Retirement Income Trust*, 134 F. Supp.2d 189, 199 (D. Mass. 2001) ("terminology found in a retirement plan [cannot] defeat the intent of Congress").

**5.      Defined Benefit Plan Standards Applied to a Cash Balance Plan.**

What is the "accrued benefit" under a defined benefit plan with a cash balance formula?  **As under any defined benefit plan, it is the benefit determined under the terms of the plan, *expressed* as an annual benefit commencing at *normal retirement age*.**  This legal truism is the key to this motion.  Once understood, it becomes all too clear what PwC was up to when it adopted the 5-year "normal retirement age" strategy.

This truism has already been endorsed by all three Federal Courts of Appeal (the Second, Seventh, and Eleventh Circuits) that have considered the issue – and there is no reason to believe the D.C. Circuit would see things any differently.  These courts have uniformly concluded that the "accrued benefit" under a cash balance plan is *not* the amount in a participant's hypothetical account, but rather the normal retirement annuity *derived from* that hypothetical account.  According to the courts, the normal retirement annuity is derived by *projecting the account balance forward* to normal retirement age, based on the interest crediting rate set forth in the plan used to determine annual interest credits for active participants, and then converting the projected account balance into an annual benefit.[24]

---

[24] *See Lyons*, 221 F.3d at 1251 ("Unlike a defined contribution plan, the 'accrued benefit' under this [cash balance] Plan is not the amount in the Participant's Personal Account, but rather an amount derived *from* that hypothetical

To illustrate the required calculation, take a typical cash balance plan with a normal retirement age of age 65 and an interest crediting rate of 6%.  A participant's "accrued benefit" under this plan at any moment is his current account balance projected to age 65 at a 6% interest rate, then converted to a life annuity commencing at that age.  If the plan's interest crediting rate instead was based on a variable rate, such as the rate on 1-year Treasury bills, the projection to normal retirement age must either use the current interest rate or the average rate over a recent period.  *Id.*

The reason a cash balance plan must go through these gyrations to calculate a projected normal retirement annuity is, as explained in the previous sections above, because (1) ERISA requires every defined benefit plan to express the "accrued benefit" under the plan as an annual benefit commencing at normal retirement age, and (2) all of the ERISA standards that govern "accrued benefits" and "benefit accruals" under a defined benefit plan are applied by reference to this annual normal retirement benefit.

For instance, take the rule under ERISA § 204(c)(3) that provides that any benefit paid to a participant in a form other than a life annuity commencing at normal retirement age can be no less valuable than the normal retirement annuity.  As described above, the rule is meant to ensure that a participant does not forfeit any part of his legally protected accrued benefit merely because he elects to receive a distribution in a form other than a life annuity.  What the rule means in the context of a cash balance plan is that any cash-out or lump-sum distribution of an employee's benefit before retirement age must be the actuarial equivalent of the employee's projected normal retirement benefit.  **A cash balance plan cannot simply pay a departing employee the "balance in his account"** – *that is a*

---

account"; the Participant "earn[s] a vested interest in an amount at normal retirement age, to be calculated under the Plan by projecting forward the amount in his hypothetical account using the interest credit rates specified in the Plan.") (emphasis added); *Esden,* 229 F.3d at 165-66 (same); *Berger,* 338 F.3d at 762 (same).  *See also* IRS Notice 96-8, Section III.A ("Under a cash balance plan, the retirement benefits payable at normal retirement age are determined by reference to the hypothetical account balance as of normal retirement age, including benefits attributable to interest credits to that age").

*defined contribution concept.* Like the basic cash balance plan "accrued benefit" concept, this too has been confirmed by all three Federal Courts of Appeal that have considered the issue.[25]

Two final examples. First, as noted, ERISA requires benefits under a defined benefit plan to accrue in a relatively steady rate over an employee's career – this, to prevent a plan from "backloading" benefit accruals to such an extent that employees do not earn meaningful benefit accruals until they have worked for 20 or 30 years. ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and IRC § 411(b)(1)(A)-(C). Second, ERISA § 204(b)(1)(G)-(H), 29 U.S.C. § 1054(b)(1)(G)-(H), and IRC § 411(b)(1)(G)-(H), prohibit age discrimination under a defined benefit plan. These sections provide that a participant's "accrued benefit" cannot be reduced because of age and service, and that the "rate of benefit accrual" under a plan cannot be reduced merely because an employee grows older or attains a particular age.

These standards all apply by reference to the projected annual benefit commencing at normal retirement age – **not to the account balance.** The projected retirement benefit is crucial to these important participant protections -- indeed, it is ultimately what those rules are trying to protect. If a sponsor is permitted to play games with the projected normal retirement annuity – the "accrued benefit" under a plan – it can play games with ERISA and unravel its protections.

### 6.    <u>Implications for the Instant Motion.</u>

That is exactly what PwC has tried to do. By defining the "normal retirement age" under the

---

[25] *See Berger,* 338 F.3d at 761-62 (because a cash balance plan is a defined benefit plan, it "triggers the congressional policy of requiring that a lump-sum distribution of pension benefits equal to the value of the benefits if the employee decides to wait to the normal retirement age and take them then in the form of a pension"); *Esden,* 229 F.3d at 168 ("a cash balance plan must project the balance of the hypothetical account forward to normal retirement age and then pay out the present value of that projected balance, computed according to [Code] section 417(e)"); *Lyons* 221 F.3d at 1251 (a lump sum cash-out distribution from a cash balance plan "cannot be less than the present value of the normal retirement benefit determined in accordance with the Treasury regulation.") (citation omitted). *See also* IRS Notice 96-8, Sec. II.A ("[I]n order to comply with [Code] sections 411(a) and 417(e) in calculating the amount of a single sum distribution under a cash balance plan, the balance of the employee's hypothetical account must be projected to normal retirement age and then the employee must be paid at least the present value, determined in accordance with section 417(e), of that projected hypothetical account balance.").

RBAP as the date each employee completes 5 years of employment, it is manipulating the fundamental principle that the "accrued benefit" under a defined benefit plan must be expressed as an annual benefit commencing at normal retirement age.  By defining the normal retirement age for participants who have earned a vested benefit under the Plan as "now," the PwC has effectively altered the statute to define the "accrued benefit" as the "current account balance" – turning its cash balance plan into a defined contribution plan for purposes of applying ERISA accrued benefit standards.  It has, indeed, attempted to "gut" ERISA.

But however "creative," PwC Mem. at 21, a gimmick is just a gimmick.  PwC's claim that the RBAP's legality is to be measured as if it were a defined contribution plan simply because it says is in substance the same contention made by each of the plan sponsors in *Lyons, Esden* and *Berger*. The plan sponsors there also claimed that *their* cash balance plans were drafted so as to exempt them from the fundamental principle that the accrued benefit under a defined benefit plan is the projected normal retirement annuity.  They too argued that their plans were not, consequently, required to calculate cash-outs based on the projected age-65 annuity, but rather could simply pay departing participants their hypothetical "account" balances.  In each case, the Circuit Courts of Appeal were unanimous in rejecting the employers' arguments.  Typical of the arguments, and of the courts' responses, was the pitch made by Xerox that "its cash balance plan is not the same as the plan described in the IRS Notice [96-8], but is instead what it calls a 'hybrid' cash balance plan," to which Judge Posner replied:  "But the only thing that makes it hybrid, according to the plan's own description, is that it specifies a lump-sum entitlement that is not the prescribed actuarial equivalent of the pension benefit to which the plan entitles employees who leave their money in the plan until they reach their normal retirement age.  **So for 'hybrid' read 'unlawful.'**" *Berger,* 338 F.3d at 763 (emphasis added).

Here, PwC has simply repackaged these discredited arguments using slightly different wording. So for "[not] typical[]," PwC Mem. at 3, this Court should read "unlawful."

**B.** **THE 5-YEARS OF WORK DATE IS INVALID AS A "NORMAL RETIREMENT AGE" BECAUSE A DATE IS NOT AN AGE.**

As discussed in the Introduction, PwC's definition of the "Normal Retirement Age" of employees covered under the RBAP fails any plain meaning or plain language test. "[T]he *date* a Participant . . . completes five (5) Years of Service" is not an "age" – it is, as the Plan states, *a "date"* of assumed relevance *regardless of age.*

Unless otherwise defined, words used by Congress are to be interpreted as taking their ordinary, contemporary, common meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979). In common usage, "normal" means typical, usual, not deviant. To "retire" is "'to withdraw from one's position or occupation: to conclude one's working or professional career,'" *Meredith v. Allsteel, Inc.*, 11 F.3d 1354, 1358 (7th Cir. 1994) (*quoting* Webster's Ninth New Collegiate Dictionary). "Age" is the chronological point in one's life a person has reached at a given moment, measured typically in years. The phrase "normal retirement age" is thus the sum of its parts and plainly means an age at which it is "normal" for a person to retire, an age at which retirement *normally* occurs. "[N]ormal retirement age under the plan" is as obviously an age at which it is "normal" *for someone covered by that plan* to retire, an age at which retirement *normally* occurs *for the covered workforce*. PwC gets it right on the RBAP website when it explains that normal retirement age is: "The age, as established by the plan, at which retirement *normally* occurs.**"** Ex. 7 (emphasis added).

As a threshold matter, it is clear that, ironically, PwC has flubbed its attempt to "foil[]" the law by making the elementary mistake of which it accuses virtually everyone else: *not reading the statute.* It has designating a *date* where ERISA explicitly calls for an *age*. ERISA and the Code identically define "normal retirement age" as being *an age:* it is the earlier of *the "normal retirement*

*age under the plan"* or the <u>later of</u> "*age 65"* or *age 65 plus* whatever time it take for a participant who commenced participation in the plan after age 60 to have been in the plan for 5 years.  ERISA § 3(24), 29 U.S.C. § 1002(34); IRC § 411(a)(8) (emphasis added).

PwC says that despite what the statute says, it is entitled to use a normal retirement *"date"* instead of a normal retirement "age" because the statute refers to "'the *time* a plan participant attains normal retirement age under the plan.'"  PwC Mem. at 12 n.8 (emphasis in the original).  PwC says the RBAP's definition of normal retirement age as the *date* that a participant has five years of service is consistent with this statutory wording.  *Id.*  No, it is not.  The statute refers to "the *time* a plan participant attains" **a certain** *age* – normal retirement age – not the time a participant completes a certain number of years of service.[26]  The date or time an employee completes 5 years of service is obviously not an age.  If PwC wants to play with the words in the statute to evade its requirements, it certainly must live by the words it voluntarily wrote into its own Plan, especially the very words by which it attempted to "foil[]" those requirements.[27]

### C. EVEN ASSUMING A DATE MAY BE USED AS AN AGE, 5 YEARS OF WORK DOES NOT STATE A VALID NORMAL RETIREMENT <u>AGE UNDER THE RBAP.</u>

#### 1. The 5-Year Age Violates the Statute's Plain Language Even if a Date <u>Can Be Used in Place of an Age.</u>

---

[26] Congress' use of "the time when . . ." grammatically accommodates the fact that the statute references three kinds of normal retirement ages:  two ages which are just ages and a third which is an age plus a waiting period of up to 5 years (to ensure that a participant joining a plan after age 65 satisfies the vesting requirements).  ERISA § 3(24), 29 U.S.C. § 1002(24); IRC § 411(a)(8) ("normal retirement age under the plan"; "age 65"; "age 65" *plus* "the 5th anniversary *of the time* a plan participant commences participation in the plan").

[27] PwC cites a handful of cases that it says support the proposition that normal retirement age can be defined by reference to the completion of a specified number of years of service, PwC Mem. at 11-12, but these cases are distinguishable and in any event not binding on this Court.  All of the cases involved a default normal retirement age with an earlier retirement permitted for participants who had completed an extraordinary number of years of service, 25 or 30 years.  Here, the 5-year standard sets the baseline normal retirement age, and is not a mere exception for employees who completed a full career's worth of service and were permitted to retire before attaining a "normal" retirement age of age 65.

Assuming for sake of argument that a date can be used where the statute calls for an age, it is still be impossible to uphold a 5-years-of-work normal retirement age for this Plan. The text requires that the specified age (or, for argument's sake, date) have two defining characteristics. First, it must be a *retirement* age. Second, it must be a "*normal*" "retirement age." PwC's definition meets neither test.

The undisputed facts establish that it is not "normal" for PwC employees to take retirement after 5 years of work: the completion of 5 years of work is, in the words of PwC's letter to the IRS, not a "'*normal* normal retirement age" and "well below th[e] actual typical retirement age."

So too, the "retirement" aspect of "normal retirement age" also is not met by the PwC definition. Its 5-year retirement date is reached (or not) without regard to true retirement – that is why employees are not informed of this "milestone" when they reach it. Its "retirement" date is arbitrary vis-à-vis actual retirement – to the point that nominal "retirement" will most often be attained near the very outset of an employee's career at the Firm.[28]

Contrary to the PwC definition's arbitrary placement of retirement as occurring upon completion of 5 years of work, the statute makes clear that "retirement" and "normal retirement" must mean that age (or date) when the employee has reached the end of his working life and active participation in the plan, and hence is no longer in need of the protections of the anti-backloading rules. No other sense can be given to the Congressional determination that the all-important backloading rules would cease to operate upon attainment of normal retirement age. This is exactly how the Supreme Court expressed its understanding of the rules in *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), where the Court said that Congress enacted the anti-backloading rules to

---

[28] Congress was concerned to mandate vesting *long before* normal retirement age -- that was one of the reasons ERISA was enacted and one of its innovations. ERISA § 2, 29 U.S.C. § 1002 (Congressional findings and policy). But under PwC's definition vesting and retirement occur simultaneously and *routinely*, which is not in keeping with Congress' intent.

"limit[] the variation permitted in accrual rates applicable across the *entire period of an employee's participation* in the pension plan."  *Id.* at 512 (emphasis added).

PwC insists nonetheless that it has the right to define normal retirement age as 5-years of work because there is in effect a huge loophole in ERISA – noticed by no one for 20 years following ERISA's enactment in 1974 (the RBAP became effective in 1994) and by almost no one since.  This loophole, PwC contends, permits an employer to specify *any* age (or date) as the "normal retirement age" under the plan.  *See* PwC Mem. at 10-14.   Pointing to the absence of an absolute lower limit expressed as a number (such as "age 50"), contrasted with the upper limit of age 65, PwC reads the statute to provide that an employer can set the normal retirement age in its plan "*as low as it pleases*." Ex. 9, PwC Letter at 5.  It does not matter if that age is **arbitrary** in relation to the actual retirement age of the covered workforce:  as PwC sees it, Congress intended plan sponsors' right to specify their plans' normal retirement age to be completely "*unrestricted.*"  *Id.*  This "lack of any limitation," PwC Mem. at 11, on an employer's power to fix the plan's normal retirement age means that, at its whim and with impunity, the employer may push the plan's normal retirement age "'to a ridiculous extreme.'"  Ex. 4, PwC Feb. 2005 Mem. at 16 ("While plaintiff argues that PwC has taken this built in flexibility to a 'ridiculous extreme' (Cmplt. ¶ 126), he points to nothing in the statute that prohibits such a definition").

But PwC overlooks the plain language and plain meaning of the statute.  The statute does not say normal retirement age is "any" age (or *date*, 5-years of service not being an age) specified by the plan.  The age must be a "*normal retirement*" age under the plan.  By not establishing an absolute lower limit expressed as a number, Congress intended the retirement age definition to have a degree of flexibility so as to not lock plans into a one-size-fits-all retirement age of age 65 (or 62 or 60) when that might not match the normal retirement age of the covered workforce.  But Congress did not intend

that *the truth* be flexible.  Indeed, PwC has it backwards:  the fact that statute does *not* establish a lower limit expressed as a number is exactly why the plain meaning of the phrase "normal retirement age" must be **heeded,** not why it can be ignored.

PwC's construction of the statute is not a *reading* of the text so much as the application of a logical fallacy to it:  PwC argues that the fact that a plan's normal retirement age may be legitimately established at an age below age 65 means that it can legitimately be *any* age (or date).  That simply does not follow.  **Under PwC's reading, *none* of the words in the phrase "normal retirement age" are given any meaning**:  the normal retirement age need not be an age (it can be a date or maybe something else); the age/date need not be related to retirement except arbitrarily; and "normal" is simply ignored.  Thus, according to PwC's logic, normal retirement age under the RBAP could be ***age 12*** if the employer in its sole, unreviewable "discretion" thinks that "best."  PwC Mem. at 10.  "Congress could not have intended such a result."  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995).  To interpret ERISA in the way urged by PwC "would take textual *force majeure*, and certainly something closer to irresistible than the provision quoted."  *Central Laborers' Pension Fund v. Heinz*, 124 S. Ct. 2230, 2236 (2004) (rejecting an interpretation of an ERISA provision that would undercut accrued benefit standards).

> **2.    The 5-year Retirement Age Cannot Be Reconciled with ERISA's Core Participant Protections.**

Plaintiff has fairly and accurately presented PwC's *entire* argument, minus citation to *dictum* from a 27-year old IRS Revenue Ruling, discussed below, for why it should be permitted to build its retirement plan around an admitted untruth – an argument that cannot be squared with the plain language of the statute.  But even if it could somehow be said that the statute ambiguous as to whether a fictitious normal retirement age is permitted, PwC's interpretation would still have to be rejected because it would gut several core protections of the statute, render many of its provisions surplusage,

and clash with still others.  *See, e.g., May Dept. Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597, 603 (7th Cir. 2002) (Posner, J.) (rejecting argument in ERISA case that "if accepted would create a huge hole in the statute").  Plaintiffs' interpretation is the one "which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested."  *Comm'r of Internal Revenue v. Engle*, 464 U.S. 206, 217 (1984).

### a.    ERISA is Concerned with Form Only if it Protects Substance - Form Cannot Defeat Substance.

In its 1999 letter to the IRS, PwC admitted that it uses the 5-years-of-work "retirement age" in order to "foil[]" the law. Ex. 9 at 6.  In particular, it said the 5-years-of-work rule is necessary to neutralize the effect of the IRS' "needless[]," "[il]logical" – basically *illegitimate* – whipsaw rule.  *Id.* at 4-6.  Now, in federal court, PwC speaks in more measured tones but is in substance saying the same thing.  PwC now acknowledges, as it must, that whipsaw and the definition of accrued benefit in a cash balance plan are the law of the land – it does not try to convince this Court of what it was claiming in 1999, *i.e.,* that the accrued benefit in the cash balance plan is "fundamental[ly] . . . different" than that in a traditional defined benefit plan.  *Id.* at 3-5.  Instead, PwC takes a different tack:  it maintains that so long as it genuflects to the need to "project" forward to normal retirement age and calculate "actuarial equivalents," *i.e.,* **so long as goes through the motions –** as the RBAP plan instrument does in § 5.1 (providing in detail for actuarial equivalent calculations and projections to normal retirement age that PwC by design intends will never occur) – it is free to *mock* those legal requirements by draining "normal" - "retirement" - and "age" of any substance.  Its claim is so long as it follows form, the Court should not double-check for substance.

But the law is not interested in a charade.  The Supreme Court established long ago that employers will not be allowed to play games with words to evade federal labor laws.  *Walling v. Harnischfeger Corp.*, 325 U.S. 427 (1945); *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S.

419 (1945); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944).  These decisions, interpreting

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a) *et seq.,* involved employers trying to

sidestep laws with which they preferred not to comply but Congress had determined mandatory.  The

parallels to the instant case are striking.  In each case, the employers claimed that they could

simultaneously avoid yet not violate FLSA's overtime rules through the insertion of contrived

definitions of "regular rate" of pay into their employment agreements – definitions that were

"completely unrelated to the payments actually and normally" made to employees – with the result

that no overtime had to be paid.  The employers defended on the grounds that, under the terms of their

contracts, no obligation to pay overtime ever arose and that freedom-of-contract principles gave them

the right to reach to make such agreements as they could successfully negotiate with their workers.

      In each case, the Supreme Court ruled decisively that an employer has no right to define

"regular rate" of pay "in a wholly unrealistic and artificial manner so as to negate the statutory

purposes."  *Youngerman-Reynolds*, 325 U.S. at 426.  The principle to be derived from these cases is

that **labels will not excuse non-compliance with federal labor laws**, nor form permitted to overcome

substance through concocted definitions designed to evade the application of the law.

      The Supreme Court's uncompromising language is fully applicable here and leaves no doubt

that it was vain for PwC to ever think that it could succeed in its gambit.  *Id.* (**no "mere label" can**

**"allow [an employer] to escape" a statute's reach or "nullify all the purposes for which [the**

**statute] was created"**) (emphasis added); *Harnischfeger Corp.*, 325 U.S. at 430-31 ("No contract

designation . . . can negate the fact that these employees do in fact regularly receive the higher rate.

To compute overtime compensation from the lower and unreceived rate is *not only unrealistic but is*

*destructive of the legislative intent*"; "We cannot sanction such a patent disregard of statutory duties")

(emphasis added); *Helmerich & Payne, Inc.*, 323 U.S. at 41-42 (employer's contracts contained

"fictitious" regular rates "derived . . . from ingenious mathematical manipulations"; employer has no right to define "regular rate" of pay "in a wholly unrealistic and artificial manner so as to negate the statutory purposes"; "[a]ny other conclusion in this case would exalt ingenuity over reality") (emphasis added).

**b.    PwC's Definition Permits Unlimited Backloading, Which Would Strike at the Heart of the Statute.**

As noted above, a 5-year normal retirement age effectively writes the ERISA anti-backloading standards out of the law.  It should thus be clear why PwC would suddenly abandon its argument that Plaintiff's backloading claim can be dismissed because the 5-year age makes the anti-backloading rules irrelevant, *see* n.10 above:  *because, PwC realizes, it proves too much.*   But PwC's wordless tactical retreat here cannot conceal its admission to the IRS in 1999 that its 5-year retirement rule is irreconcilably in conflict with the anti-backloading rules, to the point that PwC had to concede that only **a new law** could address the "clearly undesirable" problems that its 5-year retirement age creates.  No such law has been enacted or introduced since 1999, nor as far as Plaintiff knows has PwC followed through on its suggestion that a legislative solution to these "clearly undesirable" problems be found.

**c.    The 5-Year Age is Incompatible With the Nature of a True Retirement Plan.**

As dispositive as the backloading arguments are, there are additional, independent bases that preclude giving force and effect to the RBAP's 5-year retirement date, *i.e.,* the 5-year retirement date is irreconcilable with ERISA in other fundamental ways.  A sponsor that is given the ability to set normal retirement age as low as the sponsor wants could undermine the very nature of a pension plan as a *retirement* plan.  (*Any* pension plan, not just a cash balance pension plan.)  A defined benefit pension plan – the archetypical retirement plan – is required under the law to primarily provide

"retirement income" to its participants.[29]  Accordingly, the law has long prohibited in-service benefit

withdrawals before retirement age.  *See, e.g.,* Rev. Rul. 71-24, 1971-1, C.B. 114 (reproduced in the

Appendix).  A fictitious normal retirement age of 5 years of service, however, would give the vast

majority of a company's workforce immediate access to their "retirement" income.  Evasion of the in-

service withdrawal prohibition via a fictitious normal retirement "age" is no mere theoretical concern:

The RBAP permits such withdrawals.  RBAP § 5.4(a) ("Specified Distribution").[30]

### 3.     The Legislative History Confirms Plaintiff's Plain Meaning Reading.

ERISA was not the first federal legislation to address employee benefit plans. Tax laws and

IRS regulations concerning such plans had been in place for decades before ERISA was enacted.

ERISA either affirmatively integrated or left intact those rules, including the IRS's then-25-year-old,

repeatedly reiterated, authoritative definition of the term "normal retirement age."  At least as far back

as 1957, the IRS's authoritative statements of its administrative positions on pension matters were

periodically collected and published in so-called "Compendium rulings."  Each Compendium ruling

contained a detailed, reasoned definition of "normal retirement age," substantially identical from 1957

until the last Compendium that was published in 1972 just prior to ERISA's 1974 enactment.

---

[29] *See* ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) (a pension plan is one that "provides retirement income to employees"); Treas. Reg. § 1.401-1(a)(2)(i) (a qualified pension plan is an arrangement which is established and maintained by an employer "to provide for the livelihood of the employees or their beneficiaries after the retirement of such employees."); Treas. Reg. § 1.401-1(b)(1)(i) ("A pension plan . . . is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement.").  *See also Sheet Metal Workers' National Pension Fund,* 318 F.3d at 603 (law safeguards a "retirement benefit"); H.R. Rep. No. 93-807, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code & Cong. News, 4734 (statute designed to ensure that the employee's accrued benefits "are actually available for retirement purposes").

[30] The prohibition against in-service withdrawals, which the 5-year retirement age would sidestep with ease, also serves another, vitally important purpose:  it prevents executives and other highly compensated employees from circumventing the maximum contribution limits Congress set in IRC §§ 401(k) and 415 for defined contribution plans. A cash balance plan with a low retirement age could permit participants to quickly build up a large defined benefit "account balance" – taking advantage of the larger defined benefit limits provided in the Code – which could then be cashed out and rolled into a 401(k) plan.  *See* GCM 39744 for an indication that the IRS believes the ploy is unlawful ("Congress, through ERISA, recognized [the fundamental difference between defined benefit and defined contribution plans] in detailing for each type of plan a different mechanism for . . . maximum benefits or contributions (See section 415(b) and section 415(c).")

The IRS defined "normal retirement age" under these Compendiums, in relevant part, as follows:

> The normal retirement age in a pension or annuity plan is the lowest age specified in the plan at which the employee has the right to retire without the consent of the employer and receive retirement benefits based on service to date of retirement at the full rate set forth in the plan (i.e., without actuarial or similar reduction because of retirement before some later specified age). ***Ordinarily, the normal retirement age under pension and annuity plans is 65,*** the same as under the old-age survivors, and disability insurance provisions of the Social Security Act. ***A different age may be specified, provided that if it is lower than 65 it represents the age at which employees customarily retire in the particular company or industry*** and is not a device to accelerate funding.

Guides for qualification of pension, profit-sharing, and stock bonus plans, IRS Publication 778 (2-72) (1972) (emphasis added) (reproduced in the Appendix).[31]

**This remains the IRS's position to this day.** Most notably, Proposed Treasury Regulations (on the subject of "phased retirement") provide that "normal retirement age cannot be set so low as to be a *subterfuge* to avoid the requirements of section 401(a), and, accordingly, normal retirement age cannot be earlier than the earliest age that is *reasonably representative* of a typical retirement age for the covered workforce." Prop. Treas. Reg. § 1.401(a)-1(b)(1)(i), 69 FR 65108-01, 2004 WL 2532133 (emphasis added). This is simply a slightly modernized way of saying what the Service has been saying since the 1950's. Indeed, last year in a private letter ruling, the IRS said that a normal retirement age of age 60 was permitted precisely because it was "not a subterfuge" to allow in-service distributions in a pension plan, which would be inconsistent with the purpose of a pension plan, *i.e.*, "to provide, primarily, retirement benefits at retirement." Private Letter Ruling 200420030, 2004 WL

---

[31] *See also* Rev. Rul. 71-147, 1971-1 C.B. 116; 1971 IRB Lexis 506 (January 1971) (same); Rev. Rul. 69-421, 1969-2 C.B. 59; 1969 IRB Lexis 127 (July 1969) (same) *declared obsolete* by Rev. Rul. 72-488, 1972-2 CB 649 (because Publication 778 took its place); Rev. Rul. 65-178, 1965-2 CB 94 (same) *declared obsolete* by Rev. Rul. 72-488, 1972-2 CB 649 (because Publication 778 took its place); Rev. Rul. 61-157, 1961-2 CB 67 (same) *declared obsolete* by Rev. Rul. 72-488, 1972-2 CB 649 (because Publication 778 took its place); Rev. Rul. 57-163, 1957-1 CB 128 (same) *declared obsolete* by Rev. Rul. 72-488, 1972-2 CB 649 (because Publication 778 took its place). Elsewhere in the pre-ERISA Compendiums, the IRS explained the need for a "real" normal retirement age in a pension plan by contrasting true retirement plans (*i.e.*, pensions) with other deferred compensation plans (*i.e.*, profit-sharing plans), which were more properly viewed as tax-favored savings plans in which the "stated retirement age . . . does not have the same significance as 'normal retirement age' in a pension plan." *Id.*

1079271 (May 14, 2004) (reproduced in the Appendix).

Congress is of course presumed to know the legal backdrop against which it legislates. *See, e.g., Cannon v. Univ. of Chi.*, 441 U.S. 677, 699 (1979). Here one hardly needs a presumption that Congress knew of and approved the IRS's long-standing normal retirement age definition: "normal retirement age" was so clearly a short-hand with an understood meaning by 1974 that the term was used repeatedly in bills leading up to ERISA that contained *no definition of the term* _whatsoever, i.e.,_ not even the limited metes-and-bounds definition that ultimately was adopted in ERISA.[32] Moreover, although it did not make explicit reference to the IRS definition contained in the 1972 Compendium, Congress did make specific reference to the Compendium during the legislative process leading to final passage of ERISA.[33] Thus, there can be no mistaking that Congress had the IRS definition at hand and intended – or must be presumed to have intended – to incorporate its established meaning into the statute. *See, e.g., Morissette v. United States*, 342 U.S. 246, 263 (1952) (Congress presumed to know and intend meaning of a term of art it employs and where such term is used, the "absence of contrary direction may be taken as satisfaction with widely accepted definitions").

---

[32] *See* S. Rep. No. 127 (April 18, 1973), 93rd Cong., 2nd Sess. 1974, 1974 U.S.C.C.A.N. 4838, 4852, 1973 WL 12550 (Labor and Welfare Committee discussing S. 4); S. Rep. No. 383 (August 21, 1973), 93d Cong., 2nd Sess. 1974, 1974 U.S.C.C.A.N. 4889, 1973 WL 12551 (Finance Committee discussing S. 1179); H.R. 4200, 93rd Cong. 1 Sess. (Sept. 18, 1973) (full Senate adopting compromise of S.4 and S. 1179 by vote of 93-0 and repeatedly using the term "normal retirement age" without any definition); H.R. 2, 93rd Cong. 1 Sess. (March 2, 1974) (full Senate adopting bill also using term without any definition).

[33] *See, e.g.,* H.R. Rep. No. 93-807, 93d Cong., 2d Session (1974) (referring to Compendium-IRS Publication 778); S. Rep. No. 383, 93d Cong., 2nd Sess. 1974, 1974 U.S.C.C.A.N. 4889, 1973 WL 12551 (same).

### 4.     PwC's Position Has No Support.

The primary "support" PwC has mustered for its "any" age position is contained in a 1978 IRS Revenue Ruling, Rev. Rul. 78-120, 1978-1 C.B. 117.  Yet even this ruling is not what PwC makes it out to be.  The sentence of the ruling that PwC quotes, that "a plan may specify any age that is less than 65 as the normal retirement age," looks favorable to PwC's position when read in isolation.  However, the sentence is pure *dictum* and not the "holding" of the ruling.  The IRS was simply asked "whether a defined benefit pension plan that provides for a normal retirement age of less than 65 may qualify under section 401(a) of the [Code] as amended by [ERISA]."  *Id.*  All the IRS <u>ruled</u> in response was that "a pension or annuity plan will not fail to qualify under section 401(a) of the Code merely because it provides for a normal retirement age of less than 65."  *Id.*  Plaintiff agrees.  But that just puts PwC back to square one - it is of no help establishing the principle that an employer can specify a fictitious normal retirement date that bears no connection to the age at which employees in the covered workforce normally retire.  Had the ruling addressed *that* issue, the IRS's answer surely would have been far different.

Experienced pension practitioners have recognized that the 1978 ruling, notwithstanding its one sentence of inartfully phrased *dictum*, does not stand for the proposition that a plan's designation of a normal retirement age is a free-for-all.  For example, the 2005 edition of a leading ERISA treatise explains, as the treatise has for years, that a "plan may provide that the normal retirement age will be less than age 65, if such lower age is the age at which employees customarily retire in the particular company or industry and is not a device to accelerate funding."  Michael J. Canan, *Qualified Retirement Plan*s, at p. 555 (Thomson, 2005 Edition) (*citing* Rev. Rul. 78-120).  This was the law before 1978 and even before 1974, as explained above, and it remains the law today – *dictum* in an IRS revenue ruling does not change that.

In any event, the 1978 revenue ruling certainly is not, as PwC suggests, an "authoritative" interpretation of ERISA's normal retirement age standard. First, an IRS revenue ruling addresses only the status of a pension plan under the Internal Revenue Code and does not impact an employee's rights under ERISA – as clearly reflected in the language from the ruling quoted above (which relates solely to the status of a plan under section 401(a) of the Internal Revenue Code). Moreover, because an IRS revenue ruling is not subject to a formal notice and comment procedure and merely represents the views of an agency attorney, a revenue ruling is not entitled to deference. Instead, it is relevant only to the extent it has the power to persuade. *See Matz v. Household International Tax Reduction Investment Plan,* 265 F.3d 572, 574 (7th Cir. 2001); *Aeroquip-Vickers, inc. v. Comm'r,* 347 F.3d 173, 181 n.3 (6th Cir. 2003). But the 1978 ruling is inconsistent not just with the statute but with literally every other IRS pronouncement that directly addresses the subject (spanning a period beginning more than 20 years before the ruling and ending more than 20 years after). Additionally, the *dictum* cannot possibly have the power to persuade because it lacks any articulated rationale, except perhaps the logical fallacy discussed above, *i.e.,* if *less than* age 65, then *any* age under 65. That is not a rationale. That is faulty reasoning.

PwC also cites two cases that supposedly lend support to its interpretation, *see* PwC Mem. at 11-12, but they merely reiterate the undisputed point that a pension plan is permitted to designate a normal retirement age younger than age 65 in certain circumstances. No authority anywhere has ever said that a plan can designate *any* age (or date), even one that is obviously fictional.

Finally, PwC make much of the fact that the RBAP has received two IRS "determination letters." PwC implies that this means Plaintiff cannot possibly be correct that the RBAP violates ERISA or the Internal Revenue Code. *See, e.g.,* PwC Mem. at 13. This is wrong. If an IRS determination letter were a shield from wrongdoing by pension plans and their sponsors, no retirement

42

plan maintained by a large employer would *ever* be liable under ERISA, because virtually every major

plan has such a letter from the IRS. Instead, as even the IRS Chief Counsel has recognized, "a

favorable determination letter **does not prevent plan participants from asserting their rights under**

**the law.** [ERISA] permits plan participants whose rights are violated by the terms of a plan (or a plan

amendment) to recover benefits – even if a plan had received a favorable ruling from the [Internal

Revenue] Service."[34]

It is for good reason that a determination letter should not be viewed as a stamp of approval

by the government. According to IRS statistics, the IRS received and approved approximately

225,000 retirement plans in the most recent determination letter cycle (the so-called "GUST cycle")

during which the RBAP received its last determination letter. *See* "The Future of the Determination

Letter Program," Voluntary Compliance CPE (IRS August 4, 2004). If each of those plans exceeded

100 pages (the RBAP plan instrument is approximately 250 pages), that is more than 2.2 million pages

and countless individual plan provisions. In 2004, the year the RBAP received its last determination

letter, only 155 IRS employees were assigned to handle determination letters.[35] So needless to say,

---

[34] Statement of Stuart L. Brown, *supra,* at 11-12 & n.17 (*citing Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*, 980 F.2d 465 (7th Cir. 1992) (determination letter seemingly approving COLA elimination entitled to no deference in ERISA action where it "expressly limited its applicability to the Plan's status under the Internal Revenue Code," was by nature "informal," included no "discussion of the reasoning employed by the agency in reaching its conclusions")). *Accord Esden*, 229 F.3d at 175 ("We find no reason to defer to a determination letter that (a) is in part based on contradictory and misleading representations submitted by the applicant..., and (b) did not consider the issue raised by the case"); *Lyons,* 221 F.3d at 1252 ("Because it does not specifically address the issue at hand, the IRS letter is not owed any deference"); *Rybarczyk v. TRW, Inc.,* 235 F.3d 975 (6th Cir. 2000); *Shatto v. Evans Products Co.,* 728 F.2d 1224, 1228 n. 2 (9th Cir.1984) (IRS determination entitled to no deference because based on limited evidence).

[35] According to the IRS, approximately 50,000 plans were reviewed and approved in 1996, when the RBAP received its first determination letter. Because 1996 was not part of a major determination letter cycle, there were far fewer IRS agents assigned to review letters than there were in 2004.

some of the RBAP's plan provisions may not have been examined very carefully.[36]  Clearly, PwC overstates the relevance of the RBAP's determination letters.

      The bottom line is that PwC cannot supply a meaningful connection between the unremarkable premise that normal retirement age may be an age younger than 65 and its radical position that it may be "any" age.  It certainly cannot point to anything in the legislative history, structure or purpose of this remedial statute that suggests Congress gave an inch so an employer could take a mile.  Plaintiff, by contrast, can show the Court that the legislative history powerfully confirms its plain meaning interpretation of the statute.

### 5.     PwC's Interpretation is Otherwise at Odds with the Law.

      In sum, PwC's interpretation of the statute is at odds with its plain meaning, elevates form over substance, is inconsistent with other provisions of ERISA, finds no support in authoritative guidance or precedents, and is not supported by the legislative history.

      PwC does not even have grounds on which it asks for an exception to be made in its case because it can identify no legitimate purpose served by allowing an employer to falsify its employees' normal retirement age.  In fact, quite the contrary.  Viewed from the perspective of the Code (which defines "normal retirement age" in language identical to ERISA's definition), the normal retirement age of 5 years of service cannot be given effect as the Plan's normal retirement age because it would likely be classified in the jurisprudence of the Code as nothing more than a "sham."  The IRS and the courts properly refuse to give effect to sham transactions that lack economic substance and are designed solely to confer tax benefits.[37]  Here, PwC's adoption of a fictitious definition of retirement

---

[36] That is why IRS determination letters, including the ones received by the RBAP, make clear on their face that they are limited in scope.  For instance, both of the letters received by the RBAP state that they are "not a determination regarding the effect of other [*i.e.*, non-tax] federal or local statutes," such as ERISA.  The 2004 letter also states specifically that it **"does not express an opinion on any . . .  [i]ssues arising from the amendment of a defined benefit plan's formula to convert that formula into a cash balance type benefit formula"**

[37] *E.g., Boca Investerings Partnership v. United States.* 314 F.3d 625, 629 (D.C. Cir. 2003).

was clearly used to help it obtain the tax benefits plan qualification confers but which otherwise has no economic substance.

For evidence that PwC's retirement age gimmick is properly viewed as a sham, take the cash balance plan sponsors to date – IBM, Xerox, Georgia-Pacific – which have been forced to pay, out of the plans they sponsor, hundreds of millions of dollars to settle claims arising out of their efforts to evade the statute's defined benefit standards. Had these sponsors adopted PwC's 5-year retirement date gimmick, the structure of those plans would have not changed – they could have maintained the same benefit formulas, same vesting schedules, same distribution timing rules, same tax treatment, same everything – yet, under PwC's reading of the statute, the plans would have been perfectly legal as administered. No backloading. No "whipsaw" liability. No age discrimination. No problem. That is as good an illustration of a "sham" under the Code as one is likely to imagine.

Additionally, consider the fact that qualified plans receive $100 billion annually in tax subsidies from the Federal government and the taxpaying public -- indeed, it is the government's *single largest* item in the expenditure budget as calculated by Congress.[38] The tax subsidy is premised on the idea that cash balance and other pension plans provide an alternative source of *retirement* income to rank and file employees that "reduces pressure on the social security system."[39] Here, like other plan sponsors, when PwC held its hand out and took its share of these subsidies, it promised to play by the rules. Plaintiff has demonstrated that in fact PwC tried to make its own rules - and that is not right.

---

[38] Joint Committee on Taxation, Estimates of Federal Tax Expenditures for Fiscal years 2005-2009 (JCS-1-05), January 12, 2005.

[39] Joint Committee on Taxation, Present-Law Tax Rules Relating to Qualified Pension Plans (JCS-9-90), March 22, 1990, at 62-63 ("The policy rationale for [the] tax expenditure is that the tax benefits for qualified plans encourage employers to provide retirement benefits for their employees. This reduces the need for public assistance and reduces pressure on the social security system.")

## **CONCLUSION**

Wherefore, for the foregoing reasons, such other reasons as Plaintiff may have elsewhere adduced or may subsequently adduce, and/or for such other reasons as may appear to the Court, Plaintiff respectfully requests that the Court grant this motion. Oral argument is requested in the event the Court believes it might be useful.

August 11, 2005                                    Respectfully submitted,


                                                   ___/s/ Eli Gottesdiener_____
                                                   Eli Gottesdiener
                                                   **GOTTESDIENER LAW FIRM, PLLC**
                                                   1025 Connecticut Avenue, N.W.
                                                   Suite 1000
                                                   Washington, D.C.  20036
                                                   Phone: (202) 243-1000
                                                   Fax:    (202) 243-1001

                                                   Attorney for the Plaintiff and the proposed Class

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2005 I caused all Defendants identified on the

docket sheet as having been personally served or as having returned waivers of service of

summons to be served with a copy of the foregoing Memorandum of Points and Authorities by

having it hand-delivered on August 11, 2005 to their counsel at the address listed below:


David E. Mendelson
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
(202) 879-5000 (telephone)
(202) 879-5200 (facsimile)




                                            s/Eli Gottesdiener
                                            Eli Gottesdiener

47