## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TIMOTHY D. LAURENT** | : | |
| **On behalf of himself and all others similarly situated,** | : | |
| **Plaintiff,** | : | **Civil Action No.  05-1291 (PLF)** |
| **v.** | : | |
| **PRICEWATERHOUSECOOPERS LLP,** *et al.*, | : | |
| **Defendants.** | : | |

## <u>DECLARATION OF ELI GOTTESDIENER</u>

I, Eli Gottesdiener, hereby declare, under penalties of perjury as follows:

I am a shareholder of the Gottesdiener Law Firm, PLLC and counsel for the Plaintiff in the above-referenced action.  I am licensed to practice in Washington, D.C., New York, Maryland and Pennsylvania and have been admitted *pro hac vice* in this matter.   The matters set forth below are within my personal knowledge and if called to testify about them I could and would do so.

1.       Exhibit 1 to Plaintiff's Motion for Partial Summary Judgment under Counts One through Four is a copy of an article from *Pensions & Investments* magazine, "Cash Balance: Trouble for Bank Plans? IRS scrutinizes Shortened Retirement Ages," dated May 31, 1999, that I downloaded from Westlaw's news service and to the best of my knowledge is what it purports on its face to be.  I have not altered it in any way as affects the content or substance of its text.  I make the same representation for all exhibits attached this declaration.

2.      Exhibit 2 is an extract of the definition of Normal Retirement Date as appears in the NationsBank Cash Balance Pension Plan § 2.1(c)(38), effective July 1, 1998, a copy of which I obtained from a plan participant.

3.      Exhibit 3 is a copy of Chapter 11, "NationsBank Style Plans," Hubert V. Forcier, *Guide to Cash Balance Plans* (Aspen 2003 & 2005 Supp.), which I purchased from the publisher.

4.      Exhibit 4 is a copy of a motion and memorandum PwC filed in the earlier iteration of this litigation on February 9, 2005.

5.      Exhibit 5 is a document entitled "Cash Balance Notes" which I downloaded from www.pwc.com on February 5, 2005.

6.      Exhibit 6 is a declaration submitted by the Bank of America Corporation in *Pothier v. Bank of America Corp.* on February 9, 2005 as Ex. A to Doc. 68 as part of motion to transfer that PwC joined the same day via Doc. 72.

7.      Exhibit 7 is a Glossary of terms available to RBAP plan participants on the RBAP website that I viewed with the permission of a participant and then downloaded in February 2005.

8.      Exhibit 8 consists of extracts from RBAP IRS Form 5500s which I obtained from the U.S. Department of Labor.

9.      Exhibit 9 is a copy of a letter from Ira Cohen, PricewaterhouseCoopers LLP, to IRS Commissioner Charles O. Rossotti and Deputy Assistant Secretary for Tax Policy Jonathan Talisman, Sept. 30, 1999, *reprinted in* Tax Notes Today, Nov. 18, 1999, which I downloaded from Westlaw.

10.     Exhibit 10 is a copy of "Employee Directed: Consulting Firm Practices What it

Preaches on Cash Balance," *Pensions & Investments,* May 17, 1999, which I downloaded from Westlaw's news service.

11.    Exhibit 11 is a copy of "Pension Downsizing, Continued," *Tax Notes,* May 24, 1999, which I downloaded from Westlaw's news service.

The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.

Dated:  August 11, 2005

                                       ___ s/ Eli Gottesdiener _____
                                       Eli Gottesdiener

## Exhibit 1

"Cash Balance: Trouble for Bank Plans?
IRS Scrutinizes Shortened Retirement Ages,"
*Pensions & Investments,* May 31, 1999

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

5/31/99 PNSINV 1

5/31/99 Pensions & Inv. 1
1999 WL 9699041

Pensions & Investments
Copyright (C) 1999 Crain Communications, Inc. All rights reserved.

Monday, May 31, 1999

The cash balance plan of NationsBank has a five-year normal retirement age, which could mean more generous benefits for older employees. **CASH BALANCE: TROUBLE FOR BANK PLANS? IRS SCRUTINIZES SHORTENED RETIREMENT AGES**

Vineeta Anand

 WASHINGTON -- The new parent of BankAmerica Corp. and NationsBank Corp. is trying to merge the banks' cash balance plans.

 The two banks merged last year, becoming Bank of America Corp. The pension plan merger is expected to be effective next year.

 But BofA could face a tough time getting governmental clearance to combine the plans.

 Officials from the Treasury Department and IRS have begun scrutinizing plans like NationsBank's that have defined "normal" retirement as occurring at age 65 or after five years' tenure, whichever comes first. Such shortened retirement ages short-circuit various pension rules pegged to the more conventional retirement ages of 60 and 65.

 Bank and Treasury Department officials wouldn't discuss the issue; IRS officials didn't return several phone calls seeking comment.

 A short retirement age "guts" the Employee Retirement Income Security Act, said a cash balance plan expert who declined to be identified. "Twenty-eight is not a normal retirement age."

 Clearance from the IRS usually comes in the form of a "determination letter," which protects employers in case the IRS later questions any aspects of the pension plan. Trouble could develop when Bank of America asks for a determination letter on the merger of the two plans.

 The five-year tenure feature comes from the NationsBank plan, and is expected to be part of the combined plan.

 Observers say regulators could banish short retirement ages by requiring all employers to define the normal retirement age as 50 or older, and condition plan approval on the use of such a

retirement age.

What's wrong with the short retirement age?

For one thing, a retirement age expressed as five years of service lets employers give departing employees just the amount of money built up in their hypothetical cash balance accounts. Typically, in defined benefit plans, they must use complicated calculations to arrive at the lump-sum payments.

Indeed, Under Section 417(e) of the tax code, companies must calculate lump-sum payments by first projecting the account balance into an annuity at the normal retirement age, usually 65, and then figuring out the present value of that annuity by discounting back. The present value of that future retirement benefit is what employers must pay out as a lump sum.

But because the law does not require companies to project benefits beyond the normal retirement age, employers with a retirement age of five years may simply pay the account balance as a lump sum to departing employees.

What's more, an inordinately short retirement age also renders ERISA's anti-backloading rules meaningless. Federal pension law pegs backloading -- stacking benefits for employees who retire only after a lifelong career -- to the accrual rate at normal retirement age. Because the NationsBank plan has a five-year normal retirement age, the company conceivably could give more generous benefits to older employees with longer tenure.

The company credits employees' accounts with contributions ranging from 1% for young workers with little service to 10% for older employees with longer tenure. A 40-year-old with 10 years of service would get 4% of pay; a 60-year-old with 10 years of service would get 8% of pay.

Other plans with short normal retirement ages could face the same scrutiny. They include PricewaterhouseCoopers LLP.

Then, too, NationsBank's cash balance plan is raising eyebrows at the Securities and Exchange Commission because of a provision allowing participants to roll over 401(k) plan money into the cash balance plan.

Because the company lets employees roll over their 401(k) money into the cash balance plan, the bank could be seen as selling employees a security and would, therefore, need to register the plan.

With registration comes disclosure, something bank executives might not relish.

NationsBank would have to give all plan participants detailed information about the plan, including possibly that the investments are derivatives that merely track the returns on the original securities, but do not convey ownership rights. The company also might have to discuss the riskiness of investing in such derivative securities.

"Plans that contain 401(k) rollover features might involve securities law issues. If an offer and sale of a security exists, either a registration or exemption from registration would be necessary," said Mark Borges, an attorney adviser in the SEC's division of corporation finance.


TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

 Photo/Graphic: Bank of America Corp. plans to merge the cash balance plans of BankAmerica and NationsBank.

---- INDEX REFERENCES ----

COMPANY (TICKER):  BankAmerica Corp. (BAC)

NEWS SUBJECT:      World Equity Index (WEI)

NEWS CATEGORY:     NEWS

INDUSTRY:          Southern U.S. Banks; All Regional Banks; All Banks (BAS BAR BNK)

Language:  EN
SOURCE REGION:     NME US

Word Count: 698

5/31/99 PNSINV 1

# **Exhibit 2**

"[N]ormal Retirement Date" definition
<u>NationsBank Corporation Cash Balance Plan</u>

# THE NATIONSBANK CASH BALANCE PLAN

(as amended effective July 1, 1998)

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **ARTICLE I** | **NAME AND PURPOSE** | 1 |
| SECTION 1.1. | NAME | 1 |
| SECTION 1.2. | PURPOSE | 1 |
| **ARTICLE II** | **CONSTRUCTION AND DEFINITIONS** | 2 |
| SECTION 2.1. | GENERAL | 2 |

(a) Construction .......................................................... 2
(b) Definitions ............................................................. 2

(1) Account(s) ........................................................ 2
(2) Accrued Benefit ............................................... 2
(3) Act .................................................................... 3
(4) Active Participant ............................................. 3
(5) Actuarial Equivalent ........................................ 3
(6) Affiliated Group .............................................. 3
(7) Affiliated Group Compensation ...................... 4
(8) Annual Addition .............................................. 4
(9) Applicable Election Period .............................. 5
(10) Beneficiary ...................................................... 5
(11) Benefit Commencement Date ........................... 5
(12) Benefit Service ................................................ 6
(13) Board or Board of Directors ............................ 6
(14) Claim ................................................................ 6
(15) Claimant ........................................................... 6
(16) Code ................................................................. 6
(17) Committee ........................................................ 7
(18) Company .......................................................... 7
(19) Compensation .................................................. 7
(20) Compensation Committee ............................... 8
(21) Compensation Credit(s) ................................... 8
(22) Conversion Date .............................................. 8
(23) Conversion Date Accrued Benefit .................... 9

replacement fund or investment vehicle that is intended to obtain substantially the same investment results as the fund or investment vehicle that is being replaced.

(36)    Leased Employee means any individual who is not an employee of any member of the Affiliated Group but who performs services for an Affiliated Group member, where:

(A)    such services are provided pursuant to an agreement between the member and any other person (the "leasing organization");

(B)    the individual has performed such services for the member, or for the member and any "related persons" determined under Section 414(n)(6) of the Code, on a substantially full-time basis for a period of at least one (1) year; and

(C)    such services are performed under the primary direction or control by the member.

(37)    Month of Service means any calendar month in which a person has at least one (1) Hour of Service and any period for which a person is credited with Service in accordance with Section 14.7.

(38)    Normal Retirement Date, with respect to a Participant, means the first day of the calendar month following the earlier of (i) the date the Participant attains age sixty-five (65) or (ii) the date the Participant completes sixty (60) months of Vesting Service.

(39)    Parental Leave of an Affiliated Group employee means the employee's absence from work with a member of the Affiliated Group (i) which begins after 1984 and (ii) which is by reason of the pregnancy of the employee, the birth of a child of the employee or the placement of a child with the employee in connection with the employee's adoption of the child or is for purposes of caring for the child over a period beginning immediately following such birth or placement of the child.  In order for an absence to qualify as a Parental Leave, the reasons therefor and the length thereof must be established by the employee to the reasonable satisfaction of the Committee at such time and pursuant to such procedures as the Committee shall establish for such purpose. While an employee's Parental Leave shall entitle the employee to be credited with Service to the limited extent specifically provided in the Plan, such Parental Leave shall not constitute an authorized leave of absence for any non-Plan purposes, or entitle the employee to any non-Plan benefits or reemployment following such Parental Leave,

16

# Exhibit 3

## Chapter 11, *Guide to Cash Balance Plans*

# Guide to Cash Balance Plans

*Hubert V. Forcier*

*A Panel Publication*



ASPEN
PUBLISHERS

**1185 Avenue of the Americas, New York, NY 10036**
***www.aspenpublishers.com***

# 11

# NationsBank-Style Plans

## *Hubert V. Forcier*

This book generally assumes that the normal retirement age for a plan is age 65. NationsBank-style plans are based on specifying a low normal retirement age. A low normal retirement age (if recognized as proper) permits a number of design features that would otherwise violate minimum standards under the Internal Revenue Code and the Employee Retirement Income Security Act of 1974. This chapter discusses the use of this technique.

¶ 11.1    Potential Advantages of Using a NationsBank-Style Plan
        11.1[a]    Age and Service Weighting of Hypothetical Pay Credits
        11.1[b]    Use of 401(k)-Like Investment Options to Measure Hypothetical Interest Credits
¶ 11.2    Justification for Use of Low Normal Retirement Age
¶ 11.3    Rumored IRS Action

## ¶ 11.1    POTENTIAL ADVANTAGES OF USING A NATIONSBANK-STYLE PLAN

Under the NationsBank plan, normal retirement age is defined as the earlier of age 65 or five years of vesting service. If the Internal Revenue Service (IRS), Department of Labor (DOL), and Equal Employment Opportunity Commission (EEOC) and the courts continue to recognize the use of this type of low normal retirement age, employers can realize two advantages:

1. Use of an age- and/or service-weighted hypothetical pay credit schedule under which the spread between the highest hypothetical pay credit rate and the lowest hypothetical pay credit rate is any amount without violating the 133⅓ percent antibackloading rule (see ¶ 11.1[a]); and

2. Use of hypothetical interest crediting rate that can be expected to produce future values in excess of the future current yields on 30-year Treasuries without creating losses due to interest rate whipsaws (see ¶ 11.1[b]).

### ¶ 11.1[a]   Age and Service Weighting of Hypothetical Pay Credits

Under the NationsBank Plan, an age- and service-weighted formula is applied to establish the rate of the hypothetical pay credits. The NationsBank formula based on points goes from 1 percent to 10 percent of compensation:

| Age + Years of Pension Benefit Service | Hypothetical Pay Credit (as percentage of compensation) |
|---|---|
| 0–29 | 1% |
| 30–39 | 2% |
| 40–49 | 3% |
| 50–59 | 4% |
| 60–69 | 6% |
| 70–79 | 8% |
| 80 and over | 10% |

If the $133\frac{1}{3}$ percent antibackloading rule (see chapter 9) applied to such a formula on the assumption that normal retirement age was age 65, the rule would be failed, as shown in Figure 11-1.

The view taken by the NationsBank Plan is that the $133\frac{1}{3}$ percent anti-backloading rule does not apply to hypothetical pay credits awarded after a participant attains the normal retirement age specified in the plan but only applies to credits awarded before a participant attains the normal retirement age set out in the plan. To avoid a violation of the $133\frac{1}{3}$ percent antibackloading rule before a participant's attainment of the low normal retirement age specified in the NationsBank plan (earlier of age 65 or five years of vesting service), the participant receives level percentage of compensation hypothetical pay credits. The level rate of hypothetical pay credits is determined on a participant-by-participant basis. Specifically, it is determined by averaging the credits the participant would have received during his or her pre-normal retirement age years of service under the age- and service-weighted formula that applies to the participants who have attained the normal retirement age specified in the plan. An example provided in a NationsBank employee hand-out assumes that an individual entered the plan on January 1, 1998, at age 37 with one year of vesting service. Had he been under the formula applicable to employees who had more than five years of vesting service, those points would have been as follows:

| Year | Points | Hypothetical Pay Credit |
|---|---|---|
| 1998 | 37 | 2% |
| 1999 | 39 | 2 |
| 2000 | 41 | 3 |
| 2001 | 43 | 3 |
| | | Total 10% |

The total 10 percent is divided by 4 to establish a 2.5 percent hypothetical pay credit.

**Figure 11-1.  NationsBank-Style Plan**

| | |
|---|---|
| Display: | Portion of projected age 65 annuity attributable to each year of service (with the annuity being shown as a percentage of pay). The 133¹/₃% test line is shown. |
| Valuation Method: | Traditional accrued benefit valuation method (annual basis). |
| Assumptions: | Age- and service-weighted hypothetical pay credits (from 1% to 10%; see ¶11.1[a]). |
| | 5% hypothetical interest credits: future credits not conditioned on future service (i.e., future credits are guaranteed). |
| Observation: | The plan violates the 133¹/₃% antibackloading rate. |



Age of Participant During Year of Service

*Source:* Faegre & Benson LLP. With permission.

By averaging the pre-normal retirement age hypothetical pay credits, the NationsBank plan complies with the 133¹/₃ percent antibackloading rule (provided that the plan can properly use the low normal retirement age that it has specified).

### 11.1[b]   Use of 401(k)-Like Investment Options to Measure Hypothetical Interest Credits

Several funds similar to funds offered under 401(k) plans are offered under the NationsBank plan. The participant can choose which fund to be used to measure the hypothetical interest credits added to his or her hypothetical account balance. They are virtual replications of the investment choices offered under the NationsBank 401(k) plan, including equity-style funds and even an employer stock fund.

> **Note.** A reasonable estimate of the return that these funds could produce in the future could be very much higher than the current rate on 30-year Treasuries, which is the rate used under the minimum lump sum rule of Sections 411(a) and 417(e) of the Internal Revenue Code (Code). The use of relatively high projection rates for the step 1 calculation under the two-step calculation required by IRS Notice 96-8 [1996-1 CB 359] produces very large interest rate whipsaws (see chapter 8).

In a letter to the IRS Ira Cohen (who was then with Pricewaterhouse-Coopers and who is generally recognized as the inventor of the NationsBank-style plan) described how the use of a low normal retirement age such as that used in the NationsBank plan would avoid the interest rate whipsaw:

> The Whipsaw Effect, however, disappears once a participant reaches his or her normal retirement age (because there is no longer a need to project into the future—the minimum lump sum rules require projection only until normal retirement age). Interestingly, the logical reaction to the IRS's action [IRS Notice 96-8] is to reduce the normal retirement age . . . because the Whipsaw Effect would disappear at that point. Indeed, most cash balance plans with a low normal retirement age do provide [hypothetical] earnings credits based on equity indices.

[Letter from Ira Cohen to the IRS National Office, Sept 30, 1999]

> **Note.** Under the NationsBank approach there is an interest rate whipsaw before the completion of five years of vesting service. This is not material in the NationsBank situation because the plan provides for five-year deferred vesting. It makes no difference what the lump-sum benefit might be for a participant who is not vested.

ASPA has noted that if a plan provided full and immediate vesting, the normal retirement age under a NationsBank-style plan could be established as the date that each participant becomes a participant. [See Burrows, "Cash Balance Plans for Professional Firms," presented at the 2000 ASPA Annual Conference, Oct 30 and 31, 2000, slide 176.]

## ¶ 11.2  JUSTIFICATION FOR USE OF LOW NORMAL RETIREMENT AGE

In his letter to the IRS, Ira Cohen defended the practice of using a low normal retirement age:

> Any [future IRS] rules [precluding the use of low normal retirement age] would, in our opinion, require legislation. The IRS simply does not have the authority to eliminate the low normal retirement age.

> Section 411(a)(8) of the code as added by ERISA defines the normal retirement age as the earlier of (1) the time a plan participant attains the normal retirement age under the plan and (2) the later of age 65 or the 5th anniversary of plan participation. Clearly, Clause 1 permits a plan to define the normal retirement age as low as it pleases.

> Revenue Ruling 78-120 permitting unrestricted use of low normal retirement ages was adopted contemporaneously with the ERISA regulations. It clearly permits the use of a low normal retirement age, based on section 411(a)(8) of the code.

[Letter from Ira Cohen to the IRS National Office, Sept 30, 1999]

## ¶ 11.3  RUMORED IRS ACTION

In his letter to the IRS, Ira Cohen wrote that "rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages." It had previously been reported that some practitioners might have complained to the IRS about the NationsBank approach. [*Lee Shepard, Pension Downsizing, Continued,* 83 Tax Notes 1107, May 24, 1999]

Because of these rumors, it is a relatively common practice for plan sponsors that want to use NationsBank-style design features to condition the effectiveness of these features on the receipt of a favorable IRS determination letter.

> **Note.** A favorable IRS determination letter might not protect against a participant lawsuit under the Employee Retirement Income Security Act of 1974 (ERISA) (see ¶ 8.5[c](4)(iii)).

The IRS was scheduled to issue a notice of proposed rule making addressing the use of low normal retirement ages in December 2001. As of the date this book went to press, the IRS had not published such a notice.

# Guide to Cash Balance Plans

## *2005 Cumulative Supplement*

*Hubert V. Forcier*



**ASPEN**

**P U B L I S H E R S**

111 Eighth Avenue, New York, NY 10011
www.aspenpublishers.com

# 11

## NationsBank-Style Plans

### *Hubert V. Forcier*

### ¶ 11.4   PROPOSED REGULATIONS WOULD RE-IMPOSE THE PRE-ERISA MINIMUM NORMAL RETIREMENT AGE RULE

On November 10, 2004, Treasury published proposed regulations that (if adopted as proposed) would impose a minimum normal retirement age. The proposed regulations would amend Treas. Reg. Section 1.401(a)-1(b) as follows:

> Par. 2. In § 1.401(a)-1, paragraph (b)(1)(i) is amended by adding text before the period at the end of the current sentence and a new second sentence, . . . is added to read as follows:

> **§ 1.401(a)-1 Post-ERISA qualified plans and qualified trusts; in general.**

> \* \* \*

> (b) \* \* \*

> (1) \* \* \*

> (i) . . . or attainment of normal retirement age. However, normal retirement age cannot be set so low as to be a subterfuge to avoid the requirements of section 401(a), and, accordingly, normal retirement age cannot be earlier than the earliest age that is reasonably representative of a typical retirement age for the covered workforce.

The proposed regulations would not be effective until adopted in final form. See Preamble to the proposed regulations.

The focus of the proposed regulations was phased retirement. The preamble did not discuss the change to Treas. Reg. Section 1.401(a)-1(b)(1)(i).

The proposed regulations contained no transition rules. This is troubling to plan sponsors that had relied on Rev. Rul. 78-120. But at the hearing on the proposed regulations corporate America requested transition rules, and the IRS has expressed an intention to provide Code Section 411(d)(6) relief.

## ¶ 11.5  PARTICIPANT LAWSUITS

In 2004, participant litigation was begun against the NationsBank Plan (since renamed the Bank of America Pension Plan) [Pothier v. Bank of America Corp., U.S. D. Ct. S.D. Ill. 04-458 CPM]. In the litigation, the plaintiffs claim that they could sue based on the allegation that it was improper to use a young normal retirement age.

The general allegations relating to the use of a young normal retirement age were as follows [Pothier v. Bank of America Corp., U.S.D. Ct. S.D. Ill. 04-458 GPM Second Amended Class Action Complaint]:

> 45. Under ERISA, a participant's "accrued benefit" under a defined benefit plan is the benefit defined under the terms of the plan, but expressed in the form of a life annuity beginning at "normal retirement age" (subject to some limited exceptions not relevant here). ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A); *accord* IRC § 411(a)(7)(A)(i), 26 U.S.C. § 411(a)(7)(A)(i). Paying a lump sum requires determining the present value of that life annuity for the particular participant.

> 46. In general, present value is determined by using a mortality table to predict how long the participant would be expected to receive annual benefits beginning at normal retirement age and ending at his or her death, and an interest rate to discount for the time value of money if the participant instead receives his or her projected annual benefit in the form of a single lump sum payment. *See* IRC § 417(e), 26 U.S.C. § 417(e) (setting forth the minimum mortality table and interest rates that may be used). The higher the interest/discount rate used in this calculation, the lower the lump sum.

> 47. Under ERISA §§ 203(e), 205(g), 29 U.S.C. §§ 1053(e) and 1055(g), IRC § 417(e), IRS Notice 96-8, 1996-1 CB 359 (1996), and other provisions of law and guidance issued by the Treasury Department, a cash balance plan must calculate lump-sum payments by first projecting the account balance into an annuity at the normal retirement age, usually 65, using a rate based on the plan's interest crediting rate (or "investment" crediting rate under certain plan designs) and then figuring out the present value of that projected annuity by discounting back. The present value of the projected retirement benefit is the least that the plan must pay out as a lump sum. The Pension Plans (including the BankAmerica Pension Plan) did not properly comply with this requirement.

> 48. Specifically, in determining the amount of a participant's lump sum payment, the Pension Plans did not: (i) project—or if they did project, did not accurately project—the participant's hypothetical account balance to age 65 or the appropriate normal retirement age using an appropriate rate based on the Pension Plans' interest crediting rates (or the Plans' "investment" crediting rates), and/or (ii) properly calculate the annual benefit that would be available at normal retirement age based on the projected account balance, and/or (iii) then properly calculate a lump sum with the same actuarial present value as the projected annual benefit. Instead, the Pension Plan only

paid participants the balance in their hypothetical account or some other amount that did not reflect an accurate and correct computation of the projected annuity at normal retirement age and/or the present value of such annuity.

\* \* \*

52. As a cash balance plan, the NationsBank Plan maintained a hypothetical account in each participant's name. These accounts were increased each pay period by pay credits in an amount equal to 1–10% of each participant's pay for the period. For participants who had five years of service, referred to as the "normal retirement date" under the Plan, the pay credits were age- and service weighted, so that the youngest participants (those whose age + service = 0–29) received a pay credit equal to 1% of pay; participants whose age + service = 30–39 received a pay credit of 2%; participants whose age + service = 40–49 received a pay credit of 3%; participants whose age + service = 50–59 received a pay credit of 4%; participants whose age + service = 60–69 received a pay credit of 6%; participants whose age + service = 70–79 received a pay credit of 8%; and the oldest participants (age + service = 80 and over) received pay credits equal to 10% of pay.

\* \* \*

### Attempted Manipulation of the Statutory Normal Retirement Age

53. The first "innovation" PwC recommended and NationsBank adopted involved an attempt to manipulate the ERISA definition of "normal retirement age."

54. The statutory concept of a "normal retirement age" is central to the operation of ERISA and its key protections. For example, as noted above, ERISA requires a defined benefit plan to calculate benefits by reference to each participant's accrued benefit expressed as an annual amount commencing at normal retirement age. Under ERISA § 3(24), 29 U.S.C.§ 1002(24), and IRC § 411(a)(8), the normal retirement age that must be used for this purpose is the "normal retirement age under the plan" or age 65, whichever is earlier.[3]

55. While almost all large defined benefit plans (including almost all cash balance plans) define the "normal retirement age under the plan" as age 65, the same as the statutory default, ERISA provides some flexibility to accommodate specialized industries such as the airlines, where pilots typically retire at age 60 or younger. But the flexibility is strictly limited: ERISA permits a plan sponsor to adopt a normal retirement age younger than age 65 only if that age is reasonably representative of the typical retirement age of the covered workforce.

56. Nevertheless, relying on an approach characteristic of the corporate tax shelter schemes PwC "regrettably" devised and sold other clients at about the same time (the late 1990's),[4] PwC urged NationsBank to take the limited flexibility allowed under the statute to a ridiculous and patently

impermissible extreme: PwC told NationsBank to ignore the inconvenient, real-world, statutory definition of "normal retirement age" and replace it with the made-up concept of a "normal retirement *date*" which would be defined not by reference to any *age* (let alone an age, as the statute requires, that is reasonably representative of the typical retirement age of the covered workforce) but the first day of the month following the *date* that each participant completes *five (5) years of service* with the Company.[5]

57. The strategy was supposed to work as follows. Five years of service with the Company is the time after which each participant becomes vested under the Pension Plan. PwC's theory was that if every participant with a vested benefit could be deemed, via the "normal retirement *date*" definition, to have already attained normal retirement age for purposes of ERISA, the Company could, for example, effectively override the ERISA requirement that a participant's "accrued benefit" under the Pension Plan be defined in terms of the annual amount the participant could expect at retirement. Instead, the Pension Plan could effectively define the accrued benefit as "the current account balance"—a formulation the 7th Circuit recently rejected in *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003). Just as important to Defendants (including PwC which did and does employ the same sleight of hand in its own plan, *see Laurent, supra*), an abnormally low normal retirement *age*—accomplished entirely through the backdoor via the definition of a "normal retirement *date*"—also would effectively exempt the Pension Plan from, among other key participant protections, ERISA's age discrimination and backloading prohibitions. *See* ERISA §§ 204(b)(1)(A)–(C) and (G)–(H), 29 U.S.C. §§ 1054(b)(1)(A)–(C) and (G)–(H), and IRC § 411(b)(1).

58. The Company eagerly adopted PwC's proposal but its attempt (like PwC's) to circumvent ERISA in the manner its consultant urged failed and continues to fail for numerous reasons.

59. First, Defendants were too clever by half (or perhaps simply too "aggressive," *see supra* n. 4) because by failing to include *any* "normal retirement *age*" in the Pension Plan—not merely failing to include a normal retirement age that was reasonably representative of the typical retirement age of the covered workforce—by operation of law the Pension Plan's normal retirement age is the statutory normal retirement age of age 65. *See* ERISA § 3(24), 29 U.S.C. § 1002(24) and IRC § 411(a)(8); Treasury Regulation ("Treas. Reg.") § 1.411(a)-7(b)(1) and example 2 thereunder ("if *an age is* not specified by a plan," the normal retirement age under the plan is age 65) (emphasis added). Surely, *a date* is not an *age*—as the Company tacitly admits by showing itself forced to employ the different terminology ("normal retirement *date*")—and the definition of "normal retirement date" itself is tellingly not keyed to participants' age at all but rather that date immediately following the completion by participants, no matter what their age, of exactly the period of time of service it takes for them to vest under the plan (another "date"), be they age 25, 30, or 35 at the time of this supposed "retirement."[6]

60. To ensure, however, that the date-for-age swap would go unnoticed by regulators, the Company affirmatively misled the IRS, going so far as to state in, and/or at the time of the submission of, its original determination letter request that the Plan was governed by a normal retirement age of 65 when the entire thrust was entirely contrary.[7]

61. But the Company's attempt to game the statute also fails because, ironically, other provisions of the Pension Plan implicitly use a normal retirement age of age 65. For example, § 6.3(a) of the Pension Plan provides that unless a participant elects otherwise, benefits under the Pension Plan will commence not later than the 60th day after the later of (A) the close of the plan year in which the participant attains age 65 or (B) the close of the plan year in which the employee terminates employment. This provision is intended to satisfy the requirement under ERISA § 206(a), 29 U.S.C. § 1056(a), and IRC § 401(a)(14) that benefits generally commence not later than the 60th day after the later of (A) the close of the plan year in which the participant attains "the earlier of age 65 or the normal retirement age specified under the plan" or (B) the close of the plan year in which the employee terminates employment. By referring only to age 65 in clause (A) of the distribution rule, the Pension Plan signals that the normal retirement age under the Plan is age 65. Otherwise, the provision would not satisfy the distribution requirement under ERISA § 206(a), 29 U.S.C. § 1056(a), and IRC § 401(a)(14).

62. Even had the Company implemented PwC's proposed scheme in a way that somehow defined "normal retirement *age*" as five years of service, the Pension Plan's definition would not have been valid. The Company did not inform participants that the normal retirement age under the Pension Plan was five years of service—in fact, the opposite is true.

63. Nor would a normal retirement age as low as age 25 (or even younger) for many participants, and probably under age 35 for most participants, have been consistent with the stated purpose of the Pension Plan, which was and is to provide "retirement" income to Company employees. Employees do not normally "retire" after five years of employment with the Company. Thus, even had the Company amended the Pension Plan to define "normal retirement age" as five years of service, PwC's gimmick would have caused the Pension Plan by its terms to violate the requirement that a qualified pension plan be intended to primarily provide "retirement income" to employees. As such, the definition would have been invalid.[8]

64. More generally but no less crucially, a completely fictitious normal retirement age (really, "date") of the type recommended by PwC cannot be permissible because it would, if allowed, permit employers through the simple expedient of plan drafting to override a number of central provisions of ERISA and the Internal Revenue Code that are designed to protect the interests of plan participants. As noted above, the statutory concept of a "normal retirement age" is central to the operation of ERISA and its key protections. These protections include the prohibitions against age discrimination, backloading

of benefit accruals, and benefit forfeitures addressed in this Complaint. ERISA does not permit a plan sponsor to sidestep these protections by adopting its own definition of normal retirement that meshes more comfortably with the sponsor's business strategy. As one cash balance expert reportedly explained, "[a] short retirement age 'guts' the Employee Retirement Income Security Act."[9]. IRS officials are reported, with good reason, to have expressed similar concerns.

65. In any event, the Pension Plan's adoption of a five-year normal retirement date (even if read as a five-year normal retirement "age") is ineffective to avoid the Plan's clear obligations under ERISA to pay departing participants an amount no less than their "accrued benefit *determined under the plan*" ERISA § 3(23), 29 U.S.C. § 1002(23) (emphasis added). This requirement applies regardless of a plan's normal retirement age (or "date"). Under the terms of the Pension Plan, a participant accrues two types of benefits for each period of service with the Company: (1) a pay credit based on the participant's compensation during the period *plus* (2) the right to receive tax-deferred investment credits on those pay credits (at the rate promised at the time the related pay credits accrue) for as long as the participant leaves his or her account balance in the Pension Plan, through age 65 and beyond—with a floor stop-loss guarantee. ERISA requires that this right to continue to receive investment credits with limited downside risk be recognized as part of a participant's "accrued benefit" under the Pension Plan. As a result, any lump sum cash-out of a participant's benefit under the Pension Plan must include the value of this right as part of a participant's accrued benefit.

### Participant Directed "Investments"

66. Perhaps even more radical than the artificially (and unlawfully) low normal retirement age, PwC proposed and NationsBank adopted (and now Bank of America continues to maintain) a cash balance structure specifically designed to create for the Company a massive leveraged arbitrage opportunity that cynically depends on the Company, by way of the Pension Plan, profiting from its employees' investment mistakes and presumed naivety [sic].

67. Whereas almost all other cash balance programs automatically credit employees' account balances with a pre-set interest formula (such as the one-year Treasury bill rate plus one or two percentage points), the NationsBank Cash Balance Plan, as proposed by PwC and adopted by NationsBank, provided participants with no guaranteed growth in principal. Instead of crediting participants' hypothetical accounts with a fixed rate as is usually done in cash balance plans, the NationsBank Cash Balance Plan only credited a participant's account with the returns of one of a limited number of hypothetical investment options—or "Investment Measures"—that the participant was required to select among or be defaulted into a very low return stable value fund. The "Investment Measures" selected by Company Directors (and/or other high ranking executives) acting, as specified in the Pension Plan, as fiduciaries on behalf of the Company, were and are the

same Company "proprietary" mutual fund options that the Company offered participants in the Company 401(k) Plan.

68. Whether they wanted it or not, participants were and are forced to invest their defined benefit "money" as well as their defined contribution money and bear the risk that these returns will not be adequate for a comfortable retirement. As designed by PwC and adopted by the Company, the Pension Plan does not permit participants to opt-out from this forced investment scenario.

69. While the Pension Plan does guarantee that the nominal amount of the participants' hypothetical opening account balance plus the value of certain pay credits is not subject to forfeiture, it does not provide any guarantee that the value of the opening balance will not erode as a result of inflation.

70. Plaintiffs allege that it is imprudent to force or let participants "invest" the "account" balance in the Pension Plan. While ERISA anticipates permitting participants in a 401(k) savings-type plan to invest assets on their own, it is not anticipated under ERISA, and imprudent to require, that participants self-direct their pension assets. ERISA § 404(c), 29 U.S.C. 1104(c), which allows 401(k) plan fiduciaries to turn over some investment responsibility to participants, is not available to defined benefit plans such as the Pension Plan. The 401(k) Plan and the Pension Plan fiduciaries made no inquiry into participants' knowledge, ability, or time to handle these investment responsibilities. And, as a matter of fact, Plaintiffs and the Class are not well-equipped, at least on the scanty information and assistance they were given, to invest pension plan assets like professionals.

71. Moreover, the cash balance "investment" funds effectively charge participants fees and expenses wholly inappropriate when compared to the fees and expenses that would ordinarily be directly or indirectly assessed against participant benefits accruing under a defined benefit formula and/or against plan assets of the enormous scale of the Pension Plan. The majority of investment options underlying the "investment" funds were and are mutual funds managed by Company affiliates. These funds, and hence the "investment" funds, assess fees and expenses several times the going rate for plans the size of the Pension Plan (unfairly reducing participants' benefits accordingly). For the Plan fiduciaries to countenance the use of Investment Measures any more expensive or any less professionally managed than those they used and use to invest the pooled assets of the Plan was and is a breach of faith of the most basic kind, particularly where, as here, those Investment Measures were Company-managed, proprietary mutual funds that in many cases depended heavily for their continued existence or profitability on the captive Plan which also gave the funds the additional critical mass helpful in marketing such funds to third-parties.

72. As further regards the "Investment Measures," it is clear that, perhaps as a consequence of the experimental nature of this Plan, the way the Plan was drafted (in 1998, and restated in 2000) and has been implemented since that time, has caused the Company necessarily to violate the "definitely determinable" rule applicable to all defined benefit plans. ERISA § 402(b)(4),

29 U.S.C. § 1102(b)(4), provides that a retirement plan must be written and must "specify the basis on which payments are made to and from the plan." This is the ERISA counterpart to the requirement under § 401(a) of the Internal Revenue Code that a pension plan must "provide systematically for the payment of definitely determinable benefits." Treas. Reg. § 1.401(a)-l(b)(1)(i).

73. IRS Revenue Ruling 79-90 explains that a plan will not be considered to provide definitely determinable benefits if the benefit formula depends on actuarial or other factors that are within the control of the employer. By analogy, a plan formula that includes factors that are subject to the discretion of the employer does not "specify the basis on which payments are made to and from the plan" within the meaning of ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4). Here, benefits payable under the Pension Plan are based on each participant's "account balance" at the time of termination or retirement. A participant's account balance consists of the annual "contributions" or credits to the account made by the plan sponsor, plus imputed "investment" returns. Investment returns are based on participant investments in the "Investment Measures" offered to participants.

74. The menu of "Investment Measures" is not fixed by the terms of the Pension Plan, but is chosen by the Company or other Defendants acting on behalf of the Company as fiduciaries based on vague guidelines set forth in the Plan. The menu is changed from time to time at the discretion of the Company or those acting on its behalf. Moreover, the options that are selected—mutual funds managed by the Company—have such malleable standards themselves, and give such complete discretionary control to the manager, as to be a further way in which the Company retains continuous discretion and control over participants' "returns."[10] As a result, in violation of ERISA and the Internal Revenue Code, the Company is improperly left with discretion over a critical piece of the pension formula: the menu of Investment Measures that determines the investment crediting rate under the Plan.

75. Meanwhile, banking on participants receiving low notional rates of return, the Company has exploited the arbitrage opportunity to the fullest. The Company continues to invest the Pension Plan's assets using the very best investment professionals whose services are purchased at the very lowest possible cost using the economies of scale and economic bargaining power in the marketplace for financial services that the Pension Plan's huge asset base gives it. (As noted above, however, the Company's strategy has not always been successful, causing compensable losses resulting from actual losses, losses through missed investment opportunity or both).

76. Moreover, the Company has not made these investment professionals' services available to participants on the same terms that the Company, through the Pension Plan, enjoys. The Company has not even disclosed to participants its investment philosophy, strategy and/or tactics or give participants any opportunity to profit from the Company's money management strategy even if only by example. Nor has the Company expanded the range

of "investment" options to participants in case someone might somehow dis-
cover and wish to mirror the Company's investment philosophy.

---

[3] The statute provides that the "normal retirement age" means the earlier
of either (A) "the time a plan participant attains normal retirement age
under the plan" or (B) "the later of—(i) the time a plan participant attains
age 65, or (ii) the 5th anniversary of the time a plan participant com-
menced participation in the plan." ERISA § 3(24), 29 U.S.C.
§ 1002(34) and IRC § 411(a)(8). Therefore, except for participants hired
after their 60th birthday, the ERISA-defined normal retirement age is
the earlier of the normal retirement age under the plan or age 65.

[4] "In the 1990's there was increasing pressure in the marketplace for
firms to develop aggressive tax shelters that could be marketed to
large numbers of taxpayers. This had not been a traditional part of
our tax practice, but regrettably our firm became involved" in these
transactions. Testimony of Richard J. Berry, Senior Tax Partner,
PricewaterhouseCoopers LLP, before the Permanent Subcommittee
on Investigations of the Senate Committee on Governmental Affairs,
November 18, 2003.

[5] The term "normal retirement date" is defined under the Plan to be "the
first day of the calendar month following the earlier of (i) the date the
Participant attains age sixty-five (65) or (ii) the date the Participant
completes sixty (60) months of Vesting Service." Under this definition,
every participant would reach the "normal retirement date" in five
years, unless he or she joined the Company after age 60.

[6] While a pension plan can define a "date" as the date participants
vest under the plan, it cannot not define an "age" in this manner,
because the date participants vest is not a chronological "age." In
fact, many pension plans use both terms, with each term having a
distinct meaning. The IRS has even issued a ruling that cautions
plans not to confuse the two concepts, explaining that a pension plan
does not satisfy the requirement of section 411 of the Code if the
plan substitutes "normal retirement date" for "normal retirement age."
See IRS Revenue Ruling 81-211, 1981-2 C.B. 98 (1981).

[7] Recall that the Plan's actuary Towers Perrin expressed concern that
"[w]e do not know whether the IRS agent reviewing the determination
letter request understood the transaction and the applicable rules
adequately." See Pensions & Investments, "Bank Plan Blurs Line
Between DB, DC," September 21, 1998. One reason for this posited
failure of understanding may be because the agent was told untruths.

[8] See ERISA § 3(2)(A)(i), 29 U.S.C. § 1002(2)(A)(i); Treas. Reg.
§ 1.401-1(a)(2)(i) (A qualified pension plan is an arrangement which
is established and maintained by an employer "to provide for the
livelihood of the employees or their beneficiaries after the retirement
of such employees."); Treas. Reg. § 1.401-1(b)(1)(i) ("A pension plan
within the meaning of section 401(a) is a plan established and
maintained by an employer primarily to provide systematically for the
payment of definitely determinable benefits to his employees over a
period of years, usually for life, after retirement."); Treas. Reg.
§ 1.401(a)-1 (pre-ERISA regulations cited above continue to apply).

[9] Pensions and Investments, "Cash Balance: Trouble for Bank Plans?
IRS Scrutinizes Shortened Retirement Ages," May 31, 1999. The arti-
cle goes on to explain that "[o]fficials from the Treasury Department
and IRS have been scrutinizing plans . . . that have defined 'normal'
retirement as occurring . . . after 5 years' tenure. . . . Such shortened
retirement ages short-circuit various pension rules pegged to the
more conventional retirement ages of 60 and 65."

[10] Under the prospectuses governing the mutual funds in question, the Company and/or its affiliates can change both the fees and expenses and even the nature of the funds' investments without notice and effectively on a whim, so broadly worded are those prospectuses and so great is the fund managers' discretion and control.

The plaintiff's allegations related to the transfers from the 401(k) plan to the cash balance plan were as follows:

### Asset Transfers from 401(k) Plans to the Pension Plan

77. To maximize their client's arbitrage opportunity, PwC advocated a yet more radical move: it designed into its proposal to NationsBank an account removal/asset transfer from the NationsBank 401(k) Plan. The strategy was to maximize the arbitrage opportunity available with the new cash balance plan design. PwC convinced NationsBank that it could transfer assets from individual accounts in the 401(k) Plan to the Pension Plan, commingle the assets with other Pension Plan assets (*i.e.*, no longer maintain individual accounts for each participant to hold assets that had been held in individual accounts within the 401(k) Plan), and thereby maximize the arbitrage opportunity.[11] NationsBank agreed to proceed with this unprecedented strategy, which no other company has had the temerity to attempt before or since.

78. In order to accomplish this highly unorthodox maneuver which resulted in a shift of over $1.4 billion from the 401(k) Plan to the Pension Plan, the Company, PwC and other Defendants misled the Trustee, other Plan fiduciaries and the participants themselves about the nature and character of the proposed transactions. Notwithstanding these Defendants' material misrepresentations and/or omissions, the NationsBank 401(k) Trustee and the other Defendants (including the NationsBank Cash Balance Plan Trustee) knew or should have known that the account removal and asset transfer would violate Title I of ERISA, among other laws, and were duty-bound and should have refused to participate.

79. As evidence of its intent to maximize its arbitrage opportunity and belying the claim that the transfer was purely "voluntary," the Company launched a major internal media campaign to pressure employees and pressure mid-level managers to pressure employees to "consent" to the transfer. Moreover, the Company made sure that as a structural matter many participants would have no option but to consent by amending the 401(k) Plan to no longer allow participants to request loans from their 401(k) accounts: The Company told participants that if they wanted to retain the ability to take loans—a feature found in most large 401(k) plans—participants would have to transfer their accounts to the Pension Plan. The Pension Plan was amended to add a loan feature, very unusual for a defined benefit plan. Thousands of Plan participants at any one time have tens of millions of dollars in loans and in many cases depend on them to make ends meet. Shifting the loan feature from the 401(k) Plan to the Pension Plan was done solely to make sure that

as much money as possible shifted from former Plan to the latter. The Company no doubt concluded that this type of arm twisting was necessary because, as Towers Perrin put it, "[from an employee's perspective, the motives for electing a transfer aren't so clear."

\* \* \*

85. Following each of the transfers, the assets that had been held in individual accounts for each participant in the 401(k) Plans were no longer held in individual accounts within the Pension Plan. Instead, the assets were commingled with other Pension Plan assets. Before the transfers, each account in the 401(k) Plan by law was required to be, and was, fully funded—*i.e.*, by the assets in each participant's account was precisely equal to the participant's accrued benefit under the 401(k) Plans. Following the transfers, there was and is no requirement that the Pension Plan be fully funded—*i.e.*, Pension Plan assets may be less than the aggregate accrued benefit liabilities under the Pension Plan, so that if it were to terminate, benefits might not be fully funded. As a result, participants' benefits became less secure following the transfers.

86. Before the transfers, net income earned on the assets in each participant's account within the 401(k) Plan was used to increase the participant's benefit under the 401(k) Plan—*i.e.*, account income "belonged" to the account. Any extraordinary income or gains accrued to the benefit of participants. Following the transfers, investment income on those same assets was used by the Pension Plan to defray the Plan's expenses and reduce the Company's funding obligation—*i.e.*, investment income "belonged" to the Pension Plan. Any extraordinary income or gains accrued to the benefit of the Pension Plan and by extension the Company.

87. For these and other reasons, it comes as no surprise that, as the Company has recently admitted, the Internal Revenue Service is auditing the Plans and challenging whether the transfers of assets from the 401(k) Plans to the Pension Plan "were in accordance with applicable law." Bank of America Corporation SEC Form 10-Q for the quarterly period ended September 30, 2004 at 22.

---

[11] As the Plan's actuary remarked in a contemporaneous memorandum that analyzed the asset transfer proposal: "From the employer's perspective, the motive for this arrangement is financial. If the assets of the cash balance plan can actually be invested in a manner that outperforms the crediting rates for cash balance accounts, this will produce gains for the cash balance plan. The extent of this *arbitrage opportunity* probably depends on employees' cash balance investment elections." The memorandum continues: "Given that a primary motive of an employer to engage in a transfer of this type is because of an expectation that the pension fund will out-earn the returns promised to participants, *does this constitute a breach of fiduciary duty?*" *See Pensions & Investments*, "Bank Plan Blurs Line Between DB, DC," September 21, 1998 (emphasis added).

[Pothier v. Bank of America Corp., No. 04-458 GPM, SD Ill (June 30, 2004)]

A similar suit was filed against the PricewaterHouse Coopers plan. [Laurent v. PricewaterhouseCoopers, No. 04-089 MJR, SD Ill (Nov 2004)] The two cases have been consolidated.

### ¶ 11.6   TRANSFERS FROM THE NATIONSBANK 401(K) PLAN ARE THE BASIS OF SEPARATE PARTICIPANT CLAIMS

At the time the NationsBank cash balance plan was established, participants who were also participants in the NationsBank 401(k) plan were offered the option of transferring their account balances to the cash balance plan. This feature has given rise to a separate set of claims.

The counts that related to the use of the young normal retirement age were as follows:

#### COUNT ONE
#### UNLAWFUL LUMP SUM BENEFIT CALCULATION

* * *

106. If participants' benefits had been projected to age 65 using an appropriate rate based on the Pension Plan's investment crediting rate, and if the Plan had then discounted this projected figure back to their then-current age at the interest rate(s) required by ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), and IRC § 417(e)(3), as implemented by Treasury Regulation § 1.417(e)-1(d), or if the Plans had otherwise properly taken into account the value of the right to continue to earn tax-deferred interest credits with limited downside risk, participants would have received a larger lump sum distribution than the amount paid to them.

* * *

114. Specifically, Plaintiffs seek to enjoin Defendants from violating ERISA and obtain appropriate relief to redress violations of ERISA and enforce the statute, see ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), by, inter alia, compelling the Administrator to administer the Plan in compliance with the law and, more specifically, calculate or re-calculate the amounts due, plus interest, for all past benefits due, in accordance with the requirements of the statute.

#### COUNT TWO
#### AGE DISCRIMINATION

* * *

118. Second, effective as of the date of the conversion of the BankAmerica Pension Plan and the NationsBank Pension Plan to cash balance plans, and at all times thereafter, benefits provided under the terms of all the Pension Plans accrued and accrue at a rate which is reduced because of age or the attainment of any age, and therefore the Pension Plans did not and do not comply with the accrual rules of subparagraph (H) of ERISA § 204(b)(1), 29

U.S.C. § 1054(b)(1)(H) and IRC § 411(b)(1)(H). This occurred and continues to occur because, among other reasons, pay credits under the Pension Plans do not increase, and/or do not increase fast enough, to offset the reduction in the value of promised future investment credits that accrue each period as participants and other participants grow older. The result is that the rate at which participants' accrued benefits under the Pension Plans was reduced because of age or the attainment of any age.

* * *

120. Specifically, Plaintiffs seek to enjoin Defendants from violating ERISA and obtain appropriate relief to redress violations of ERISA and enforce the statute, see ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), by, inter alia, compelling the Administrator to administer the Plan in compliance with the law and, more specifically, calculate or re-calculate the amounts due, plus interest, for all past benefits due, in accordance with the requirements of the statute.

The counts that related to the transfers from the 401(k) plan were as follows:

### COUNT THREE
### ELIMINATION OF PROTECTED BENEFIT

* * *

124. Treasury Regulation § 1.411(d)-4, Q&A-3(a)(2), which implements ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1), and IRC § 411(d)(6)(1), provides that the separate account feature of an employee's benefit under a defined contribution plan such as the above-referenced 401(k) plans is a protected benefit that may not be eliminated except as provided under Code § 411(d)(6). IRC § 411(d)(6) or the regulations do not provide an exception that allows the separate account feature to be eliminated and no other exception to ERISA § 204(g), 29 U.S.C. § 1054(g) is applicable here.

* * *

126. Pursuant to ERISA § 502, 29 U.S.C. § 1132, the Defendants should be, among other things, enjoined from continuing to violate the foregoing provision of ERISA in the manner set forth above and a constructive trust should be imposed upon all of the current and former traceable assets of the Pension Plan. In addition ordering all relief available to the Plans under ERISA § 409(a), 29 U.S.C. § 1109(a), the Court should compel Defendants to create or recreate separate participant accounts within the 401(k) Plan retroactive to the date of each of the 401(k) asset transfers, and assets transferred from each participant's 401(k) original account should then be treated as having been deposited into these reconstruction accounts. To the extent that each participant's traceable share of the Pension Plan's overall actual investment experience after the transfers was better than the performance of the notional investments credited to the participant under the Pension Plan, the participant should be entitled to an upward adjustment reflecting the difference and/or an amount equal to the amount of the Pension Plan's unjust arbitrage profit. To the extent that the participant's transferred assets or the actual investment experience of those assets

cannot be established, Defendants should be compelled to assume the assets had been put to the highest and best use available to the Pension Plan during the relevant time and adjust each participant's account upward accordingly.

* * *

139. Investment returns are based on participant investments in the "Investment Measures" offered to participants. The menu of "Investment Measures" is not fixed by the terms of the Pension Plan, but is chosen by the Company or other Defendants acting on behalf of the Company based on vague guidelines set forth in the Plan. The menu is changed from time to time at the discretion of the Company or other fiduciaries. Moreover, the options that are selected—mutual funds managed by the Company—have such malleable standards themselves, and give such complete discretionary control to the manager, as to be a further way in which the Company retains continuous discretion and control over participants' "returns."

140. As a result, the Company has discretion over a critical piece of the pension formula: The menu of Investment Measures that determines the investment crediting rate under the Plan. This violates the requirements of ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4) and Treasury Regulation §§ 1.401-1(b)(1)(i) and 1.401 (a)-1(b)(1)(i)-(ii) that benefits be "definitely determinable" and that a plan "specify the basis on which payments are made to and from the plan."

141. Among other things, Plaintiffs seek a declaration that the Company violated § 402(b)(4) of ERISA when it designed and implemented the Plan without objectively specifying the basis on which payments are made to and from the Plan. Plaintiffs also seek to enjoin Defendants from violating ERISA and to obtain other appropriate relief to redress this violation of ERISA and enforce the statute by, *inter alia*, compelling Defendants to administer the Plan in compliance with the law and, more specifically, calculate or re-calculate the amounts due, plus interest, for all past benefits due under the Plan based on an appropriate investment rate that was not subject to the discretion of the Company or the other Defendants. In addition, Plaintiffs seek an order reforming the Plan and/or compelling the Company to amend and/or administer the Plan *nunc pro tunc* to bring it into compliance with the statute.

* * *

## COUNT SIX
### PROHIBITED INUREMENT TO THE BENEFIT OF THE EMPLOYER

* * *

144. The ERISA's anti-inurement clause provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the

exclusive purpose of providing benefits to participants in the plan and their beneficiaries." ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1).

* * *

146. By causing the Plans' assets to inure to the benefit of Bank of America and holding those assets for purposes other than the exclusive purpose of providing benefits to participants in the plan and their beneficiaries, all Defendants have directly or indirectly violated ERISA's anti-inurement clause, ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), causing injury to the Plans and the Plans' participants and improperly benefiting Defendants in the ways set forth above and to be more fully demonstrated after discovery and at trial.

* * *

## COUNT NINE
### INTERFERENCE WITH THE ATTAINMENT OF PENSION RIGHTS

* * *

164. Defendants intentionally discriminated against all 401(k) Plan participants who did not "consent" to the 401(k) account/asset transfer and intentionally interfered with their right under the 401(k) Plans to not transfer their separate accounts to the Pension Plan and their statutory right to keep their separate account-accrued benefit by not "consenting" to the transfer by penalizing anyone who exercised those rights with the loss of the right to take a loan against that account or those account assets and at the same time holding out to them the prospect of retaining or regaining that right if they would "consent" to transfer that account or those account assets to the Pension Plan.

165. Plaintiffs seek, *inter alia*, a declaration that Defendants violated ERISA § 510 and an order enjoining Defendants from violating ERISA and granting all other appropriate relief to redress this violation of ERISA and enforce the statute.

# **Exhibit 4**

## PwC February 2005 Motion to Dismiss and Memorandum of Law

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TIMOTHY D. LAURENT, <br> On behalf of himself and on behalf of all <br> others similarly situated, <br>    Plaintiff, <br>   vs. <br> PRICEWATERHOUSECOOPERS LLP, et al, <br>    Defendants | No. 04-809 GPM <br><br> Chief Judge G. Patrick Murphy |

## DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendant PricewaterhouseCoopers LLP ("PwC") and all individual defendants named in the First Amended Complaint ("Complaint") paragraphs 25 and 28 (collectively "the served defendants") hereby jointly move this Court, pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a), to dismiss the Complaint for improper venue.* If this Court reaches the merits of this case, the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. In support of this motion, PwC states as follows:

1. Plaintiff's Complaint should be dismissed because venue is not proper in this district. Under 29 U.S.C. § 1132(e)(2), claims arising under ERISA may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found. None of these criteria is met in the Southern District of Illinois: the PwC retirement plans at issue are all administered in Florida; the alleged breaches occurred in either

---

\* Plaintiff filed the First Amended Complaint on January 28, 2005. In paragraph 36 of the Complaint, plaintiff named an additional twelve individuals as defendants. These individuals have yet to be served with a copy of the Complaint and they have not joined in this motion.

Florida, where the plan is administered, or in New York, where the plan was authored and adopted; and no defendant named in the Complaint resides or is found in this district.

2.    If this Court reaches the merits of plaintiff's claims, the Complaint should be dismissed for failure to state a claim.  Plaintiff relies throughout the Complaint on Tax Code regulations regarding the "nondiscrimination" requirements for tax-qualified plans. The Seventh Circuit and other courts have made clear that these regulations do not give rise to an individual cause of action.  Moreover, each of plaintiff's claims under ERISA is defeated by clear statutory language and well-established caselaw interpreting these provisions.

3.    Count One fails because plaintiff cannot state a "discrimination" claim based merely on allegations that partners were awarded greater benefits than employees under the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "RBAP").  ERISA provides relief only when a plaintiff can show that his employment status was changed or that he was deprived of his right to benefits.  Plaintiff does not, and cannot, allege, that he suffered such a loss, and he cannot save his claim by referencing Tax Code regulations that do not provide an individual cause of action.

4.    Count Two should be dismissed because employers do not violate ERISA's anti-inurement provision when they benefit economically from a plan's design.  Plaintiff's claim fails because his argument is based solely on the benefit PwC allegedly received due to the RBAP's design.

5.    Counts Three, Four, and Six all fail because the definition of normal retirement age in the RBAP complies with ERISA and established caselaw.  Plaintiff's argument that the RBAP's normal retirement age is invalid and should be replaced by an age 65 normal retirement age is without legal support and is merely an attempt by him to rewrite the terms of the plan to

create ERISA violations where none exist. Plaintiff's age discrimination claim in Count Three cannot succeed because the RBAP's normal retirement age ensures that a participant's benefits are not decreased based upon age. Counts Four and Six fail because plaintiff's lump sum benefit payment included all to which he was entitled. The forward projections plaintiff claims were necessary to calculate this payment are not required once a participant reaches normal retirement age, as plaintiff concedes he had done here under the terms of the RBAP.

6.     Count Five should be dismissed because plaintiff cannot state a claim under ERISA's forfeiture provision based on the claim that his benefits were allegedly reduced when the funds he selected suffered negative investment returns because, as a matter of law, this does not constitute a forfeiture under ERISA.

7.     Count Seven fails to state a claim because RBAP benefits are "definitely determinable" under ERISA, and the Treasury Regulations on which plaintiff relies do not apply to ERISA claims.

8.     Count Eight's breach of fiduciary duty claims cannot succeed because plaintiff's allegations focus on plan design, which is not a fiduciary function. Plaintiff's claim that PwC engaged in "prohibited transactions" should be dismissed because he has failed to identify any transaction that is prohibited under ERISA.

9.     Count Nine's allegations are also insufficient to state a claim. Even accepting plaintiff's allegations about the summary plan description, which are contradicted by other allegations in the Complaint, plaintiff fails to properly allege that PwC acted in bad faith, actively concealed the plan's terms, or that he relied on the summary plan description to his detriment.

10.    In further support of this motion, the served defendants submit the accompanying Memorandum In Support Of Their Motion to Dismiss the First Amended Complaint and Appendix of Exhibits.

WHEREFORE, the served defendants move this Court for an order dismissing the Complaint for improper venue, or, if this Court determines venue is proper, an order dismissing the Complaint with prejudice for failure to state a claim.

Dated:  February 16, 2005

Respectfully submitted,

/s/Michael J. Nester
Michael J. Nester (Bar #02037211)
DONOVAN, ROSE, NESTER &
  JOLEY, P.C.
8 East Washington Street
Belleville, Illinois  62220
(718) 788-1500

Robert J. Kopecky
Douglas G. Smith
Lauren O. Casazza
Jason W. Callen
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

*Co-Counsel for Defendant
Pricewaterhousecoopers LLP and
Defendants Named in Paragraphs 25 and 28
of the First Amended Complaint*

4

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2005, I electronically filed DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT with the Clerk using the CM/ECF system which will send notification of such filings to the following:

Mr. Eli Gottesdiener
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, NY 11215
eli@gottesdienerlaw.com
**Attorney for Plaintiffs**

Mr. Robert J. Kopecky
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
rkopecky@kirkland.com
**Attorney for PricewaterhouseCoopers LLP**

Respectfully submitted,

BY   /S/MICHAEL J. NESTER
        MICHAEL J. NESTER, #02037211
        Donovan, Rose, Nester & Joley, P.C.
        8 East Washington Street
        Belleville, Illinois  62220
        (618) 235-2020 (phone)
        (618) 235-9632 (fax)
        mnester@ilmoattorneys.com

ATTORNEY FOR DEFENDANT
PRICEWATERHOUSECOOPERS LLP AND
DEFENDANTS NAMED IN PARAGRAPH 25
AND 28 OF THE FIRST AMENDED
COMPLAINT

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

TIMOTHY D. LAURENT,  )
On behalf of himself and on behalf of all  )
others similarly situated,  )
 )
        Plaintiff,  )    No. 04-809 GPM
 )
   vs.  )
 )    Chief Judge G. Patrick Murphy
PRICEWATERHOUSECOOPERS LLP, et al,  )
 )
      Defendants  )
 )
_____  )

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Michael J. Nester (Bar #02037211)
DONOVAN, ROSE, NESTER &
 JOLEY, P.C.
8 East Washington Street
Belleville, Illinois  62220
(718) 788-1500

Robert J. Kopecky
Douglas G. Smith
Lauren O. Casazza
Jason W. Callen
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................3

    The PwC RBAP ..................................................................................................................3

    Plaintiff's Allegations ........................................................................................................4

ARGUMENT ..........................................................................................................................5

I.       ERISA's Venue Requirements Are Not Satisfied. ............................................................5

II.     Plaintiff Fails To State A Claim Upon Which Relief May Be Granted................................7

    A.     Count One: Plaintiff Has Failed To State A Claim Because ERISA § 510
          Does Not Apply To Claims, Such As Those Here, Based On The Design
          Or Administration Of A Retirement Plan. ..................................................................8

          1.     Plaintiff Does Not, And Cannot, Allege That His Employment
               Status Was Changed. ....................................................................................8

          2.     Plaintiff's Own Complaint Demonstrates That He Maintained His
               Right To Receive Benefits. ........................................................................10

    B.     Count Two: Plaintiff Fails To State A Claim Because He Does Not, And
          Cannot, Allege That PwC Used Plan Assets For Its Own Benefit. ........................12

    C.     Counts Three, Four, And Six: Plaintiff Fails To State A Claim Because
          The Normal Retirement Age Definition Complies With ERISA. ..........................14

          1.     The RBAP's Normal Retirement Age Is Valid...........................................15

          2.     Count Three: Benefits In The RBAP Are Not Reduced Based On
                Age............................................................................................................17

          3.     Counts Four And Six: Plaintiff's Lump Sum Payment Was
                Correctly Calculated. .................................................................................20

    D.     Count Five: Plaintiff Fails To State A Claim Because Plaintiff Did Not
          Suffer A Forfeiture Of Benefits. .............................................................................22

    E.     Count Seven: Plaintiff Fails To State A Claim Because Benefits Under
          The RBAP Are "Definitely Determinable." ............................................................24

    F.     Count Eight: Plaintiff Fails To State A Claim Because PwC Has Not
          Breached Any Fiduciary Duties To Plaintiff. .........................................................26

    G.    Count Nine: Plaintiff Has Failed To State A Claim Because He Does Not
          Allege That PwC Acted in Bad Faith In Authoring The Summary Plan
          Description...........................................................................................................28

CONCLUSION.............................................................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Abraham v. Exxon Corp.*,
 85 F.3d 1126 (5th Cir. 1996) ..................................................................... 10, 12

*Alessi v. Raybestos-Manhattan, Inc.*,
 451 U.S. 504 (1981)........................................................................................ 23

*Anderson v. Chrysler Corp.*,
 99 F.3d 846 (7th Cir. 1996) ................................................................ 9, 27, 28

*Anderson v. Simon*,
 217 F.3d 472 (7th Cir. 2000) ......................................................................... 11

*Bass v. Retirement Plan of Conoco, Inc.*,
 676 F. Supp. 735 (W.D. La. 1988)................................................................. 13

*Berger v. Xerox Corp. Ret. Income Guar. Plan*,
 338 F.3d 755 (7th Cir. 2003) ............................................................... 3, 17, 20

*Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*,
 2000 WL 369671 (N.D. Ill. 2000) ................................................................. 24

*Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*,
 241 F.3d 609 (7th Cir. 2001) ......................................................................... 23

*Brown Schools, Inc. v. Florida Power Corp.*,
 806 F. Supp. 146 (W.D. Tex. 1992)................................................................. 6

*Campbell v. BankBoston, N.A.*,
 327 F.3d 1 (1st Cir. 2003)............................................................................... 17

*Cooper v. IBM Personal Pension Plan*,
 274 F.Supp.2d 1010 (S.D. Ill. 2003)............................................................. 18

*Czyz v. General Pension Bd.*,
 578 F. Supp. 126 (W.D. Pa. 1983)................................................................. 25

*Deeming v. American Standard, Inc.*,
 905 F.2d 1124 (7th Cir. 1990) .......................................................................... 9

*Dooley v. American Airlines, Inc.*,
 797 F.2d 1447 (7th Cir. 1986) ....................................................................... 24

*Esden v. Bank of Boston*,
 229 F.3d 154 (2d Cir. 2000)........................................................................... 25

*Fischer v. Philadelphia Elec. Co.,*
    96 F.3d 1533 (3d Cir. 1996)........................................................................................... 10

*Flanigan v. General Elec. Co.,*
    242 F.3d 78 (2d Cir. 2001)............................................................................................. 13

*Fletcher v. Kroger Co.,*
    942 F.2d 1137 (7th Cir. 1991) ........................................................................................ 13

*Furnari v. Dornan,*
    1993 WL 5051517, at *2 (9th Cir. 1993)................................................................... 10, 12

*Geib v. New York State Teamsters Conference Pension and Ret. Fund,*
    758 F.2d 973 (3d Cir. 1985)............................................................................................ 16

*Griggs v. MBNA Corp.,*
    2002 WL 32309983, at *2 (S.D.Ill. 2002) .......................................................................... 3

*Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan,*
    24 F.3d 1491 (3d Cir. 1994)............................................................................................. 9

*Health Cost Controls of Illinois, Inc. v. Washington,*
    187 F.3d 703 (7th Cir. 1999) .......................................................................................... 16

*Henson v. CSC Credit Services,*
    29 F.3d 280 (7th Cir. 1994) ............................................................................................ 11

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432 (1999).......................................................................................... 13, 14, 26

*Huppeler v. Oscar Mayer Foods Corp.,*
    32 F.3d 245 (7th Cir. 1994) ............................................................................................ 23

*Janowski v. International Bhd. of Teamsters, Local No. 710 Pension Fund,*
    673 F.2d 931 (7th Cir. 1982) .......................................................................................... 15

*King v. National Human Res. Comm., Inc.,*
    218 F.3d 719 (7th Cir. 2000) .......................................................................................... 26

*Kyles v. J.K. Guardian Sec. Servs., Inc.,*
    222 F.3d 289 (7th Cir. 2000) ..................................................................................... 21, 22

*Lockheed Corp. v. Spink,*
    517 U.S. 882 (1996)................................................................................................. 26, 27

*McFarland v. Yegen,*
    699 F. Supp. 10 (D.N.H. 1988).......................................................................................... 6

*McGath v. Auto-Body North Shore, Inc.,*
    7 F.3d 665 (7th Cir. 1993) ................................................. 9

*Mills, Mitchell & Turner v. Commissioner of Internal Revenue,*
    1993 WL 80580 (U.S. Tax Ct. 1993)................................. 12

*Panaras v. Liquid Carbonic Indus. Corp.,*
    74 F.3d 786 (7th Cir. 1995) ............................................. 28, 29, 30

*Reklau v. Merchants Nat'l Corp.,*
    808 F.2d 628 (7th Cir. 1986) ........................................... 7, 10, 11

*Ryan v. Asbestos Workers Union Local 42 Pension Fund,*
    2002 WL 90976 (3d Cir. 2002)......................................... 16

*Shaw v. Delta Air Lines, Inc.*
    463 U.S. 85 (1983)............................................................ 8

*Stamper v. Total Petroleum, Inc. Ret. Plan,*
    188 F.3d 1233 (10th Cir. 1999) ....................................... 11, 12, 24, 25

*Vallone v. CNA Fin. Corp.,*
    375 F.3d 623 (7th Cir. 2004) ........................................... 30

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.,*
    987 F.2d 429 (7th Cir. 1993) ........................................... 3

*Waeltz v. Delta Pilots Ret. Plan,*
    137 F.Supp.2d 1091 (S.D. Ill. 2001),
    *aff'd*, 301 F.3d 804 (7th Cir. 2002)................................. 1, 6, 7

## STATUTES

26 U.S.C. § 401................................................................. 10, 25

26 U.S.C. § 411................................................................. 15, 16

26 U.S.C. § 7801............................................................... 12

29 U.S.C. § 1002............................................................... 15, 16, 17, 22

29 U.S.C. § 1022............................................................... 28

29 U.S.C. § 1053............................................................... 22

29 U.S.C. § 1054............................................................... 17, 19, 22

29 U.S.C. § 1102............................................................... 24

29 U.S.C. § 1103 ................................................................................................................ 13

29 U.S.C. § 1106 ................................................................................................................ 27

29 U.S.C. § 1132 .................................................................................................................. 5

29 U.S.C. § 1140 .................................................................................................................. 8

29 U.S.C. § 1202 ........................................................................................................... 12, 16

## OTHER AUTHORITIES

IRS Publication 794 .......................................................................................................... 11

Rev. Rul. 78-120,
    1978-1 C.B. 117 ........................................................................................................... 16

Rev. Rul. 79-90,
    1979-1 C.B. 155 ........................................................................................................... 24

## REGULATIONS

Dept. of Labor, *Contents of Plan Descriptions and Summary Plan Descriptions*,
    29 CFR 2520.102-4 ....................................................................................................... 29

Treas. Reg. § 1.401 ............................................................................................................ 25

## INTRODUCTION

This case should be dismissed for two separate and independent reasons. First, venue for plaintiff's claims, all of which purportedly arise under ERISA, does not lie in this district. Second, each of the claims asserted in plaintiff's nine-count Amended Complaint ("Complaint") fails to state a claim on which relief may be granted.

Venue is improper because none of the statutory requirements for venue in ERISA cases are satisfied in this district. None of the parties to this case – including plaintiff – reside in the district. Neither the administration of the plans nor the alleged breaches that are the subject of this lawsuit occurred here. Indeed, the retirement plans that are the subject of plaintiff's Complaint were designed and are administered far outside the district. Both this Court and the Seventh Circuit have ruled under very similar circumstances that dismissal for improper venue is required. *See Waeltz v. Delta Pilots Ret. Plan*, 137 F.Supp.2d 1091 (S.D. Ill. 2001), *aff'd*, 301 F.3d 804 (7th Cir. 2002).

Should the Court reach the merits, each count of plaintiff's Complaint should be dismissed for failure to state a claim. Plaintiff's Complaint relies extensively on lengthy pejorative characterizations and attribution of evil motives based on PwC's alleged desire to obtain "the maximum benefit permitted by law" under ERISA and the Tax Code. (Cmplt. ¶ 88) But the sufficiency of plaintiff's claims rests on the facts alleged, the language of the statute, and controlling decisions interpreting that statute. The plain language of ERISA as well as established Supreme Court and Seventh Circuit precedent refute each of plaintiff's claims.

Much of plaintiff's Complaint depends on an attempt to rewrite the terms of the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "RBAP") and then claim that the rewritten Plan violates ERISA. Specifically, several of plaintiff's counts seek to invalidate the RBAP's normal retirement age, which is based on five

years of service, and retroactively replace it with an age 65 retirement age in order to *manufacture* causes of action such as alleged "whipsaw" and age discrimination claims that simply *could not*, and in fact *did not*, exist under the terms of the RBAP that were *actually applied* in determining plaintiff's benefits. Because ERISA specifically authorizes plans to define the normal retirement age below age 65, plaintiff's attempt to rewrite PwC's retirement plan should be rejected. Plaintiff's Complaint also fails to state a claim based on defendants' design and adoption of the RBAP's terms because such actions do not implicate ERISA's "discrimination," anti-inurement, and fiduciary duty provisions. Plan design and adoption also cannot serve as the basis for a breach of fiduciary duty claim.

Nor can plaintiff state a viable claim by relying on federal income tax regulations regarding the "nondiscrimination" requirements for tax-qualified plans, which plaintiff cites throughout his Complaint. These "nondiscrimination" rules relate solely to requirements in the Tax Code (not ERISA) that place limits on a tax-qualified plan's ability to favor highly compensated employees over non-highly compensated employees. The Seventh Circuit has held that these particular provisions do not create substantive rights under ERISA that can be enforced by an individual plan participant. Even if these regulations could form the basis for a private lawsuit, however, the IRS has taken no action against PwC under these provisions and nothing in the Complaint demonstrates that the RBAP is anything other than fully compliant.

In sum, none of plaintiff's allegations state a claim for which relief may be granted. Rather, they represent nothing more than an attempt to second-guess appropriate choices that were made in designing PwC's plan. Indeed, many of plaintiff's allegations, if allowed to proceed, would require the invalidation of *all* cash balance plans, or in some cases, *all* retirement

plans. Plaintiff's Complaint is inconsistent with both the statutory language of ERISA and the decisions applying the relevant provisions, and it should be dismissed.

## BACKGROUND

### The PwC RBAP

The RBAP is a cash balance plan that PwC first offered to its partners and employees in 1994. Cash balance plans are a common type of defined benefit plan in which an employee has an account that is periodically credited according to a formula specified in the plan. *See* IRS Notice 96-8 (February 5, 1996); *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 757-58 (7th Cir. 2003). PwC obtained a determination letter from the Internal Revenue Service that the terms of the RBAP complied with relevant provisions of the Tax Code. (Cmplt. ¶¶ 44-45, 57)

Under the RBAP, every pay period the firm credits an amount equal to a percentage of each employee's compensation to an account for each plan participant. (*Id.* ¶ 67) Partners' benefits are based on a percentage of the benefit limitation amounts for tax-qualified plans specified in the Tax Code. (Ex. A, RBAP § 2.15)[1] Participants in the RBAP are afforded a wide range of investment options and may select among a menu of investment funds having different levels of risk, ranging from money market funds to bond and stock funds. (Ex. B, RBAP Summary Plan Description ("SPD") (1998) at 13-15 (listing available funds)) These funds are substantially identical to the ones made available in the 401(k) Plan. (Cmplt. ¶ 68)

---

[1] The Court may consider these documents without converting this motion into a motion for summary judgment because the RBAP plan documents and summary plan descriptions are cited throughout the Complaint and are central to plaintiffs' claims. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."); *Griggs v. MBNA Corp.*, 2002 WL 32309983, at *2 n.1 (S.D. Ill. Oct. 16, 2002).

Each individual's account is credited with investment gains (if any) based on the performance of the investments they select. (*Id.*) Thus, employees have the ability to determine their investment approach based on their own financial goals. Participants who wish to invest more conservatively can select more stable funds, while participants with a more extended time horizon to retirement can select a mixture of aggressive and conservative funds. (Ex. B, RBAP SPD (1998) at 13-15) The RBAP gives participants flexibility to change their selections as their retirement goals evolve. (Ex. C, RBAP SPD (2004) at 6)

Pursuant to the "flexibility" plaintiff acknowledges ERISA provides with respect to the determination of retirement age under a pension plan (Cmplt. ¶¶ 125, 126), the RBAP defines the normal retirement age as 65 or the attainment of 5 years of service, whichever is earlier. (Cmplt. ¶ 39; Ex. A, RBAP § 2.32) In contrast to "traditional" defined benefit plans, the five-year retirement feature of the RBAP offers employees the advantage of portability. Under PwC's plan, after five years of service, employees' benefits vest and they may elect to receive the balance of their plan account after they have terminated employment, which they may take in cash or roll over to another employer's tax-qualified plan or an Individual Retirement Account to preserve the RBAP's deferred taxation features. (Ex. A, RBAP § 6.1)

**Plaintiff's Allegations**

Plaintiff filed his Complaint on November 5, 2004, against PwC, the RBAP, the Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP (the "401(k) plan"), the Savings Plan for Employees of PricewaterhouseCoopers LLP, and the Profit Sharing Plan for Partners of PricewaterhouseCoopers LLP (collectively "the Plans"), the Administrative Committee for the RBAP and its members, and the trustees for the RBAP. Plaintiff filed an Amended Complaint on January 27, 2005. Plaintiff alleges various violations of ERISA and the Tax Code. In particular, many of plaintiff's allegations focus on the plan's specification of a

- 4 -

five-year normal retirement age – a retirement age that plaintiff recognizes is authorized under ERISA and was a term contained in the RBAP when the IRS reviewed and approved the plan. (Cmplt. ¶¶ 125-26)

Plaintiff chose to file this action in the Southern District of Illinois, despite the fact that neither plaintiff nor any of the defendants reside in the district. PwC is headquartered in New York, and none of the committee members, trustees, or members of the PwC Board of Partners and Principals named as defendants reside in the district. (Ex. D, Hindman Decl. ¶¶ 2, 4) Moreover, the design of each of the Plans was adopted and implemented in New York. (*Id.* ¶ 3) Before it was dissolved, the RBAP administrative committee was also based in New York. (Ex. E, Burnham Decl. ¶ 3) Finally, the Plans are administered in Tampa, Florida. (*Id.* ¶ 2)

## ARGUMENT

### I.    ERISA's Venue Requirements Are Not Satisfied.

This case should be dismissed because plaintiff has filed it in the wrong forum. ERISA's venue provision authorizes the filing of an action in only three potential forums: "Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). The Southern District of Illinois meets none of these criteria.

*First*, the Plans are not administered in this district. All of the Plans are administered in Tampa, (Ex. E, Burnham Decl. ¶ 2), and plaintiff does not allege otherwise. Accordingly, venue is not proper under the first prong of Section 1132(e)(2).

*Second*, all of the alleged breaches took place outside this district. Plaintiff alleges that the defendants breached their duties when they "designed and/or administered" the retirement plans. (Cmplt. ¶ 147) This Court has held that in cases such as this involving a challenge to the

- 5 -

terms of a plan under ERISA, the breach occurs where "[t]he Plan calculates all benefits, communicates with all Plan participants, and authorizes payment of all benefits." *See Waeltz*, 137 F. Supp. 2d at 1092, 1093. None of these activities occurred in the Southern District of Illinois. Benefits under each plan were calculated in New Jersey. (Ex. E, Burnham Decl. ¶ 2) Communications concerning the plans were developed in Tampa and New York City, and plan payments were authorized in Tampa and New Jersey. (*Id.*) Under this Court's decision in *Waeltz*, venue is not proper in the Southern District of Illinois on this basis.

In fact, courts have repeatedly held in cases alleging a breach of fiduciary duty under ERISA that the breach occurs only in the district where the defendants committed or failed to commit the actions that their duties required. *See, e.g., Brown Schools, Inc. v. Florida Power Corp.*, 806 F. Supp. 146, 149 (W.D. Tex. 1992); *McFarland v. Yegen*, 699 F. Supp. 10, 13 (D.N.H. 1988). Here, the location of the alleged breach would be in either New York or Tampa – the locations where the plans at issue were designed or administered. (*See* Ex. D, Hindman Decl. ¶ 3; Ex. E, Burnham Decl. ¶ 2)

*Finally*, none of the defendants reside or are found in this district. The Seventh Circuit has held that a defendant is "found" in a district only if it has the sort of minimum contacts with the district that would support the exercise of personal jurisdiction. *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 810-11 (7th Cir. 2002). Here, none of the defendants have sufficient minimum contacts with this district to assert jurisdiction. Plaintiff only vaguely alleges that one or more defendants "reside here or … may be found here." (Cmplt. ¶ 9) But PwC does not maintain an office in this district, and none of the individual named defendants resides in this district. (Ex. D, Hindman Decl. ¶¶ 2, 4) The Administrative Committee of the RBAP (which was disbanded in 1998) held its meetings in New York City. (Ex. E, Burnham Decl. ¶ 3) The

- 6 -

PwC plans at issue are also all administered outside Illinois. (*Id.* at ¶ 2)  Accordingly, under the Seventh Circuit's decision in *Waeltz*, venue under this third prong of Section 1132(e)(2) is also improper.

Nor is the residence of a small number of plan participants in the district sufficient to make this an appropriate forum as plaintiffs allege. (*See* Cmplt. ¶ 9)  The Seventh Circuit has made clear that the residence of a small percentage of plan participants in a particular district is not sufficient to support venue there. *See Waeltz*, 301 F.3d at 811.  In *Waeltz*, the Seventh Circuit agreed with this Court that the residence in the district of two plan participants out of 2,740 – less than one-tenth of one percent – was insufficient to authorize suit in the district. *Id.* This case is nearly identical, with only 74 out of 45,118 participants in the RBAP and 401(k) plan – less than two-tenths of one percent – residing in the Southern District of Illinois. (Ex. E, Burnham Decl. ¶ 4)  Indeed, the situation here is even more compelling than in *Waeltz* given that the sole named plaintiff does not reside in the district, but rather resides in Inverness, Illinois, *i.e.,* in the Northern District of Illinois. (*See* Cmplt. ¶ 10)  Accordingly, plaintiff's Complaint should be dismissed for improper venue under ERISA.

**II.    Plaintiff Fails To State A Claim Upon Which Relief May Be Granted.**

Should the Court reach the merits, the Complaint should be dismissed because it fails to state a claim.  Each of plaintiff's counts fails under the plain language of ERISA, and the Seventh Circuit has made clear that the IRS "nondiscrimination" regulations upon which plaintiff relies so heavily do not provide a private cause of action. *See Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 631 (7th Cir. 1986) (holding that there is "no basis" to conclude that regulations enacted under this provision of the Tax Code "are imposed on pension plans by the substantive terms of ERISA") (internal quotations omitted).

A.    **Count One: Plaintiff Has Failed To State A Claim Because ERISA § 510 Does Not Apply To Claims, Such As Those Here, Based On The Design Or Administration Of A Retirement Plan.**

In Count One, plaintiff claims that PwC's design and administration of the RBAP "discriminated" against him in violation of ERISA § 510 by "maximizing partner benefits and suppressing rank-and-file benefits." (Cmplt. ¶¶ 146-147, 150) This claim should be dismissed because ERISA § 510 does not apply to actions, such as those alleged here, by plan sponsors in the design or administration of a retirement plan. Even if plaintiff's factual allegations regarding alleged "discrimination" are accepted as true, "ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits." *Shaw v. Delta Air Lines, Inc.* 463 U.S. 85, 91 (1983).

1.    **Plaintiff Does Not, And Cannot, Allege That His Employment Status Was Changed.**

ERISA § 510 makes it unlawful for an employer "to discharge, fine, suspend, expel, discipline, or discriminate against a [plan] participant or beneficiary for exercising any right to which he is entitled under [a benefit plan or this title]...or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or this title]." 29 U.S.C. § 1140. Plaintiff's selective quotation from the statute omits key words such as "discharge," "fine," "suspend," "expel," and "discipline" that make clear that Section 510 applies *solely* to *changes in the employment relationship* that prevent an employee from exercising or attaining rights under a retirement plan. (*See* Cmplt. ¶ 146)

Indeed, this has been the consistent interpretation of Section 510 adopted by the Seventh Circuit and other federal courts. These courts have made clear that plaintiffs cannot bring a cause of action under ERISA § 510 alleging "discrimination" based on the *design* of a benefit plan. Rather, "a *fundamental prerequisite* to a[n] [ERISA] § 510 action is an allegation that the

- 8 -

employer-employee relationship, and *not merely the pension plan*, was changed in some discriminatory or wrongful way." *Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir. 1990) (emphasis added). In other words, ERISA § 510 "was designed to protect the employment relationship which *gives rise* to an individual's pension rights." *Id.*; *see also Anderson v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996) (Section 510 applies only where employer "wrongfully alters the employment relationship to prevent benefit rights from vesting.").

Thus, the design of a plan does not, as a matter of law, implicate or violate ERISA § 510, even when that design or amendment allegedly prevents an employee from attaining a retirement benefit. In *McGath v. Auto-Body North Shore, Inc.*, 7 F.3d 665 (7th Cir. 1993), for example, the Seventh Circuit held that an employer did not violate ERISA § 510 when it amended its plan's eligibility provision to prevent one employee from becoming eligible to participate. The Court expressly rejected the theory that Section 510 encompassed "discrimination in the plan itself rather than the employment relationship." *Id.* at 668-69; *see also Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1502-04 (3d Cir. 1994) (finding no violation of ERISA § 510 where employer amended a plan to remove a life insurance component because such amendments did not change the employer-employee relationship).

Here, plaintiff does not, and cannot, allege that PwC took any action to change his employment status. To the contrary, plaintiff argues that PwC "discriminated" against him because it "designed and/or administered" its benefit plans to provide greater benefits to partners than to employees. (Cmplt. ¶ 147) Under the plain language of ERISA § 510, such allegations fail as a matter of law. *See McGath*, 7 F.3d at 668-69; *Deeming*, 905 F.2d at 1127.

### 2.    Plaintiff's Own Complaint Demonstrates That He Maintained His Right To Receive Benefits.

Plaintiff's claim under ERISA § 510 also fails because plaintiff does not claim that the design of the RBAP deprived him of his *right* to benefits under the plan, as is required under Section 510. Rather, plaintiff maintains that it merely affected his benefit *level.* (*See* Cmplt. ¶ 152) Such allegations are insufficient to support cause of action under ERISA § 510. *See Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1543 (3d Cir. 1996) (explaining that claims of discrimination under ERISA § 510 do not apply to "mere changes in the level of benefits").

Nor can plaintiff rely upon federal income tax regulations to state a claim. (*See* Cmplt. ¶¶ 147-48, 153 (citing IRC § 401(a)) The tax regulations enacted under IRC § 401(a) limit benefits that may be provided to highly compensated employees under a tax-qualified pension plan (26 U.S.C. § 401); but these regulations have nothing to do with ERISA or Section 510. Indeed, the Seventh Circuit and other courts have consistently held that regulations enacted under IRC § 401(a) "do not create substantive rights under ERISA." *See, e.g., Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 631 (7th Cir. 1986) ("There is no basis under § 1202(c) or elsewhere in ERISA, to find that the provisions of IRC § 401 … are imposed on pension plans by the substantive terms of ERISA.") (internal quotations omitted); *Furnari v. Dornan*, 1993 WL 501517, at *2 (9th Cir. 1993) (IRC nondiscrimination rules do not provide an individual cause of action); *see also Abraham v. Exxon Corp.*, 85 F.3d 1126, 1131 (5th Cir. 1996) (Treasury regulations determine whether a plan is a qualified tax plan, but "do not create substantive rights under ERISA.").

Plaintiff cannot avoid this long-established authority by claiming that the RBAP "incorporates by reference" these tax regulations. (Cmplt. ¶¶ 40, 153) While plaintiff relies on the fact that the RBAP states it "is intended [to]…meet the requirements of Sections 401 and

- 10 -

501" of the Tax Code (Cmplt. ¶ 40), *all* benefit plans must contain certain terms in order to qualify for beneficial tax status. *See, e.g.,* IRS Publication 794 (April 1994) (stating that the IRS determination letter indicates that "the terms of the plan conform to the requirements of [IRC] section 401(a)"). Plaintiff's claim is therefore flatly inconsistent with the decision in *Reklau,* which made clear that regulations enacted under Section 401 of the Code do not provide a basis for a private cause of action. *See* 808 F.2d at 631.

Such precatory language has not stopped courts from consistently holding that regulations enacted under Section 401(a) do not create a private cause of action. *See Stamper v. Total Petroleum, Inc. Ret. Plan,* 188 F.3d 1233, 1239 (10th Cir. 1999). In *Stamper,* the plan under review, like the RBAP, stated: "The Plan is intended to qualify as a defined benefit pension plan under Section 401(a) of the Internal Revenue Code of 1986, as amended." (Ex. F, Total Petroleum, Inc. Retirement Plan at 2 § 1.02)[2] Nonetheless, as in *Reklau,* the court held that these IRS regulations could not provide a basis for a private cause of action under ERISA. *Stamper,* 188 F.3d at 1239-40.

Granting a plan participant a private cause of action under ERISA for an alleged failure to comply with the Tax Code's nondiscrimination requirement would upset the enforcement mechanism Congress carefully crafted for the Code's nondiscrimination rules. Although Congress included parallel sections in ERISA and the Tax Code regarding participation and vesting (ERISA §§ 201-211; IRC §§ 410-411) and funding (ERISA §§ 301-308; IRC § 412) it

---

[2] Although this provision of the plan was not discussed in the Court's opinion, the plan is part of the record on appeal and is publicly available. The plan was attached to the defendant's motion for summary judgment and was included in the appellate record. (*See* Ex. F.) This Court may take judicial notice of the plan because it is in the public record. *See Anderson v. Simon,* 217 F.3d 472, 474-75 (7th Cir. 2000) ("In ruling on a 12(b)(6) motion, a district court may take judicial notice of matters of public record without converting the 12(b)(6) motion into a motion for summary judgment."); *Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir. 1994) (court may take judicial notice of documents filed in another court).

did not include the Tax Code's nondiscrimination requirements in ERISA. In addition, Congress made clear by statute the particular treasury regulations that are applicable to ERISA. *See* 29 U.S.C. § 1202(c) (only regulations enacted under Sections 410(a), 411, and 412 of the Tax Code apply to ERISA). As the court in *Stamper* stated, regulations enacted pursuant to Section 401(a) of the Internal Revenue Code were not included in Section 1202(c), and therefore "it would be improper to read into ERISA a requirement Congress elected to apply only to the Tax Code." 188 F.3d at 1239.

Congress has given the IRS sole authority to interpret and enforce these regulations. *See* 26 U.S.C. § 7801; *Furnari*, 1993 WL 501517 at *2. The remedy for a violation of the Tax Code's nondiscrimination rules is the plan's loss of beneficial tax status – not a private suit for damages. *See Mills, Mitchell & Turner v. Commissioner of Internal Revenue*, 1993 WL 80580 (U.S. Tax Ct. Mar. 23, 1993) (failure of plan to meet requirements under Section 401(a) would "caus[e] the trust to lose its tax exempt status"). As the Seventh Circuit and other courts have made clear, plaintiff cannot assume a role expressly delegated to the IRS or pursue a remedy Congress did not include under ERISA. *See Abraham*, 85 F.3d at 1131 (Failure to meet the requirements of those Treasury Regulations results in the loss of a beneficial tax status; "it does not permit a court to rewrite the plan.").

### B.   Count Two: Plaintiff Fails To State A Claim Because He Does Not, And Cannot, Allege That PwC Used Plan Assets For Its Own Benefit.

Count Two, which asserts a claim under ERISA's anti-inurement provision, should be dismissed because plaintiff does not, and cannot, allege that PwC used RBAP assets for PwC's own unlawful purposes. (*See* Cmplt. ¶¶ 158-160) Under established Supreme Court precedent, plaintiff's allegation that PwC economically benefited from the plan design is insufficient to state a claim under ERISA § 403(c)(1).

- 12 -

ERISA's anti-inurement provision, Section 403(c)(1), states that the assets of a plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries." 29 U.S.C. § 1103(c)(1). This statute has a limited application – it specifically "addresses circumstances in which an employer takes funds out of the plan and converts them back to its own use." *Bass v. Retirement Plan of Conoco, Inc.*, 676 F. Supp. 735, 745 (W.D. La. 1988).

Section 403(c)(1) does not prohibit an employer from economically benefiting from a plan design or amendment. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442 (1999); *Fletcher v. Kroger Co.*, 942 F.2d 1137, 1140 (7th Cir. 1991) (holding that an employer's selective use of early retirement incentives under pension plan resulting in incidental benefits to the employer did not violate the anti-inurement clause); *Flanigan v. General Elec. Co.*, 242 F.3d 78, 88 (2d Cir. 2001) (holding that transaction in which employer spun off division did not result in violation of ERISA even if employer received a higher sales price because it was able to transfer surplus pension assets).

The Supreme Court in *Hughes* rejected the same kinds of allegations plaintiff makes here. In *Hughes*, the plaintiff-employees alleged that their employer violated ERISA when it used their pension plan's surplus to reduce its labor costs by providing early retirement incentives and eliminating employee contributions for new participants in lieu of offering them higher wages. 525 U.S. at 436-37. The Court rejected plaintiff's argument that this violated ERISA § 403(c)(1), explaining that the anti-inurement clause "focuses exclusively on whether fund assets were used to pay pension benefits to plan participants." *Id.* at 442. Because the assets in the plan were used "for the sole purpose of paying pension benefits," the fact that the employer benefited from use of the surplus did not violate ERISA. *Id.*

- 13 -

Plaintiff's claim here is nothing more than a restatement of the theory rejected by the Court in *Hughes*. Plaintiff does not, and cannot, allege that PwC confiscated RBAP assets for its own use. He does not, and cannot, allege that PwC took *any* funds out of the plan. Rather, plaintiff alleges that PwC designed the RBAP so that plan assets would appreciate at a faster rate than the return on the funds chosen by employees, thereby reducing the possibility that it would need to make future contributions. (Cmplt. ¶ 111) Even accepting this baseless allegation as true, *Hughes* establishes that such benefits to the employer resulting from the design of a retirement plan cannot be the basis for a claim under ERISA.

Indeed, plaintiff seeks to require PwC to take actions that would *disadvantage* its employees. In addition to prohibiting PwC from taking measures to cause the appreciation of plan assets and thereby ensure the continued financial viability of its pension plans, plaintiff suggests that PwC should *restrict* the investment options available to plan participants. (*See* Cmplt. ¶ 68 (suggesting that PwC should have pegged participants' accounts to "a Treasury bill rate or some other index").) Such a result would deprive participants of the flexibility they currently enjoy in selecting funds and indexes based on their own individual financial goals. Participants would also lose the opportunity to outperform the typically conservative Treasury index rate. Participants may always select conservative investment funds that generate a rate of return that approximates the treasury rate. (Ex. B, RBAP SPD (1998) at 13-15) Under the RBAP, participants with more extended time horizons have the chance to select mixtures of funds that will outpace this rate. *Id.*

### C.     Counts Three, Four, And Six: Plaintiff Fails To State A Claim Because The Normal Retirement Age Definition Complies With ERISA.

Plaintiff's claims in Counts Three, Four, and Six all depend on his argument that the RBAP's definition of "normal retirement age" is invalid. (*See* Cmplt. ¶¶ 164-68, 173-78, 189-

92) As a matter of law, however, the RBAP's normal retirement age is valid under ERISA, which expressly authorizes an employer to choose the "normal retirement age" in its plan. Here, the RBAP defines "normal retirement age" as the earlier of age 65 or five years of service. Plaintiff acknowledges that ERISA "permitted" PwC "flexibility" in defining the "normal retirement age" used in the RBAP. (*Id.* ¶ 126)

Plaintiff cannot claim that the RBAP, by its terms, violates any of the substantive ERISA provisions on which Counts Three, Four, and Six are based. Instead, he attempts to rewrite the RBAP's normal retirement age in an effort to create ERISA violations where none exist. Thus plaintiff's claims are all premised entirely on the legally baseless contention that the retirement age under the RBAP is in fact age 65 – not each participant's age after five years of service. Given the validity of the RBAP's five-year normal retirement age definition, plaintiff's claims under each of these counts should be dismissed.

## 1.    The RBAP's Normal Retirement Age Is Valid.

The fundamental flaw in plaintiff's argument in these three counts is that ERISA specifically authorizes employers to define "normal retirement age" below age 65. ERISA states that "normal retirement age" is the *earlier* of:

> (A) *the time a plan participant attains normal retirement age under the plan*, or
> (B) the later of (i) the time a plan participant attains age 65, or (ii) the 5th anniversary of the time a plan participant commenced participation in the plan.

ERISA § 3(24), 29 U.S.C. § 1002(24) (emphasis added); *see also* 26 U.S.C. § 411(a)(8). The Seventh Circuit and other federal courts have confirmed that this plain language authorizes retirement plans to define "normal retirement age" below age 65. *See Janowski v. International Bhd. of Teamsters, Local No. 710 Pension Fund*, 673 F.2d 931, 937, 938 (7th Cir. 1982) ("Under § 411(a)(8) the trustees certainly could have established a normal retirement age of less than 65."), *vacated on other grounds*, 463 U.S. 1222 (1983); *Geib v. New York State Teamsters*

- 15 -

*Conference Pension and Ret. Fund,* 758 F.2d 973, 976 (3d Cir. 1985) ("The statute clearly permits the use of a normal retirement age less than 65").

Plaintiff acknowledges the definition of "normal retirement age" in ERISA affords employers "flexibility" in designing their pension plans. *(See* Cmplt. ¶ 125-26) In keeping with the flexibility permitted by this definition, the IRS, in interpreting the parallel provision of the Code (26 U.S.C. § 411(a)(8)),[3] has stated that it is acceptable to use any age for the "normal retirement age" and that "[i]n view of the definition of normal retirement age found in section 411(a)(8) of the Code, and in the absence of any statutory prohibition or limitation, a plan may specify *any* age that is less than 65 as the normal retirement age." *See* Rev. Rul. 78-120, 1978-1 C.B. 117 (emphasis added).[4] While plaintiff argues that PwC has taken this built in flexibility to a "ridiculous extreme" (Cmplt. ¶ 126), he points to nothing in the statute that prohibits such a definition. To the contrary, ERISA specifically authorizes pension plans to define "normal retirement age." The fact that the plan's normal retirement age complies with ERISA is fatal to each of plaintiff's claims in Counts Three, Four, and Six.[5]

---

[3] Regulations and revenue rulings made pursuant to Section 411 of the Tax Code are made applicable to ERISA by 29 U.S.C. § 1202(c). As explained in Part II.A.(2), this statutory provision does not incorporate into ERISA the federal income tax regulations promulgated under Section 401(a)(4) of the Code.

[4] Employers may also define as "normal retirement age" a specific number of years of service completed by the employee. *See Ryan v. Asbestos Workers Union Local 42 Pension Fund,* 2002 WL 90976, at *3-5 (3d Cir. 2002) (holding that a plan could specify "normal retirement age" as a period of years of service). This is consistent with the plain language of ERISA § 3(24), which defines normal retirement age as the "the *time* a plan participant attains normal retirement age under the plan." 29 U.S.C. § 1002(24) (emphasis added).

[5] Plaintiff suggests that the RBAP's normal retirement age should be held invalid, despite the fact that it is expressly authorized under ERISA, because it allegedly conflicts with information contained in the plan's SPD, website, and attachments to Form 5500 filings. (Cmplt. ¶¶ 128-30). Accepting these allegations as true, plaintiff's argument that definitions found in these other documents should control is without merit because he fails to allege that he saw, much less detrimentally relied, on these other definitions. The Seventh Circuit has held that when the plan and the SPD conflict, the terms of the plan must govern where the plaintiff fails to allege that he "reasonably relied on the summary plan description to his detriment." *See Health Cost Controls of Illinois, Inc. v. Washington,* 187 F.3d 703, 711 (7th Cir. 1999).

- 16 -

## 2.    Count Three: Benefits In The RBAP Are Not Reduced Based On Age.

Plaintiff's claims in Count Three depend on his baseless allegation that the RBAP's normal retirement age is invalid. Plaintiff argues that the RBAP violates age discrimination rules because the rate at which his benefit accrued (as well as his accrued benefit) allegedly declined as he aged. (Cmplt. ¶ 166-67)  The RBAP's definition of normal retirement age, however, actually ensures that the type of "reduction" plaintiff alleges will not occur.  The only way plaintiff can assert his age discrimination claim is by making a legally and factually baseless allegation – that "the RBAP's definition of 'normal retirement age' is invalid and ... by default the normal retirement age under the RBAP is 65." (*Id.* ¶ 165)  The normal retirement age specified under the RBAP is not 65, however, and plaintiff's benefits were not calculated – or required to be calculated – using this age. Plaintiff is simply attempting to manufacture an age discrimination claim by rewriting the terms of the RBAP.

Under ERISA § 204(b)(1)(G)(H), an employee's accrued benefit or rate of benefit accrual cannot be reduced based on the employee's age. 29 U.S.C. § 1054(b)(1)(G)(H).  In a cash balance plan, a participant's accrued benefit is calculated in terms of an annuity beginning at normal retirement age, 29 U.S.C. § 1002(23)(A), and, if the plan provides for interest credits, the accrued benefit must include any interest credits projected to normal retirement age. *See Berger v. Xerox Ret. Income Guar. Plan*, 231 F. Supp. 2d 804, 817 (S.D. Ill. 2002).  Under cash balance plans that use a normal retirement age of 65, for example, the amount of interest credits an employee will receive until he or she attains normal retirement age necessarily depends on the employee's current age.  If the normal retirement age is 65, the plan account balance of a 35-year-old employee will have a longer time to accrue interest (30 years) than the same account balance of a 55-year-old employee (10 years). *See Campbell v. BankBoston, N.A.*, 327 F.3d 1, 9 (1st Cir. 2003).

- 17 -

Even if such differences in the amount of interest credits could be construed as implicating the age discrimination provisions of ERISA and the ADEA, such a situation does not occur under the RBAP. Under the RBAP, an employee's benefits vest at the *same time* the employee reaches the normal retirement age at five years of service. Thus, there is *never* any need to perform any such forward-looking projection of interest credits to normal retirement age. Such forward projections are necessary *only* where an employee has a vested right as a participant in a plan and has *not yet reached* normal retirement age – a situation that *never* occurs under the RBAP given its permitted definition of "normal retirement age." This distinguishes the RBAP from other cash balance plans. *Cf. Cooper v. IBM Personal Pension Plan*, 274 F.Supp.2d 1010, 114 (S.D. Ill. 2003) (normal retirement age of 65).

Plaintiff recognizes that this aspect of the RBAP is fatal to his age discrimination argument and again asserts erroneously that his benefits were reduced because the normal retirement age was in reality 65 – not the 5 years of service that is actually specified in the RBAP and was actually applied in calculating plaintiff's benefits – because the actual retirement age specified in the RBAP was somehow "invalid."[6] (Cmplt. ¶ 165) But as explained above, under the plain language of the statute, the RBAP's retirement age complies with ERISA. Thus, plaintiff's attempt to manufacture an age discrimination claim by rewriting the terms of the RBAP – *i.e.*, to create a problem where none exists -- is wholly without merit.

The validity of the RBAP's normal retirement age also defeat's plaintiff's anti-backloading claim, which is based on a contention that is exactly the *opposite* of that which

---

[6] The Treasury Regulations plaintiff cites in paragraphs 139 and 165 of his Complaint only apply – for federal income tax purposes – if the plan does not define a normal retirement age. The RBAP does, as the plaintiff acknowledges, define a "normal retirement age." (*See* Cmplt. ¶ 39) Thus, these provisions are inapplicable.

plaintiff makes under his age discrimination claim. Plaintiff's anti-backloading claim is based on the allegation that the RBAP discriminates – not against – but *in favor* of plan participants with greater years of service. (Cmplt. ¶ 168) *See* ERISA § 204(b)(1) (29 U.S.C. § 1054(b)(1)) (prohibiting plans from providing excessively low benefit accruals in participants' early years of service, with dramatically escalating accruals in later years). Plaintiff again alleges that because the RBAP's normal retirement is invalid, it should be rewritten to be age 65 and that under the new retirement age, the RBAP would violate ERISA's anti-backloading rules.

Plaintiffs' anti-backloading claim fails for at least two reasons. *First*, the RBAP's normal retirement age fully complies with ERISA (*see supra* Section II.C.(1)), and under the current retirement age there is no violation of the anti-backloading rules. Indeed, plaintiff concedes that the rules only "apply with respect to benefits that accrue under a plan through normal retirement age" (Cmplt. ¶168), and yet he fails to allege that there is any change in annual benefit accruals under the RBAP prior to a participant's normal retirement age. *Second*, even if the normal retirement age were somehow "invalid" (which it is not), plaintiff fails to allege that participants' benefits would be increased based on years of service or age. In fact, plaintiff makes the exact opposite argument in his age discrimination claim by contending that the RBAP reduces – not backloads – benefit accruals based on a participant's increasing age.[7]

---

[7] Plaintiff's additional claim that the RBAP violated age discrimination rules because his benefits were at times reduced on account of age or service during periods in which investment returns were negative (Cmplt. ¶ 166) is without support and is contradicted by the allegations in the Complaint. PwC made the same investment choices available to all plan participants. (*See id.* ¶ 68-69) Thus, if a particular investment choice had a negative return year, that negative return would have applied to all participants in the plan who chose that option, regardless of their age. As a result, there could be no age discrimination in this respect.

### 3. Counts Four And Six: Plaintiff's Lump Sum Payment Was Correctly Calculated.

Plaintiff's claims in Count Four and Six also similarly fail because the RBAP's definition of the normal retirement age is valid. In Count Four, plaintiff asserts that PwC inaccurately calculated the lump sum benefit payment he received when he left PwC because "PwC did not project, or did not accurately project, his hypothetical account balance to age 65." (*Id.* ¶ 176) This allegation is legally insufficient because ERISA does not require any such projection.

Certain cash balance plans include interest credits and use interest crediting rates that are higher than the statutory discount rate (*i.e.*, the 30-year Treasury rate described in ERISA § 205(g)(3)(A)(ii)(II)). Under such a plan, when an employee leaves the employer, but has not yet attained normal retirement age, the plan administrator must perform a "whipsaw calculation" to determine the present value of the employee's normal retirement benefit. This calculation entails projecting the employee's account balance forward to include interest credits up to normal retirement age, and then using the 30-year Treasury rate to discount this amount back to the current age of the employee. *See, e.g., Berger v. Xerox Corp. Ret. Plan*, 338 F.3d 755, 759-60 (7th Cir. 2003). The whipsaw calculation is not required for employees who have attained normal retirement age by the time their employment is terminated. *See* IRS Notice 96-8 (February 5, 1996).

Here, plaintiff concedes that he had already attained normal retirement age as defined by the RBAP when his employment was terminated because he had completed five years of service. (Cmplt. ¶¶ 175-76) He concedes that he received the full amount of his account balance under the RBAP. (*Id.*) Plaintiff's complaint is that PwC failed to "project" his account balance "to age 65" (*See id.* ¶ 176), but no such projection was required because plaintiff had attained normal retirement age under the RBAP by the time his employment was terminated. Plaintiff's attempt

- 20 -

to manufacture an ERISA claim by rewriting the RBAP's definition of normal retirement age fails for all of the reasons explained above. In short, plaintiff has no basis to complain that his lump sum payment was not "projected" to a normal retirement age different from that provided by the plan.[8]

Plaintiff's claim in Count Six alleges that PwC violated ERISA when it spun off portions of the RBAP due to the sale of some of its business units because "the amount transferred on behalf of each participant was equal to the balance in each participant's account rather than the present value of participants' normal retirement benefit under the RBAP." (Cmplt. ¶ 192) As in the case of employee termination under Count Four, plaintiff suggests that PwC violated ERISA by failing to calculate the "present value of participants' normal retirement benefit" using a normal retirement age of 65, rather than the actual retirement age specified in the RBAP. (*See id.* (citing ERISA § 208(a)(2))

Plaintiff's claim should be dismissed for two reasons. *First*, plaintiff does not allege that he was a participant in any of the spin-off plans referenced in Count Six. (*See* Compl. ¶¶ 187-93) Accordingly, plaintiff has not alleged sufficient facts to establish that he has standing to assert this claim. *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 294 (7th Cir. 2000) (holding that standing hinges on "one's personal stake in the dispute" and whether one has suffered an "injury in fact"). *Second*, even if plaintiff had standing, his claims fail because the RBAP's definition of normal retirement age is valid. Plaintiff cannot complain that assets

---

[8] Plaintiff suggestion that he is entitled to relief even if the RBAP's definition of normal retirement age is held "valid" makes no sense. (*See* Cmplt. ¶¶ 140-42) Plaintiff claims that when he was paid a lump sum he was forced to forfeit his right to future interest credits that would accrue *if he had left his money in the Plan.* (*Id.*) But plaintiff concedes he was entitled to these credits "for as long as he [left] his money in the RBAP." (*Id.* at 141) Plaintiff did not leave his money in the Plan; he received all that he was entitled to under the terms of the RBAP and applicable law.

transferred during spin-offs were not calculated at present value based upon a normal retirement age (age 65) that was not applicable under the plain language of the Plan.

**D.    Count Five: Plaintiff Fails To State A Claim Because Plaintiff Did Not Suffer A Forfeiture Of Benefits.**

Count Five fails because plaintiff does not allege that he suffered an impermissible loss of benefits due to him under the terms of the RBAP. (*See* Cmplt. ¶ 183) ERISA's anti-forfeiture provision states that an "employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." ERISA § 203(a) (29 U.S.C. § 1053(a)). Plaintiff argues that the RBAP violated this provision because participants' benefits could be reduced when the investment funds they selected suffered a negative return.[9] (Cmplt. ¶ 127) Plaintiff equates a negative return with a "forfeiture" of a nonforfeitable benefit under the statute. This argument runs directly counter to statutory language and Supreme Court precedent.

ERISA defines a "nonforfeitable" benefit as one obtained by a participant or his beneficiary under a pension plan "which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." ERISA § 3(19) (29 U.S.C. § 1002(19)). Each of these requirements must be met for a benefit to be "nonforfeitable." Plaintiff's alleged claim here fails to satisfy any of these three conditions. Investment returns do *not* arise from a participant's service; investment credits under the plan could be made regardless of a participant's continued employment (*See* Cmplt. ¶ 141) Investment returns are *not*

---

[9] Plaintiff also strangely argues that his benefits were unlawfully reduced in violation of ERISA § 204(e)(3) (29 U.S.C. § 1054(e)(3)). (Cmplt. ¶184) This provision merely provides that employees who decide to return to work after a period of absence may return any plan benefits they received at the time of their departure. *See* 29 U.S.C. § 1054(e). By returning these benefits, the employee's prior years of service are factored into later calculations of their accrued benefit. *Id.* Nowhere does plaintiff allege that PwC denied employees the opportunity to earn back their prior years of service after a period of absence. In any event, plaintiff lacks standing to make such a claim because he fails to allege that he himself returned to service with PwC after a period of separation. *See Kyles*, 222 F.3d at 294.

"unconditional" benefits because they are specifically conditioned on the performance of the funds that are selected by plan participants. Finally, under the RBAP participants are *not* legally entitled to any particular investment return enforceable against the Plan.

ERISA § 203(a) protects an employee's right to the pension benefit he or she has accrued, but "does not guarantee a particular *amount* or a *method* for calculating the benefit." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981) (emphasis added); *see also Huppeler v. Oscar Mayer Foods Corp.*, 32 F.3d 245, 246 (7th Cir. 1994) (ERISA focuses on the loss of "benefits previously promised" and "does not concern itself with the *amount* of benefits promised.") (emphasis in original); *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609, 611 (7th Cir. 2001) (upholding a floor offset arrangement under which the value of the participant's defined contribution account fluctuated, thus impacting his benefits under a defined benefit plan).

Here, the RBAP is quite clear that plan participants receive investment credits based on their own investment decisions. The RBAP guarantees no specific rate of return to plan participants. If participants want to ensure a modest positive return, they can select a money market fund. (Ex. B, RBAP SPD (1998) at 13-15) Under the RBAP, participants are entitled to what the plan promised and what ERISA § 203(a) guarantees – their account balance adjusted to reflect both positive and negative investment returns. *See Brengettsy*, 241 F.3d at 612 (when plaintiff received "the full benefits to which the plan documents entitled him, he has no basis for complaining of a violation of the terms of the plan or a forfeiture of vested benefits."). Here, the Complaint does not allege that plaintiff, or any other participant, was denied the full amount of his account balance as provided by the terms of the RBAP.

**E.    Count Seven: Plaintiff Fails To State A Claim Because Benefits Under The RBAP Are "Definitely Determinable."**

Plaintiff's claim in Count Seven that benefits under the RBAP are not "definitely determinable" (Cmplt. ¶¶ 196-201) fails because the Seventh Circuit has held that ERISA does *not* incorporate the Tax Code standards on which plaintiff's argument relies.   Under ERISA § 402(b)(4), benefit plans must "specify the basis on which payments are made to and from the plan."   29 U.S.C. § 1102(b)(4).   Plaintiff argues that this provision is related to the federal income tax regulations that require pension plans to provide "for the payment of definitely determinable benefits" in order to be tax qualified.   The IRS has said that these regulations are violated if the benefit depends on actuarial or other factors that are within the control of the employer.   Rev. Rul. 79-90, 1979-1 C.B. 155.   Plaintiff relies solely on this Revenue Ruling in support of his claim that PwC violated ERISA's "definitely determinable" provision by retaining control over the investment options available to employees through the RBAP.   This claim is contrary to established Seventh Circuit precedent.

*First*, the Seventh Circuit and other courts have held that ERISA does not incorporate the same "definitely determinable" standard found under the income tax laws.[10]   *Dooley v. American Airlines, Inc.*, 797 F.2d 1447, 1452-53 (7th Cir. 1986) (refusing to read the discretionary standard embodied in the Treasury Regulations into ERISA § 402(b)(4)); *Stamper v. Total Petroleum, Inc. Ret. Plan*, 188 F.3d 1233, 1239-40 (10th Cir. 1999) (rejecting arguments that the Treasury Regulations are incorporated into ERISA); *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 2000 WL 369671, *5 (N.D. Ill. 2000) (noting that the Seventh Circuit has rejected the

---

[10] Plaintiff's argument that this standard is "incorporat[ed] by reference" into the RBAP based on language from the preamble (Cmplt. ¶198) is wrong for many the same reasons outlined in Section II.A.   The inclusion of general Tax Code compliance language in the terms of the plan document has not dissuaded courts from consistently refusing to apply the Treasury Regulation's "definitely determinable" standard to ERISA.   *See Stamper*, 188 F.3d at 1240-41.

application of a prohibition on employer discretion in the establishment of actuarial assumptions for ERISA purposes).

ERISA § 402(b)(4) requires only that a benefit plan put employees "on notice of the principles under which plan payouts are determined." See *Stamper*, 188 F.3d at 1240; *see also Czyz v. General Pension Bd.*, 578 F. Supp. 126, 129 (W.D. Pa. 1983) (stating the ERISA's requirement is met "if a plan specifies the basis upon which payments are to be made, so as to satisfy the legislative purpose that each participant knows exactly where he stands with respect to the plan"). The RBAP fully complies with ERISA because it specifies how benefits accrue under the plan and how employees' investment elections may affect their benefits by increasing or decreasing the value of the RBAP account based on the performance of the selected investment measures. Plaintiff's Complaint contains no allegations to the contrary.

*Second*, if plaintiff's argument were accepted, then every employer who offers a 401(k) plan would be guilty of violating ERISA. The requirements of ERISA § 402(b)(4) are applicable to all benefit plans, including defined contribution plans such as 401(k) plans. A staple feature of 401(k) plans is the selection of investment options by plan participants, with the participant's account fluctuating up or down based upon the performance of the investment selected. If this section of ERISA prohibited an employer from choosing the funds that determine the value of the participant's benefits based on investment performance, then every employer across the country would be guilty of violating ERISA.[11]

---

[11] Even if these Treasury Regulations applied, plaintiff has not alleged any basis for concluding that the RBAP in fact violates the IRS standards. The tax law requires that any actuarial assumptions used for the purpose of determining benefit amounts be specified in the plan document in a way that precludes employer discretion. *See* 26 U.S.C. § 401(a)(25); Treas. Reg. § 1.401(a)-1(b)(1); *see also Esden v. Bank of Boston*, 229 F.3d 154, 166, n.16 (2d Cir. 2000) (holding that defendant's cash balance plan did not violate the definitely determinable benefit requirement). The RBAP satisfies this requirement because the plan document specifies the actuarial assumptions (Continued...)

- 25 -

**F.    Count Eight: Plaintiff Fails To State A Claim Because PwC Has Not Breached Any Fiduciary Duties To Plaintiff.**

Count Eight alleges that PwC breached its fiduciary duties through its design of the RBAP (Cmplt. ¶¶ 209-211) and by selecting funds for the RBAP of "mediocre" quality (*Id.* ¶ 212). Plaintiff also claims that PwC violated ERISA by using plan assets for its own benefit through "prohibited transactions." (Cmplt. ¶ 207)  None of these theories states a viable claim.

*First*, to state a claim for breach of fiduciary duty, plaintiffs must first establish that the employer was in fact acting in a fiduciary capacity. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 889, 891 (1996). Plaintiff's alleged breach of fiduciary duty fails because the Supreme Court has made clear that the establishment, amendment, and design of an employee benefit plan are *not* fiduciary functions and that employers cannot be held liable for breaches of ERISA fiduciary duties for their decisions in these areas. *See, e.g., Hughes*, 525 U.S. at 444 ("ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated."); *King v. National Human Res. Comm., Inc.*, 218 F.3d 719, 723 (7th Cir. 2000) ("defined functions of a fiduciary do not include plan design, the amendment of a plan, or the termination of a plan").

*Second*, plaintiff's assertion that PwC violated its fiduciary duties by deliberately choosing poor-performing funds is inconsistent with the allegations in plaintiff's own Complaint. Plaintiff does not, and cannot, allege that the funds that were offered to PwC's employees participating in the RBAP were different than the funds available to partners under the RBAP

---

that would be used to determine the present value of any optional forms of benefit under the RBAP.  (Ex. A, RBAP § 2.2)

(Cmplt. ¶¶ 68, 85-88) He also concedes that these funds were the same funds that were available to participants in PwC's 401(k) Plan (*Id.* ¶ 69) Thus, PwC's partners would not benefit from choosing "poor-performing" funds. Plaintiff is similarly off-base in claiming that the selection of these funds by PwC partners or employees created a conflict of interest. The PwC partners and employees who selected the funds had no conflict of interest given that they were plan participants themselves and thus had a direct economic interest in the performance of the funds selected.[12]

*Third*, plaintiff fails to allege that PwC engaged in any "prohibited transaction." ERISA prohibits fiduciaries from engaging in transactions in which the fiduciary "deal[s] with the assets of the plan in his own interest or for his own account." ERISA § 406(b)(1) (29 U.S.C. § 1106(b)(1)). Plaintiff alleges no such "transaction" in this case. Instead, plaintiff appears to be alleging that the incidental benefit PwC received from the design of the RBAP somehow constitutes a "prohibited transaction." In *Lockheed v. Spink*, however, the Supreme Court rejected a similar argument, holding that an employer did not engage in a "prohibited transaction" merely because it benefited from a requirement that employees execute a claims release before receiving enhanced pension benefits. 517 U.S. 882, 892-93 (1996). The Court held that "prohibited transactions" under ERISA typically are "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders" and further "involve uses of plan assets that are potentially harmful to the plan." *Id.* at 893; *see also Anderson v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996) (holding that an employer's

---

[12] Plaintiff is wrong to suggest that the Trustees violated the terms of the RBAP (and thereby breached their fiduciary duties) by selecting the funds. (Cmplt. ¶ 113 n.14) In order to state a breach of fiduciary duty claim, plaintiff must show "losses to the plan resulting from each such breach." *See* 29 U.S.C. § 1109(a). Even if the Court accepted plaintiff's allegation as true, plaintiff's claim still fails because he does not allege that the RBAP suffered any losses as a result of the Trustees' alleged selection of funds.

reduction of benefits did not constitute a "transaction" even though the reduction lowered the amount of money the employer was required to pay under the plan). Plaintiff's Complaint fails to allege that PwC engaged in any such "prohibited transaction" under ERISA.

**G.    Count Nine: Plaintiff Has Failed To State A Claim Because He Does Not Allege That PwC Acted In Bad Faith In Authoring The Summary Plan Description.**

Plaintiff's claims in Count Nine fail because his argument that the SPD is "intentionally vague" is contradicted by allegations in the Complaint. Even accepting this contention as true, plaintiff's claims fail because he has at most alleged only a technical violation of the notification rules. (*See* Cmplt. ¶¶ 216-18) Under ERISA, SPDs must "reasonably apprise participants and beneficiaries of their rights and obligations under the plan." ERISA § 102(a) (29 U.S.C. § 1022(a)). The Seventh Circuit has repeatedly held that technical violations of these notice rules standing alone do not provide a cause of action – a plaintiff must show that the employer acted in bad faith or actively concealed the plan's terms, or that plaintiff detrimentally relied on the alleged inaccuracies. *See, e.g., Anderson*, 99 F.3d at 859. Moreover, a plaintiff must allege more than "conclusory allegations unsupported by factual assertions." *See Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 792 (7th Cir. 1995) (internal quotations omitted).

Plaintiff argues that the SPD is "intentionally vague" and does not clearly indicate that the RBAP is a cash balance plan. (Cmplt. ¶¶ 117-18, 151, 217) Yet plaintiff concedes that the current SPD states that the RBAP is a cash balance plan. (Cmplt. ¶¶ 71, 217) While plaintiff also alleges that the RBAP's definition of "normal retirement age" is inconsistent with the definition contained in the SPD, he does not quote any language from the SPD supporting this conclusory allegation. (Cmplt. ¶ 128) Furthermore, these allegations standing alone do not state a claim for relief. *See Anderson*, 99 F.3d at 859 ("We have repeatedly held that technical

violations of ERISA's notification requirements, without a showing of bad faith, active concealment or detrimental reliance, do not state a cause of action.").

Plaintiff also does not allege that he relied to his detriment on any alleged omissions or misrepresentations in prior versions of the SPD. Specifically, plaintiff does not claim that he suffered any harm as a result of the alleged omissions of details regarding the execution of the RBAP. While plaintiff does make several conclusory allegations that PwC "concealed the [RBAP]'s true design, operations, and objectives" (Cmplt. ¶ 47) and was "[h]iding the ball from participants" (*id.* ¶ 120), bare legal conclusions unsupported by factual representations are insufficient to withstand a motion to dismiss. *See Panaras*, 74 F.3d at 792.[13]

In *Panaras*, for example, the plaintiff-employee alleged that his employer acted in bad faith and actively concealed the plan's terms while violating ERISA's disclosure requirements. *Id.* The Court held that plaintiff's allegations of bad faith and active concealment were insufficient where he had merely alleged that his employer must have acted in bad faith because it benefited from the concealment: "Such bare speculation is available in nearly every circumstance in which an employer both downgrades its employee benefits and fails to comply with the ERISA notice provisions. It is not, however, adequate to state an ERISA cause of action." *Id.*

---

[13] Plaintiff misstates the law when he suggests that PwC violated ERISA because employees were not informed of the partners' benefit formula under the RBAP. (Cmplt. ¶ 94 n. 10) Department of Labor regulations clearly specify that when a plan "provide[s] different benefits for various classes of participants," the SPD provided need only be "appropriate to that class" and "may omit information which is not applicable to the class of participants or beneficiaries to which it is furnished." Dept. of Labor, *Contents of Plan Descriptions and Summary Plan Descriptions*, 29 CFR 2520.102-4. The SPD must also identify "the class of participants and beneficiaries for which it has been prepared and the plan's coverage of other classes." *Id.* The plaintiff's quotation from the RBAP's SPD shows that it clearly complies with ERISA. (*See* Cmplt. ¶ 94 n. 10 quoting RBAP SPD at 3 ("While partners participate in the plan, due to the nature of the partner compensation and benefits structure, certain provisions of the plan described in this SPD...do not apply to them.))

Plaintiff's allegations in this case fare no better. Plaintiff's claims that PwC somehow benefited from misleading its employees are not "allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Id.* (internal quotations omitted). Plaintiff offers no explanation how such alleged concealment of the cash balance nature of the plan or the plan's normal retirement age from participants could have benefited PwC at the expense of plan participants. Nor does he offer any reasonable theory why PwC would have engaged in an alleged campaign of misinformation. Plaintiff's allegations equally give rise to the inference that any alleged omissions were at most honest mistakes. Thus, as in *Panaras*, plaintiff has failed to state a claim.[14]

## CONCLUSION

For the reasons state above, this Court should dismiss plaintiff's Complaint for improper venue. If this Court determines venue is proper, plaintiff's Complaint should be dismissed with prejudice for failure to state a claim.

Dated: February 16, 2005

Respectfully submitted,

/s/Michael J. Nester
Michael J. Nester (Bar #02037211)
DONOVAN, ROSE, NESTER &
JOLEY, P.C.
8 East Washington Street
Belleville, Illinois 62220
(718) 788-1500

---

[14] Plaintiff also claims that PwC breached its fiduciary duty to communicate honestly with employees because its SPDs contained alleged inaccuracies. Under established Seventh Circuit law, however, the breach of fiduciary duty claim is subject to the same standard outlined above - plaintiffs must demonstrate that the employer actively "set out to disadvantage or deceive its employees." *See Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 642 (7th Cir. 2004). Because the allegations in the Complaint do not meet the legal standards articulated by the Seventh Circuit, plaintiff's claims should be dismissed.

Robert J. Kopecky
Douglas G. Smith
Lauren O. Casazza
Jason W. Callen
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*Co-Counsel for Defendant
PricewaterhouseCoopers LLP and the
individual defendants named in paragraphs
25 and 28 of the First Amended Complaint*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

TIMOTHY D. LAURENT,                              )
On behalf of himself and on behalf of all        )
others similarly situated,                       )
                                                 )
        Plaintiff,                     )       No. 04-809 MJR
                                                 )
   vs.                                       )       Chief Judge G. Patrick Murphy
                                                 )
PRICEWATERHOUSECOOPERS LLP, et al,               )
                                                 )
        Defendants                     )
                                                 )
_____          )

**DEFENDANTS' APPENDIX OF EXHIBITS IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Exhibit A..........RBAP Plan Documents (as amended and restated; effective July 1, 1995)

Exhibit B..........PwC Retirement Plans Guide- Summary Plan Descriptions for PwC Plans
                (1998) (excerpt)

Exhibit C..........RBAP Summary Plan Description (2004)

Exhibit D..........Declaration of Roger C. Hindman (with Attachment 1)

Exhibit E...........Declaration of Melinda Burnham

Exhibit F..........Total Petroleum, Inc. Retirement Plan (excerpt from appellate record of
                *Stamper v. Total Petroleum, Inc. Retirement Plan*, 188 F.3d 1233 (10th Cir.
                1999)

# **Exhibit 5**

## "Cash Balance Notes"

*May 2000*



# Cash Balance Notes

## Survey of Cash Balance Conversions

Since late 1998, cash balance plans, the employers who sponsor them and their advisors have faced an onslaught of criticism. The assertions, based largely on a few anecdotes, relate to employers' motives for converting to cash balance plans and the resulting financial impact on their employees. We at PricewaterhouseCoopers (PwC) find most of the assertions to be inconsistent with our experience designing and implementing these plans ever since Kwasha Lipton (now part of PwC) developed the first one in 1985.

PwC decided to gather a significant amount of information on actual conversions to cash balance so that all interested parties can better assess the validity of the criticisms. The survey includes 100 plans converted throughout the last 15 years, sponsored by employers in many industries, covering about 1-1/4 million employees with plan assets of about $133 billion. The number 100 was chosen because we believe it to be a large enough sample to be reasonably representative of the plans that currently exist.

**Chart 1**
**Plans With Indicated Number of Employees**



Over 10,000 — 26%
5,001 to 10,000 — 11%
3,001 to 5,000 — 13%
1,001 to 3,000 — 34%
Up to 1,000 — 16%

The survey's primary focus is on the prevalence and details of the various approaches employers have adopted in transitioning from their traditional pension plans to cash balance plans and the expected impact on employer costs. In order to put these transition approaches in perspective, the study also looks at some key aspects of the plan designs both before and after the conversions, such as lump sum options, vesting provisions, and "integration" with Social Security. Additionally, we looked at some employee communications issues.

This edition of *Cash Balance Notes* provides a summary of the principal findings of the survey. You can obtain a copy of the full survey report by contacting: PricewaterhouseCoopers LLP, Attn: Mary Seaman, phone: 201-530-2026; fax: 201-530-2314; email: mary.seaman@us.pwcglobal.com.

### Background

Since the first cash balance plan was developed in 1985, this design has attracted the attention of many employers seeking to modernize their traditional defined benefit

**Distribution by Industry**

|  | Sponsoring Employers | Covered Employees |
|---|---|---|
| Financial Services | 23% | 35% |
| Health Care/ Pharmaceutical | 21% | 7% |
| Manufacturing | 12% | 6% |
| Oil/Gas/Chemicals | 7% | 3% |
| Consumer Products | 7% | 6% |
| Food Products | 6% | 2% |
| Telecommunications | 6% | 18% |
| Transportation | 5% | 8% |
| Other | 13% | 15% |

plans. By far the most common approach for implementing a cash balance plan has been a "conversion" from an existing defined benefit plan. That is accomplished by amending the defined benefit plan to introduce the cash balance formula and any special transition provisions.

The IRS has issued only limited guidance on how the various plan qualification rules should be applied to cash balance plans. Nevertheless, several hundred employers have converted their plans and received IRS approval with little fanfare. Employee reactions to cash balance plans have generally been positive, at least until recently.

Beginning with an article that appeared in the *Wall Street Journal* in December 1998, cash balance plans and the employers converting to them have come under a relentless attack from several directions. In addition to the national and trade media, many other parties have weighed in on this debate. These include members of Congress, litigation attorneys, special interest groups, academicians, government agencies, employees of a few cash balance sponsors, cash balance sponsors themselves and pension practitioners.

Those opposed to the cash balance design have claimed or implied the following:

- Opening account balances often are intentionally understated leading to little or no benefit accruals for years after a conversion.

- Effective transition provisions designed to minimize future benefit reductions are the exception rather than the rule.

- For many employers cost reduction is the primary motive for switching.

- Another important employer motive is to mask benefit reductions.

Some critics assert that cash balance plans (or the conversions to them) violate age discrimination laws. That is a legal issue and is beyond the scope of the survey.

## Survey Results Contradict Most Major Criticisms

The following summarizes the survey findings that address these claims and implications.

> *Using High Interest Rates in Determining Opening Balances Thereby Causing the "Wear-Away Effect" Is Not Common Practice*

Eighty-seven percent (87%) of the surveyed plans provided employees "opening balances" on the conversion date. In all but a few of those cases, the opening balance was set equal to (or based on) the lump sum present value of the employee's annuity benefit accrued at the date of conversion under the old benefit formula. The employer has leeway in selecting the interest rate assumption used for this purpose. The higher the rate, the lower the opening balances. And if that rate is higher than the 30-year U.S. Treasury bond rate at the conversion date, it is more likely that there will be a period of time (following the conversion) during which an employee will not earn additional benefits. This phenomenon is explained in the "Wear-Away Effect" box on page 8.

As shown in Chart 2 below, 72% of the plans that provide opening balances calculated those amounts using an interest rate no higher than prevailing 30-year U.S. Treasury bond rates. The rate was more than 1% above the Treasury rate in only 15% of the cases.

**Chart 2**
**Interest Rate for Determining Opening Balances**
(Compared to Range of 30-Year Treasury Rates Around Conversion Date)



| Label | Value |
|---|---|
| More than 2% Above Range | 2% |
| 1.1%-2.0% Above Range | 13% |
| Up to 1% Above Range | 13% |
| Within Range | 39% |
| Below Range | 33% |

*Observations: This finding does not support any contention that there is widespread employer practice to understate opening balances by using high interest rates, thereby intentionally causing the "wear-away effect."*

*In the last few years when 30-year Treasury rates were low in relation to historical levels, there was some tendency for employers to use a rate for calculating opening balances higher than the current 30-year Treasury rates. We think this practice is an appropriate and acceptable strategy given the significant longer-term financial commitment the employer makes when providing opening balances.*

> **The Practice of Providing Grandfathered Benefits and Transition Pay Credits Is Widespread**

Eighty-one percent (81%) of the plans surveyed provide one or both of the most common transition provisions: prior plan grandfathers and transition pay credits. (See Chart 3 below.) Prior plan grandfathers preserve the old plan formula on an ongoing basis either (1) as a minimum (i.e., the employee gets the greater of the benefit under the old formula or the benefit provided by the cash balance account) or (2) as a one-time choice on the conversion date (i.e., the employee elects to stay under the old formula and forgo the cash balance formula).

**Chart 3**
**Most Common Transition Provisions**



No Grandfather or Transition Pay Credits — 19%

One–Time Choice and Transition Pay Credits — 1%

Minimum Grandfather Only — 38%

Minimum Grandfather and Transition Pay Credits — 22%

Transition Pay Credits Only — 15%

One–Time Choice Grandfather Only — 5%

While the details of these provisions, such as the group of employees to whom they apply and for how long, vary considerably, all the provisions are intended to mitigate reductions in future pension accruals that might otherwise have occurred for employees on the conversion date.

*Observations: These findings clearly indicate that employers address the potential for benefit reductions for mid- and late-career employees when converting to a cash balance plan. In our experience, the time spent considering and designing these transition provisions often exceeds the time spent on all other aspects of the conversion. Even for the 19% of the plans that did not have grandfather provisions (minimum or employee choice) or transition pay credits, we found that almost all of them either provided different transition enhancements (e.g., generous opening balances) or had little or no need for special provisions (e.g., because pay credits increase steeply by age or service).*

> **Employers Generally Did Not Expect Their Overall Costs of Retiree Programs to Decrease**

Short-term defined benefit plan accounting costs were expected to decrease in 49% of the cases—the percent increases to 56% after the costs of transition benefits have been paid. However, 70% of the respondents indicated that the overall costs of the new retirement programs (including programs such as 401(k) plans) were expected to be the same or greater in the short-term than the program being modified. The percent drops slightly—to 67%—when considering long-term costs.

3



**Chart 4**
**Expected Change in**
**Annual Accounting Costs**

*(Chart showing Short-term and Long-term expected changes)*

**Short-term**

DB Only: Increase 20%, Unchanged 31%, Decrease 49%
All Retirement Programs: Increase 30%, Unchanged 40%, Decrease 30%

**Long-term**

DB Only: Increase 9%, Unchanged 35%, Decrease 56%
All Retirement Programs: Increase 21%, Unchanged 46%, Decrease 33%

■ Increase    □ Unchanged    ■ Decrease

*Observations:* This finding does not support the frequent contentions that the primary motive of plan sponsors who converted to cash balance plans was to reduce employer costs—especially when one considers not just the impact on defined benefit plan costs but on overall benefit and compensation costs.

> *In Many Conversions, Benefit Reductions of at Least 20% for Some Employees Are Possible in Some Situations*

Benefit reductions of 20% or more were expected to arise for some employees at certain retirement ages in 59% of the cases responding to this question.

*Observations:* The survey did not explore this issue in more depth. But, based on our experience, in many cases the benefit reductions of 20% or more occur for a relatively small group of employees who are several years away from retirement and primarily at the earliest retirement ages where the subsidies were greatest under the prior plan formula.

The phasing out of rich early retirement benefits is a by-product of a cash balance conversion that many employers now consider to be desirable in managing their current and projected workforce needs. Expensive early retirement benefits (except perhaps in window programs used as a downsizing or restructuring tool) probably will continue to be phased out at many companies, whether through the conversion to a cash balance plan or otherwise. This trend not only benefits employers trying to run their businesses but also should provide more employment opportunities for older workers.

Some critics leave the impression that benefit reductions are occurring overnight. That simply is not true. The law does not allow any benefits already accrued to be taken away. Employees may find that their expectations of earning additional pensions in future years have been adversely affected by a cash balance conversion. But pension laws covering private employer plans do not protect those expectations, any more than our laws guarantee future employment for employees or protect employers from losing productive employees.

## Other Key Plan Design Findings

The survey also looks at some key aspects of the plan designs both before and after the conversions. That information reveals some important aspects of the cash balance concept—the change in the way benefits are distributed among employee groups and the availability of lump sums.

> *Redistributive Effect of the Cash Balance Design Benefits Lower-Paid, Mobile and Females Workers*

It is undisputed that benefits under the typical cash balance plan are distributed more evenly over an employee's career than they are in a traditional defined benefit plan that holds back most of the benefits until retirement ages. It stands to reason that in a cash balance conversion that is not expected to materially change plan costs, the "redistribution" effect will result in some "winners" and some "losers."

*Observations:* In conversions where defined benefit costs remain about the same, typically there are at least two or three winners for each loser. Those most likely to be winners are employees who will not spend most of their

*careers with that employer; that is, mobile workers. Winners also typically include those who have one or more periods of absence from the work force (e.g., to raise children), and those who receive lower than average pay raises (i.e., typically lower paid employees). There are employees who may be adversely affected. The degree of impact depends on many factors, including the designs of the old and new benefit formulas and the special transition provisions included in the conversion.*

The survey reveals two aspects of conversions that further demonstrate the tendency of cash balance plans to benefit lower-paid, mobile and female employees—a significant move away from "integrating" benefits with Social Security and acceleration of vesting requirements in some instances.

Sixty-two percent (62%) of the cash balance plans provide the same regular pay credit rates at all pay levels—the remaining 38% provide higher credits on pay above specified levels to "integrate" (i.e., coordinate) with Social Security benefits that are based on employees' pay only up to certain levels. About twice as many plans, 75%, had benefit formulas that integrated with Social Security before the conversions to cash balance.

**Chart 5**
**Disparity in Benefit Formula Between**
**Lower- and Higher-Paid Employees**



Before Conversion — 25% Neutral or Favors Lower-Paid, 75% Favors Higher-Paid

After Conversion — 62% Neutral or Favors Lower-Paid, 38% Favors Higher-Paid

☐ Neutral or Favors Lower-Paid
■ Favors Higher-Paid

**Before Conversion**    **After Conversion**

***Observations:*** *In a significant number of the conversions, a greater proportion of the benefit dollars will be provided to lower-paid employees. If plan costs are expected to remain about the same, lower-paid employees will tend to get benefit increases and higher-*

*paid employees will get benefit reductions; if costs are being reduced, most or all of the benefit reductions will be borne by higher-paid employees.*

Although most of the plans continue to apply one of the statutory vesting schedules after the conversion, 16 plans did accelerate vesting.

***Observations:*** *Due to the account "look-alike" aspect of cash balance plans, we expect that more companies will accelerate vesting in their cash balance plans to bring them more in line with the vesting schedules of their 401(k) plans. Of course, to the extent that vesting is accelerated, mobile employees will benefit.*

> ***Lump Sum Options Are Much More Prevalent After Conversions***

Employers that offer or are considering offering lump sums to terminating employees find cash balance plans to be an attractive vehicle. Unlike in traditional defined benefit plans, cash balance lump sums (i.e., account balances) are not subject to large swings from interest rate volatility. Also, most employers that adopt a cash balance plan think employees will expect lump sums to be offered given how cash balance plans express and communicate benefit values.

The percentage of the plans that provide lump sum options increased from 27% before the conversion to 94% after.

***Observations:*** *The increased availability of lump sums increases employees' options when the time comes to have their cash balance accounts distributed and reinvested. For instance, lump sum distributions allow the employee the opportunity to combine amounts with other retirement monies (e.g., in an IRA) and withdraw money when needed.*

*Some critics assert that employers offer lump sums to save costs, which they say helps explain the move toward cash balance plans. In general, offering lump sums has just the opposite effect—it increases plan costs. When a lump sum is paid, the plan is forgoing the*

5

*opportunity to achieve investment returns (over the duration of the annuity that otherwise would have been paid) in excess of the conservative investment return underlying the conversion from an annuity to a lump sum (or vice versa in a cash balance plan)—typically the 30-year U.S. Treasury bond rate. Also, employees in poor health can "select against the plan" by electing lump sums, thereby increasing plan costs. In fact, many employers have resisted offering lump sums, except for small amounts, for these reasons.*

*One assertion is that lump sums are understated for employees who retire early since the lump sums do not reflect the value of early retirement subsidies. It is true that some traditional plans that offer lump sums do not include the value of any early retirement subsidy, as permitted by law. (In the survey, only six of the 27 pre-conversion plans that offered lump sums did not include the early retirement subsidies.) However, in the context of a cash balance conversion, this issue is, at most, a transition issue since a cash balance plan rarely provides ongoing subsidized early retirement annuities. Furthermore, to the extent that a lump sum does not include the value of an early retirement subsidy—whether in a traditional plan or during the transition period in a cash balance conversion—the employee can preserve the value of the subsidy by taking the annuity.*

*Some critics say cash balance plans will result in more "leakage" from the retirement system due to the prevalence of lump sum payments. Leakage is an important retirement and tax policy issue but we think the issue should be considered more broadly than pointing to cash balance plans. Moreover, given that more substantial benefits are earned in the early years of service in a cash balance plan, it seems quite possible that more of these lump sums will be preserved for retirement than currently is the case with the many involuntary lump sums under $5,000 paid from traditional defined benefit plans. Of course, the leakage issue is even more important in the context of defined contribution plans where payment options other than lump sums are rare and in-service distributions are common.*

## Employee Communications

The survey also looked at a few employee communications issues relating to potential benefit reductions, opening balance timing and calculation details, and periodic account statements.

> *In Most Cases Employees Do Not Receive Details about Significant Potential Benefit Reductions*

When projected benefit reductions of 20% or more could occur, details were provided to employees in 30% of the cases. In most of the other cases, either general information or only a hint of potential reductions was communicated to employees.

> *Typically, Opening Balances Were Communicated Shortly after the Conversion and Some Details Were Provided on How They Were Calculated*

The most common timeframe for communicating opening balances to employees is the three-to-six month period after the conversion date (50%).

Some details of how the opening balance was determined are almost always communicated, including the underlying assumptions, although only the prior plan accrued benefit was provided in 25% of the cases.

> *Typically, Account Balances Are Communicated at Least Annually but Values Related to Grandfather Benefits Are Not Included*

Account balances are communicated either quarterly or annually in almost all cases, but the value of grandfather or legally protected benefits is included in those account balances in only 15% of the cases.

*Observations: Based on these three findings, there may be some justification for Congress to expand the type of information that must be provided to employees whenever a defined benefit plan is being amended to significantly reduce future benefit accruals for some or all employees—not just when a cash balance plan is introduced. We think that any such legislation should address the legitimate needs of employees to understand the general impact the change is likely to have on them. But new legislation should not create an administrative burden for employers, subject the employer to new legal exposure in the future or overwhelm employees with a multitude of numbers.*

## Critics Would Lead Us Down a Dangerous Path

Many of the criticisms discussed here, together with other legal arguments, have led to extreme proposals in Congress, such as mandating choice whenever a plan is converted to cash balance. We believe implementing such proposals would be counterproductive. Furthermore, the survey findings reveal that most of the criticisms simply are not borne out by the facts.

Defined benefit plans have been on a decline in the U.S. for many years and cash balance plans offer one of the few hopes of slowing or even reversing that trend. New mandates or bans on designs like cash balance will take us on a dangerous path. Further decline in the private defined benefit system could lead to a further erosion of private savings with greater risk borne by employees. Ultimately, the resulting public outcry could lead to mandated private pensions or an expansion of Social Security. That, in turn, could jeopardize the high productivity and employment levels that have separated our economy from others that have saddled their employers with compensation and benefit mandates.

## A Few Final Thoughts

In developing this study, we decided to continue collecting data until we had information on 100 conversions. We believe it to be a large enough sample to be reasonably representative of the plans that currently exist. We note, however, that our sample might have certain characteristics that differ somewhat from the plans not included in the survey.

It is also important to bear in mind that the cash balance landscape is changing all the time. Many new variations, including conversion techniques, have been introduced over the last 15 years and some approaches have become more popular recently. For some aspects of the conversions, the survey splits the data by date of conversion to see if there are any clear trends.

Perhaps the most important observation that can be drawn from the survey is that making broad generalizations can lead to improper conclusions. In order to gain a full understanding of the total impact of a conversion to a cash balance plan on the employees and on the employer's financial obligations, one must look at much more than just a few particular elements of the changeover. A superficial look at any particular conversion is bound to miss important factors and give an incomplete and possibly unfair assessment of the employer's objectives and of the overall impact on different employee groups.

# Wear-Away Effect

Under the law when a defined benefit plan is amended, including a conversion to a cash balance format, the benefit the employee had earned up to the date of the change must be preserved as a minimum. This is often referred to as the "protected benefit." If the employee ultimately receives his or her benefit in a lump sum, the protected benefit must be converted to a lump sum amount using assumptions specified in the law. One key assumption is the interest rate used to "discount" the stream of future annuity payments to a current value. The specified interest rate is based on the 30-year U.S. Treasury Bond rate around the time the lump sum is paid.

Most employers that change to the cash balance plan design choose to provide an "opening balance" for each employee to reflect the current value of that protected benefit. But for this purpose, employers are not required to use the legally prescribed assumptions. For example, the employer might select 7% as the interest rate to determine the opening balance even though the Treasury bond rate is 6% at the time the plan is being converted. The resulting opening balances will be lower than they would have been had the employer used the 6% rate. Let's say that the opening balance for an employee works out to be $20,000. However, if the employee leaves immediately after the conversion, his or her lump sum will be equal to the protected minimum amount—i.e., based on the 6% interest rate. Let's say that turns out to be $25,000. The employee will receive a lump sum that is $5,000 higher than the account balance.

If instead the employee continues to work, his or her cash balance account will grow each year by interest credits and pay credits. Assuming that the rate on 30-year Treasury bonds remains at 6%, the protected benefit will also grow but more slowly—by about the 6% interest rate each year. It is likely that after a period of time, the account balance will catch up to (and then exceed) the value of the protected benefit.

The period during which the employee will continue to be affected by the protected benefit is sometimes called the "wear-away period." The wear-away issue is complicated by changes in the interest rate on 30-year Treasury bonds that occur before the employee terminates employment. If the rate goes up, the wear-away period will be shorter; if the rate goes down, the period will be longer. A wear-away effect can also arise if the old formula included subsidized early retirement benefits and the employee retires early after the conversion date.

---

*Cash Balance Notes* is published by PricewaterhouseCoopers. Its contents are designed to give general information rather than a comprehensive treatment of the subject matter or legal advice. Reproducing *Cash Balance Notes'* contents is permissible with consent from Pete Costigan.

# **Exhibit 6**

## Dorazil Declaration

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| | ) Civil Case No.04-458-GPM |
| ANITA POTHIER, et al. | ) |
| | ) |
| On behalf of herself and on | ) **DECLARATION OF RICHARD J.** |
| behalf of all others similarly situated, | ) **DORAZIL IN SUPPORT OF BANK OF** |
| | ) **AMERICA DEFENDANTS' MOTION** |
| Plaintiffs, | ) **TO TRANSFER PURSUANT TO 28** |
| | ) **U.S.C. § 1404(a)** |
| v. | ) |
| | ) |
| BANK OF AMERICA CORP., et al. | ) **Chief Judge G. Patrick Murphy** |
| | ) |
| Defendants. | ) |
| | ) |

I, Richard J. Dorazil, hereby state and declare as follows:

## I.    Introduction

1.    This Declaration is submitted in support of the Motion to Transfer Venue

Pursuant to 28 U.S.C. § 1404(a) filed by defendants Bank of America Corporation, Bank

of America, N.A., The Bank of America Pension Plan, The Bank of America 401(k) Plan,

the Bank of America Corporation Corporate Benefits Committee, and the individual

defendants, all of whom reside outside the Southern District of Illinois.

2.    I am a Senior Vice President in Personnel at Bank of America Corporation ("Bank

of America"). My official title is Senior Vice President, Global Benefits Executive. I

was hired to this position in 2002. Prior to assuming my current position, I held the

position of Vice President, Global Benefits with Motorola from 1989 to 2002. I have



**EXHIBIT**

A

resided and worked in Charlotte, North Carolina since December 2002. My office and files are located in the Western District of North Carolina.

3.     The facts set forth in this Declaration are based on my personal knowledge and information and records of the regularly conducted business activities of Bank of America. The Bank of America Pension Plan (f/k/a NationsBank Pension Plan and NationsBank Cash Balance Plan), and The Bank of America 401(k) Plan (f/k/a NationsBank 401(k) Plan and NationsBank Retirement Savings Plan).

4.     If called to testify as a witness, I can testify competently to the matters and facts set forth in this Declaration.

## II.    Bank of America and Its Retirement Plans Are Located in the Western District of North Carolina

5.     Bank of America maintains its principal place of business and corporate headquarters in Charlotte. Meetings of the Bank of America Corporation Board of Directors are held in Charlotte, and Bank of America typically holds its annual meeting of shareholders there as well. Bank of America is the successor to NationsBank Corporation ("NationsBank"), which was incorporated under the laws of the State of North Carolina and maintained its principal place of business in Charlotte, North Carolina. No meetings of the Bank of America Corporation Board of Directors or NationsBank Corporation Board of Directors have ever been held in the Southern District of Illinois.

6.     From its Charlotte headquarters, Bank of America sponsors The Bank of America Pension Plan ("Pension Plan") and The Bank of America 401(k) Plan ("401(k) Plan") for its employees and employees of its subsidiaries regardless of where they live. In addition, predecessors of these plans, including the NationsBank Pension Plan, NationsBank Cash

2

Balance Plan, NationsBank 401(k) Plan, and NationsBank Retirement Savings Plan were sponsored and coordinated by NationsBank from its Charlotte headquarters.

7.    The BankAmeraccount Plan was adopted by BankAmerica Corporation effective July 1, 1985, and subsequently was renamed the BankAmerica Pension Plan ("BankAmeraccount Plan"). Prior to 1998, the BankAmeraccount Plan was administered in California. In 1998, following the merger of BankAmerica Corporation and NationsBank, the BankAmeraccount Plan was merged into the NationsBank Cash Balance Plan, and the BankAmeraccount Plan ceased to exist. Since that time, any activities relating to the BankAmeraccount Plan or its benefit formula have been coordinated from Charlotte. The BankAmeraccount Plan was not developed, sponsored or administered from the Southern District of Illinois at any time.

**A.    The Pension Plan's Cash Balance Formula Was Developed, Approved, and Has Been Overseen in the Western District of North Carolina**

8.    In the Second Amended Complaint ("Complaint"), plaintiffs allege that the cash balance formula of the Pension Plan violates ERISA. The Complaint also challenges various voluntary transfers of 401(k) assets to the Pension Plan. Both the cash balance formula of the Pension Plan and the 401(k) transfers were developed and approved in the Western District of North Carolina. Moreover, since that time, the implementation and operation of the Pension Plan and 401(k) transfers have been supervised and coordinated from Charlotte.

9.    Several committees within Bank of America participated in matters relating to its employee benefit plans during the relevant period of events in this case: the Bank of America Corporation Corporate Benefits Committee ("Corporate Benefits Committee"),

3

the Bank of America Corporation Management Compensation Committee ("Management Compensation Committee"), and the Compensation Committee of the Bank of America Corporation Board of Directors ("Directors Compensation Committee").

10.    The Plan Administrator for the Pension Plan and 401(k) Plan is the Corporate Benefits Committee. The Corporate Benefits Committee customarily meets at Bank of America headquarters in Charlotte, North Carolina on a quarterly basis, or at the request of the Chairman of the Committee. All eight current members of the Corporate Benefits Committee reside in the Western District of North Carolina. Meeting minutes and documents relating to the activities of that committee are maintained in the Western District of North Carolina.

11.    The Corporate Benefits Committee is supported by the Bank of America Personnel group ("Personnel"), which has its central location in Charlotte, and the Bank of America Corporate Treasury unit ("Corporate Treasury"), located in Charlotte. The employees in Personnel and in Corporate Treasury who directly support the Corporate Benefits Committee on a regular basis in matters relating to the Pension Plan and 401(k) Plan reside and work in the Western District of North Carolina. No meetings of the Corporate Benefits Committee, Personnel, or Corporate Treasury have taken place in the Southern District of Illinois.

12.    Meetings of the Management Compensation Committee customarily are held at the Bank of America headquarters in Charlotte, North Carolina on a quarterly basis, or at the request of the Chairman of the Committee. Meeting minutes and records of the Management Compensation Committee are maintained in the Western District of North

4

Carolina. No meetings of the Management Compensation Committee have taken place in the Southern District of Illinois.

13.     The Directors Compensation Committee reviews and adopts proposals that relate to employee benefit plans, including proposals for the adoption, amendment, modification or termination of such plans. The Directors Compensation Committee, which has currently four members, customarily meets at the Bank of America headquarters in Charlotte, North Carolina on a quarterly basis, or at the request of the Chairman of the Committee. Two of the four current members live in North Carolina. Meeting minutes and records of the Directors Compensation Committee are maintained in the Western District of North Carolina. No meetings of the Directors Compensation Committee have taken place in the Southern District of Illinois.

**B.     Bank of America Developed the Pension Plan's Cash Balance Formula in the Western District of North Carolina**

14.     On information and belief, Bank of America (and its predecessor, NationsBank) have periodically amended and restated their employee benefit plans to accommodate changes in benefit design to benefit plan participants, to reflect the merger and acquisition of other entities, and to comply with laws and regulations. Such amendments and modifications have been effectuated at Bank of America's corporate headquarters in Charlotte, North Carolina.

15.     Specifically, beginning in 1995, Bank of America (then known as NationsBank) began exploring the possibility of converting its existing defined benefit plan into a cash balance plan and permitting the voluntary transfer by participants of 401(k) Plan assets to the converted cash balance plan.

16.    The following NationsBank employees led the efforts and were key participants in meetings to design a cash balance benefit formula and convert the existing plan. These individuals no longer work for Bank of America.

- *Charles Cooley* was the former head of Personnel and sat on the Corporate Benefits Committee and the Management Compensation Committee. Mr. Cooley resides in the Western District of North Carolina.

- *Lawrence McCray* was the former Executive Vice President in Personnel. Mr. McCray reported to Mr. Cooley. Mr. McCray is retired and maintains a residence in the Western District of North Carolina.

- *Charles Loring* was a Senior Vice President in Personnel. Mr. Loring reported to Lawrence McCray and to Charles Cooley. Mr. Loring resides in the Western District of North Carolina.

- *Ann West*, a former member of Personnel, worked with Charles Loring on matters relating to the cash balance plan design and development and the 401(k) transfers. Ms. West resides in the Western District of North Carolina.

17.    During the period when changes to the Pension Plan were being considered, representatives from NationsBank met with various third party consultants and advisors to discuss the design of a cash balance formula, the 401(k) transfers, and the conversion of NationsBank's existing plan. Such third parties included the outside consultant and auditor, PricewaterhouseCoopers LLP ("PwC"); the actuary for the Pension Plan, Towers Perrin; and NationsBank's legal counsel, Kennedy Covington Lobdell & Hickman, LLP ("Kennedy Covington").

6

18.    Towers Perrin was the Pension Plan actuary at the time of the conversion to a cash balance formula and the 401(k) transfers.  Bard Brutzman and John Hoover of Towers Perrin worked on the conversion and on matters relating to the cash balance benefit formula.  Messrs. Brutzman and Hoover are no longer employed by Towers Perrin.  To the best of my knowledge, both Messrs. Brutzman and Hoover currently reside in the Western District of North Carolina.

19.    PwC provided consulting and advisory services to Bank of America relating to the design and development of the cash balance plan formula and the 401(k) transfers.  Meetings of representatives of PwC and NationsBank relating to these matters took place in Charlotte, North Carolina.  In addition, PwC served as the independent auditor for the Pension Plan's financial statements.  The PwC audit activities relating to the Pension Plan were conducted from PwC's Charlotte office.  To the best of my knowledge, the PwC partner engaged in the audits resides in the Western District of North Carolina.

20.    Kennedy Covington was NationsBank's counsel at the time of the conversion of the Pension Plan to a cash balance formula and the 401(k) transfers, and the firm has continued to represent Bank of America in matters relating to the Pension Plan and 401(k) Plan.  Kennedy Covington has provided its services to Bank of America from the firm's main office in Charlotte, North Carolina.  The following lawyers were involved in the development and conversion of the Pension Plan to a cash balance formula and the 401(k) transfers:  Raleigh Shoemaker, Daniel Johnson, and Lee Movius.  Each of these attorneys worked in Kennedy Covington's Charlotte offices at the time and currently resides in the Western District of North Carolina.  While I understand and believe that communications that Kennedy Covington attorneys and representatives had with

7

representatives of NationsBank and Bank of America are protected by the attorney-client privilege and other applicable privileges. I have provided information regarding the location of these non-party witnesses in the event that plaintiffs contend they have discoverable information.

21. None of the design or development activities relating to the Pension Plan's cash balance formula or the 401(k) transfers took place in the Southern District of Illinois. No decisions regarding the design or development of the cash balance formula or the 401(k) transfers were made in the Southern District of Illinois.

22. No meetings involving NationsBank, PwC, Towers Perrin or Kennedy Covington representatives regarding the design or development of the cash balance formula or the 401(k) transfers were conducted in the Southern District of Illinois. I am not aware of any third-party involved in any way with these aspects of the Pension Plan's design who resides or works in the Southern District of Illinois.

23. None of the individuals named above and, to the best of my knowledge, no other witness with knowledge of the design or conversion of the Pension Plan to a cash balance formula resides or works in the Southern District of Illinois.

## C. Approval of the Pension Plan's Cash Balance Formula Took Place in the Western District of North Carolina

24. In 1996-97, the Corporate Benefits Committee considered and obtained reports on the development of the cash balance formula. Meetings in which these reports were provided were held in Charlotte, North Carolina.

25. At the time the cash balance conversion was being considered, the Corporate Benefits Committee had six members. Of these six members, five currently reside in the

8

Western District of North Carolina, including those who no longer are employed by NationsBank or Bank of America. The sixth member resides in Atlanta, Georgia, which is closer to the Western District of North Carolina than to the Southern District of Illinois. None of the Corporate Benefits Committee members involved in the consideration of the cash balance plan resides or works in the Southern District of Illinois.

26. Subsequently, the Management Compensation Committee met in Charlotte, North Carolina to consider a resolution authorizing the amendment of the NationsBank Pension Plan to adopt a cash balance formula.

27. At the time the Management Compensation Committee considered the resolution authorizing the Pension Plan amendment, the Committee had six members. All six members reside in the Western District of North Carolina, including those who no longer are employed by NationsBank or Bank of America. None of the Management Compensation Committee members who were involved in the consideration of the Pension Plan amendment resides or works in the Southern District of Illinois.

28. In addition to the Management Compensation Committee members, former Bank of America Personnel representatives, including Lawrence McCray, former Executive Vice President of Personnel, attended the meeting at which the Management Compensation Committee considered amending the Pension Plan to adopt a cash balance formula. As noted above, Mr. McCray is no longer employed by NationsBank or Bank of America, and he maintains a residence in the Western District of North Carolina.

29. The Directors Compensation Committee, chaired by Charles Coker, then met at the NationsBank headquarters in Charlotte, North Carolina and adopted a resolution authorizing the amendment of the Pension Plan to convert it to a cash balance formula.

9

At the time the Directors Compensation Committee adopted the resolution authorizing amendment of the Pension Plan, the Committee had five members, one of whom resides in North Carolina. No members of the Directors Compensation Committee who were involved in the adoption of the resolution authorizing amendment of the Pension Plan reside in the Southern District of Illinois.

30.     The actions of the Directors Compensation Committee, the Management Compensation Committee, and the Corporate Benefits Committee relating to the consideration and approval of the Pension Plan's cash balance formula were taken at Bank of America headquarters in Charlotte, North Carolina. No corporate actions with respect to the adoption, amendment, modification or termination of any Bank of America employee benefit plans have ever taken place in the Southern District of Illinois.

31.     At no time from the date that the Pension Plan conversion was authorized to the present has any member of the Corporate Benefits Committee, the Management Compensation Committee, the Directors Compensation Committee, or the Bank of America Corporation Board of Directors resided or worked in the Southern District of Illinois. In addition, none of the individual defendants in this case resides or works in the Southern District of Illinois. I am not aware of any witness who participated in any way in the approval of the conversion of the Pension Plan to a cash balance formula who resides or works in the Southern District of Illinois.

## D.    Essential Plan Functions Are Coordinated And Supervised from the Western District of North Carolina

32.     Essential functions relating to the Pension Plan and the 401(k) Plan are coordinated and supervised from Charlotte, North Carolina. Since the conversion of the

10

Pension Plan to a cash balance formula and the 401(k) transfers, no essential functions relating to these Plans have occurred in the Southern District of Illinois.

33.    Plan administration is currently supervised by the Corporate Benefits Committee. which is the ERISA plan administrator, assisted by Personnel and Corporate Treasury.

34.    Within Personnel, I head up Bank of America's Global Benefits Team from my office in Charlotte, North Carolina.

35.    From the time of the Pension Plan conversion and the voluntary 401(k) transfers to the present, the operations of the Pension Plan and 401(k) Plan have been supervised from Charlotte, North Carolina.

36.    Exult, Inc. ("Exult"), now part of Hewitt Associates, Inc., is the service delivery manager responsible for coordinating the service providers and the systems by which the Pension Plan and 401(k) Plan are administered and information is communicated to participants. Exult conducts nearly all of its operations relating to these Plans in Charlotte, North Carolina. Many of the employees who work on the Pension Plan and the 401(k) Plan are based in Exult's Charlotte, North Carolina office, and reside in the Western District of North Carolina.

37.    From the time of the conversion of the Pension Plan to a cash balance formula and the 401(k) transfers to the present, the activities of the Corporate Benefits Committee. the Management Compensation Committee, and the Directors Compensation Committee relating to the Pension Plan and the 401(k) Plan have taken place in the Western District of North Carolina. Further, the activities of Personnel and Corporate Treasury relating to the Pension Plan and the 401(k) Plan have been supervised from the Western District of North Carolina.

11

38.      To the best of my knowledge, no witness with knowledge of these essential plan

functions resides or works in the Southern District of Illinois.

### E.      Decisions Regarding the Investment of Pension Plan Assets Are Made in the Western District of North Carolina

39.      Plaintiffs' complaint alleges various claims in connection with the investment of

the assets of the Pension Plan. All decisions relating to asset allocation, selection of

investment managers, and investment policy are made at Bank of America headquarters

in Charlotte, North Carolina.

40.      The Corporate Benefits Committee has assigned certain responsibilities for the

investment of Pension Plan assets to the Pension Asset Management Group of Corporate

Treasury. All work done by the Pension Asset Management Group relating to the

investment of Pension Plan assets and the formulation of strategies for the investment of

all Pension Plan assets takes place in Charlotte, North Carolina. All persons within the

Pension Asset Management Group who work on these matters reside in the Western

District of North Carolina.

41.      No activities regarding the investment of Pension Plan assets have occurred in the

Southern District of Illinois.

42.      No witness with knowledge of the investment of Pension Plan assets resides or

works in the Southern District of Illinois.

### III.      Documents and Records are Located in the Western District of North Carolina

43.      Documents maintained by Bank of America relating to the Pension Plan and the

401(k) Plan, as well as minutes of the committee meetings in which the Pension Plan

conversion was considered or approved are located in the Western District of North

12

Carolina, or in off-site storage facilities accessible through records located at or accessible from Bank of America headquarters in Charlotte.

44.     Non-privileged documents related to the Pension Plan conversion and 401(k) Plan voluntary transfers also are maintained by Kennedy Covington at its office in Charlotte, North Carolina, or in off-site storage in the Western District of North Carolina.

45.     No documents relevant to the development, implementation or oversight of the Pension Plan's cash balance formula or the 401(k) transfers were created in the Southern District of Illinois. I also am not aware of any such documents that are currently stored in the Southern District of Illinois.

**IV.     Pension Plan Participants in the Southern District of Illinois and the Western District of North Carolina**

46.     To the best of my knowledge and information, based on current records:

    a.     None of the Named Plaintiffs resides or works in the Southern District of Illinois. According to Bank records, one of the Named Plaintiffs, William Pender, lives in the Western District of North Carolina.

    b.     The only possible connection I am aware of that the Pension Plan may have with the Southern District of Illinois is the presence of a minuscule percentage of participants in the District who, as of the date that this action was filed, had cash balance accounts in the Pension Plan.

    c.     As of June 30, 2004, the date this action was filed, the Pension Plan had approximately 111,800 participants employed by Bank of America or its subsidiaries who had cash balance accounts. Of these 111,800 participants, only approximately 100 (less than $1/10^{th}$ of one percent)

worked and accrued benefits in the Southern District of Illinois.

Approximately 11,500 (more than 10 % of the total) worked and accrued

benefits in the Western District of North Carolina.[1]

d.    In addition, as of June 30, 2004, there were approximately 24,900

participants, beneficiaries or alternate payees with vested cash balance

accounts relating to employees who had terminated their relationship with

the Bank on or after July 1, 1998. Of that total, approximately 175 were in

the Southern District of Illinois and 1,425 were in the Western District of

North Carolina.

e.    As of June 30, 2004, the total balance of all cash balance accounts in the

Pension Plan was almost $5 billion (approximately $4,918,000,000). Of

this total balance, approximately $8 million  (approximately .16%) was

credited to the accounts of cash balance participants in the Southern

District of Illinois as of June 30, 2004.[2]  In contrast, approximately $364

million (approximately 7%) was credited to the accounts of cash balance

participants in the Western District of North Carolina as of June 30, 2004.

---

[1] Current employees who are participants in the Pension Plan accrue benefits and receive communications regarding the Pension Plan where they work, not where they live. Accordingly, the contacts that the Pension Plan has with this District should be assessed by considering the number of employees who work in this District, not those who live in the District but who work and accrue benefits elsewhere. As of June 30, 2004, approximately 750 current employees lived in the Southern District of Illinois but worked and therefore accrued benefits outside this District. Because these 750 employees were not accruing benefits in the Southern District of Illinois, they are not included in the above numbers. Certain other employees of Bank of America or its subsidiaries who worked in the Southern District of Illinois as of June 30, 2004, were not participants in the Pension Plan as of that date.

[2] As of that same date, approximately $20.8 million was credited to the accounts of the cash balance participants who live in the Southern District of Illinois but work and therefore accrue benefits outside this district (*see* note 1).

14

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on February 8, 2005

Richard J. Dorazil

CH1 3157774v2

# Exhibit 7

## PwC Benefits Express Website Definition of
## Normal Retirement Age

Print Page | Close Window

RBAP
XXX-XX-2347

## Plan Guidelines

RETURN TO PLAN GUIDELINES PAGE

## Glossary

Whether or not you study the financial section of the newspaper every day, at some point you've probably come across an unfamiliar investment term. We have compiled the following glossary of investment terms to use as a convenient reference tool.

Click on any link below to view the term's definition.

### Terms

- Aggressive Growth
- Amortization
- Annuity
- Annual and Semi-Annual Reports
- Appreciation
- Asset Allocation Fund
- Assets
- Auditor's Report
- Automatic Reinvestment
- Balanced Fund
- Basis Point
- Bear Market
- Beneficiary
- Big Board
- Blue Chip Stocks
- Bond
- Bond Fund
- Bull Market
- Capital Appreciation (Depreciation)
- Capital Gains Distribution
- Cash Equivilants
- Collective Fund
- Commercial Paper
- Common Stock
- Compensation
- Compounding
- Corporate Bond Fund
- Custodian
- Declaration Date
- Defined Benefit Plan
- Defined Contribution Plan
- Derivative
- Distribution
- Diversification
- Dividend
- Dollar-Cost Averaging
- Equities

- Equity Fund
- Exchange Privilege
- Ex-Dividend
- Expense Ratio
- Family of Funds
- Fiduciary
- Fixed Income Fund
- Forfeitures
- Fund Manager
- Ginnie Mae (GNMA) Fund
- Global Fund
- Growth Fund
- Hardship Withdrawals
- Income Fund
- Index
- Individual Retirement Account (IRA)
- Investment Advisor
- Investment Company
- Investment Objective/Strategy
- Load
- Long-Term Bond Funds
- Lump Sum Distribution
- Management Fee
- Maturity
- Maturity Date
- Money Manager
- Money Market Fund
- Municipal Bond Fund
- Mutual Fund
- Net Asset Value
- No-Load Fund
- Normal Retirement Age (NRA)
- Open-End Investment Company
- Operating Expenses
- Payment Date
- Pension Benefit Guaranty Corporation(PBGC)

- Plan Administrator
- Plan Participant
- Plan Vesting
- Plan Year
- Portfolio
- Pre-tax Contributions
- Preferred Stock
- Prospectus
- Qualified Domestic Relations Order (QDRO)
- Qualified Plan
- Recordkeeper
- Redeem
- Required Distributions
- Rollover
- Sales Charge
- Sector Fund
- Securities & Exchange Commission
- Short-Term Fund
- Statement of Additional Information (SAI)
- Stock
- Summary Plan Description (SPD)
- Suspension
- Tax-deffered
- Total Return
- Transactions
- Transfer Agent
- Trustee
- 12b-1 Fee
- U.S. Government fund
- Valuation Date
- Vest/Vesting
- Volatility
- Yield
- Yield to Maturity

| Term | Definition |
|---|---|
| Aggressive Growth | A mutual fund that seeks maximum capital growth. Some aggressive growth funds invest in small growth companies or undervalued companies, while others employ specialized investment strategies. These kinds of funds involve special risk considerations. |
| BACK TO TOP | |
| Amortization | The liquidation of a debt on an installment basis. |

BACK TO TOP

**Annuity**

A contract that provides an income for a specified period of time such as a number of years or for life.

BACK TO TOP

**Annual and Semi-Annual Reports**

Reports sent out by a mutual fund to its shareholders. Among the items included are the fund's performance over the reporting period and the composition of the fund's portfolio on the reporting date.

BACK TO TOP

**Appreciation**

An increase in an investment's principal value.

BACK TO TOP

**Asset Allocation Fund**

A mutual fund that allocates assets among stocks, bonds and money market securities. As market and economic conditions change, the manager can shift assets among the particular industry categories in an effort to maximize returns and/or protect principal.

BACK TO TOP

**Assets**

Everything that a corporation owns, such as cash, investments, inventory, equipment, patents, etc.

BACK TO TOP

**Auditor's Report**

A written statement by the accounting firm that reviews a mutual fund's financial statements.

BACK TO TOP

**Automatic Reinvestment**

The process of having all fund distributions automatically reinvested in additional fund shares.

BACK TO TOP

**Balanced Fund**

A fund designed to pay current income and seek long-term growth. Generally, such funds invest in bonds, preferred stocks and common stocks, with some minimum percentage (usually 25%) of the fund invested in bonds.

BACK TO TOP

**Basis Point**

A single unit of an interest rate or yield. One basis point equals one-hundredth of one percent. For example, the difference between 5.40% and 5.50% is 10 basis points.

BACK TO TOP

**Bear Market**

A prolonged period when stock or bond prices, or both, are generally falling.

BACK TO TOP

**Beneficiary**

The individual or organization designated to receive the value of a participant's account in the event of his or her death.

BACK TO TOP

**Big Board**

Another name for the New York Stock Exchange.

BACK TO TOP

**Blue Chip Stocks**

Common stock of a large, well-established corporation with a strong earnings record and a history of paying dividends in good times and bad.

BACK TO TOP

**Bond**

A debt security issued by a government or corporation. The issuer agrees to pay a stated rate of interest and to return the face value to the investor on a specific maturity date.

BACK TO TOP

**Bond Fund**

A fund whose portfolio consists primarily of fixed income securities. Such funds principally seek current income and not capital growth, though principal value will increase or decrease over time. Yield, share price and investment return of all bond mutual funds fluctuate.

BACK TO TOP

**Bull Market**

A prolonged period when stock or bond prices, or both, are generally rising.

BACK TO TOP

**Capital Appreciation (Depreciation)**

An increase (decrease) in the principal value of a security.

BACK TO TOP

**Capital Gains Distribution**

A fund achieves capital gains by selling securities in its portfolio for a profit. Capital gains, if any, are usually paid annually.

BACK TO TOP

**Cash Equivalents**

Investments that have a ready market and can be sold easily; usually includes receivables, notes, and bonds with short-term maturities. Cash equivalents are most commonly found in money market funds.

BACK TO TOP

**Collective Fund**

An unregistered actively-managed investment portfolio that commingles participant assets in order to obtain economies of scale. A collective fund is not a mutual fund and is subject to different regulations than a mutual fund. Collective funds are not required to have a prospectus, are not available for investment by the general public and their fund values are not published in the newspaper.

BACK TO TOP

**Commercial Paper**

Short-term notes issued by large corporations, finance companies and certain governmental entities, and commonly found in money market funds.

BACK TO TOP

**Common Stock**

A security representing equity ownership in a company.

BACK TO TOP

**Compensation**

The amount of wages, salary or other earned income an individual receives from services rendered as a result of employment.

BACK TO TOP

**Compounding**

The process of seeking to increase the growth potential of a fund investment by having distributions reinvested in additional fund shares, allowing more money to work toward growth.

BACK TO TOP

**Corporate Bond Fund**

A fund that consists chiefly of corporate bonds and usually seeks income as its primary objective.

BACK TO TOP

**Custodian**

Bank of New York, our custodian, is responsible for changes relating to plan asset changes, as directed by our Trustee, PricewaterhouseCoopers.

BACK TO TOP

**Declaration Date**

The day on which a fund declares a dividend to be paid to its shareholders.

BACK TO TOP

**Defined Benefit Plan**

A plan under which contributions made by the employer are allocated to participants based on a predetermined formula.

BACK TO TOP

**Defined Contribution Plan**

A type of qualified plan in which your benefits are based solely on your account balance. The account balance depends on the level of employer contributions and your contributions and the investment earnings on those contributions.

BACK TO TOP

**Derivative**

A financial instrument whose value derives from the performance of another index, security or other asset.

BACK TO TOP

**Distribution**

With regard to mutual funds, distributions are the income and capital gains (if any) paid by a mutual fund to its shareholder.

BACK TO TOP

**Diversification**

Making investments among various securities or other asset classes to reduce the risk associated with investing in a single security or asset class.

BACK TO TOP

**Dividend**

A payment of income to shareholders.

BACK TO TOP

**Dollar-Cost Averaging**

An investment method in which a shareholder invests the same amount regularly (monthly, quarterly, etc.), regardless of market conditions. Dollar-cost averaging is designed to result in a lower average cost per share since a shareholder buys more shares when prices are low and fewer shares when prices are high. Regular investment programs do not guarantee a profit in declining markets, and require that you make

BACK TO TOP

regular investments in down markets. You should consider your ability to continue making investments in declining markets before engaging in a regular investment plan.

Equities

Another name for common stocks.

BACK TO TOP
Equity Fund

See "Growth Fund".

BACK TO TOP
Exchange Privilege

An option enabling shareholders to shift assets from one fund to another eligible fund in the same family as market conditions or their personal goals change. Exchanges are made at current net asset value, and a gain or loss may be experienced upon the sale of shares.

BACK TO TOP
Ex-Dividend

The day when distributions declared by a mutual fund are deducted from its net assets. When a fund goes "ex-dividend," its closing net asset value is computed minus the distribution.

BACK TO TOP
Expense Ratio

A mutual fund's current cost of doing business, expressed as a percentage of assets. A fund's expense ratio equals a fund's annual expenses (excluding interest and income taxes paid) divided by average net assets.

BACK TO TOP
Family of Funds

Mutual funds that generally share a common investment advisor/administrator.

BACK TO TOP
Fiduciary

An entity vested with legal power to invest or administer funds on behalf of another person.

BACK TO TOP
Fixed Income Fund

A mutual fund investing primarily in debt securities that offers a monthly dividend.

BACK TO TOP
Forfeitures

Loss of rights or ownership to firm matching contributions and the investment earnings on those contributions by terminating service before full vesting.

BACK TO TOP
Fund Manager

See "Investment Advisor".

BACK TO TOP
Ginnie Mae (GNMA) Fund   A mutual fund that invests principally in securities issued by the Government National Mortgage Association (GNMA), an organization that pools mortgages of housing lenders and sells GNMA certificates for investment.

BACK TO TOP
Global Fund

A mutual fund that invests in securities issued by both U.S. and foreign companies.

BACK TO TOP
Growth Fund

A mutual fund that invests generally in the common stock of companies with above-average earnings potential and strong track records.

BACK TO TOP
Hardship Withdrawals

An in-service withdrawal from a 401(k) plan due to your financial need that cannot be satisfied from other resources. The conditions for a hardship withdrawal can be determined through a "safe harbor" (rules defined by the IRS) under which certain expenses are deemed to be unforeseen or immediate financial needs. The regulations also require that a plan penalty be imposed, such as suspension or forfeiture.

BACK TO TOP
Income Fund

See "Bond Fund".

BACK TO TOP
Index

Statistical composite of the performance of a specific group of securities. With stock, for example, there are the Standard & Poor's 500 Index and the Dow Jones Industrial Average.

BACK TO TOP
Individual Retirement Account (IRA)

A retirement savings program for individuals to which yearly tax deductible contributions up to a specified limit can be made. The amounts contributed are not taxed until

BACK TO TOP

**Investment Advisor**

BACK TO TOP
**Investment Company**

BACK TO TOP
**Investment Objective/Strategy**

BACK TO TOP
**Load**

BACK TO TOP
**Long-Term Bond Funds**

BACK TO TOP
**Lump Sum Distribution**

BACK TO TOP
**Management Fee**

BACK TO TOP
**Maturity**

BACK TO TOP
**Maturity Date**

BACK TO TOP
**Money Manager**

BACK TO TOP
**Money Market Fund**

BACK TO TOP
**Municipal Bond Fund**

BACK TO TOP
**Mutual Fund**

BACK TO TOP
**Net Asset Value**

BACK TO TOP
**No-Load Fund**

BACK TO TOP
**Normal Retirement Age (NRA)**

BACK TO TOP
**Open-End Investment Company**

withdrawal. Withdrawal is not permitted, without penalty, until the individual reaches ages 59½.

The organization that selects, manages and monitors the securities in a mutual fund pursuant to a written contract. The investment advisor is also referred to as the fund manager.

A company which pools the assets of investors with like investment objectives and invests such assets in a portfolio of securities.

Each fund has a specific goal (objective) and policy (strategy) that determines how it seeks to reach that goal. The objective and strategy that are the best for you depend on many factors (e.g., your goals, age, ability to assume risk, personal finances, etc.).

A sales fee imposed by a fund for the purchase or sale of fund shares. If a sales fee is charged for the purchase or sale of shares, it is called a front-end or back-end load.

Bond funds that hold securities with an average maturity greater than 10 years.

A single payment representing the entire assets of a retirement plan.

The fee paid to a mutual fund's investment advisor for investing the assets of the fund's portfolio, and monitoring the portfolio's performance pursuant to a written advisory contract. The management fee is paid out of the fund's total assets directly, and not by charging an investor's account.

The amount of time that a debt security (bond) has before it is due.

The day an investment (principal) in a bond or other debt security is due to be paid back.

See "Investment Advisor".

An investment fund that seeks maximum current income through investment in securities whose maturities are less than one year.

A mutual fund that invests in tax-exempt securities, which provide income free from Federal and, in some cases, state and local taxes.

A company that pools money for a group of investors and buys and sells securities on their behalf. In doing so, it seeks a specific investment objective and redeems shares upon demand. Key benefits of mutual funds include professional management and diversification.

This is the value of one share of a mutual fund. It is usually calculated once a day, based on the closing market price for each security held in the fund's portfolio. It is determined by dividing the value of the fund's assets by the number of outstanding shares.

A mutual fund that does not impose a sales charge in excess of 25 basis points. Investors pay net asset value when buying shares.

The age, as established by a plan, when retirement normally occurs.

BACK TO TOP
A mutual fund.

Operating Expenses

Costs incurred by a fund to conduct its day-to-day operation, other than the management fee and any distribution charges (e.g. legal, accounting, transfer agency, shareholder servicing, custodial, blue sky, etc.).

BACK TO TOP
Payment Date

The day on which a mutual fund sends a distribution to its shareholders.

BACK TO TOP
Pension Benefit Guaranty Corporation (PBGC)

The federal agency, established as a non-profit corporation, charged with administering the plan termination provisions of ERISA Title IV and the Multiemployer Pension Plan Amendments Act of 1980. Employers pay premiums to the PBGC, which guarantees benefits for participants and beneficiaries when defined benefit plans terminate.

BACK TO TOP
Plan Administrator

Usually plan sponsors or employers responsible for managing the administration of a qualified retirement plan. The Plan Administrator for the PricewaterhouseCoopers plans is PricewaterhouseCoopers.

BACK TO TOP
Plan Participant

Any staff member or former staff member of an employer, member or former member of an employee organization, or partner in a partnership who is or may become eligible to receive a benefit of any type from an employee benefit plan, or whose beneficiaries may be eligible to receive any such benefit.

BACK TO TOP
Plan Vesting

The right to receive a present or future pension benefit, vests when it is no longer contingent upon remaining in the service of the employer.

BACK TO TOP
Plan Year

12-month continuous period of time as defined by the plan.

BACK TO TOP
Portfolio

An investor's total holdings among different classes of securities such as bonds, mortgages and common stocks.

BACK TO TOP
Pre-tax Contributions

Dollars deducted from pay before income taxes are calculated and deducted.

BACK TO TOP
Preferred Stock

Class of stock that pays dividends at a specified rate and does not carry voting rights.

BACK TO TOP
Prospectus

A legal document setting forth the complete history and current status of a security issue which must be made available to all interested purchasers in advance of a public offering under the Securities Act of 1933.

BACK TO TOP
Qualified Domestic Relations Order (QDRO)

A domestic relations order is a judgment, decree or order (including approval of property settlement agreement) that (1) relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a participant and (2) is made pursuant to a state domestic relations law (including a community property law). A domestic relations order becomes a qualified domestic relations order if it creates or recognizes the existence of an alternate payee's right, or assigns to an alternate payee the right, to receive all or a portion of the benefits payable to a participant under a plan, specifies required information and does not alter the amount or form of plan benefits. An alternate payee is a spouse, former spouse, child or other dependent of a participant who is recognized by domestic relations order as having a right to receive all, or a portion of, the benefits under a plan with respect to the participant.

BACK TO TOP
Qualified Plan

A plan that the Internal Revenue Service approves as meeting the requirements of

Section 401(a) of the 1954 Internal Revenue Code. Such plans receive tax advantages.

BACK TO TOP

**Recordkeeper**

Assists the plan sponsor with administering "keeping" participant and plan records. Mellon is our recordkeeper.

BACK TO TOP

**Redeem**

To sell your shares of a mutual fund back to the company that issued them.

BACK TO TOP

**Required Distributions**

Payments that must be made once a participant reaches age 70½; they are calculated to span his or her life expectancy. When a participant dies, the payments then must be made to the beneficiary.

BACK TO TOP

**Rollover**

A plan contribution made by an employee, attributable to a distribution from a qualified plan or a conduit IRA.

BACK TO TOP

**Sales Charge**

Any charge or fee intended to finance the sale of shares.

BACK TO TOP

**Sector Fund**

A mutual fund that invests primarily in specific areas or industries, such as gold, healthcare, telecommunications, etc.

BACK TO TOP

**Securities & Exchange Commission**

An organization created by an act of Congress entitled the "Securities Act of 1934." An independent bipartisan, quasi-judicial agency of the United States government. The laws administered by the commission relate in general to the field of securities and finance and seek to provide protection for investors and the public in their securities transactions. The SEC is charged with enforcing the Securities Act.

BACK TO TOP

**Short-Term Fund**

Mutual fund that invests mainly in securities with maturities greater than one year and less than three.

BACK TO TOP

**Statement of Additional Information (SAI)**

This document contains more detailed supplementary information about a mutual fund. It is available upon request at no charge from the fund, and is also known as "Part B" of the registration account.

BACK TO TOP

**Stock**

A stock represents equity ownership in a corporation. As a stockholder, you stand to profit by selling the stock for more than you paid or when the company passes its earnings through to you in the form of dividend payments. You are subject to risk that the market price of the stock will fall or that dividends may not be paid.

BACK TO TOP

**Summary Plan Description (SPD)**

A requirement of ERISA for a written statement of a plan in an easy-to-read form, including a statement of eligibility, coverage, participant rights and appeal procedure. It is provided to participants, beneficiaries and the Department of Labor.

BACK TO TOP

**Suspension**

Not being permitted to withdraw from the plan while continuing in employment. A temporary interruption of employer contributions without terminating the plan.

BACK TO TOP

**Tax-deferred**

Tax treatment granted to qualified retirement plans where taxes are not imposed when benefits are accrued (under a defined benefit plan) or contributions are made (under a defined contribution plan), but instead are imposed when benefits are paid to participants in cash.

BACK TO TOP

**Total Return**

A historical measure of a mutual fund's overall performance. Total return reflects the reinvestment of dividends and capital gain distributions, if any, and the change in the fund's net asset value over a specific time period.

BACK TO TOP

**Transactions**

All the activity of a portfolio: purchases and sales of securities, contributions to the fund and disbursements out of the fund, transfers, income receipts from dividends or bond interest, and payment of any administrative expenses.

BACK TO TOP

**Transfer Agent**

The entity responsible for executing investor's investment transactions for the fund, transferring ownership of fund shares on the fund's books and records, and disbursing dividends. The transfer agency function can be internalized within a fund family.

BACK TO TOP

**Trustee**

PricewaterhouseCoopers, our Trustee, is responsible for oversight and administration of plan assets.

BACK TO TOP

**12b-1 Fee**

The use of fund assets to pay certain distribution costs, such as marketing and advertising costs, and payments to third parties who sell fund shares. Such fees can be paid only pursuant to a written plan, adopted pursuant to with rule 12b-1 under the Investment Company Act.

BACK TO TOP

**U.S. Government Fund**

A mutual fund that invests in bills, notes and/or bonds issued by the U.S. Treasury and other government agencies and instrumentalities. Most of these securities are direct obligations of the U.S. Government, and shares of such funds are not government guaranteed.

BACK TO TOP

**Valuation Date**

The date as of which a participant's account is updated and reflects the contributions and investment earnings.

BACK TO TOP

**Vest/Vesting**

Employee contributions are always fully vested. Employer contributions, such as firm matching contributions, may be paid at a specified rate depending upon plan provisions.

BACK TO TOP

**Volatility**

The degree by which a mutual fund's net asset value moves up or down in price over a period of time.

BACK TO TOP

**Yield**

A term describing the net income generated by a mutual fund, usually paid to you in the form of dividends which, in the case of a qualified retirement plan, are generally reinvested in additional shares. Various methods of calculating yield exist.

BACK TO TOP

**Yield to Maturity**

The total return from a fixed income security held to maturity, taking into account interest and capital gains (or losses).

BACK TO TOP

**PLAN GUIDELINE TOPICS:**

| | |
|---|---|
| Address Change | Personal Identification Number (PINs) Questions |
| Beneficiary Designation Questions | Questions About Changing Your Investment Elections |
| Eligibility Questions | Questions About Keeping Track of Your Account |
| Enrollment Questions | Questions About Vesting |
| Final Distribution Questions | Questions About Your RBAP Credits |
| Fund Reallocation and Fund Transfer Questions | Retirement |
| Glossary | Stock Market Closings |
| How Much Will I Need to Retire? | |
| How to Use This Site | |
| Investment Fund Questions | |

Copyrighted © 2004. Terms of Use.

# **Exhibit 8**

## Extracts from RBAP IRS 5500's Forms

| Form **5500** | **Annual Return/Report of Employee Benefit Plan** This form is required to be filed under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6047(e), 6057(b), and 6058(a) of the Internal Revenue Code (the Code). ▶ Complete all entries in accordance with the instructions to the Form 5500. | Official Use Only OMB Nos. 1210 - 0110 1210 - 0089 **2003** This Form is Open to Public Inspection. |
|---|---|---|

Department of the Treasury Internal Revenue Service
Department of Labor Employee Benefits Security Administration
Pension Benefit Guaranty Corporation

**Part I    Annual Report Identification Information**

For the calendar plan year 2003 or fiscal plan year beginning    07/01/2003    and ending    06/30/2004

A  This return/report is for:  (1) ☐ a multiemployer plan;  (3) ☐ a multiple-employer plan; or
(2) ☒ a single-employer plan (other than a multiple-employer plan);  (4) ☐ a DFE (specify) _____

B  This return/report is:  (1) ☐ the first return/report filed for the plan;  (3) ☐ the final return/report filed for the plan;
(2) ☐ an amended return/report;  (4) ☐ a short plan year return/report (less than 12 months).

C  If the plan is a collectively-bargained plan, check here ................................................ ▶ ☐

D  If filing under an extension of time or the DFVC program, check box and attach required information. (see instructions) ............... ▶ ☒

**Part II    Basic Plan Information — enter all requested information.**

**1a** Name of plan
RETIREMENT BENEFIT ACCUMULATION PLAN FOR EE'S OF
PWC LLP

**1b** Three-digit plan number (PN) ▶    002

**1c** Effective date of plan (mo., day, yr.)
06/01/1954

**2a** Plan sponsor's name and address (employer, if for a single-employer plan)
(Address should include room or suite no.)
PRICEWATERHOUSECOOPERS LLP

C/O TAX DEPARTMENT

3109 W. DR. M.L. KING JR. BLVD.

TAMPA    FL  33607

**2b** Employer Identification Number (EIN)
13-4008324

**2c** Sponsor's telephone number
813-351-6919

**2d** Business code (see instructions)
541211

Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report if it is being filed electronically, and to the best of my knowledge and belief, it is true, correct and complete.

| SIGN HERE | _signature_ | 4/13/05 | SAMUEL P. STARR |
|---|---|---|---|
| | Signature of plan administrator | Date | Type or print name of individual signing as plan administrator |
| SIGN HERE | _signature_ | 4/13/05 | SAMUEL P. STARR |
| | Signature of employer/plan sponsor/DFE | Date | Type or print name of individual signing as employer, plan sponsor or DFE |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.    v6.1    Form **5500** (2003)

0  2  0  3  6  5  0  1  0  H

J 00728

Retirement Benefit Accumulation Plan
For Employees of PricewaterhouseCoopers LLP
(EIN/PN 13-4008324/002)

Attachment to 2003 Form 5500

Schedule B, Line 6 - Statement of Actuarial Assumptions/Methods
(continued)

| | |
|---|---|
| Mortality | The 1994 Group Annuity Reserving mortality table (94 GAR), blended 50% males/50% females, projected to 2002, was used. Prior to July 1, 2003, the 1983 Group Annuity Mortality Table, blended 50% males/ 50% females, was used, except for calculating lump sum cash-outs of career average benefits at termination/retirement, the 94 GAR mortality table was used. |
| Retirement | For active partners and principals, age 60 or immediately if over age 60; for active employees, age 65 or immediately if over age 65. |
| Salary Scale | 6% per year, compounded annually. |
| Cash Balance Accumulation Rate | Accumulation rate was based on the investment mix of cash balance assets. 6.50% was assumed as of July 1, 2003. (Prior to July 1, 2003, 6.15% was used.) |
| Annuity Conversion Rate | The assumed conversion rate of 6.15% was based on expected long-term interest rates under IRC Section 417(e). This rate was used for conversion of projected career average benefits to lump-sums at termination/retirement (for entry age funding calculations) and for conversion of projected cash balances to annuities at termination/retirement (for current liability calculations). |
| Spouse's Age | Female spouses are assumed to be three years younger than males. |
| Form of Payment | It is assumed that members will elect lump sum benefits upon withdrawal or retirement, except current terminated vested partners who left before July 1, 1999 and are not eligible for lump sums are assumed to elect life annuity at age 65 (or immediately if over age 65). |

J 00741

M:\TLS\RET\03\DB\CLIENT\PWC2005\PwCMM401.doc

**Retirement Benefit Accumulation Plan**
**For Employees of PricewaterhouseCoopers LLP**
**(EIN/PN  13-4008324/002)**

**Attachment to 2003 Form 5500**

**Schedule B, Line 6 – Description of Weighted Average Retirement Age**

Calculation of average retirement age, weighted by covered payroll:  65 x 79% + 60 x 21% = 64

J 00746

| Form **5500** | Annual Return/Report of Employee Benefit Plan | Official Use Only<br>OMB Nos. 1210-0110<br>1210-0089 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Pension and Welfare Benefits<br>Administration<br>Pension Benefit Guaranty Corporation | This form is required to be filed under sections 104 and 4065 of the Employee<br>Retirement Income Security Act of 1974 (ERISA) and sections 6039D, 6047(e),<br>6057(b), and 6058(a) of the Internal Revenue Code (the Code).<br>► Complete all entries in accordance with<br>the instructions to the Form 5500. | **2002**<br><br>This Form is Open to<br>Public Inspection |

**Part I**   Annual Report Identification Information

For the calendar plan year 2002 or fiscal plan year beginning   07/01/2002   and ending   06/30/2003

**A** This return/report is for:  **(1)** ☐ a multiemployer plan;  **(3)** ☐ a multiple-employer plan; or
  **(2)** ☒ a single-employer plan (other than a  **(4)** ☐ a DFE (specify) _____
    multiple-employer plan);

**B** This return/report is:  **(1)** ☐ the first return/report filed for the plan;  **(3)** ☐ the final return/report filed for the plan;
  **(2)** ☐ an amended return/report;  **(4)** ☐ a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ►☐

**D** If filing under an extension of time or the DFVC program, check box and attach required information (see instructions) . . . . . . . . . ►☐

**Part II**   Basic Plan Information — enter all requested information.

| **1a**  Name of plan<br>RETIREMENT BENEFIT ACCUMULATION PLAN FOR EE'S OF<br>PWC LLP | **1b**  Three-digit<br>plan number (PN)  ►   002 |
|---|---|
| | **1c**  Effective date of plan (mo., day, yr.)<br>06/01/1954 |
| **2a**  Plan sponsor's name and address (employer, if for a single-employer plan)<br>(Address should include room or suite no.)<br>PRICEWATERHOUSECOOPERS LLP<br><br>C/O TAX DEPARTMENT<br><br>3109 W. DR. M.L. KING JR. BLVD.<br><br>TAMPA                                          FL   33607 | **2b**  Employer Identification Number (EIN)<br>13-4008324 |
| | **2c**  Sponsor's telephone number<br>813-351-6919 |
| | **2d**  Business code (see instructions)<br>541211 |

Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report if it is being filed electronically, and to the best of my knowledge and belief, it is true, correct and complete.



| **SIGN HERE** | _[signature]_ | 4/8/04 | Samuel P. Starr |
|---|---|---|---|
| | Signature of plan administrator | Date | Type or print name of individual signing as plan administrator |
| **SIGN HERE** | _[signature]_ | 4/8/04 | Samuel P. Starr |
| | Signature of employer/plan sponsor/DFE | Date | Type or print name of individual signing as employer, plan sponsor or DFE |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.   v5.0   Form **5500** (2002)

0 2 0 2 3 0 0 1 0 8

J 00649

Retirement Benefit Accumulation Plan
For Employees of PricewaterhouseCoopers LLP
(EIN/PN 13-4008324/002)

### Attachment to 2002 Form 5500

### Schedule B, Line 6 - Statement of Actuarial Assumptions/Methods
### (continued)

| | |
|---|---|
| Mortality | The 1983 Group Annuity Mortality Table, blended 50% males/ 50% females, was used. For calculating lump sum cash-outs of career average benefits at termination/retirement, the mortality table was changed to the 1994 Group Annuity Reserving (94 GAR) mortality table, blended 50% males/50% females, projected to 2002. |
| Retirement | For partners and principals, age 60 or immediately if over age 60; for employees, age 65 or immediately if over age 65. |
| Salary Scale | 6% per year, compounded annually. |
| Deemed Plan Interest Rate/Accumulation Rate | Defined by reference to the four-year average of U.S. Treasury Rates for thirty-year constant maturity securities in effect two months prior to the beginning of the Plan Year. |
| Spouse's Age | Female spouses are assumed to be three years younger than males. |
| Form of Payment | It is assumed that all participants will elect lump sum benefits upon withdrawal or retirement. |
| Loading for Expenses | None. |
| Maximum Compensation Limitation under IRC Section 401(a)(17) | Compensation was limited to $200,000 for purposes of calculating benefits. |
| Maximum Benefit Limitation under IRC Section 415(b) | $160,000 at age 65 for 2002. |

Retirement Benefit Accumulation Plan
For Employees of PricewaterhouseCoopers LLP
(EIN/PN  13-4008324/002)

### Attachment to 2002 Form 5500

### Schedule B, Line 6 - Description of Weighted Average Retirement Age

Calculation of average retirement age, weighted by covered payroll:  $65 \times 84\% + 60 \times 16\% = 64$.

J 00662

Form **5500**
Department of the Treasury
Internal Revenue Service

Department of Labor
Pension and Welfare Benefits
Administration

Pension Benefit Guaranty Corporation

## Annual Return/Report of Employee Benefit Plan

This form is required to be filed under sections 104 and 4065 of the Employee
Retirement Income Security Act of 1974 (ERISA) and sections 6039D, 6047(e),
6057(b), and 6058(a) of the Internal Revenue Code (the Code).

► Complete all entries in accordance with
the instructions to the Form 5500.

840373 1693
133 01 0001

OMB Nos. 1210 - 0110
1210 - 0089

**2001**

This Form is Open to
Public Inspection

### Part I  Annual Report Identification Information

For the calendar plan year 2001 or fiscal plan year beginning   07/01/2001,   and ending   06/30/2002

**A** This return/report is for:
(1) [ ] a multiemployer plan;
(2) [X] a single-employer plan (other than a multiple-employer plan);
(3) [ ] a multiple-employer plan, or
(4) [ ] a DFE (specify) _____

**B** This return/report is:
(1) [ ] the first return/report filed for the plan;
(2) [ ] an amended return/report;
(3) [ ] the final return/report filed for the plan;
(4) [ ] a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here ......................................................... ►[ ]

**D** If filing under an extension of time or the DFVC program, check box and attach required information (see instructions) .................. ►[X]

### Part II  Basic Plan Information — enter all requested information.

**1a** Name of plan
RETIREMENT BENEFIT ACCUMULATION PLAN FOR
EMPLOYEES OF PRICEWATERHOUSECOOPERS LLP

**1b** Three-digit
plan number (PN)  ►    002

**1c** Effective date of plan (mo., day, yr.)
06/01/1954

**2a** Plan sponsors name and address (employer, if for a single-employer plan)
(Address should include room or suite no.)
PRICEWATERHOUSECOOPERS LLP

C/O TAX DEPARTMENT

3109 W. DR. M.L. KING JR. BLVD.

TAMPA                             FL  33607

**2b** Employer Identification Number (EIN)
13-4008324

**2c** Sponsor's telephone number
813-351-6919

**2d** Business code (see instructions)
541211

Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report if it is being filed electronically, and to the best of my knowledge and belief, it is true, correct and complete.



| Signature of plan administrator | 4/14/03 | Samuel P. Starr |
| --- | --- | --- |
| | Date | Typed or printed name of individual signing as plan administrator |
| Signature of employer/plan sponsor/DFE | 4/14/03 | Samuel P. Starr |
| | Date | Typed or printed name of individual signing as an employer, plan sponsor or DFE as applicable |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.    v4.1    Form **5500** (2001)



0 2 0 1 0 1 0 1 0 5

Retirement Benefit Accumulation Plan
For Employees of PricewaterhouseCoopers LLP
(EIN/PN 13-4008324/002)



### Attachment to 2001 Schedule B (Form 5500), Line 6

#### Actuarial Basis
(continued)

| | |
|---|---|
| Retirement | For partners and principals, age 60 or immediately if over age 60; for employees, age 65 or immediately if over age 65. |
| Salary Scale | 6% per year, compounded annually. |
| Deemed Plan Interest Rate/Accumulation Rate | Defined by reference to the four-year average of U.S. Treasury Rates for thirty-year constant maturity securities in effect two months prior to the beginning of the Plan Year. |
| Spouse's Age | Female spouses are assumed to be three years younger than males. |
| Form of Payment | It is assumed that all participants will elect lump sum benefits upon withdrawal or retirement. |
| Loading for Expenses | None. |
| Maximum Compensation Limitation under IRC Section 401(a)(17) | Compensation was limited to $170,000 for purposes of calculating benefits. |
| Maximum Benefit Limitation under IRC Section 415(b) | $140,000 at Social Security Normal Retirement Age for 2001. |

**Retirement Benefit Accumulation Plan**
**For Employees of PricewaterhouseCoopers LLP**
**(EIN/PN  13-4008324/002)**



**Attachment to 2001 Schedule B (Form 5500), Line 6(b)**

Calculation of average retirement age, weighted by covered payroll:  65 x 86% + 60 x 14% = 64.

## **Exhibit 9**

Letter from Ira Cohen, PricewaterhouseCoopers LLP,
to IRS Commissioner Charles O. Rossotti
and Deputy Assistant Secretary for Tax Policy Jonathan Talisman,
Dated Sept. 30, 1999,
*reprinted in* Tax Notes Today, Nov. 18, 1999

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

LEXSTAT 1999 TNT 222-20

Copyright © 1999 Tax Analysts
Tax Notes Today

NOVEMBER 18, 1999 THURSDAY

**DEPARTMENT:** Official Announcements, Notices, and News Releases; Treasury Tax Correspondence

**CITE:** *1999 TNT 222-20*

**LENGTH:** 3843 words

**HEADLINE:** 1999 TNT 222-20 BLAME FOR CASH BALANCE PLAN CONTROVERSY BELONGS WITH IRS GUIDANCE, PricewaterhouseCOOPERS SAYS. (Section 411 -- Minimum Vesting;) (Release Date: SEPTEMBER 30, 1999) (Doc 1999-36542 (8 original pages))

**CODE:** *Section 411* -- Minimum Vesting;
*Section 414(j)* -- Defined Benefit Plans

**ABSTRACT:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury.

**SUMMARY:** Ira Cohen of PricewaterhouseCoopers LLP, Teaneck, N.J., has placed the blame for the controversy over cash balance plans on pension guidance issued by the IRS and Treasury. Cohen argues that IRS guidance has created a "whipsaw effect" that "perversely" causes cash balance participants to receive earnings credits below market rates. To avoid that effect, cash balance plans use a retirement age that is below the actual typical retirement age to determine plan benefits. If the IRS and Treasury want to eliminate the controversy over cash balance plans, he says, they should eliminate the "whipsaw effect."

**AUTHOR:** Cohen, Ira
PricewaterhouseCoopers LLP

**GEOGRAPHIC:** United States

**INDEX:** pension plans, vesting standards, minimum;
pension plans, benefits, defined

**REFERENCES:** Subject Area:
  Individual income taxation;
  Benefits and pensions
Cross Reference:
  For a summary of IR-1999-79, see Tax Notes, Oct. 25, 1999, p. 449;
  for the full text, see *1999 TNT 202-17*, Doc 1999-33676 (1 original
  page), or H&D, Oct. 20, 1999, p. 707.

**TEXT:**

Release Date: SEPTEMBER 30, 1999

September 30, 1999

Mr. Charles O. Rossotti
Commissioner

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

Internal Revenue Service
1111 Constitution Avenue, N.W.,
Room 3000
Washington, D.C. 20224

Mr. Jonathan Talisman
Deputy Assistant Secretary for Tax Policy
U.S. Department of The Treasury
Main Treasury, Office of the Assistant Secretary for Tax Policy
1500 Pennsylvania Avenue, N.W.
Room 1334
Washington, D.C. 20020

Dear Commissioner Rossotti and Mr. Talisman:

[1] I am writing to you to explain why one element of the current controversy over cash balance plans -- a low normal retirement age in a qualified defined benefit plan, -- has been a necessary result of poor rulemaking by the Treasury Department and is not a devious attempt by taxpayers to circumvent reasonable rules. (By a low normal retirement age, I mean a retirement age that is defined in the plan document that is well below that actual typical retirement age -- the low retirement age might be as low as the age at five years of participation in the plan.) I urge you to consider the merits of the low normal retirement age in this context -- as a hero rather than a villain. If the IRS eliminates the use of the low normal retirement age, the IRS should also revise Notice 96-8 to correct the pension policy disaster fostered by that Notice.

I. The Whipsaw Effect

[2] The policy problem created by the Treasury Department and IRS regulations has to do with the dreaded "whipsaw effect" and rules requiring payment of minimum lump sums from qualified defined benefit plans that offer the lump sum form of distribution. Review of the minimum lump sum rules under *section 417(e) of the Internal Revenue Code* of 1986, as amended (the "Code") and the guidance relating to the "whipsaw effect" will be helpful in fully understanding the problem.

A. IRS Rules Regarding Minimum Lump Sums

[3] Let's briefly review the economic conditions prevailing when the minimum lump sum rules were first created. In the late 1970's and early 1980's, interest rates were at an all time high, often as high as 15%. In this time of high interest rates, employers frequently terminated qualified defined benefit plans with surplus assets to gain access to the surplus. The high interest rates had the effect of inflating the amount available for reversion, because pension liabilities are generally calculated as if the liability were due when the plan participants retire -- some time in the future. If a plan terminates today, the present value of that future liability in a high interest rate environment is relatively small. Therefore, when plans terminate in a high interest rate environment, plan assets required to satisfy liabilities to plan participants are relatively smaller, increasing the plan assets available for reversion.

[4] On plan termination, benefits may be settled either by purchasing an annuity contract or paying a lump sum. In the era of abnormally high interest rates, like 15% per annum, the surplus reverting to the employer upon plan termination was significantly larger if lump sums were paid than if annuities were purchased. (This resulted because the price of annuity contracts reflected the fact that annuity payments commence some time in the future, so the present value discounting required when lump sums were paid would not occur or would be performed over a shorter period of time.) Indeed, some oversight committee testimony in that era showed that some companies wanted to maximize their surplus badly enough to provide their executives with an additional bonus depending on the percentage of the executives' subordinate employees who could be induced to take a lump sum on plan termination. Plan participants, like most small investors, were typically unable to obtain those high interest rates in savings accounts or purchases of debt instruments. Consequently, participants electing lump sums received less long-term economic value than those electing annuities.

[5] Congress sought to change this result by defining minimum lump sums in terms of a maximum. interest rate, so that the effect of present valuing the pension due at retirement age would be regulated by adding *Section 417(e) of the Code. Section 417(e)* was modified several times. At present, *Section 417(e)* states:

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

. . . . "(3) Determination of present value.

    (A)  In general.

    (i)  Present Value. Except as provided in subparagraph

    (B), for purposes of paragraphs (1) and (2), the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate.

    (ii) Definitions. For purposes of clause (i) --

    (I)  Applicable mortality table. The term "applicable mortality table" means the table prescribed by the Secretary. Such table shall be based on the prevailing commissioners' standard table (described in *section 807(d)(5)(A)*) used to determine reserves for group annuity contracts issued on the date as of which present value is being determined (without regard to any other subparagraph of *section 807(d)(5)*).

    (II) Applicable interest rate. The term "applicable interest rate" means the annual rate of interest on 30 year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe."

[6] The Treasury Regulations (the "Regulations") implementing the minimum lump sum legislation state that that lump sum may never be less than the present value of the annuity payable at a participant's normal retirement date at a mandated interest rate. *Section 1.417(e)-1(d)(I) of the Regulations* states:

. . . . "The present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit determined in accordance with the preceding sentence". . . .

[7] This regulatory requirement is neither mandated nor suggested by the law or the legislative history. In fact, it ignores a key element of the problem the rule was designed to address. Participants in terminating plans are allowed to take annuities or lump sums IMMEDIATELY UPON PLAN TERMINATION, even if they are still employed (if the plan design allows). The rule does, however, represent a vital regulatory step hurling cash balance plans into the jaws of the dreaded "whipsaw effect." As we will see, absent this requirement, the "whipsaw effect" would be eliminated because a plan could define the lump sum as the present value of the immediate annuity -- a more accurate reflection of the design options available to plan sponsors in terminating and ongoing plans.

D. Cash Balance Plans and the "Whipsaw Effect"

[8] In simple economic terms, a cash balance plan provides a benefit in the form of an account. This notional account is credited with pay credits each year and is adjusted periodically according to an earnings index. This earnings rate is usually a predetermined independent index (such as 5-year Treasury bills or the S&P 500), or the earnings rate may be a fixed interest rate such as 5%; in some designs, participants may choose among different earnings indices which mimic actual investments such as those available in the plan sponsor's 401(k) plan. Cash balance plans generally offer a lump sum and an immediate annuity upon termination of employment, and our experience with cash balance plans suggests that nearly all participants will take the lump sum form of distribution.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[9] Because the fundamental benefit is an account balance, these plans -- unlike traditional defined benefit plans -- should not save the employer money (at times of higher interest rates) when the employee takes a lump sum. After all, the account should be the account regardless of the interest rate. However, that elegant equation -- the account equals the account -- is not in the IRS's current mathematical repertoire.

[10] The IRS has created the "whipsaw problem," on the basis of its regulations relating to minimum lump sums. Because these regulations mandate that the minimum lump sum relates to the benefit at normal retirement age, the IRS required cash balance plans develop a normal retirement age annuity benefit by projecting the account balance to normal retirement age using an interest rate reflective of the investment adjustments (the "Projection Rate"), then converting that amount to an annuity. Then, in order to comply with the minimum lump sum rules, that benefit at normal retirement age needs to be discounted to the benefit commencement date. If the projection rate is greater than the discount rate, the plan could be "whipsawed" into paying a lump sum that is greater than a participant's account. Although seemingly reasonable when viewed separately, the minimum lump sum rate and the Projection Rate therefore combine to create the "Whipsaw Effect." This phenomenon was described in Notice 96-8.

[11] However, under that Notice, the Projection Rate to be used is not defined, nor is it defined elsewhere in any applicable IRS authority. Reasonable people can differ as to what Projection Rate is appropriate -- particularly for those that are adjusted according to an equity-based index, such as the Dow Jones Industrial Average. The example below illustrates the Whipsaw Effect. Consider two participants A and B, both age 40, whose accounts earn 4%, a sub- market rate, and 8%, a market rate, respectively. Also assume that the discount rate for minimum lump sums under *section 417(e)* is 6%. Assume A and B each have $ 1,000 in their accounts.

|  | A | B |
| --- | --- | --- |
| 1) Account Balance -- Beginning of year | $ 1,000 | $ 1,000 |
| 2) Investment Credit | 4% | 8% |
| 3) Account Balance -- End of Year | $ 1,040 | $ 1,080 |
| 4) Years to age 65 | 24 | 24 |
| 5) Line 3 projected to age 65 | $ 2,666 | $ 6,848 |
| 6) Present Value of (5) at | $ 658 | $ 1,691 |
| 7) Lump sum Greater of (3/or/6) | $ 1,040 | $ 1,691 |

C. Impact of the Whipsaw Effect

[12] In the above example, the employer would like to provide the account balance as improved for earnings ($ 1,040 for A and $ 1,080 for B). Because the employer had the audacity to provide B with an earnings rate that better reflected the market, the minimum lump sum increased from $ 1,080, which was all that was promised, to $ 1,691 (a 57% increase). Consequently, employers, unwilling to be gouged by the relentless teeth of the Whipsaw, provide less than a market rate of return to employee accounts. Do these rules benefit anyone? The IRS rules go out of their way to severely punish employers who credit true market related investment adjustments. These IRS rules truly assure that no good deed goes unpunished.

D. Some Conclusions Regarding the Whipsaw Effect

[13] This discussion is meant to suggest that because cash balance plans do not benefit in high interest rate environments by offering lump sums in the form of accounts, the law requiring minimum lump sums has no meaning in cash balance plans. Application of the minimum lump sum rate to lump sum distributions from cash balance plans therefore makes no sense in light of the legislative background. The IRS rules are like a solution hunting for a problem.

[14] The major problem inherent in the Whipsaw Effect is that the IRS pigeonholes cash balance plans in a manner that is fundamentally inconsistent with their basic design or rational pension policy. In the case of a traditional pension plan, an annuity is promised. If a lump sum is provided and if the amount of the lump sum is below market equivalence, the employer or the plan realizes profit on every such lump sum election. Thus employers have a financial interest to encourage lump sums. Employees are not actuaries. They rarely seek actuarial advice. In a high interest rate environment in the absence of protective legislation, many would nonetheless take an inferior lump sum. As stated earlier, Congress passed the minimum lump sum law to avoid that situation.

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

[15] In the case of cash balance plans where a lump sum is the fundamental promise, the economics are reversed. Notice 96-8 first operates to reduce the earnings credit by applying the minimum lump sum rules in a way that does not acknowledge that the promise to employees in a cash balance plan is essentially different from the promise in a traditional defined benefit plan. Notice 96-8 also provides that a cash balance plan cannot subsidize the rates at which the account is converted to an annuity (to avoid an end-run around the rules that create the whipsaw problem). Thus rules designed to increase benefits in the traditional defined benefit plan tend to depress benefits in cash balance plans. Thus the rules tend to reduce employer costs in a cash balance plan at the expense of employee benefits. Although some employers may enjoy that result, many employers would prefer to credit a greater rate of return. What kind of policy precludes market rates of return from being applied to cash balance accounts or reducing the amount that may be paid as annuities? It is hard to explain such a policy.

[16] The IRS, however, would contend that its position is sound in that it requires the same mathematical relationship of annuity pensions to lump sum distributions in all type of defined benefit plans. Measured by that yardstick, the IRS is absolutely correct. This reasoning, however, is analogous to treating a nosebleed of a person by firmly applying a tourniquet around that person's neck. It works. The bleeding will stop. But like the IRS rules, the side effects are most unpleasant.

II. The Low Normal Retirement Age

[17] Sir Isaac Newton's third law of motion states that for every action there is an opposite and equal reaction. The IRS regulations needlessly created the Whipsaw Effect (the action). The Whipsaw Effect, however, disappears once a participant reaches his or her normal retirement age (because there is no longer a need to project into the future -- the minimum lump sum rules require projection only until normal retirement age). Interestingly, the logical reaction to the IRS's action is to reduce the normal retirement age (the reaction) because the Whipsaw Effect would disappear at that point, Indeed, most cash balance plans with a low normal retirement age do provide earnings credits based on equity indices. Our belief is that the Whipsaw Effect should not be protected by legislation or further IRS guidance because the low normal retirement age, created by ERISA, /1/ should move the ever grinding teeth of the Whipsaw Effect away from harming plans and their participants.

[18] Rumors abound that the IRS is contemplating adopting rules that will preclude low normal retirement ages. Any such rules would, in our opinion, require legislation. The IRS simply does not have the authority to eliminate the low normal retirement age.

[19] *Section 411(a)(8) of the Internal Revenue Code* as added by ERISA defines the normal retirement age as the earlier of (1) the time a plan participant attains the normal retirement age under the plan and (2) the later of age 65 or the 5th anniversary of plan participation. Clearly, Clause 1 permits a plan to define the normal retirement age as low as it pleases.

[20] *Revenue Ruling 78-120* permitting unrestricted use of low normal retirement ages was adopted contemporaneously with the ERISA regulations. It clearly permits the use of a low normal retirement age, based on *Section 411(a)(8) of the Code*.

III. Recommendation: IRS Elimination of the Whipsaw

[21] The IRS has the authority to eliminate the "Whipsaw Effect" by use of logic instead of blindly following technical rote in a model that the IRS itself created.

[22] The Congress provided an interest rate that must be used in computing minimum lump sums. What does that signify? If a participant received the lump sum, invested the distribution at the rate specified and withdrew assets ratably in equal installments, and if the participant was considerate enough to die precisely where the mortality table indicates, then the lump sum would accumulate sufficient funds to provide the precise annuity. To reach this conclusion, Congress concluded that this specified minimum lump sum interest rate is the rate of return participants are likely on average to obtain on a long-term investment of amounts received in the lump sum distribution. Otherwise, there would be no actuarial equivalence. This assumes that employees receiving lump sums would, of course, have unlimited access to investment markets.

[23] Cash balance plans, however, either with or without investment choice, generally limit participants' abilities to obtain market rate earnings credits prior to the time they take a final distribution. Any limitation on rates of earnings credits available in a cash balance plan would result in lower investment returns than would otherwise be possible, not raise them. Thus as long as the available earnings credit rates do not exceed investment grade rates, the Whipsaw Effect

© 1999, Tax Analysts, Tax Notes Today, NOVEMBER 18, 1999

could be eliminated by assuming that the Projected Rate is equal to the minimum lump sum rate. The IRS should issue guidance updating Notice 96-8 that articulates this principle; then plan sponsors would not be required to rely on a low normal retirement age to implement what is fundamentally sound pension policy.

### IV. The Law Flaw in the Anti-Backloading Rules

[24] The IRS may be concerned about the use of low normal retirement ages for another reason. The rules against "backloading" the accrual of benefits in a defined benefit plan apply only to the accrual of benefits up to a participant's "normal retirement age." These rules are designed to prevent plans from providing for the accrual of most of a participant's benefits later in his or her career, thereby circumventing the minimum, vesting rules.

[25] The anti-backloading rules came into the law in 1974 as part of the minimum vesting standards. Under the minimum vesting standards, a participant must vest in a percentage of his or her benefit no less rapidly than under one of several statutory vesting schedules. Under the minimum vesting standards, a person's vested benefit is the product of (1) the benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage. If an employer did not want to provide early vesting, the employer could provide negligible accruals until the point that employer desires to provide vesting; after all vesting 100% vesting in an accrued benefit of zero is not different from not vesting at all.

[26] The fundamental problem was accruing large amounts in later years relative to small amounts in earlier years ("Backloading"). Therefore, Congress provided a floor of protection by enacting the Anti-Backloading Rules. The floor, however, was flawed. The Anti-Backloading Rules provide protection against backloading for the period from plan entry to the normal retirement age. As a matter of law, benefits accrued subsequent to the normal retirement age are not subject to anti-backloading requirements (the "Law Flaw"). This flaw is clearly undesirable, but will not be cured by trying to eliminate the low normal retirement age. The Law Flaw will still exist as applied to benefits accruing after a "normal" normal retirement age.

[27] The Law Flaw has existed for many years, but has not received significant attention until recently. The spotlight on the Law Flaw is likely to mean that the Law Flaw will be exploited in previously unimagined ways, even if the use of the low normal retirement age is inhibited through new IRS guidance. As a result, we would recommend legislation to fix the Law Flaw. Such legislation would essentially limit post-normal retirement age accrual rates to some reasonable percentage of pre-normal retirement age accrual rates. With such legislation in place, the low normal retirement age would be incapable of manipulation as a means of avoiding the Anti- Backloading Rules.

### V. Conclusions

[28] The IRS has needlessly created the Whipsaw Effect, which perversely causes cash balance participants to receive earnings credits below market rates. The IRS could eliminate the Whipsaw Effect in several different ways, but until such time as the IRS does so, the low normal retirement age avoids the Whipsaw Effect. The IRS may be thinking about changing its position on low normal retirement ages, thereby strengthening the Whipsaw Effect. The IRS does not have authority to change the definition in the statute, If administratively, however, the IRS were to be successful, then participants in cash balance plans will receive less than a market return because of the IRS-created Whipsaw Effect. It is only through the strength and wisdom of our hero in this saga (the low normal retirement age) that the pension policy dragon (the Whipsaw Effect) created by the IRS has been foiled. If the IRS decides to kill off our hero, it should slay the dragon as well -- otherwise, it will be inhibiting the development of the only type of qualified defined benefit plan that provides a reasonable alternative to a private pension system that is dominated by the 401(k) plan.

Sincerely,

Ira Cohen
PricewaterhouseCoopers LLP
Teaneck, NJ

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* End of Document \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## **Exhibit 10**

"Employee Directed:
Consulting Firm Practices What it Preaches on Cash Balance,"
*Pensions & Investments,* May 17, 1999

Copyright 1999 Crain Communications, Inc. Pensions and Investments

May 17, 1999 SECTION: News; Pg. 1 LENGTH: 892 words

HEADLINE:

**EMPLOYEE DIRECTED: CONSULTING FIRM PRACTICES WHAT IT PREACHES ON CASH BALANCE**

BYLINE: Vineeta Anand

BODY:

Consultant PricewaterhouseCoopers LLC is practicing what it preaches- — --adding to its own cash balance pension plans the bells and whistles it designs for others.  And, in a separate development, Lucent Technologies Inc, Murray Hill, N.J., is setting up a cash balance plan for all of its new U.S. employees.

PricewaterhouseCoopers is gussying up its cash balance plans, with combined assets of about $1.1 billion, before merging them into one.  The firm, which has been pushing the envelope on innovative cash balance pension plan designs for its clients, has three plans of its own: a second--generation plan covering Pricewaterhouse employees that was set up in the mid-1990s; a separate, plain--vanilla one that covers employees of the former Coopers & Lybrand accounting firm, which Pricewaterhouse acquired in July; and a third for former employees of Kwasha Lipton, an earlier Coopers acquisition. Kwasha was one of the first companies to set up a cash balance plan. In a typical cash balance plan, the employer continues to manage the underlying assets of the defined benefit pension plan, but credits each employee's hypothetical account by a percentage of pay. The employer also determines the return on each employee's account, frequently linked to the yield on long--term Treasury bonds.

In fact, these accounts exist only on paper, and the employer continues to use professional money managers to invest the underlying assets, hoping to best the return it offers participants, and pocket the difference. Some of the newer generation of cash balance pension plans, such as the one Pricewaterhouse set up some years ago for its own employees, could give employers an even bigger arbitrage by tying the return on employees' accounts to investment options they pick, usually mirroring the investment options in their 401(k) plans.

Employer could profit

Assuming some employees pick conservative investment options, such as money market funds, currently returning around 5% annually, and the employer invests the money in the Standard & Poor's 500 stock index fund (which has had a 11.5% runup already this year), the employer could pocket the difference. Moreover, participant--directed cash balance plans, which have been adopted by fewer than six employers so far, are controversial because employees could conceivably lose all their retirement money, depending on how their investments fare.

PricewaterhouseCoopers' remodeling, expected to be completed by the end of the year, will affect only 19,000 employees who worked for Coopers and Kwasha before the acquisition. After

the revamp, the Coopers and Kwasha pension plans will be folded into the Pricewaterhouse plan. "The harmonization of the prior plans is still under study and subject to approval by the firm's governance bodies. We expect that process to be completed by the end of the year," said a company spokeswoman. Executives declined to comment about the changes officially, but some discussed them in private conversations.

The plan gives employees the choice of investing their hypothetical accounts in 17 options. According to the plan description employees received in December, employees' accounts are credited with an employer contribution of 5% of pay- — --which includes overtime and bonuses- — --up to the ceiling of $160,000 as determined by law. Directors' accounts are credited with 7% of pay.  Many of the choices, including S&P 500 and Russell 2000 index funds, mirror those available to employees through the firm's 401(k) retirement plan.  The Pricewaterhouse participant--directed cash balance plan had received the official nod from the Internal Revenue Service when it was set up. Such approval protects employers if the IRS later raises questions about their pension plans. But what has not been worked out, according to sources who declined to be identified, is the sticky business of calculating transitional benefits Kwasha and Coopers employees will receive as part of the move to the Pricewaterhouse plan.  Thus, Kwasha and Coopers employees do not know how their opening account balances in the new plan will be calculated.

Plain vanilla

The Lucent plan, which kicks in on Jan. 1, 2000, will cover thousands of U.S. workers at 21 companies Lucent has acquired since October 1996. Two of the acquisitions are still pending. None of the acquired companies had traditional pension plans. The cash balance plan, which the company is referring to as an "account balance plan," also will cover non--union employees hired after Jan. 1, 1999.

Lucent is not tinkering with the $45 billion traditional defined benefit pension plan covering existing employees. It is setting up a cash balance plan because younger workers prefer these hybrid plans to stodgy traditional pension plans.  Lucent is adopting a plain vanilla cash balance plan and will credit employees' accounts with an undisclosed guaranteed fixed interest rate. Employee accounts also will be credited with between 3% and 10% of pay; the percentage gets higher as workers get older.  Lucent designed the new pension plan in--house with help from ASA Inc., a Somerset, N.J., actuarial consulting firm that, like Lucent once was an AT&T subsidiary.The company is not planning to make changes anytime soon in how the plan assets are invested, the spokesman said.

--DATE: May 20, 1999

# **Exhibit 11**

## "Pension Downsizing, Continued," *Tax Notes,* May 24, 1999

10 of 11 DOCUMENTS

Copyright © 1999 Tax Analysts
Tax Notes

MAY 24, 1999

**LENGTH:** 2648 words

**DEPARTMENT:** News, Commentary, and Analysis; News Stories

**CITE:** Tax Notes, May 24, 1999, p. 1107;
83 Tax Notes 1107 (May 24, 1999)

**HEADLINE:** 83 Tax Notes 1107 – PENSION DOWNSIZING, CONTINUED. (Release Date: MAY 21, 1999)

**AUTHOR:** Sheppard, Lee A.
Tax Analysts

**CODE:** 401 — Pension Plans

**GEOGRAPHIC:** United States

**INDEX:** annuities, employee, survivor; pension plans, participation standards, minimum; pension plans, vesting standards, minimum; pension plans, benefits, limits

**REFERENCES:** Subject Area:
  Benefits and pensions

**TEXT:**

Release Date: MAY 21, 1999 [*1107]

As this article is being written, the new, and reportedly dull, "Star Wars" movie is about to have its official opening, and stories abound about employers coping with employees who want the day off. Some employers have just thrown in the towel and declared May 19 a holiday, while others have gone further, buying movie tickets for employees and even renting out entire theaters as a morale booster. It all sounds like something out of a schmaltzy Frank Capra movie until one considers the essential financial facts. Renting a movie theater is cheap compared to providing a pension. As employees regale in George Lucas's loopy space fantasy, their employers and their pension advisors are whittling their retirement benefits down to nothing.

And all without terminating their existing defined benefit plans. Despite all the blather about accommodating the expectations of younger workers, the two overriding goals of the large public companies converting their conventional defined benefit plans to the cash balance format are, first, not to terminate the defined benefit plan, and, second, to cut costs.

If they could terminate the defined benefit plans — many of which are actuarially overfunded due to the irrationally exuberant securities markets — without incurring the hated 50 percent excise tax, they would do it in a heartbeat. Indeed, no one would even be discussing cash balance plans or other hybrid formats if defined benefit plans could just be made to disappear.

Much has been written about how cash balance plans cut employers' pension funding costs, and redistribute pension benefits from older workers to younger workers. (See Tax Notes, Jan. 11, 1999, p. 171.) And much has been written about the cynicism of actuaries in describing the redistributive and cheapening effects of cash balance conversions, recorded on tape at actuaries' meetings. (The Wall Street Journal, May 5, 1999, p. C1.) Actuaries and other pension specialists are pooh–poohing these admissions against interest, and complaining that their remarks have been taken out of context

83 Tax Notes 1107, *1107

(they haven't been) but they cannot dispute one fundamental big thing. The Senate Finance Committee has the tapes of the actuaries' meetings. The Finance members can listen to the tapes. Even the dumbest legislator can understand from the tapes that the bottom line is that retirement benefits are being cut, not just for older workers, but for most workers. And that does not look pretty.

Where has the United States Treasury been in all this? Sitting on its hands, feeling powerless, watching as one huge Fortune 100 firm after another converts its conventional defined benefit plan to the cash balance format. The government has, after all, been dithering on cash balance plan conversions for more than a decade, while age discrimination lawsuits and unflattering press attention are recent phenomena.

But now something has come along that even the slightly embarrassed Treasury may not be able to ignore. Pension advisers, emboldened by a decade of improvidently granted determination letters and reliance on a reassuring sentence in a preamble to an otherwise irrelevant regulation, have begun playing fast and loose with retirement ages in cash balance plans — which has the effect of cutting benefits.

Retire in Five Years?

Last year, NationsBank Corp. — the former North Carolina National Bank that recently acquired Bank of America, which did the first cash balance conversion — converted to a cash balance format, and got a determination letter for its new plan. (Pensions and Investments, Sept. 21, 1998, p. 1.) Its new plan takes a hyper-technical approach to the question of what constitutes a normal retirement age. Under the NationsBank plan, an employee who has five years of service — just enough to vest — is also considered ready to retire. "Normal retirement age" under this plan is defined as age 65 or five years of service, whichever comes first. NationsBank received a determination letter for this plan conversion in January 1997.

PricewaterhouseCoopers, which designed the NationsBank plan, put the same retirement age provision in its own plan.

The point of defining normal retirement age this way is that, in projecting pay and interest credits forward and then discounting them back to determine a lump sum owed to the employee under the cash balance scheme, the employer would not have to make any projection at all. *Section 417(e)* does not require any projection of benefits beyond the participant's normal retirement age, which coincides with vesting under the NationsBank plan. That lack of projection presumably limits the employer's liability to the employee [*1108] to the amount of the employee's hypothetical account balance.

To many pension practitioners, that result is too good to be true, and some have apparently complained to the government. Recall that Notice 96–8, *1996–1 C.B. 359,* establishes that an employer cannot simply pay a departing employee the amount of his hypothetical individual account under a cash balance plan, but must, consistent with the rules governing defined benefit plans, project the employee's accrued benefit out to an annuity commencing at normal retirement age and then discount it back to present value to determine the appropriate lump sum to be paid.

*Section 417(e)* prescribes interest rates that must be used in discounting the projected benefit to present value. Those rates, when combined into a single blended rate, are sometimes lower than the rates used by cash balance plans for calculating interest credits, so that the result arrived at from projecting forward and discounting back can be larger than the amount of the employee's hypothetical account. For example, if the plan grants interest credits at 6 percent, and the *section 417(e)* rate is 4 percent, the lump sum required to be paid on departure will be higher than the employee's cash balance. Employers call this "whipsaw."

It is acknowledged that the five–years–of–service retirement age was chosen so that NationsBank could avoid the whipsaw — to avoid incurring a liability to a departing employee in an amount larger than the employee's hypothetical account balance under the cash balance plan. Some practitioners do not think *section 417(e)* should be so easy to avoid, and that the NationsBank position rests on a hyper–literal reading of the relevant statutes. Some of the more

aggressive practitioners, however, are on record as stating that *sections 411(b)* and 417(e) only apply until normal retirement age, however that is defined, so that after that the plan sponsor can do whatever it wants. In this view, the setting of normal retirement age can be purely arbitrary. Another view is that "retirement" means termination of employment with the employer who maintains the particular plan.

*Section 411(a)(8)* defines "normal retirement age" as the earlier of the employee's attainment of the plan's designated

normal retirement age, or the later of age 65 or the attainment of five years of covered service. The latter clause sets an upper limit of age 65 or five years of service on the normal retirement age.

Courts have interpreted *section 411(a)(8)* to mean that a plan can define a normal retirement age of 55, or even earlier if it is reasonable under the circumstances, such as, say, police officers who burn out after 20 years on the job. Normal retirement age case law is mostly concerned with preventing employers from overfunding defined benefit plans by choosing normal retirement ages that are too early.

Before ERISA was enacted, the IRS believed that normal retirement age should be age 65 or, if lower, the age at which employees customarily retire in the particular industry. *(Rev. Rul. 71–147, 1971–1 C.B. 116.)* The IRS permits normal retirement ages set lower than age 55, however, provided only that benefits are adjusted according to *section 415(b)(2)(C). (Rev. Rul. 78–120, 1978–1 C.B. 117.)* That is, the IRS has found no statutory restrictions on the setting of normal retirement ages. NationsBank may force it to reconsider that position. The government has begun looking at the normal retirement age question.

With a normal retirement age defined as being whenever the employee attains five years of service, NationsBank hopes to confine its liability to participants to the hypothetical individual account balance, and also to make in–service distributions widely available to participants. A defined benefit plan is permitted to make in–service distributions after an employee has attained normal retirement age.

This raises the question of funding of cash balance plans. Sponsors of cash balance plans are dreaming if they think their plans are sufficiently funded on a termination basis, or sufficiently funded to operate the way the sponsors have told their employees they would operate. Defined contribution plans are funded with the total amount of the individual accounts. Defined benefit plans are run like insurance companies, with actuarially determined reserves in an amount sufficient to purchase annuities for those participants who hang around long enough to receive them. Because many defined benefit plans that convert to the cash balance format are overfunded, funding is not much of an issue in the short run. But if every employee who was offered a lump sum in a cash balance plan took it, the plan would be underfunded.

The backloading rules of *section 411(b)*, which cause complications for cash balance plans, are also believed to be avoided by the NationsBank [*1109] definition of normal retirement age. *Section 411(b)* prescribes minimum accrual requirements designed to prevent defined benefit plans — which in their conventional forms tend to be backloaded — from being too backloaded. It seems ironic that cash balance plans, which are more frontloaded than conventional defined benefit plans, should have trouble satisfying rules against too much backloading, but they do.

Cash balance plans generally strive to meet the so–called 133 percent rule of *section 411(b)(1)(B)*, which says that benefit accrual for any one year cannot be more than one–third greater than it was for the year before. *Section 411(b)(1)(B)* also speaks of the calculation of an accrued benefit payable at normal retirement age. Basically, the law does not pay any attention to backloading beyond normal retirement age. So NationsBank hopes to accrue benefits consistently with the backloading rules for each participant's first five years of service, and then backload as much as it wants after that point in time.

At this juncture, some of our non–specialist readers may be wondering whether pension practitioners ever think about concepts like substance over form or legislative intent. The answer is no, and that answer holds on both the private and government sides of the equation. A comparison is useful. About a decade ago, government officials were flummoxed when a large company figured out how to obtain the reserve method for its self–insured medical benefits by putting them in an employee stock ownership plan. (See Tax Notes, Dec. 10, 1990, p. 1165.) The IRS response, since 1992, has been not to issue determination letters to those plans. *(Rev. Proc. 99–6, 1999–1 IRB 187.)* It took a long time just to get to a point where the IRS refused to issue determination letters. The IRS is, however, still issuing determination letters to cash balance plans.

Affirmative Whipsaw

Some employers make affirmative use of the so–called whipsaw resulting from Notice 96–8, because it, when combined with a low retirement age and the cash balance mechanism, can produce results that are not so bad from the employer's point of view. Thus another tactic for limiting the employer's liability to older workers is seen in the ITT Educational Services, Inc. cash balance plan, which uses a combination of a low normal retirement age, a high interest credit rate, and a steeply graduated pay credit rate for a result that can be read to discriminate against older employees.

The ITT Educational Services cash balance plan has a normal retirement age of 55. The plan features steeply

graduated pay credits based on age and service, ranging from 2 to 12 percent and a fixed interest credit of 8 percent. When calculating the actuarial equivalent of a participant's normal retirement benefit for purposes of payment of a lump sum before the participant reaches age 55, the plan will accrue interest credits to age 55. When, in so doing, the plan projects accrued benefit out to normal retirement age and discounts it back at the *section 417(e)* rate, the required discount rate that it would be using is the 30-year Treasury rate, roughly 5 percent, so there is the so-called whipsaw right there.

The key to the age discrimination inherent in this formula is the use of an interest credit higher than the *section 417(e)* rate, and the accrual of interest credits to age 55 when determining lump sums. Here the huge interest credit overwhelms the effect of the graduated pay credits when it is combined with a low retirement age. The result is that a departing younger employee would receive a lump sum exceeding his hypothetical individual account, because of the low *section 417(e)* discount rate, while a departing older employee would be limited to his hypothetical individual account, because of the lower retirement age. The employer still incurs the effect of the whipsaw on the lump-sum payouts to younger employees, but incurring it is a way to raise payout to younger employees while the low retirement age cuts off older employees.

As explained previously, there is nothing wrong with a normal retirement age of 55 per se. The way for the government to go after this would be with a straightforward age discrimination inquiry into cash balance plans. Readers will recall that the government's only utterance on the age discrimination question was contained in an ineffectual preamble to a set of irrelevant regulations.

The preamble to the proposed 1991 nondiscrimination rules contains the IRS's only statement thus far about the age discrimination question raised by cash balance plans. The preamble states: "The fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation will not cause a cash balance plan to fail to satisfy the requirements of *section 411(b)(1)(H)*, relating to age-based reductions in the rate at which benefits accrue under a plan." The rules in question, promulgated under *section 401(a)(4)*, are designed to prevent too much discrimination in favor of the highly paid, making this sentence obiter dicta.

— Lee Sheppard

**************** End of Document ****************

10 of 11 DOCUMENTS

Copyright © 1999 Tax Analysts
Tax Notes

MAY 24, 1999

**LENGTH:** 2648 words

**DEPARTMENT:** News, Commentary, and Analysis; News Stories

**CITE:** Tax Notes, May 24, 1999, p. 1107;
83 Tax Notes 1107 (May 24, 1999)

**HEADLINE:** 83 Tax Notes 1107 – PENSION DOWNSIZING, CONTINUED. (Release Date: MAY 21, 1999)

**AUTHOR:** Sheppard, Lee A.
Tax Analysts

**CODE:** 401 — Pension Plans

**GEOGRAPHIC:** United States

**INDEX:** annuities, employee, survivor; pension plans, participation standards, minimum; pension plans, vesting standards, minimum; pension plans, benefits, limits

**REFERENCES:** Subject Area:
 Benefits and pensions

**TEXT:**

Release Date: MAY 21, 1999 [*1107]

As this article is being written, the new, and reportedly dull, "Star Wars" movie is about to have its official opening, and stories abound about employers coping with employees who want the day off. Some employers have just thrown in the towel and declared May 19 a holiday, while others have gone further, buying movie tickets for employees and even renting out entire theaters as a morale booster. It all sounds like something out of a schmaltzy Frank Capra movie until one considers the essential financial facts. Renting a movie theater is cheap compared to providing a pension. As employees regale in George Lucas's loopy space fantasy, their employers and their pension advisors are whittling their retirement benefits down to nothing.

And all without terminating their existing defined benefit plans. Despite all the blather about accommodating the expectations of younger workers, the two overriding goals of the large public companies converting their conventional defined benefit plans to the cash balance format are, first, not to terminate the defined benefit plan, and, second, to cut costs.

If they could terminate the defined benefit plans — many of which are actuarially overfunded due to the irrationally exuberant securities markets — without incurring the hated 50 percent excise tax, they would do it in a heartbeat. Indeed, no one would even be discussing cash balance plans or other hybrid formats if defined benefit plans could just be made to disappear.

Much has been written about how cash balance plans cut employers' pension funding costs, and redistribute pension benefits from older workers to younger workers. (See Tax Notes, Jan. 11, 1999, p. 171.) And much has been written about the cynicism of actuaries in describing the redistributive and cheapening effects of cash balance conversions, recorded on tape at actuaries' meetings. (The Wall Street Journal, May 5, 1999, p. C1.) Actuaries and other pension specialists are pooh–poohing these admissions against interest, and complaining that their remarks have been taken out of context

(they haven't been) but they cannot dispute one fundamental big thing. The Senate Finance Committee has the tapes of the actuaries' meetings. The Finance members can listen to the tapes. Even the dumbest legislator can understand from the tapes that the bottom line is that retirement benefits are being cut, not just for older workers, but for most workers. And that does not look pretty.

Where has the United States Treasury been in all this? Sitting on its hands, feeling powerless, watching as one huge Fortune 100 firm after another converts its conventional defined benefit plan to the cash balance format. The government has, after all, been dithering on cash balance plan conversions for more than a decade, while age discrimination lawsuits and unflattering press attention are recent phenomena.

But now something has come along that even the slightly embarrassed Treasury may not be able to ignore. Pension advisers, emboldened by a decade of improvidently granted determination letters and reliance on a reassuring sentence in a preamble to an otherwise irrelevant regulation, have begun playing fast and loose with retirement ages in cash balance plans — which has the effect of cutting benefits.

Retire in Five Years?

Last year, NationsBank Corp. — the former North Carolina National Bank that recently acquired Bank of America, which did the first cash balance conversion — converted to a cash balance format, and got a determination letter for its new plan. (Pensions and Investments, Sept. 21, 1998, p. 1.) Its new plan takes a hyper-technical approach to the question of what constitutes a normal retirement age. Under the NationsBank plan, an employee who has five years of service — just enough to vest — is also considered ready to retire. "Normal retirement age" under this plan is defined as age 65 or five years of service, whichever comes first. NationsBank received a determination letter for this plan conversion in January 1997.

PricewaterhouseCoopers, which designed the NationsBank plan, put the same retirement age provision in its own plan.

The point of defining normal retirement age this way is that, in projecting pay and interest credits forward and then discounting them back to determine a lump sum owed to the employee under the cash balance scheme, the employer would not have to make any projection at all. *Section 417(e)* does not require any projection of benefits beyond the participant's normal retirement age, which coincides with vesting under the NationsBank plan. That lack of projection presumably limits the employer's liability to the employee [*1108] to the amount of the employee's hypothetical account balance.

To many pension practitioners, that result is too good to be true, and some have apparently complained to the government. Recall that Notice 96–8, *1996–1 C.B. 359,* establishes that an employer cannot simply pay a departing employee the amount of his hypothetical individual account under a cash balance plan, but must, consistent with the rules governing defined benefit plans, project the employee's accrued benefit out to an annuity commencing at normal retirement age and then discount it back to present value to determine the appropriate lump sum to be paid.

*Section 417(e)* prescribes interest rates that must be used in discounting the projected benefit to present value. Those rates, when combined into a single blended rate, are sometimes lower than the rates used by cash balance plans for calculating interest credits, so that the result arrived at from projecting forward and discounting back can be larger than the amount of the employee's hypothetical account. For example, if the plan grants interest credits at 6 percent, and the *section 417(e)* rate is 4 percent, the lump sum required to be paid on departure will be higher than the employee's cash balance. Employers call this "whipsaw."

It is acknowledged that the five–years–of–service retirement age was chosen so that NationsBank could avoid the whipsaw — to avoid incurring a liability to a departing employee in an amount larger than the employee's hypothetical account balance under the cash balance plan. Some practitioners do not think *section 417(e)* should be so easy to avoid, and that the NationsBank position rests on a hyper–literal reading of the relevant statutes. Some of the more

aggressive practitioners, however, are on record as stating that *sections 411(b)* and 417(e) only apply until normal retirement age, however that is defined, so that after that the plan sponsor can do whatever it wants. In this view, the setting of normal retirement age can be purely arbitrary. Another view is that "retirement" means termination of employment with the employer who maintains the particular plan.

*Section 411(a)(8)* defines "normal retirement age" as the earlier of the employee's attainment of the plan's designated

normal retirement age, or the later of age 65 or the attainment of five years of covered service. The latter clause sets an upper limit of age 65 or five years of service on the normal retirement age.

Courts have interpreted *section 411(a)(8)* to mean that a plan can define a normal retirement age of 55, or even earlier if it is reasonable under the circumstances, such as, say, police officers who burn out after 20 years on the job. Normal retirement age case law is mostly concerned with preventing employers from overfunding defined benefit plans by choosing normal retirement ages that are too early.

Before ERISA was enacted, the IRS believed that normal retirement age should be age 65 or, if lower, the age at which employees customarily retire in the particular industry. *(Rev. Rul. 71–147, 1971–1 C.B. 116.)* The IRS permits normal retirement ages set lower than age 55, however, provided only that benefits are adjusted according to *section 415(b)(2)(C)*. *(Rev. Rul. 78–120, 1978–1 C.B. 117.)* That is, the IRS has found no statutory restrictions on the setting of normal retirement ages. NationsBank may force it to reconsider that position. The government has begun looking at the normal retirement age question.

With a normal retirement age defined as being whenever the employee attains five years of service, NationsBank hopes to confine its liability to participants to the hypothetical individual account balance, and also to make in-service distributions widely available to participants. A defined benefit plan is permitted to make in-service distributions after an employee has attained normal retirement age.

This raises the question of funding of cash balance plans. Sponsors of cash balance plans are dreaming if they think their plans are sufficiently funded on a termination basis, or sufficiently funded to operate the way the sponsors have told their employees they would operate. Defined contribution plans are funded with the total amount of the individual accounts. Defined benefit plans are run like insurance companies, with actuarially determined reserves in an amount sufficient to purchase annuities for those participants who hang around long enough to receive them. Because many defined benefit plans that convert to the cash balance format are overfunded, funding is not much of an issue in the short run. But if every employee who was offered a lump sum in a cash balance plan took it, the plan would be underfunded.

The backloading rules of *section 411(b)*, which cause complications for cash balance plans, are also believed to be avoided by the NationsBank [*1109] definition of normal retirement age. *Section 411(b)* prescribes minimum accrual requirements designed to prevent defined benefit plans — which in their conventional forms tend to be backloaded — from being too backloaded. It seems ironic that cash balance plans, which are more frontloaded than conventional defined benefit plans, should have trouble satisfying rules against too much backloading, but they do.

Cash balance plans generally strive to meet the so-called 133 percent rule of *section 411(b)(1)(B)*, which says that benefit accrual for any one year cannot be more than one–third greater than it was for the year before. *Section 411(b)(1)(B)* also speaks of the calculation of an accrued benefit payable at normal retirement age. Basically, the law does not pay any attention to backloading beyond normal retirement age. So NationsBank hopes to accrue benefits consistently with the backloading rules for each participant's first five years of service, and then backload as much as it wants after that point in time.

At this juncture, some of our non-specialist readers may be wondering whether pension practitioners ever think about concepts like substance over form or legislative intent. The answer is no, and that answer holds on both the private and government sides of the equation. A comparison is useful. About a decade ago, government officials were flummoxed when a large company figured out how to obtain the reserve method for its self-insured medical benefits by putting them in an employee stock ownership plan. (See Tax Notes, Dec. 10, 1990, p. 1165.) The IRS response, since 1992, has been not to issue determination letters to those plans. *(Rev. Proc. 99–6, 1999–1 IRB 187.)* It took a long time just to get to a point where the IRS refused to issue determination letters. The IRS is, however, still issuing determination letters to cash balance plans.

Affirmative Whipsaw

Some employers make affirmative use of the so-called whipsaw resulting from Notice 96–8, because it, when combined with a low retirement age and the cash balance mechanism, can produce results that are not so bad from the employer's point of view. Thus another tactic for limiting the employer's liability to older workers is seen in the ITT Educational Services, Inc. cash balance plan, which uses a combination of a low normal retirement age, a high interest credit rate, and a steeply graduated pay credit rate for a result that can be read to discriminate against older employees.

The ITT Educational Services cash balance plan has a normal retirement age of 55. The plan features steeply

graduated pay credits based on age and service, ranging from 2 to 12 percent and a fixed interest credit of 8 percent. When calculating the actuarial equivalent of a participant's normal retirement benefit for purposes of payment of a lump sum before the participant reaches age 55, the plan will accrue interest credits to age 55. When, in so doing, the plan projects accrued benefit out to normal retirement age and discounts it back at the *section 417(e)* rate, the required discount rate that it would be using is the 30–year Treasury rate, roughly 5 percent, so there is the so–called whipsaw right there.

The key to the age discrimination inherent in this formula is the use of an interest credit higher than the *section 417(e)* rate, and the accrual of interest credits to age 55 when determining lump sums. Here the huge interest credit overwhelms the effect of the graduated pay credits when it is combined with a low retirement age. The result is that a departing younger employee would receive a lump sum exceeding his hypothetical individual account, because of the low *section 417(e)* discount rate, while a departing older employee would be limited to his hypothetical individual account, because of the lower retirement age. The employer still incurs the effect of the whipsaw on the lump-sum payouts to younger employees, but incurring it is a way to raise payout to younger employees while the low retirement age cuts off older employees.

As explained previously, there is nothing wrong with a normal retirement age of 55 per se. The way for the government to go after this would be with a straightforward age discrimination inquiry into cash balance plans. Readers will recall that the government's only utterance on the age discrimination question was contained in an ineffectual preamble to a set of irrelevant regulations.

The preamble to the proposed 1991 nondiscrimination rules contains the IRS's only statement thus far about the age discrimination question raised by cash balance plans. The preamble states: "The fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation will not cause a cash balance plan to fail to satisfy the requirements of *section 411(b)(1)(H)*, relating to age–based reductions in the rate at which benefits accrue under a plan." The rules in question, promulgated under *section 401(a)(4)*, are designed to prevent too much discrimination in favor of the highly paid, making this sentence obiter dicta.

— Lee Sheppard

**************** End of Document ****************