## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TIMOTHY D. LAURENT** | **:** | |
| | **:** | |
| **On behalf of himself and all** | **:** | |
| **others similarly situated,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | **Civil Action No. 05-1291 (PLF)** |
| **v.** | **:** | |
| | **:** | |
| **PRICEWATERHOUSECOOPERS LLP,** *et al.*, | **:** | |
| | **:** | |
| **Defendants.** | **:** | |
| | **:** | |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
### THE FIRST AMENDED CLASS ACTION COMPLAINT

Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20036
Phone: (202) 243-1000
Fax:    (202) 243-1001

August 29, 2005         Attorney for the Plaintiff and the proposed Class

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………… 1

ARGUMENT……………………………………………………………………… 9

I.    The Complaint States Valid Claims For Relief Under Counts One Through Five Relating To The RBAP's Violation of ERISA's Core Defined Benefit Pension Plan Standards………………………………………………………..…..  9

    A.    Count One – Lump-Sum Cash-Outs/Other Pre-Retirement Distributions..12

        1.    Liability based on an age 65 normal retirement age…………………….. 12

        2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP……………………………………... 13

    B.    Count Two – Reduction in Accrued Benefits on Account of Age.................. 17

        1.    Liability based on an age 65 normal retirement age…………………... 17

        2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP……………………….……………… 19

    C.    Count Three – Reduction in Rate of Benefit Accruals on Account of Age.. 19

        1.    Liability based on an age 65 normal retirement age. ……………..…… 20

        2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP…………………………………….. 25

    D.    Count Four – Unlawful Backloading of Benefit Accruals…………………. 26

        1.    Liability based on an age 65 normal retirement age…………………... 27

        2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP………………………....……………. 30

    E.    Count Five – Forfeiture of Normal Retirement Benefit…………...……… 31

II.    The Complaint States Claims Arising Out Of The Partners' Income Discrimination-Maximization Scheme. …………………………………..……………………. 33

    A.    Count Six – Income Discrimination by the Plans…..………………….... 33

**B.    Count Seven – Interference with Pension Rights by PwC**..………..………... 36

**III.    The Complaint States Claims Arising Out Of The Design And Implementation Of The RBAP's "Participant-Directed" Investment Crediting Rate Feature**...………... 37

**A.    Count Eight – Failure to Provide an Objective Benefit Formula**…………... 37

**B.    Count Nine – Anti-Cutback Violations**..………………………………….. 39

**C.    Count Ten – Fiduciary Breaches in the Selection and De-Selection of Investment Experience Choices**..……………………………...………….... 40

**IV.    Plaintiff Has Standing To Bring Suit On Behalf Of The Plans**..………..…..…... 42

**V.    There Is No Statute Of Limitations Issue Here**. ……………..………..………. 44

## <u>INTRODUCTION</u>

Relying on an approach characteristic of the corporate tax shelter schemes it "regrettably" devised and sold clients at about the same time,[1] Defendant PricewaterhouseCoopers LLP ("PwC" or the "Firm") designed for its partners effective July 1, 1994 a uniquely aggressive deferred compensation scheme premised on the use of three of its ERISA-governed employee benefit plans (the "Plans") – a defined benefit "cash balance" pension plan (the "Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP" or "RBAP") and two defined contribution 401(k) plans (the "primary" and "segregated" "401(k) Plans").  Similar to senior executives at other firms who implemented their own aggressive compensation-maximizing strategies, PwC's partners crossed the line from mere profit maximization to illegality.[2]

Plaintiff Timothy D. Laurent, a former PwC employee and a participant in the RBAP and primary 401(k) Plan, has filed an eleven-count First Amended Class Action Complaint (the "Complaint" or "Compl.").  Plaintiff's Complaint demonstrates that as written and administered by PwC's partners, the Plans:

- Unlawfully discriminate against rank-and-file PwC employees in contributions and benefits in violation of Internal Revenue Code ("Code") "nondiscrimination" standards as incorporated by reference into the Plans;

- Violate standards that regulate pension plan benefit accruals; and

- Cause PwC employees to forfeit millions of dollars of benefits to which they are legally entitled.

---

[1] Testimony of Richard J. Berry, Senior Tax Partner, PricewaterhouseCoopers LLP, before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, November 18, 2003 ("regrettably our firm became involved").

[2] Two essential background facts that may be helpful to bear in mind and which were probably *sine qua nons* for the alleged scheme to "work" as well as it has until now: (1) PwC is a closely-held partnership, Compl. ¶ 21, that can (2) shield its internal operations from public view.  It does not, for example, offer interests in the Firm for sale to the public and hence is not required to make disclosures to the Securities and Exchange Commission and the public concerning its internal operations.

PwC and seven other PwC-related entities – the three Plans, their Administrative Committees and PwC's Board of Partners and Principals (the "Board")[3] – have moved to dismiss (Doc. 9), arguing failure to state a claim under Counts One through Ten and lack of standing to bring Count Eleven (and Count Ten).  Mtn. at 2-4; Mem. at 2.[4]  PwC's motion has no merit and should be denied in its entirety.

*  *  *

PwC extols the supposed virtues of the RBAP, complaining that "[w]hile plaintiff's Complaint spins out an array of convoluted and complex theories to support his claims . . . . The RBAP [is] a highly desirable form of pension plan . . . ."  Mem. at 1.

The RBAP *is* indeed desirable – for PwC **partners**.  However, it is not desirable for ordinary workers.  The Complaint shows how the Firm meticulously crafted the RBAP and the 401(k) Plan instruments to provide partners the maximum amount of tax-sheltered retirement benefits allowed by law, while calibrating benefit formulas to provide rank-and-file employees with only the bare minimum thought necessary to maintain the tax-qualified status of the plans.  While this was an approach the partners were free to adopt in principle, they went overboard.  The Plans each contain two different and very unequal benefit structures – a secret one for partners, and a second one, which rank-and-file employees and the IRS were affirmatively led to believe is the benefit structure applicable to *everyone*.  In fact, the two benefit structures are the antithesis of "separate but equal":  they provide partners with grossly disproportionate contributions and benefits, in violation of both ERISA § 510, 29 U.S.C. § 1140, which prohibits

---

[3] The remaining, individual current or former PwC partner-Defendants are expected to join in the entity-Defendants' motion when they respond to the Complaint on or before September 6, 2005.  References to "PwC" include or may include all or some PwC-related Defendants other than PwC itself, whether entities or individuals, as applicable and should be apparent from context.

[4] Reference to Defendants' "motion" should be construed as applying to their motion, memorandum of law in support, or both.  The motion is referred to as "Mtn."  The memorandum is referred to as "Mem."

discrimination that interferes with participants' attainment of benefits (Count Six), and the explicit terms of the Plans that specifically incorporate Code standards (Count Seven).

**Under the RBAP**, the disparities are so great that a partner with a draw of $200,000-$300,000 often earns benefits of $50,000 or more, *see* RBAP §§ 7.3-7.4, while a rank-and-file employee earning $50,000 typically accrues a benefit of $2,500 in a year, RBAP §§ 2.15.[5]  This clearly disproportionate benefit accrual pattern – approximately 20% of pay for partners and 5% of pay for employees – is, however, concealed from both participants and the IRS through definitional and other drafting innovations, Compl. ¶ 62 – as well as by the fact, as noted *infra* n. 2, that PwC, a closely-held partnership, need disclose virtually nothing to the public or regulators about its internal operations or finances.

**Under the 401(k) Plans,** there are also two separate and very unequal benefit formulas, one for partners and a much more mundane formula for the rank-and-file, also carefully concealed from regulators and participants.  Partners, who are permitted to contribute up to the maximum allowed by law, are rewarded with a 200% Firm matching contribution <u>every year</u> they participate.  Compl. ¶ 41.  Rank-and-file employees get the same deal only in the first *month* they participate – after that, the match drops to 25%.  *Id.*  To make *that* "work" under the Code and the related provisions of the Plans, PwC resorted to plain class discrimination.  It created two identical 401(k) plans:  a real one (the "primary 401(k) Plan") for almost everyone in the Firm and then a kind of off-shore or off-balance sheet plan (the "segregated 401(k) Plan") where the Firm parks its lowest paid, lowest contributing employees.  This makes the contributions made by and on behalf of the partners under the primary 401(k) Plan *look* less discriminatory when

---

[5] For convenience, the parties use the identical acronym shorthand "RBAP" to refer both to the employee benefit plan known as The Retirement Benefit Accumulation Plan of PricewaterhouseCoopers LLP, and the RBAP written plan instrument attached to PwC's motion to dismiss (Ex. C).  They are not, as explained below, one and the same thing.

compared to contributions made by and on behalf of rank-and-file employees – though in fact nothing has changed but the optics. Compl. ¶ 53-55. Research reveals no instance of an abuse of ERISA and the Code so basic that the very *existence* of a plan (the segregated 401(k) Plan) dispositively establishes the sponsor's bad faith.

PwC's defense to this aspect of Plaintiff's Complaint is wholly technical and insubstantial: it is contained, as to Count Seven, entirely in one footnote. Mem. at 28-29, n.19. (On either side of that footnote, PwC devotes five pages to an argument Plaintiff expressly does not make: *i.e.,* that Defendants should be held liable for violating provisions of the Tax Code. Plaintiff contends that Defendants are liable *under ERISA* for violating the *terms of the RBAP and 401(k) Plans* that incorporate by reference certain Tax Code standards. *Compare* Compl. ¶¶ 43-45, 172, 182 with Mem. at 27-31.) PwC challenges neither the facts nor Plaintiff's contention that it is violating the law. Instead, PwC's defense is that no matter what it is doing to the rank-and-file or the taxpaying public (which heavily subsidizes the Plans), *there is not a thing Plaintiff or this Court can do about it,* as this is a matter for the IRS and the IRS alone. In Part II, Plaintiff shows that PwC is wrong. For now, however, Plaintiff emphasizes that PwC does not and cannot challenge a single one of the Complaint's factual allegations concerning this income discrimination scheme.[6] PwC's failure to rebut or even acknowledge any of the details of this scheme as Plaintiff has described it (with repeated citation to Defendants' own documents) is a

---

[6] PwC's failure to take issue with any of Plaintiff's allegations regarding its discrimination-maximization scheme is not because this is a Fed. R. Civ. P. 12(b) motion and PwC is precluded from challenging those averments: to the contrary, PwC puts the Court on notice, see Mem. at 37 n.24, that the Firm is not bound by the rules "ordinarily" governing motions to dismiss whenever, in its view, it believes it has been accused of something that is "demonstrably false." PwC has demonstrated that it will rebut "false" factual allegations with whatever materials it has at its disposal, whether admissible under the Federal Rules of Evidence or not, and without the need for authentication. Mem. at 37 n.24 & Exhibit G (although "ordinarily" PwC "would accept as true on a motion to dismiss" the Complaint's factual allegations, when "in fact" PwC believes an allegation is "demonstrably false" it will not accept that allegation; here attaching a "Financial Well-Being" newsletter that it thinks rebuts the facts alleged in Count Eleven concerning its imprudent investment of plan assets).

strong statement of the Complaint's accuracy.[7]

Nor does PwC argue that what it is doing is actually lawful.  The Firm's repeated suggestion, *see* Mem. at 1, 6 & n.3, 12-13, and 24, that the IRS determination letters it received for the RBAP found or imply no illegality in this regard is just more legerdemain.[8]  The 1996 RBAP IRS letter addressing the nondiscrimination requirements expressly states that "[c]ontinued qualification of the plan under its present *form* will depend on its *effect <u>in operation</u>.*"  Mem., Ex. A (emphasis added).  Plaintiff's whole point is that through ruses the Plans in *form* appear compliant but *in substance* are not – which is precisely IRS's concern in these kind of cases.[9]  Even as to form, there is no suggestion that the IRS reviewing agent assigned to this matter successfully fathomed the intricacies of the 250-page RBAP.  To the contrary, the "determination" letter PwC attaches is cursory, conclusory and otherwise entirely non-specific.  Particularly after the Supreme Court's decision in *U.S. v. Mead Corporation,* 533 U.S. 218 (2001), such letters are, except for internal IRS purposes, meaningless.[10]  Even before *Mead,* the

---

[7] The lengths to which PwC goes to evade the facts simply highlights them.  PwC must be aware that it looks bad to have a second 401(k) plan that exists solely to ensure that the lowest paid workers don't count so it avoids discussing not only the content of Plaintiff's nondiscrimination allegations but the very fact that the 401(k) Plans figure into them at all or are the subject of the unrelated plan asset fiduciary breach claims in Count Eleven.  From word one through page 6 of its brief PwC addresses the Court about this case as if Plaintiff's Complaint exclusively involved the RBAP (and this is not merely through omission).  After a glancing reference on page 6, the first and only focused discussion of the 401(k) Plans reads as follows:  "Although naming the 401(k) Plans as Defendants, Counts One [through] Five [and] Eight [through] Ten of [Plaintiff's] complaint relate exclusively to the RBAP.   Plaintiff *briefly mentions* the 401(k) Plans in Counts Six, Seven, and Eleven."  *Id.* at 7 n.5 (emphasis added).  "[B]riefly mentions?"  The *third paragraph* of the Complaint specifically alleges that the segregated 401(k) Plan was "***integral*** to the income discrimination scheme alleged herein," Compl. ¶ 3 (emphasis added); the discrimination in those Plans is treated in detail in 35 paragraphs in the body of the Complaint, *see id.* ¶¶ 19-55; and that discrimination is the direct and explicit concern of Counts Six and Seven.

[8] PwC did not attach and does not reference any such letters being received for either *401(k) Plan*.  If it has any such letters it wishes to present, Plaintiff will be happy to discuss them in cross-motions for summary judgment.

[9] *See, e.g.,* IRS Discrimination Scheme Mem., Compl. ¶¶ 48-49 & n.17 ("plans may violate the nondiscrimination requirements of the Code even though they ostensibly satisfy certain provisions in the nondiscrimination regulations").

[10] *See, e.g., Matz v. Household International Tax Reduction Investment Plan,* 265 F.3d 572, 574 (7th Cir. 2001) (explaining that after *Mead* whether deference is owed an informal IRS position not subject to formal notice and comment "turns on the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control").

courts generally gave no weight whatsoever (in ERISA actions, in particular) to a determination letter like this one, that does not even purport to state *a basis* for its "determination."[11]  The IRS itself endorsed that lack of deference.[12]  Finally, the letters here also must be disregarded for the related reason that PwC chose to not attach its application, correspondence and other written representations that it made to the IRS.  From what we know *was* presented or likely presented to the IRS, the Court can have little confidence that the IRS reviewing agent had the slightest idea what he was dealing with.[13]  Here are the facts:

     **It is _fact_** that the RBAP plan instrument falsely presents the Plan as having *one* formula applicable to rank-and-file and partner participants alike.  RBAP § 2.15.

     **It is _fact_** that the RBAP partner formula is buried 50 pages away under deceptive, anodyne headings.  Compl. ¶ 62 (discussing RBAP Art. 7, §§ 7.3-7.4).

     **_It is fact_** that the RBAP partner formula is designed to maximize partner pension benefits by taking the statutory dollar limit and working backwards to determine the amount of annual accruals necessary to get there.  But the formulas used to derive the annual accruals are so complex and impenetrable that only an experienced actuary could decipher their substance. Compl. ¶¶ 60-61; RBAP §§ 7.3-7.4.

     **It is _fact_** that the RBAP summary plan description ("SPD") falsely implies that partners' benefits are calculated the same way rank-and-file employees' benefits are.  In the SPD, rank-

---

[11] *E.g., Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*, 980 F.2d 465, 469 (7th Cir. 1992) (determination letter seemingly approving COLA elimination entitled to no deference in ERISA action where it included no "discussion of the reasoning employed by the agency in reaching its conclusions"); *Esden v. Bank of Boston*, 229 F.3d 154, 175 (2nd Cir. 2000) ("We find no reason to defer to a determination letter that (a) is in part based on contradictory and misleading representations submitted by the applicant..., and (b) did not consider the issue raised by the case"); *Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*. 221 F.3d 1235, 1252 (11th Cir. 2000) ("Because it does not specifically address the issue at hand, the IRS letter is not owed any deference").

[12] *E.g.,* Statement of Stuart L. Brown, Chief Counsel, Internal Revenue Service, before the Senate Committee on Health, Education, Labor and Pensions at 11-12 & n.17 (Sept. 21, 1999) (*citing Hickey*).

[13] *See also* Doc. 13, Pls. Mem. in Support of Mtn. for PSJ at 42-44 (presenting statistics and other data regarding the huge volume of plans a small number of reviewing agents must process).

and-file participants are told only that certain provisions of the Plan "do not apply" to partners. *See, e.g.,* 2004 RBAP SPD at 3 ("While partners participate in the plan, due to the nature of the partner compensation and benefits structure, certain provisions of the plan described in this SPD . . . do not apply to them.  Information on those matters is covered in separate annual memoranda to partners").  Participants would have had no way of knowing that the provisions that did not apply *were the benefit calculations themselves.*[14]

Given these circumstances, PwC's suggestion that the Court infer that the Plans must be lawful *because no one has ever filed suit before,* including the IRS, *see* Mem. at 1, is the opposite of "*connectedthinking." *Cf.*  http://www.pwc.com/us/eng/main/home/index.html.[15]

* * *

It was essential to PwC's discrimination-maximization strategy to find a way to keep the defined benefit plan's rank-and-file benefit as low as possible:  that is where the "cash balance" formula and nearly-unique definition of "normal retirement age" come in.  As a PwC actuary told other actuaries at a 1998 conference, the cash balance format provides "an advantage as it masks a lot of the changes . . . .  There is very little comparison that can be done between the two plans [the prior traditional defined benefit plan and a subsequent cash balance plan]."  *Wall Street*

---

[14] Similarly, the 401(k) Plan SPD does not describe the different match structures for rank-and-file employees and partners.  In fact, the SPD does not describe the match structure for partners at all.  Instead, it says: "Due to the nature of the partner compensation structure, certain administrative procedures described in this Summary Plan Description (SPD), primarily those relating to earnings definitions, enrollment, and timing of elections and contributions, do not apply to partners.  Instructions on these procedures are covered in separate annual memoranda to partners."  2004 401(k) Plan SPD at 3.  The failure to describe the different partner contribution scheme has nothing to do with "the nature of the partner compensation structure" and everything to do with the scheme to discriminate itself which depended on keeping rank-and-file employees as well as government regulators in the dark. .

[15] Without citation or further specificity, PwC says:  "Plaintiff alleges that certain plan features utilized in the RBAP have been the subject of publicity, and in some cases criticism, for years."  Mem. at 1.  The only things to which PwC can be referring are:  (1) the RBAP's nearly-unique 5-years of service "normal retirement age" -- which was indeed the subject of publicity and criticism, Compl. ¶ 94 n.30, albeit in specialized trade publications, not the *Washington Post* (and, as discussed below, the RBAP SPD assured participants that normal retirement was *age 65*)**;** and (2) the RBAP's unprecedented "participant-directed" 401(k)-style feature by which participants are required to select hypothetical investment options the "return" on which is "applied" against their hypothetical cash balance "account."  There was no publicity or disclosure of the two-tier benefit structure or its shocking disparity of benefits and contributions.

*Journal*, "Actuaries Become Red-Faced Over Recorded Pension Talk," May 5, 1999, Compl. ¶ 5. But it is the RBAP's purported definition of "normal retirement age" that actually delivers the *coup de grâce*, gutting ERISA's key defined benefit plan protections and saving the partners tens of millions of dollars otherwise owed to RBAP participants.

As Plaintiff discusses in more detail in his pending motion for partial summary judgment under Counts One through Four (seeking a declaration that a 5-years of service normal retirement "age" for the RBAP is invalid), § 2.32 of the RBAP plan instrument purports to define the "normal retirement age" of employees covered by the Plan as the date each PwC employee completes 5 years of employment with the Firm. PwC employees, of course, do not normally "retire" after working for 5 years. Nevertheless, PwC contends that the normal retirement age of employees covered under the RBAP is the date each employee completes 5 years of employment with PwC – **on the sole basis that PwC *says* so** in the Plan instrument. PwC has *admitted* (in a 1999 letter after word of this extraordinary definition was leaked to the pension media) that it defined "normal retirement age" in this manner because it allows the RBAP to pay smaller benefits to rank-and-file employees than would be required if the Plan adopted a traditional normal retirement age of age 65. *See* Doc. 14, Ex. 9; Compl. ¶¶ 103-07.[16]

PwC does not dispute that, if the normal retirement age is age 65, then Plaintiff states a valid claim (indeed, has established *liability*) under Count One (improper lump sum calculations; forfeiture of vested benefits). Mtn. at 2-3; Mem. at 14-15. A normal retirement age of age 65 also significantly – Plaintiff contends, fatally – undermines PwC's defenses with regard to Counts Two through Four (unlawful age discrimination and backloading of benefit accruals). However,

---

[16] In legal terms, the fictitious retirement age allows PwC to effectively treat the RBAP as a "defined contribution" plan for ERISA purposes, which allows the RBAP to sidestep the more stringent requirements that apply to plans of the "defined benefit" variety. Nevertheless, PwC concedes that the RBAP is in fact a defined benefit plan. Every federal Court of Appeals that has addressed the issue has held that a cash balance plan is required to comply with ERISA standards that apply to defined benefit plans: no plan term can change that.

Plaintiff also demonstrates that these Counts – like all of the other Counts in the Complaint – state valid claims *regardless* of the RBAP's normal retirement age.  In other words, even if the Court assumes normal retirement age is 5 years of service (or some other age besides age 65), the Complaint states a valid claim under all Counts.[17]

## ARGUMENT

### I.    THE COMPLAINT STATES VALID CLAIMS FOR RELIEF UNDER COUNTS ONE THROUGH FIVE RELATING TO THE RBAP'S VIOLATION OF ERISA'S CORE DEFINED BENEFIT PENSION PLAN STANDARDS.

If, as Plaintiff contends, normal retirement age under the RBAP is age 65, PwC appears to concede that Plaintiff states a valid claim for relief under Count One. Mem. at 14-17.  (Indeed, PwC would be all but forced to concede *liability*, with only the proper interest rate left to be determined.)  A normal retirement age of 65 also provides more than sufficient grounds to withstand PwC's motion to dismiss Counts Two through Five.

If normal retirement age under the RBAP is 5 years, Counts One through Five still state claims for relief because of the unique nature of the RBAP's benefit formula.

*    *    *

As a threshold matter, Plaintiff contends that the normal retirement age under the RBAP is age 65 rather than 5 years of service.  His arguments in support of this position are spelled out at length in the Complaint and in his brief in support of his pending motion for partial summary judgment, Doc. 13, and are not repeated here.[18]

---

[17] Defendants' statute of limitations defense to Counts One through Nine and standing challenges to Counts Ten and Eleven have no merit; all other challenges are dealt with along the way and also shown unavailing.

[18] Plaintiff, does, however, respond to **PwC's incorrect, repeated suggestion that the IRS determination letters, which do not reference the Plan's normal retirement age, provide it with some kind of "pass."**  If PwC were really interested in obtaining the IRS' studied views on its extraordinary, one-in-30,000 defined benefit plan definition of normal retirement age, it would not have done what it did – *i.e.*, sneak it by an overworked and unsuspecting IRS reviewing agent sitting in a cubicle in Cincinnati who follows a checklist that does *not* include "make sure applicant is not attempting to turn statute on its head."  PwC knew this was not an even remotely valid theory.  Thus, neither before or after the RBAP's effective date of July 1994, or before marketing the 5 year

However, Plaintiff draws to the attention of the Court an additional reason why, for purposes of this opposition, the normal retirement age under the RBAP must be assumed to be age 65 throughout the relevant time: because **the RBAP's SPDs say so.**  Courts are in near unanimous agreement that when there is a discrepancy between SPD and the plan instrument itself (which few participants ever see), the language of the SPD governs.  *E.g., Whiteman v. Graphic Communications International Union Supplemental Retirement and Disability Fund,* 871 F. Supp. 465, 467 (D.D.C. 1994).[19]  That is precisely the situation that obtains here.

PwC has not made available to counsel or the Court all of the RBAP's SPDs, dating back to 1994.[20]  However, the Complaint alleges that "the RBAP's Summary Plan Descriptions at least since 1999 (1999, 2001, 2003 and 2004) state that **normal retirement age is *age 65*.**"  Compl. ¶ 88 (emphasis in the original).  The conflict is clear:  the RBAP 1999-2004 SPDs' representations of age 65 as the RBAP's normal retirement age clearly conflict with, and hence

---

retirement age concept to third-party clients, did PwC seek to alert the Department of Treasury or the IRS National Office of its view (and seek some form of ruling, in the form of a revenue ruling or private letter ruling) that it was possible to define 5 years of employment, regardless of age, as the RBAP's normal retirement age. Compl. ¶ 94. PwC wrote regulators in September 1999 about the matter only after the practice of using a 5-year retirement age was exposed in the pension press in a series of embarrassing articles – including one in which one expert aptly said the 5 year rule "guts" the statute – that reported that regulators were concerned and might investigate and take action to halt the practice. Moreover, even if one pretends, as PwC urges, that the IRS letters reflect the agency's determination that the 5-years of service or age 65 whichever is earlier definition "met the requirements of the Tax Code," Mem. at 12, it should be obvious what a red herring that is. Plaintiff does not contend that this definition is always *per se* unlawful, only that it is unlawful *in the context of the RBAP.* When a plan sponsor submits a determination letter application to the IRS, the *IRS accepts the representations* made in the application for purposes of granting that letter. *See Morrison v. Int'l Programs Consortium, Inc.,* 253 F.3d 5, 9-10 (D.C. Cir. 2001). The IRS does not look behind the representations, but warns the applicant that **the determination letter is only as good as the representations made.** *See* IRS Pub 794. Thus, PwC is correct (minus the implication of its verb choice) when it says "plaintiff resorts to asserting that PwC misrepresented the RBAP's normal retirement age to IRS regulators." Mem. at 12. PwC did exactly that and PwC is wrong to accuse Plaintiff of "resort[ing]" to making an allegation that PwC does not and cannot dispute: *i.e.,* that it is not normal for PwC employees to retire after working for the Firm five years regardless of their age. **That** is the misrepresentation to the IRS. The elaborate charade of projecting forward to a necessarily already attained normal retirement age of 5 years of service spelled out in the RBAP plan instrument, Compl. ¶¶ 94-97, pales in comparison.

[19] *Accord Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 378 (3d Cir. 2003) (holding that where a SPD conflicts with plan language, the SPD will control) (collecting cases).

[20] For those years, Plaintiff concedes that the issue cannot now be decided (on this record) in Plaintiff's favor. However, more importantly, neither is the record susceptible of disposition for those years on this claim in Defendants' favor. Defendants cannot establish that Plaintiff will be unable to prove that the SPDs for those years state an age 65 normal retirement age.

control over, the RBAP plan instrument's § 2.32 definition ("[t]he *earlier* of the date a Participant

attains age 65 *or* completes five (5) Years of Service").[21]

Instead of addressing the conflict, PwC responds by setting up a straw man, insisting that

Plaintiff "bases [his] claim for benefits on alleged 'misrepresentations' in the SPDs."  Mem. at

13-14 &n.14.  That is absurd:  Plaintiff says the SPDs' statements of the RBAP's normal

retirement age are *correct,* not that they are false or misleading.  He does not bring a

misrepresentation or fiduciary breach claim premised on the SPDs being *false*; he brings a claim

premised upon them being *true.*[22]  The Third Circuit in *Burstein v. Ret. Account Plan for*

*Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365 (3d Cir. 2003) explained

how this distinction makes all the difference in the world.  *Id.* at 381-82.  This dispatches PwC's

related objection that Plaintiff has failed to allege and prove reliance:  as *Burstein* explains, a

claimant seeking to enforce the terms of an ERISA plan does not have to demonstrate reliance on

the governing SPD in order to recover his benefits due thereunder.  *Id.  Accord Whiteman*, 871 F.

Supp. at 466-67 (awarding disability benefits based on discrepancy; no reliance required).[23]

---

[21] Without denying what is on the printed page, PwC attempts to belittle *the placement* in the identically worded 1999 and 2001 SPDs of the statement as to the normal retirement age. Mem. at 13. But the SPDs state the Plan's normal retirement age *exactly where and how* the Department of Labor's regulations *required* the disclosure to be made.  *See* 29 C.F.R. § 2520.102-3(t)(2) (model statement). The regulations, which were promulgated before the 1999 and 2001SPDs were drafted, impose the affirmative duty to "also include a statement describing the plan's normal retirement age, as that term is defined in section 3(24) of the Act." 29 C.F.R. § 2520.102-3(j)(1).  Certainly PwC is not saying it violated the law:  it used the SPDs *to comply with its legal obligation under the regulations to state the Plan's normal retirement age.*  The unclean hands doctrine or other principles of estoppel should thus deprive PwC of the ability to deny the 1999 and 2001 SPDs' statement of the Plan's normal retirement age are somehow ineffective.  Similarly unavailing is the argument that the Court should disregard the 2003 and 2004 SPDs (where the age 65 normal retirement age is even more forceful presented) because Plaintiff "left . . . the Plan in 2002." Plaintiff still has not "left . . . the Plan": it has yet to pay him the benefits he is due.

[22] Curiously, PwC says that "Plaintiff does not allege that he received less than what the terms of the RBAP provided he would receive," Mem. at 6-7, that is what he alleges:  Plaintiffs' benefits under the RBAP as amended to comply with the statute would be far greater in several ways if calculated based on an age 65 normal retirement age.

[23] Contrary to PwC's suggestion, Mem. at 14 n.9, it is irrelevant that Plaintiff had the theoretical right ask for and "read" a copy of the 250-page byzantine RBAP plan instrument to learn that it contained a different definition of normal retirement age.  See Germany v. Operating Engineers Trust Fund, 789 F. Supp. 1165, 1172 (D.D.C. 1992) (rejecting nearly identical argument as to conflicting subrogation clauses).  If an employee were expected to request and read the entire plan to obtain an understanding of benefits provided, then there would be no need to provide a

A.    **Count One – Lump-Sum Cash-Outs/Other Pre-Retirement Distributions.**

In Count One, Plaintiff alleges he was paid only an amount equal to the nominal balance in his hypothetical cash balance account rather than an amount equal to the actuarial present value of his vested accrued benefit.  Compl. ¶ 126-130.  If true, this results in a *per se* violation of ERISA § 203(a)(2), 29 U.S.C. § 1053(a)(2), and IRC § 411(a)(2), which provide that a participant who has satisfied a plan's vesting requirements has a nonforfeitable right to 100% of the participant's "accrued benefit" derived from employer contributions.

1.    **Liability based on an age 65 normal retirement age.**

As Plaintiff explains in greater detail in Section I.A.2 of his motion for partial summary judgment, Doc. 13 at 21-23, ERISA requires that a defined benefit plan – including a defined benefit plan of the "cash balance" variety such as the RBAP – must, as an initial matter, always express a participant's "accrued benefits" under the plan in the form of an annuity commencing at normal retirement age.  The statute does not require that benefits can only be *paid* in that form. However, payment in an alternative form cannot result in a forfeiture of vested benefits. According to ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), and Code § 411(c)(3), if a plan pays benefits in a form other than an annuity commencing at normal retirement age – for example, a single lump sum cash-out payment – the alternative payment can be no less valuable than the actuarial present value of the normal retirement annuity.  This is the enforcement mechanism to ensure that participants do not forfeit benefits to which they are entitled under ERISA merely because they receive benefits in a form other than a normal retirement annuity.

To prove that a particular distribution complies with ERISA § 204(c)(3), a cash balance plan must always first determine what a participant's benefit would be if paid in the form of an

---

summary plan description.  *Id.*  Equally unavailing then is PwC's closely related contention that the SPDs' disclaimer is controlling.  Courts uniformly reject this defense.  *E.g.*, Burstein, 334 F.3d at 379; *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 908 (2d Cir. 1990).

annuity commencing at normal retirement age.  Otherwise, it would be impossible to demonstrate that the payment was the "actuarial equivalent" of this normal retirement annuity. PwC did not make this calculation.  More specifically, in determining the amount of the alternative forms of benefit available to Plaintiff, the RBAP did not, as required by law, (a) calculate Plaintiff's "accrued benefit" by projecting his hypothetical account balance to age 65 using the RBAP's investment crediting rate and expressing this projected balance in the form of an annuity commencing at that age, and then (b) determine the alternative forms available to Plaintiff based on the value of this accrued benefit, using the required factors to determine actuarial equivalence as required under ERISA, the Code, and the terms of the RBAP.  The Plan's failure to conduct these required calculations – or to perform them in the manner required by ERISA, *see* Compl. ¶ 130 n.42 – and pay benefits accordingly, caused Plaintiff to forfeit a significant portion of his vested, accrued benefits.  Compl. ¶¶ 118-132.[24]

PwC's *only* counter-argument is that the RBAP is not required to project Plaintiff's nominal account balance to age 65 to determine the amount of his accrued benefit, because Plaintiff had worked for more than 5 years and thus had already attained "normal retirement age." Mem. at 14-15.   PwC contends that because Plaintiff had already attained normal retirement age, the RBAP could simply pay Plaintiff the nominal balance in his account at that time of payment. In other words, as PwC sees it, Plaintiff's *projected* benefit at normal retirement age was in fact simply his *current* account balance, because Plaintiff had reached retirement age.

But, for the reasons explained in the pending summary judgment motion and here, Plaintiff's normal retirement age under the RBAP is age 65, not the 5th anniversary of his date of

---

[24] As PwC itself recognizes, Mem. at 15, it is settled law that a cash balance plan such as the RBAP must calculate benefits in the manner described.  *See* IRS Notice 96-8, Sec. II.A; *Esden v. Bank of Boston,* 229 F.3d 154, 168 (2d Cir. 2000); *Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan,* 221 F.3d 1235, 1251 (11th Cir. 2000); *Berger v. Xerox Corporation Retirement Income Guarantee Plan,* 338 F.3d 755, 761-62 (7th Cir. 2003) (Posner, J.).

hire.  Therefore, the RBAP was required to pay Plaintiff an amount equal to the present value of his projected retirement benefit commencing at age 65, which it did not do.[25]

### 2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP.

Under the terms of the RBAP, a participant with a vested account balance in excess of $5,000 has a nonforfeitable right to leave his or her benefits in the RBAP even *after* normal retirement age, through at least age 70½ and beyond.  Compl. ¶ 131, RBAP § 2.14. 5.6(b).[26] Under ERISA and relevant case law, this *right* to leave benefits in the Plan indefinitely and continue to receive investment credits – a right promised by the Plan – must be recognized as part of a participant's "accrued benefit," and the value of the right must therefore be factored into any benefit distribution.[27]

This is the same principle that PwC acknowledges, Mem. at 16, applies with respect to the nearly identical right of participants to leave their benefits in the Plan and continue to receive investment credits *through* normal retirement age.  The rights in fact are exactly the same – the only differences being (i) the period of time over which the rights extend, and (ii) the fact that a participant's right to continue to receive investment credits through normal retirement age is

---

[25] More generally, the RBAP was required to calculate the amount of *any* benefit, in whatever form (lump sum or annuity), as the actuarial equivalent of the projected age-65 normal retirement annuity, as Plaintiff clearly asserts in the Complaint.  Compl. ¶¶ 125 and 132.  PwC does not address this contention, apparently conceding it is correct if the Court rules in favor of Plaintiff's contention regarding the proper calculation of lumps sums.

[26] Although PwC was not required to write the Plan in precisely this fashion, *see, e.g.,Berger* 338 F.3d at 762 (noting that interest credits must be promised only *through* normal retirement because the backloading rules cease to apply at that age); 26 C.F.R. ("Treas. Reg.") § 1.411(a)-11(c)(4) (permitting a plan to force out benefit distributions after the later of normal retirement age or age 62), it did.  As demonstrated below, by doing so, PwC defined Plaintiff's statutorily protected accrued benefit.  As the Supreme Court explained in *Central Laborers' Pension Fund v. Heinz,* 124 S. Ct. 2230, 2235 (2004):  "Nothing in ERISA requires employers to establish employee benefits plans.  Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan.  ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits. . . .  When Congress enacted ERISA, it 'wanted to . . . make sure that if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it.'"

[27] The value of the right to continued future investment credits under the RBAP is the present value of the expected investment return of a participant's account for his or her expected lifetime (using standard mortality tables), based on the Plan's investment crediting rate and the present value discount factors set forth in the Plan.

guaranteed under the statute, while the right to continue to receive investment credits indefinitely, even after normal retirement age, is guaranteed under the terms of the RBAP.  But these differences are irrelevant:  regardless of the period over which the rights extend or whether the rights are guaranteed under the statute or promised by the terms of the Plan, the *right to future investment credits* that accrues along with each pay credit awarded under the RBAP is an *accrued right* that is part of a participant's accrued benefit.[28]

This conclusion finds direct support in a number of court decisions that have addressed closely analogous fact patterns.  These cases involved defined benefit plans that had automatic cost-of-living adjustment ("COLA") features built-in to the normal retirement benefit promised under the plan, over and above what was required under ERISA.  The COLA features were "stapled" to the nominal benefits promised under the plans, just as the right to future investment credits is stapled to the nominal benefits promised under the RBAP.  Courts that have addressed these types of COLAs have uniformly concluded that a participant's *right* to future benefit adjustments are an *integral part of the participant's accrued benefit* – and therefore must, for example, be factored into any lump sum cash-out.

For example, in *Laurenzano v. Blue Cross and Blue Shield of Mass. Inc. Retirement Income Trust*, 134 F.Supp.2d 189 (D. Mass. 2001), the court held that "a lump sum distribution in lieu of [a normal retirement] annuity [must] include the present value of the projected COLA payments" promised under the plan:

> [T]o calculate properly the lump sum distribution, this Court holds that the Plan must project (based on reasonable actuarial assumptions) the stream of COLA payments that a participant would otherwise receive as part of his annual benefit commencing at

---

[28] The concept is that a right to future adjustments in a participant's benefit – **where the right is not conditioned on the performance of future service by participants** – has been "accrued" by the participant in the same way that the promise of a nominal dollar amount has been accrued.  *Cf. Central Laborers' Pension Fund v. Heinz,* 124 S. Ct. 2230, 2235-36 (a participant's accrued benefit under a pension plan consists of more than merely the nominal dollar amount promised under the plan).

> normal retirement age, and then the Plan must determine the present value of that
> stream of COLA payments, along with the present value of the fixed annuity
> payments, using the present value function provided in the Plan.

*Id.,* at 191, 204 (emphasis added). *See also Hickey v. Chicago Truck Drivers, Helpers &*

*Warehouse Workers Union*, 980 F.2d 465, 469 (7th Cir. 1992) ("A participant's right to have his

basic benefit adjusted for changes in the cost-of-living accrued each year along with the right to

the basic benefit. A participant's entitlement to his or her normal retirement benefit included, as

one component, the right to have the benefits adjusted pursuant to the COLA provision.").[29]

Thus, even if the normal retirement age under the RBAP is 5 years of employment, the

Plan is nevertheless bound to pay participants an amount that reflects the estimated present value

of the right to continue to receive investment credits indefinitely had they left their money in the

Plan. PwC argues that this cannot be correct because the IRS did not in Notice 96-8 require the

type of calculation Plaintiff describes. Mem. at 16. But there is a simple explanation for this: not

all cash balance plans continue to provide investment credits indefinitely even after normal

retirement age. The IRS was explaining the basic rule, not attempting to cover every possible fact

scenario.

PwC also argues that the ERISA provisions and cases Plaintiff cites in the Complaint

merely require a plan to pay the present value of a participant's account balance as projected only

*to* normal retirement age, not beyond. *Id.* But the holdings in *Laurenzano, Kohl, Hickey,* and

*Shaw* clearly are not so limited. These cases hold that a right to continued adjustments in a

participant's benefit (even *after* normal retirement age) is embedded in*,* and is therefore an

integral part of, a participant's accrued benefit to the extent the *right* to such future adjustments is

not conditioned on the performance of future services – *i.e.*, to the extent the right has been

---

[29] *See also Kohl v. Ass'n of Trial Lawyers of America*, 183 F.R.D. 475, 479-83 (D. Md. 1998) (same as *Laurenzano*);
*Shaw v. Int'l Assoc. of Machinists and Aerospace Workers Pension Plan*, 750 F.2d 1458, 1464-65 (9th Cir. 1985)
(right to future indexing part of accrued benefit in pension plan; benefits indexed to wage rate increases).

earned.

## B.    Count Two – Reduction in Accrued Benefits on Account of Age

In Count Two, Plaintiff alleges that his "accrued benefit" under the RBAP was reduced over certain periods solely on account of age, in violation of ERISA § 204(b)(1)(G), 29 U.S.C. § 1054(b)(1)(G), and Code § 411(b)(1)(G), which provide that a "participant's accrued benefit [cannot be] reduced on account of any increase in his age or service."

### 1.    Liability based on an age 65 normal retirement age.

If the normal retirement age under the RBAP is age 65, a participant's accrued benefit under the Plan is his "account balance" at any moment *projected* to age 65 and converted into an annuity commencing at that age.[30] This projected benefit – not the participant's hypothetical account balance – is the "accrued benefit" subject to testing under ERISA § 204(b)(1)(G),[31] as PwC concedes. Mem. at 17-18.

On this basis, it is clear that the RBAP discriminates based on age. Because of the nature of the projection calculation, in any period during which a participant's account balance remains unchanged from one year to the next (because his account experiences a zero net rate of return), the participant's projected age-65 accrued benefit necessarily is reduced during the period – this is mathematically irrefutable.[32] The same is true of any period during which a participant's

---

[30] *See* Section I.A.1, above. To illustrate numerically, assume a participant with a current account balance of $100 is 30 years old, the investment crediting rate assumption for the plan is 5%, and normal retirement age is age 65. On these facts, the participant's projected account balance at normal retirement age would be $100 x (1.05)$^{35}$ = **$551.60**. The participant's "accrued benefit" is this projected balance, converted into a life annuity that begins at age 65. If an annuity factor of 10 is assumed, the annual payment would be $55.16/yr for life (*i.e.*, $551.60 ÷10 = $55.61), plus the present value of the continued right under the Plan to continue to receive investment credits. *See, e.g.,* IRS Notice 96-8.

[31] *See Cooper v. IBM Personal Pension Plan,* 274 F. Supp. 2d 1010, 1016 (S.D. Ill. 2003) ("It is clear that a participant's accrued benefit, as it appears in § 204(b)(1)(G), must be measured by reference to the amount of an employee's annual benefit at age 65.").

[32] To continue the example above, if the participant's account balance remains unchanged after a year (*e.g.*, he no longer is an active employee with PwC and experiences a net zero rate of return on his deemed investments for the year), his projected account balance at age 65 would now be $100 x (1.05)$^{34}$ = **$525.33**. This is because the

account balance *drops* because of hypothetical investment losses, as well as over any period during which his account balance increases by an amount too small to offset the reduction in the projected age-65 benefit that occurs because the participant moves one year closer to age 65.[33]

PwC has two responses. First, while PwC concedes that there would be a potential age discrimination problem if the normal retirement age under the RBAP were age 65, Mem. 18, PwC protests that the RBAP does not suffer from this defect because normal retirement age under the Plan is the 5th anniversary of each participant's date of hire, not age 65. *Id.* In other words, PwC argues that its fictitious definition of "normal retirement age" effectively exempts the RBAP from the ERISA and Tax Code age discrimination rules – rules that PwC *acknowledges* apply to every other defined benefit plan and every other cash balance plan in the United States (other than the small handful of plans that may have similarly adopted PwC's fictitious retirement age). However, as demonstrated above and in Plaintiff's pending motion for partial summary judgment, the normal retirement age under the RBAP is in fact (or must, for purposes of this opposition to PwC's motion to dismiss, be presumed to be) age 65, so this defense is to no avail.

PwC makes a second argument: that the reduction in Plaintiff's accrued benefit *that PwC acknowledges may have occurred*, Mem. at 20, happened not because Plaintiff was growing older, but because of fluctuations in Plaintiff's investment credits. *Id.* This may sound good but it is wrong. As demonstrated above, the reduction occurs even if investment credits are taken out of the picture (*i.e.*, if they are assumed to be zero). As PwC acknowledges, all else being equal, a cash balance participant's projected age-65 benefit drops every year because "a 35- year-old employee will have a longer time to accrue interest (30 years) than the same account balance of a

---

participant is now age 31, so the exponent in the projection formula (which reflects the number of years from the participant's current age to age 65) is reduced from 35 to 34.

[33] If the participant's account balance drops to $95, his projected account balance at age 65 would, at age 31, be $95 x $(1.05)^{34}$ = **$499.07**. If the account balance increases to $103, the participant's projected account balance at age 65 would now be $103 x $(1.05)^{34}$ = **$541.09**, still less than his accrued benefit was at age 30.

55-year-old employee (10 years)." Mem. at 18. This reduction occurs *solely* on account of age.[34]
Defendants' motion to dismiss Count Two should be rejected.[35]

**2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP.**

Even if normal retirement age is 5 years, Count Two still states a valid claim for relief because of the unique nature of the RBAP's benefit formula. As demonstrated in Section I.A.2 above, under ERISA and relevant case law, the right to continue to receive investment credits under the RBAP for as long as a participant leaves his benefits in the Plan – promised by the Plan – must be recognized as part of a participant's "accrued benefit" in exactly the same way as the right to receive investment credits through normal retirement age. This means that, all else being equal, a participant's *total* accrued benefit (including the projected amount of future investment credits) is reduced as the participant ages. The math is exactly the same as above. Defendants' motion to dismiss Count Two should be rejected.

**C.    Count Three – Reduction in Rate of Benefit Accruals on Account of Age.**

In Count Three, Plaintiff alleges that the *rate* at which he and other participants accrued

---

[34] The reduction in the participant's accrued benefit illustrated in the example is clearly not attributable to investment losses or some other factor – **the benefit drops solely because the exponent in the projection formula is reduced from 35 to 34, which occurs solely because the participant had a birthday and is now one year closer to age 65** – *i.e.*, the accrued benefit clearly drops solely "on account of age.

[35] PwC's suggestion that Plaintiff's age discrimination claims would apply to *all* cash balance plans, PwC Mem at 19, is wrong. Under a typical cash balance plan that provides interest credits based on a fixed interest rate or a variable rate pegged to Treasury securities or a similar debt instrument, a participant's projected *net* benefit will *not* decrease merely because the participant grows older – because the account will always increase by just enough to offset the reduction that occurs because of age. For example, in a plan with a *guaranteed* fixed interest crediting rate of 5% (as opposed to a mere investment rate *assumption*), participant account balances will always increase by 5% each year. So, in an ordinary cash balance plan, the participant's balance in the examples above would always increase from $100 when he is age 30 to $105 when he is age 31. Plugging these facts into the benefit projection formula, the participant's projected account balance at age 65 would then, at age 31, be $105 x $(1.05)^{34}$ = $551.60. This is exactly the same amount as the projected balance when the participant was age 30. The new larger account balance at age 31 offsets the loss of a year of compounding that occurs because the participant grew older, thereby avoiding an impermissible reduction in the projected age-65 balance. This will always be the case under a plan that guarantees a positive interest crediting rate that is the same rate used to project the current balance to normal retirement age – a participant's account balance will always grow just enough to offset the lost value of a year of compounding as he grows older. So the violation described in Count Two is *not* a problem for most cash balance plans – just the virtually unique RBAP, with its "innovative" "second generation" design.

19

benefits under the RBAP was reduced every month he participated in the RBAP on account of age, in violation of ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i), and Code § 411(b)(1)(H)(i), which provide that "the rate of the employee's benefit accrual [cannot be] reduced, because of the attainment of any age."

### 1.    Liability based on an age 65 normal retirement age.

As discussed above, it is well settled that an employee's "accrued benefit" under a cash balance plan such as the RBAP is the employee's current account balance projected to normal retirement age and converted to an annuity commencing at that age.  The *rate* at which the employee's benefit accrues under the Plan – the "rate of the employee's benefit accrual" – is the rate at which that projected benefit accrues over time.  *See Cooper* at 1016 ("The best interpretation of this phrase is that it also refers to an employee's age 65 annual benefit and the rate at which that age 65 annual benefit accrues.")

The problem for the RBAP is that this rate decreases as employees grow older, in direct contradiction of ERISA § 204(b)(1)(H).  This is because stapled to each pay credit provided to a participant in the Plan is a promise by the RBAP that that pay credit will be supplemented (or reduced) by "investment credits" for as long as the pay credit remains in the Plan.  RBAP § 2.13(b), 2.14.  When these pay credits and the associated promises of future investment credits are **expressed together in terms of an annuity payable at normal retirement age** – age 65 in the case RBAP – a troublesome accrual pattern becomes evident:  the rate of benefit accrual varies inversely with age.[36]  The variation results solely because of increased age – age and age alone is the factor that explains the reduction.  *See* Compl. ¶¶ 148-151.

---

[36] A mathematical illustration is set forth in the Complaint.  Compl. ¶¶ 148-151.  Comparing the benefits accrued for the year by the participant's in the example, it is clear that the RBAP discriminates against older participants within the meaning of ERISA.  The two participants are identical in every respect except age.  Thus, **age is the *only* factor that explains the vastly different benefit accrual rates for the two participants:**  $42,153.65 for the younger participant and $3,890.61 for the similarly situated but older participant.

PwC has two counterarguments.  First, while PwC concedes that there would be a potential age discrimination problem if the normal retirement age under the RBAP were age 65, Mem. at 17-18, it protests that the RBAP does not suffer from this defect because "normal retirement age" under the Plan is the 5th anniversary of each participant's date of hire, not age 65. As demonstrated above and in Plaintiff's motion for partial summary judgment, the RBAP's normal retirement age is age 65, so this argument is unavailing.

PwC's second argument is that Plaintiff is applying the age discrimination test under ERISA § 204(b)(1)(H) the wrong way.  According to PwC, "the rate of the employee's benefit accrual" that is subject to testing under that provision is *not* the rate of increase in the employee's "accrued benefit" – *i.e.,* it is not the rate at which benefits accrue under the plan.  Rather, a participant's "rate of . . . benefit accrual" refers to the nominal pay credits made to the employee's hypothetical cash balance account, *as though a cash balance plan were a defined contribution plan.*[37]  Mem. at 19-20.

This contention is so contrary to the plain words of the statute and common English usage – and the bright-line defined benefit/defined contribution plan binary distinctions relentlessly drawn by the statute[38] – that it would be difficult to take seriously had two federal district courts

---

[37] "A defined contribution plan satisfies [age discrimination standards] if, under the plan . . . the rate at which *amounts are allocated to the employee's account* is not reduced, because of the attainment of any age."  ERISA § 204(b)(2)(A) (emphasis added).  *Compare* ERISA § 204(b)(1)(H), which in the case a of a *defined benefit* plan requires examination of the employee's "benefit accruals."  Three subsections within the same section of ERISA – §§ 204(b)(1)(B), (b)(1)(H) and (h) – use the term "benefit accrual."  The term has an accepted meaning under the first two subsections:  the change in a participant's "accrued benefit" – *i.e.,* the change in his projected normal retirement benefit.  *See* Treas. Reg. 1.411(b)-1(b)(2)(ii), Examples (2) and (3); *accord Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 514 (1981); 63 F.R. 68678, 68680 (December 14, 1998) ("The statutory phrase "rate of future benefit accrual" implies, on its face, that [it refers to] changes in the accrued benefits").  It makes little sense to think that the identical term has a different meaning in the third subsection – particularly when the entire section (ERISA § 204) is titled "Benefit Accrual Requirements."  If Congress had to continually reiterate that a common term possesses the same meaning in each subsection, even the most careful draftsman would be hard-pressed to enact effective legislation.

[38] *See* Part I.A.1 and A.2, Pls. Mem. in Support of Mtn. PSJ, Doc. 13.

not agreed with it.[39]  In those cases, the sponsors of the plans at issue led the courts to believe that a ruling consistent with the literal terms of the statute would doom all cash balance plans[40] – a pitch Defendants make here as well when they assert that Plaintiff's claim of age discrimination in Count Three "would apply to all cash balance plans."  Mem. at 19.  Yet, as PwC's client the Bank of America recently conceded in a case that concerns an identical claim of age discrimination under a cash balance plan modeled after the RBAP, cash balance plans can "be crafted to satisfy the defined benefit age discriminate test."  Bank Mem. in Support of Mtn. to Dismiss, Doc. 65 at 15 n.2, *Pothier infra* (citing Zelinsky, *The Cash Balance Controversy*, 19 Va. Tax. Rev. 683, 735-36 (Spring 2000)).

Though both courts expressly recognized they had defined benefit pension plans before them, the district courts in *Onan* and and *Tootle,* both likely persuaded by the misleading sky-is-falling predictions of cash balance plan sponsors (and their lobbyists), effectively legislated a fix for the sponsors that the democratic process has not yielded:  the courts ruled that defined benefit plans of the *cash balance* variety could prove compliance with age discrimination requirements by using the standards applicable to defined contribution plans instead of defined benefit plans. Although there is absolutely no basis for this in the statute, it was a "more sensible approach," explained the *Tootle* court, because:

> [a]pplying the ERISA provisions designed for traditional defined benefit plans to cash balance plans could lead to illogical results[[41]] . . . . .  The **more sensible** approach is

---

[39]  *Eaton v. Onan Corp.*, 117 F.Supp.2d 812 (S.D. Ind. 2000); *Tootle v Arinc, Inc.,* 222 F.R.D. 88 (D. Md. 2004). PwC also cites *Lunn v. Montgomery Ward Co.*, 166 F.3d 880, 883 (7th Cir. 1999) as support for its position.  But *Lunn* was narrowly focused on a specific fact pattern involving the interaction of a defined benefit and defined contribution plan under a "floor-offset" arrangement that is not relevant here.  *Lunn* does *not* stand for the general proposition that ERISA § 204(b)(1)(H) allows a defined benefit plan to be tested for age discrimination as though it were a defined contribution plan.

[40]  *See, e.g., Tootle,* 222 F.R.D. at 93 (Under plaintiff's theory, "all cash balance plans per se violate the ERISA age discrimination provision, by virtue of their design").

[41]  Plaintiff respectfully submits that the only "illogical" result is that firms who went into these plans knowing from day one that they would with justification be challenged as age discriminatory, *see, e.g.,* http://www.cashpensions.com/CB-Myths-Facts%208-16-05.pdf, will be shown to have been exceedingly "illogical"

to measure benefit accrual under cash balance plans by examining the rate at which amounts are allocated and the changes over time in an individual's account balance, as the **ERISA provisions designed for traditional defined contribution plans** would direct.

*Tootle,* 88 F.R.D. at 94 (emphasis added).[42]

The most widely cited and best reasoned District Court decision on age discrimination took a more traditional approach to statutory interpretation, and refused to "perform legal legerdemain by dodging the detail requirements of ERISA in order to save" the cash balance plan at issue in the case. *Cooper,* 274 F. Supp. 2d at 1022. In *Cooper,* the Court addressed the argument that "'benefit accrual' means something different than the term 'accrued benefit'" by focusing on simple grammatical construction of the words:

> Defendants question why Congress would use different language in succeeding subparagraphs (accrued benefit and benefit accrual) unless it intended the subparagraphs to cover different types of benefits. The answer is simple. Congress chose to be grammatically correct. The term accrued benefit in §204(b)(1)(G) means an employee's age 65 *accumulated benefit*. If Congress had used the term accumulated benefit in § 204(b)(1)(G), instead of the term accrued benefit, it would not have used the clumsy phrase "rate of accumulated benefit" in §204(b)(1)(H). Presumably, Congress would have opted for standard English and used the phrase "rate of benefit accumulation," even though it intended to cover the same type of benefit in both subparagraphs.[2]
>
> n.2. For a simpler example, consider the word popcorn. Popcorn is the word used to describe the product created by exposing corn kernels to extreme heat. If asked to draft a phrase related to the speed of this process, one would not say "rate of popcorn." Rather, to be grammatically correct, one would say "the rate corn pops."

*Id.* at 1016. Using the correct definition and facing the indisputable mathematics, the *Cooper*

---

in forging ahead, insouciant of the consequences. They are simply trying, inequitably, to use the enormity of their own folly as the basis for their entitlement to be rescued. They have no *legal* argument and have failed legislatively: they want *deus ex machina,* however they can get it. *See, e.g., Cooper,* 274 F.Supp.2d at 1022 ("[t]hese [age discrimination] requirements were in effect before [the company] considered adopting the [cash balance plan]. [The company], like many other corporate plan sponsors, proceeded with open eyes and was fully informed of the consequences of the litigation that was sure to come.")

[42] *See also Onan,* 117 F. Supp at 832-33 ("Defendants propose, and the court agrees, that in the case of a cash balance defined benefit plan, the rate of benefit accrual should be defined as the change in the employee's cash balance account from one year to the next **[even though] this method would not work for other defined benefit pension plans**") (emphasis added).

court quickly concluded the cash balance plan at issue in the case violated ERISA § 204(b)(1)(H) by reducing a participant's rate of benefit accrual with increasing age.  *Id.* at 1017.

The irony is, not only is the *Cooper* court's interpretation of the statute the only one consistent with its plain and obvious meaning, but is also is the "more sensible approach," contrary to what the *Tootle* and *Onan* courts were led to believe.  Allowing a *defined benefit* plan to use *defined contribution* plan standards to test for age discrimination – the approach adopted by *Tootle* and *Onan* – would allow blatant age discrimination with the stroke of a plan sponsor's pen in any of the existing 30,000 defined benefit plans governed by ERISA.  That is because *any* defined benefit formula can be expressed in terms of a "cash balance" equivalent:  an actuary merely converts the accrued-to-date normal retirement benefit to its current lump sum present value.[43]  Under PwC's theory, a traditional defined benefit plan that has been restated to use a "cash balance" formula could with impunity structure its benefit formula so that the rate of accrual dropped each year solely on account of age.  For instance, take the following benefit formula:  Each participant accrues an annual benefit equal to the participant's compensation *times* the percentage in the following chart based on the participant's age:[44]

| Age | Multiplier |
|-----|------------|
| 40  | 2.7%       |
| 41  | 2.5%       |
| 42  | 2.4%       |
| 42  | 2.3%       |
| 44  | 2.1%       |

---

[43] *See, e.g,* Paul Strella, *Specialized Qualified Plan – Cash Balance, Target, Age-Weighted and Hybrids*, Tax Management Portfolio No. 352-3rd ("Although most cash balance plans are designed to look like an account based defined contribution plan, *they can also be designed to look like a traditional career average pay defined benefit plan with an indexed annuity benefit,*" and vice versa) (emphasis added).  Mr. Strella, a prominent cash balance plan *proponent,* is an attorney and enrolled actuary with the Washington Resource Group of Mercer Human Resource Consulting, a global consulting firm that advises Fortune 500 companies with regard to cash balance and other plans.  *See* http://wrg.wmmercer.com/about.asp?a=wrg.

[44] For example, a 40-year old employee with a salary of $50,000 would accrue a benefit equal to $50,000 x 2.7% = $1,350.  A 45-year old with the same salary would accrue a benefit of $50,000 x 2% = $1,000.  And a 65-year old would accrue a benefit of $50,000 x .6% = $300.  The rate of benefit accrual declines *every year*.

| Age | Multiplier |
|-----|-----------|
| 45 | 2.0% |
| . . . | . . . |
| 65 | 0.6% |

Prominent employer-side cash balance *proponents* agree that under PwC's proposed approach, this benefit formula – which plainly discriminates on its face – is "lawful." *See* Barker and O'Brien, "Do Cash Balance Plans Violate the ADEA," Benefits Law Journal, Vol. 13, No. 2, at 78 and Appendix I (Summer 2000), http://www.ipbtax.com/Cash%20Bal%20Violate%20ADEA.pdf. The courts in *Tootle* and *Onan* were not presented with the *truly* "illogical" results of the snake oil they were being sold. ERISA should not be so easily hoodwinked.

In any event, even if PwC is correct that it should be allowed to test the RBAP for age discrimination based on the standards that apply to defined contribution plans, the RBAP discriminates based on age. Each benefit accrual under the RBAP consists of two parts: (i) a pay credit represented by a nominal dollar amount and (ii) a *promise* that that nominal dollar amount will be supplemented (or reduced by) investment credits for as long as the benefits remain in the plan. Using the actuarial assumptions mandated under ERISA for this purpose, *see* Section I above (requiring use of the plan's rate to project forward, and a statutory rate to discount back to the present), the present value of this *promise*, all else being equal, is always worth more to a younger participant than a similarly-situated older participant. As a result, even under PwC's proposed approach, the rate of benefit accrual under the RBAP is reduced every year as participants grow older.[45]

### 2.    Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP.

Even if normal retirement age is 5 years, Count Three still states a valid claim for relief

---

[45] PwC may respond by pointing out that the *Onan* and *Tootle* courts did not see it this way. However, the math is indisputable. The courts probably were not presented with the argument.

for the same reason that Count Two states a valid claim if normal retirement age is 5 years:  the

right to continue to receive investment credits under the RBAP *for as long as a participant leaves*

*his benefits in the Plan* must be recognized as part of a participant's "accrued benefit" in exactly

the same way as the right to receive investment credits *through* normal retirement age.  This

means that even if the normal retirement age under the RBAP is 5 years of service (or some other

age besides age 65), the rate of benefit accrual under the Plan is reduced as participants grow

older.  This occurs for precisely the same reason and in precisely the same manner as described in

part 1 of this section, which assumes a normal retirement age of age 65.

### D.    Count Four – Unlawful Backloading of Benefit Accruals

In Count Four, Plaintiff alleges that in some cases the rate at which benefits accrue under

the RBAP increases from one year to the next by more than the amount permitted under ERISA's

"anti-backloading" standards.  These standards are indeed designed to ensure that participants

will accrue benefits under pension plan at a relatively steady rate over the course of their careers,

rather than earning the bulk of their benefits only as they approach retirement age.[46]

To that end, ERISA and the Tax Code provide identically that a defined benefit plan must

satisfy one of three standards governing the rate which benefits must accrue under the terms of

the plan through normal retirement age.  Almost all cash balance plans seek to comply with the

---

[46] As PwC explained in a 1999 letter to the IRS, the anti-backloading rules are an integral part of ERISA's all-important vesting standards:  "Under the minimum vesting standards, a person's vested benefit is the product of (1) the benefit earned under the plan (the "accrued benefit") and (2) the vesting percentage.  If an employer did not want to provide early vesting, the employer could provide negligible accruals until the point that employer desires to provide vesting; after all vesting 100% in an accrued benefit of zero is not different from not vesting at all.  The fundamental problem was accruing large amounts in later years relative to small amounts in earlier years ("Backloading").  Therefore, Congress provided a floor of protection by enacting the Anti-Backloading Rules. . . . These rules are designed to prevent plans from providing for the accrual of most of a participant's benefits later in his or her career, thereby circumventing the minimum, vesting rules."  PwC 1999 IRS letter, Ex. 9 to Doc. 13 (internal footnote omitted).

so-called "133-1/3 % standard,"[47] which generally provides that, under the term of the plan in the current form, the rate at which a participant *could* accrue benefits under the plan's benefit formula in any future year may not exceed by more than one-third the rate at which the participant is currently accruing benefits.  ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), and Code § 411(b)(1)(B).  An important feature of the backloading rules is that <u>all</u> benefit accruals under a plan must satisfy the anti-backloading requirements – the standard is not that a plan must "generally" satisfy the requirements or that "most" benefit accruals satisfy the requirements.  *Id.* The remedy for improper backloading is to increase the rate of benefit accruals for years in which the accruals are too low to satisfy the anti-backloading standards.

## 1.    <u>Liability based on an age 65 normal retirement age.</u>

The anti-backloading rules apply to the annual "rate" at which benefits *do or can* accrue under a plan – *i.e.*, the rate or potential rate of benefit accrual under the plan.  As described above in Section C, the "rate of benefit accrual" under a cash balance plan with a normal retirement age of age 65 is the rate at which the projected age-65 annuity increases from one period to the next. This is the accepted interpretation of the term "rate of benefit accrual" for purposes of the anti-backloading rules, and is not disputed by PwC.[48]  Mem. at ¶¶ 21-24.  *See, e.g.,* Treas. Reg. 1.411(b)-1(b)(2)(ii), Examples (2) and (3); *accord Alessi* 451 U.S. at 514 (1981).

As detailed in the Complaint, the RBAP fails to comply with any of the three available anti-backloading standards. While the general pattern under the RBAP is that the rate of benefit

---

[47] *See, e.g.,* Hubert V. Forcier, *Guide to Cash Balance Plans*, 9-2, 11-2, 3 (Aspen 2003 & 2004 Supp.) (133-1/3% antibackloading rule is the only one of the three available anti-backloading standards that can be satisfied by most cash balance plans).  Defendants appear to concede this is the relevant test when they cite ERISA § 204(b)(1)(B)(iv) in their motion, Mem. at 21.

[48] This *accepted meaning* of the term "rate of benefit accrual" in the ERISA anti-backloading provisions provides further strong evidence that the "rate of benefit accrual" that is subject to testing for compliance with age discrimination standards – which standards reside in the *same section and even subsection of ERISA* (just a few paragraphs down from the anti-backloading standards) – is the rate of increase in the projected age-65 benefit, not the rate of increase in the account balance, as PwC posits.

accruals *decreases* based on age and service (see Counts Two and Three), the Complaint describes three circumstances in which the pattern is reversed – only one of which will be highlighted here because of its relative complexity.[49]

Recall that the benefit a participant accrues under the RBAP each pay period is a projected annuity derived from two items (i) the participant's pay credit for that period *and* (ii) the stream of investment credits that is expected to be earned pursuant to the promise stapled to the pay credit. The backloading problem relates to the portion of the normal retirement annuity attributable to the projected investment credits. Investment credits under the RBAP are based on three things: (1) the menu of investment options made available to participants; (2) each participant's selections from the menu; and (3) the rate of return on each investment option. The projected stream of investment credits is based on all three variables. Because PwC retains control over the menu of investment measures used to determine the investment credits – and because the expected rate of return on particular investment options may vary over time (for example, the expected future rate of investment return was probably higher in the 1990s than it is today) – it is impossible to prove that the *expected stream* of investment credits associated with a particular pay credit accrued in a future year will not be significantly larger than the expected rate of return in prior year.[50] As a result, it is impossible for the RBAP to *prove* that the benefits that accrue under the Plan will always satisfy the 133-1/3% anti-backloading standard, which is what ERISA requires

---

[49] Plaintiff continues to assert the violations that arise from the other two circumstances. Briefly, those circumstances are: (1) When a rank-and-file employee is promoted to partner and their rate of benefit accrual sky-rockets; and (2) when certain employees receive the RBAP's minimum benefit of $7,000 and then have a *net zero* rate of accrual for a number of years, followed by a positive net rate of accrual. Compl. ¶¶ 157-58.

[50] For example, if PwC selects a conservative menu of investments for the 2006 plan year, pay credits for that year may come with an associated stream of future investment credits at an expected rate of 5%. If PwC changes the menu in 2007 to a more aggressive mix of investments, pay credits in 2007 may come with an associated stream of future investment credits at an expected rate of 10%. Overall market conditions and individual investment allocations could also impact the expected rate of future investment results.

Defendants make three counter-arguments.  First, Defendants argue that when running the backloading tests, the RBAP can ignore any changes in the benefit formula that are attributable to an employee's promotion from employee to director or partner.  Mem. at 21-22.  Defendants cite the rule in ERISA § 204(b)(1)(B)(iv), 29 U.S.C. § 1054(b)(1)(B)(iv) that provides that "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant . . . ."  But this is no help to Defendants (who likely are more familiar with mathematical concepts than they admit) – the "factors" that may be considered to remain constant under this rule are external *variables* that are plugged into a benefit formula established under the plan.  The regulations give "the consumer price index" as an example. Treas. Reg. § 1.411(b)-1(b)(2)(D).  *The plan's benefit formula itself* – which is what changes when an employee is promoted to partner – is not a mere "factor" *in* the formula that can be assumed to remain constant.  This only makes sense.  Otherwise, a plan could say employees classified as being in "group A" (defined as employees in their first 5 years of service) would earn at a low rate, employees in "group B" (years 5-10) at a higher rate, employees in "group C" (years 10-15) even higher, and so on – and the backloading rules would be meaningless.

Defendants also argue that the $7,000 guaranteed benefit provided to participants in their first year of participation in the Plan is "house money" that only helps participants.  Mem. at n. 14.  House money or not, the $7,000 guarantee accrues on the first day a participant joins the Plan – with the effect that the regular pay and investment credits added to the participant's account (which still starts at zero) are without effect until those credits exceed $7,000.  The *net accrual rate* – which is the relevant standard under Treas. Reg. § 1.411(b)-1(a)(1) ("the accrued benefit under all . . . formulas [in the plan] must be aggregated") – is therefore zero for a few years after the employee's first day in the Plan, at some point becoming positive again.  This

switch from a zero net rate of accrual to a positive net rate of accrual violates the 133-1/3%

standard on its face.[51]

Finally, Defendants misconstrue the claim described in the text above. Contrary to

Defendants' assertion, Plaintiff does not contend that compliance with backloading rules must be

tested and demonstrated every year based on *actual* investment returns – he contends that the Plan

*by design* does not *guarantee* that the rate of benefit accruals may not increase by an

impermissible margin in a later year. Plaintiff does not focus on "the actual investment

experience" under the Plan. Mem. at 24. His focus is on the *expected* stream of future

investment experience – that is what accrues along with each pay credit. Under the RBAP's

"innovate" design, the expected stream of investment return might be impermissibly larger with

respect to a pay credit accrued in a later year, for the reasons described in the Complaint and

repeated above.[52] Defendants' motion to dismiss Count Four should be rejected.[53]

### 2. Liability without regard to normal retirement age, based on the accrued benefit as defined by the RBAP.

Even if the normal retirement age under the RBAP is after 5 years of service, the unlawful

---

[51] Defendant's back-up position that the $7,000 guarantee is somehow saved under IRS rulings that permit "floor-offset" arrangements, Mem. at 23, is unavailing. As Defendants note, a floor-offset arrangement involves *two* plans, typically a defined benefit and defined contribution plan. The RBAP is a single plan, so the rules governing floor-offset plans are simply inapposite. In a single plan, the regulations are clear that all formulas must be netted.

[52] Defendants' assertion that the menu of investment measures made available to RBAP participants is a "relevant factor" that can be presumed to remain constant has no more merit here than when used to shield the gross disparity in the employee and partner benefit formulas from scrutiny. The menu of investments is a core feature of the RBAP's benefit formula, not an external variable that is plugged into the formula. Moreover, it is mere rhetoric that traditional defined benefit plans would have difficulty meeting the backloading tests as interpreted by Plaintiff. Increases in compensation do not cause a problem under the backloading rules because the "rate of benefit accrual" that is tested may be expressed as a percentage of each participant's compensation. *See* Treas. Reg. § 1.411(b)-1(b)(2)(ii)(F)(iii), ex. (1)-(3); *Carollo v. Cement and Concrete Workers Dist. Council Pension Plan,* 964 F. Supp. 677, 682 (E.D. N.Y 1997). This is more artifice from PwC, not argument.

[53] In PwC's prior, February 2005 motion to dismiss for failure to state a claim in the Southern District of Illinois (before Plaintiff's suit, commenced in November 2004, was dismissed for lack of venue in May 2005, *see generally Laurent v. PricewaterhouseCoopers LLP,* 04-809 (S.D. Ill.), PwC also relied almost exclusively on the 5-year retirement age to avoid liability under Count Four (backloading). It advances no such argument here, apparently having realized that a court might be reluctant to endorse the 5-year age if it found out that doing so would overnight make unlimited backloading possible for *any* of the 30,000 defined benefit plans in existence that adopt the 5-year fiction because the backloading protections *end* at normal retirement age. *See* Doc. 13 at 37.

backloading of benefit accruals described above occurs with respect to benefits that accrue in the first 5 years of each affected employee's participation in the RBAP.  The backloading rules apply to *all* benefit accruals, not merely *vested* accruals.  *See* ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and Code § 411(b)(1)(A)-(C).

### E.    Count Five – Forfeiture of Normal Retirement Benefit

In Count Five Plaintiff alleges that the RBAP fails to protect the value of each participant's "normal retirement benefit."  The normal retirement benefit is central to ERISA:  it "is the lynch pin in determining the *amount* of the benefits protected by the vesting rules." *Berger v. Nazametz,* 157 F. Supp.2d 998, 1006 (S.D. Ill. 2001), *aff'd,* 338 F.3d 755 (7th Cir. 2003) (emphasis added)

A participant's "normal retirement benefit" is his "accrued benefit" *at the time he in fact attains normal retirement age*.  ERISA § 3(22), 29 U.S.C. § 1002(22), and IRC § 411(a)(9).  In the context of the RBAP, a participant's "normal retirement benefit" is his nominal account balance at normal retirement age expressed in the form of an annuity commencing at that age, <u>*plus*</u> the value of the *right* to continue to earn investment credits for as long as he leaves his benefit in the plan.  *See* Section I.A.2. above.

It is this second component that is not preserved in all cases, as ERISA requires.  The examples set forth in Section I.C, nn. 30-33, above, present a fact pattern under which a participant's accrued benefit is reduced from one year to the next.  If PwC is correct that normal retirement age occurs after an employee's 5th year of employment, the benefit reduction in the examples occurs *after* normal retirement age.[54]  This violates the ERISA requirement that, in order to preserve the value of the normal retirement benefit, "[a] defined benefit plan must make

---

[54] A similar example could be constructed demonstrating a failure if normal retirement age were age 65.

an actuarial adjustment to an accrued benefit, the payment of which is deferred past normal retirement age." Treas. Reg. § 1.401(a)(9)-6, Q&A-9.[55]  The idea is that if a participant does not commence benefit distributions until after normal retirement age, he should be entitled receive a benefit that has the *same (or greater) actuarial value* as the benefit he could have taken at normal retirement age – he should not be punished for delaying commencement of benefits.[56]

Defendants' sole response to Count Five is premised on a flatly wrong assertion:  that there is no forfeiture of future investment credits because such credits are not "nonforfeitable" benefits.  Mem. 24-27.  The *right* to receive future investment credits (at *some* rate) <u>is</u> a nonforfeitable right that accrues under the RBAP with each pay credit (see the discussion in Counts One-Three above).  Other portions of PwC's submission seem to understand this cash balance axiom.

The remainder of PwC's response to Count Five is addressed to an argument Plaintiff does not make.  Plaintiff does not argue in Count Five that the RBAP improperly applies ERISA's *vesting* requirements.  Vested participants remain vested.  The issue is the *amount* of the benefits in which they remain vested – which is a benefit accrual, not vesting, issue.  *See* the quoted passage from *Berger* in the introduction to this Section I.E., and *compare* ERISA § 203 (vesting) with ERISA § 204 (accrual).  Defendants' motion to dismiss Count Five should be rejected.

---

[55] This requirement is derived from the statutory requirement under § 204(c)(3), 29 U.S.C. § 1054(c)(3), which requires that "[i]f an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit."  The Treasury Regulation quoted in the text interprets this ERISA requirement and as such is authoritative guidance for purposes of ERISA.  *See also* Proposed Treas. Regs. §§ 1.411(b)-2 and 1.411(c)-1(f)(2) (repeating the rule quoted above); IRS Revenue Ruling 81-140.

[56] "The only exception to this rule is that generally no actuarial adjustment is required to reflect the period during which a benefit is suspended as permitted under section 203(a)(3)(B) of [ERISA]."  *Id.*  Benefits are *not* suspended under the RBAP as permitted under this provision Compl. ¶ 168, as PwC appears to concede.

## II.    THE COMPLAINT STATES CLAIMS ARISING OUT OF THE PARTNERS' INCOME DISCRIMINATION-MAXIMIZATION SCHEME.

In Counts Six and Seven, Plaintiff alleges that PwC, the RBAP, and the two 401(k) Plans unlawfully discriminate against rank-and-file PwC employees.

### A.    Count Six – Income Discrimination by the Plans

In Count Six, Plaintiff alleges that the RBAP and the two 401(k) Plans provide significantly smaller benefits, as a proportion of income, to rank-and-file employees than to partners, in violation of the terms of all three Plans which specifically incorporate provisions of the Internal Revenue Code that prohibit such discrimination.  The blatantly discriminatory features of both Plans are described at length in the Complaint at ¶¶ 46-63, and in the Introduction above.

PwC does not challenge Plaintiff's contention that the Plans discriminate against rank-and-file employees, or even that it is violating the law.  PwC's only defense is that neither Plaintiff nor any other participant has standing to challenge the discrimination.  But just like its defense to Count Five, PwC's contention in this regard is based on complete mischaracterization of Plaintiff's allegation in Count Six.  PwC devotes five pages to an argument Plaintiff expressly does not make:  that Defendants should be held liable for violating provisions of the Tax Code.  Instead, Plaintiff contends that Defendants are liable *under ERISA* for violating the *terms of the RBAP and 401(k) Plans* that incorporate by reference certain Tax Code standards.  *Compare* Compl. ¶¶ 42-45, 172 with Mem. at 27-31.

PwC's response to *that* can be found in footnote.  There, PwC contends that the RBAP should not be construed to incorporate the Code's qualified plan provisions by reference because the RBAP plan instrument's assertions that the Plan is intended to comply with the Code and shall be interpreted and construed to comply with the Code are merely "aspirational" and

33

"precatory." Mem. at 28-29 & n.19. In other words, PwC argues, no matter what else the RBAP

plan instrument may say, the Court should not find incorporation by reference because the

document "does *not* say that it is 'incorporating by reference'" those Code provisions." *Id.*

(emphasis in the original).[57]

    But the term-of-art phrase "incorporation by reference" is a lawyer's shorthand more than

anything else. Its absence here is really not significant: even if used, it would still need to be

reduced to specifics to guide not just the courts but, importantly, the mostly non-lawyer C.P.A.

partners who were intended to serve as Administrative Committee members and Trustees. Those

specifics are provided in the RBAP in clear, forceful directive statements that all but say

"incorporate by reference."

    PwC emphasizes only the statement that "it is intended that this Plan meet the

requirements of Sections 401 and 501 of the Internal Revenue Code of 1986, as amended," RBAP

at 1-2. Mem. at 29. The Court does not have to decide the effect of that statement in isolation

because what PwC mentions in passing but otherwise fails to work into its "analysis" is the fact

that the RBAP and 401(k) Plans specifically direct that "the Plan shall be **interpreted and**

**construed, wherever possible**, to comply with the terms of ERISA, the Code, and regulations

and rulings issued thereunder." RBAP § 16.6(b); 401(k) Plan § 17.9(b).

    It was nearly identical language to that effect that caused the court in *Vizcaino v.*

*Microsoft Corp.,* 97 F.3d 1187 (9th Cir. 1996), a*ff'd en banc,* 120 F.3d 1006, 1015 n.2 (1997), to

conclude, as many other courts have on similar language, that the plan thereby incorporated by

---

[57] Note that PwC *again* completely ignores the 401(k) Plans. It is understandable that PwC may be uneasy or at a loss for words to address what it has done in putting a "lower" class of worker into a pension quarantine. But Plaintiff submits that if PwC in a solemn filing with this Court, seeking dismissal with prejudice of a putative class action seeking to advance the interests of tens of thousands of men and women who go to work every day for the Firm, is unable to even acknowledge the role of the 401(k) Plans in the Complaint filed against it – to the point that it does not make the argument anywhere in its brief that the *401(k) Plans* do not incorporate the Code's qualification provisions – the Court should deem the argument waived, at least until summary judgment, and not make the argument for it or let it make that argument for the first time in reply.

reference (without using the phrase "incorporate by reference") the operative Code provisions as

a term of the plan. *Id.* at 1197 n.12 (plaintiffs "may, and did, assert a cause of action *for breach*

*of contract, not* for violation of the Internal Revenue Code"; "**[w]hile Internal Revenue Code**

**provisions and Treasury regulations do not create substantive rights under ERISA,** *if an*

*ERISA plan explicitly provides that it is to be construed to meet such provisions***, courts look to**

**them** in determining employee eligibility for participation in the plan**"**) (emphasis added).

*Accord Nielsen v. Nobart Color, Inc. Employees Profit-Sharing Plan & Trust,* 1986 U.S. Dist.

Lexis 15978, *6 n.10 (N.D. Ill. Dec. 24, 1986) (where the plan specifically required the trustees *to*

*interpret the plan to meet the Code's requirements*, **"**if Trustees' interpretation of Plan § 6.04

caused Plan's nonconformity to Code § 401(a), Trustees would have violated their duties under

the Plan and ERISA (see Section 1104(a)(1)(D).") (emphasis added).[58]

     The presence of such language is *not* required by the Code as a precondition for

qualification, so they would be mere *surplusage* – oddly forceful and important sounding

surplusage – if not given the effect Plaintiff reads them to have, *i.e.,* creating enforceable rights in

favor of the Plans' first, second or third-party beneficiaries, namely, their participants.  It makes

no sense to have all of these directives *for the benefit of* participants but not enforceable by them.

The Plans contain no such disclaimer that their express intended beneficiaries have no right to

enforce compliance with any particular provisions of the Plans.[59]

     The motion to dismiss Count Six should be denied:  it is clear that "Plaintiffs can  . . . sue

---

[58] *See also Crouch v. Mo-Kan Iron Workers Welfare Fund*, 740 F.2d 805 (10th Cir. 1984) ("Because the pension plan states that it is to be construed to meet the requirements of ERISA, and there are obvious and significant benefits to meeting those requirements, we conclude that we must construe the plan as" requiring compliance with the relevant IRC provisions that are thereby deemed incorporated by reference).

[59] PwC suggests that Congress would frown upon the courts giving effect to the plain language that employers voluntarily put in their employee benefit plans. Mem. at 29.  Quite the contrary.  Construing these otherwise gratuitous statements (according to PwC) as creating contractual rights to enforce the Code's qualification requirements is fully consistent with sound public policy and with the sponsor's stated intentions:  it may be only through timely participant action that corrective steps are taken to avert the loss of qualified status that would harm the sponsor and the trust, and not merely plan participants.

on the basis of the plan language," *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 151 (3d Cir. 1987), *aff'd in part, rev'd in part*, 489 U.S. 101 (1988) (participant can enforce plan's adoption of Code's vesting-upon-partial-termination rule).[60]

### B.    Count Seven – Interference with Pension Rights by PwC

In Count Seven, Plaintiff alleges that PwC violated ERISA § 510, 29 U.S.C. § 1140, when it adopted and now administers separate and discriminatory contribution and benefit structures for partners and non-partner employees under the 401(k) Plans and the RBAP. These separate structures were designed and are administered for the sole purpose of preventing non-partner employee/participants from accruing rights to retirement plan benefits that would otherwise have been required for the Plans to satisfy the Code's nondiscrimination standards, which are incorporated by reference into the Plans.

PwC argues that ERISA § 510 is "aimed primarily" at actions by an employer that impact the employment relationship – something that Plaintiff tries to hide from the Court through "selective quotation from the statute." Mem. at 32. Plaintiff is not hiding anything. He acknowledges that the D.C. Circuit and other courts have noted *in dicta* that ERISA § 510 <u>generally</u> requires an individual to prove that his employment relationship was impacted. But the statute – which, for example, explicitly prohibits discrimination against *non-employee beneficiaries* as well as employees – clearly is not limited *solely* to employment actions: after all, a beneficiary cannot be fired to deprive him of benefits.[61] That is why Plaintiff focuses his claim on the prohibition in § 510 against "discrimination . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or

---

[60] Surely, if the matter is still in doubt, this is a clear case for the application of the doctrine *contra proferentem*.

[61] *Cf. McGath v. Auto-Body North Shore, Inc*, 510 F.3d 665, 668-669 (implying that on the right facts, a § 510 claim might be viable even without an employment impact, remarking that "we must be mindful that § 510 protects the employee not only against the classical forms of employer harassment that might occasion the loss of benefits, but also against the more atypical forms of employer misconduct that can produce the same result").

ERISA]."

The Supreme Court has already rejected PwC's contention, Mem. at 33, that "the design

of a plan does not, as a matter of law, implicate or violate ERISA § 510," finding, to the contrary,

that:

> the **power to amend** or abolish [a] plan does not include the power to 'discharge, fine, suspend, expel, discipline, or discriminate against' the plan's participants and beneficiaries 'for the purpose of interfering with [their] attainment of . . . rights . . . under the plan.'

*Inter-Modal Rail Employees Assoc. v Atcheson, Topeka and Santa Fe Railway Company,* 520

U.S. 510, 516 (1997). This only makes sense. Otherwise, a sponsor could simply draft or amend

its plan to "approve" the sponsor's discriminatory actions and thereby escape liability under

§ 510.. As the Supreme Court put it, "Section 510 counterbalances [a sponsor's] flexibility [to

draft or amend its plan] by ensuring that employers do not 'circumvent the provision of promised

benefits.'" *Id.*

If ever there were a fact pattern that warranted a finding of liability for discrimination

under ERISA § 510, this is it. As described in the Introduction and further detailed in the

Complaint, Compl. ¶¶50-63, PwC denies benefits to rank-and-file employees who are entitled to

them under the terms of the Plans and ERISA (because the Plans incorporate the Tax Code's

nondiscrimination provisions).[62] Further, it is clear that PwC went to the lengths it did for the

sole purpose of purposefully interfering with these employee's rights. None of the cases cited by

Defendants involved this type of widespread and systematic – and plainly intentional –

discrimination against rank-and-file employees of the type alleged here. On the facts of *this* case

---

[62] PwC argues that ERISA § 510 does not apply to "mere changes in the level of benefits." Mem. at 33. This too is wrong, at least in the context of a retirement plan. Otherwise, a sponsor could, as a matter of policy, fire employees the day before each would reach the point at which they would become eligible for an early retirement subsidy – a policy that PwC presumably would agree would violate § 510.

– where PwC, for example, took the extraordinary step of moving a group[63] of the very lowest

paid rank-and-file employees into the "lower class" 401(k) Plan – Plaintiff has stated a valid

claim under ERISA § 510.

### III.   THE COMPLAINT STATES CLAIMS ARISING OUT OF THE DESIGN AND IMPLEMENTATION OF THE RBAP'S "PARTICIPANT-DIRECTED" INVESTMENT CREDITING RATE FEATURE.

#### A.    Count Eight – Failure to Provide an Objective Benefit Formula.

To be tax-qualified, a pension plan has to "provide systematically for the payment of

definitely determinable benefits."  Treas. Reg. § 1.401(a)-1(b)(1)(i); *accord* Rev. Rul. 79-90,

1979-1 CB 155.  Congress codified Rev. Rul. 79-90 in 1984 in Code § 401(a)(25), which

provides that "actuarial assumptions . . .[must be] specified in the plan in a way which precludes

employer discretion." In a cash balance plan, the interest crediting rate is a key actuarial

assumption and, as the IRS has explained, "[i]f the interest rate is subject to the discretion of the

employer, it is highly unlikely that the plan would be able to satisfy the requirement that benefits

be definitely determinable."  *See, e.g.,* Private Letter Ruling 9645031 (Nov. 8, 1996).

The RBAP, as designed and implemented, suffers from this basic defect.  The RBAP

gives PwC's partners unfettered discretion over a critical piece of the pension formula:  the menu

of investment options that determines the investment crediting rate under the RBAP.  *See* Compl.

¶¶ 71-73.  PwC does not challenge Plaintiff's contention that the RBAP violates the Code in this

way.  Rather, it merely reiterates its position that Plaintiff has no standing to enforce provisions of

the tax Code.  As demonstrated in Section II.A above, Plaintiff *does* have standing to enforce the

---

[63] PwC's argument that it did not take any action targeting Plaintiff *as an individual,* Mem. at 33, is inapposite. Plaintiff alleges that the separate benefit structures and PwC's continuing maintenance and administration of such structures are specifically intended to curtail the rights of a *group* of employees (non-partners, especially the 3rd class employees placed in the segregated 401(k) Plan) vis-à-vis other employees (partners) for a discriminatory purpose. That is exactly the type of behavior ERISA § 510 prohibits.  *See Hartline v. Sheet Metal Workers' Nat. Pension Fund*, 134 F. Supp. 2d 1, 18-19 (D.D.C. 2000), *aff'd,* 286 F.3d 598 (D.C. Cir. 2002). (ERISA § 510 violation must "involve[] the singling out or targeting of a particular person **or group**.") (emphasis added).

terms of the RBAP that specifically and forcefully incorporate the these Code provisions.

### B.    Count Nine – Anti-Cutback Violations

PwC argues that Plaintiff fails to allege a violation of ERISA and the Code's "anti-cutback" rule, ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6), resulting from changes in the RBAP's menu of "investment experience choices." PwC asserts the anti-cutback rule is inapplicable unless there is a plan *amendment* reducing the participant's accrued benefits. Mem. at 34.

PwC knows better, if only because the parties have briefed this issue before. It knows that Plaintiff is suing under the Treasury Department's 1988 notice-and-comment regulations that *extend* the anti-cutback rule to situations not involving actual plan amendments, precisely so employers cannot sidestep the anti-cutback principle via some other forms of action that does not require an actual plan amendment.[64] *See* Treas. Reg. § 1.411(d)-4 Q&A5 (cutback rule construed to forbid any plan provision that "permits the employer, either directly or indirectly, *through the exercise of discretion*, to deny a participant a section 411(d)(6) protected benefit") (emphasis added). In *Counts v. Kissack Water & Oil Serv., Inc.*, 986 F.2d 1322 (10th Cir. 1993), the 10th Circuit applied this regulation to find ERISA anti-cutback violations even in the absence of any formal plan amendment, as PwC knows Plaintiff asks this Court to do here.

PwC also misstates the claim: PwC says that Plaintiff alleges that *each* change in the menu constitutes a prohibited cutback. Mem. at 33. That is significantly underinclusive but also overinclusive of Plaintiff's actual claim: the cutback violation is not in the change of benchmarks

---

[64] That fact alone makes PwC's citation to *Stewart* unavailing. While *Andes v. Ford Motor Co.,* 70 F.3d 1332 (D.C. Cir. 1995) does post-date the 1988 regulations, the regulations were not at issue in the case. It is not clear what PwC is attempting to accomplish by playing hide-the-law. If on reply it attempts to argue the regulations are for some reason invalid or even inapplicable, Plaintiff should be entitled to a surreply. Whatever its gambit, what it writes in its opening brief is not at all responsive to the Complaint, which specifically invokes the regulations. Compl. ¶¶ 190, 194.

*per se* – it is for the RBAP's failure to comply with Revenue Ruling 81-12, which Congress incorporated *into* the anti-cutback rule of ERISA and the Code in the Retirement Equity Act of 1984.  *See Stamper v. Total Petroleum, Inc. Retirement Plan*, 188 F.3d 1233, 1238-39 (10th Cir. 1999).[65]  Translated to this context, here the Plan had to either (i) keep track of how participants would have done under the "old" menu of investments compared to the new one (the "wearaway" method), or (ii) calculate the benefit accrued under the old benchmark until the time it was discontinued and make sure that value was added to the benefit accrued under the new benchmark, calculated on a going forward basis (the "A + B" method).  Compl. ¶¶ 74-75.  *See* Rev. Rul. 81-12.  The Plan did neither. The motion to dismiss Count Nine should be denied.

### C.    Count Ten – Fiduciary Breaches in the Selection and De-Selection of Investment Experience Choices.

PwC also misstates Plaintiff's claims under Count Ten.  There, Plaintiff challenges PwC's decision, as a matter of plan design and as implemented, to delegate its responsibility to determine a key aspect of the Plan's benefit formula – the investment measures offered – to inherently conflicted PwC partners who stand to personally lose dollar-for-dollar (as a group) whenever participants "win," *i.e.,* are given a higher yielding set of investment benchmarks from which to choose.  *See* Compl. ¶ 76.  Unable to challenge the claim as such, PwC argues that Plaintiff lacks "standing" to bring it because he supposedly "ceased participating in the RBAP over three years ago."  Mem. at 36 (also claiming that "Plaintiff cashed out of the RBAP in 2002 and thus is not . . . a participant").  PwC argues that as a long-gone participant, Plaintiff "has no standing to seek prospective injunctive or other equitable relief against any of the Defendants."  Mem. at 36.  Furthermore, PwC contends, Plaintiff is also out of luck looking back in time -- he

---

[65] Ironically, PwC relies heavily on an inapposite *attachment* in *Stamper* (discussed by no one in that case), but ignores *Stamper*'s holding that Rev. Rul. 81-12 has been incorporated into the anti-cutback rule since 1984 and is directly enforceable by participants.

seeks damages and not equitable restitution and thus cannot obtain monetary relief under *Great-West Life & Annuity v. Knudson,* 534 U.S. 204 (2002).  Mem. at 36-37.

In fact, Plaintiff has stated a claim for relief – declaratory, injunctive *and* monetary.   Even on PwC's misreading of *Great-West,*[66] the Complaint describes a situation for which equitable restitution – or imposition of a constructive trust, or equitable lien – is perfectly appropriate, and flows from the declaratory and injunctive relief Plaintiff seeks.[67]

Plaintiff's claim for relief here is really no different than any other claim premised on an illegal calculation of accrued benefits.  Plaintiff seeks payment of benefits due under the Plan as properly designed and administered.  A participant's accrued benefit in a defined benefit plan is always "*determined under the plan*" – even it the plan may first need to be reformed or otherwise corrected for illegality.  The fact that PwC's plan design and implementation was so defective from the start that the Court will have to hypothesize what the Plan's investment measures would have been had they been selected in conformity with the highest fiduciary standards, *see, e.g., Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir. 1985), does not mean that Plaintiff has no claim.  To the contrary, in making this assessment the Court would simply resolve any doubts in

---

[66] *Great-West* did not address a fiduciary breach claim against a fiduciary.  The United States correctly takes the view, as does the Seventh Circuit among other courts, that even after *Great-West,* ERISA § 502(a)(3) authorizes make-whole monetary relief against breaching fiduciaries.  *See* Brief for United States as *Amicus Curiae, Aetna Health Inc. v. Davila,* Nos. 02-1845, 03-83 at 27-28 n.13, 2003 WL 23011479 *27 (December 18, 2003); *Williams Electronic Games, Inc. v. Garrity,* 366 F.3d 569, 576-578 (7th Cir. 2004) (Posner, J.).  Thus, Plaintiff states valid claims against Defendants as fiduciaries for direct monetary recovery, as well as against them for declaratory and injunctive relief in addition to or as a predicate for equitable relief (equitable restitution, constructive trust, equitable lien) against the Plan for the accrued benefits Plaintiff is owed.

[67] The declaratory and injunctive relief sought – plan formation, appointment of independent fiduciaries, etc. – will benefit current participants who are continuing to accrue new pay credits as well as current participants such as Plaintiff who has *not* been cashed out.  Contrary to what PwC claims, Plaintiff has multiple colorable claims that he is still owed significant Plan benefits, with or without regard to the claims made under Count Ten.  PwC does itself no credit by cutting and pasting the Complaint to make it appear as if *Plaintiff* is saying he has been paid all benefits due him under the RBAP.  For example, according to Defendants, Plaintiff alleges in the Complaint that he "**received** 'a single sum distribution of his entire accrued benefit from both the RBAP and the 401(k) Plan.' (Cmplt. ¶ 17)."  Mem. at 9 (emphasis added).  Plaintiff alleges no such thing.  What the Complaint actually says is that Plaintiff **requested** a single lump sum distribution of his entire accrued benefit from both the RBAP and the 401(k) Plan."  Compl. ¶ 17.  What "Plaintiff **received** [was] a lump sum payment on May 20, 2002 [in an] an amount equal to the **nominal balance** in Plaintiff's cash balance account," Compl. ¶ 128, which Plaintiff asserts throughout the Complaint was *not* the full amount of his vested accrued benefit under the RBAP.

41

favor of the participant. *Id.*[68]

## IV.    PLAINTIFF HAS STANDING TO BRING SUIT ON BEHALF OF THE PLANS.

In Count Eleven, Plaintiff alleges on behalf of the three Plans that Defendants

mismanaged the Plans' assets by investing them in inappropriate and retail-priced mutual funds.

Compl. ¶¶ 79-81, 112-117, 205-06.  PwC argues Plaintiff lacks standing because he is no longer a

participant in the Plans.  Mem. at 37-39.  But the well-pled Complaint establishes otherwise.

Plaintiff agrees that to have standing to sue derivatively on behalf of a plan under ERISA

§ 502(a), 29 U.S.C. § 1132(a)(2), a plaintiff must be "a participant, beneficiary, or fiduciary" of a

plan.  ERISA § 3(7), 29 U.S.C. § 1002(7).  But that "must be read in the context of traditional

concepts of standing, not in the context of adjudicating the ultimate issue of the merits of the

plaintiffs' claim," *Astor v. International Business Machines Corp.*, 7 F.3d 533, 538-39  (6th Cir.

1993), meaning the focus is on whether a person has alleged such a personal stake in the outcome

of a case that he should be entitled to obtain its judicial resolution.  Plaintiff meets that test easily

for both the RBAP and 401(k) Plans.

First, it is clear Plaintiff has a colorable claim for benefits from the RBAP.  That the

RBAP is *underfunded,* Compl. ¶ 8(iv), and its benefits not fully insured by the Pension Benefit

Guarantee Corporation, confirms Plaintiff's very real stake in wanting to have the millions of

dollars he alleges were unnecessarily paid out of the Plan put back into it, and to stop the further

dissipation of Plan assets on structurally inappropriate and needlessly expensive investment

vehicles.  One of the reasons ERISA was enacted was to prevent negligent handling of plan assets

and to provide participants with a ready remedy.  ERISA § 2, 29 U.S.C. § 1001.[69]

---

[68] PwC also says Plaintiff lacks standing under Count Ten – but because he fails to state a claim.  Mem. at 38 n.26. That cart-before-horse contention is addressed immediately below.

[69] PwC is wrong that "[t]he claim in Count Eleven does not allege that the Plan fiduciaries' investment of plan assets in mutual funds had any impact on plaintiff's benefits due under the RBAP."  Mem. at 39.  The impact is the

Plaintiff's standing to sue on behalf of the 401(k) Plans for past as well as continuing breaches is also clear.  Plaintiff's standing to remedy current breaches is based on his colorable claim that he is still a participant owed contributions from the Plan, to offset the effect of the partners' economic discrimination scheme.[70]  Plaintiff's certainly has standing to remedy past breaches that directly affect his level of benefits (even if withdrawn from the Plan, he is owed more), and breaches that occurred while he was still an active participant.  ERISA would be more or less a dead letter otherwise.  That is why it is so curious that PwC says that it was unable to find *a single case* in which a court has upheld standing "for a former participant seeking to recover damages *for the benefit of a plan* under Section 502(a)(2), 29 U.S.C. § 1132(a)(2)."  There are many such cases - they are routine -- two more new ones just in the past week.[71]  The motion to dismiss Count Eleven should be denied.[72]

---

[70] weakening of Plaintiff's retirement income security and increased risk of loss of those benefits if PwC goes the way of Andersen LLP.

[70] The remedy for a plan that by its terms purports to promise contributions or benefits that are insufficient to satisfy nondiscrimination standards is reformation of the plan to require larger contributions or benefits that do comply.  *See* § 1.401(a)(4)-11(g)(2), (g)(3)(ii); Rev. Proc. 2003-44, ("The correction method for failures relating to nondiscrimination should provide benefits for non-highly compensated employees.")  As a current participant, Plaintiff has standing whether or not he even alleges a current loss caused by imprudent conduct.  *Brock v. Robbins,* 830 F.2d 640, 647-49 (7th Cir. 1987) (damages not an element of claim for breach; injunctive relief available in their absence; "[t]he likelihood that a fund's assets will be unnecessarily diminished is greatly increased when its trustees show a propensity to engage in imprudent conduct"); *cf. Fink v. National Sav. & Trust Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985).

[71] *E.g., In re Schering-Plough Corp. ERISA Litigation,* 2005 WL 1993990 (3rd Cir. Aug. 19, 2005) (ERISA § 502(a)(2) case; former participants have standing to sue on behalf of 401(k) plan to recover damages for the benefit of the plan as well as themselves via the plan);.*Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 350 (5th Cir. 1989) (ERISA § 502(a)(2) case; although plaintiffs had received distribution from profit sharing plan they had standing because they claimed entitlement to difference between price they received for their plan shares and shares' alleged fair market value); *In re Williams Co. ERISA Litigation,* 02-CV-153 (N.D. Okl. Aug. 22, 2005) (ERISA § 502(a)(2) case; former participants had standing to bring suit in 401(k) case on plan's behalf having received lump-sum distribution); *Rankin v. Rots,* 220 F.R.D. 511, 522-23 (E.D. Mich. 2004) (ERISA § 502(a)(2) case; former employee who received distribution from 401(k) had standing to sue on behalf of plan; "Rankin had a vested benefit which, if defendants breached their fiduciary duties, might have affected her benefit"; "If the Plan prevails, then any recovery would likely affect the amount of Rankin's benefit"); *In re CMS Energy ERISA Litigation,* 225 F.R.D. 539, 545 (E.D. Mich. 2004) (ERISA § 502(a)(2) case; plaintiffs who received distributions had standing to assert plan claims for breach because they were participants in the plan during a time when alleged breaches occurred).

[72] The cases PwC cites are inapposite.  For example, *Crawford v. Lamantia,* 34 F.3d 28 (1st Cir. 1994), *agrees* with *Sommers* but simply found on the facts the plaintiff could not show the breach in question had any impact on him. PwC is wrong to suggest that that fact-bound case supports its position in any way - it undermines it.

## V.    __THERE IS NO STATUTE OF LIMITATIONS ISSUE HERE__.

PwC argues Plaintiff's non-fiduciary claims under Counts One through Nine for

additional benefits dues under ERISA or the terms of the Plans are time-barred by the District of

Columbia's three-year statute of limitations for breach of contract. Mem. at 8-9. PwC further

contends that Plaintiff's cause of action accrued under the federal "discovery" rule governing

breach of contract cases and that Plaintiff's cause of action accrued when he received

distributions from the Plans in May 2002. *Id.* at 9 n.6 (claiming it was then that Plaintiff

discovered that his lump sum distribution "consisted of his account balance and nothing more").

This is wrong. Plaintiff's cause of action only accrued either in February 2005 or August 2005

when the RBAP and 401(k) Plan filed motions to dismiss clearly repudiating Plaintiff's

contention he is still owed monies from the Plans.[73]

The clear repudiation standard, as PwC surely knows, is controlling D.C. Circuit law and

a subspecies of the federal discovery rule, applicable in the ERISA or trust context. That high

standard arises out of the trust relationship itself, which allows beneficiaries to be less on their

guard when it comes to pension trust settlors and trustees than arms'-length third-parties.[74] In

essence, the beneficiary has no duty to discover his claim unless and until his fiduciary clearly

tells him that the additional benefits, affirmatively sought, shall not be paid. That did not happen

here until after Plaintiff filed suit, because Plaintiff never made any claim for benefits (and PwC

---

[73] If, as Plaintiff would contend, the filing of his suit in November 2004 tolled the statute of limitations period, including for purposes of this suit, both for him and the proposed Class, then PwC's February 2005 motion to dismiss would constitute the requisite clear repudiation. *See American Pipe and Construction Co. v. Utah,* 414 U.S. 538 (1974); *Schur v. Friedman & Shaftan, P.C.,* 123 F.R.D. 611, 613 (N.D. Calif. 1988) (prior class action tolls second where defendant's dismissal from first without prejudice and with no definitive determination of class certification as to that defendant). If on the other hand that suit is deemed a nullity because dismissed for lack of venue, so too would PwC's original motion be deemed a nullity and it would have been only with the filing of PwC's motion to dismiss in this action that Plaintiff's cause of action accrued.

[74] It is not contracts but "the common law of trusts [that serves as] a starting point for analysis of cases brought under ERISA." Chao v. Trust Fund Advisors, 2004 WL 444029, * 1 (D.D.C. Jan. 20, 2004) (GK) (internal quotations and citations omitted).

twice now has waived any contention Plaintiff must or should do so) or otherwise approached PwC with these contentions only to be turned down.

The test for when such claims accrue was decided by the D.C. Circuit in 1963 in the closely-related Taft-Hartley Act context.  In *Kosty v. Lewis,* 319 F.2d 744 (D.C. Cir.1963), a participant in a Taft-Hartley retirement plan sued when he was denied benefits as a result of a plan amendment governing years-of-continuous service eligibility.  One of the key issues on appeal was precisely when did the claim accrue.  The D.C. Circuit held that the statute of limitations did not bar an equitable claim by a beneficiary against a trustee unless the trustee made "a clear and continuing repudiation of the right" of the beneficiary to enjoy the benefits of the trust**.**  *Id.* at 750.  **The court held that that occurred only once "a defense was interposed in [the] case."**  *Id.*

More recently**,** Judge Lamberth came to the same conclusion in an opinion analyzing when Indian trust beneficiaries' claims for an equitable accounting against the government accrued.  *Cobell v. Norton*, 260 F.Supp.2d 98, 106 (D.D.C. 2003) (collecting ERISA statute of limitations cases requiring clear and unequivocal benefit denials).  *Cobell* held that *Kosty* is "controlling" because it establishes this Circuit's test for determining when a claim accrues.[75]

---

[75] The negative imprint of *Kosty* (and *Cobell*) is clear throughout PwC's discussion of the limitations issue.  This is most true in footnote 6 where PwC tip-toes around even acknowledging that there is a trust/ERISA subspecies of the federal discovery rule that is the subject of dozens of cases, almost all of which state the clear repudiation standard in one form or another for benefits claims and non-fiduciary breach/statutory violation claims.  *See, e.g., Romero v. Allstate Corp.,* 404 F.3d 212, 223-24 (3d Cir. 2005) (reaffirming "clear repudiation" rule and applying it to an anti-cutback claim; "clear repudiation" standard is "consistent with the federal discovery rule and, in the specific context of ERISA, avoids a myriad of ills") (collecting recent cases from other circuits).  PwC does not avoid its obligation to cite controlling authority when it cites *Connors v. Hallmark & Son Coal Co.,* 935 F.2d 336 (D.C. Cir. 1991) yet implies that it was an ERISA *benefits* case when it was just another multiemployer plan trustee chasing yet another delinquent employer.  Tellingly, PwC does not cite a single benefits or non-fiduciary breach/statutory violation ERISA case from *anywhere* following its "analysis" that does not also talk about the special consideration of the trust relationship or at least refer to the well-developed case law PwC is so eager to conceal.

## <u>CONCLUSION</u>

Wherefore, for the foregoing reasons, such other reasons as Plaintiff may have elsewhere adduced or may subsequently adduce, and/or for such other reasons as may appear to the Court, Plaintiff respectfully requests that the Court deny Defendants' motion. Oral argument is requested in the event the Court believes it might be useful.


August 29, 2005                              Respectfully submitted,



                                             ___/s/ Eli Gottesdiener_____
                                             Eli Gottesdiener
                                             **GOTTESDIENER LAW FIRM, PLLC**
                                             1025 Connecticut Avenue, N.W.
                                             Suite 1000
                                             Washington, D.C.  20036
                                             Phone: (202) 243-1000
                                             Fax:    (202) 243-1001

                                             Attorney for the Plaintiff and the proposed Class