**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit 1</u>

Notice of Appeal in *Cooper v. IBM Personal Pension Plan*, No. 99-829 (Aug. 30, 2005)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KATHI COOPER, ET AL.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 99-829** |
| | ) | |
| **THE IBM PERSONAL PENSION** | ) | |
| **PLAN AND IBM CORPORATION,** | ) | **CLASS ACTION** |
| | ) | |
| **Defendants.** | ) | |

### NOTICE OF APPEAL

Notice is hereby given that the Defendants in the above named case, The IBM Personal

Pension Plan and IBM Corporation, hereby appeal to the United States Court of Appeals for the

Seventh Circuit from the final judgment entered in this action on August 16, 2005.   This appeal

includes the rulings in the district court's order of July 31, 2003, embodied in the final judgment

of August 16, 2005, granting Plaintiffs summary judgment on liability on certain claims.  This

notice is timely filed within 30 days of the final judgment.  *See* Fed. R. App. P. 4(a)(1)(A).

/s/ Robert D. Wick

| | |
|---|---|
| Of Counsel: | Jeffrey G. Huvelle |
| | Robert D. Wick |
| Donald J. Rosenberg | Covington & Burling |
| Douglas G. Vetter | 1201 Pennsylvania Avenue, N.W. |
| IBM Corporation | Washington, D.C.  20004 |
| 1133 Westchester Avenue | 202-662-6000 |
| White Plains, New York  10604 | |
| | Frederick J. Hess |
| | Lewis, Rice & Fingersh |
| | 325 South High Street |
| | Belleville, IL  62220 |
| | 618-234-8636 |
| | |
| | *Attorneys for Defendants* |
| August 30, 2005 | The IBM Personal Pension Plan |
| | and IBM Corporation |

## CERTIFICATE OF SERVICE

I hereby certify that this 30th day of August 2005, I electronically filed Defendants' Notice of Appeal with the Clerk of Court using the CM/ECT system which will send notification of such filings to the following:

Steven A. Katz
Douglas R. Sprong
Korein Tillery
10 Executive Woods Court
Belleville, IL  62226

Robert F. Hill
John H. Evans
Hill & Robbins, P.C.
1441 Eighteenth Street, Suite 100
Denver, CO  80202

William K. Carr
Law Offices of William K. Carr
2222 E. Tennessee Avenue
Denver, CO  80209


/s/ Robert D. Wick
Robert D. Wick

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit 2</u>
Unpublished Opinions

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2451412 (D.D.C.)
(Cite as: 2004 WL 2451412 (D.D.C.))
H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Derek T. WILSON, Plaintiff,
v.
PRUDENTIAL FINANCIAL, et al., Defendants.
Civil Action No. 03-2313 (RMU).

Oct. 18, 2004.

Kevin L. Chapple, Washington, DC, for Plaintiff.

Stephanie Louise Marn, Proskauer Rose LLP, James P. Steele, William Edward Buchanan, Carr Maloney PC, Washington, DC, for Defendants.

*MEMORANDUM OPINION*

RICARDO M. URBINA, District Judge.

GRANTING IN PART AND DENYING IN PART CARCO'S MOTION TO DISMISS; DENYING CARCO'S
MOTION FOR SUMMARY JUDGMENT
I. INTRODUCTION

*1 Derek T. Wilson ("the plaintiff") allegedly lost his offer for at-will employment due to a problematic background check. He brings suit against the company that processed his background check, CARCO Group, Inc. ("CARCO"), alleging negligence (count one) and defamation (count two). The case is now before the court on CARCO's motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. Because the plaintiff states a claim for negligence, and because there are genuine issues as to material facts, the court denies CARCO's motion to dismiss or for summary judgment with respect to count one. Because the plaintiff does not plead malice or wilful intent as required by the Fair Credit Reporting Act ("FCRA"), however, the court grants CARCO's motion to dismiss with respect to count two.

II. BACKGROUND
A. Factual History

The court discussed the facts of this case in *Wilson v. Prudential Financial,* 2004 WL 1898290 (D.D.C. Aug. 13, 2004), and therefore limits the background information in this opinion to what will be necessary to resolve the instant motion. Specifically, the plaintiff alleges the following facts: in 2002, Prudential offered the plaintiff a position for at-will employment. Compl. ¶ 2. The plaintiff accepted the offer. *Id.* ¶ 4. On August 1, 2002, Prudential sent the plaintiff a letter "confirming his acceptance of [Prudential's] offer" and indicating that the offer was contingent on the satisfactory completion of a background-verification process that Prudential expected to take ten days. *Id.* ¶¶ 5-6, 25.

CARCO is a "consumer reporting agency," as defined by the FCRA. CARCO's Mot. to Dismiss ("Def.'s Mot") at 7; Opp'n at 3. Prudential retained CARCO to complete their background-verification process, and on September 3, 2002, CARCO provided Prudential with an investigative consumer report. *Compl.* ¶¶ 13-14; Reply at 3 (describing CARCO's report as an "investigative consumer report[ ]").

CARCO's report contained a section on criminal history, and CARCO entered the word "pending" in the box correlating to the status of the plaintiff's supposed criminal history in Oklahoma. Compl. ¶ 14. On the same day that Prudential received CARCO's report, Prudential sent the plaintiff a copy of the report and a letter denying the plaintiff's application for employment. *Id.* ¶ 9. Prudential cited an incomplete, unsatisfactory, and untimely background verification as the reason for its denial. *Id.* ¶¶ 9-11, 16.

The plaintiff subsequently contacted Oklahoma authorities, who informed the plaintiff that there were no criminal charges pending against him. *Id.* ¶ 19. The plaintiff also ordered a background check from the Oklahoma State Bureau of Investigation. *Id.* He learned that although there are persons named "Derek Wilson" and "Derrick Wilson" against whom charges are pending, neither shares the plaintiff's social-security number or date of birth. *Id.* ¶ 20. On September 5, 2002, the plaintiff informed CARCO that his personal history was clear of criminal charges and asked CARCO to send an amended report to Prudential. *Id.* ¶ 21. On September 6, 2002, CARCO sent Prudential an amended report indicating that the plaintiff had no criminal charges "pending" against him. *Id.* ¶ 22.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On September 25, 2002, Prudential sent the plaintiff a third letter stating that Prudential was aware that the plaintiff's background was clear and that Prudential would contact the plaintiff "when a suitable position became available." *Wilson,* 2004 WL 1898290, at *2. Prudential never hired the plaintiff.

### B. Procedural History
**\*2** On November 1, 2002, the plaintiff brought suit in the Superior Court of the District of Columbia, claiming breach of contract by Prudential and negligence and defamation by CARCO. *Wilson v. Prudential Financial,* 218 F.R.D. 1, 2 (D.D.C.2003). On December 18, 2002, Prudential removed the action to this court on the basis of diversity. On January 6, 2003, CARCO filed a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. On February 26, 2003, the plaintiff moved the court to extend time through March 26, 2003 to file his responses to the defendants' motions. The court denied the plaintiff's motion to extend time, however, and granted, as conceded, the defendants' motions to dismiss (the court dismissed the plaintiff's complaint without prejudice). *Id.* at 4.

In November 2003, the plaintiff once again brought suit against Prudential and CARCO. *Wilson,* 2004 WL 1898290, at *1. The plaintiff reasserted his claim of breach of contract by Prudential and negligence and defamation by CARCO. *Id.* The court granted Prudential's motion to dismiss, but denied CARCO's motion to dismiss for insufficiency of service of process and directed the plaintiff to perfect service. *Id.* at *7.

In August 2004, after the plaintiff perfected service, CARCO moved to dismiss for failure to state a claim or, in the alternative, for summary judgment. *See generally* Def.'s Mot. On August 28, 2004, the plaintiff filed oppositions to the defendants' motion to dismiss, and on August 31, 2004, the defendants filed their reply. The court now turns to CARCO's motion.

### III. ANALYSIS
#### A. Legal Standards
#### 1. Motion to Dismiss Pursuant to 12(b)(6)
A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002). To survive such

a motion, the complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1040 (D.C.Cir.2003) (citing Fed R. Civ. P. 8(a)(2) and *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley,* 355 U.S. at 47-48 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.,* 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory." *Krieger v. Fadely,* 211 F.3d 134, 136 (D.C.Cir.2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. District of Columbia,* 353 F.3d 36, 37 (D.C .Cir.2004); *Kingman Park,* 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States,* 334 F.3d 61, 64, 67 (D.C.Cir.2003); *Holy Land Found. for Relief & Development v. Ashcroft,* 333 F.3d 156, 165 (D.C.Cir.2003); *Browning,* 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren,* 353 F.3d at 39; *Browning,* 292 F.3d at 242.

#### 2. Summary Judgment
**\*3** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Diamond v. Atwood,* 43 F.3d 1538,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322; *Anderson,* 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene,* 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (internal citations omitted).

### B. Negligence

In his first cause of action, the plaintiff claims that CARCO failed to deliver an accurate background-verification report to Prudential in a timely manner. Compl. ¶ 24. For the reasons that follow, the court holds that the plaintiff states a claim for negligence and therefore denies CARCO's motion to dismiss or for summary judgment on the plaintiff's negligence count.

The court begins by noting that the plaintiff does not appear to dispute the defendant's application of District of Columbia negligence law or what that law entails. *Compare* Def.'s Mot. at 5 (applying

District of Columbia law) *with* Opp'n at 3-5 (responding to the defendant's arguments on negligence without disputing the application of District of Columbia law). A claim for negligence in the District of Columbia has four elements: (1) the defendant owed a duty to the plaintiff, (2) the defendant breached its duty, (3) and that breach was the proximate cause of (4) damages sustained by the plaintiff. *Powell v. District of Columbia,* 634 A.2d 403, 406 (D.C.1993). Although the plaintiff need not plead each of these elements in his complaint to survive a motion to dismiss, he must at least present facts to demonstrate that negligence provides the appropriate remedy for his grievance. *See Swierkiewicz,* 534 U.S. at 511- 14.

**\*4** Section 1681h(e) limits negligence actions against consumer reporting agencies to those provided in §§ 1681n (providing for civil liability for *willful* noncompliance) & 1681o (providing for civil liability for *negligent* noncompliance). 15 U.S.C. § 1681h(e). Section 1681o, in turn, indicates that damages for negligence may only be recovered against a consumer reporting agency if the negligence arises from a breach of the requirements set forth in the FCRA. 15 U.S.C. § 1681o. In essence, therefore, with only a few exceptions, the only duties that may be actionable against CARCO are those enumerated in the FCRA.

The thrust of CARCO's motion is directed at the "duty" element of negligence. Def.'s Mot. at 6. In his complaint, the plaintiff asserts that CARCO owed a duty to the plaintiff to report to Prudential in an accurate and timely manner. Compl. ¶ 24. In making this assertion, the plaintiff notes that CARCO is a "consumer reporting agency" that Prudential retained for the purpose of completing the background-verification process. *Id.* ¶ 8. In his opposition, the plaintiff clarifies his position by explaining that the FCRA requires a consumer reporting agency, such as CARCO, to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information[.]" Opp'n at 3-4 (citing *Jones v. Federated Financial Reserve Corp.,* 144 F.3d 961, 965 (6th Cir.1998) (citing 15 U.S.C. § 1681(b)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CARCO argues that the plaintiff's claim regarding CARCO's duty to provide Prudential with an accurate and timely report is nothing more than a conclusory legal statement. Def.'s Mot. at 6. CARCO also states that the plaintiff did not sufficiently assert the applicability of the FCRA in his pleadings and did not claim that CARCO had a duty to adopt reasonable procedures regarding fair and accurate dissemination of information to third parties in a timely matter. Reply at 2. CARCO also believes that the background verification report "speaks for itself." Def.'s Mot. at 2.

The court determines that the FCRA analysis that the plaintiff relies on is reasonably inferred from his assertion that CARCO is a "consumer reporting agency." Compl. ¶ 8. Although not specifically quoted by the plaintiff, § 1681e(b) requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Moreover, in a case that has particular relevance to the instant action, the D.C. Circuit has determined that even where a credit report contains factually correct information, that report does not comply with the FCRA if the information nonetheless misleads the readers. *Koropoulos v. Credit Bureau, Inc.,* 734 F.2d 37, 40 (D.C .Cir.1984) (rejecting lower court's argument that § 1681e(b) "makes a credit reporting agency liable for damages only if the report contains statements that are technically untrue").

**\*5** As indicated above, to survive a motion to dismiss, the complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n,* 348 F.3d at 1040. Although the court interprets the facts in the complaint in the light most favorable to the non-moving party, the plaintiff's memoranda may be used to clarify the allegations set forth in his complaint. *See Pegram v. Herdrich,* 530 U.S. 211, 230 (2000). In this case, the plaintiff alleges that CARCO is a consumer reporting agency and that the word "pending" and the timing of the report produced the type of result that 15 U.S.C. § 1681e(b) seeks to prevent. *See* Compl. ¶¶ 8, 24-31; *see also Koropoulos,* 734 F.2d at 40 n. 4 (noting the congressional purpose in the FCRA of preventing " *misleading* information") (quoting 115 Cong. Rec.

2411 (1969)) (emphasis added by D.C. Circuit). Accordingly, the plaintiff sets forth sufficient facts alleging that CARCO breached a duty arising under the FCRA to adopt reasonable procedures to prevent misleading information and that this breach harmed the plaintiff. [FN1] The court thus determines that, at least at this stage of the proceedings, the plaintiff satisfies the conditions set forth under § 1681o and § 1681h(e), and Federal Rule of Civil Procedure 12(b)(6), for stating a claim of negligence. [FN2]

> FN1. CARCO does not argue that a lack of injury defeats the plaintiff's negligence claim. Since it is unnecessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz,* 534 U.S. at 511-14, or "plead law or match facts to every element of a legal theory," *Krieger,* 211 F .3d at 136 (internal quotation marks and citation omitted), the court need not engage in its own analysis of injury. Furthermore, the court notes that although in its previous ruling it held that potential at-will employees generally have "no remedy in contract law against a perspective employer," *Wilson,* 2004 WL 1898290, at \*6, such a determination does not necessarily bar recovery against a consumer reporting agency under a tort theory.

> FN2. Of course, CARCO argues that "pending" refers to the status of the investigation, not the plaintiff's actual criminal history, but CARCO's argument shows how reasonable people can differ on the meaning of a word, not that the plaintiff can prove no set of facts in support of his claim of that would entitle him to relief. *Warren,* 353 F.3d at 37; *cf. Guimond v. Trans Union Credit Information Co.,* 45 F.3d 1329 (9th Cir.1995) (stating that the reasonableness of an agency's attempt to comply with the FCRA "will be [a] jury question[ ] in the overwhelming majority of cases").

CARCO has also moved for summary judgment on the plaintiff's negligence claim. Def.'s Mot. at 2-4. The one affidavit that CARCO submitted in support of its motion for summary judgment (which affidavit this court has not considered for purposes of adjudicating CARCO's motion to dismiss) does nothing to remove the genuine issues of material fact in this case concerning, for example, whether CARCO's report complied with the duty not to present misleading information that the FCRA imposes on entities such as CARCO. The court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

therefore denies CARCO's motion for summary judgment. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450 n. 12 (stating that "the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment in negligence cases"); *Gracyalny v. Westinghouse Elec. Corp.,* 723 F.2d 1311 (7th Cir.1983) (stating that, "[i]n negligence cases, questions concerning the reasonableness of the parties' conduct, foreseeability and proximate cause particularly lend themselves to decision by a jury. Thus, summary judgment is rarely appropriate in negligence cases") (internal citations omitted); *Brandstetter v. National R.R. Passenger Corp.,* 1987 WL 25664, *4 n. 4 (D.D.C.1987) (stating that "[i]ssues of conformity with applicable standards of care, proximate cause and forseeability are peculiarly fact-specific and contextual, and invariably concern considerations of reasonableness and credibility of evidentiary sources that are best left to the sound discretion of the trier of fact. Hence it is exceedingly rare for a negligence case ... to be resolved on summary judgment"); *cf. Paraskevaides v. Four Seasons Washington,* 292 F.3d 886, 893 (D.C.Cir.2002) (stating that "[w]hether a plaintiff is contributorily negligent is usually a question for the jury") (citation omitted).

## C. Defamation

*6 The plaintiff next asserts that CARCO defamed him by submitting a background-verification report to Prudential with the word "pending" listed in the box correlating to the status of the plaintiff's supposed criminal history in Oklahoma. Compl. ¶¶ 13-14. For the reasons that follow, the court grants CARCO's motion to dismiss the plaintiff's defamation allegation.

### 1. Limitation of Liability Under the FCRA

Although neither party has raised the FCRA's limitation of liability provision in connection with the defamation claim, the court notes that 15 U.S.C. § 1681h(e) provides a reason independent from statute of limitations to dismiss count two. [FN3] Indeed, the statute of limitations for claims arising under the FCRA is two years, and therefore the plaintiff's claim would not be time-barred when considered in the context of the FCRA. 15 U.S.C. § 1681p.

FN3. *Cf. Chute v. Walker,* 281 F.3d 314, 319 (1st Cir.2002) (indicating that a *sua sponte* decision

without notice is justified if "it is crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile").

Section 1681h(e) states that

Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). To overcome this qualified immunity, the plaintiff must therefore show that CARCO furnished information with malice or willful intent to injure. *See, e.g., Thornton v. Equifax, Inc.,* 619 F.2d 700, 703 (8th Cir.1980). The plaintiff has not claimed malice or willful intent to injure the plaintiff in his complaint, *cf.* Compl. ¶ 34 (stating that CARCO "either knew or should have known that the false and defamatory statement it punished to Prudential was not true"), and there is no provision in sections 1681n and 1681o that would allow his defamation claim to proceed without these elements. Accordingly, CARCO is protected by the qualified immunity conferred by the FCRA, and the court dismisses the plaintiff's claim of defamation for failure to state a claim. [FN4]

FN4. Even if the FCRA did not preempt the plaintiff's claim, the applicable statute of limitations under state law would bar recovery. When, as the parties in this case argue, a conflict of law exists, the court must use the choice of law rules for the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487 (1941); *A.I. Trade Finance v. Petra Intern. Banking Corp,* 62 F.3d 1454, 1458 (D.C.Cir.1995). The choice of law rules for the District of Columbia treat statutes of limitation as procedural, and therefore compel the court to apply the statute of limitation for the District of Columbia. *A.I. Trade Finance,* 62 F.3d at 1459. In the District of Columbia, the statute of limitations for defamation claims is one year from the date of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

first publication. D .C.Code § 12- 301(4); *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298 n. 2 (D.C.2001). District of Columbia courts adhere strictly to the one year limitation, *Mullin,* 785 A.2d at 298, and follow the "single publication" rule, under which publication of defamatory matter "gives rise to but one cause of action for libel, which accrues at the time of the original publication[.]" *Ogden v. Ass'n of the United States Army,* 177 F.Supp. 498, 502 (D.D.C.1959). Because the statute of limitations runs from the date of the original publication, any subsequent sale or delivery of a copy of the publication does not create a new cause of action. *Id.*

Viewing the facts of this case in the light most favorable to the plaintiff, the alleged defamation occurred on September 3, 2002. Compl. ¶ 19 (referring to CARCO's "September 3, 2002, background verification report"). As indicated above, the plaintiff first brought suit on November 1, 2002, and the court dismissed his complaint without prejudice on March 23, 2003. Opp'n at 1-2. The plaintiff then brought the present suit on November 7, 2003. *See generally* Compl. Accordingly, applying the District of Columbia's statute of limitations as a matter of procedure, and considering that courts narrowly construe the District of Columbia's statute to bar any claim that fails to toll the statute within the time allotted, the plaintiff's suit for defamation would be barred because it was filed over a year after the alleged defamatory publication. The plaintiff's November 1, 2002, suit did not toll the statute. "[I]f a plaintiff mistakes his remedy, in the absence of any statutory provisions saving his rights, or where from any cause ... the action abates or is dismissed, and, during the pendency of the action, the limitation runs, the remedy is barred." *Carter v. Washington Metropolitan Area Transit Authority,* 764 F .2d 854, 856 (D.C.Cir.1985) (citing *Willard v. Wood,* 164 U.S. 502, 523 (1896)). This premise holds true whether the pending action was voluntarily or involuntarily dismissed. *See Dupree v. Jefferson,* 666 F.2d 606, 611 (D.C.Cir.1981) (addressing the pendency of voluntarily dismissed actions); *York & York Construction Co. v. Alexander,* 296 A.2d 710, 712 (D.C.1972) (addressing the pendency of involuntarily dismissed actions).

Furthermore, the plaintiff has not identified any reason to equitably toll the statute. *Cf. Carter,* 764 F.2d at 858 (noting that "[e]xceptions to the general rule of strict application are seen as justifiable only

when the court perceives that an extraordinarily inequitable outcome would otherwise obtain"). Accordingly, even if the FCRA did not impose a statute of limitations, the plaintiff's defamation claim would fall outside the one-year period that the District of Columbia statute of limitations prescribes. *See Smith v. Brown & Wiliamson Tobacco Corp.,* 3 F.Supp.2d 1473, 1475 (D.D.C.1998).

## IV. CONCLUSION

For the foregoing reasons the court denies CARCO's motion to dismiss the plaintiff's negligence count; denies CARCO's motion for summary judgment on the plaintiff's negligence count; and grants CARCO's motion to dismiss the plaintiff's defamation count. An order consistent with this Memorandum Opinion is separately and contemporaneously issued on this 18th day of October, 2004.

Not Reported in F.Supp.2d, 2004 WL 2451412 (D.D.C.)

Motions, Pleadings and Filings (Back to top)

. 2004 WL 2878893 (Trial Pleading) Defendant Carco Group, Inc.'s Answer to Plaintiff's Complaint (Nov. 03, 2004)

. 2004 WL 2878868 (Trial Motion, Memorandum and Affidavit) Prudential Financial's Reply Memorandum in Support of Its Motion to Dismiss Count Three of Plaintiff's Complaint (Jan. 08, 2004)

. 2003 WL 23934037 (Trial Motion, Memorandum and Affidavit) Defendant Carco Group, Inc.'s Reply to Plaintiff's Opposition to Motion to Dismiss, or, in the Alternative, for Summary Judgment (Dec. 12, 2003)

. 2003 WL 23934027 (Trial Motion, Memorandum and Affidavit) Defendant Prudential Financial's Motion to Dismiss Breach of Contract Claim in Plaintiff's Complaint With Prejudice (Nov. 20, 2003)

. 2003 WL 23934023 (Trial Pleading) Complaint and Jury Trial Demand (Nov. 07, 2003)

. 1:03cv02313 (Docket) (Nov. 07, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
**(Cite as: 2004 WL 2451412, \*6 (D.D.C.))**

. 2003 WL 23934052 (Trial Motion, Memorandum and Affidavit) Defendant Carco Group, Inc.'s Reply to Plaintiff's Opposition to Motion to Dismiss, or, in the Alternative, for Summary Judgment (Aug. 31, 2003)

. 2003 WL 23934031 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Opposition to Defendant Carco's Motion to Dismiss or, in the Alternative, for Summary Judgment (2003)

. 2003 WL 23934041 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Opposition to Defendant Prudential's Motion to Dismiss (2003)

. 2003 WL 23934047 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Order of August 3, 2004 (2003)

. 2003 WL 23934049 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Opposition to Defendant Carco's Motion to Dismiss or, in the Alternative, for Summary Judgment (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              **Page    1**
Not Reported in F.Supp.2d, 2003 WL 22383031 (D.D.C.)
**(Cite as: 2003 WL 22383031 (D.D.C.))**
н

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Dawn v. MARTIN, Plaintiff,
v.
HOWARD UNIVERSITY, et al., Defendant.
No. CIV.A.99-1175 TFH/JM.

Oct. 20, 2003.
James William Morrison, Holland & Knight,
L.L.P., Washington, DC, Dawn Valore Martin,
Quin Harry Martin, Washington, DC, for Plaintiff.

Leroy T. Jenkins, Jr., Howard University, Office
of Legal Affairs, Washington, DC, Brian Lawrence
Schwalb, Schwalb, Donnenfeld & Schwalb, P.C.,
Washington, DC, Nadine Chandler Wilburn, Office
of Corporation Counsel, D.C., Washington, DC,
James Patrick Schaller, Jackson & Campbell, P.C.,
Washington, DC, Deborah K. St. Lawrence,
Howard University, Washington, DC, William
ChappeleEugene Robinson, Phillip A. Lattimore, III
, Washington, DC, Frederick Douglas Cooke, Jr.,
Rubin, Winston, Diercks, Harris & Cooke, L.L.P.,
Washington, DC, for Defendant.

REPORT AND RECOMMENDATION

FACCIOLA, Magistrate J.

  **\*1** For the reasons stated in this opinion, I
recommend that the parties' cross motions for
summary judgment be denied except that Howard
University's motion be granted as to plaintiff's
claims based on Howard's leaving certain faculty
positions vacant and hiring a tax professor.

BACKGROUND
The plaintiff, Dawn V. Martin ("Martin"), was a
visiting professor at Howard University Law School
[FN1] from August 16, 1996 until her contract
expired on May 15, 1998.

  FN1. Hereafter "HU".

This lawsuit grows out of incidents involving a
mentally deranged homeless man, Leonard Harrison
("Harrison"), whose strange behavior led plaintiff to
seek protection from HU. Subsequently, however,

plaintiff complains that HU created a hostile
working environment because of its inadequate
reaction to Harrison's behavior. She also complains
that HU retaliated against her because of her
complaints to the administration about its inadequate
response.

INTRODUCTION
I. *The Parties' Failure to Comply with the Local
Rules*

  The parties have cross-moved for summary
judgment. This obliged each of them to comply with
our local rules by filing a *Statement of Material
Facts as to Which There Is No Genuine Issue.* LCvR
7.1(h). Once they received each other's *Statement,*
they were obliged to file an opposition that "shall be
accompanied by a separate concise statement of
genuine issues setting forth all material facts as to
which it is contended there exists a genuine issue
necessary to be litigated." *Id.* The statement of
genuine issues must refer to that portion of the
record, created by discovery and otherwise, that
supports the contention that a certain fact is
disputed. *Id.* Neither party complied with the rule.
Plaintiff filed *Plaintiff's Statement of Material
Undisputed Facts* ("Plains.Statement"), but HU filed
what it called *Howard University's (Corrected)
Statement of Material Facts that Preclude Summary
Judgment for Plaintiff.* HU said that it filed this
document "to support its opposition to plaintiff's
motion for summary judgment" and then in a
footnote stated:
HU asserts that this statement precludes this Court
from entering summary judgment for plaintiff.
Indeed, to the extent these facts are undisputed by
plaintiff, as set forth in HU's motion for summary
judgment, this Court must grant summary judgment
for HU. Moreover, the existence of these factual
issues precludes the entry of summary judgment for
plaintiff.
  *Id.* at 1 n. 1.

  HU's assertion that material facts preclude
summary judgment for plaintiff has to mean that
plaintiff is not entitled to summary judgment
because there are factual issues that have to be
resolved by a jury. But, if there are factual issues
that have to be resolved by a jury, that means that
HU is not entitled to summary judgment either since

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
(Cite as: 2003 WL 22383031, *1 (D.D.C.))

the existence of any factual issues precludes granting summary judgment for HU as much as it precludes it for plaintiff.

Unfortunately, plaintiff, apparently forgetting that she was both movant and opponent of a motion, also failed to comply with the rule and file a statement of facts as to which there is a genuine issue. The parties' failure to comply with the local rule puts me in the impossible predicament of attempting to resolve cross-motions for summary judgment without knowing exactly what facts are disputed. Confronted with two irreconcilable versions of the facts, I certainly cannot prefer one to the other.

*2 I could, at this point, say a plague on both your houses and strike both motions for failure to comply with the local rule. But, given the tortured, acrimonious history of this case, I am, to put it mildly, reluctant to engender another round of briefing or an appellate issue on what might be characterized as a technical ruling. Moreover, I have presided over this case so long that I can divine what is and what is not in dispute for the limited purposes of my responsibility. As will become obvious, I am firmly convinced that there are genuine issues of material fact as to nearly every issue dividing the parties. Given that conclusion, striking the cross motions would only prolong the agony that this case has become for the parties and the court.

## II. *Issues Resolved by Chief Judge Hogan Will Not Be Revisited*

Before turning to my analysis, I must note that in 1999, Chief Judge Hogan denied HU's motion for summary judgment and specifically held that there were factual issues that precluded an award of summary judgment. *Martin v. Howard Univ.*, 1999 U.S. Dist. LEXIS 19516 (D.D.C. Dec. 16, 1999). As hard as it is to believe, in its current motion, HU ignores that decision and once again advances the very arguments Judge Hogan rejected. It is, of course, legitimate for a party to renew a motion for summary judgment based on information newly garnered as a result of the discovery process. *See Williamsburg Wax Museum, Inc. v. Historical Figures, Inc.*, 810 F.2d 243, 250 (D.C.Cir.1987). But, what HU cannot do is ignore the Chief Judge's decision and expect me to ignore it as well. I cannot reconsider a decision I did not issue, nor do I have any power to overrule the Chief Judge. Thus, his

determinations control.

More specifically, the Chief Judge concluded:
1. The alleged harassment by Harrison of the plaintiff was based on her sex;
2. Whether Harrison's conduct was sufficiently severe or pervasive to be actionable under the rubric of a hostile environment claim was a jury question;
3. Whether plaintiff's letter was sufficiently detailed to place HU's Dean Alice Gresham Bullock ("Bullock") on notice that plaintiff believed that she had been the victim of a hostile work environment was a question of fact for the jury;
4. Whether plaintiff engaged in protected activity when she informed Bullock of Harrison's activities and complained about what she felt was the inadequacy of campus security was a question of fact for the jury;
5. There was a sufficient causal connection between the adverse actions about which plaintiff complained and her complaints about Harrison and campus security to make the issue of whether the former were retaliation for the latter a triable issue of material fact; and
6. Whether one of plaintiff's complaints of retaliatory action, that, as a result of HU's retaliation, she was evicted from her officer prematurely, constituted an adverse employment action was a material issue of fact for the jury.

*3 I will not permit HU, in its second motion for summary judgment, to re-litigate those issues that were resolved against it. Triable issues of fact in 1999 remain triable issues of fact in 2003.

## III. *The Issues Raised by HU's Second Motion That May Be Considered*

Reading HU's second motion with some indulgence, there are only three issues that it did not press in its first motion: 1) whether plaintiff suffered an adverse personnel action, *i.e.*, a materially adverse consequence affecting the terms, conditions, or privileges of employment because of Harrison's activities; 2) whether HU's response to plaintiff's complaints about Harrison was adequate; [FN2] and 3) whether information disclosed during discovery compels the conclusion that Howard did not retaliate against plaintiff such that no reasonable juror could conclude to the contrary.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. HU specifically indicated in its first motion that "material facts regarding the appropriateness of the University's response are indeed in dispute." *Defendant Howard University, Howard University School of Law, President H. Patrick Swygert, and Dean Alice Bullock's (in her Official Capacity) Reply Memorandum of Points and Authorities in Support of their Motion to Dismiss the Complaint or in the Alternative for Summary Judgment* at 4. It, therefore, was not moving for summary judgment on the ground that HU's response to plaintiff's complaints about Harrison was appropriate. Hence, HU can make that argument now.

### DISCUSSION

### I. *Plaintiff Need Not Show an Adverse Employment Action*

As to the first issue, whether plaintiff must show that she suffered an adverse employment action, HU muddles two distinct bodies of law. When a person claims to be victimized by discrimination and invokes Title VII, she must establish that she was subjected to an adverse employment action, such as a demotion or a loss of pay. *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999). On the other hand, when a person complains of being subjected to a hostile environment because of sexual harassment, she is not obliged to show an adverse employment action so long as she establishes that the harassment is sufficiently severe or pervasive to alter the conditions of her employment, even though she remains employed at the same salary and in the same position. *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) . Plaintiff was, therefore, not obliged to show that she was fired or demoted as a condition of establishing a hostile working environment. If she did, the protections afforded employees who have to work in hostile environments would evaporate as long as their employers, while tolerating the harassment, did not fire or demote them. What HU is really saying is that only two personal encounters with Harrison do not constitute a hostile environment. But, Chief Judge Hogan has already ruled that whether Harrison's actions did or did not constitute a hostile environment is a triable issue of fact. *Martin,* 1999 U.S. Dist. LEXIS 19516 *8.

### II. *The Adequacy of HU's Response*

As to the second issue, the adequacy of HU's

response to Harrison's activities, there is a self-evident jury issue presented. Juries exist, after all, to apply a standard, as defined by the court's instructions, to the evidence it hears. There is not much dispute as to what Harrison did, what complaints plaintiff made, and what HU did in response. It is also undisputed that, when Harrison returned to the campus, he was not apprehended. Hence, the adequacy of HU's actions raises a jury question in the same sense as a doctor's treatment of a patient may or may not be deemed negligent under the applicable standard of care. HU's assertion that its response was adequate does not make the issue any less a jury question. The demand by plaintiff for summary judgment on the grounds that HU's response was inadequate has to be denied for the same reason.

**\*4** Moreover, if HU were to argue that no reasonable person could conclude that its response was inadequate, plaintiff could point, for example, to the fact that, despite her complaints, the administration failed to alert all of its officers about Harrison's bizarre contacts with the plaintiff. Indeed, when Officer Dowdy encountered Harrison on campus, he simply examined his identification and let him go. This occurred even though campus security and the Metropolitan Police Department had agreed that Harrison should be arrested if he ever came back on campus. Those facts alone create a genuine issue of material fact as to the adequacy of HU's response to plaintiff's complaints. On the other hand, that plaintiff admittedly secured the assistance of the HU security staff nullifies her right to claim that a reasonable person would have to find HU's response inadequate. On either side of the coin, the adequacy of HU's response to plaintiff's complaints is a pristine example of a triable issue of fact.

### III. *Understanding Plaintiff's Retaliation Claims*

### A. *Chronology of Events*

Plaintiff claims that three additional acts of retaliation occurred after HU decided not to renew her contract. To understand HU's argument as to these claims, one has to understand the sequence of events in this case.

Plaintiff's visiting professorship was scheduled to end with the 1997-1998 school year. *Howard*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    **Page  4**
**(Cite as: 2003 WL 22383031, \*4 (D.D.C.))**

*University's Motion for Summary Judgment* ("Defs.Mot.") at 6. On October 1, 1997, Martin formally applied for a tenure-track position, or in the alternative, for a renewed visitorship. Plains. Statement at 20. Martin followed up with a memorandum to the HU's Appointments, Promotions and Tenure Committee ("APT"), dated October 2, 1997, requesting consideration for appointment to a permanent, tenure-track position. Defs. Mot. at 13-14. In the meantime, Howard advertised three available faculty positions for the 1998-1999 academic year: 1) Labor/Equal Employment Opportunity ("Labor/EEO") Law, 2) Constitutional/Civil Rights Law ("Constitutional Law"), and 3) Commercial Law. Plains. Statement at 20.

On Oct. 31, 1997, Martin interviewed with Bullock. Defs. Mot. at 14. Bullock told Martin that her appointment as Visiting Associate Professor of Law would terminate on May 15, 1998 and that Martin was being rejected for reappointment. *Id.* On November 3, 1997, Bullock wrote Martin a letter memorializing the meeting. *First Amended Complaint* ("Plains. Amended Compl.") at Ex. L.

On November 5, 1997, Martin submitted a memorandum to the APT Chair, Isaiah Leggett ("Leggett") to "assist [the APT] in assessing [Martin's] application for a permanent faculty position, or in the alternative, an extension of [her] visitorship." Defs. Mot. at Ex. 13. On November 7, 1997, Martin interviewed with the APT Committee. *Id.* at 15. On December 18, 1997, the APT Committee met to discuss all open positions. *Id.* After reviewing Martin's application and her supporting materials, the APT decided against recommending Martin for reappointment. *Id.* That same day, Professor Andrew Taslitz ("Taslitz"), Vice-Chair of the APT, verbally informed Martin of the Committee's decision. *Id.*

**\*5** Shortly thereafter, the APT extended offers to E. Christi Cunningham ("Cunningham"), Reginald Robinson ("Robinson"), and Lateef Mtima ("Mtima"), for the Labor/EEO position, the Constitutional Law position, and the Commercial Law position, respectively. *Id.* at 15-16. In February 1998, Robinson rescinded his original acceptance. Defs. Mot. at 16-17. When Martin became aware of Robinson's recision, she immediately wrote to Bullock. In a letter dated

March 6, 1998, Martin requested that HU reconsider the APT's initial December 18 decision to reject her as a candidate for a tenured professorship. In the same letter, Martin also asked that she be considered for the newly vacant Constitutional/Civil Rights position. Plains. Amended Compl. at Ex. Q.

At some point thereafter, tenured HU Tax Law Professor Loretta Argrett ("Argrett") decided to extend her sabbatical leave for another semester. Argrett told Howard she would not return until the Spring semester of 1999, at the earliest. Plains. Statement at 50.

In the Spring of 1998, Bullock determined that she was unable to teach her courses in Tax and Trusts & Estates because of her responsibilities as Dean. Defs. Mot. at Ex. 6. She also realized that Associate Dean Michael Newsom ("Newsom") would not be able to continue teaching Property Law and Trusts & Estates. *Id.* In addition, at some point in time, HU suspended one of its Property Law professors. *Id.*

On April 15, 1998, the APT recommended to Bullock that HU hire Angela Vallario ("Vallario") to teach a Tax course and a Wills, Trusts & Estates course. Defs. Mot. at 19.

On April 8, 1998, Bullock responded to Martin's March 6 letter. Plains. Amended Comp. at Ex. R. Focusing on Martin's request for reconsideration of the December 18 APT decision, Bullock told Martin that HU would not reconsider her application and that the only courses "for which the school has urgent teaching needs ... do not include courses which you teach." *Id.* Additionally, Bullock described how the events that occurred in February 1998 had resulted in changes in HU's hiring needs. *Id.*

In response to Bullock's April 8, 1998 letter, Martin wrote back, asking that she be considered for *any* position at Howard. Plains. Amended Comp. at Ex. S. On April 10, 1998, Martin again wrote to Bullock, this time proposing a number of scenarios in which, she thought, HU could reshuffle the faculty assignments in order to accommodate her desire for a position. *Id.* at Ex. T.

Bullock replied to Martin's April 10, 1998 letter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

(Cite as: 2003 WL 22383031, *5 (D.D.C.))

and, in rejecting Martin's proposed reassignments, stated that "[t]he School of Law executed contracts with new hires several months ago which confirm their teaching assignments. I have no basis to rescind those agreements." Plains. Amended Comp. at Ex. U. Bullock then forwarded Martin's letters to the APT for formal reconsideration. *Id.* Positive action was not taken by the APT, and Martin left HU as the school year ended. Defs. Mot. at 19.

### B. *HU's Denial of Martin's Initial Application for Tenure or Renewed Visitorship*

**\*6** The first act of retaliation alleged by plaintiff is the easiest to articulate and understand: HU's denial of her initial application for tenure or renewed visitorship. This claim is predicated on the December 18, 1997 decision by the ATP not to recommend her re-appointment. The result was that plaintiff lost her job and it was given to Cunningham.

According to Martin, following her complaints regarding Harrison, Bullock expressed "animosity" toward Martin personally and displayed a "sarcastic, callous and hostile response to the issue" generally. Plains. Mot. at 16. Martin also contends that Bullock grew more and more weary of having to deal with Martin's situation and that Bullock's discomfort was made known to the members of the APT. According to Taslitz, Bullock spoke to him about Martin prior to the APT's December 18, 1997 decision on Martin's application. Deposition of Andrew Taslitz ("Taslitz Dep.") at 130:2-132:11. Taslitz recalled that Bullock raised concerns about Martin's judgment and questioned her abilities as an academic. *Id.* Martin thus claims that the APT evaluation process was "poisoned" since Bullock "used" Taslitz to misrepresent Martin at the APT evaluation. Plains. Mot. at 17-18. [FN3] Martin also claims that the APT was simply a "rubber stamp" for Bullock's recommendation. *Id* .

> FN3. Taslitz admits that he spoke with Bullock about Martin prior to the APT Committee meeting to review Martin's application for tenure. Taslitz Dep. at 130:2-131:8. He also admits that she expressed her displeasure with Martin as a law professor and made specific mention of Martin's "poor judgment" to him. *Id.* at 131:9-22. When the APT Committee met to discuss Martin's application for tenure, Taslitz presented a number of "concerns" to the

other Committee members regarding Martin. *Id.* at 136:11-140:15. Taslitz also recalled that two other Committee members may have expressed comments about Martin's "bad judgment" when the APT discussed her qualifications. Taslitz confirmed that the comments were tied in some way to Bullock. *Id.* at 168:14-169:12. Taslitz testified that "there were a number of people on the faculty who had been saying that they thought you had poor judgment and that the Dean had also expressed that view very early on in your time at Howard." *Id.*

HU contends that Martin was not recommended for the EEO tenure position because she: 1) lacked scholarship, 2) exhibited poor judgment, and 3) was not "actively involved in the intellectual life of the Law School community." *Id.* at 38-39.

#### 1. *Martin's Lack of Scholarship*

In support of its claim that Martin lacked scholarship, HU argues that Martin failed to complete and misrepresented her expected ability to complete an article that she was preparing for publication. According to HU, during her initial job interview with the APT in early 1996, Martin represented to the Committee that she had an article in "final form" and "immediately ready for publication." Def.'s Mot. at 6. HU also claims that Martin indicated that she expected to have the article, entitled *911: How Will Police and Fire Departments Respond to Public Safety Needs and Comply with the Americans with Disabilities Act?* (" *911* "), [FN4] finished by the beginning of the 1996-97 school year. [FN5] In her letter to the APT supporting her application for tenure, however, Martin outrightly expressed her self-dissatisfaction with the progress of *911*. HU claims that she even stated that she was "extremely embarrassed at how long [the article] has taken to be ready to send out." [FN6] Defs. Mot. at Ex. 13, p. 4. HU further claims that, in the same letter, Martin promised that the *911* article would be finished the very next day and that her other research project (*Lights, Camera, Discrimination! Playing the Victim Under Title VII* ("*Lights* ")) would be done by January 1998.

> FN4.   Taslitz testified that Martin explicitly represented that the "*911* piece at the time [Martin] had accepted the offer to Howard would be published or at a minimum accepted for publication by the time [Martin] started employment at Howard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22383031, *6 (D.D.C.))

and, in fact, it was not accepted for publication ...."
Taslitz Dep. at 137:19-138:1.

FN5. In her November 5, 1997 letter to the APT in support of her application for tenure, Martin wrote that she "would have liked to have had *911* published at least a year ago." Defs. Mot. at Ex. 13, p. 5.

FN6. Martin cited eleven reasons why the article was not finished. Among those reasons were a car accident in October of 1996, which caused Martin constant headaches and damage to her back and neck, pneumonia suffered over the winter school break of 1996-97, a diagnosis of a severe mold allergy and exposure to "visible" mold-infested classrooms, an IRS problem, difficulties with research assistants, ongoing litigation with her landlord due to "hidden defects," and computer problems that forced Martin to retype the entire article. *Id.*

### 2. *Martin's Poor Judgment*

**\*7** In addition to lacking scholarship, Martin, according to HU, also exhibited poor judgment. According to Taslitz, Martin behaved inappropriately at a faculty meeting by refusing to let drop an issue that the faculty had debated and voted on. Despite the fact that the faculty ultimately voted in a way not favored by Martin, according to Taslitz, Martin remained "very insistent" as to the correctness of her viewpoint. Taslitz Dep. at 170:10-17. In addition, Taslitz stated that several faculty members came away with the impression that "anyone who disagreed with [Martin] was unreasonable" and that "some people were feeling insulted by that." *Id.* Taslitz also stated that other faculty members had told him they didn't believe Martin had good judgment. Taslitz Dep. at 243:12-21.

According to Professor Andrew Gavil ("Gavil"), also an APT member involved in Martin's evaluation, Martin once referred to one of her students with whom she was having a conflict as a "bitch." Deposition of Professor Andrew Gavil ("Gavil Dep.") at 88:7-21. Gavil further stated that the comment was "troublesome" to him since he "was not accustomed to hearing faculty talk about a student that way." *Id.* Gavil recounted the matter to Taslitz and expressed his feeling that Martin's

actions showed "very bad judgment." Taslitz Dep. at 247:20-248:21.

### 3. *Martin's Interaction with the Law School Community*

Finally, HU claims that Martin was not "actively involved in the intellectual life of the Law School community." *Id.* at 38-39. Various faculty members complained to Taslitz that they "found [Martin] difficult to deal with on a personal basis." Taslitz Dep. at 240:2-5, 243:12-21. Newsom told Taslitz that Martin had created "headaches" for his office. *Id.* Taslitz also reported that faculty members "were disturbed [and] felt uncomfortable with [Martin]." *Id.* at 26:3-19. According to Taslitz, Gavil had indicated his "frustration" with the lack of progress in Martin's scholarship and had noted that there were a "significant number of people who [felt] they [were] having difficulties relating to [Martin]." Taslitz Dep. at 247:20-248:21. Taslitz also stated that Gavil was concerned that Martin had not gone to luncheons to talk about articles and scholarship. *Id.*

Martin agues that HU's proferred reasons are pretextual. The first suggestion of pretext is rooted in the Committee's consideration of applicant publications. Taslitz testified that when the APT met on December 18, 1997 to discuss and consider several candidates for open tenured positions at the Law School, the University considered only articles that were in print by the date of the APT action. According to Taslitz, this was in accordance with the requirements for an Associate Professorship. Taslitz Dep. at 119:20-120:16. Taslitz admitted, however, that while a two-article minimum was the "standard," it was not the "rule." *Id.* Nevertheless, although the publication of two articles was cited as a "minimum standard" for an Associate Professorship, HU offered it as the primary reason for its refusal to offer Martin tenure. *See, e.g.,* Defs. Mot. at 6. Leggett, for example, testified that Cunningham's scholarship production was a "crucial point of the decision" to choose her over Martin. Deposition of Isaiah Leggett ("Leggett Dep.") at 169:4-14.

**\*8** In Howard's Answers to Interrogatories dated October 17, 2000, Howard stated that Martin was refused tenure in part because as of December 18, 1997 Martin had "no scholarship articles accepted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22383031, *8 (D.D.C.))

for publication." Plains. Mot. at 25. In fact, HU was aware that Martin's *911* article had been accepted for publication on December 17, 1997, that she had substantially completed work on a second article (*Lights* ), and that she was in the process of researching a third. Taslitz Dep. at 159:12-162:13. Significantly, four of the five APT Committee members testified that they knew of the article's publication. Plains. Statement of Facts at 27. Taslitz even testified that he had informed the other members that Martin's article was recently accepted for publication. Taslitz Dep. at 141:7-16.

Leggett testified that not only was he made aware that the *911* article had been approved by the time of the December 18 meeting, but that he was even considering giving Martin credit for two different articles. Leggett Dep. at 117:15-121:8. Nevertheless, when asked why he chose Cunningham, Leggett testified that Cunningham had not only published during her time at Howard but had also presented "sufficient information" to suggest that she would publish again and was in the process of doing so. *Id.* at 160:6-19. Although Leggett testified that publication was a "crucial" factor in his decision, he admitted to a not even having read Cunningham's article. *Id.* at 170:19-20.

The second suggestion of pretext is rooted in the reason offered by the Committee in support of its decision to hire Cunningham for the Labor/EEO position. According to Taslitz, Cunningham had extremely positive academic and professional experience. Taslitz Dep. at 133:21-136:10. However, Leggett testified that Martin had more professional experience in EEO law than Cunningham. Leggett Dep. at 153:2-4. Although Leggett deemed Cunningham's qualitative experience to be better than Martin's, the Committee did not identify qualitative legal experience as a factor for consideration. *Id.* at 200:19-202:3. Finally, Professor J. Clay Smith, another Committee member, testified that Martin's and Cunningham's qualifications were "very close." Plains. Mot. at 32.

The third suggestion of pretext is rooted in the Committee's assessment of Martin's judgment. Leggett testified, contrary to Taslitz' assertion, that he found Cunningham and Martin "basically both qualified ... judgment-wise." Leggett Dep. at 194:22-195:3. Leggett also testified inconsistently with Taslitz on the issue of faculty comments about

Martin. Leggett received comments from faculty members about Martin that were not negative. In fact, according to Leggett, faculty members generally had "good things [to say] about [Martin's] ... work," Leggett Dep. at 249:7-12, and there was "no faculty concern brought to [Leggett's] attention regarding Martin's appointment." *Id.* at 251:13-15. Leggett himself admitted that he found Martin "to be collegial" based on his personal contact with her. *Id.* at 258:20-259:7. Although Taslitz considered the impressions of other faculty members important in assessing Martin's "contribution to the life of the Law School community," Taslitz Dep. at 240:2-5, Leggett testified that he personally "did not give a great deal of weight" to positive faculty comments about Martin and that there "was not a serious discussion among the faculty members" from which to base dispositive judgment on either Martin or Cunningham. Leggett Dep. at 265:11-19.

**\*9** Reading the record in a light most favorable to plaintiff, the articulated reasons for firing Martin are contradicted by the potential testimony of members of the ATP committee who have voiced positive views of Martin. First, contrary to HU's contention that Martin lacked scholarship, there is evidence that members of the APT Committee were in fact aware that one of Martin's articles had been accepted for publication and that she was working on two others. In addition, while Cunningham's scholarship production was cited as pivotal in her selection, one Committee member admitted to not even having read the article. Second, contrary to HU's contention that Martin displayed poor judgment, there is evidence that certain faculty members had positive impressions of Martin and that both she and Cunningham were viewed as equally qualified in terms of their exercise of judgment. Finally, that Martin's professional experience in EEO law was greater than Cunningham's undercuts the argument that Cunningham was substantially more qualified than Martin. In fact, it appears that the decision was a close call.

Allowing for the reality that the selection process is not a scientific one and for the deference that must be paid to the right of an employer, particularly a university, to hire whomever it sees fit, these inconsistencies compel me to conclude that a reasonable finder of fact could find them untrue and a pretext for retaliation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22383031, *9 (D.D.C.))

### C. *HU's Hiring of a Tax, Trusts and Estates Professor*

The second act of retaliation alleged by Martin is that Bullock inappropriately converted a vacant Constitutional Law/Civil Rights position into a Visiting Tax, Trust and Estates position and offered it to Vallario in retaliation against plaintiff for her complaining about Harrison. *Id.* ¶ 312. Plaintiff insists that Bullock only did this to ensure that plaintiff did not return to HU because she was not qualified to teach a tax course, even though she was qualified to teach a constitutional law course.

HU claims that the Law School's faculty needs for the 1998-1999 academic year simply "changed" around the Spring of 1998. First, HU cites Argrett's decision to extend her sabbatical leave for another semester. Second, HU cites Bullock's and Newsom's decisions to give up their teaching responsibilities. According to HU, these changes created the following vacancies: Tax (3 sections), Trusts and Estates (2 sections), and Property (4 sections). Bullock went to the APT to begin the hiring process anew, and as a result, the APT hired Vallario.

Martin counters that HU simply reshuffled the deck. Martin argues that when she reapplied for the Constitutional Law position, Bullock simply did not want to deal with her anymore. Therefore, instead of vetting Martin through the APT again for a different position, Bullock decided to rearrange her and her colleague's schedule and to create a position for which there was previously no need.

### D. *HU's Decision to Leave Certain Positions Vacant*

**\*10** The third act of retaliation identified by Martin is that HU, in retaliation for her complaints about Harrison, left certain positions open rather than consider her for any of them. *Id.* ¶¶ 326, 327, 330, 340, 345. According to Martin, HU failed to fill several vacancies that were created at various times during the first few months of 1998. Specifically, Martin claims that HU failed to fill the following positions: 1) the Constitutional Law vacancy created by Robinson's rescission of her acceptance, 2) the vacancy created by Argrett's decision to extend her sabbatical, 3) the vacancy created by the decision of a professor named Ramsey to leave the faculty, and

4) the Property Law vacancy created by the suspension of a Property Law professor. Plains. Mot. at 42.

In Martin's view, three positions were vacant as of October 1997. Accordingly, Bullock recommended that three professors be hired and three offers were made. When only two professors accept the APT's offer, a vacancy was created. According to Martin, additional vacancies were then created by the decisions of Argrett and Ramsey. Finally, another vacancy was created by the school's suspension of one of its Property Law professors.

HU, on the other hand, argues that the decisions it made were perfectly appropriate given the school's changing staffing needs. First, while HU admits that the Constitutional Law position remained vacant until after February of 1998, HU argues that it ultimately decided not to fill the position because of the staffing changes that occurred in the Spring of that year.

According to Bullock, in October of 1997, she had the budgetary resources to fill three positions for the 1998-99 academic year. She claims that the APT was charged to fill these positions and that offers were in fact made. She further claims that even at the time Robinson rescinded, Bullock's staffing needs had changed. At that point in time, instead of offering the Constitutional Law position to another professor, Bullock claims that she needed a professor to teach Tax, Property, and Trusts & Estates. With only enough funds remaining in the budget to cover one position, Bullock decided not to hire a Constitutional Law professor as originally planned, but instead decided to hire a professor to cover the Tax, Property, and Trusts & Estates courses. This decision led to the hiring of Vallario. As stated by Bullock:

[a]ctually it was fortuitous that Reggie Robinson didn't accept the offer. Although establishing a presence in civil rights and constitutional law was important, the priority had to be courses already in the curriculum and in need of coverage by full-time faculty. And that is what tax and property and trusts and estates were.

Bullock Dep. at 184:7-14.

Martin counters that she offered several "suggestions" for reorganizing the faculty in order to accommodate her, but that these alternatives were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22383031, *10 (D.D.C.))

never considered. For example, Martin wanted HU to ask Professor Cunningham to, in essence, relinquish her promotion and agree not to teach Labor and EEO Law so that Martin could teach those courses. Plains. Statement at 52 ¶ 246. Martin also suggested that HU reassign newly promoted Mtima's responsibilities as well. Instead of teaching Torts I and II, courses for which he had been promoted to teach, Martin suggested that HU ask him to teach Property courses instead. *Id.* at 247.

### E. Only HU's Decisions Not to Reappoint Martin or Offer Her Another Position Are Cognizable

**\*11** It is settled in this circuit that an act, claimed to be retaliatory, must constitute an adverse employment action. An adverse action is one that has materially adverse consequences affecting the terms, conditions, or privileges of her employment such that a reasonable finder of fact could conclude that the plaintiff has suffered objectively tangible harm. *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999). Two of Martin's retaliation claims easily meet this criterion: 1) the decision, formalized in Bullock's letter of November 3, 1997, not to reappoint her as Visiting Associate Professor, and 2) the decision, formalized in Bullock's letter of April 8, 1998, rejecting Martin's application for any position on the HU faculty. Combined, they led to Martin's dismissal and the loss of her job.

It is equally clear that the other acts of which she complains, the conversion of the Constitutional Law/Civil Rights position into a Visiting Tax, Trust position and the decision to leave certain faculty positions vacant, do not qualify as adverse actions. They lack a direct and immediate impact upon Martin that would permit them to be characterized as causing objectively tangible harm. While these acts ultimately led, in Martin's view, to her departure from HU despite her desire to stay in any faculty position, they did not in themselves cause her any harm cognizable as retaliatory.

In this context, the decision in *Page v. Bolger,* 645 F.2d 227 (4th Cir.1981) is particularly instructive. In that case, Page, an African American, challenged his not being promoted by an all-white review committee. In addition to his claim as to the promotion itself, plaintiff tried to create an additional claim as to the selection of the review committee that made the decision. The Fourth

Circuit, however, rejected that theory and concluded that Title VII applies only to ultimate employment decisions such as hiring or discharging:

Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII there are certainly others than those we have so far specifically identified that may be so considered [,] for example, entry into training programs, *Wright,* 609 F.2d at 712 n. 10. By the same token, it is obvious to us that there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of § 717 and comparable provisions of Title VII. We hold here merely that among the latter are mediate decisions such as those concerning composition of the review committees in the instant case that are simply steps in a process for making such obvious end-decisions as those to hire, to promote, etc.

*Id.* at 233.

An even closer case, because it arises in a university context, is *Foley v. University of Houston System,* 324 F.3d 310, 316 (5th Cir.2003), in which the court, reasoning as the Fourth Circuit did in *Page,* stated:

**\*12** Dr. Hutto's retaliation claim does not fare as well. The record below fails to establish the second essential element of her claim, *i.e.,* that an adverse employment action occurred. Under our jurisprudence, an adverse employment action means an ultimate employment decision, such as hiring, granting leave, discharging, promoting, and compensating. *Dollis v. Rubin,* 77 F.3d 777, 781-82 (5th Cir.1995). The employment actions alleged by Hutto do not meet that standard. Viewing the record in the light most favorable to her, Hutto is complaining of the following employment actions on the part of the Appellants: (1) they schemed to remove her as Chair of the Education Division in August 1996, and to replace her with Cheryl Hines; (2) they tried to undermine an important program within the Division known as the Center for Professional Development and Technology (CPDT), which reflected upon Hutto's leadership; (3) Haynes and Hines reprimanded her for circulating unauthorized flyers regarding the Administration and Education Program (AED) and generally attempted to undermine that program; and (4) they refused to attend the Phi Kappa Phi

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        **Page  10**
**(Cite as: 2003 WL 22383031, \*12 (D.D.C.))**

initiation ceremony the year that Hutto was the president of the organization. None of these adverse actions qualify as ultimate employment decisions. Her loss of the title of Chair of the Division in August 1996 did not result in any loss of compensation or benefits and she remained on the faculty as a tenured professor. Furthermore, that particular claim is clearly barred by the statute of limitations. The other listed allegations fall far short of ultimate employment decisions.

*Id.* at 317. *Accord: Saleh v. Virginia State U.,* 1999 U.S. Dist. Lexis 21842 \*50 (E.D.Va.1999)("Siddiqi's final claim is that he has applied repeatedly for graduate faculty status, to no avail until just recently. Because this claim involves only the process by which Siddiqi has secured a change in job title, it is not cognizable under the doctrine of *Page v. Bolger,* 45 F.2d 227 (4th Cir.1981)").

Similarly here, the mediate decisions of Bullock to convert one faculty position from Constitutional Law to Tax, Trust and Estates and to leave other faculty positions open do not form the bases for independent claims of relief because they are not adverse actions. They, therefore, may not be submitted to the jury as independent claims of relief in addition to the claims predicated on Bullock's letters that (1) advised Martin that she was being rejected for reappointment and (2) advised Martin that her application for another position on the HU faculty was rejected.

**IV.** *Plaintiff's Breach of Contract Claim*

In her final claim, Martin attempts to re-establish that an oral contract was made by Howard to extend Martin a tenure-track position after her visitorship ended. Chief Judge Hogan has already rejected her breach of contract claim, *Martin,* 1999 U.S. Dist. LEXIS 19516 at \*20-22, and I cannot and will not accept plaintiff's demand that I reach a contrary conclusion.

**V.** *Plaintiff's Renewal of Her August 3, 2001 Motion for a Default Judgment Based on Howard University's Production of Late, Incomplete, and Falsified/Tainted Evidence*

**\*13** In her August 3, 2001 motion, plaintiff sought to waive the 15-page limit previously established by this court. That motion was denied by the Chief

Judge on September 4, 2001. With total disregard for the limits established by the Chief Judge, plaintiff now seeks to renew her previous motion. However, it has not escaped the court that although her current motion, contained within her motion for summary judgment, is only three pages long, plaintiff seeks to include, by incorporation, those arguments made in her original 43-page motion, excluding exhibits: "Plaintiff renews her August 3, 2001 *Motion for a Default Judgment, Due to Howard University's Production of Late, Incomplete and Falsified/Tained Discovery* and incorporates, by reference all arguments made therein ...." Plains. Mot. at 48. A document that is 43 pages long does not become 15 pages long because it is attached to a document that is 15 pages long. A judicial order cannot be that easily evaded. Plaintiff's renewed motion should be denied.

CONCLUSION

For the reasons articulated above, I, therefore, recommend that *Plaintiff's Motion for Summary Judgment* [# 289] be denied. I further recommend that *Howard University's Motion for Summary Judgment* [# 288] be granted as to plaintiff's claim of retaliation based on HU's decision to leave certain positions vacant, [FN7] but denied as to all other portions.

> FN7. In the amended complaint, plaintiff characterizes HU's decision to leave certain positions vacant as the second and fourth acts of retaliation committed against her. Plains. Amended Compl. at 49, 64.

Failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Not Reported in F.Supp.2d, 2003 WL 22383031 (D.D.C.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.