# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIMOTHY D. LAURENT,                    )
On behalf of himself and on behalf of  )
all others similarly situated,         )
                                       )
   Plaintiff,          ) Civil Action No. 05-1291 (PLF)
                                       )
  vs.                       ) Judge Paul L. Friedman
                                       )
PRICEWATERHOUSECOOPERS LLP, et al.,    )
                                       )
   Defendants.         )
                                       )
_____  )

## DEFENDANTS' APPENDIX OF EXHIBITS IN SUPPORT
## OF THEIR RESPONSES TO PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT AND STATEMENT OF MATERIAL FACTS

Exhibit A......RBAP Plan Documents (amended and restated; effective July 1, 1995) (excerpts)

Exhibit B......Huber V. Forcier, *Guide to Cash Balance Plans* (Aspen 2003) (excerpts) and *2005 Cumulative Supplement* (Aspen 2005) (excerpts)

Exhibit C......RBAP Summary Plan Description (2001)

Exhibit D......Declaration of Melinda Burnham

Exhibit E......RBAP IRS Determination Letter (1996)

Exhibit F......RBAP IRS Determination Letter (2004)

Exhibit G......Michael J. Canan, *Qualified Retirement Plans* (Thompson West 2005) (excerpt)

Exhibit H......1997 Enrolled Actuaries Meeting, Questions to IRS/Treasury and Summary of their Responses (March 1997) (excerpt)

Exhibit I......Benefits Express Website Glossary (Aug. 31, 2005) (excerpt)

Exhibit J......Unpublished Case
   • *Barry v. United States Capital Guide Board,* 2005 WL 1026703 (D.D.C. 2005)

Dated:  September 16, 2005   Respectfully submitted,

_____s/David E. Mendelson_____

David E. Mendelson (471863)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
(202) 879-5000 (phone)
(202) 879-5200 (fax)
dmendelson@kirkland.com

Robert J. Kopecky
Douglas G. Smith
Lauren Casazza
Jason W. Callen
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

*Counsel for Defendants
PricewaterhouseCoopers LLP,
PricewaterhouseCoopers LLP Board of
Partners and Principals, the Retirement
Benefit Accumulation Plan for Employees
of PricewaterhouseCoopers LLP,
the Savings Plan for Employees and Partners of
PricewaterhouseCoopers LLP, the Savings
Plan for Employees of
PricewaterhouseCoopers LLP,
the Administrative Committee to the Retirement
Benefit Accumulation Plan for Employees
of PricewaterhouseCoopers LLP,
the Administrative Committee to the Savings
Plan for Employees and Partners of
PricewaterhouseCoopers LLP,
the Administrative Committee to the Savings Plan
for Employees of PricewaterhouseCoopers LLP,
Lawrence H. Anderson, John J. Barry,
William L. Bax,
Michael J. Boberschmidt, W. Keith Booth,
David J. Breen, Willard W. Brittain, Jay Brodish,
J. Frank Brown, Philip J. Clements,
Ira Cohen, Marsha R. Cohen, Michael S. Collins,
Brian L. Cornell, James E. Daley,
G. William Dauphinais, Jonathan J. Davies,
Sherry T. Davis, Samuel A. DiPiazza,
Robert B. Dubner, John R. Dunleavy,*

*J. Christopher Everett, Iris D. Goldfein,*
*Robert H. Herz, Roger C. Hindman,*
*Stephen D. Higgins, Craig M. Jacobsen,*
*Eugene S. Katz, Scott W. Kaufman,*
*Richard P. Kearns, Peter Kelly, Richard R. Kilgust,*
*Wendy L. Kornreich, James P. Kovacs,*
*Frederic L. Laughlin, D. Leon Leonhardt,*
*Keith D. Levingston, Dennis J. Lubozynski,*
*Ronald T. Maheu, Philip P. Mannino,*
*Anthony F. Martin, James L. McDonald,*
*Donald A. McGovern, James P. McNally,*
*Nicholas G. Moore, Robert C. Morris, Jr.,*
*Dennis M. Nally, Eldon Olson, Shaun F. O'Malley,*
*Matthew O'Rourke, Gary Pell,*
*Lawrence F. Portnoy, Louise A. Root,*
*Denis J. Salamone, Robert M. Sarsany,*
*Frank V. Scalia, James J. Schiro,*
*Christine G. Snyder, Garrett L. Stauffer,*
*George G. Strong Jr., Paul J. Sullivan,*
*Robert P. Sullivan, Ann M. Thornburg,*
*Randell S. Vallen, Francis J. Van Kirk,*
*Peggy M. Vaughn, Gary W. Van Wagnen,*
*Gerald M. Ward,*
*Brett D. Yacker, and George J. Yost III.*

_____s/ Patrick James Attridge_____
Patrick James Attridge  (357973)
KING & ATTRIDGE
39 West Montgomery Avenue
Rockville, MD  20850
(301)-279-0780 (phone)
(301)-279-2988 (fax)

*Counsel for Defendants Donald T.*
*Nicolaisen and Walter G. Ricciardi*

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit A</u>

RBAP Plan Documents (amended and restated; effective July 1, 1995) (excerpts)

*RETIREMENT BENEFIT ACCUMULATION PLAN
FOR EMPLOYEES OF PRICEWATERHOUSECOOPERS LLP*

**As Amended and Restated
Effective July 1, 1995**

*RETIREMENT BENEFIT ACCUMULATION PLAN*
*FOR EMPLOYEES OF PRICEWATERHOUSECOOPERS LLP*

## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | PURPOSE AND APPLICABILITY OF PLAN | 3 |
| 1.1 | Purpose of Plan | 3 |
| 1.2 | Applicability of Plan | 3 |
| ARTICLE 2 | DEFINITIONS | 4 |
| 2.1 | Accrued Benefit | 4 |
| 2.2 | Actuarial Equivalent | 4 |
| 2.3 | Actuary | 4 |
| 2.4 | Adoption Agreement | 4 |
| 2.5 | Administrative Committee | 5 |
| 2.6 | Affiliated Employer | 5 |
| 2.7 | Beneficiary | 5 |
| 2.8 | Benefit | 6 |
| 2.9 | Break in Service | 6 |
| 2.10 | Code | 6 |
| 2.11 | Compensation | 6 |
| 2.12 | Computation Period | 8 |
| 2.13 | Deemed Account Balance | 8 |
| 2.14 | Deemed Investment Experience | 9 |
| 2.15 | Deemed Payroll Period Allocation | 10 |
| 2.16 | Deemed Plan Interest Rate | 14 |
| 2.17 | Director | 15 |
| 2.18 | Earned Income | 15 |
| 2.19 | Effective Date | 16 |
| 2.20 | Eligible Employee | 16 |
| 2.21 | Employee | 16 |
| 2.22 | Employer | 18 |
| 2.23 | Employer Contributions | 19 |
| 2.24 | Entry Date | 19 |
| 2.25 | ERISA | 20 |
| 2.26 | Fiduciary | 20 |
| 2.27 | Firm | 20 |
| 2.28 | Highly Compensated Employee | 20 |
| 2.29 | Hour of Service | 24 |
| 2.30 | Investment Manager | 26 |
| 2.31 | Leased Employee | 26 |
| 2.32 | Normal Retirement Age | 27 |
| 2.33 | Normal Retirement Benefit | 27 |
| 2.34 | Participant | 27 |

2.35    Plan ........................................................................................................ 27
2.36    Plan Administrator ................................................................................ 27
2.37    Plan Year .............................................................................................. 27
2.38    Policy Board ......................................................................................... 28
2.39    Qualified Joint and Survivor Annuity ................................................ 28
2.40    Qualified Pre-Retirement Survivor Annuity ...................................... 28
2.41    Spouse ................................................................................................... 28
2.42    State ....................................................................................................... 28
2.43    Trust ...................................................................................................... 29
2.44    Trustee ................................................................................................... 29
2.45    Valuation Date ...................................................................................... 29
2.46    Year of Service ..................................................................................... 30

ARTICLE 3        ELIGIBILITY AND YEARS OF SERVICE ................................ 34
3.1    Eligibility Requirements ........................................................................ 34
3.2    Cessation of Eligibility .......................................................................... 34
3.3    Eligible Employees ................................................................................ 34

ARTICLE 4        CONTRIBUTIONS .................................................................... 38
4.1    Employer Contributions ......................................................................... 38
4.2    Form of Employer Contributions ........................................................... 38
4.3    No Participant Contributions .................................................................. 38

ARTICLE 5        RETIREMENT BENEFITS ...................................................... 39
5.1    Normal Retirement Benefit ..................................................................... 39
5.2    Payment of Benefits ............................................................................... 41
5.3    Qualified Joint and Survivor Annuity .................................................... 43
5.4    Optional Forms ....................................................................................... 45
5.5    Method of Payment of Benefit ............................................................... 46
5.6    Distribution Procedures .......................................................................... 47
5.7    Death of the Participant .......................................................................... 49
5.8    Designation of Beneficiary ..................................................................... 51
5.9    Distribution Only Upon Written Instructions and Release for Payment ............... 53
5.10   Direct Rollover ....................................................................................... 53
5.11   Distribution for Minor or Incompetent Beneficiary ............................... 55
5.12   Location of Participant or Beneficiary Unknown ................................... 56

ARTICLE 6        VESTING ................................................................................... 57
6.1    Employer Contributions .......................................................................... 57
6.2    Amendments Affecting Benefits ............................................................. 59

ARTICLE 7        LIMITATIONS ON BENEFITS ................................................ 60
7.1    General Limit .......................................................................................... 60
7.2    Adjustment to Limits .............................................................................. 60
7.3    Definitions .............................................................................................. 62
7.4    Definitions .............................................................................................. 67

ARTICLE 8        PLAN LOANS ................................................................. 75
    8.1    Loans to Participants .............................................................. 75

ARTICLE 9        TOP-HEAVY ................................................................. 76
    9.1    Applicability of Top Heavy Rules ........................................... 76
    9.2    Top Heavy Status ................................................................. 76
    9.3    Minimum Accrued Benefit ...................................................... 79
    9.4    Vesting Requirement and Schedule ......................................... 80
    9.5    Definitions .......................................................................... 81

ARTICLE 10       ADMINISTRATION ........................................................ 83
    10.1   Duties and Responsibilities of Fiduciaries;
           Allocation of Fiduciary Responsibility ..................................... 83
    10.2   Powers and Responsibilities of the Plan
           Administrator ...................................................................... 83
    10.3   Allocation of Duties and Responsibilities ................................. 86
    10.4   Appointment of the Plan Administrator .................................... 86
    10.5   Expenses ............................................................................ 87
    10.6   Claim Procedure .................................................................. 87

ARTICLE 11       TRUST FUND; POWERS, DUTIES AND IMMUNITIES OF
                 TRUSTEE ................................................................... 90
    11.1   Receipt of Contributions by Trustee ....................................... 90
    11.2   Investment Responsibility ...................................................... 90
    11.3   Appointment of Investment Manager ...................................... 90
    11.4   No Prohibited Transaction ..................................................... 90
    11.5   Duties of Trustee Concerning Contributions ............................ 90
    11.6   Distribution of Benefits by the Trustee .................................... 91
    11.7   Contributions Held in Trust .................................................... 91
    11.8   Investment of Trust Fund ...................................................... 92
    11.9   Powers and Duties of Trustee ................................................ 93
    11.10  Application of Trust Funds .................................................... 96
    11.11  Litigation ........................................................................... 96
    11.12  Accounting by Trustee .......................................................... 96
    11.13  Reliance on Written Instructions ............................................ 97
    11.14  Disputes ............................................................................ 97
    11.15  Duties of Trustee Limited ...................................................... 97
    11.16  Notices to Trustee ............................................................... 97
    11.17  Notices to Employer or Participants ........................................ 98
    11.18  Resignation, Removal and Appointment of Trustee ................... 98
    11.19  No Diversion of Trust ........................................................... 99

ARTICLE 12       INDEMNIFICATION OF FIDUCIARIES ............................. 100
    12.1   Rights To Indemnification .................................................... 100
    12.2   Advancement of Expenses .................................................... 100
    12.3   Determination of Right to Indemnity ..................................... 101
    12.4   Other Rights ...................................................................... 102

**ARTICLE 13       PARTICIPATING EMPLOYERS** ..........................................103
   13.1   Adoption by Other Employers .............................................103
   13.2   Adoption of Plan and Trust by Affiliated
        Employer ..............................................................................103
   13.3   Designation of Agent ...........................................................103
   13.4   Amendment ...........................................................................104
   13.5   Discontinuance of Participation ...........................................104
   13.6   Plan Administrator's Authority ............................................104

**ARTICLE 14       CHANGE IN EMPLOYMENT** ...........................................105
   14.1   Participant Transfer from Employer to Employer .................105
   14.2   Participant Transfer from Employer to Affiliated
        Non-Employer .....................................................................105
   14.3   Employee Credit for Services With Affiliated Non-
        Employer ..............................................................................105

**ARTICLE 15       AMENDMENT, TERMINATION AND MERGER** ...........106
   15.1   Establishment of Plan ..........................................................106
   15.2   Power of Amendment ...........................................................106
   15.3   Failure of Plan to Qualify Upon Amendment ......................106
   15.4   Termination ...........................................................................106
   15.5   Merger, Consolidation, or Transfer .....................................108
   15.6   Limitation of Benefits ..........................................................108

**ARTICLE 16       MISCELLANEOUS** ..........................................................110
   16.1   Exclusive Benefit of Participants and
        Beneficiaries ........................................................................110
   16.2   Nonguarantee of Employment .............................................111
   16.3   Rights to Trust Assets ..........................................................111
   16.4   Nonalienation of Benefits ....................................................112
   16.5   Bonding .................................................................................112
   16.6   Construction ..........................................................................113
   16.7   Discretionary Acts To Be Non-Discriminatory ...................113
   16.8   Titles and Headings ..............................................................113
   16.9   Counterparts ..........................................................................114
   16.10  USERRA ...............................................................................114

**APPENDICES**
   **APPENDIX A** .....................................................................................116
   **APPENDIX B** .....................................................................................118
   **APPENDIX C** .....................................................................................172
   **APPENDIX D** .....................................................................................174

### RETIREMENT BENEFIT ACCUMULATION PLAN
### FOR EMPLOYEES OF PRICEWATERHOUSECOOPERS LLP

AGREEMENT, effective, as of the first day of June 1954, by and between Coopers & Lybrand LLP (the "Firm"), and, as of the first day of July 1994, by and between Price Waterhouse LLP (the "Firm"), and, as of the first day of July 1998, by and between PricewaterhouseCoopers LLP (the "Firm"), a partnership with its principal office in New York, NY, and the Trustees.

### WITNESSETH

WHEREAS, effective as of the first day of June 1954, Coopers & Lybrand LLP adopted this defined benefit pension plan, as the Coopers & Lybrand Retirement Plan (the "Plan"), and, effective as of the first day of July 1998, PricewaterhouseCoopers LLP adopted this Plan, as the Coopers & Lybrand Retirement Plan; and

WHEREAS, effective as of the first day of July 1994, Price Waterhouse LLP adopted a defined benefit pension plan, as the Retirement Benefit Accumulation Plan for Employees of Price Waterhouse LLP (the "PW Plan") and, effective as of the first day of July 1998, PricewaterhouseCoopers LLP adopted the PW Plan, as the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "RBAP"); and

WHEREAS, effective as of the first day of July 1999, the RBAP was merged into this Plan

1

and this Plan was amended and restated to conform to the terms of the RBAP and renamed as the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP; and

WHEREAS, it is intended that this Plan meet the requirements of Sections 401 and 501 of the Internal Revenue Code of 1986, as amended; and

WHEREAS, this Plan must be amended to reflect changes in the law and for other purposes.

NOW, THEREFORE, it is agreed that, effective as of the first day of July 1995, the Firm hereby amends and restates this Plan, to read as follows:

Code.

2.32 <u>Normal Retirement Age</u>. The earlier of the date a Participant attains age 65 or completes five (5) Years of Service.

2.33 <u>Normal Retirement Benefit</u>. A single life annuity for the life of a Participant payable at the later of the Participant's attained age or Normal Retirement Age, as set forth in Article 5 of the Plan.

2.34 <u>Participant</u>. A person who has met the eligibility requirements of Article 3 and whose Benefit hereunder has not been completely distributed.

2.35 <u>Plan</u>. The Retirement Benefit Accumulation Plan for Employees of Price Waterhouse LLP and, effective July 1, 1998, The Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP, as set forth in this Plan document, and as it may be amended from time to time. Plan should also be read as referring, where applicable, to the Trust established in Article 11 hereof.

2.36 <u>Plan Administrator</u>. The persons or entity designated by the Firm to administer the Plan pursuant to Section 10.4.

2.37 <u>Plan Year</u>. The twelve (12) consecutive month period commencing each July 1 and ending the immediately following June 30.

Limited Equity Partner or Limited Equity Principal he ceases to be active. For Participants who attain age 70 1/2 after December 31, 2001, the Participant's Normal Retirement Benefit must be distributed, or distribution must commence, no later than April 1 of the calendar year following the calendar year in which the Participant attains age 70 1/2 even though the Participant may still be employed by the Employer or not ceased to be active, and such distribution shall be increased each following December 31 to take into account the Participant's Accrued Benefit not distributed as of such December 31.

5.2 <u>Payment of Benefits</u>. Prior to July 1, 1999, for purposes of a distribution under the Plan, the value of a Participant's Benefit shall be its value as of the Valuation Date occurring on the 20th day of the second following calendar month after the calendar month during which a Participant provides the Plan Administrator with a request for a distribution of his or her Benefit (or in the case where a Participant's Benefit does not exceed $5,000 ($3,500 prior to July 1, 1998) during which termination of a Participant's employment occurs, or a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal ceases to be active), unless the 20th day of the second following calendar month is a day on which shares are not traded on a national stock exchange, in which case it shall be the Valuation Date occurring on the first day before the 20th day on which shares are traded on a national stock exchange. Effective on and after July 1, 1999, for purposes of a distribution under the Plan of: (1) a Benefit in excess of $5,000, the value of a Participant's Benefit shall be its value as of the Valuation Date occurring on the last business day of the calendar month during which the Participant provides the Plan Administrator with a request for a distribution of his or her Benefit if the request is received by the Plan Administrator by the

41

twentieth (20th) day of such month; provided, however, that a request for a distribution which is provided to the Plan Administrator during the same calendar month in which a Participant's termination of employment occurs (or in which a Partner, Principal, Limited Equity Partner, or Limited Equity Principal ceases to be active) shall result in such Participant's Benefit being valued on the Valuation Date occurring on the last business day of the next calendar month if the request is received by the Plan Administrator by the twentieth (20th) day of the month in which the Participant's termination of employment occurs (or in which a Partner, Principal, Limited Equity Partner, or Limited Equity Principal ceases to be active); and (2) a Benefit that is $5,000 or less, the value of a Participant's Benefit shall be its value as of the Valuation Date occurring on the last business day of the second calendar month following the calendar month in which a Participant's termination of employment occurs (or in which a Partner, Principal, Limited Equity Partner, or Limited Equity Principal ceases to be active). If the last business day of any calendar month is a day on which shares are not traded on a national stock exchange, the Valuation Date shall be the first day on which shares are traded on a national stock exchange before the last business day. A Participant's Benefit shall be paid as soon as practicable following its Valuation Date. Any Deemed Payroll Period Allocation made to the Participant's Deemed Account Balance subsequent to the initial distribution, shall be distributed as soon as practicable following the date of such Deemed Payroll Allocation. All distributions hereunder shall be made in a consistent and uniform manner with regard to timeliness of distribution. Notwithstanding any other provision of the Plan to the contrary, a Participant's request for a distribution will be valued as of the Valuation Date occurring on the next business day following receipt of the request for the distribution

42

when such request is made to comply with an independence standard imposed by any international, federal or state regulatory agency or professional association.

5.3   Qualified Joint and Survivor Annuity.

(a)   A married Participant's Benefit shall be paid in the form of a Qualified Joint and Survivor Annuity unless the Participant elects an optional form of Benefit pursuant to a Qualified Election, as defined in Subsection (b), not earlier than ninety (90) days or less than thirty (30) days before the date that Benefit payments would commence.

(b)   A Qualified Election is an election of an optional form of Benefit by a married Participant to which his or her Spouse consents in a writing witnessed by a Plan representative or a notary public. A Qualified Election constitutes a waiver of the Qualified Joint and Survivor Annuity. A Participant may make a Qualified Election not to have his or her Benefit paid in the form of a Qualified Joint and Survivor Annuity and may elect an alternative form of payment not earlier than ninety (90) days or less than thirty (30) days before the date on which Benefits are scheduled to commence. The Benefit commencement date for a distribution in a form other than a Qualified Joint and Survivor Annuity may be less than thirty (30) days after receipt of the written explanation described in Section 5.3(c) provided: (a) the Participant has been provided with information that clearly indicates that the Participant has at least thirty (30) days to consider whether to waive the Qualified Joint and Survivor Annuity and to elect (with Spousal Consent) a form of distribution other than a Qualified Joint and Survivor Annuity; (b) the Participant is permitted to revoke any affirmative distribution election at least until the Benefit commencement date or, if later, at any time prior to the expiration of the seven day period that begins the day after the

43

Participant may revoke any prior election without the consent of his or her Spouse at any time prior to the commencement of benefits, in which case benefits shall be paid in the form of a Qualified Joint and Survivor Annuity, unless an alternative election is duly made with the appropriate Spousal consent.

(c)    The Administrative Committee shall provide to each Participant within a reasonable period prior to the commencement of benefits a written explanation of:

(1)    the terms and conditions of the Qualified Joint and Survivor Annuity;

(2)    the Participant's right to make, and the effect of, an election to waive the Qualified Joint and Survivor Annuity form of benefit;

(3)    the rights of a Participant's Spouse; and

(4)    the right to make, and the effect of, a revocation of a previous election to waive the Qualified Joint and Survivor annuity.

5.4    Optional Forms.    In lieu of the form of Benefit set forth in Sections 5.1 or 5.3, the Participant may elect, subject to the rules of Subsection 5.3(b), if applicable, one of the following forms of Benefit.

(a)    Specified Distribution.    Upon attainment of Normal Retirement Age, a Participant who is (i) a Partner or Principal, or (ii) a Non-Highly Compensated client-service Employee may receive a distribution of all or any portion of his or her Accrued Benefit in any form available under the Plan. This form of distribution shall not be available to a Highly Compensated client-service Employee or any practice-support Employee. This form of distribution shall not be available to any Participant who was a participant in the Coopers & Lybrand Retirement Plan or the Kwasha Lipton Retirement Plan prior to July 1,

45

1999.

(b) <u>Lump Sum Payment</u>. A single lump sum cash payment to the Participant upon his or her termination of employment, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he ceases to be active, or upon the Participant's death to his or her Beneficiary. This is the only form of distribution available to a Beneficiary who is not the Participant's Spouse. The amount of any lump sum payment to a Participant or Beneficiary shall not be less than the Actuarial Equivalent of the Participant's Normal Retirement Benefit. A Participant who is required to cease receiving his Benefit in any form permitted under the Plan in order to comply with an independence standard imposed by any international, federal or state regulatory agency or professional association may receive a single lump sum payment that is not less than the Actuarial Equivalent of the undistributed portion of the Participant's Normal Retirement Benefit.

(c) <u>Single Life Annuity</u>. An annuity with equal monthly installments payable to the Participant for his or her lifetime. This is the automatic form of Benefit for a single Participant, unless such Participant elects another form. The amount of the annuity is the Actuarial Equivalent of the Participant's Deemed Account Balance.

5.5 <u>Method of Payment of Benefit</u>. The Administrative Committee, in its sole discretion, may provide for the payment of Benefits under this Article by the Trustee through the purchase of annuity contracts from an insurer, or through direct cash payments from the Trust to the Participant or Beneficiary. Any annuity contract purchased from an insurer which is distributed to a Participant or Beneficiary must be nontransferable in the hands of the Participant or Beneficiary. Neither the Administrative Committee, Employer or the

46

Trustee, nor their successors, shall be responsible for the failure on the part of the insurer to make payments provided by any such annuity contract, which is distributed to a Participant or Beneficiary.

    5.6  <u>Distribution Procedures</u>.  Distribution of a Participant's Benefit shall be made as follows:

    (a)  <u>Participant's Benefit Does Not Exceed $5,000</u>.  The Benefit payable to a Participant or Beneficiary shall be distributed in a lump sum upon the Participant's termination of employment, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he ceases to be active, provided that the Actuarial Equivalent value of his or her Benefit does not exceed $5,000 ($3,500 prior to July 1, 1998), and the nonvested portion of the Participant's Accrued Benefit will be forfeited.  Such distribution shall not require consent of the Participant or his or her Spouse. If the Participant's vested Benefit is zero, the Participant shall be deemed to have received a distribution of such Benefit.  If a Participant receives a distribution under this Section 5.6(a) and the Participant resumes employment, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal again becomes active, and is covered under the Plan, the Participant's Accrued Benefit will be restored to the amount on the date of the distribution (including all optional forms of benefit) if the Participant repays to the Plan the full amount of the distribution before the earlier of five (5) years after the first date on which the Participant is subsequently re-employed by the Employer, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he again becomes active, or the date the Participant incurs five (5) consecutive 1-year

47

Breaks in Service following the date of the distribution. If a Participant is deemed to receive a distribution of zero and the Participant resumes employment, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal again becomes active, and is covered under this Plan before the date the Participant incurs 5 consecutive 1-year Breaks in Service, upon the re-employment of such Participant, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he again becomes active, the Participant's Accrued Benefit will be restored to the amount on the date of such deemed distribution. Any Accrued Benefit that is restored under this Section shall have Deemed Investment Experience credited to or subtracted from it at the rate earned by the money market mutual fund that is among the investment experience choices prescribed by the Administrative Committee for the period from the forfeiture to the restoration.

(b) Participant's Benefit Exceeds $5,000. The Benefit payable to a Participant shall be distributed to the Participant upon the Participant's termination of employment, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he ceases to be active, at his or her election, and the election of his or her Spouse, if applicable, provided that the Benefit exceeds $5,000 ($3,500 prior to July 1, 1998), and the nonvested portion of the Participant's Accrued Benefit will be forfeited. If a Participant receives a distribution and the Participant resumes employment, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal again becomes active, and is covered under the Plan, the Participant's Accrued Benefit will be restored to the amount on the date of the distribution if the Participant repays to the Plan the full amount of the distribution before the earlier of five (5) years after the first date on which

48

the Participant is subsequently re-employed by the Employer, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he again becomes active, or the date the Participant incurs five (5) consecutive 1-year Breaks in Service following the date of the distribution. Any Accrued Benefit that is restored under this Section shall have Deemed Investment Experience credited to or subtracted from it at the rate earned by the money market mutual fund that is among the investment experience choices prescribed by the Administrative Committee for the period from the forfeiture to the restoration.

(c) <u>Required Distribution</u>. Unless the Participant otherwise elects, distribution of his or her Benefit shall commence no later than the 60th day after the close of the Plan Year in which the latest of the following events occurs:

(1) the Participant's attainment of age sixty-five (65) or if earlier, Normal Retirement Age; or

(2) the 10th anniversary of the Participant's commencement of participation in the Plan; or

(3) the Participant's termination of employment with the Employer, or in the case of a Participant who is a Partner, Principal, Limited Equity Partner or Limited Equity Principal when he ceases to be active.

5.7 <u>Death of the Participant</u>. If the Participant dies after distribution of his Benefit has begun in a form described in Section 2.39, the remaining portion of such interest will continue to be distributed at least as rapidly as under the form of distribution being used prior to the Participant's death. If the Participant dies before distribution of his Benefit has begun, and the Participant's Beneficiary is the Participant's surviving Spouse, the date

49

entire Benefit otherwise payable (and he or she is not survived by a secondary Beneficiary, or the second Beneficiary also dies), the remainder shall be paid in a lump sum to the heir or heirs of the last surviving designated Beneficiary in accordance with priorities (1) through (3) above.

5.9   <u>Distribution Only Upon Written Instructions and Release for Payment</u>.  All distributions under the Plan shall be made by the Trustee only upon receipt of written instructions furnished by the Administrative Committee setting forth the name and address of the recipient, and the amount and manner of distribution.  In making any such distribution, the Trustee shall be fully entitled to rely on the instructions furnished by the Administrative Committee, and shall be under no duty to make any inquiry or investigation with respect thereto.  Any payment to any Participant, Participant's legal representative or guardian, or Beneficiary, in accordance with the provisions of this Plan and Trust, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee, Employer, and Plan Administrator.  The Trustee or Plan Administrator may require such Participant, legal representative or guardian, or Beneficiary, as a condition precedent to such payment, to execute a receipt and release thereof in such form as shall be determined by the Trustee or Plan Administrator.

5.10  <u>Direct Rollover</u>.

(a)   <u>General Application</u>

Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section 5.10, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator to have any portion of an eligible rollover

distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)  Definitions.

(1)  Eligible rollover distribution:  An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include:  any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and, effective January 1, 1999, any hardship distribution described in Section 401(k)(2)(B)(i)(IV), 403(b)(7) or 403(b)(11) of the Code. For distributions made after December 31, 2001, an eligible rollover distribution may include the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

(2)  Eligible retirement plan:  An eligible retirement plan is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts the distributee's eligible rollover distribution.  In the case of an eligible rollover distribution to the surviving spouse, for distributions made prior to January 1, 2002, an eligible retirement

54

plan is an individual retirement account or individual retirement annuity, and for distributions made after December 31, 2001, an eligible retirement plan shall also include a qualified trust described in Section 401(a) of the Code. For distributions made after December 31, 2001, an eligible retirement plan with respect to that portion of an eligible rollover distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities) shall be a qualified trust under section 401(a) of the Code which is a defined contribution plan and which separately accounts for amounts so transferred (including separately accounting for the portion of such distribution which is includable in gross income and the portion of such distribution which is not so includable), an individual retirement account described in section 408(a) of the Code, or an individual retirement annuity described in section 408(b) of the Code.

(3)  Distributee:  A distributee includes a Participant or former Participant.  In addition, the Participant's or former Participant's surviving spouse and the Participant's or former Participant's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse.

(4)  Direct rollover:  A direct rollover is a payment by the Plan to the eligible retirement plan specified by the distributee.


5.11  Distribution for Minor or Incompetent Beneficiary.  In the event any amount is distributable to a minor or to any person who, in the judgment of the Plan Administrator or the Trustee, is incapable of making proper disposition thereof, such payment shall be made for the benefit of such minor or such incompetent in any of the following ways as the Plan

IN WITNESS WHEREOF, the Firm and the Trustees have caused this Plan to be executed on

the dates indicated below to be effective as of the dates stated above.

PricewaterhouseCoopers LLP

By: _____    5/41/02

John F. Carter    Date

U.S. Partner Affairs Leader

TRUSTEE                          TRUSTEE

_____  _____    _____  _____

Marsha R. Cohen        Date      Roger C. Hindman        Date

TRUSTEE                          TRUSTEE

_____  _____    _____  _____

Peter K. Kelly         Date      Richard R. Kilgust      Date

TRUSTEE                          TRUSTEE

_____  _____    _____  _____

Wendy L. Kornreich     Date      Robert C. Morris Jr.    Date

TRUSTEE                          TRUSTEE

_____  _____    _____  _____

Robert P. Sullivan     Date      Randal S. Vallen        Date

TRUSTEE

_____  _____

Brett D. Yacker        Date

g:\ebs\draft\aacron\pw plans\pwc employee rbap 20010801

115

RESOLUTIONS ADOPTED
BY THE FINANCE COMMITTEE OF THE BOARD OF
PARTNERS AND PRINCIPALS OF PRICEWATERHOUSECOOPERS LLP

**WHEREAS**, PricewaterhouseCoopers LLP ("PwC") sponsors the Retirement Plan for Employees of PricewaterhouseCoopers LLP (the "Retirement Plan"), Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP (the "RBAP"), and Profit Sharing Plan for Partners of PricewaterhouseCoopers LLP (the "Profit Sharing Plan") (together, the "Plans"); and

**WHEREAS**, PwC, on June 24, 2002, applied to the Internal Revenue Service ("IRS") for letters of determination that the Plans, as amended to comply with the Uruguay Round Agreements Act, Uniformed Services Employment and Reemployment Rights Act of 1994, Small Business Job Protection Act of 1996, Taxpayer Relief Act of 1997, Internal Revenue Service Restructuring and Reform Act of 1998 and Community Renewal Tax Relief Act of 2000, are tax qualified under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and that the trusts established and maintained thereunder are exempt from income tax under section 501(a) of the Code; and

**WHEREAS**, the IRS, by letters dated February 6, 2004, required, in connection with its consideration of the applications for letters of determination, that certain amendments be made to the Plans; and

**WHEREAS**, PwC, by letters dated February 27, 2004, submitted proposed amendments to the Plans to the IRS; and

**WHEREAS**, the IRS issued favorable letters of determination on the tax qualification of the Plans, dated March 22, 2004, conditioned upon the adoption by PwC of the proposed amendments submitted to the IRS; and

**WHEREAS**, the Plans provide that they may be amended by the Finance Committee of the Board of Partners and Principals of PwC (the "Finance Committee"); and

**WHEREAS**, the Finance Committee desires to amend the Plans, as required by the letters of determination.

**NOW, THEREFORE, be it:**

**RESOLVED**, that, amendments, attached hereto as Exhibit I, to the Retirement Plan be and hereby are adopted; and

**RESOLVED**, that, amendments, attached hereto as Exhibit II, to the RBAP, be and hereby are adopted; and

**RESOLVED,** that, amendments, attached hereto as Exhibit III, to the Profit Sharing Plan, be and hereby are adopted; and

**RESOLVED,** that, John F. Carter, U.S. Partner Affairs Leader of PwC, and Roger C. Hindman, a partner of PwC, or any one of them, be and hereby are (is) authorized to execute such other documents and perform such acts as they (he) may deem necessary or appropriate to carry out the intent and purposes of the amendments made to the Plans by the foregoing Resolutions.

Exhibit I

**Retirement Plan for Employees of
PricewaterhouseCoopers LLP**

**Statement of Amendment**

1.    The Plan is amended to add to the definition of Highly Compensated Employee in
Section 2.1, effective for the plan year beginning July 1, 1997 and plan years thereafter,
the following:

An Employee, who in accordance with Section 414(q) of the Code:

(i)    was a 5% owner (as defined in Section 414(q)(2) of the Code) of the
Employer or an Affiliated Employer during the Plan Year for which such
determination is made or the preceding Plan Year, or

(ii)    earned more than $80,000 of Compensation (as defined in Section
414(q)(4) of the Code) from the Employer or an Affiliated Employer in
the preceding Plan Year; provided, however, that the $80,000 amount is
subject to adjustment at the same time and in the same manner as provided
under Section 415(d) of the Code, except that the base period is the
calendar quarter ending September 30, 1996.

2.    The Plan is amended to add a Section 10.13, effective December 12, 1994, as follows:

10.13 Military Service.  Notwithstanding any other provision of the Plan to the contrary,
accrual of benefits, credited service and vesting service with respect to qualified military
service will be provided in accordance with Section 414(u) of the Code, effective for re-
employment on or after December 12, 1994.

3.    The Plan is amended to delete the last sentence of Section 9.2D, effective as of July 1,
1975, and replace it with the following:

Further, any amount remaining in the Trust Fund, arising from erroneous actuarial
computation, after the full satisfaction of all liabilities under the Plan, shall be returned to
the Employing Firms.

4.    The Plan is amended to add the following to Section 14.4H, effective for Limitation
Years beginning on or after January 1, 1995:

$30,000, as adjusted under Section 415(d) of the Code.

5.    The Plan is amended to delete Section 14.4I for Limitation Years beginning after December 31, 1999.

Exhibit II

**Retirement Benefit Accumulation Plan for Employees of
PricewaterhouseCoopers LLP**

**Statement of Amendment**

The Plan is amended to add the following to Section 2.28, effective for the plan year beginning July 1, 2000 and plan years thereafter:

For "determination years" ending June 30, 2001 and thereafter, the determination of who is a Highly Compensated Employee shall be made with reference to the calendar year beginning within the "look-back year" in accordance with Notice 97-45.

Civil Action No. 05-1291 (PLF)

# **Exhibit B**

Huber V. Forcier, *Guide to Cash Balance Plans*
(Aspen 2003) (excerpts) and
*2005 Cumulative Supplement* (Aspen 2005)
(excerpts)

# Guide to Cash Balance Plans

*Hubert V. Forcier*

*A Panel Publication*



ASPEN

P U B L I S H E R S

**1185 Avenue of the Americas, New York, NY 10036**
*www.aspenpublishers.com*

# Introduction

Paradoxically, as the use of cash balance plans has become more widespread among employers, cash balance plans have become more controversial—both from the perspective of retirement policy and from the perspective of legal compliance. This book discusses retirement policy issues, but focuses on legal compliance issues.

**Some Basics**

A *cash balance plan* is a defined benefit plan that, to a greater or lesser extent, mimics the features of a defined contribution plan. A hypothetical account is established for each participant. In general, two types of credits are added to the hypothetical account balance:

1. Hypothetical pay credits. Hypothetical pay credits are usually expressed as a percentage of covered compensation. In most examples used in this book the hypothetical pay credits are assumed to be 4 percent of covered compensation.

2. Hypothetical interest credits. These credits are expressed as a percentage of the hypothetical account balance. In most examples used in this book, the hypothetical interest credits are assumed to be 6 percent per year.

Cash balance plans have proven to be very popular among large employers. Cash balance plans are also increasingly popular among professional/small business firms.

Although one can get arguments on the point, as a matter of long-term benefit strategy, most large employers see many significant advantages to cash balance plans—at least in comparison to traditional defined benefit plans. One of the most important advantages seen by large employers relates to how employees perceive the employer's plan.

Employers believe that in comparison to traditional defined benefit plans, cash balance plans are far easier for employees to understand and value. In the author's experience, large employers that have converted from traditional defined benefit plans to cash balance plans have seen their employees place a much higher value on the cash balance plan than they placed on the traditional formula defined benefit plan.

Nevertheless, it must be acknowledged that some employers that have converted from traditional defined benefit plans to cash balance plans have not seen an increase

# 3

# Advantages of a Cash Balance Plan for Some Large Employers

*Hubert V. Forcier*

Most large employers that would consider adopting a cash balance plan are now maintaining a traditional defined benefit plan. When considering whether to convert to a cash balance plan, they will begin by analyzing where they want to be in the long term. Therefore, they will first analyze cash balance plan design on the basis of how it will affect the "next employee through the door." This chapter identifies the factors that may be important in that analysis.

¶ 3.1   Easier for Employees to Understand
¶ 3.2   More Level Allocation of Pension Costs
¶ 3.3   Reduced Pension Costs
¶ 3.4   Acquisitions Facilitated
¶ 3.5   Advantages over Defined Contribution Plans
    3.5[a]   Early Retirement Windows Available
    3.5[b]   Less Complex Administration
    3.5[c]   Timing of Forfeiture Gains
    3.5[d]   Funding Flexibility
    3.5[e]   Cost Control
    3.5[f]   Flexibility to Provide Benefits for Imputed Compensation or Service

## ¶ 3.1   EASIER FOR EMPLOYEES TO UNDERSTAND

Cash balance plans are perceived to be far easier for employees to understand, and to value, than traditional defined benefit plans. The common wisdom is that employees find it difficult to understand and value the benefit provided by a traditional defined benefit plan. The traditional defined benefit formula expresses the benefit as a monthly annuity starting at age 65. It is widely believed that employees tend to value their assets in terms of present value and have difficulty understanding the present value of an annuity starting in the future.

Cash balance plans are designed to be perceived by employees in essentially the same way as defined contribution plans are perceived. The contributions to a defined contribution plan are easily understood and appreciated by even the most unsophisticated employee. An employee sees the contribution to a defined contribution plan as roughly equivalent to cash compensation for services performed that year (at least to the extent the contribution is vested).

Under a cash balance plan, the employee also sees an annual pay credit as roughly equivalent to cash compensation for services performed that year (again, at least to the extent the contribution is vested).

The ability of all employees to value a defined contribution plan and a cash balance plan is usually viewed as one of the most important employee relations reasons for using such plans.

Under a traditional defined benefit plan, for each year of service the employee earns an increase in his or her *normal retirement benefit.* The normal retirement benefit is almost always expressed as a single life annuity beginning at normal retirement age—usually age 65. For most employees, normal retirement age is a long way off. Thus, the reference point for valuing the benefit is remote.

An even greater impediment to appreciating the value of the benefit being earned under a traditional defined benefit plan is the difficulty in understanding the present value of an annuity. Most employees have great difficulty understanding present value concepts. The plan sponsor's discussion of the benefit in employee communication materials tends to focus on the amount of the projected monthly or annual retirement benefit—not on present value. In the case of a plan that provides a specific dollar amount of an annuity for each year of service, the focus is on the dollar amount of the future benefit that has been, or will be, earned. For a plan that is based on final pay (usually final average pay), the focus is on the percentage of final pay that will be provided.

In an early and influential paper dealing with cash balance plans, authored by Lawrence T. Brennan and Dennis R. Coleman, partners at Kwasha Lipton (hereinafter the Kwasha monograph), this point was discussed as follows:

> Most traditional final average pay plans contain complex benefit formulas that are neither understood by the average employee nor easily communicated in simple dollar terms to which employees can relate. *Instead, the benefit is perceived by most plan participants as nothing more than a vague, distant promise.* Younger employees in particular (often more than half the work force) are not motivated by a promise of a future income equal to some percentage of future pay, starting some time in the next century, and tend to discount the plan accordingly.[1]

Some advisors hold a contrary view. They believe that a traditional defined benefit plan can be explained to employees in a way that will result in the employees' placing a high value on the benefit. More recently, some

employers faced nothing short of an employee revolt when converting from a traditional defined benefit formula to a cash balance plan.[2] Those revolts are some evidence that at least older, long-service employees can value defined benefit plans—and prefer them to cash balance plans.

## ¶ 3.2  MORE LEVEL ALLOCATION OF PENSION COSTS

Compared to traditional defined benefit formulas, cash balance formulas allocate more of the value of the employer's pension dollars to younger, short-service employees. The more level allocation of the employer's pension costs under a cash balance plan can be seen as more fair and, in any event, necessary if the employer is seeking to attract and retain a younger, more mobile workforce.

Traditional defined benefit formulas tend to allocate most of the employer's pension dollars to older, long-service employees. This can be illustrated by calculating the value of the annual benefit earned for each year of service using the immediate lump-sum valuation method (annual basis). That value is roughly the premium that would have to be paid to an insurance company to provide the annuity benefit that the employee earns under the traditional defined benefit formula as the result of working during a particular year.

Figure 3-1, which is based on the traditional defined benefit plan formula illustrated in ¶ 4.2[a], shows that the value of the benefit earned each year (when expressed as a percentage of compensation) is very low in the early years of an individual's career (in Figure 3-1, approximately 2 percent in the first year) and very high in the later years (in Figure 3-1, approximately 18 percent in the last year).

In contrast, under a cash balance plan the accrual pattern (measured by current values) is level, or in the case of an age- and/or service-weighted hypothetical pay credit, at least less skewed to the benefit of older, long-service employees. Obviously, if a plan makes a level, 4 percent of compensation contribution each year, the employee earns a benefit with a perceived present value equal to 4 percent of pay each year.

In an age- and/or service-weighted cash balance plan there is some skewing to the older, long-service employee, but the skewing is usually far less than the skewing in a traditional defined benefit plan. This is illustrated in Figure 3-2, which is based on the following age and service formula:

| Sum of Participant's Age Plus Years of Service | Pay Credit |
|---|---|
| Under 50 | 3.00% |
| 50 but less than 60 | 4.00% |
| 60 but less than 70 | 5.00% |
| 70 but less than 80 | 6.00% |
| 80 but less than 90 | 7.00% |
| 90 or more | 8.00% |

# Guide to Cash Balance Plans

## *2005 Cumulative Supplement*

*This supplement supersedes all previous supplements.*

# 3

# Advantages of a Cash Balance Plan for Some Large Employers

*Hubert V. Forcier*

## ¶ 3.3    REDUCED PENSION COSTS

*Page 3-9, add the following subsections:*

### 3.3[a]    The Continuing Debate on Whether Employers Adopt Cash Balance Plans to Reduce Pension Costs

It was widely reported that by switching to a cash balance plan, IBM expected to save $2 billion over ten years.[9.1]

Delta Airlines candidly announced that its proposed conversion to a cash balance plan would save it $500 million over four years:

> Delta said the new [cash balance] plan structure is expected to "significantly" reduce the company's pension expenses in 2003 and reduce them by approximately $500 million over the next five years. . . .

> Under the plan, employees hired after June 30, 2003, will be eligible for the cash balance benefit only. For current employees who are employed June 30, 2003, there will be a seven-year transition period to the new plan, from June 30, 2003, to June 30, 2010, during which the employees will earn the current plan retirement benefit or the new cash balance benefit, whichever is greater. Because of the transition period, Delta said current employees who retire within the next seven years will see no adverse impact on their retirement income benefit:

>> "As Delta works to recover from the current financial crisis, the company must act to control the high and rapidly growing costs of retirement benefits while protecting the interests of Delta people," Bob Colman, Delta executive vice president for human resources, said in a statement. "Unless these steps are taken, Delta's retirement expenses would increase at an unsustainable rate."[9.2]

On the other hand, Watson Wyatt Worldwide reminded the public that its study in 2000 showed that most conversions are cost-neutral—and that 80 percent of the employees fare better.[9.3]

In July 2004 the Federal Reserve Board of Governors published a report by S. Aaronson and J. Coronado entitled "Are Firms or Workers Behind the Shift Away from DB Pension Plans?" The study did not focus on the shift from traditional DB plans to cash balance plans, but rather on the shift away from DB plans in general. However, the conclusion of the study supports the general assertion of the sponsors of cash balance plans that conversions of traditional DB plans to cash balance plans are attributable to changes in the workforce. The Introduction of the study stated:

> The last twenty years have seen a significant change in the structure of pension plans. Between 1979 and 1998 there was a 17 percentage point decline in the proportion of employees covered by traditional defined benefit (DB) pensions, in which long tenure is compensated, and a 12 percentage point rise in employees covered by defined contribution (DC) plans where there is no penalty to leaving an employer. The factors underlying this shift, however, are the subject of some debate. In this study we estimate the contribution of changes in workforce characteristics and production environments to the shift in pension coverage. We estimate reduced form equations of the change in DB or DC coverage for 2-digit industries, using SUR. Pension coverage and demographic data are taken from the Current Population Survey and the Survey of Income and Program Participation. We merge in data on industry characteristics from a variety of sources.
>
> Our findings suggest that shifts in the production environment explain a large part of the decline in traditional DB pension coverage. For example, it appears that technological change has weakened long-term employment relationships; industries with growth in multi-factor productivity one standard deviation above the sample mean had a 3.5 percentage point greater decline in DB coverage and 2.2 percentage point greater increase in DC coverage. We also find that industries facing increasing competition saw a decline in DB coverage; industries with a decline in the average return to capital one standard deviation above the mean had a 1.1 percentage point greater decline in DB coverage and a 0.8 percentage point greater rise in DC coverage. On the demand side, a rise in the proportion of the labor force with expectations of reduced job tenure (for instance, individuals in dual-earner couples and married women with children) appears to have increased the demand for portable pensions on the part of workers. A rise in the proportion of dual earner couples one standard deviation above the mean reduces DB coverage by 1.3 percentage points and raises DC coverage by 3.0 percentage points. A similar rise in the proportion of women with children reduces DB coverage by 5.4 percent, while raising DC coverage by 1.6 percent. These results are robust to a variety of specifications, including accounting for the potential endogeneity of some of our measures through the use of instrumental variables. In total, the changes in

workforce characteristics and production environments we consider can explain most of the decline in DB coverage; factors that are common to all industries, such as an increased regulatory burden of operating DB pensions post-ERISA account for about a third of the overall decline.

In July 2004 the Education Resource Information Center published a list (and brief description) of independent research on the topic. Its description was as follows:

> Despite what one reads in the popular press, cash balance and other hybrid pension plans actually provide more generous benefits for employees than the traditional pension plans they are replacing. As a result, cash balance and other hybrid plan conversions have actually benefitted employees. These conclusions emerge from a growing body of research conducted by independent economists and academicians. Their principal conclusions with illustrative quotations appear below:
>
> - *Traditional defined benefit plans deliver the bulk of their benefits to employees who retire in their mid-50's after spending 20 to 30 years with the same employer.*
>
>   [P]ension accruals in traditional DB plans are minimal at young ages, grow rapidly in the late 40's and 50's as workers approach retirement age, and then become negative as workers lose pension wealth when they remain at work past the plan's retirement age. For workers in their early 60's who have participated in the DB plan since age 25, for example, pension wealth declines on average by about 14 percent of annual salary each year. Johnson & Steuerle, Urban Institute, Promoting Work at Older Ages: The Role of Hybrid Pension Plans in an Aging Population, at 21 & Fig. 12 (2003) (Tab N).
>
> - *Few employees retire in their mid-50's after spending 20 to 30 years with the same employer, even at large companies.*
>
>   [A]t any given point in time the fraction of workers who have held their current job for a very long period of time (20 or more years) is relatively small. Over the period 1983-1996, the fraction of all wage and salary workers with 20 or more years of tenure with their current employer consistently hovered around 10 percent. Yakoboski, Employee Benefit Research Institute, Debunking the Retirement Policy Myth: Lifetime Jobs Never Existed for Most Workers, at 6 (1998) (Tab W).
>
> - *Hybrid plans are better suited to Americans' work patterns because hybrid plans allow workers to earn benefits steadily throughout their careers.*
>
>   By distributing pension wealth more equally across the population than [traditional defined benefit] plans, cash balance plans would increase median lifetime pension wealth in the total covered population and more people would gain pension wealth than lose. Johnson & Uccello, Urban Institute, The Potential Effects of Cash Balance Plans on the Distribution of Pension Wealth at Midlife, at 29 (2001) (Tab M).

- *The motivation for switching to hybrid plans is not cost savings but the need to adapt pensions to employees' career patterns and employers' business needs.*

  While the idea that firms are undertaking cash balance conversions to reduce benefits lacks analytic underpinnings, it has nonetheless serviced as the basis of various legislative proposals in Congress and has been the dominant theme in media coverage of this trend. Because of its influence, the idea is worthy of empirical analysis. . . . Our results indicate that, while critics have decried the trend of the conversion of traditional DB pension plans to cash balance plans as reducing benefit generosity, the implications for retirement security may actually be favorable. The earlier accrual and portability of benefits will better facilitate the accumulation of wealth for a more mobile labor force. Copeland & Coronado, Federal Reserve Board, Cash Balance Pension Plan Conversions and the New Economy, at 12, 22 (2002) (Tab F).

### 3.3[b]   The Financial Accounting Standards Board

In mid-2003, the Financial Accounting Standards Board (FASB) considered a recommendation of its Emerging Issues Task Force (EITF) that would have required the present value of the accrued benefits for cash balance plans to be determined by using the assumed rate for the future interest credits—rather than a reasonable estimate of the rate of return on the plan assets. The proposed rule would have eliminated the "expected investment differential."

The criticism of the proposal expressed by Watson Wyatt Worldwide was typical of the view of practitioners:

"One of the key goals of pension account rules is to make it easier to compare the true costs of pension plans between different companies," says Eric Lofgren, global director of benefits consulting at Watson Wyatt. "But the EITF is on a course to introduce an approach that is seldom, if ever, used currently, and that completely undermines the goal of comparability."

Lofgren explains that the proposed change results in materially different liabilities for comparable cash balance plans based on the way interest credits with similar values are described. If forced to use the lower discount rate in valuing liabilities, some companies would be compelled to overstate their long-term plan liabilities significantly. Certain companies would be forced to take a charge against shareholder equity. Lofgren noted that, by establishing a separate set of accounting rules applicable only to cash balance plans, two plans that are expected to pay out very similar benefits may be forced to recognize substantially different liabilities and costs—solely because one plan uses a different plan design to deliver the same benefits. "Ironically, cash balance plans that use shorter term interest credits, perhaps based on six-month yields, would have the largest relative disadvantage, even though their design provided a lower benefit payout than plans that based their benefits on longer-term yields," notes Lofgren.