**Civil Action No. 05-1291 (PLF)**

# Exhibit D
Declaration of Melinda Burnham

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TIMOTHY D. LAURENT,          )
                                 )
          Plaintiff,        )
                                 )
   vs.                      )    Civil Action No. 05-1291 (PLF)
                                 )
PRICEWATERHOUSECOOPERS LLP, et al, )   Judge Paul L. Friedman
                                 )
          Defendants       )
                                 )
                                 )
                                 )

**DECLARATION OF MELINDA BURNHAM**

Melinda Burnham hereby states as true subject to penalty of perjury:

1.    I am the Director of National Benefits Administration for PricewaterhouseCoopers LLP ("PwC"). The facts set forth in this declaration are based on the books and records of PwC and ACS (formerly Mellon HR Solutions) and are true to the best of my personal knowledge. If called to testify as a witness in this matter, I could and would testify as to the facts set forth in this declaration.

2.    Timothy D. Laurent is a former employee of Coopers & Lybrand LLP and PwC. When Mr. Laurent left PwC, his lump sum benefit payment from the Retirement Benefit Accumulation Plan ("RBAP") included the benefit he accrued under the Coopers & Lybrand "career average" pension plan through June 30, 1998 plus his RBAP account balance.

3.    A list of the investment funds offered through the RBAP as of September 1, 2005 is attached as Attachment 1. The funds offered through the RBAP are the same funds made available to participants in the Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP and the Savings Plan for Employees of PricewaterhouseCoopers LLP.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 16, 2005.

_____
Melinda Burnham

**Attachment 1**

<u>Funds Available Through The RBAP As Of September 1, 2005</u>

*Cash Equivalents*

   Northern Trust Short Term Investment

*Fixed Income*

   Wells Fargo Stable Value Fund
   Northern Trust TIPS
   Northern Trust - Lehman L.T. Government Bonds Index
   Evergreen Core Bond Fund I
   Payden High Yield Income R Shares

*Balanced*

   Wells Fargo Growth Balanced C Fund
   Merrill Lynch Global Allocation Fund I

*Large Cap*

   Lord Abbett Affiliated Y Class
   Northern Trust S&P 500 Collective Fund
   ABN AMRO Growth Fund I

*Small Cap*

   Neuberger Berman Genesis Trust
   Northern Trust Small Company Index
   Waddell & Reed Small Cap Fund

*International Stocks*

   Lazard International Equity

*International Emerging*

   Lazard Emerging Markets

*REITs*

   Alpine Realty Income & Growth

3

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit E</u>
## RBAP IRS Determination Letter (1996)

INTERNAL REVENUE SERVICE                                    DEPARTMENT OF THE TREASURY
DISTRICT DIRECTOR
G.P.O. BOX 1680
BROOKLYN, NY  11202
                                                Employer Identification Number:
Date:  FEB — 0 1996                                 13-5326270
                                                File Folder Number:
PRICE WATERHOUSE LLP                                133007316
C/O ROBERT A NACRON                             Person to Contact:
C/O PRICE WATERHOUSE LLP                            JOSEPH SCHIANO
1177 AVENUE OF THE AMERICAS RM 303              Contact Telephone Number:
NEW YORK, NY  10036                                 (203) 840-4110
                                                Plan Name:
                                                  RETIREMENT BENE ACCUMULATION PLAN
                                                  FOR EMPLYS OF PRICE WATERHOUSE LLP
                                                Plan Number: 195

Dear Applicant:

    We have made a favorable determination on your plan, identified above,
based on the information supplied.  Please keep this letter in your permanent
records.

    Continued qualification of the plan under its present form will depend
on its effect in operation.  (See section 1.401-1(b)(3) of the Income Tax
Regulations.)  We will review the status of the plan in operation periodically.

    The enclosed document explains the significance of this favorable
determination letter, points out some features that may affect the qualified
status of your employee retirement plan, and provides information on the
reporting requirements for your plan.  It also describes some events that
automatically nullify it.  It is very important that you read the publication.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other federal
or local statutes.

    This determination letter is applicable for the plan adopted on
June 23, 1995.

    This plan has been mandatorily disaggregated, permissively aggregated, or
restructured to satisfy the nondiscrimination requirements.

    This plan satisfies the nondiscrimination in amount requirement of section
1.401(a)(4)-1(b)(2) of the regulations on the basis of a general test described
in the regulations.

    This letter is issued under Rev. Proc. 93-39 and considers the amendments
required by the Tax Reform Act of 1986 except as otherwise specified in this
letter.

    This plan satisfies the nondiscriminatory current availability require-
ments of section 1.401(a)(4)-4(b) of the regulations with respect to those
benefits, rights, and features that are currently available to all employees
in the plan's coverage group.  For this purpose, the plan's coverage group
consists of those employees treated as currently benefiting for purposes of
demonstrating that the plan satisfies the minimum coverage requirements of

                                                Letter  835 (DO/C

-2-

PRICE WATERHOUSE LLP

section 410(b) of the Code.

    This plan also satisfies the requirements of section 1.401(a)(4)-4(b) of the regulations with respect to the specific benefits, rights, or features for which you have provided information.

    This letter may not be relied upon with respect to whether the plan satisfies the qualification requirements as amended by the Uruguay Round Agreements Act, Pub. L. 103-465.

    We have sent a copy of this letter to your representative as indicated in the power of attorney.

    If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

                              Sincerely yours,

                              Herbert J. Huff
                              District Director

Enclosures:
Publication 794

                                        Letter   835 (DO/CG

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit F</u>
## RBAP IRS Determination Letter (2004)

INTERNAL REVENUE SERVICE
P. O. BOX 2508                                          DEPARTMENT OF THE TREASURY
CINCINNATI, OH  45201

Date: MAR 2 2 2004          Employer Identification Number:
                              13-4008324
                            DLN:
PRICEWATERHOUSECOOPERS LLP     17007178010032
1301 AVENUE OF THE AMERICAS  Person to Contact:
NEW YORK, NY  10019-6013       JUANITA M FRERICH          ID# 75310
                            Contact Telephone Number:
                              (877) 829-5500
                            Plan Name:
                              RETIREMENT BENEFIT ACCUMULATION
                              PLAN FOR PWC LLP
                            Plan Number: 002

Dear Applicant:

     We have made a favorable determination on the plan identified above based
on the information you have supplied.  Please keep this letter, the application
forms submitted to request this letter and all correspondence with the Internal
Revenue Service regarding your application for a determination letter in your
permanent records.  You must retain this information to preserve your reliance
on this letter.

     Continued qualification of the plan under its present form will depend
on its effect in operation.  See section 1.401-1(b)(3) of the Income Tax
Regulations.  We will review the status of the plan in operation periodically.

     The enclosed Publication 794 explains the significance and the scope of
this favorable determination letter based on the determination requests
selected on your application forms.  Publication 794 describes the information
that must be retained to have reliance on this favorable determination letter.
The publication also provide examples of the effect of a plan's operation on
its qualified status and discusses the reporting requirements for qualified
plans.  Please read Publication 794.

     This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other federal
or local statutes.

     This determination is subject to your adoption of the proposed amendments
submitted in your letter dated February 27, 2004.  The proposed amendments
should be adopted on or before the date prescribed by the regulations under
Code section 401(b).

     This determination letter is applicable for the amendment(s) executed
on May 21, 2002.

     Issues arising from the amendment of a defined benefit plan's benefit
formula to convert that formula into a cash balance type benefit formula are
under study, and this determination letter does not express an opinion on any
of these issues.  A cash balance type formula generally defines a benefit for

                                              Letter  835 (DO/CG)

-2-

PRICEWATERHOUSECOOPERS LLP

each employee by reference to a single-sum amount, such as 10 percent of final average pay times years of service, or the amount of the employee's hypothetical account balance.

This letter considers the changes in qualification requirements made by the Uruguay Round Agreements Act, Pub. L. 103-465, the Small Business Job Protection Act of 1996, Pub. L. 104-188, the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353, the Taxpayer Relief Act of 1997, Pub. L. 105-34, the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, and the Community Renewal Tax Relief Act of 2000, Pub. L. 106-554.

This letter may not be relied on with respect to whether the plan satisfies the requirements of section 401(a) of the Code, as amended by the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. 107-16.

The requirement for employee benefits plans to file summary plan descriptions (SPD) with the U.S. Department of Labor was eliminated effective August 5, 1997. For more details, call 1-800-998-7542 for a free copy of the SPD card.

If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

Paul T. Shultz
Director,
Employee Plans Rulings & Agreements

Enclosures:
Publication 794

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit G</u>

Michael J. Canan, *Qualified Retirement Plans*
(Thompson West 2005) (excerpt)

# QUALIFIED RETIREMENT PLANS

## 2005 Edition

By

### MICHAEL J. CANAN
Gray, Robinson, P.A.
Orlando, Florida

## Volume 1

**WEST'S EMPLOYMENT LAW SERIES**

**THOMSON**

**WEST** ™

Mat #40218171

gence to met the notice
f (i) the person exercised
1ents, and (ii) the person
the person knew of the
of reasonable diligence.[34]

**Benefits of Defined**

think in terms of what
retires under the plan.
or a number of Years for
1 (or, for that matter, a
oyment prior to early or
1ese employees have any
7 terminate[1] will depend
for the period beginning
ipant, and ending with
ive participation. In the
of 65 and provides that
ctical matter only those
eceive benefits.[2] (This is
uld be beneficial to the
ions, would probably be
many years of service
ted. Conversely, a plan
r of participation, equal
ould be extremely costly
d cheer.

protect the participants
quiring a minimal rate
es who do not remain
will still receive plan

it will accrue benefits at the
nnually. Normal retirement
plan is on the employee's
Thus, an employee who en-
t age 21 and leaves the plan
eceive no benefits under the
ugh close to 15 years of ser-
performed. If the employee
ice until age 54, there would
crued benefit equal to only
nal retirement benefit at age
h the employee had almost
ervice with the employer.
eem to be inherently inequi-
inconsistent with the vesting
ired for employer contribu-
quire 100% vesting after no
years of service (10 with a
plan), as discussed in § 9.6.

The benefit accrual formulas discussed in this Section do not prevent "frontloading."[3] For example, a plan is permitted to credit the employee with accrued benefits at the rate of 10% annually starting with the first year of participation. Thus, an employee who became a participant at age 25 would have accumulated 100% of his or her accrued benefits by the age of 35, a considerably faster rate of benefit accrual than that required by the formulas discussed below.

**[A]   Normal Retirement Age**

The normal retirement age[4] is the earlier of:

(1) The time specified by a plan at which a plan participant attains normal retirement age, or

(2) The later of:

(a) the time the plan participant attains age 65, or

(b) the fifth anniversary of the date the plan participant commences participation in the plan.[5]

Thus, one should first ascertain whether the plan explicitly provides for a normal retirement age. If the plan does not specify a normal retirement age, then the normal retirement age is deemed to be the earliest age at which the participant's accrued benefits under the plan no longer increase solely on account of age or service.[6] For example, a unit benefit plan which provides that benefits will be 1% of actual compensation per year, for all years of participation prior to age 66, will be treated as having a normal retirement age of 65 since benefits will not increase on account of age or years of service after that date. If the plan provided that benefits would be equal to 1% of actual compensation per year without limitation to age, no normal retirement age can be inferred from the plan but the statute would supply the definition, as discussed below.

The plan may provide that the normal retirement age will be less than 65, if such lower age is the age at which employees customarily retire in the particular company or industry and is not a device to accelerate funding. However, if the retirement age is less than 55, the maximum amount payable pursuant to IRC § 415(b)(1)(A) (see discussion in § 10.4) must be reduced in accordance with IRC § 415(b)(2)(C).[7] If the actual retirement age under the plan is less than the normal retirement age, a funding excess may develop, resulting in a partial

---

**3.** However, at least one of the design-based safe harbors for defined benefit plans under the § 1.401(a)(4) regulations, the unit credit formula using a fractional accrual, has restrictions on the rate of accrual to prevent front-loading. See § 10.2.

The formulas which establish the minimum accrual rate for accrued benefits in a defined benefit plan utilize the terms "normal retirement age" and "normal retirement benefit." These terms are defined under their following respective subheadings.

**4.** IRC § 411(a)(8)(B) and ERISA § 3(24)(B). Treas.Reg. § 1.411(a)-7(b)(1)(i).

**5.** If the participant misstates his or her age as being lower than it actually is, the participant may be held to the misstated age, even though the above limitations have been met. Nass v. Staff Retirement Plan of Local 810, I.B.T., 515 F.Supp. 950 (S.D.N.Y. 1981).

**6.** Treas.Reg. § 1.411(a)-7(b)(1).

**7.** Rev.Rul. 71-147, 1971-1 C.B. 116, and Rev.Rul. 78-120, 1978-1 C.B. 117.

disallowance of the deduction for plan contributions.[8] A profit-sharing plan may provide for normal retirement age at 55, even though this age is significantly below the industry average.[9]

If the normal retirement age is greater than 65,[10] or if no normal retirement age can be inferred from the plan, then the normal retirement age for each participant will be the later of (a) the time the participant attains age 65, or (b) the fifth anniversary of the date the plan participant commenced participation in the plan. Thus, if the plan year is a calendar year and the employee commences participation on July 1, 1989, the fifth anniversary of commencement of participation will be July 1, 1994. However, years of service which may be disregarded under the break in service provisions of IRC § 410(a)(5)(D) (§ 8.4) may be disregarded in determining when participation commenced.

## [B]  Normal Retirement Benefits

The normal retirement benefits under a plan are the greater of the early retirement benefit (if any) or the benefit commencing at normal retirement age.[11] If both the benefit payable at early retirement age[12] and that payable at normal retirement age are expressed by the plan in the same form, the comparison will be easy. No actuarial adjustment is to be made for the fact that the early retirement benefit will be started at an earlier age. Thus, an annuity of $500 per month beginning at normal retirement age is greater than an annuity of $450 per month beginning at early retirement, and so $500 per month would be the normal retirement benefit. However, if the annuity payable at normal retirement were, for example, payable on a monthly basis, and the early retirement benefit were payable annually, the early retirement benefit would need to be converted to the same form as the benefit payable at normal retirement, since this is the only way the two benefits could be accurately compared.

Early retirement benefits under a plan may be tied-in with public retirement systems. For example, a plan might provide early retirement benefits of $500 per month beginning at age 55 and dropping to $400 per month at age 65. At age 65 the individual would receive at least $100 per month in Social Security benefits, so the individual's total retirement benefit would stay the same or increase. As long as these additional early retirement benefits do not exceed Social Security benefits payable at a later date to the participant under Title II[13] of the Social Security Act, and the additional benefits terminate when the participant is eligible for the Title II Social Security benefits (unreduced for age), then the additional benefits will not be considered in determining the normal

retirement benefits unde... normal retirement bene... retirement benefits are ... and without regard to ... qualified disability benefi... ty benefit provided by a ... would be provided for th... normal retirement age.[15]

The plan formula fo... for example, a percentag... five highest consecutive y... years as a participant. ... average compensation ea... pant, and the participant ... her benefits might be u... not receive credit for a ... regulations require that ... be converted to a full y... plan need not provide fo... which will not decrease... compensation).

A floor-offset arran... though an employee's be... tively reduced if the ind... retirement age.[17]

## [C]  Accrual Requirer...

The benefit formula ... for all present and futur... the 3% method, the 133... years, see *Transitional* ... exclusively by the purcha... requirements of IRC § 4... these three tests if each... the following tests: (1) ... surrender value of the p... (2) the requirements of ... insurance contracts. IRC...

As discussed above ... aimed at preventing ... § 411(b)(1)(G) contains ...

---

8.  Rev.Rul. 78–331, 1978–2 C.B. 158.

9.  Rev.Rul. 80–276, 1980–2 C.B. 131.

10.  See Lindsay v. Thiokol Corp., 112 F.3d 1068 (10th Cir.1997) for a case in which the employer was permitted to amend the plan to raise the normal retirement age from 65 to 67.

11.  Treas.Reg. § 1.411(a)–7(c).

12.  The early retirement age, if any, would be designated as such in the plan; it is not defined by statute.

13.  Title II benefits include retirement and disability benefits.

14.  Treas.Reg. § 1.411(a)–...

15.  A benefit was treated ... disability benefit, rather than ... ment benefit, even though th... calculated in the same manne... retirement benefit. PLR 98520...

16.  Treas.Reg. § 1.411(a)–...

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit H</u>

1997 Enrolled Actuaries Meeting, Questions to
IRS/Treasury and Summary of their Responses
(March 1997) (excerpt)

**1997 Enrolled Actuaries Meeting**

**Questions to IRS/Treasury**

**and Summary of their Responses**

**March, 1997**

Summary of Meeting Between the Enrolled Actuaries Program Committee
and Staff of the Treasury Department
and Internal Revenue Service on February 6, 1997

The following pages set forth the questions posed to Staff of the Treasury Department and the Internal Revenue Service at a meeting on February 6, 1997 with representatives of the Enrolled Actuaries Program Committee. Included also are summaries of the answers to those questions. The summary answers to the questions are intended to reflect as accurately as possible the statements made by the government representatives. However, this material does not represent the official position of the Treasury Department or the Internal Revenue Service or of any other governmental agency. Moreover, neither the Treasury nor the Service has in any way approved this booklet or reviewed it to determine whether the statements herein are accurate or complete.

The following representatives of the Enrolled Actuaries Program Committee attended the meeting:

      James G. Durfee, Towers Perrin
      Ethan E. Kra, William M. Mercer, Inc.
      Marjorie R. Martin, Sedgwick Noble Lowndes
      Donald J. Segal, The Segal Company
      Lawrence J. Sher, Coopers & Lybrand L.L.P. - Kwasha Lipton Group
      Amy Viener, A. Foster Higgins & Co., Inc.

The following representatives of the Treasury Department and the Internal Revenue Service attended the meeting:

      James E. Holland, Jr., Chief, Actuarial Branch 1, Internal Revenue Service
      Linda Marshall, Senior Attorney, Chief Counsel Branch 1, Internal Revenue Service
      Harlan M. Weller, Government Actuary, U.S. Department of Treasury
      Richard Wickersham, Chief, Projects Branch 3, Internal Revenue Service
      Ken Yednock, Chief, Projects Branch 1, Internal Revenue Service

The Program Committee would like to thank the many practitioners who submitted questions for this booklet.

Copyright © 1997, Enrolled Actuaries Meeting
All rights reserved by Enrolled Actuaries Meeting. Permission is granted to print or otherwise reproduce a limited number of copies of the material on the diskette for personal, internal, classroom, or other instructional use, on the condition that the foregoing copyright notice is used so as to give reasonable notice of the copyright of the Enrolled Actuaries Meeting. This consent for free limited copying without prior consent of the Enrolled Actuaries Meeting does not extend to making copies for general distribution, for advertising or promotional purposes, for inclusion in new collective works, or for sale or resale.

## INDEX

<u>Subject Matter</u>                                                                         <u>Questions</u>

1.  Funding ....................................................................................................   1-11

2.  Funding Limits ........................................................................................   12-13

3.  §415 .........................................................................................................   14-17

4.  Nondiscrimination – SBJPA ...................................................................   18-26

5.  Nondiscrimination – Other .....................................................................   27-30

6.  Minimum Distribution Requirements .....................................................   31-33

7.  Other DB Issues......................................................................................   34-38

8.  Other DC Issues ......................................................................................   39-42

9.  Other .......................................................................................................   43-47

QUESTION #35

Other DB Issues:  In-service Distributions and Normal Retirement Age

A qualified DB plan allows for in-service distributions at or after Normal Retirement Age (NRA).

   (a)   Are there any restrictions as to how NRA is defined under such a plan (other than the age
         65/fifth anniversary of participation maximum)?  For example, could it be age 50?

   (b)   Could the plan provide two different NRAs with respect to two distinct benefits under the plan?


RESPONSE

(a)   There is no general rule providing a minimum NRA.  Therefore, a normal retirement age of 50 is
      permissible.

(b)   No.  The plan cannot have two different NRAs with respect to two distinct benefits.

1997-35

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit I</u>
Benefits Express Website Glossary
(Aug. 31, 2005) (excerpt)

**Benefits Express Online**

___

**XXXXXXX4588**

August 31, 2005

## Glossary

[A-F] [G-L] [M-S] [T-Z]

**After-Tax Contributions**

After-tax contributions are made from your pay after federal, Social Security, state and local taxes (where applicable) are deducted. Because you pay tax on these contributions before you save them in the plan, you pay taxes only on their earnings when you take a distribution. Also referred to as post-tax contributions.

Back To Top

**Aggressive Growth Fund**

A mutual fund that seeks maximum capital growth. Some aggressive growth funds invest in small growth companies or undervalued companies, while others employ specialized investment strategies. These kinds of funds involve special risk considerations.

Back To Top

**Alternate Payee**

An individual named under a Qualified Domestic Relations Order (QDRO) who has a right to receive some or all of a participant's benefits.

Back To Top

**Amortization**

The paying off of debt in regular installments over a period of time.

Back To Top

**Annuity**

A contract that provides an income for a specified period of time such as a number of years or for life.

Back To Top

**Annual and Semi-Annual Reports**

**Net Asset Value**

This is the value of one share of a mutual fund. It is usually calculated once a day, based on the closing market price for each security held in the fund's portfolio. It is determined by dividing the value of the fund's assets by the number of outstanding shares.

Back To Top

**No-Load Fund**

A mutual fund that does not impose a sales charge in excess of 25 basis points. Investors pay net asset value when buying shares.

Back To Top

**Normal Retirement Age**

The age set forth in a retirement plan for employees to receive full benefits upon retirement. Retirement before the normal retirement age may result in a reduction in benefit.

Back To Top

**Open-End Investment Company**

A mutual fund.

Back To Top

**Operating Expenses**

Costs incurred by a fund to conduct its day-to-day operation, other than the management fee and any distribution charges (e.g. legal, accounting, transfer agency, shareholder servicing, custodial, blue sky, etc.).

Back To Top

**Payment Date**

The day on which a mutual fund sends a distribution to its shareholders. Distribution meaning dividend distribution?

Back To Top

**Pension Benefit Guaranty Corporation (PBGC)**

The federal agency, established as a non-profit corporation, charged with administering the plan termination provisions of ERISA Title IV and the Multiemployer Pension Plan Amendments Act of 1980.

**Civil Action No. 05-1291 (PLF)**

# <u>Exhibit J</u>
Barry v. United States Capital Guide Board,
2005 WL 1026703 (D.D.C. 2005) (unpublished)

Slip Copy                                                                                                                     **Page   1**
Slip Copy, 2005 WL 1026703 (D.D.C.), 30 NDLR P 110
**(Cite as: 2005 WL 1026703 (D.D.C.))**

Motions, Pleadings and Filings

United States District Court,
District of Columbia.
Kevin BARRY, Plaintiff,
v.
UNITED STATES CAPITOL GUIDE BOARD,
Defendant.
No. Civ.A. 04-0168(RBW).

Filed Feb. 5, 2004.
May 2, 2005.
R. Scott Oswald, Employment Law Group, PLLC,
Washington, DC, Lead Attorney, Attorney to be
Noticed, for Kevin Barry, Plaintiff.

Toby R. Hyman, Office of Senate Chief, Counsel
for Employment, Washington, DC, Lead Attorney,
Attorney to be Noticed, Julie E. Saker, Office of
Senate Chief, Counsel for Employment, Alexandria,
VA, Attorney to be Noticed, Jean Marie Manning,
Office of Senate Chief, Counsel for Employment,
Washington, DC, Attorney to be Noticed, for
United States Capitol Guide Service, Defendant.

Toby R. Hyman, Lead Attorney, Attorney to be
Noticed, Julie E. Saker, Jean Marie Manning, (See
above for address), Attorney to be Noticed, for
United States Capitol Board, Defendant.

*MEMORANDUM OPINION*

WALTON, J.

**\*1** The plaintiff filed this action pursuant to the
Congressional Accountability Act of 1995 ("CAA"),
2 U.S.C. § 1371(a) seeking to recover damages
from the defendant, the United States Capitol
Guide Board ("Guide Board"), for its alleged unlawful
actions related to the termination of his employment.
[FN1] Complaint ("Compl.") ¶¶ 1-2. The defendant
has now filed a motion to dismiss, or in the
alternative, for summary judgment, [FN2] arguing
that the plaintiff cannot establish (1) a causal
connection between his alleged protected activity
and the unlawful employment action or (2) that the
defendant's legitimate, nondiscriminatory reason for
terminating his employment was a pretext for
discrimination. Defendant's Motion to Dismiss or,
in the Alternative, for Summary Judgment ("Def.'s
Mot. for Summ. J.") at 1. The plaintiff, however,

seeks to stay consideration of the defendant's
summary judgment motion and to permit discovery
pursuant to Federal Rule of Civil Procedure 56(f).
[FN3] For the following reasons, this Court grants
the plaintiff's motion to permit discovery and denies
without prejudice the defendant's motion to dismiss,
or in the alternative, for summary judgment.

FN1. The plaintiff originally brought this action
against both the Guide Board and the United States
Capitol Guide Service ("Guide Service"). On
October 12, 2004, the plaintiff filed a notice of
voluntary dismissal of the Guide Service pursuant to
Rule 41(a)(1)(I), thereby leaving the Guide Board as
the sole defendant in the case.

FN2. Specifically, before the Court are: (1) the
defendant's Motion to Dismiss the Amended
Complaint ("Def.'s Mot. to Dismiss"); (2) the
defendant's Motion to Dismiss, or in the Alternative,
for Summary Judgment (Def.'s Mot. for Summ. J.");
(3) the defendant's Statement of Points and
Authorities in Support of its Motion to Dismiss or, in
the Alternative, for Summary Judgment ("Def.'s
Statement of Points"); (4) the defendant's Statement
of Undisputed Material Facts in Support of Its
Motion to Dismiss or, in the Alternative, for
Summary Judgment (Def.'s Statement of Material
Facts"); (5) the plaintiff's Statement of Points and
Authorities in Opposition to Defendant's Motion to
Dismiss or, in the Alternative, for Summary
Judgment ("Pl.'s Opp'n"); and (6) the defendant's
Reply to Plaintiff's Opposition to Defendant's Motion
to Dismiss or, in the Alternative, for Summary
Judgment ("Def.'s Reply").

FN3. Before the Court are: (1) the plaintiff's Motion
to Stay Consideration of Defendant's Motion for
Summary Judgment, and to Permit Discovery,
Pursuant to Rule 56(f) ("Pl.'s Mot."), (2) the
plaintiff's Memorandum in Support of the Plaintiff's
Motion to Stay Consideration of Defendant's Motion
for Summary Judgment, and to Permit Discovery,
Pursuant to Rule 56(f) ("Pl.'s Mem."), (3) the
defendant's Opposition to Plaintiff's Motion to Stay
Consideration of Defendant's Motion for Summary
Judgment, and to Permit Discovery, Pursuant to Rule
56(f) ("Def.'s Opp'n"), and (4) the plaintiff's Reply
to Defendant's Opposition to Plaintiff's Motion to
Stay Consideration of Defendant's Motion for
Summary Judgment and to Permit Discovery

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pursuant to Rule 56(f) ("Pl.'s Reply").

## I. *Background*

Congress created the United States Capitol Guide Service ("Guide Service") to provide guided tours of the "United States Capitol Building for the education and enlightenment of the general public." 2 U.S.C. § 2166(a) (2004). The Guide Service is subject "to the direction, supervision, and control of the Guide Board, which consists of the Architect of the Capitol, the Sergeant at Arms of the Senate, and the Sergeant of Arms of the House of Representatives. *Id.* The plaintiff, who is deaf, and, as such, is allegedly a qualified individual with a disability as defined by the Rehabilitation Act of 1973, 29 U.S.C. § 791 and the Americans with Disabilities Act of 1990, 42 U.S.C. § 1211(8), began his employment with the Guide Service on January 1, 1994, as a guide. Compl. ¶¶ 9, 10. According to the plaintiff, as an employee of the Guide Service and the Guide Board, [FN4] which are "employing offices" [FN5] under the CAA, his employment falls under the CAA. *Id.* ¶¶ 5, 7; *see* 2 U.S.C. § 1301(3)(C), (9)(D) (2004).

FN4. A "covered employee" means an employee of the Guide Service. 2 U.S.C. § 1301(3).

FN5. An "employing office" means the Guide Board. 2 U.S.C. § 1301(9)(D).

In 1996, the plaintiff applied for the position of Chief Guide with the Guide Service but was not selected. *Id.* ¶¶ 12, 13. Rather, another employee, who is not disabled, and according to the plaintiff less qualified than him, was selected for the position. *Id.* ¶ 13. The plaintiff opines that his non-selection was due solely and proximately to the plaintiff's disability and need for sign language interpreter services. *Id.* ¶ 15. On March 4, 1996, the plaintiff requested counseling with the Office of Compliance ("OC") regarding his non-selection and subsequently had two meditation meetings with the OC. During the second meeting, the counsel for the Guide Service asserted that the plaintiff's non-selection was not because of discrimination. In June, 1996, the plaintiff received a "Memorandum of Serious Misconduct," which alleged that he had engaged in sexual harassment and that the allegations had arisen during the investigation of the plaintiff's failure to promote complaint. *Id.* ¶¶ 17, 18. This memorandum was placed in the plaintiff's

personnel file. *Id.* ¶ 21. In March, 1997, the plaintiff filed a formal administrative complaint, which alleged discrimination regarding the promotion denial and also retaliation against him when he was not provided an opportunity to rebut the sexual harassment charges. *Id.* ¶¶ 24-27. Following the filing of this complaint, an investigation ensued and all adverse references to the "Memorandum of Serious Misconduct" were removed from the plaintiff's personnel records. *Id.* ¶ 28.

*2 Over the next 6 years, the plaintiff alleges that his supervisor "bore a grudge" against him, which manifested in the creation of a difficult work environment. *Id.* ¶ 30. The plaintiff alleges that on one occasion, his supervisor told his interpreter in September, 1997 that "it takes two people to do [the plaintiff's] job," telling the interpreter that, because of his hearing impairment, the plaintiff caused the Guide Service to have to pay two people to perform one job. *Id.* ¶ 31. The supervisor purportedly told the plaintiff's interpreter "that she would not be getting a salary increase," which resulted in the interpreter leaving for a better paying job. *Id.* ¶¶ 33, 35. After the interpreter's departure and until his termination, the plaintiff was allegedly denied the services of a full time interpreter; rather, he was instructed by his supervisor to use the interpreters at the Congressional Special Services Office ("CSSO"), which is part of the Guide Service, Def.'s Mot. for Summ. J. at 4, where he had to make an appointment and "wait [his] turn." *Id.* ¶¶ 36, 37. As further proof of his hostile work environment claim, the plaintiff alleges that information on policy changes and tour information were withheld from him, making him appear incompetent and ignorant in front of his peers. *Id.* ¶¶ 42-44. The plaintiff also opines that he was treated in a disparate manner from his similarly situated co-workers when he asked to take vacation and bereavement leave. *Id.* ¶¶ 50-54.

In June, 2003, the plaintiff had a conversation with a coworker, who was an interpreter temporarily working with the CSSO. *Id.* ¶ 56. In this conversation, the plaintiff allegedly asked the interpreter about her ethnic background and he told her that he thought she was Spanish, *id.* at 58, even though she is a third-generation American. Def.'s Mot. for Summ. J. at 7. In a separate conversation, the plaintiff allegedly asked the same interpreter if

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

she was gay. Compl. ¶ 60. After learning about these conversations, the Assistant Director of the CSSO and the Director of the Visitor Services commenced an investigation. Def.'s Mot. for Summ. J. at 6. The investigation allegedly revealed that the plaintiff told the interpreter that she would not want to work at the Guide Board for various reasons. *Id.* at 7. At the time these alleged statements were made, the interpreter was working as a temporary contract interpreter in order for her to assess whether she would have liked to work for the CSSO if she had been given an offer of employment. *Id.* at 5.

On July 15, 2003, following the completion of the investigation, the plaintiff's employment with the Guide Service was terminated. *Id.* ¶¶ 65-68. The Director concluded that the plaintiff was disloyal for undercutting CSSO's efforts to hire a qualified interpreter by trying to convince her not to take the job. Def.'s Mot. for Summ. J. at 11. Moreover, the Director did not find the plaintiff's statements made during the investigation credible and concluded that the plaintiff displayed poor judgment and unprofessional conduct as a manager. *Id.* The plaintiff argues, however, that his conversations with his coworker were innocuous and hence, his termination was really in retaliation for the complaints he filed in 1996 and 1997. Compl. ¶ 69. Accordingly, the plaintiff commenced this action alleging that the Guide Board retaliated against him for engaging in protected activity under the CAA and that the Guide Board violated the CAA, when it terminated his employment in July, 2003. *Id.* ¶¶ 2, 70, 79, 81.

## II. *The Parties' Arguments*

**\*3** The defendant seeks to have the complaint dismissed, or in the alternative, moves for summary judgment. The defendant posits that the plaintiff cannot establish a *prima facie* case of retaliation because he cannot establish a causal link between the alleged protected activity and the purported adverse employment action and thus the complaint should be dismissed. Def.'s Mot. for Summ. J. at 14. Morever, the defendant argues that even assuming the plaintiff's ability to establish a *prima facie* case of retaliation, the plaintiff cannot show that the defendant's articulated legitimate, non-discriminatory reason for terminating his employment was a pretext for retaliation and thus they are entitled to summary judgment. *Id.* at 21-22.

In response, the plaintiff seeks to stay consideration of the defendant's motion for summary judgment and to permit the plaintiff time to conduct discovery pursuant to Federal Rule of Civil Procedure 56(f). Specifically, the plaintiff asserts that he cannot factually challenge the defendant's summary judgment motion without the opportunity to conduct discovery and that the plaintiff has raised meritorious allegations of bad faith, civil rights violations, and improper conduct on the part of the defendant that warrant his opportunity to conduct discovery. Pl.'s Mem. at 1-2. In support of his motion, the plaintiff included the affidavit of R. Scott Oswald, Esq. ("Oswald Aff."). The defendant argues that the plaintiff's motion to permit discovery should be denied because the plaintiff has neither identified any facts he intends to discover that would create a triable issue, nor explained why he cannot produce them without discovery. *See* Def.'s Opp'n. at 2, 4-5. The defendant opines in the alternative that if the Court permits discovery, then the scope of such discovery should be limited to the facts necessary to oppose the defendant's motion for summary judgment. *Id.* at 7.

## III. *Standard of Review*
### (A) Motion to Dismiss Under Rule 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Barr v. Clinton,* 370 F.3d 1196, 1199 (D.C.Cir.2004) (citing *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994)). However, the Court need not accept asserted inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *Kowal,* 16 F.3d at 1276. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference into the complaint, and matters about which the Court may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624-25 (D.C.Cir.1997). The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
(Cite as: 2005 WL 1026703, *3 (D.D.C.))

prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46.

(B) Motion for Summary Judgment Under Rule 56

**\*4** Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). All evidence must be viewed "in the light most favorable" to the nonmoving party. *Info. Handling Servs., Inc., v. Def. Automated Printing Servs.,* 338 F.3d 1024, 1032 (D.C.Cir.2003) (citing *Waterhouse v. District of Columbia,* 298 F.3d 989, 991 (D.C.Cir.2002)). However, summary judgment should ordinarily be entered only after the plaintiff has been given "adequate time for discovery." *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Info. Handling Servs ., Inc.,* 338 F.3d at 1032. And district courts are afforded substantial discretion to manage discovery as they see fit. *Stella v. Mineta,* 284 F.3d 135, 147 (D.C.Cir.2002).

"The court must give a party opposing summary judgment an adequate opportunity to obtain discovery." *Radich v. Goode,* 886 F.2d 1391, 1391 (3d Cir.1989) (citing *Dowling v. Philadelphia,* 855 F.2d 136, 139 (3d Cir.1988)). Courts have noted that pre-discovery summary judgment motions are premature and should only be used for exceptional circumstances. *Patton v. Gen. Signal Corp.,* 984 F.Supp. 666, 669 (W.D.N.Y 1997). One such circumstance is when a motion for summary judgment is made before discovery has ended and there is no genuine issue of material fact. *Brill v. Lante Corp.,* 119 F.3d 1266, 1275 (7th Cir.1997). However, even if the parties have not commenced discovery, if the plaintiff has failed to present any genuine issues of material facts, then the defendant's motion for summary judgment may be granted. *Raymond v. United States Capitol Police Bd.,* 157 F.Supp.2d 50, 55 (D.D.C.2001).

In order to show that there are genuine issues of fact for trial, the nonmoving party must "go beyond the pleadings," marshaling evidence culled from its own affidavits, or by the depositions, answers to interrogatories, and admissions on file. *Celotex,* 477

U.S. at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (holding that the adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts"). Rule 56(f) states that if it "appears from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had...." Fed.R.Civ.P. 56(f). Rule 56(f) motions should be granted "almost as a matter of course unless the nonmoving party has not diligently pursued discovery of the evidence ." *Berkeley v. Home Ins. Co.,* 68 F.3d 1409, 1414 (D.C.Cir.1995) (citing *Wichita Falls Office Assoc. v. Banc One Corp.,* 978 F.2d 915, 919 n. 4 (5th Cir.1992). "The purpose of 56(f) is to provide non-movants with a much needed tool to keep open the doors of discovery in order to adequately combat a summary judgment motion ." *Wichita Falls Office Assoc.,* 978 F.2d at 919.

IV. *Legal Analysis*
**\*5** It is helpful to begin the Court's analysis by briefly reviewing the well-established framework for establishing retaliation. Similar to employment discrimination claims, a claim of retaliation is governed by the *McDonnell Douglas Corp. v. Green* burden-shifting framework. *Holbrook v. Reno,* 196 F.3d 255, 263 (D.C.Cir.1999); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973); *see also Lathram v. Snow,* 336 F.3d 1085, 1089 n. 3 (D .C. Cir.2003) ("The *McDonnell Douglas* framework, with some differences in the phrasing of the *prima facie* case, applies to [the plaintiff's] claim of unlawful retaliation.") (citing *Morgan v. Fed. Home Loan Mortg. Corp.,* 328 F.3d 647, 651 (D.C.Cir.2003)). In order to establish a *prima facie* case of retaliation, the plaintiff must demonstrate: (1) that he engaged in a statutorily protected activity; (2) that his employer took an adverse personnel action; and (3) that a causal connection existed between the two events. *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D .C. Cir.1985). If the plaintiff is successful in proving a *prima facie* case of retaliation, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Holbrook,* 196 F.3d at 263. The employee must then prove by a preponderance of the evidence that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

asserted reason offered by the defendant was a pretext for retaliation. *Id.* (citing *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984); *see Trawick v. Hantman,* 151 F.Supp.2d 54, 60 (D.D.C.2001) (referring to the *McDonnell Douglas* framework and requiring evidence to reveal that the defendant's proffered reason was a pretext for employment discrimination). [FN6]

FN6. The McDonnell Douglas framework applies to employment discrimination cases brought under the CAA. *See Singh v. United States House of Representatives,* 300 F.Supp.2d 48, 53 (D.D.C.2004); *Raymond v. United States Capitol Police Board,* 157 F.Supp.2d 50, 55-56 (D.D.C.2001); *Trawick v. Hantman,* 151 F.Supp.2d 54, 60-61 (D.D.C.2001).

(A) Defendant's Motion to Dismiss

The defendant seeks to dismiss the complaint alleging that while the plaintiff did engage in statutorily protected activity and he was affected by adverse personnel action, the plaintiff cannot establish a causal connection between his participation in that protected activity and his termination, which occurred more than six years later. Def.'s Mot. for Summ. J. at 14. The defendant emphasizes that the temporal proximity between an employer's knowledge of the plaintiff's protected activity and an adverse employment action must be relatively close in time to establish the causal connection. *Id.* at 15. However, " '[t]emporal proximity is but one method of proving retaliation. Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection." ' *Buggs v. Powell,* 293 F.Supp.2d 135, 149 (D.D.C.2003) (quoting *Che v. Mass. Bay Transp. Auth.,* 342 F .3d 31, 38 (1st Cir.2003)). Thus, the Third Circuit in *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173 (3d Cir.1997) stated

that where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference. These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference.

*6 *Id.* at 177 (internal citations and quotations omitted).

Viewing the facts set forth in the complaint in the light most favorable to the plaintiff, it is clear that after drawing all appropriate inferences in his favor, that the plaintiff has stated a claim of retaliation even though its proximity to the protected activity would not alone support the claim. *Buggs,* 293 F.Supp.2d at 149. Of particular importance to the Court is the fact that the plaintiff's supervisor during the time between the protected activity and the adverse employment action was the individual who was promoted to the position for which the plaintiff had also applied. While under his prior competitor's supervision, the plaintiff identifies three similarly situated co-employees and he alleges that while their respective levels of responsibility and work loads were comparable, his co-employees received larger annual pay increases from his supervisor than he did. Compl. ¶ 40. In addition, the supervisor allegedly accorded less favorable treatment to the plaintiff when he allowed the plaintiff three days of bereavement leave, whereas he afforded other Guide Service employees a full week in similar situations. Compl. ¶¶ 50-51, 53; Pl.'s Opp'n at 5. The plaintiff alleges that his supervisor made a practice of withholding policy changes and tour information from him, which caused him to appear incompetent in front of his peers. Compl. ¶¶ 42-43. According to the plaintiff, the supervisor did not investigate his complaint of insubordination of a tour guide who was under the plaintiff's supervision, even though the supervisor purportedly investigated complaints of insubordination by other employees. Compl. ¶¶ 47-49; Pl.'s Opp'n at 4. Collectively, this evidence is sufficient to establish a "pattern of antagonism" that the plaintiff was subjected to following his participation in the statutorily protected activity. *Buggs,* 293 F.Supp.2d at 149. Thus, based upon the allegations in the complaint, and at this stage of the proceedings, it would not be appropriate for this Court to determine whether the plaintiff will succeed on this claim. Rather, unless discovery indicates otherwise, that determination is best left to a fact-finder. *See, e.g., Anderson,* 477 U.S. at 255 ("[D]rawing ... legitimate inferences from the facts are jury functions, not those of a judge...."). Therefore, the Court must deny the defendant's motion to dismiss because the defendant has not demonstrated "beyond a doubt that the plaintiff cannot prove any set of facts in support of his claim which would entitle him to relief." *See Conley,* 355 U.S. at 45-46.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(B) Defendant's Motion for Summary Judgment

The defendant also seeks summary judgment, alleging that the plaintiff cannot rebut the defendant's legitimate, nondiscriminatory reason for terminating his employment. Def.'s Mot. for Summ. J. at 21-22. As discussed above, once a defendant has articulated a legitimate, nondiscriminatory reason for the employment action, "the McDonnell Douglas framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] '[retaliation] vel non.' " *Reeves v. Sanders Plumbing Prods., Inc.,* 530 U.S. 133, 142-43 (2000). Thus, to survive the defendant's motion for summary judgment, the plaintiff must show that a jury could conclude "by a preponderance of the evidence that the asserted reason is a pretext for retaliation." *Holbrook,* 196 F.3d at 263. To do so, this Court must consider whether a jury could infer retaliation from: (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employee's proffered reason; and (3) any further evidence available to the plaintiff. *See, e.g., Waterhouse v. District of Columbia,* 298 F.3d 989, 992-93 (D.C.Cir.2002).

*7 This inquiry is necessarily fact intensive and granting a motion for summary judgment on this issue prior to providing the parties with any opportunity for discovery is clearly contrary to this Circuit's precedent. *See Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 28-29 (D.C.Cir.1997) (reversing district court's denial of the plaintiff's Rule 56(f) motion because the plaintiff should have been provided the opportunity to conduct discovery to garner facts to refute the defendant's legitimate non-discriminatory reason for the alleged adverse employment action); *Velikonja v. Muller,* 315 F.Supp.2d 66, 78-80 (D.D.C.2004) (finding that Rule 56(b) motion should be granted "[b]ecause it [was] unclear based on the undeveloped record whether plaintiff [would] be able to proffer evidence" to refute the defendant's articulated legitimate, non-discriminatory reason for his actions).

Similar to this case, the plaintiffs in *Paquin* and *Velikonja* opposed the defendants' motions for summary judgment on the ground that further discovery was necessary in order to demonstrate pretext. *Paquin,* 119 F.3d at 28; *Velinkonja,* 315 F.Supp.2d at 79. For example, the defendant in

*Paquin* explained that the plaintiff's termination was based on his written performance evaluation and the court noted that comparable evaluations of other executives at the plaintiff's level were the type of evidence that might reveal the defendant's explanations as a pretext for discrimination. *Paquin,* 119 F.3d at 28. And in *Velinkonja,* the plaintiff had yet to conduct any depositions in order to attempt to make his case, and the court recognized that granting summary judgment at that stage of the proceedings would have been "premature." *Velinkonja,* 315 F.Supp.2d at 80.

Here, the plaintiff asserts that he has not had the opportunity to conduct any discovery and based on his complaint and his attorney's affidavit, such discovery may likely reveal disputed issues of material fact. It is simply impossible at this time for this Court to determine whether there is a genuine issue as to whether the plaintiff's termination was because of the alleged inappropriate conduct he committed in 2003 or was in retaliation for his 1996 and 1997 statutorily protected activity. Thus, the plaintiff must be afforded the opportunity to engage in discovery so that he may attempt to acquire evidence to rebut the defendant's alleged legitimate and nondiscriminatory reason for his termination. [FN7] Therefore, this case does not merit summary judgment being awarded to the defendant at this time and the motion will be dismissed without prejudice. [FN8] *See Americable Int'l, Inc. v. Dep't of Navy,* 129 F.3d 1271, 1274 (D.C.Cir.1997) (noting that summary judgment may well be in order if after discovery, the court determines that there are no genuine issues as to any material fact).

FN7. For example, such discovery may lead to evidence that the plaintiff was treated differently than other similarly situated employees. *See, e.g., Paquin,* 119 F.3d at 28; *Velinkonja,* 315 F.Supp.2d. at 80- 81.

FN8. At the conclusion of discovery, the defendant may, if it feels it is proper, file a renewed motion for summary judgment.

(C) Scope of Discovery

The defendant argues that if this Court grants the plaintiff's Rule 56(f) motion, the scope of the plaintiff's discovery should be limited to efforts to disclose facts necessary to oppose the defendant's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion. Under Rule 56(f), if the party opposing a motion for summary judgment
**\*8** cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 56(f). Courts frequently invoke Rule 56(f) to provide for limited discovery when, for example, an initial period of discovery has already occurred if additional discovery is necessary to oppose a summary judgment motion. *See e.g., Stella,* 284 F.3d at 147 (remand to district court for its determination as to whether *additional* discovery was required); *Richardson v. Nat'l Rifle Ass'n,* 871 F.Supp. 499 (D.D.C.1994) (requiring that a party opposing summary judgment alert the court to the need for *further* discovery); *Am. Broad. Co., v. United States Info. Agency,* 599 F.Supp. 765, 768 (D.D.C.1984) (contemplating situations in which additional discovery is needed).

Such is not the case here, as no discovery has yet taken place and the plaintiff has had no opportunity to develop a factual record to support his claims. Thus, in light of the allegations raised in the complaint, this Court concludes that it is more appropriate to permit full discovery so as to afford the plaintiff "a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56 ' and a chance 'to pursue reasonable discovery." ' *Taylor v. FDIC,* 132 F.3d 753, 765 (D.C.Cir.1997) (quoting *First Chicago Int'l v. United Exch. Co., Ltd.,* 836 F.2d 1375, 1380 (D.C.Cir.1988)) (emphasis added). Under Rule 26, discovery is permitted of *"any* matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1) (emphasis added). While "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly," *Crawford-El v. Britton,* 523 U.S. 574, 598 (1998), this Court can find no reason to mandate such a limitation here. Accordingly, this Court finds it appropriate to afford the plaintiff "an opportunity to make *full* discovery." *Celotex,* 477 U.S. at 326 (emphasis added).

## V. *Conclusion*

Based on the foregoing analysis, and viewing the facts in a light most favorable to the plaintiff, the defendant's dismissal motion must be denied because the defendant has not demonstrated beyond doubt that the plaintiff can prove no set of facts in support of his claim. Moreover, the plaintiff must be afforded the opportunity to conduct discovery so he can attempt to develop evidence to contest the defendant's motion for summary judgment. Therefore, considering the defendant's motion for summary judgment at this time is inappropriate. Consequently, this Court must grant the plaintiff's motion to stay consideration of the defendant's summary judgment motion until discovery is conducted, and deny the defendant's motion for summary judgment without prejudice.

**\*9** SO ORDERED. [FN9]

FN9. An Order consistent with this Court's Memorandum Opinion is issued herewith.

## *ORDER*

Upon consideration of the defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment and the plaintiff's Motion to Stay Consideration of Defendant's Motion for Summary Judgment, and to Permit Discovery, the reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED that the plaintiff's motion to stay consideration of summary judgment and to permit discovery is GRANTED.

ORDERED that the defendants's motion to dismiss is DENIED.

ORDERED that the defendants's motion for summary judgment is DENIED without prejudice.

SO ORDERED.

Slip Copy, 2005 WL 1026703 (D.D.C.), 30 NDLR P 110

Motions, Pleadings and Filings (Back to top)

. 2004 WL 2056974 (Trial Motion, Memorandum and Affidavit) Plaintiff Kevin Barry's Opposition to Defendant's Emergency Motion to Seal Confidential Portions of the Amended Complaint (Jun. 14, 2004)

. 2004 WL 2056968 (Trial Motion, Memorandum and Affidavit) Plaintiff Kevin Barry's Response to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
(Cite as: 2005 WL 1026703, *9 (D.D.C.))

Page   8

Defendant's Emergency Motion to Seal Confidential Portions of the Complaint (Jun. 07, 2004)

. 1:04cv00168 (Docket)
(Feb. 05, 2004)

. 2004 WL 2056957 (Trial Pleading) Amended Civil Complaint for Equitable and Monetary Relief and Demand for Jury %n1 %n (2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.