**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TIMOTHY D. LAURENT** | : |
| | : |
| **On behalf of himself and all others similarly situated,** | : |
| | : |
| **Plaintiff,** | :    **Civil Action No.  05-1291 (PLF)** |
| **v.** | : |
| | : |
| **PRICEWATERHOUSECOOPERS LLP,** *et al.*, | : |
| | : |
| **Defendants.** | : |
| | : |

**PLAINTIFF'S REPLY MEMORANDUM
IN SUPPORT HIS MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>UNDER COUNTS ONE THROUGH FOUR</u>**

Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
Phone:     (202) 243-1000
Fax:        (202) 243-1001

October 11, 2005              Attorney for Plaintiff and the proposed Class

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………….... 1

DISCUSSION………………….………………………………………………….…...…… 2

A.    Plaintiff's Claims Under Counts One Through Four Are Not Time-Barred .................... 2

B.    Plaintiff Has Standing …….………………………………………………….……. 6

    a.    Any Participant Has Standing To Challenge The Legality Of Plan
        Provisions Under ERISA …………………………………………………...……. 7

    b.    Plaintiff Is A Former Employee With A Colorable Claim To Benefits ..……...…. 7

    c.    ERISA Standing Confers Article III Standing …………………………………. 12

C.    There Are No Genuine Issues of Material Fact ………………………………….…. 13

D.    There Are No Other Procedural Impediments …..………………………….……..… 14

E.    PwC's Heavy Reliance On IRS Rulings Is Misplaced …………………………….……. 16

    a.    The IRS Agrees With Plaintiff's Normal Retirement Age Standard ……..……. 17

    b.    The IRS Determination Letters Have No Bearing On ERISA Liability………... 20

    c.    Revenue Ruling 78-120 Cannot Override The Statute …………………….….... 20

F.    On The Merits, The RBAP's "Normal Retirement Age" Is An Illegal Subterfuge …...... 21

CONCLUSION ………………………………………………………………………. 26

## **INTRODUCTION**

PwC employees do not reach "normal retirement age" five years after they begin working just because PwC says they do. Neither ERISA nor IRS precedents require such an absurd result. As Plaintiff demonstrates in his motion for partial summary judgment, the loophole PwC purports to have found in the statute simply does not exist.

The only issue is whether PwC's various procedural defenses shield it from an immediate declaration that the RBAP's fictitious retirement age is illegal. They do not. As Plaintiff demonstrates below, his motion is proper. PwC itself has put the validity of the 5-year retirement age directly at issue in its motion to dismiss, saying it is one basis upon which the Court can dismiss *three* of Plaintiff's claims with prejudice. The Court's consideration of Plaintiff's motion at this juncture also is highly desirable. The declaration Plaintiff seeks would greatly simplify the case by immediately removing any pretense that the RBAP is somehow different from the plans analyzed in the court cases mentioned above and in other cases that have found "cash balance" pension plans to have violated ERISA age discrimination and other accrued benefit standards.

Once Defendants are told that they cannot hide behind the RBAP's fictitious "retirement age" definition, the parties and the Court can more efficiently focus on the procedural and legal issues that remain, referring to principles established in these other court cases. Plaintiff will no longer have to present – and PwC will no longer have to respond – to two sets of arguments, with one set based on a normal retirement age of age 65 and another set of arguments based on a retirement age of 5 years of employment.[1] And at

---

[1] Plaintiff contends that the RBAP violates ERISA regardless of whether the Plan's "normal retirement age" is age 65 or 5 years of employment. *See, e.g.,* Compl. ¶¶ 100 n.32, 131, 142 n.44.

least with regard to Count One, the parties can proceed directly to the relief stage, as PwC effectively concedes liability on that Count if normal retirement age is age 65. PwC Opp. at 10-11 ("defendants' motion argues that Counts Two, Three and Four [but not Count One] fail to state a claim under ERISA *even if* the five-year normal retirement age is invalid.") (emphasis in original).

## DISCUSSION

### A.    Plaintiff's Claims Under Counts One Through Four Are Not Time-Barred.

As Plaintiff also shows in his opposition to the motion to dismiss (Doc. 20 at 44-45), PwC's contention that Plaintiff's claims under Counts One through Four are time-barred is meritless. Plaintiff's cause of action did not accrue until *this year* – on February 16, 2005. It was on that date, in the matter styled *Laurent v. PricewaterhouseCoopers, et al.,* 04-809-GPM (S.D. Ill.), that the RBAP filed its motion to dismiss Plaintiff's first amended complaint (substantially similar to the current Complaint). That marked the first time that the Plan ever addressed – and clearly repudiated – Plaintiff's claim that he was entitled to additional benefits, a claim Plaintiff made for the first time on November 5, 2004, when he filed suit in the Southern District of Illinois.

Although PwC pretends not to know it, the "clear repudiation" rule, establishing the point at which the participant's cause of action accrues for limitations purposes, is not just the law of this Circuit, *see* Pl. Opp. at 44-45 (discussing *Kosty v. Lewis*, 319 F.2d 744 (D.C. Cir. 1963), among other cases) – it is basically the law *everywhere*.[2]  That rule sensibly

---

[2] *See, e.g., Romero v. Allstate Corp.,* 404 F.3d 212, 223-24 (3d Cir. 2005); *Carey v. IBEW Local 363 Pension Plan,* 201 F.3d 44, 47-48 (2d Cir. 1999); *Union Pac. R.R. v. Beckham,* 138 F.3d 325, 330-31 (8th Cir. 1998); *Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 65-67 (7th Cir. 1996); *Martin v. Construction Laborers' Pension Trust,* 947 F.2d 1381, 1384-86 (9th Cir. 1991); *Cotter v. Eastern Conf. of Teamsters Retirement Plan*, 898 F.2d 424 (4th Cir. 1990)*; Employees of Howard B. Wolf, Inc.,* 637 F.2d 357, 361 (5th Cir. 1981).

provides that a participant will not be deemed to have "discovered" his claim in such a manner that he is called upon to assert his rights – *i.e.,* no such claim will accrue for limitations purposes – until he either receives a formal denial of a claim for additional benefits, or the plan or a plan fiduciary clearly repudiates his claim for additional benefits in some other way. *See, e.g., DeVito v. Pension Plan of Local 819*, 975 F. Supp. 258, 264-65 (S.D.N.Y. 1997) (the limitations period for a claim by a participant "that the Plan itself violates ERISA on its face" "begins to run 'when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries,'" *quoting Valle v. Joint Plumbing Indus. Bd.,* 623 F.2d 196, 202 n.10 (2d Cir. 1980), in turn *citing Kosty*).

Unable to distinguish *Kosty*[3] and still unwilling to acknowledge the existence of the "clear repudiation" standard, PwC in its motion-to-dismiss reply simply repairs to the same incomplete and misleading presentation of *Connors v. Hallmark & Sons Coal Co.*, 935 F.2d 336 (D.C. Cir. 1991), it offered up to the Court in its original moving papers. But *Connors* only further proves Plaintiff's point. PwC cites *Connors* for the proposition that under the federal "discovery" rule, courts impute awareness of breach of contract claims to plaintiff at the time of injury, "'*even if the plaintiff protests that she did not in fact become aware of the injury when it occurred.*'" PwC Reply at 3 (emphasis added by PwC). What PwC does not disclose is that *Connors* characterized this as the general rule that applies in "*garden-variety breach of contract actions,*" *id.* at 342, but ***not*** the rule that applies in an ERISA action

---

[3] *Kosty*, decided under the Taft-Hartley Act, is "controlling" in this Circuit for determining the accrual of federal causes of actions regarding trust-related claims, as Judge Lamberth recognized in *Cobell v. Norton*, 260 F.Supp.2d 98, 106 (D.D.C. 2003). It is "controlling" because its rule of decision drew on the same common law trust principles that informed the enactment and inform the correct interpretation of ERISA. Even on the facts, the parallels are close because the plaintiff was the victim of what would be viewed under ERISA as an illegal cut-back of benefits. 319 F.2d at 750. *See also NLRB v. Amax Coal Co.,* 453 U.S. 322, 329-334 (1981), discussing overlap between ERISA and Taft-Hartley Act). Yet PwC would have the Court conclude that *Kosty* is not even "*relevant.*" PwC Reply at 4 (emphasis added).

where the aggrieved party – who "remain[s] dependent upon the [defendants'] honesty and accuracy" – does not discover its injury until a later date because the injury was difficult for the plaintiff to discern. *Id.* at 342-43 (emphasis added).

Then-Circuit Judge Ruth Bader Ginsberg, writing for the Court in *Connors*, referred to Judge Posner's explanation of the discovery rule the court would apply:

> Judge Posner, writing for a Seventh Circuit panel, has explained that the 'time of injury' rule can be considered analytically as but a particular instance of the discovery rule: if the injury is such that it should reasonably be discovered at the time it occurs, then the plaintiff should be charged with discovery of the injury, and the limitations period should commence, at that time. But if, on the other hand, the injury is not of the sort that can readily be discovered when it occurs, then the action will accrue, and the limitations period commence, only when the plaintiff has discovered, or with due diligence should have discovered, the injury. *See Cada*, 920 F.2d at 450 ("Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date - *often the same, but sometimes later* - on which the plaintiff discovers that he has been injured.") (emphasis added).

*Id.* at 342.

Then-Judge Ginsberg then went on to apply this standard to facts with close parallels to the facts here:  Mine operators (including Hallmark & Son Coal Co.) agreed with the Trustees of a mine workers pension plan that the operators would calculate the amount of pension funding contributions due to the plan under various collective bargaining agreements and report these amounts to the Trustees.  The Trustees performed an audit, and filed suit alleging that the companies had failed to properly report and pay the contributions due.  One significant dispute was over when the Trustees' cause of action accrued.  The D.C. Circuit viewed the matter as follows:

> The Agreements that establish Hallmark's obligations to the Funds place primary responsibility for accurate contributions upon the employer mine operators, whose duty it is to calculate correctly the various factors that determine each company's contributions to the Funds . . . . [T]he Agreements require operators to report the information monthly to the Trustees.

> Nevertheless, the Trustees remain dependent upon the operators' honesty and accuracy. . . .  [As a result,] breach of the employers' contractual obligations to contribute and report seems likely to be a hidden injury, similar to be the type of injury that has long triggered the discovery rule.  Furthermore, application of the discovery rule is consistent with Congress' intent in ERISA to provide 'broad remedies' and 'to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective . . . recovery of benefits due to participants.'  S. Rep. No. 127, 93d Cong., 1st Sess. 35 (1973).

*Id.* at 342-43.

Given the inherently "hidden" nature of the violations involved, the D.C. Circuit concluded that the plaintiffs' cause of action did not accrue as each payment by the operators was made – but only later, when the violations were discovered.  *Id.*

Thus, contrary to what PwC would like this Court to believe, *Connors* just brings one back to Plaintiff's original contention – *i.e.,* that his claim did not accrue when he received a lump distribution from the Plan (*i.e.,* the date of "*injury,*" as in the garden-variety contract case), but at the earliest when he discovered the statutory *violations* alleged in the Complaint.[4]  That is, in essence, simply another formulation of *Kosty* and the clear repudiation rule.  *See, e.g., Romero, supra* n.2, 404 F.3d at 223-24 (*citing Connors* and explaining that "[t]h[e] 'clear repudiation' concept is consistent with the federal discovery rule" and "developed in the more specific ERISA context" for "ERISA non-fiduciary duty claim[s]").[5]

---

[4] *Laurenzano v. Blue Cross and Blue Shield of Mass., Inc. Retirement Income Trust*, 134 F. Supp.2d 189, 199 (D. Mass. 2001), like Connors, is adverse to PwC's position.  Under that case, the date of accrual is variable and dependent on whether or not the participant elects to pursue administrative remedies; if he does, then the limitations period does not accrue until after there is a denial.  But the RBAP provides that a participant may pursue an administrative claim at any time, *see* RBAP § 10.6 – and thus that route is still open to Plaintiff, in which case for limitations purposes *his cause of action has not accrued even now*.  While this shows *Laurenzano's* variable accrual test (adopted by no other court as far as Plaintiff is aware) is not a very sensible one, if followed here it would, again, favor Plaintiff, not PwC.

[5] Even if Plaintiff's claim could be said to have accrued in May 2002 when Plaintiff received a lump sum payment from the Plan, the statute of limitations was tolled throughout the period his claims were pending in the Southern District of Illinois (from November 4, 2004 until May 20, 2005), making Plaintiff's action, filed

**B.**    **Plaintiff Has Standing.**

The Court need not pause long to consider PwC's newly-discovered "standing" defense which PwC conspicuously omitted from its motion to dismiss. PwC presumably saw then that the defense was frivolous but is now in need of additional make-weight.[6]

In any event, Plaintiff clearly has standing under Counts One through Four. "The plaintiffs here claim to have been stiffed in their capacity as participants, and since former employees retain participant status, these plaintiffs are within the scope of section 502 [of ERISA]." *Clair v. Harris Trust and Savings Bank*, 190 F.3d 495, 497 (7th Cir. 1999) (Posner, C.J.). Of course Plaintiff can sue. The analysis is as follows:

a. It is well-settled that *any* "participant" in an ERISA plan has standing to challenge the legality of the plan's terms under ERISA, which is the basis of Plaintiff's claims in Counts One through Four of the Complaint.

b. Plaintiff is a "participant" for purposes of this standard because he is a former employee with a colorable claim to vested benefits.

c. Any participant with ERISA standing by definition has Article III standing.

*        *        *

---

well within the three-year limitations period, still timely. *See American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974); *Schur v. Friedman & Shaftan, P.C.,* 123 F.R.D. 611, 613 (N.D. Calif. 1988) (prior class action tolls second where defendant's dismissal from first without prejudice and with no definitive determination of class certification as to that defendant). Restating without analysis *American Pipe*'s holding in the narrowest way possible, PwC Reply at 2 n.1, PwC ignores *Schur* and discusses inapposite federal diversity cases, *id.,* where *all* rules relating to limitations are local ones -- which is not the case here where the accrual rule is federal.

[6] The PwC Defendants raised "standing" objections in their two separately filed motions to dismiss solely as to Counts Ten and Eleven. These new standing arguments (at least the *statutory* standing arguments) should be deemed waived under Rule 12(g) because they are really just impermissible successive Rule 12(b)(6) defenses that the PwC Defendants had ample opportunity to raise in their Rule 12(b) motions.

### a.    Any Participant Has Standing To Challenge The Legality Of Plan Provisions Under ERISA.

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), provides that a civil action may be brought

> by a participant . . . (A) to enjoin any act of practice which violates any provision of this title or the terms of the plan, or (B) to obtain other equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Courts have uniformly held that this provision gives *any* participant in a plan the right to challenge the legality of the terms of the plan under ERISA – even a participant that may not be able to demonstrate that the illegal plan terms resulted in a reduction in his or her benefits. *E.g., Berger v. Nazametz,* 2001 U.S. Dist. Lexis 10222, *7-8 (S.D. Ill. June 26, 2001) ("Each member of the class has standing to bring an action to challenge an allegedly illegal plan provision, 29 U.S.C. § 1132(a)(3), regardless of whether it resulted in actual damages to a particular class member"), *aff'd, Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003); *Cooper v. IBM Personal Pension Plan*, 274 F.Supp.2d 1010, 1014 (S.D. Ill. 2003) ("[t]he plain language of [ERISA § 502(a)(3)] confers statutory standing to plan participants, such as the named Plaintiffs, who seek to protect their employee benefit rights"; "Congress is entitled to enact statutes which create standing where it would otherwise not exist").[7]

### b.    Plaintiff Is A Former Employee With A Colorable Claim To Benefits.

It is equally well-settled that a former employee with a "colorable claim" to vested benefits under a plan is a "participant" for purposes of this standing rule. The Supreme

---

[7] *Accord* Antonin Scalia, "The Doctrine of Standing as an Essential Element of the Separation of Powers," 17 Suffolk U. L. Rev. 881, 885 (1983) ("legal injury is by definition no more than the violation of a legal right; and legal rights can be created by the legislature").

Court established the relevant standard in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 110, 117-18 (1989):

> In our view, the term 'participant' is naturally read to mean . . . former employees . . . who have a colorable claim to vested benefits. In order to establish that he may become eligible for benefits, a claimant must have a colorable claim that (1) he will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future.

*See also Clair,* 190 F.3d at 497 (in a class action suit brought under ERISA § 502(a)(3), "the 'participants' . . . entitled to sue under ERISA's enforcement provisions include former employees 'who have 'a colorable claim' to vested benefits,'" *quoting Firestone*).

Here, there is no genuine issue as to Plaintiff's status as a former employee and RBAP participant with vested rights under the Plan. Defendants specifically state: "Defendants do not dispute that plaintiff is a former employee of PricewaterhouseCoopers, LLP ('PwC'), or that he terminated his employment with PwC in 2002 and received a single lump sum distribution of his benefits on May 20, 2002." PwC Rule 7(h) Stmt. ¶ I.2; *see also* PwC Reply at 4-5 (similar admission); PwC Opp. Ex. D, Burnham Decl. ¶ 2 (same).

Moreover, PwC cannot seriously contend that Plaintiff does not have a "colorable claim" to benefits under the RBAP. As one of the cases cited by PwC in its opposition explains, "[t]he requirement of a colorable claim [under ERISA] is not a stringent one. [It] depends on an arguable claim, not on success." Only if a claim is "frivolous" is jurisdiction lacking. *Panaras v. Liquid Carbonic Industries Corp.,* 74 F.3d 786, 790 (7th Cir. 1991).

Plaintiff's claims plainly satisfy this standard. His legal theory in Count One – the so-called "whipsaw" count, which principally alleges that the Plan failed to calculate and pay him the present value of his right to earn future investment credits out to a valid normal retirement age – is the same one that has been accepted by three different Federal Courts of

Appeals[8] and his theories under Counts Two, Three and Four also have been accepted by federal courts, *e.g., Cooper*, 274 F.Supp.2d at 1014-22 (whipsaw, backloading, age discrimination).  In each of the four referenced cases, the plans involved were required to pay additional benefits in the tens of millions, sometimes hundreds of millions of dollars. The same would be true here.  If Plaintiff's claims succeed under any of the Counts One through Four, it is inevitable the Plan will owe him and other members of the proposed class significant additional benefits.[9]

For example, Plaintiff alleges in Count Four that ERISA's age discrimination standard must be applied to the rate at which participants' projected age-65 benefits accrue. If Plaintiff prevails on this claim, the RBAP will owe Plaintiff and other members of the proposed class additional benefits regardless of the interest (or investment) rate used to calculate the projected age-65 benefit, and regardless of any other factor.  *See, e.g., Cooper*, 274 F.Supp.2d at 1021(once it is agreed that benefits must be tested for age discrimination based on the projected age-65 annuity, "the result is inevitable.  In terms of an age 65 annuity, the interest credits will always be more valuable for a younger employee as opposed to an older employee").  The interest rate and certain other factors may be necessary to determine the precise amount that would be owed, but they are not relevant to

---

[8] *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755, 762-63 (7th Cir. 2003) (Posner, J.); *Esden v. Bank of Boston*, 229 F.3d 154, 173 (2d Cir. 2000); *Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1251 (11th Cir. 2000), all affirming the IRS position announced in IRS Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996).

[9] It is irrelevant, *see* PwC Opp. at 4-5 that the lump sum paid to Plaintiff may have been larger than the benefit he would have paid under the former Coopers & Lybrand ("C&L") pension plan.  Plaintiff's claim is that his benefits were calculated pursuant to RBAP terms that were and are illegal under ERISA, not that he received benefits that were smaller than what he would have received under the C&L plan.

the issue of liability for additional benefits:  additional benefits will be owed to Plaintiff and each and every member of the proposed class.[10]

Additional benefits under Count One are also all but inevitable.  According to PwC, one of the virtues of the RBAP is that "[w]hile many other cash balance plans provide periodic interest credits based on a fixed or variable rate linked to an index such as Treasury securities (Compl. ¶ 66), the RBAP offers participants the opportunity to increase their account balances beyond increases that would be provided by such interest credits." Translation:  the expected investment crediting rate under the RBAP is higher than the expected interest rate on Treasury securities.  Because a whipsaw issue is created anytime the projected rate of return under the plan is greater than the projected rate of return on 30-year Treasury securities, PwC effectively concedes it will owe Plaintiff and other participants additional benefits if the 5-year normal retirement age does not hold up.   This is consistent with the thrust of PwC's letter to the IRS 1999,[11] which argues that a low normal retirement age is necessary to avoid a whipsaw problem.  If there was no whipsaw issue, why would PwC have adopted the low retirement age?  PwC has no other explanation.

---

[10] PwC intentionally confuses liability and damages as a pretext for larding its submission with repeated objections to the supposed lack of "evidence" supporting Plaintiff's motion.  In fact, PwC's entire approach presupposes that Plaintiff had or has some burden of production or proof as regards the introduction of evidence here when black-letter law establishes that a party can carry its burden of production in bringing a motion for summary judgment without introducing any evidence at all, such as here where pure questions of law are involved.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986) (repeatedly making this precise point); *id.* at 330-31 (Brennan, J., dissenting) (agreeing with this point).  Moreover, and though one would never know it reading PwC's brief, Plaintiff has *not* moved for entry of a judgment of liability on any count, claim or cause of action contained in the Complaint.  He seeks a declaration on an *issue,* which is perfectly appropriate under Rule 56(c).  In more than one way, therefore, much of PwC's brief is directed toward a motion Plaintiff has not yet made.

[11] Ex. 9 to Pl's Mtn. for Partial SJ (Docs. 12-14), Letter from Ira Cohen, partner, PricewaterhouseCoopers LLP, to IRS Commissioner Charles O. Rossotti and Deputy Assistant Secretary for Tax Policy Jonathan Talisman, Sept. 30, 1999, *reprinted in* Tax Notes Today, Nov. 18, 1999 (the "Cohen Letter").

While Plaintiff has not put into evidence some of the elements that would be required to calculate the precise amount owed him were his claims to prevail, that is not required to establish standing. Benefit calculations are for the relief stage. For purposes of standing, again, Plaintiff need only demonstrate to the satisfaction of the Court that he has a "colorable claim" to vested benefits.[12]

This only makes sense. Under PwC's proposed standard, PwC Opp. at 18, no former employee would *ever* have standing – it is of course impossible to prove harm if one does not have standing to complain of violations in the first place. PwC acknowledges as much when it states (on the same page on which it asserts that plaintiff must "*prove[]* he has standing") that "Courts have applied an exception to [the] rule [that only current participants can sue under ERISA] where a former participant can *allege* that he has a 'colorable claim to vested benefits.'" *Id.* (emphasis added). The fact that Plaintiff received a lump sum distribution of an amount that *PwC* contends was his entire accrued benefit is obviously irrelevant. *E.g., Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 346-47, 350 (5th Cir. 1989) ("[c]learly, a plaintiff alleging that his benefits were wrongly computed has a claim for vested benefits").[13]

---

[12] *Panaras,* 74 F.3d at 790 ("Standing is available to any former employee who has a colorable claim to benefits which the employer promised to provide pursuant to the employment relationship and which a nonfrivolous *argument* suggests have accrued to the employee's benefit") (emphasis added). *Accord Abraham v. Exxon Corp.,* 85 F.3d 1126, 1129 (5th Cir. 1996); *Davis v. Featherstone,* 97 F.3d 734, 737-38 (4th Cir. 1996); *Vartanian v. Monsanto Co.,* 14 F.3d 697, 702-03 (1st Cir.1994).

[13] PwC disingenuously cites *Teagardener v. Republic-Franklin Inc. Pension Plan,* 909 F.2d 947, 952 (6th Cir. 1990) for the proposition that "Generally, employees cease to be 'participants' in a plan when they leave employment and accept payment of everything due them in a lump sum and are no longer earning any right to future benefits." PwC Opp. at 18. As the Sixth Circuit explained in a later case, *Teagardener* addressed a unique fact pattern involving the *dissolution* of a plan and does *not* stand for the general proposition that employees who have received a distribution of benefits lack standing and "are, therefore, no longer plan participants protected by ERISA's provisions." *Astor v. IBM Corp.,* 7 F.3d 533, 538 (6th Cir. 1993).

###### c.    **ERISA Standing Confers Article III Standing.**

Because Plaintiff has standing under ERISA, he has standing under Article III of the Constitution.[14]  PwC has cited no case in which a participant who has been held to have standing under ERISA has been found to lack standing under Article III – as far as Plaintiff is aware, there are none.  That is not surprising.  Recognizing the limited ability of the Secretary of Labor to police tens of thousands of private pension plans, Congress enacted ERISA § 502(a), 29 U.S.C. § 1132(a), providing for numerous categories and subcategories of actions that any one individual participant can bring, showing Congress' intent to create participant standing to the maximum extent permitted under Article III.

As was its prerogative, Congress granted every employee who participates in an ERISA-covered plan the right to participate in a *lawful* plan.  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  To the extent a plan does not comply with ERISA, the individual rights of every participant in the plan have been violated, giving every participant standing to enforce his rights.  *Berger v. Nazametz, supra*; *Cooper, supra*.[15]  That is what Plaintiff seeks to do here – no more, no less.

---

[14] *E.g., Flynn v. Dick Corp.*, Civ. No. 03-1718, 2005 U.S. Dist. Lexis 16389, *6-11 (D.D.C. July 29, 2005) (in a suit brought under ERISA § 502(a)(3), the statutory grant of standing under ERISA satisfies the requirements of Article III standing, *quoting Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing")); *Financial Institutions Retirement Fund v. Office of Thrift Supervision*, 964 F.2d 142, 147 (2nd Cir. 1992) ("Congress may override prudential limits by statute . . . and ERISA clearly accomplishes this result"); *BankAmerica Pension Plan v. McMath*, 2001 U.S. Dist. Lexis 2805, *25-26 (N.D. Cal. 2001) (because "the ERISA standing requirement is narrower than the constitutional standing requirement . . . [a] plaintiff who may sue under section [502(a)] also by definition [is] able to satisfy the Article III standing requirement").

[15] *See also McGarry v. Secretary of the Treasury*, 853 F.2d 981, 985 (D.C. 1988) (plaintiffs had standing to challenge the alleged deprivation of their ERISA right to get notice of employer's request for IRS waiver of minimum funding requirements and to have IRS consider any relevant information and views they might provide whether or not they can show any connection to any actual or threatened loss of retirement benefits).

C.    **There Are No Genuine Issues of Material Fact.**

There is no issue of material fact that precludes summary judgment. While summary judgment motions are typically preceded by substantial discovery, the typical case contains factual disputes that require exploration and a degree of resolution before disputed legal questions (if any) are reached. Here, the question before the Court in Plaintiff's motion presents a pure question of law: Does PwC's pension plan define "normal retirement age" in a manner that is lawful under ERISA? The Court has before it everything that is necessary to make that decision of law.[16]

The only two facts material to the question are not disputed – nor could they be *genuinely* disputed: (1) the terms of the Plan; and (2) the fact that PwC employees do not normally retire without regard to their age after 5 years of working for PwC. That latter fact is not one that PwC does contest or can possibly contest given, among other things, its yearly representations to the Federal government as to when PwC employees normally retire, *i.e.,* age 65. *See* Pl. SJ Stmt of Undisputed Facts ¶ 11 & Ex. 8.[17]

---

[16] *See, e.g*, *Country Club Associates Limited Partnership v. FDIC*, 918 F.Supp. 429, 434 (D.D.C. 1996) ("'In cases in which the dispositive issue involves the construction of a contract, summary judgment may be appropriate if the provisions of the contract are unambiguous'"; granting plaintiff's motion for partial summary judgment on liability based on undisputed terms of loan agreement).

[17] Accounting and actuarial rules require accountants and actuaries to base their assumptions on their best estimate of when retirement will *in fact* typically occur, focusing on substance rather than form. IRC § 412(c)(3)(B); FAS 87 ("Employers' Accounting for Pensions") ¶¶ 39, 43. Thus, the retirement age assumptions stated in PwC's filings represent repeated admissions that the "normal" retirement age of Plan participants is not after 5 years of employment with the Firm (and indeed equals the statutory default of age 65). PwC says, without more, that it "dispute[s] that these actuarial assumptions have anything to do with the "normal retirement age" defined in the RBAP." Defs. Rule 7(h) Stmt. ¶ 11. If "normal retirement age" can be completely fictitious as PwC asserts, then PwC is correct – but that is not a matter of fact for a Rule 7(h) response but a legal question to be decided by this Court. PwC has clearly conceded for purpose of this motion the fact that PwC employees do not normally retire after 5 years of work. *See* Local Rules 7(h) and 56.1; *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 153-54 (D.C. Cir. 1996) (district court is to deem as admitted moving party's facts that are uncontroverted by the nonmoving party's Rule 7(h) (then-Rule 108(h)) statement). *See also* Rule 56(e); *Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999) (to survive summary judgment, mere conclusory allegations are not enough).

In its brief, PwC asserts that "the normal retirement [sic] used in the RBAP

corresponds to the average time participants stay with the firm."  PwC Opp. 10.  But the

question presented here concerns *retirement* -- specifically the age at which participants

normally retire.  The average length of employees' *tenure* with the Firm, regardless of age is

of no relevance here.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment").[18]

### D.    There Are No Other Procedural Impediments.

PwC throws out, but never follows up on, three "aspects of the procedural posture of

this case" that it says "militate against deciding plaintiff's motion now."  PwC Opp. at 11.

None of these points has any merit -- and the first two are barely worthy of mention.[19]

PwC's third objection is that Plaintiff's motion is "inconsistent" with the "'usual

order of disposition'" under the Federal Rules "under which class certification should be

addressed *before* summary judgment."  PwC Opp. at 11 (emphasis in the original; *citing*

---

[18] PwC does not even bother to support this length-of-tenure assertion with an affidavit, when it obviously has ready access to such data.  This lack of seriousness is evidenced elsewhere in PwC's submission, most notably where PwC argues that there is an issue of material fact because Plaintiff has not demonstrated that the RBAP's normal retirement age is unlawful "in the context of the RBAP."  PwC Opp. at 31.  PwC well knows that all Plaintiff means by the "in context" modifier is that the RBAP covers employees of a tax and accounting firm, not NFL football players.  If the RBAP covered NFL players, a normal retirement age of age 30 might very well be legitimate.  But "in the context" of the RBAP, a normal retirement age of 5 years of service is not legitimate, because accountants and tax consultants do not normally "retire" after 5 years of employment.  PwC obviously is an accounting firm and, as noted, it does not (and could not genuinely) contend that its employees normally retire after 5 years.  *E.g., People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 63 (1920) (Cardozo, J.) ("[W]e are not to close our eyes as judges to what we must perceive as men.")  Thus, Plaintiff's "in the context" point does not implicate an unresolved material fact.

[19] First, PwC says "defendants have not yet even answered the Complaint," *id.,* but why that matters is never explained.  Summary judgment is appropriate practically "at any time." Fed. R. Civ. P. 56(a).  *See Jung v. Ass'n of Amer. Med. Colleges,* 339 F.Supp.2d 26, 35 (D.D.C. 2004) (rejecting argument that motion for judgment on the pleadings was "premature" because some defendants had not answered).  Second, PwC complains that "no discovery has been conducted," PwC Opp. at 11, but apart from any issue solely relating to *relief* (*i.e.,* the proper investment crediting rate to use once liability is established) which is not relevant here, PwC never says what it is it needs in discovery relevant to the pure legal issue presented.  In any event, PwC failed to file the necessary Rule 56(f) papers so that contention is waived.

*Curtin v. United Airlines, Inc.,* 275 F.3d 88, 92 (D.C. Cir. 2001)).  But PwC says nothing

further on the topic or suggests what possible prejudice it would suffer if, as in *Curtin,* the

"usual order of disposition" were reversed or, indeed, why proceeding to judgment on the

validity of the 5 year retirement age in this case is not entirely sensible.  *See Curtin,* 275

F.3d at 92 ("nothing in . . . Rule 23(c) requires the district court to rule on class certification

before granting or denying a motion for summary judgment"); *see also Leonard v.*

*Southwestern Bell Corp. Disability Income Plan,* 408 F.3d 528, 534 (8th Cir. 2005)

("because the merits of Leonard's case and those of all similarly situated beneficiaries of the

plans are now clear, resolution of all claims in a single action is more, not less, advisable.

The only fact questions remaining are what beneficiaries are situated as Leonard is, and how

much money the plans owe them for improper offsets of fees paid to obtain a workers'

compensation award").[20]

In any event the timing of the Court's consideration of this motion vis-à-vis class

certification is largely a non-issue because Plaintiff's class certification motion (Doc. 32)

will also soon be ripe for decision as well.  Plaintiff, the sole current class representative, has

already voluntarily provided PwC with his documents and proposed dates for his deposition

---

[20] *Accord Cruz v. American Airlines,* 150 F.Supp.2d 103, 111 (D.D.C. 2001) ("courts may, in their discretion, assess motions for summary judgment prior to motions for class certification"); *Hyman v. First Union Corp.,* 982 F. Supp. 8, 10-11 (D.D.C. 1997) (same).  *See also Postow v. OBA Federal Savings and Loan Ass'n,* 627 F.2d 1370, 1380-84 (D.C. Cir.1980) (no prejudice to defense if it suffers an adverse ruling when it moves for judgment without awaiting certification).  Here, it would be perfectly appropriate for the Court to take up Plaintiff's summary judgment motion even before a ruling on class because the defense eschewed *res judicata* against a class by moving to dismiss prior to class certification, the defense's motion to dismiss raises the self-same legal issue raised here and Plaintiff seeks certification of a non-opt out class under Fed. R. Civ. P. 23(b)(1) and/or (b)(2).  *See, e.g.,Giles v. Secretary of Army*, 475 F. Supp. 595 (D.D.C. 1979) and 84 F.R.D. 374, 375 (D.D.C. 1979), *aff'd and remanded for modified remedy*, 627 F.2d 554 (D.C. Cir. 1980) (granting plaintiff's pre-certification cross-motion for summary judgment in Rule 23(b)(2) non-opt-out case); *Allen v. Honeywell Retirement Earnings Plan,* 382 F.Supp.2d 1139 (D. Ariz. 2005) (pension case challenging the legality of a plan's provisions; granting named plaintiffs' motion for summary judgment in part and ruling on defense motion to dismiss, all before class certification); *Law v. National Collegiate Athletic Ass'n,* 134 F.3d 1010 (10th Cir. 1998) (affirming trial court's pre-certification grant of summary judgment in named plaintiffs' favor).

and, as his motion amply demonstrates, this case is ideally suited for class treatment under any of three separate provisions of Rule 23 (Rule 23(b)(1)(A), (b)(1)(B) and (b)(2)).  Thus, the Court will soon be able to render rulings on both sides' dispositive motions as well as class certification in tandem if it wishes, as is often done in these types of cases.

**E.**     **PwC's Heavy Reliance On IRS Rulings Is Misplaced.**

A single revenue ruling published more than 27 years ago and two IRS "determination letters" issued to the RBAP do not shield PwC and the Plan from liability under ERISA.

As a threshold matter, it is not entirely clear what PwC has in mind when it repeatedly refers to the RBAP's determination letters and IRS Revenue Ruling 78-120.  If the statute is clear, as PwC contends, agency pronouncements are largely irrelevant, under the standard PwC itself proposes – particularly informal guidance of the type presented by PwC.  PwC Opp. at 28 ("[W]hen a statute is clear and unambiguous, consideration of administrative interpretation contrary to such language is inappropriate; the agency cannot override the congressional will as memorialized in the statutory language").  PwC must be citing the letters and the rulings in an effort to convince the Court that the IRS agrees with PwC's interpretation of the statute.[21]

**a.**     **The IRS Agrees With Plaintiff's Normal Retirement Age Standard**

However, it could not be clearer that the IRS does *not* agree with PwC's interpretation.  The IRS does not read the statute as providing a free-for-all, allowing a plan sponsor to define "normal retirement age" any way it pleases, even if the age selected does

---

[21] Contrary to PwC's contention, PwC Opp. at 27-28, Plaintiff does not cite pre-ERISA rulings for their precedential value, but rather to provide the background on which Congress was legislating when it considered and enacted ERISA.  *See, e.g.,* Pl. Mem. at 39.

not reflect reality. Quite the opposite. As discussed in Plaintiff's motion, the IRS's recently

proposed regulations – Prop. Treas. Reg. § 1.401(a)-1(b)(1)(i), 69 FR 65108-01,

2004 WL 2532133 – specifically provide that

> normal retirement age **cannot be set so low as to be a subterfuge** to avoid the requirements of section 401(a), and, accordingly, normal retirement age **cannot be earlier than the earliest age that is reasonably representative** of a typical retirement age for the covered workforce.

*Id.* (emphasis added).

While these regulations have not yet been finalized (and Plaintiff does not cite them

for their precedential value), proposed regulations are not issued without thorough agency

review – and it is fair to presume that the IRS would not propose regulations that the agency

did not believe reflects the best interpretation of the statute.[22] The proposed regulations

make it absolutely clear that the IRS does *not* agree with PwC's interpretation of the statute

and *does* agree with Plaintiff's reading.[23]

### b. The IRS Determination Letters Have No Bearing On ERISA Liability

It is well settled that IRS determination letters have no bearing on a participant's

---

[22] PwC's observation, PwC Opp. at 27, that the regulations would apply only prospectively proves nothing other than that the IRS does not want to violate § 7805(b) of the Tax Code, which requires that *all* new regulations apply prospectively, absent an exception. PwC's surmise, *id.* at 28, as to why the regulations have not yet been finalized also is disingenuous. It is very common for tax regulations to remain in proposed stage for a year or more, and many remain in proposed form for a much longer period. *E.g.*, Prop. Reg. § 1.401(a)(9)-1 (in proposed form from 1987 until 2002); Prop. Reg. § 1.280G-1 (in proposed form from 1989 to 2002); Prop. Reg. § 1.404A-1 (in proposed form since 1985; not yet finalized).

[23] It appears that *the RBAP plan administrator* also agreed with Plaintiff's common sense reading – before PwC told it to get with the program. Defendants admit (by not refuting with evidence or otherwise) that the RBAP website provided a glossary of terms for participants that includes a definition of "Normal Retirement Age" that as of August 11, 2005 (the date of Plaintiff's motion), defined that term as: "The age, as established by the plan, at which retirement normally occurs," *see* Plt.'s Stmt of Undisputed Mat'l. Facts ¶ 10 – consistent with the standard suggested by Plaintiff and the IRS. But close inspection of Defendants' Rule 7(h) Statement reveals that instead of addressing that embarrassing fact by argument, sometime between August 11 and August 31, 2005, **PwC went on-line and *changed* the definition** to: "The age set forth in a retirement plan for employees to receive full benefits upon retirement." *See* Defs. Rule 7(h) Stmt ¶ 10 & Ex. I. Plaintiff will pursue this apparent spoliation of evidence in discovery and report any relevant findings to the Court.

rights under ERISA.  In *Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1251 (11th Cir. 2000)*,* the Eleventh Circuit was faced with the precise issue raised by Plaintiff in Count One of the Complaint:  Can a cash balance pension plan cash out departing employees by distributing merely the employees' current account balances.  The plan's sponsor, Georgia Pacific, made the same argument PwC presents here:

> In 1989 the IRS issued Georgia-Pacific a determination letter stating that the Plan was tax qualified.  **Georgia-Pacific argues that based upon that letter it cannot be held liable for any underpayment of benefits to Lyons and those similarly situated.**  The reasoning is that in determining the plan was tax qualified the IRS must have concluded that distributing the participant's Personal Account complied with IRC § 417(e), the Internal Revenue Code subsection that parallels ERISA § 203(e).

221 F.3d at 1252 (emphasis added).

The court said no:  "the IRS letter is not owed any deference. . . .  **The letter may protect the Plan from adverse tax treatment, but it does not protect the Plan from liability to participants.**"  *Id.* (emphasis added).[24]

One month later, the Second Circuit considered the same issue concerning the proper calculation of lump sum benefits under a cash balance plan.  As in *Lyons*, "the Plan argue[d] that it [was] entitled to rely on the favorable determination letters issued by the IRS in 1990 and 1995."  *Esden v. Bank of Boston,* 229 F.3d 154, 162 (2d Cir. 2000).  "The Plan contends that because these letters are 'a construction and application of the regulations by the administrative agency charged with their enforcement . . . [they] are entitled to great weight.'  Judge Leval, for the Court, responded as follows:

---

[24] *See also Hickey v. Chicago Truck Drivers, Helpers & Warehouse Workers Union,* 980 F.2d 465, 469 (7th Cir.1992) ("Given the informal nature of these letters, the express limitations included in the IRS letter, and the absence of any reasoning to explain the basis for the statements, we do not think that any implication in either of these letters ... is entitled to deference"); *In re Gulf Pension Litigation,* 764 F. Supp. 1149, 1172 (S.D. Tex.1991) ("[T]he Court also finds that the IRS determination is due no deference because it evidences no investigation or legal analysis of the facts by the IRS").

[T]he Plan's reliance on determination letters cannot shield it from liability in a suit brought by a plan participant for violations of ERISA. . . . A favorable determination letter indicates only that an employee retirement plan qualifies for favorable tax treatment by meeting the formal requirements of *I.R.C. § 401(a)*. See IRS Publication 794. . . . Even if the Plan can rely on the favorable determination letters as a defense against any future IRS challenge to its qualified status, the determination letters do not bar plan participants from asserting their rights under ERISA. **'The law permits plan participants whose rights are violated by the terms of a plan (or a plan amendment) to recover benefits – even if the plan has received a favorable ruling from the service.'** Hearings on Hybrid Pension Plans Before the Senate Comm. on Health, Education, Labor and Pensions, 106 Cong. (1999) (prepared testimony of Stuart Brown, Chief Counsel, IRS).

It could not be otherwise. In enacting ERISA, Congress expressly recognized the limited protection that the previous regulatory regime had provided for pension participants. That regulatory scheme had relied solely on the tax incentives provided to qualified plans and the IRS's power to disqualify noncompliant plans. See, e.g., H.R. Rep. No. 93-533 (1974) reprinted in 1974 U.S.C.C.A.N. 4639, 4642 ('The Internal Revenue Code provides only limited safeguards for the security of anticipated benefit rights in private plans since its primary functions are designed to produce revenue and to prevent evasion of tax obligations.'). Under ERISA, to correct this lack of safeguards, **Congress created substantive rights for pension plan participants and expressly created private causes of action in federal court to vindicate those rights. See ERISA § 502(a)** (setting out private rights of action), (f) (establishing federal question jurisdiction without regard to citizenship of the parties or amount in controversy). An erroneous ruling by an IRS key district director, especially when procured by submission of limited or confusing information, cannot defeat the express statutory rights of plan participants. **The adjudication of those rights is for the federal courts, not the field offices of the IRS.**

*Id.* at 176-77 (emphasis added).

The determination letters received by the RBAP in both 1996 and 2004 are substantially similar in all material respects to the letters analyzed by the Eleventh, Second, and Seventh Circuits in the cases above. The letters themselves make the limited nature of their intended scope clear, each providing that "this letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other federal or local statutes," such as ERISA. The 2004 letter received by the RBAP also states

specifically that it "does not express an opinion on any . . . [i]ssues arising from the amendment of a defined benefit plan's formula to convert that formula into a cash balance type benefit formula" – hardly an indication that the IRS was giving its stamp of approval to the RBAP's cash balance provisions.

### c.  Revenue Ruling 78-120 Cannot Override The Statute

Accountants do not normally retire after working for 5 years.  PwC cannot and does not contend otherwise.  Rather, PwC's position is that it does not matter at what age its employees normally retire.  According to PwC, IRS Revenue Ruling 78-120 says that "normal retirement age" is whatever age or date the firm says it is – age 12 would have worked.  PwC Opp. at 19-21 (normal retirement age can be "any" age).

Revenue Ruling 78-120 does not stand for this proposition.  *See* Pl. Mem. at 41.  *But even if it did* – even if the ruling said on its face that a plan maintained by an accounting firm could define "normal retirement age" as 5 years of employment – a mere revenue ruling does not have the power to override a federal statute:  "The Commissioner's rulings have only such force as Congress chooses to give them, and Congress has not given them the force of law." *Dixon v. U.S.*, 381 U.S. 68, 73 (1965); *accord National Railroad Passenger Corporation v. U.S.*, 338 F. Supp.2d 22, 28 n.6 (D.D.C. 2004) ("The Court is unpersuaded by the reasoning in Revenue Ruling 79-404, which cannot overrule a clear statutory requirement.").[25]

---

[25] As one of the largest and most sophisticated tax and accounting firms in the world, PwC knew it was not entitled to rely on a mere revenue ruling to shield itself from ERISA liability when it adopted what it *admits* is a fictitious retirement age.  Thus, the firm has no basis to argue that it "relied" on the ruling and should therefore be excused from violating the statute.  On the other hand, PwC should be able to rely on its determination letters to avoid *income tax* disqualification of the RBAP, provided it timely amends the RBAP to the extent required following any adverse ruling in this lawsuit.

**F.      On The Merits, The RBAP's "Normal Retirement Age" Is An Illegal
<u>Subterfuge.</u>**

The focus thus comes back full circle to where it belongs: the statute.  Plaintiff's core
arguments regarding the unlawfulness of the RBAP's purported "normal retirement age" are
spelled out at length in his motion and are not repeated here.  Plaintiff will instead respond
briefly to PwC's repeated contention that the statute gives the Firm unfettered freedom to
contract around the ERISA.

Under the statute, the normal retirement age for purposes of ERISA is defined as the
normal retirement age "under the plan."  PwC contends that this means the normal
retirement age for ERISA purposes is whatever age or date a plan sponsor designates as the
normal retirement age in the plan document – *i.e.*, normal retirement age is whatever the
plan says it is.

PwC understandably does not want to be seen as making a "freedom to contact"
argument, PwC Opp. at 31, n.16, but that is exactly what it is:  PwC says normal retirement
is literally any age or date to which it (or the plan) affixes the label "normal retirement age."
The problem for PwC is that the Supreme Court made it clear, in a series of cases involving
an issue with remarkable parallels to the issue here, that an employer's freedom to contract
only goes so far.[26]  The Supreme Court held that when a statutory term is defined by
reference to a term in a contract governing employee compensation, the contract cannot be
written in a manner that undercuts the statute in a way that Congress could not have possibly
have intended.

---

[26] *Walling v. Harnischfeger Corp.*, 325 U.S. 427 (1945); *Walling v. Youngerman-Reynolds Hardwood Co.*, 325
U.S. 419 (1945); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944).

In 1938, Congress enacted the Fair Labor Standards Act ("FLSA"), the landmark labor law that established the minimum wage and overtime standards. 29 U.S.C. § 201, *et seq.* The FLSA required that employees be compensated for overtime at wages that were a multiple of the "regular" rate at which they are employed – *i.e.*, the wage rate established by contract for work performed during the regular work week. *Id.* § 7. Some employers were unhappy with the new requirements, and engaged in a course of action designed to skirt the new law. These employers amended their employment contracts with employees to define the "regular" rate of pay as an arbitrary rate that was less than the normal rate actually paid to employees – so that overtime wages would not be a multiple of the actual rate paid during a normal work week, but would be a lower amount based on the arbitrary definition of "regular" rate of pay designed in employment contracts. *E.g., Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 38-39 (1944) ("These so-called 'regular' and 'overtime' hourly rates were calculated so as to insure that the total wages for each tour would continue the same as under the original contracts, thereby avoiding the necessity of increasing wages or decreasing hours of work as the statutory maximum workweek of 40 hours became effective.") (footnotes omitted).

The Supreme Court had no trouble concluding that, while an employer generally is free to set by contract the rate at which it will compensated its employees (subject to minimum standards), the freedom to contract was not unfettered: "No plan so obviously inconsistent with the statutory purpose can lay a claim to legality." *Id.* at 39. The Court explained its rationale:

> While the words 'regular rate' are not defined in the Act, they obviously mean the hourly rate actually paid for the normal, non-overtime workweek . . . . But respondent's plan made no effort to base the regular rate upon the wages actually received or upon the hours actually and regularly spent each week in working.

22

> Nor did it attempt to apply the regular rate to the first 40 hours actually and regularly worked.  Instead the plan provided for a **fictitious regular rate** consisting of a figure somewhat lower than the rate actually received. . . . It was derived not from the actual hours and wages but from **ingenious mathematical manipulations, with the sole purpose being to perpetuate the pre-statutory wage scale**.

*Id.* at 41 (emphasis added).

The employer protested that the language of the statute had no explicit limits (other than establishing a minimum wage, which the contract's "regular rate" exceeded).  The Court rejected this position:

> It is no answer that the artificial regular rate was a product of contract or that it was in excess of the statutory minimum. The Act clearly contemplates the setting of the regular rate in a **bona fide manner** through wage negotiations between employer and employee, provided that the statutory minimum is respected.  ***But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes.***  Even when wages exceed the minimum prescribed by Congress, the parties to the contract must respect the statutory policy of requiring the employer to pay one and one-half times the regular hourly rate for all hours actually worked in excess of 40.  Any other conclusion in this case would exalt ingenuity over reality and would open the door to insidious disregard of the rights protected by the Act.

*Id.* at 42 (emphasis added).[27]

There is no denying the close parallels between the situation addressed in the FLSA cases and the circumstances here. Replace the term "regular rate" of pay under the contract with "normal retirement age" under the plan and the issues are virtually identical.  Plaintiff respectfully suggests that the end result should also be identical.  Otherwise, PwC (and the

---

[27] *See also Youngerman-Reynolds*, 325 U.S. at 426 (It is a firmly established principle of statutory construction that no "mere label" can "allow [an employer] to escape" a statute's reach or "nullify all the purposes for which [the statute] was created."); *Harnischfeger Corp.*, 325 U.S. at 430 ("we look not to contract nomenclature but to actual payments"); *Bellas v. CBS, Inc.*, 221 F.3d 517, 540 (3rd Cir. 2000) (concurrence) ("For appellants to attach the 'shutdown' label to Bellas' termination of employment, and then to attempt to use that label as a springboard for a flawed [ERISA] analysis, does more than violate the home truth contained in one of the aphorisms ascribed to Abraham Lincoln:  If you call a tail a leg, how many legs has a dog?  Five?  No, calling a tail a leg don't make it a leg.").

scores of other plan sponsors who are sure to adopt a similar strategy if PwC prevails here) will have found a way to do what the Supreme Court concluded must not be permitted: draft around core provisions of a federal labor statute.[28]

The anti-backloading provisions are the clearest (but not the only) illustration of this nullification-by-contract result. As explained in Plaintiff's motion, Congress enacted the ERISA anti-backloading rules as an important backstop to ERISA's vesting rules, the need for which was one of the key reasons Congress enacted ERISA in the first place. *See* ERISA § 2(a), 29 U.S.C. § 1002(a). As PwC acknowledges, t*he backloading rules cease to operate at normal retirement age*. Thus, if PwC is correct that a plan sponsor can designate *any* age or date as the "normal retirement age," then a plan sponsor would have the **unchecked power to exempt itself from the anti-backloading rules altogether**.[29] This is not mere "colorful rhetoric" as PwC has characterized some of PwC's claims. PwC itself has acknowledged that, under its interpretation of the statute, a plan's normal retirement age is capable "of manipulation as a means of avoiding the Anti-Backloading Rules," which is "clearly undesirable." Cohen Letter, *supra*. More like "illegal."[30]

---

[28] *See also May Dept. Stores Co. v. Federal Ins. Co.,* 305 F.3d 597, 601 (7th Cir. 2002) (ERISA "is a paternalistic regulation, intruding on the freedom of the contracting parties, the plan and its participants, every step of the way") (Posner, J.).

[29] PwC's interpretation would permit unlimited backloading of benefit accruals, not only in cash balance plans but in *all* defined benefit plans. In other words, PwC's interpretation would open *for all employers* precisely the very loophole Congress intended to *close* by adopting the anti-backloading rules.

[30] A March 2001 *amicus* brief PwC filed in the Supreme Court several years ago seeking to overturn *Lyons, supra,* shows that the Firm knew the 5-year retirement age was just a gimmick that would not stand once challenged. *See* Ex. 1, 2001 WL 34116882. PwC told the Supreme Court that unless it overturned *Lyons* and held that cash balance plans could lawfully pay terminating participants their hypothetical account balance without more, "cash balance plans **cannot be operated as intended.**" *Id.* at *2 (emphasis added). But PwC is telling this Court just the opposite – *i.e.,* that with the flick of a pen, simply by defining retirement as 5 years of work, a sponsor *can* pay terminating participants merely their hypothetical account balance. PwC can't have it both ways.

The Court would be in good company were it to reject PwC's attempt to circumvent ERISA via a drafting ploy. As noted in the introduction, each of the three Federal Circuit Courts of Appeals that have issued substantive rulings in cash balance pension plan cases involving the issue raised in Count One concluded that the plan had violated ERISA. In each of those cases, the employers (Xerox, Georgia-Pacific and Bank of Boston) argued – just like the employers in the FLSA cases and just as PwC argues here – that they had inserted terminology into their plans that effectively overrode the statute. All three courts ruled in favor of plan participants. There was no other option. As Judge Barrington Parker explained in *Foltz v. U.S. News & World Report, Inc.,* 663 F. Supp. 1494 (D.D.C. 1987), *aff'd,* 865 F.2d 364 (D.C. Cir. 1989):

> Employee benefits plans, like the one at issue here, are governed by two spheres of regulation, the private and the public. Such plans are established by private parties -- either by the employer acting alone, or by agreement between the employer and employees -- and generally operate according to the terms established by the controlling documents. If, however, one or more of such terms conflicts with any provision of federal regulation, in this case ERISA, **then those terms are rendered invalid.** Hence, in examining whether plaintiffs are owed additional benefits, one must answer two questions. First, under the terms of the documents governing the . . . Plan, are plaintiffs owed greater benefits than they received? Second, if not, **are there supervening provisions of federal law that render the relevant Plan provisions invalid** and that entitle plaintiffs to greater benefits?

*Id.* at 1513 (footnote omitted). *Cf. Holt v. Winpisinger,* 811 F.2d 1532, 1541 (D.C. Cir. 1987) (refusing to recognize waiver-by-contract of ERISA-created vesting rights).

## **CONCLUSION**

Wherefore, for the reasons set forth in the accompanying Memorandum and such other reasons as may be subsequently adduced or as may appear to the Court, Plaintiff respectfully requests that the instant motion be granted.  A proposed Order is attached.[31]

October 11, 2005                    Respectfully submitted,


_____s/ Eli Gottesdiener____
Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
Phone:        (202) 243-1000
Fax:           (202) 243-1001

Attorneys for Plaintiff and the proposed Class

---

[31] This proposed Order was inadvertently omitted from Plaintiff's opening brief.