2001 WL 34116882
2001 WL 34116882 (U.S.)

For opinion see 121 S.Ct. 1504
Briefs and Other Related Documents

Supreme Court of the United States.

GEORGIA-PACIFIC CORPORATION SALARIED EMPLOYEES RETIREMENT PLAN and Georgia-
Pacific Corporation, Petitioners,

v.

Jerry L. LYONS, individually and on behalf of all other persons similarly
situated, Respondents.
No. 00-1234.

October Term, 2000.
March 2, 2001.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Eleventh Circuit

Motion for Leave to File Brief and Brief Amicus Curiae of Unifi Network and Towers Perrin in Support of Petition for Writ of Certiorari

Robert A. Long, Jr., Counsel of Record, Richard C. Shea, Robert S. Newman, Covington & Burling, 1201 Pennsylvania Ave., N.W., Washington, D.C. 20004, (202) 662-6000, Counsel for Amici Curiae.

MOTION OF UNIFI NETWORK AND TOWERS PERRIN
FOR LEAVE TO FILE A BRIEF AMICUS
CURIAE IN SUPPORT OF THE PETITION FOR WRIT OF CERTIORARI

**\*1** Unifi Network, a subsidiary of PricewaterhouseCoopers LLP ("Unifi Network"), and Towers Perrin hereby move, pursuant to Rule 37.2, for leave to file the attached brief amicus curiae in support of the petition for writ of certiorari in this case. While the petitioners have consented to the filing of this brief, respondent Jerry Lyons has declined to consent. Correspondence reflecting the consent of the petitioners has been lodged with the Clerk.

Unifi Network and Towers Perrin consult with and advise employers on how to provide retirement and other employee benefits to their employees. PricewaterhouseCoopers is the world's largest professional services organization, and Towers Perrin provides advice to approximately three-quarters of the Fortune 1000.

For several decades, amici have consulted with and assisted numerous employers in the adoption and maintenance of defined benefit pension plans to meet the employers' objectives and the needs of their employees. In recent years, amici have concluded that traditional defined benefit plan designs no longer meet those objectives and needs for an increasing number of employers, especially those with more dynamic and diverse workforces that are faced with mounting competitive pressures. Some of those employers have decided to curtail or terminate their defined benefit plans in favor of defined contribution plans. Other employers have decided to change their defined benefit plans to designs, such as a "cash balance" plan, that distribute benefits more evenly among employees, are better understood and appreciated by employees, and provide more flexibility in payment options.

Kwasha Lipton-now part of Unifi Network-developed the first cash balance plan, which was implemented by Bank of America in 1985. For more than fifteen years, amici have assisted numerous employers in designing and administering cash balance plans. Amici and other experts have met on many occasions with government regulators to provide advice and make suggestions on how to apply to cash balance plans the various tax-qualification and related rules under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. s 1001 et seq. ("ERISA"). To date, no **\*2** comprehensive, definitive regulatory guidance of general applicability has been issued addressing cash balance plans. Nevertheless, amici, cash balance plan sponsors, and other experts have derived substantial comfort that cash balance plans may be operated as they were designed and intended from the numerous favorable determination letters issued to cash balance plans by the Internal Revenue Service ("IRS"). Many of these letters approved cash balance plans having provisions that are substantially the same as those included in the Georgia Pacific plan and that have been rejected by the Eleventh Circuit's decision below.

For the past fifteen years, these IRS determination letters have been the only definitive expression from any government agency that specifically address the way in which cash balance plans are to satisfy the present value requirements at issue in this case. Cash balance sponsors had no other means of gaining comfort that their plans satisfied the ERISA requirements that directly parallel the Internal Revenue Code provisions. Furthermore, not until the Eleventh Circuit's decision below (and the almost simultaneous decision of the Second Circuit in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000), cert. dismissed, 121 S. Ct. 674 (2001)) did any court conclude that cash balance plans cannot be operated in the manner in which they were designed. These court decisions have thereby disrupted the settled expectations of amici, cash balance plan sponsors, and the employees who participate in cash balance plans.

This case will have far-reaching effects on employee pension plan design and administration. Under the decision below, cash balance plans cannot be operated as intended nor in the forms that have previously been approved by the Internal Revenue Service. In addition, the Eleventh Circuit's decision would subject these plans to conflicting regulatory requirements. Unless the decision of the Eleventh Circuit is reviewed and clarified by this Court, the decision is sure to restrict the broad authority accorded employers to determine the way in which they provide retirement benefits to their employees. In addition, the failure of the Eleventh Circuit to accord any deference **\*3** to determination letters issued by the IRS causes uncertainty that will discourage the voluntary adoption of pension plans by employers.

Because of the importance of these issues to Unifi Network, Towers Perrin, and defined benefit plan sponsors, and because of their extensive experience with the issues presented in this case, amici respectfully move for leave to file the attached brief amicus curiae to assist the Court in evaluating the petition for certiorari in this case.

> Respectfully submitted,
> Robert A. Long, Jr.
> Counsel of Record
> Richard C. Shea
> Robert S. Newman
> COVINGTON & BURLING
> 1201 Pennsylvania Ave., N.W.
> Washington, D.C. 20004
> (202) 662-6000
> Counsel for Amici Curiae

Dated: March 2, 2000

## TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE .................................................. 2

SUMMARY OF ARGUMENT .......................................................... 3

REASONS FOR GRANTING THE WRIT ............................................... 4

I. THE ELEVENTH CIRCUTT'S INTERPRETATION IMPROPERLY RESTRICTS THE BROAD AUTHORITY EMPLOYERS ENJOY UNDER FEDERAL LAW TO DETERMINE THE RETIREMENT BENEFITS OF THEIR EMPLOYEES ............................................. 4.

   A. Employers That Adopt Cash Balance Plans Are Exercising Their Right to Provide Retirement Benefits That Fit the Needs of Their Employees Better than Traditional Defined Benefit Plans ................... 6

   B. The Decision of the Eleventh Circuit Fundamentally Alters the Benefits Payable under a Cash Balance Plan Based on an Interpretation of ERISA That Cannot Be Squared with the Statute ............................ 10

II. THE COURT SHOULD ADDRESS THE PROPER DEGREE OF DEFERENCE TO BE ACCORDED BY THE COURTS TO IRS DETERMINATION LETTERS ...................... 14

CONCLUSION ................................................................. 16

## *TABLE OF AUTHORITIES*

*Cases*

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1958) ....................... 14

*Eaton v. Onan Corp*, 117 F. Supp. 2d 812 (S.D. Ind. 2000) ................... 11

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............. 11--12

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996) ................................ 4

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ............................. 15

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) ............................................ 15

*Richards v. United States*, 369 U.S. 1 (1962) ............................... 12

*United States v. Moore*, 95 U.S. (5 Otto) 760 (1877) ........................ 12

*United States v. Shewmaker*, 936 F.2d 1124 (10th Cir. 1991) ................. 12

*Statutes and Regulations*

ERISA s 3(23), 29 U.S.C. s 1003(23) ........................................ 5, 13

ERISA s 3(34)-(35), 29 U.S.C. s 1003(34)-(35) .............................. 5

ERISA s 203(e), 29 U.S.C. s 1053(e) ....................................... 11--14

ERISA s 204(b)(1)(C), 29 U.S.C. s 1054(b)(1)(C) ............................ 5

ERISA s 204(b)(1)(G)-(H), 29 U.S.C. s 1054Co)(1)(G)-(H) .................... 12

ERISA s 204(c)(3), 29 U.S.C. s 1054(c)(3) .................................. 5

ERISA s 3002(c), 29 U.S.C. s 1202(c) ....................................... 16

I.R.C. s 410(a) ............................................................ 16

I.R.C. s 411(a)(7)(A)(i) ................................................... 5, 13

I.R.C. s 411(a)(11) ........................................................ 12--14

*I.R.C. s 411 (b)(1)(C)* .................................................... 5

*I.R.C. s 411(c)(3)* ....................................................... 5, 13

*I.R.C. s 412* ............................................................ 16

*I.R.C. s 414(i)-(j)* ....................................................... 5

*I.R.C. s 417(e)* ....................................................... 13--14

*Rev. Rul. 96-47, 1996-2 CB 35* ............................................. 13

*Treas. Reg. s 1.401(a)(4)-3(d)(1)(i)* ....................................... 5

*Treas. Reg. s 1.411(a)-7(a)(1)(ii)* ....................................... 5, 13

*Treas. Reg. s 1.411(a)-11(c)(2)(i)* ........................................ 13

*Treas. Reg. s 1.411(c)-1(e)(1)* ............................................ 14

*Treas. Reg. s 1.411(d)-6 Q&A-5(a)(1)* ....................................... 5

Miscellaneous

Council for Economic Development, New Opportunilies for Older Workers (1999) ................................................ 8

Forman. Public Pensions: Choosing Between Defined Benefit and Defined Contribution Plans, 1999 Der. C.L. Rev. 198-99 ............................ 8

GOVERNMENT ACCOUNTING OFFICE, CASH BALANCE PLANS: MMPLICATIONS ROR RETIREMENT INCOME, Report to the Chairman, Sen. Special Comm. on Aging, GAO/HEHS-00-207, (Sept. 2000) .......................................... 7, 9

IRS Announcement 95-33, p 362.1(1)(a), 1995-19 LR.B. 14 .................... 14

Kopp & Sher, A Benefit Value Comparison of a Cash Balance Plan with a Traditional Final Average Pay Defined Benefit Plan, Society of Actuaries Monograph (1998) ............................................... 9

Letter from Senator Charles Grassley, Chairman U.S. Special Senate Committee on Aging, to David Walker, Comptroller General of the United

States, U.S. General Accounting Office (Aug. 4, 2000) ..................... 7

*Pension Benefit Guaranty Corp., Title IV Aspects of Cash Balance Plans with Variable Indices*, 65 Fed. Reg. 41610 (July 6, 2000) ................. 11

*Watson Wyatt Worldwide, The Unfolding of a Predictable Surprise: A Comprehensive Analysis of the Shift from Traditional Pensions to Hybrid Plans* (2000) ............................................................... 9

*Worksheet Number 2A-Determination of Qualification (Department of Treasury - Internal Revenue Service)* 2000 ................................ 14

**\*1 BRIEF OF UNIFI NETWORK AND TOWERS PERRIN AS AMICI CURIAE IN SUPPORT OF THE PETITION FOR WRIT OF CERTIORARI**

Unifi Network, a subsidiary of Price water house Coopets LLP ("Unifi Network"), and Towers Perrin respectfully submit this brief amicus curiae in support of the petition for a writ of certiorari in this case. [FN1]

> FN1. Counsel for Unifi Notwork and Towers Perrin authored this brief in its entirety. No person or entity, other than amici, made a monetary contribution to the preparation or subrmssion of this brief.

**\*2 INTERESTS OF AMICI CURIAE**

Unifi Network and Towers Perrin consult with and advise employers on how to provide retirement and other employee benefits to their employees. Price water house Coopers is the world's largest professional services organization, and Towers Perrin provides advice to approximately three-quarters of the Fortune 1000.

For several decades, amici have consulted with and assisted numerous employers in the adoption and maintenance of defined benefit pension plans to meet the employers' objectives and the needs of their employees. In recent years, amici have concluded that traditional defined benefit plan designs no longer meet those objectives and needs for an increasing number of employers, especially those with more dynamic and diverse workforces that are faced with mortaring competitive pressures. Some of those employers have decided to curtail or terminate their defined benefit plans in favor of defined contribution plans. Other employers have decided to change their defined benefit plans to designs, such as a "cash balance" plan, that distribute benefits more evenly among employees, are better understood and appreciated by employees, and provide more flexibility in payment options.

Kwasha Lipton-now part of Unifi Network-developed the first cash balance plan, which was implemented by Bank of America in 1985. For more than fifteen years, amici have assisted numerous employers in designing and administering cash balance plans. Amici and other experts have met on many occasions with government regulators to provide advice and make suggestions on how to apply to cash balance plans the various tax-qualification and related rules

under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. s 100l et seq. ("ERISA"). To date, no comprehensive, definitive regulatory guidance of general applicability has been issued addressing cash balance plans. Nevertheless, amici, cash balance plan sponsors, and other experts have derived substantial comfort that cash balance plans may be operated as they were designed and intended from the numerous favorable determination letters issued by the internal Revenue Service ("IRS"). Many of these **\*3** letters approved cash balance plans having provisions that are substantially the same as those included in the Georgia Pacific plan and that have been rejected by the Eleventh Ctrcuit's decision below.

## SUMMARY OF ARGUMENT

Defined benefit pension plans cover approximately 47 million employees in the United States today. Cotlectwely, these plans hold several trillion dollars in assets set aside to provide retirement benefits to American workers. Defined benefit plans historically have conformed to traditional plan designs. In many segments of the workforce, traditional plan designs fail to deliver meaningful retirement benefits to most employees covered by these plans, particularly women and lower-paid employees. Instead, benefits are concentrated on the relatively small segment of the workforce that spends all or most of a career, without interruption, at a single employer. Employers, both governmental and private, have taken steps in recent years to redesign their defined benefit plans to better address the needs of ail their employees. The result has been a marked shift away from traditional plan designs to newer plan designs that distribute retirement bcncfits more equitably among employees. Cash balance plans have been at the forefront of this shift. Such plans now cover millions of employees at hundreds of employers, including roughly one in every five of the nation's largest private employers.

The issue in this case goes to the heart of whether defined benefit pension plans can provide more equitable benefits that do not conform to traditional plan designs. The decision of the court of appeals below adopts an interpretation of the statute that makes it difficult if not impossible for cash balance plans to operate as intended. This interpretation is unsound because it ignores the plain language of the statute, and because it forces cash balance plans to distribute benefits in a manner that not only undermines the employment relationship, but also violates the very provision of the statute the court of appeals sought to interpret. As a result, the decision improperly restricts the broad authority employers enjoy under federal law to determine the compensation and retirement benefits of their employees. Furthermore, the decision undermines the settled expectations of employers **\*4** and employees alike as to the benefits that cash balance plans would provide and that the Internal Revenue Service previously had approved in numerous determination letters issued to individual plans, including the plan in this case.

Amici urge the Court to grant the petition for certiorari. A major portion of the nation's wealth is set aside in defined benefit pension plans. Employers should be free to use the assets they have accumulated in these plans to provide for the retirement needs of more of their employees. An interpretation of the statute that is faithful to its language is sufficient to achieve this important national objective.

## REASONS FOR GRANTING THE WRIT

I. THE ELEVENTH CIRCUIT'S INTERPRETATION IMPROPERLY RESTRICTS THE BROAD AUTHORITY EMPLOYERS ENJOY UNDER FEDERAL LAW TO DETERMINE TIlE RETIREMENT BENEFITS OF THEIR EMPLOYEES.

ERISA and the Code [FN2] place solely and squarely in the hands of employers two critical decisions: whether to establish a pension plan at all and, once such a plan is established, what benefits to offer employees under the plan. As this Court has observed, "Nothing in ERiSA requires employers to establish employee benefits plans. Nor does ERISA mandate what land of benefits employers must provide if they choose to have such a plan." Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996).

> FN2. References in this brief to "ERISA" are to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C s 1001 et seq., and references to the "Code" are to Internal Revenue Code of 1986, as amended.

The latitude granted employers to determine benefits is particularly broad in the case of a defined benefit pension plan. In contrast to a defined contribution plan, which is limited to providing *5 benefits based solely on the contributions and earnings accumulated in individual participant accounts, a defined benefit plan is defined simply as "any plan which is not a defined contribution plan." See ERISA s 3(34)-(35), 29 U.S.C. s 1003(34)-(35); Code s 414(i)-(j). Thus, an employer that is willing to assume the greater liability of promising a defined level of retirement benefits (as opposed to limiting its liability to a defined level of contributions) is free to establish a defined benefit plan and to specify the type of retirement benefits the plan will provide.

For certain enumerated purposes, ERISA and the Code require the benefits otherwise specified by the employer in a defined benefit plan to be expressed as or converted into a traditional annuity commencing at normal retirement age. See, e.g., ERISA ss 3(23)(A), 204(b)(1)(C) (for purposes of testing benefit accruals for prohibited backloading), 29 U.S.C. ss 1003(23)(A), 1054(b)(1)(C); see also Code s 41 l(a)(7)(A)(i), (b)(1)(C) (same); Treas. Reg. s 1.401 (a)(4)-3(d)(1)(i) (for purposes of testing benefit accruals for prohibited discnmination). However, both statutes are clear that employers are free to define the benefits the plan will actually pay in ways other than as a traditional annuity beginning at normal retirement age. See. e.g., ERISA s 204(c)(3) (discussing defined benefit plans in which "an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age" (emphasis added)), 29 U.S.C. s 1054(c)(3); Code s 411(c)(3) (same); Treas. Reg. s 1.41 l(a)- 7(a)(1)(ii) (same); Treas. Reg. s 1.411(d)-6 Q&A-5(a)(1) (same).

In recent years, employers have begun to avail themselves of the flexibility afforded by defined benefit plans to define retirement benefits in ways other than as traditional deferred annuities. In particular, employers have been moving away from traditional plan designs to newer plan designs, such as cash balance plans, that define benefits in terms of a current lump sum value that grows steadily over time in a fair and equitable manner. Employers have been making this shift for good reason. As explained further below, for many employers these new plans address the retirement needs of their employees far better than plans based on traditional deferred annuities.

**\*6** The decision of the Eleventh Circuit below would undermine the ability of employers to determine the benefits that cash balance plans actually pay. Worse still, the decision would force employers to add an unintended windfall benefit to cash balance plans that would (1) vary erratically from one year to the next, (2) diminish over time as younger employees age, (3) not be available in most cases to older employees at all, (4) thereby impose a substantial financial penalty on employees who continue employment with the sponsoring employer or who wait to begin receiving their benefits, and (5) threaten the funded status of many plans through a substantial, unanticipated increase in benefit liabilities.

That Congress could not possibly have intended this result is self-evident. There is no need, however, for recourse to Congressional intent to confirm the flaws in the Eleventh Circuit opinion, because the opinion overlooks the plain language of the statute. That language prescribes precisely how plans that define benefits in terms other than traditional deferred annuities are to comply with the provision of ERISA the Eleventh Circuit sought to interpret. By interpreting ERISA in a manner that is faithful to its language, this Court can restore to employers their rightful authority to determine the benefits they provide their employees under cash balance plans.

A. Employers That Adopt Cash Balance Plans Are Exercising Their Right to Provide Retirement Benefits That Fit the Needs of Their Employees Better than Traditional Defined Benefit Plans.

Employers that sponsor defined benefit plans have been shifting away from plans that provide traditional deferred annuities to plans, such as cash balance plans, that define benefits in terms of a current lump sum value that grows steadily over time in a fair and equitable manner. This shift in plan design has been occurring for good reason. Traditional plans provide benefits that are heavily backloaded economically and therefore deliver the bulk of their pension dollars to employees who spend all or most of their career with the sponsoring employer. The benefits these employees receive under most **\*7** traditional plans far outstrip their relative pay and service with the employer.

In most segments of the economy, the vast majority of employees do not spend anywhere near an entire career with a single employer and therefore miss out on the opportunity to earn meaningful retirement benefits even though they nominally are covered under a traditional defined benefit plan. [FN3] The benefits these employees receive under a traditional plan are insignificant in comparison to the benefits paid to long-service employees. [FN4]

> FN3. See Letter from Senator Charles Grassley, Chairman U.S. Special Senate Committee on Aging, to David Walker, Comptroller General of the United States, U.S. General Accounting Office p 5 (Aug. 4, 2000), reprinted in 2000 TNT 192-15 (Oct. 3, 2000) ("While [traditional defined benefit plans] tend to be very generous for those few employees that work for one employer their entire career . . . it is less beneficial when employees work for more than one employer during their working hves (the situation for the vast majority of ali U.S. workers)."); GOVERNMENT ACCOUNTING OFFICE, CASH BALANCE PLANS: IMPLICATIONS FOR RETIREMENT INCOME , Report to the Chairman, Sen. Special Comm. on Aging (hereinafter the "GAO, CASH

> BALANCE PLANS "), GAO/HEHS-00-207, at 29 n.23 (Sept 2000) ("median number of years any employee had with one employer was 4 7 years").

> FN4. In industries with Iow employee turnover, a traditional defined benefit plan can provide meaningful retirement benefits to most employees because most employees will fit the long-service career pattern needed to benefit from traditional deferred annuities. Even in indusmes with higher levels of employee turnover, a traditional plan can provide an effective means of rewarding long-service employees if that is the employer's pnncipal retirement objective.

The profiles of employees who fail to benefit under traditional defined benefit plans are as vaned as the American work. force itself. Employees who change jobs at younger ages or in mid-career, for example, leave the employer when the value of traditional deferred annuities is de minimis at best. Conversely, employees who are hired in mid-career often arrive too late to build up substanttal service under a traditional plan's benefit formula or to qualify for lucrative early retirement substdies. For similar reasons, employees who interrupt their careers to raise a family or to care for an ailing relative often fred the hiatus in employment has deprived them of crucial *8 service credits needed to earn a meaningful benefit under a traditional plan, even if they return to work with the same employer. Because the value of traditional annuities declines after retirement age in most traditiona] plans, employees who are hired or continue to work after retirement age earn benefits that progressively deeline in value as the older worker ages on the job. [FN5] The cumulative result of these individual experiences is an allocation of pension benefits across an employer's workforce that leaves large gaps in pension coverage for many employees.

> FN5. Forman, Public Pensions Choosing Between Defined Benefit and Defined Contribution Plans, 1999 Del. C.L Rev. 198-99; Council for Economic Development, New Opportunities for Older Workers, at 24-25 (1999), availabte at
> http://www.ced.org/docs/older.pdf

The shortcomings of traditional defined benefit plans are not limited to the relatively small amount of benefits they deliver to most employees. The basic nature of traditional deferred annuity benefits is of concern as well. Most employees today want to know how much their retirement benefits are worth and want control over their retirement assets after they terminate employment. Traditional plans can pay out benefits in a single lump sum distribution that reflects the value of the employee's benefits and that can be rolled over into another retirement plan or an individual retirement account under the employee's control. However, the basic promise and only dollar guarantee of a traditional defined benefit plan is to pay out a deferred annuity. Because the value of the prorrused annuity fluctuates over time in response to interest rates, the amount of the lump sum distribution under a traditional plan is never guaranteed and instead is constantly at risk to changes in interest rates.

Cash balance plans address the shortcomings of traditional defined benefit plans by providing a more equitable distribution of benefits among employees and a stable cash balance account that precisely tracks the value of the employee's retirement benefit and is payable in a single lump sum distribution after termination of employment. Benefit accruals in a cash balance

plan are spread out more evenly over an employee's career, in contrast to the backloaded **\*9** benefit accruals in a traditional plan. As a result, all employees have the opportunity to earn meaningful retirement benefits regardless of their relative tenure with the sponsoring employer. Studies show that most employees receive significantly more valuable benefits under a cash balance plan than under a traditional defined benefit plan. [FN6]

> FN6. See. e.g., Watson Wyatt Worldwide, The Unfolding ora Predictable Surprise: A Comprehensive Analysis of the Shift from Tradittonal Penstons to Hybrid Plans, at iii (2000), available at http:// www.watsonwyatt.com/homepage/ us/res/cash balance.him; Kopp & Sher, A Benefit Value Comparison of a Cash Balance Plan with a Tradttional Final Average Pay Defined Benefit Plan, Society of Actuaries Monograph (1995), available at http://www.soaorg/library/ scctionnosws/pension/PFN9810.pdf, cf GAO, CASH BALANCE PLANS at 26, 29 n.23 ("[W]orkers employed by more than one employer dunng their career can receive more retirement income under multiple cash balance plans than multiple traditional defined benefit plans.").

Employers have achieved these laudable obi ectives by defining benefits in cash balance plans in a way that differs markedly from a traditional plan. As a technical matter, a "cash balance plan" is a defined benefit pension plan that determines an employee's benefit by reference to a hypothetical account balance, often referred to as the employee's "cash balance." An employee's accrued benefit at any point in time equals the balance in the hypothetical account at that time. Typically, the account balance grows each year by credits equal to a percentage of the employee's pay for the year (so-called "pay credits") and by credits in the nature of interest on the employee's account balance ("interest credits"). Generally, pay credits continue until the employee terminates employment with the sponsoring employer, while interest credits continue until the employee begins receiving benefits under the plan (even if benefits begin long after the employee has terminated employment with the sponsoring employer). In the typical cash balance plan, a participant is entitled to receive the account balance in a single lump sum distribution payable at any time after the participant terminates employment with the sponsoring employer. Alternatively, the participant can receive his or her benefit in the form of an annuity equal to the actuarial equivalent of the account balance at the time annuity payments begin.

**\*10** B. The Decision of the Eleventh Circuit Fundamentally Alters the Benefits Payable under a Cash Balance Plan Based on an Interpretation of ERISA That Cannot Be Squared with the Statute.

As described above, an essential feature of cash balance plans is their ability to express an employee's benefit as a current lump sum value and to pay out that benefit in a lump sum distribution equal to the employee's current cash balance account. Without this feature, cash balance plans cannot achieve their objectives of distributing benefits equitably among employees and insulating the value of employees' benefits from changes in interest rates.
The Eleventh Circuit held in the case below that a lump sum distribution from a cash balance plan cannot be limited to an employee's cash balance account and instead must include an additional benefit. Under the methodology adopted by the Eleventh Circuit, commonly referred to as the "whipsaw" method, an employee's cash balance account must be projected forward to

normal retirement age at the interest credit rate set forth in the plan and then discounted back to an actuarial present value using the statutory interest rates specified in ERISA section 203(e) and Code section 411(a)(11). [FN7] If the resulting amount exceeds the employee's current cash balance account, then the lump sum distribution payable to the employee must be increased to equal the amount so determined.

> FN7. The precise steps for making this calculation are not entirely clear from the court's opinion.

The Eleventh Circuit recognized that the additional benefit it was mandating would be payable any time the plan's interest credit rate exceeds the statutory interest rate. Projecting out an employee's cash balance account at the plan's interest credit rate and then discounting it back at a lower statutory interest rate will always yield an amount larger than the employee's cash balance account. The court also recognized that the amount of the additional benefit will increase the younger an employee is at the time he or she receives a **\*11** lump sum distribution. This difference in amount based on the employee's age is attributable to the fact that the difference in interest rates which produces the additional benefit will apply over a longer period of time for younger employees and therefore will produce a larger additional benefit for them than for older employees. Indeed, if the court's method is applied strictly, in most cases the additional benefit will disappear entirely for any employee at or over normal retirement age at the time of distribution.

The Eleventh Circuit's interpretation of ERISA section 203(e) cannot be squared with the language of the statute. First, the whipsaw method appears nowhere in the statute or the implementing regulations. Instead, the method was inferred by the court from the general requirements of the statute and the language of the plan document in question. As far as the language of the plan document is concerned, the Eleventh Circuit simply got it wrong. Although the court insists that the plan document requires projecting forward an employee's cash balance account to normal retirement age at the plan's interest credit rate to determine the employee's accrued normal retirement age annuity, the plan says no such thing. On the contrary, the plan document is clear, that, if an employee wishes to receive an annuity beginning at normal retirement age, the employee must watt until normal retirement age to see how large his or her cash balance account is at that point and therefore how much of an annuity he is entitled to receive under the plan's annuity conversion factors. Because the plan's interest credit rate is based on a variable index (as are most cash balance plans'), it is impossible to know in advance the size of the intervening interest credits and therefore the ultimate size of the account at any point in the future. [FN8]

> FN8. For this reason, the approach of projecting interest credits based on a variable index forward to normal retirement age is inherently problematic See Eaton v. Onan Corp., 117 F. Supp.2d 812, 833 (S.D. Ind 2000); Pension Benefit Guaranty Corp., Title IV Aspects of Cash Balance Plans with Variable Indices, 65 Fed Reg. 41610, 41611-12 (July 6, 2000)

Second, a statute must be interpreted in a manner that harmonizes ali of its provisions. See FDA v. Brown & Williamson Tobacco **\*12** Corp., 529 U.S. 120, 133 (2000) ("A court must .

. . interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all pans into an harmonious whole.") (internal quotations and citations omitted); Richards v. United States, 369 U.S. 1, 11 (1962) ("We believe it fundamental that a section ora statute should not be read in isolation from the context of the whole Act."). An interpretation that places two provisions of the same statute in conflict with one another is to be disfavored over an alternative interpretation that does not. United States v. Moore, 95 U.S. (5 Otto) 760, 762-63 (1877) (rejecting an interpretation of one statutory provision which would conflict with another); United States v. Shewmaker, 936 F.2d 1124, 1128 (10th Cir. 1991). The additional benefit mandated by the Eleventh Circuit's whipsaw method produces large disparities in benefits among employees based solely on their relative ages. Employees of different ages who have the same pay and service history with the employer (and therefore the same size cash balance accounts) will receive dramatically different lump sum benefits based solely on the difference in their ages. A younger employee will receive a larger lump sum than a middle-aged employee who, in turn, will receive a larger lump sum than an employee past normal retirement age, who in most cases will derive no benefit from the whipsaw calculation at all. This disparate treatment of older employees under ERISA section 203(e) is difficult to reconcile with ERISA section 204(b)(1)(G) and (H), which generally bars such agespecific effects in defined benefit plans.

Third, the whipsaw method not only is not required by ERISA section 203(e), it actually violates it. An employee who terminates employrnent before normal retirement age faces a dilemma under the Eleventh Circuit's opinion. If the employee does not consent to an immediate lump sum distribution and instead leaves his or her benefit in the plan until normal retirement age, the employee will forgo entirely the additional benefit mandated by the Eleventh Circuit. For younger employees especially, the amount of additional benefit lost could be substantial. However, the implementing Treasury regulations under ERiSA section 203(e) and the parallel Code section 411(a)(11) specifically prohibit a plan from imposing a substantial detriment on any employee who does not consent to an *13 immediate distribution. See Treas. Reg. s 1.411 (a)- 11(c)(2)(i). The Internal Revenue Service has found a substantial detriment to exist as a result of plan provisions and practices with far less economic significance than that at stake here. See Rev. Rul. 96-47, 1996-2 CB 35. It is apparent that the Eleventh Circuit cannot reasonably interpret section 203(e) to require a plan to violate that same section.

Fourth, the Eleventh Circuit apparently requires a cash balance plan to convert an employee's current account balance into a deferred annuity beginning at normal retirement age by projecting forward the account balance at the plan's interest credit rate. This method is directly at odds with the provisions of the statute that govern how an accrued benefit expressed in the form of an annuity beginning at normal retirement age is to be derived for a plan that does not define its benefits in that way. [FN9] The present value requirements of ERISA section 203(e) and Code section 411(a)(11) apply to an employee's nonforfeitable "accrued benefit." ERISA section 3(23) and Code section 411(a)(7)(A)(i) define the term "accrued benefit" for this purpose. The implementing regulation under those sections, Treas. Reg. s 1.411(a)- 7(a)(1)(ii), provides that in the case of a defined benefit plan that does not provide an accrued benefit in the form of an annuity beginning at normal retirement age, the term "accrued benefit" means an annuity beginning at normal retirement age that is the "actuarial equivalent (determined under section 411(c)(3)...) of the accrued benefit determined under the plan." Internal Revenue Service guidance under Code section 411(c)(3) in rum provides that actuarial equivalence for this

purpose is to be determined using the interest rate assumptions of Code section 417(e), not the interest credit rate set forth in the plan. See Treas. Reg. s 1.411(c)-1(e)(1); IRS Announcement 95- 33, p 362.1(1)(a), 1995-19 I.R.B. 14.

> FN9. The Eleventh Circuit in the decision below observed that the plan in this case defines the accrued benefit in terms of an annuity commencing at normal retirement age. However, the definition cited by the court is not part of the operative provisions of the plan and is set forth only for the limited purposes illustrated above at page 5. The operative provisions of the plan make clear that the benefit promised employees is an immediate lump sum distribution in the amount of the participant's current cash balance account.

**\*14** Applying the method specified in the statute leads to entirely different results from the whipsaw method embraced by the Eleventh Circuit. The method specified in the statute requires a plan to convert an employee's current account balance into an actuarially equivalent annuity beginning at normal retirement age using the interest rate assumptions of Code section 417(e). Discounting this actuarially equivalent annuity back to present value using the same interest rate assumptions (which also apply under ERISA section 203(e) and Code section 411(a)(11)) yields a minimum lump sum distribution that exactly equals the employee's cash balance account.

## II. THE COURT SHOULD ADDRESS THE PROPER DEGREE OF DEFERENCE TO BE ACCORDED BY THE COURTS TO IRS DETERMINATION LETTERS.

This case also presents the Court with the opportunity to consider the propriety of the Eleventh Circuit's failure to accord any deference to the determination letter issued by the Internal Revenue Service (the "IRS") approving the Georgia-Pacific Plan. The Eleventh Circuit concluded that, although the IRS reviews determination letters with a checklist that includes compliance.with Code section 417(e), [FN10] and despite the absence of any other applicable regulatory guidance, the determination letter issued by the IRS is not to be accorded any weight, [FN11]

> FN10. See Worksheet Number 2A-Determination Of Qualification (Department of Treasury - Internal Revenue Service) 2000, at V.g. (Appendix 77a to Petitioners' Petition for a Writ of Cernorari)

> FN11. The Eleventh Circuit noted that, remarkably, the IRS urged the court not to consider the determination letter that it issued. This Court bas recognized that an agency's litigation posttion may not reflect an agency's considered judgment on an issue because litigation counsel does not make policy rotan agency. See. e.g., Bowen v Georgetown Univ Hosp, 488 U.S. 204, 212 (1988). In this case, the IRS's liugating position does not appear to have been accepted by policy-making officials at the IRS given that there has been no attempt by the IRS to revoke the targe numbers of favorable deterccunation letters it has issued to cash balance plans that do not apply the whipsaw approach.

**\*15** This Court has repeatedly stated that ERISA is an "enormously complex and detailed"

statute, Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993), compliance with which requires constant attention and judgment from employers, plan administrators, and their advisors. In recognition of this fact, Congress has established a process by which plan sponsors may obtain certainty-before voluntarily undertaking the multi-million dollar obligation to provide retirement benefits-that the form of its retirement plan satisfies the requirements of the Internal Revenue Code. In this process, the IRS accepts comments submitted by interested employees and reviews a retirement plan's form for compliance with the qualification requirements of the Code. Frequently, this process includes discussions between the IRS and a plan sponsor, and sponsors often amend plans in response to the IRS's comments. Once the IRS is satisfied that a plan meets the qualification requirements of the Code, it issues a determination letter stating only the conclusion that the form of the plan is qualified under the Code.

Absent the determination letter process, the risk associated with adopting a retirement plan would increase dramatically and employers would likely be dissuaded from adopting retirement plans. This is especially true when employers confront areas of the law for which no guidance of general applicability exists. In such cases-for example, with respect to cash balance plans-employers have only determination letters on which to rely. in such situations, consulting firms such as amici may rely on a series of such letters issued to plans that they have designed. Should determination letters carry no weight in court, the process set forth to provide plan sponsors with certainty will not achieve its purpose.

Deference should aisc be given to determination letters to ensure thru retirement plan sponsors and fiduciaries are subject to a uniform regulatory scheme. ERISA was enacted to provide a single regulatory regime to govern employee benefit plans. Cf New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 657 (1995) ("The basic thrust of [ERISA's] preemption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit **\*16** plans."). Accordingly, Congress has sought in many instances to limit interpretive authority over parallel provisions in the Code and ERISA to one agency. See. e.g., ERISA s 3002(c), 29 U.S.C. s 1202(c) (Treasury regulations under Code sections 410(a), 411, and 412 apply to the parallel provisions in ERISA). If courts accord no weight to determination letters, plan sponsors and fiduciaries may confront conflicting regulatory requirements imposed by identical statutory provisions. This is, in fact, the result reached by the Eleventh Circuit in the case below. See, Part I, supra.

## CONCLUSION

Amici respectfully ask the Court to grant certiorari in this case to preserve the broad authority accorded employers in determining how to provide retirement benefits to their employees and to provide the lower courts with greater direction as to their ability, to second-guess the administrative guidance on which employers and plan administrators must, by necessity, rely. The petition for certiorari should be granted.

> Respectfully submitted,
> Robert A. Long, Jr.
> Counsel of Record

>Richard C. Shea
>Robert S. Newman
>COVINGTON & BURLING
>1201 Pennsylvania Ave., N.W.
>Washington, D.C. 20004
>(202)662-6000
>Counsel for Amici Curiae

Dated: March 2, 2000
Georgia-Pacific Corp. Salaried Employees Retirement Plan v. Lyons
2001 WL 34116882

Briefs and Other Related Documents (Back to top)

. 2001 WL 34116885  (Appellate Petition, Motion and Filing) Reply Brief of Petitioner (Mar. 13, 2001)
. 2001 WL 34116879  (Appellate Petition, Motion and Filing) Brief in Opposition to Petition for Writ of Certiorari (Mar. 02, 2001)
. 2001 WL 34116883  (Appellate Petition, Motion and Filing) Motion for Leave to File Brief Amici Curiae and Brief Amici Curiae of the National Association of Manufacturers and the American Benefits Council in Support of Petitioners (Mar. 02, 2001)
. 2001 WL 34116871  (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Jan. 23, 2001)
END OF DOCUMENT