# In The Matter Of:

*TIMOTHY D. LAURENT v.*
*PRICEWATERHOUSECOOPERS, LLP*

---

*TIMOTHY D. LAURENT*
*November 3, 2005*

---

## LEGALINK MANHATTAN

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**D. LAURENT, TIMOTHY - Vol. 1**

TIMOTHY D. LAURENT

Page 1

1    IN THE DISTRICT COURT OF THE UNITED STATES
          FOR THE DISTRICT OF COLUMBIA
2
3
4    TIMOTHY D. LAURENT, on behalf   )
     of himself and on behalf of  )
5    others similarly situated,    )
          Plaintiff,          )
6                        ) Civil Action
          -vs-           ) No. 05-1291 (PLF)
7                        )
     PRICEWATERHOUSECOOPERS, LLP,   )
8    et al.,               )
          Defendants.        )
9
10
11
12      Videotaped deposition of TIMOTHY D. LAURENT
13   taken before NADINE J. WATTS, CSR, RPR, and Notary
14   Public, pursuant to the Federal Rules of Civil Procedure
15   for the United States District Courts pertaining to the
16   taking of depositions, at Suite 5900, 200 East Randolph
17   Drive, in the City of Chicago, Cook County, Illinois,
18   commencing at 9:39 o'clock a.m. on the 3rd day of
19   November, A.D., 2005.
20
21
22
23
24

Page 2

1        There were present at the taking of this
2    deposition the following counsel:
3        GOTTESDIENER LAW FIRM, PLLC by
         MR. ELI GOTTESDIENER
4        498 7th Street
         Brooklyn, New York  11215
5        (718) 788-1500
6          on behalf of the Plaintiff;
7        KIRKLAND & ELLIS, LLP by
         MR. DOUGLAS G. SMITH and
8        MR. JASON W. CALLEN
         200 East Randolph Drive
9        Chicago, Illinois  60601
         (312) 861-3374
10
           on behalf of the Defendants, including
11         PricewaterhouseCoopers, LLP.
12
13
14   ALSO PRESENT:  Mr. Brian P. Bruce, videographer
15
16
17
18
19
20
21
22
23
24

Page 3

1          VIDEOTAPED DEPOSITION OF
                TIMOTHY D. LAURENT
2               NOVEMBER 3, 2005
3
4    EXAMINATION BY:                    PAGE
5    Mr. Douglas G. Smith                5
6          * * * * * *
7            EXHIBITS
8                          PAGE
9    Deposition Exhibit No. 1           26
10   Deposition Exhibit No. 2           126
11   Deposition Exhibit No. 3           147
12   Deposition Exhibit No. 4           182
13   Deposition Exhibit No. 5           184
14   Deposition Exhibit No. 6           184
15   Deposition Exhibit No. 7           191
16         * * * * * *
17
18
19
20
21
22
23
24

Page 4

1        THE VIDEOGRAPHER:  Good morning.  We are going on
2    the video record at 9:39 a.m.  Today's date is
3    November 3rd in the year 2005.
4        My name is Brian P. Bruce, Sr., and I'm a legal
5    videographer associated with LegaLink Chicago located at
6    230 West Monroe Street in Chicago, Illinois.  The court
7    reporter today is Nadine Watts, also with LegaLink
8    Chicago.
9        Here now begins the videotaped deposition of
10   Timothy D. Laurent in the matter captioned
11   Timothy D. Laurent, on behalf of himself and on behalf
12   of all others similarly situated, versus
13   PricewaterhouseCoopers, LLP, et al.
14        This matter is pending in the United States
15   District Court, for the District of Columbia, and bears
16   Case No. 05 L 1219 (PLF).
17        This deposition is being held at 200 East
18   Randolph Street, Suite 5900, in Chicago, Illinois and is
19   being taken on behalf of certain defendants.
20        Will all counsel present please identify
21   themselves for the record, state whom you represent,
22   starting with the noticing party.
23     MR. SMITH:  Doug Smith and Jason Callen on behalf of
24   defendants, including PricewaterhouseCoopers.

Page 5

1    MR. GOTTESDIENER: Eli Gottesdiener on behalf of
2    Timothy Laurent and a proposed class of similarly
3    situated persons.
4        THE VIDEOGRAPHER: Thank you, Counsel.
5        Will the court reporter please swear in the
6    witness at this time.
7            TIMOTHY D. LAURENT,
8    called as a witness herein, having been first duly
9    sworn, was examined upon oral interrogatories and
10   testified as follows:
11           EXAMINATION
12         by Mr. Smith:
13   MR. SMITH: Q  Good morning, Mr. Laurent. Have you
14   ever been deposed before?
15   A  No.
16   Q  You understand I'm going to ask you a series of
17   questions, and will you let me know if you don't
18   understand any of my questions?
19   A  Yes.
20   Q  Could you state your full name for the record.
21   A  Timothy Darrick Laurent.
22   Q  And you might want to spell that for the court
23   reporter so she has it.
24   A  T-I-M-O-T-H-Y, new word, D-A-R-R-I-C-K, new

Page 6

1    word, L-A-U-R-E-N-T.
2    Q  Okay. And are there any other names by which
3    you've legally been known?
4    A  No.
5    Q  And what's your current address?
6    A  84 North Highland, H-I-G-H-L-A-N-D, Highland
7    Road, Inverness, Illinois 60067.
8    Q  Okay. And how long has that been your address?
9    A  Approximately three years.
10   Q  Three years. Have you -- And could you just
11   tell me if you remember what your other addresses were
12   since 1995?
13   A  Prior to that was 51 Arlene Avenue, Palatine,
14   Illinois 60067.
15   Q  Okay. And was that the whole period from 1995
16   through your current address?
17   A  I believe that was '97 forward.
18   Q  Okay. And before that what was your address?
19   A  1558 Chivalry Court, Palatine, Illinois 60067.
20   Q  And does that cover all of the addresses you've
21   resided at since 1995?
22   A  Yes.
23   Q  Have you ever been involved in any lawsuits
24   before?

Page 7

1    A  No.
2    Q  Not as a witness or as a party?
3    A  Not that I recall.
4    Q  Could you tell me what your highest level of
5    education is?
6    A  College.
7    Q  And what was your degree in?
8    A  Engineering.
9    Q  And where did you go?
10   A  University of Illinois.
11   Q  And before that did you attend high school?
12   A  Correct.
13   Q  And where did you attend high school?
14   A  Palatine.
15   Q  And as part of your education in college, did
16   you take any courses in investing or finance or
17   accounting?
18   A  No.
19   Q  Did you take any business-related courses in
20   college?
21   A  No.
22   Q  Do you do any investing on your own?
23   A  Yes.
24   Q  Okay. How would you describe your familiarity

Page 8

1    with investments and pension plans?
2    A  Average.
3    Q  And the investing that you do on your own, what
4    kind of investments do you invest in?
5    A  Stocks.
6    Q  Do you invest in mutual funds or directly in
7    stocks?
8    A  Directly in stocks.
9    Q  And how has your performance in your investments
10   been?
11   A  Modest.
12   Q  And by modest, what percent do you typically
13   earn on your investments in a year?
14   A  At this moment, I don't know.
15   Q  Can you give me an estimate? Would it be less
16   than 10 percent?
17   A  I do not know at this moment.
18   Q  Okay. Who's your current employer?
19   A  Critical Mass.
20   Q  And what kind of company is that?
21   A  Consulting.
22   Q  And where are they located?
23   A  Calgary.
24   Q  Calgary, Canada?

Page 9

1   A  Correct.
2   Q  And do you work from home doing consulting, or
3  how does that work?
4      MR. GOTTESDIENER: Objection. Answer the question
5  if you can.
6      THE WITNESS: I work at a client's site generally.
7      MR. SMITH: Q  Do they have an office in Illinois
8  or not?
9   A  Yes.
10  Q  Okay. And what kind of work do you do in
11 consulting? What field do you --
12  A  IT consulting.
13  Q  And how long have you been with that employer?
14  A  About a week.
15  Q  And before you were hired by them what was your
16 employment?
17  A  Employer or employment?
18  Q  Employer.
19  A  Comergent.
20  Q  Could you spell that?
21  A  C-O-M-E-R-G-E-N-T, Comergent.
22  Q  And what period of time did you work for them?
23  A  Late 2004 until last week.
24  Q  And why did you leave Comergent?

Page 10

1   A  I needed a change.
2   Q  Okay. Did you voluntarily leave?
3   A  Yes.
4   Q  Before Comergent where did you work?
5   A  A company called Netlojix, N-E-T-L-O-J-I-X.
6   Q  And what period of time did you work at
7  Netlojix?
8   A  2004 -- Excuse me. 2002 to fall of 2004.
9   Q  And where are they located?
10  A  Arlington Heights.
11  Q  And where was Comergent located?
12  A  Redwood City, California.
13  Q  And when you were working for Comergent, did
14 they have an office out here or were you working from
15 home?
16  A  Office out here.
17  Q  And where is their office out here?
18  A  Chicago.
19  Q  Before Netlojix where did you work?
20  A  PricewaterhouseCoopers.
21  Q  Okay. And was there a gap between when you
22 worked for Pricewaterhouse and Netlojix?
23  A  Yes.
24  Q  How long was that gap?

Page 11

1   A  Nine, ten months.
2   Q  And were you unemployed during that period?
3   A  Correct.
4   Q  Why did you leave Netlojix?
5   A  It felt right.
6   Q  Have you -- In each of those transitions have
7  you earned more money at the company that you went to?
8   A  No.
9   Q  Have you ever been fired or asked to leave a
10 company?
11  A  No.
12  Q  Did you have any income during the nine or ten
13 months that you were not employed after you left
14 Pricewaterhouse?
15  A  No income from a job.
16  Q  Okay. Before PricewaterhouseCoopers -- Well,
17 just to back up a minute, what was the period of time
18 that you worked at Pricewaterhouse?
19  A  Late '95 until September 2001.
20  Q  Okay. When did you work for Coopers & Lybrand?
21  A  Late '95 until the merger in June of -- July of
22 '98.
23  Q  And before Coopers where did you work?
24  A  Wordlink, W-O-R-D-L-I-N-K.

Page 12

1   Q  And what kind of position did you have at
2  Worldlink?
3   A  Consulting.
4   Q  And when did you work -- What period of time did
5  you work for Worldlink?
6   A  Wordlink was '94 through late '95.
7   Q  And why did you leave Worldlink?
8   A  To improve my lifestyle.
9   Q  Did you get a raise or is that what you mean?
10 What do you mean by improve your lifestyle?
11     MR. GOTTESDIENER: Objection.
12     THE WITNESS: Better opportunities.
13     MR. SMITH: Q  Does that mean more money or was
14 there some other reason?
15     MR. GOTTESDIENER: Objection.
16     THE WITNESS: One aspect is more money.
17     MR. SMITH: Q  Okay. And before Worldlink where
18 did you work?
19  A  Wordlink. Before Wordlink was the University of
20 Illinois.
21  Q  And what period of time did you work there?
22  A  '90 through '94.
23  Q  Okay. And what was your position there?
24  A  Network administrator.

TIMOTHY D. LAURENT

Page 13

1  Q  And before that where did you work?
2  A  Before University --
3  Q  Of Illinois. Was there any other employment?
4  A  A job during high school I'm sure.
5  Q  And when did you graduate from college?
6  A  May of '94.
7  Q  So you were a network administrator at the
8  University of Illinois while you were attending college
9  there; is that correct?
10  A  Correct.
11  Q  You also -- I think on one of your resumes is
12  that you worked for Bromley Companies. What was that?
13  MR. GOTTESDIENER: Objection. Go ahead.
14  THE WITNESS: Also a network administrator.
15  MR. SMITH: Q  Okay. And when did you work for
16  them?
17  A  I believe it was '92 to '94.
18  Q  And have we covered all your employment from
19  college through the present?
20  A  Yes.
21  Q  And you've served as a network administrator
22  during college, and then after that were your positions
23  all as IT consultant?
24  A  Yes.

Page 14

1  Q  Were your responsibilities pretty similar in all
2  of those subsequent positions or not?
3  A  Fairly similar.
4  Q  Do you remember the -- I think I asked you about
5  the period you were working for PwC. Do you remember
6  the exact date that you began working at PwC? And I'll
7  just use PwC occasionally to refer to Pricewaterhouse.
8  MR. GOTTESDIENER: Objection. Go ahead.
9  THE WITNESS: PricewaterhouseCoopers, meaning the
10  merged firm, was July 1st of 1998.
11  MR. SMITH: Q  Okay. And when did you begin work
12  at Coopers & Lybrand?
13  A  I believe that was November 8, 1995.
14  Q  And when did you cease working at
15  PricewaterhouseCoopers?
16  A  As the companies merged and became one.
17  Q  When did you cease working at
18  PricewaterhouseCoopers?
19  A  I'm sorry. It was September -- I believe
20  September 1st, 2001.
21  Q  And why did you -- What were the reasons for
22  your leaving Pricewaterhouse?
23  A  I was laid off.
24  Q  And who made the decision to lay you off?

Page 15

1  A  Unknown.
2  Q  Did you ever inquire about that?
3  A  A committee of partners. I do not know who.
4  Q  And did you get any explanation for why you were
5  laid off?
6  A  Yes.
7  Q  And what was that?
8  A  Excess number.
9  Q  What do you mean?
10  A  I was an excess number. I did not need -- They
11  did not need my services at that time. As you know,
12  there was a downturn in the economy.
13  Q  And what was your feeling at that time about
14  your termination?
15  A  A little disappointed.
16  Q  And were you disappointed when you didn't
17  receive another employment for several months after you
18  were terminated from PwC?
19  A  I took the opportunity to have some time off.
20  Q  And how did you feel about that?
21  A  Somewhat of a relief.
22  Q  And did you have any financial hardship as a
23  result of your termination and unemployment for nine or
24  ten months?

Page 16

1  A  Not really.
2  Q  What were your responsibilities while you were
3  working at PwC?
4  A  I was a managing consultant.
5  Q  And what exactly does that entail?
6  A  Project management.
7  Q  What kind of projects did you manage?
8  A  CRM projects.
9  Q  And what is that?
10  A  CRM is customer relationship management.
11  Q  And what does that mean for somebody who
12  doesn't -- like me, who never worked at PwC?
13  A  CRM is the focus of one's business on the
14  customer.
15  Q  Okay. And, I mean, what exactly did you do for
16  the customers?
17  A  I led a team of developers.
18  Q  And what did they develop?
19  A  Applications based on packages of software.
20  Q  And who were some of the companies that you
21  worked for?
22  A  BMW, Sprint.
23  Q  And who were the people that you worked with at
24  PwC?

TIMOTHY D. LAURENT

Page 17

1    A  Mostly PwC employees.
2    Q  And who were they?
3    A  Everyone from partner down to junior level
4    consultants.
5    Q  And what were the names -- Can you recall the
6    names of people you worked with at PwC?
7    MR. GOTTESDIENER: Objection. Go ahead.
8    THE WITNESS: Some of the partners. Ed Himermeal
9    (phon.), for example. A coworker, perhaps David
10   McDonald.
11   MR. SMITH: Q  Anyone else?
12   A  Perhaps Bill Loumporidis.
13   Q  How do you spell that? That might help --
14   A  Yes. Loumporidis, L-O-U-M-P-O-R-I-D-I-S.
15   Q  Anyone else you can name that you worked with at
16   Pricewaterhouse?
17   A  David Forester.
18   Q  And anyone else?
19   A  Brian Chow.
20   Q  Anyone else?
21   A  That's all I can recall at this moment.
22   Q  And in your position at PwC were you on a track
23   that could potentially lead to partnership or not?
24   A  Yes.

Page 18

1    Q  And did -- At any time when you were employed at
2    PwC did you have the expectation that you might become a
3    partner there?
4    A  No.
5    Q  And why was that?
6    A  It wasn't in my life goals.
7    Q  How did you understand how the partnership track
8    operated at PwC?
9    A  A lot of sales.
10   Q  And what do you mean by that?
11   A  Bringing in new customers.
12   Q  So the more new customers you brought in, the
13   better your chances of making partner; is that what
14   you're saying?
15   A  That's my understanding.
16   Q  Were there employees at PwC who were in
17   positions where they wouldn't be on a partnership track?
18   A  Not that I'm aware of.
19   Q  So every employee at PwC, including secretaries
20   and things like that, could become a partner or --
21   A  I'm sure the potential is there.
22   Q  And did your salary increase while you were at
23   PwC?
24   A  Yes.

Page 19

1    Q  Did it increase every year?
2    A  I believe so.
3    Q  Did your -- Did PwC's contributions to your
4    401-K and pension plan increase every year?
5    MR. GOTTESDIENER: Objection.
6    THE WITNESS: I do not recall.
7    MR. SMITH: Q  Do you recall anything about what
8    your -- the PwC contributions were to your pension plan
9    or 401-K plan?
10   MR. GOTTESDIENER: Objection.
11   THE WITNESS: I can make an assumption that as my
12   salary --
13   MR. GOTTESDIENER: Don't make any assumptions.
14   THE WITNESS: No.
15   MR. SMITH: Well, you can't instruct him, Eli, about
16   how to answer the question.
17   THE WITNESS: With an increase in salary --
18   MR. SMITH: Q  What is your understanding?
19   A  With an increase in salary there would be a
20   potential to have more contributions, meaning the
21   amount.
22   Q  Okay. And so as your salary increased at PwC,
23   you would experience an increase in contributions to
24   your pension plan and 401-K?

Page 20

1    MR. GOTTESDIENER: I'm going to object to this
2    question and the other questions as including questions
3    that are calling for legal conclusions.
4    You can go ahead and answer if you can.
5    THE WITNESS: Please repeat the question.
6    MR. SMITH: Q  As your salary increased at PwC, you
7    believe that PwC's contributions to your 401-K plan and
8    pension plan increased?
9    A  I'm not sure that the percentage increased.
10   Q  Did the amount increase though?
11   A  At this moment, I don't recall.
12   Q  All right. Do you recall what plans you
13   participated in while you were at PwC?
14   A  I participated in two plans.
15   Q  And what were those?
16   A  The RBAP.
17   Q  The RBAP?
18   A  That's correct, RBAP, and the 401-K.
19   Q  And the 401-K plan, do you understand there were
20   two 401-K plans at PwC?
21   A  That's my understanding.
22   Q  And did you participate -- I believe you did --
23   in the savings plan for employees and partners of PwC?
24   A  Yes.

TIMOTHY D. LAURENT

Page 21

1   Q   Okay.  And -- But you didn't participate in the
2   savings plan for employees of PwC; is that correct?
3   A   I would have to check my records.
4   Q   Have you heard of the segregated 401-K plan?
5   A   Yes.
6   Q   Did you participate in the segregated 401-K
7   plan?
8   A   No.
9   Q   In this lawsuit you understand you've been
10  designated as a class representative?
11  A   Yes.
12  Q   And you're seeking to represent a class of other
13  participants in the PwC plans?
14  A   Correct.
15  Q   Are you seeking to represent participants who
16  participated in the segregated 401-K plan?
17  A   Everyone who had participated in all three
18  plans.
19  Q   Are you seeking to represent any partners who
20  participated in any of the PwC plans?
21  A   No.
22  Q   Are any of your family members participants in
23  cash balance plans?
24  A   Not that I'm aware of.

Page 22

1   Q   At all of these various positions that you've
2   had did you participate in any other 401-K or pension
3   plans?
4   A   No.
5   Q   Are the only -- Well, you participated in the
6   Coopers plans, right?
7   A   Yes.
8   Q   And you participated in PwC's plans?
9   A   (Nodding head.)
10  Q   Are those the only pension or 401-K plans you've
11  ever participated in?
12  A   No.
13  Q   Okay.  What other pension or 401-K plans have
14  you participated in?
15  A   Wordlink had one.  Comergent has one.
16  Q   And what kind of plan did Wordlink have?
17  A   Mostly mutual funds.
18  Q   Was it a 401-K plan?
19  A   Correct, it was a 401-K plan.
20  Q   And you participated in that plan?
21  A   Yes.
22  Q   And do you have any criticism of Wordlink's
23  401-K plan?
24  A   No.

Page 23

1   Q   Comergent, what kind of plans did they have?
2   A   401-K plan.
3   Q   No pension plan?
4   A   Not that I'm aware of.
5   Q   Okay.  And are you participating in that 401-K
6   plan?
7   A   Yes.
8   Q   Okay.  And do you have any criticism of
9   Comergent's 401-K plan?
10  A   No.
11  Q   And does Comergent's 401-K plan offer you a
12  range of investment funds that you can invest in or how
13  does it work?
14  MR. GOTTESDIENER:  Objection.  Go ahead.
15  THE WITNESS:  There's a predefined list of mutual
16  funds and other investment opportunities that they have
17  presented to me.
18  MR. SMITH:  Q   And about how many funds do they
19  allow you to choose from?
20  A   Perhaps a dozen or so.
21  Q   Is their 401-K plan similar to
22  Pricewaterhouse's?
23  MR. GOTTESDIENER:  Objection.
24  THE WITNESS:  No.

Page 24

1   MR. GOTTESDIENER:  Calls for a legal conclusion.
2   MR. SMITH:  Q   What are the differences?
3   A   They do not contribute.
4   Q   Okay.  Other than that, are there any
5   differences between Pricewaterhouse's and Wordlink's --
6   I mean Comergent's plan?
7   A   I believe Comergent's is legal and
8   Pricewaterhouse Cooper's is an illegal fund and plans.
9   Q   And on what basis is that conclusion based on?
10  A   The details of which you can find in the
11  complaint.
12  Q   And other than the details in the complaint, do
13  you have any other basis for concluding that PwC's plans
14  are illegal?
15  A   Just what is in the complaint.
16  Q   Now, on the Comergent plan, you'd agree that
17  PwC's plan was more generous than the Comergent plan in
18  that it allowed the employer to contribute to give you
19  money?
20  MR. GOTTESDIENER:  Objection.
21  THE WITNESS:  The Pricewaterhouse Cooper plan did
22  allow for contribution from a fund.
23  MR. SMITH:  Q   And the PricewaterhouseCoopers plan
24  insofar as it had employer contributions was more

TIMOTHY D. LAURENT

Page 25

1  generous than the Comergent plan?
2    MR. GOTTESDIENER: Objection.
3    THE WITNESS: They did have contributions.
4    MR. SMITH: Q  That's not my question. I'm asking,
5  isn't it true that the -- that the Pricewaterhouse plan
6  is more generous than the Comergent plan insofar as it
7  has employer contributions?
8    A  I don't know if I can qualify that as generous,
9  but, yes, it did contribute.
10    Q  You get more money under the Pricewaterhouse
11  plan than you would under the Comergent plan because of
12  their employer contributions, correct?
13    MR. GOTTESDIENER: Asked and answered.
14    THE WITNESS: Yes.
15    MR. SMITH: Q  Now, what kind of investment have
16  you chosen under the Comergent plan?
17    A  A fairly wide variety. Maybe an 80/20, 75/25
18  ratio of higher risk to lower risk.
19    Q  And by a higher risk do you mean stock-type
20  investments?
21    A  Stocks and equities, yes.
22    Q  And a lower risk, what would those be, what kind
23  of investments?
24    A  Bonds, for example.

Page 26

1    MR. SMITH: I'm going to mark as Exhibit 1 a set of
2  documents that have been produced to us, which have
3  Bates Nos. TDL1 through TDL171.
4    Is that what's in front of you?
5    (Document marked as Deposition
6    Exhibit 1 for identification.)
7    THE WITNESS: It appears so.
8    MR. SMITH: Q  Do you recognize those documents?
9    MR. GOTTESDIENER: Do you want him to look at each
10  one?
11    MR. SMITH: Q  You can flip through them if you
12  want.
13    A  I recognize the first document. Some of them
14  look familiar.
15    Q  Okay. Are there any that don't look familiar?
16    A  I'd have to take a closer look.
17    Q  Why don't you take a look and let me know if
18  there are any that don't look familiar to you.
19    MR. GOTTESDIENER: Well, I'm going to object. You
20  can ask him a question. The question is, you want him
21  to look through each one and tell you whether or not any
22  of the documents there don't look familiar to him?
23    MR. SMITH: That's my question.
24    MR. GOTTESDIENER: Okay. Well, then you need to go

Page 27

1  through and make sure that you can distinguish between
2  what looks familiar and what doesn't look familiar.
3    THE WITNESS: Page 1 and 2 look familiar.
4    MR. GOTTESDIENER: Just look through them and at the
5  end, when you're done, then you can tell us.
6    THE WITNESS: Okay. At one time or another I have
7  seen these documents.
8    MR. SMITH: Q  Okay. I mean, did you have those
9  documents in your possession at all times?
10    A  Yes.
11    Q  Okay. Are there any documents that are not in
12  that stack that you have or have ever had relating to
13  the PwC plans or Coopers plans?
14    A  I'm not aware I have currently any documents
15  that are not in this pile.
16    Q  Are there any documents that you've had in the
17  past that are not in that pile?
18    A  There may be perhaps.
19    Q  Can you identify any documents sitting here
20  today that you've had relating to the PwC plans or
21  Coopers plans that are not reflected in Exhibit 1?
22    A  I don't recall.
23    Q  Okay. Was PwC the only employer that ever
24  terminated you?

Page 28

1    A  I was laid off, yes.
2    Q  And that was the only employer that ever --
3    A  Correct, correct.
4    Q  -- did that?
5    Who did you discuss your termination with?
6    A  Family members, friends.
7    Q  And what are their names?
8    A  My family?
9    Q  Yes.
10    A  My father.
11    Q  And what's his name?
12    A  Fred Ray Laurent. My mother, Sharon Ann
13  Laurent. Brother, Mark Edward Laurent. Brother, Aaron
14  Jonathan Laurent.
15    Q  And who were your friends that you discussed
16  your termination with?
17    A  I imagine most of them.
18    Q  And can you give me the names of any of those
19  people?
20    A  Yes.
21    Q  And what are their names?
22    A  Mike McQuade.
23    Q  Anyone else?
24    A  Most of my friends.

TIMOTHY D. LAURENT

Page 29

1    Q  Are there any other names that you can give me?
2    A  Brian Chow.
3    Q  Anyone else?
4    A  Dave Forester.
5    Q  Anyone else?
6    A  Rob Walton.
7    THE REPORTER: I'm sorry?
8    THE WITNESS: Robert Walton.
9    MR. SMITH: Q  Anyone -- Are there any other
10   people -- Brian Chow and Dave Forester, are those the
11   people that worked at PwC?
12   A  At one point, yes, they did.
13   Q  Do either of them still work there?
14   A  I don't believe so.
15   Q  Okay. Are there any other people who worked at
16   PwC that you discussed your termination with?
17   A  Anyone currently at PwC?
18   Q  Or in the past.
19   A  Probably, yes.
20   Q  Who would those people be? Could you name them?
21   A  Bill Loumporidis.
22   Q  Anyone else?
23   A  I don't recall at this moment.
24   Q  Okay. Did you ever voice any objection that

Page 30

1    your termination was unfair?
2    A  I don't believe so.
3    Q  You've mentioned some of the people that you
4    worked with at PwC. Who did you work primarily with or
5    who would you have the most exposure to?
6    MR. GOTTESDIENER: Objection.
7    THE WITNESS: I worked for Bill Loumporidis at one
8    point.
9    MR. SMITH: Q  Anyone else who would be most
10   familiar with your work?
11   A  I worked for Sean Whithurst, W-H-I-T-H-U-R-S-T.
12   Q  Anyone else that would be most familiar with
13   your work?
14   A  Those are probably the two primary.
15   Q  Okay. You're not claiming, are you, that the
16   Coopers & Lybrand plans were illegal in any way?
17   A  It was my understanding that the plans are
18   illegal.
19   Q  The Coopers plans that you participated in --
20   A  I'm sorry, I'm mixing them up. Not Coopers &
21   Lybrand. PricewaterhouseCoopers however.
22   Q  Okay. So just to clarify, you're not claiming
23   that the Coopers & Lybrand plans were illegal in any
24   way?

Page 31

1    A  My understanding is they are not.
2    Q  And why weren't the Coopers & Lybrand plans
3    illegal?
4    MR. GOTTESDIENER: Objection, calls for a legal
5    conclusion.
6    THE WITNESS: I'm not an actuary. I have not
7    studied the plan in detail I do not believe.
8    MR. SMITH: Q  Okay. What's your basis for saying
9    they're not illegal?
10   MR. GOTTESDIENER: Objection, asked and answered.
11   THE WITNESS: I do not have the knowledge of past
12   experiences to check those.
13   MR. SMITH: Q  Okay. And what's your basis for
14   saying that the Comergent plan is not illegal?
15   MR. GOTTESDIENER: Comergent?
16   MR. SMITH: Q  Yes, Comergent.
17   A  I have not studied their plan.
18   Q  All right. You're not a current employee of
19   PwC, correct?
20   A  Correct.
21   Q  And you're not currently a participant in any
22   PwC plans?
23   MR. GOTTESDIENER: Objection, calls for a legal
24   conclusion.

Page 32

1    THE WITNESS: I left money on the table when I got
2    my distribution, so I believe I am a participant.
3    MR. SMITH: Q  You believe that you're a current
4    participant right now?
5    A  Correct.
6    Q  And just explain a little bit more what is your
7    belief?
8    MR. GOTTESDIENER: Objection. Go ahead.
9    THE WITNESS: When I received my distribution, I
10   left money on the table.
11   MR. SMITH: Q  And what do you mean by that?
12   A  The legal calculations of the defined benefit
13   plan allowed for a much larger annuity or accrued
14   annuity, if you will. I only received the account
15   balance, which is not was owed to me.
16   Q  When is the last time you got a statement from
17   PwC regarding any of its plans?
18   A  I believe the last statement was the
19   distribution statement.
20   Q  And does PwC view you as a current participant
21   in their plans?
22   MR. GOTTESDIENER: Objection, calls for speculation.
23   THE WITNESS: I do not know.
24   MR. SMITH: Q  Have you ever received any

TIMOTHY D. LAURENT

Page 33

1  communication from PwC since you received your
2  distribution saying you're a current participant in
3  their plans?
4      A  No.
5      Q  You're not currently receiving any benefits
6  under PwC plans, are you?
7      A  Only what I've left on the table.
8      Q  I mean, you haven't received any payments from
9  PwC since your lump sum distribution, have you?
10     A  Correct.
11     Q  Do you know if the way in which benefits are
12  calculated under the PwC plans has changed since you
13  were terminated by PwC?
14     A  I'm unaware if they've changed since I left.  I
15  assume they're still illegal.
16     Q  And what's that assumption based on?
17     MR. GOTTESDIENER:  Asked and answered.  Go ahead.
18     THE WITNESS:  The unlawful calculation of the
19  pension fund when I was there.  I've not received notice
20  that they have changed that.
21     MR. SMITH:  Q  Okay.  And where did you get
22  information that anything -- any calculation of benefits
23  under the PwC plans was unlawful?
24     A  I've done some research.

Page 34

1      Q  When was the first time you concluded that PwC's
2  plans were unlawful?
3      A  I'd have to refer to my counsel for that answer.
4      Q  You can't tell me what the date was?
5      A  I do not know the date.
6      Q  Was it this year or last year?  Can you give me
7  the year?
8      MR. GOTTESDIENER:  Of what?  The year of what?
9      MR. SMITH:  Q  The year -- Can you give me the year
10  in which you first determined that PwC's plans were
11  unlawful?
12     A  Under the complaint that was in June of 2005, it
13  states it quite clearly there.  If --
14     Q  Before filing your complaint --
15     MR. GOTTESDIENER:  You're not letting him finish his
16  answer.
17     MR. SMITH:  Q  Do you have anything to add?
18     MR. GOTTESDIENER:  Add?  You caught him in
19  mid-sentence.
20     MR. SMITH:  Q  Well, that's why I'm asking him if he
21  has anything to add.  Do you have anything to add to
22  your answer?
23     MR. GOTTESDIENER:  I object.  Ask him a new
24  question.

Page 35

1      MR. SMITH:  Q  First I want to know if the witness
2  has anything to add to his answer.
3      A  I had an understanding before the document was
4  submitted to the court system as per discussions with
5  counsel.
6      Q  While you were working at PwC did you believe
7  any of their plans were unlawful?
8      A  They did not notify me that it was unlawful.
9      Q  But whether or not they notified you, did you
10  believe at the time you were working at PwC that their
11  plans were unlawful?
12     A  At that time, no.
13     Q  Okay.  Did you first determine that PwC's plans
14  were unlawful before or after you met Mr. Gottesdiener,
15  your lawyer?
16     A  I had an idea before.  It was confirmed after.
17     Q  And how did you get the idea that the PwC plans
18  were unlawful before you met Mr. Gottesdiener?
19     A  Watching CNN.
20     Q  What specifically did you see on CNN?
21     A  There was an Enron scandal at that point.
22     Q  And what did Enron have to do with the PwC that
23  made you think that --
24     A  It was based on mutual funds and it got me

Page 36

1  thinking.
2      Q  Okay.  And what were you thinking based on
3  seeing the Enron thing?
4      A  That possibly the mutual funds at
5  PricewaterhouseCoopers were also mismanaged or illegal.
6      Q  Okay.  And when did you see that CNN show?
7      A  I believe it was 2003.
8      Q  And when you saw the CNN show in 2003 and began
9  to suspect that the plans were illegal --
10     MR. GOTTESDIENER:  Objection.
11     MR. SMITH:  Q  -- did you do anything to contact
12  any lawyers about that?
13     A  Did some research on the Web.
14     Q  What kind of research?
15     A  Just general research of mutual funds.  I saw
16  Mr. Gottesdiener on CNN, checked out his website.
17     Q  You mentioned that it's your position that
18  you're a current participant in PwC's plans, correct?
19     A  Correct.
20     Q  Are you seeking to represent any former
21  participants in PwC's plans?
22     A  All of them.
23     Q  Okay.  Are you seeking to represent -- You're no
24  longer an employee of PwC, right?

TIMOTHY D. LAURENT

Page 37

1    A  Correct.
2    MR. GOTTESDIENER: Asked and answered.
3    MR. SMITH: Q  And there are participants in PwC's
4  plans who are still working at PwC, right?
5    A  That is my understanding.
6    Q  Are you seeking to represent the people who are
7  participants who are still working at PwC?
8    A  I seek to have represent -- to represent all
9  participants since June of '94.
10    Q  And so that would include any of the people that
11  are participating currently?
12    A  Correct.
13    Q  And who are currently employed by PwC?
14    MR. GOTTESDIENER: Asked and answered. Go ahead.
15    THE WITNESS: Yes.
16    MR. SMITH: Q  All right. Do you know who
17  developed the RBAP plan?
18    A  I do not know their names.
19    Q  Do you know when it was developed?
20    A  I believe it was prior to June of '94.
21    Q  But other than that, do you know the specific
22  date or when it came into existence?
23    A  I'm not aware of that date.
24    Q  Do you know who developed the 401-K plan that

Page 38

1  you participated in?
2    A  I'm not aware of who did that.
3    Q  Do you know anything about how it came about
4  that the PwC plans you participated in were designed the
5  way they were?
6    MR. GOTTESDIENER: Keep what I've told you separate.
7    MR. SMITH: Is that an instruction not to answer?
8  You can't instruct the witness how to answer the
9  question. Are you telling him not to answer it?
10    MR. GOTTESDIENER: No.
11    MR. SMITH: Q  Including everything that
12  Mr. Gottesdiener has communicated to you, the facts he
13  has told you, do you understand -- have any
14  understanding about why the RBAP or the other PwC plan
15  that you participated in were designed?
16    MR. GOTTESDIENER: That's a yes or no.
17    MR. SMITH: Listen, you can't tell him how to answer
18  the question, Eli. What basis do you have for telling
19  him what answer to give to the question?
20    MR. GOTTESDIENER: Because you just included me and
21  you just included our discussions, and I don't want him
22  to start giving answers that disclose our discussion.
23    MR. SMITH: Okay. So you're directing him not to
24  answer about any facts you may have provided him?

Page 39

1    MR. GOTTESDIENER: No, I'm not. You haven't
2  listened to what I said.
3    MR. SMITH: Q  Okay. What facts has
4  Mr. Gottesdiener provided you regarding your lawsuit?
5    MR. GOTTESDIENER: Do not answer that question.
6    MR. SMITH: What's your basis for telling him not to
7  answer that question?
8    MR. GOTTESDIENER: The basis is that the facts that
9  this witness knows from me, the way you've asked the
10  question, are necessarily going to reflect back in his
11  answer my legal advice and the facts and information
12  that he has provided me. Therefore, my objection is
13  based on the attorney-client privilege and the attorney
14  work product privilege. You can attain the witness'
15  knowledge without singling out me and our discussions.
16    MR. SMITH: Are you directing him not to answer
17  questions about facts you have -- or to tell me what
18  facts you have provided him regarding this case?
19    MR. GOTTESDIENER: Mr. Smith, I have given you my
20  answer to your previous question.
21    MR. SMITH: Q  Okay. Mr. Laurent, has
22  Mr. Gottesdiener provided you facts regarding this case?
23  I'm just asking for a yes or no answer on that.
24    A  Yes.

Page 40

1    Q  Okay. And how many discussions has
2  Mr. Gottesdiener had with you in which he has provided
3  you facts regarding this case?
4    A  I don't recall the exact number.
5    Q  Would it be more than ten?
6    A  I don't believe so.
7    Q  Would it be more than five?
8    A  Perhaps.
9    Q  Okay. Now, what were the specific facts that
10  Mr. Gottesdiener communicated to you regarding this
11  case?
12    MR. GOTTESDIENER: Don't answer that.
13    MR. SMITH: Okay. What's the basis for your
14  objection -- I mean your instruction not to answer?
15    MR. GOTTESDIENER: I'll refer you back to what I
16  said previously. When you talk about this case, you're
17  talking about all of the details of this case.
18    MR. SMITH: That's an inappropriate assertion of
19  privilege. I'd refer you to in re Seal case, and the
20  D.C. Circuit has said that facts communicated by the
21  lawyer to the client are not privileged. We may have to
22  reopen the deposition at a later time and seek costs and
23  fees to do so.
24    MR. GOTTESDIENER: Correct. Your problem with your

TIMOTHY D. LAURENT

Page 41

1   question is you say this case. That includes my
2   discussions with him about his deposition, the
3   procedures, advice to him. It is completely unrelated
4   to facts about the plans. If you want to ask him about
5   the plans, you can correct your inappropriate question.
6       MR. SMITH: Q Okay. What facts about the plans
7   has Mr. Gottesdiener communicated to you?
8       MR. GOTTESDIENER: That, you can answer.
9       THE WITNESS: The facts are contained within the
10  11-count complaint.
11      MR. SMITH: Q And has Mr. Gottesdiener
12  communicated to you any other facts about the plans
13  other than what's reflected in the complaint?
14      A Not to my understanding.
15      Q Okay. Are you aware of the IRS or any other
16  government regulator ever saying there is anything
17  illegal about any of PwC's plans?
18      A At this moment, I don't know.
19      Q You can't identify any such statement?
20      MR. GOTTESDIENER: Objection, asked and answered.
21      THE WITNESS: At this moment, at this table, I'm not
22  aware of any.
23      MR. SMITH: Q You're not claiming, are you, that
24  the IRS or government regulators have made any errors in

Page 42

1   reviewing PwC's plans, are you?
2       MR. GOTTESDIENER: Objection.
3       THE WITNESS: I'm not an expert in actuarial
4   sciences and, thus, I'm not claiming that.
5       MR. SMITH: Q Okay. Are you claiming that PwC
6   misled the IRS or any other government regulators
7   regarding its plans?
8       MR. GOTTESDIENER: Objection.
9       THE WITNESS: The plan is unlawful to my knowledge.
10  I do not know that they led or misled any government
11  body.
12      MR. SMITH: Q Okay. Other than your lawyer,
13  Mr. Gottesdiener, can you identify anyone who has said
14  that there is anything wrong or illegal with PwC's
15  plans?
16      A I'm not aware of anybody.
17      Q You're not aware of any current or former PwC
18  employees who think there's anything wrong or illegal
19  with PwC's plans?
20      A At this moment, I'm not aware of any.
21      Q Do you have any understanding of what a cash
22  balance plan is?
23      A Yes.
24      Q And what's your understanding?

Page 43

1       A It's a type of defined benefit.
2       Q And are you claiming that there's anything wrong
3   or illegal about cash balance plans per se?
4       A Per se? I don't know that --
5       Q Why don't I rephrase my question then. Are you
6   claiming that there's anything wrong or illegal with
7   cash balance plans in general?
8       A They seem to be a hybrid between a cash balance
9   and a -- excuse me, a defined contribution, a defined
10  balance plan, and the ERISA law, as I understand it, is
11  fairly black and white about the definition of defined
12  contribution and a defined benefit. Also, my
13  understanding is a cash balance plan tends to be a
14  hybrid of those two.
15      Q Do you believe that all cash balance plans are
16  illegal?
17      MR. GOTTESDIENER: Objection.
18      THE WITNESS: If they're a hybrid, then yes.
19      MR. SMITH: Q Can you tell me what you think is
20  wrong or illegal with the RBAP?
21      A There are 11 counts in the complaint. It
22  details out very nicely what is unlawful about the RBAP
23  and 401-K plans.
24      Q And before you met Mr. Gottesdiener did you have

Page 44

1   any specific things in either the RBAP or the 401-K plan
2   that you thought were illegal?
3       A I believe that the 401-K was mismanaged.
4       Q And what do you mean by that?
5       A The mutual funds had all included to be at
6   retail rates, as well as being chosen by the governing
7   body.
8       Q Okay. And was that a conclusion you reached
9   before or after you met Mr. Gottesdiener?
10      A Before.
11      Q And why -- What do you think is unlawful about
12  having mutual funds in the 401-K plan?
13      MR. GOTTESDIENER: Objection.
14      THE WITNESS: My understanding is PwC had a large
15  amount of money, perhaps billions of dollars. It is
16  silly to have mutual funds when they, themselves, could
17  be investing directly. They've wasted millions of
18  dollars on fees.
19      MR. SMITH: Q Well, does Comergent have mutual
20  funds in its 401-K plan?
21      A I believe so.
22      Q And do you believe that Comergent's 401-K plans
23  are illegal because they offer mutual funds in their
24  401-K plan?

TIMOTHY D. LAURENT

Page 45

1    A   My understanding is it's a much smaller firm.
2    They don't have the cash available to do such things,
3    nor do they have people on staff, intelligence to make
4    these types of decisions.
5        Q   So do you believe that their -- Comergent's
6    having mutual funds in their 401-K plans is illegal?
7    A   No.
8        Q   Do you believe that all large companies that
9    offer mutual funds in their 401-K plans have illegal
10   401-K plans?
11   A   No.
12       Q   Why is that?
13   A   PwC had an expertise.  Not all companies have an
14   expertise.
15       Q   Okay.  Do you agree that all companies that have
16   financial expertise that are large companies that offer
17   mutual funds in their 401-K plans have illegal 401-K
18   plans?
19   A   If they've broken their fiduciary
20   responsibilities, yes.
21       Q   Okay.  Can you tell me here today, aside -- I
22   know you've pointed to the complaint, but can you
23   explain for me what exactly is illegal with the RBAP?
24   MR. GOTTESDIENER:  Objection, asked and answered.

Page 46

1    THE WITNESS:  There are several general areas that I
2    believe are unlawful.
3    MR. SMITH:  Q   And what are those?
4    A   One of them is the phony retirement age or how
5    they say retirement duration of five years.
6        Q   And what -- Why is that illegal?
7    A   A normal retirement age generally is known by
8    most as 65.
9        Q   And what law does that violate?
10   A   I believe it is in the ERISA law.
11       Q   Okay.  And what's your basis for that belief?
12   A   It may also be under tax law.
13       Q   What's your basis for that belief?
14   A   My details of the -- in the complaint.
15       Q   Are you relying on the complaint that
16   Mr. Gottesdiener drafted for you for your conclusion
17   that PwC's plans are unlawful?
18   MR. GOTTESDIENER:  Objection.  Go ahead.
19   THE WITNESS:  I've read the plans.  It seems
20   logical.  He's a smart guy.  He's been on very
21   compulsive discussions.  I've not seen anything from PwC
22   that comes close to that.
23   MR. SMITH:  Q   Okay.  What do you want changed in
24   the RBAP?

Page 47

1    A   I'd like the plan legalized.
2        Q   And what specifically would make it legalized?
3    A   There are 10 counts, and I can refer you to
4    those 10 counts.
5        Q   I'm asking you, sitting here today, can you tell
6    me --
7    MR. GOTTESDIENER:  Objection.  He wasn't finished
8    with his answer.
9    MR. SMITH:  Q   I'm asking you, sitting here today,
10   can you tell me what exactly you want changed in the
11   RBAP?
12   MR. GOTTESDIENER:  If you know.
13   THE WITNESS:  Basically I would like it legalized by
14   not breaking the rules of the reseller tax law.
15   MR. SMITH:  Q   And what amendments need to be made
16   in your view to make the plan legal?
17   MR. GOTTESDIENER:  Objection, mischaracterizes his
18   testimony.
19   THE WITNESS:  As I said, there are several different
20   areas.  One being the phony retirement age.  I'd like
21   that fixed.  There's also a disproportionate amount of
22   money that the partners receive as compared to the call
23   it rank and file normal PwC employees.
24   MR. SMITH:  Q   And how would you like the

Page 48

1    retirement age fixed?
2    A   Standard number.
3        Q   And what would that be?
4    A   My understanding, not being a lawyer, is
5    probably 65.  Could be more, could be less.
6        Q   And how do you want this problem about partners
7    getting more money fixed?
8    A   I'd have to refer you to counsel for the answer
9    to that.
10       Q   You don't know how that would be fixed sitting
11   here today?
12   A   A judge will have to make that call.
13       Q   But do you know?
14   MR. GOTTESDIENER:  Asked and answered.
15   MR. SMITH:  Q   Do you know how you would fix the
16   plan to make partners get less and employees get more?
17   MR. GOTTESDIENER:  Asked and answered.
18   THE WITNESS:  I don't know that they would get less
19   or more.  A judge will have to make the call on how it
20   gets calculated.
21   MR. SMITH:  Q   But you don't have any
22   recommendations sitting here today on --
23   A   Sitting here today, as I've said, I do not --
24   I'll have to refer back to my testimony a moment ago.

TIMOTHY D. LAURENT

Page 49

1   Q   Okay. Do you want the RBAP to be terminated?
2   A   No.
3   Q   Okay. And why is that?
4   A   I just want it made lawful.
5   Q   Why don't you want it terminated though?
6   A   It's not a bad plan if it were lawful.
7   Q   When you first started in the RBAP, did you
8   think that it was a good plan?
9   A   Yes.
10  Q   And when you first started in the 401-K plan,
11  did you think it was a good plan?
12  A   Yes.
13  Q   Did you ever voice any concerns about the PwC
14  plans you were participating in while you were at PwC?
15  A   While I was at PwC, no.
16  Q   Was the first time that you voiced concerns
17  about the PwC plans after you saw the CNN show in 2003?
18  A   Yes.
19  Q   Are there any benefits of the RBAP that you're
20  aware of?
21      MR. GOTTESDIENER: Object.
22      THE WITNESS: The employer does contribute money.
23  That's a benefit.
24      MR. SMITH: Q   Anything else?

Page 50

1   A   It seems like a reasonable plan if it were
2   legal.
3   Q   Is one of the benefits the fact that you defer
4   taxes under the RBAP?
5   A   That would be a benefit.
6   Q   Okay. Is the menu of investment options that
7   you're given a benefit of the RBAP?
8   A   A predefined list makes it interesting.
9   Q   Would that be a benefit?
10  A   It could be if the calculations were correct.
11  Q   And is the fact that you can choose to earn
12  higher returns if you pick more aggressive investments a
13  benefit under the RBAP?
14  A   The way the defined benefit plan works, there's
15  a formula, and things are based on that formula.
16  Q   I'm just asking about -- Well, you have the
17  option to choose investment measures that could be stock
18  funds or bond funds under the RBAP. You're familiar
19  with that, right?
20  A   Correct.
21  Q   And some of the investment measures have higher
22  risk associated with them and some lower risk; is that
23  correct?
24  A   The hypothetical use of stocks and -- or bonds,

Page 51

1   I do understand that exists.
2   Q   And is it a benefit of the RBAP that you can
3   invest in higher risk investments so that you can get a
4   greater return on your money in the RBAP?
5   A   Hypothetical investment, yes.
6   Q   Okay. Is another benefit of the RBAP the fact
7   that the benefits are portable, that you could take a
8   lump sum distribution from the plan?
9   A   One of the options is a lump sum, yes.
10  Q   And would you consider that a benefit of the
11  RBAP?
12  A   I don't see it as a benefit or not. It's a fact
13  of the plan.
14  Q   Some plans you might not be able to have those
15  options though, do you agree with that?
16  A   I agree that it is possible that a plan may not
17  have the option to take a lump sum out.
18  Q   And you view the fact that you can take a lump
19  sum and take it to someplace else, is that a benefit of
20  the RBAP?
21  A   Yes.
22  Q   Did you ever discuss any of the PwC plans with
23  any employees of PwC while you were working there?
24  A   No, it was pretty secret.

Page 52

1   Q   You were secret or -- I didn't quite hear. It
2   was secret?
3   A   These discussions of your investments was no one
4   else's business.
5   Q   Okay. So you never discussed any of the plans
6   with any of the other employees of PwC?
7   A   Not that I'm aware of.
8   Q   And did you ever discuss any of PwC's plans with
9   any of the people who are in human resources or
10  responsible for benefits at PwC?
11  A   I don't recall.
12  Q   All right. Are there any other employees or
13  former employees that you've talked with since you left
14  PwC about PwC's plans?
15  A   Not that I'm aware of.
16  Q   Okay. While you were at PwC you never heard
17  anyone say that PwC's plans were not beneficial or were
18  illegal, did you?
19  A   I don't recall anyone saying it was illegal.
20  Q   And did you recall anyone saying while you were
21  at PwC that the plans were not beneficial to employees?
22  A   I don't believe I heard that.
23  Q   Since you left PwC have you heard anything from
24  any current or former employees saying that the plans

TIMOTHY D. LAURENT

Page 53

1  were illegal or not beneficial?
2      A   No.
3      Q   Have you discussed your lawsuit and the relief
4  you're seeking in your complaint with any of the current
5  employees of PwC to see if they agree with the changes
6  that you're proposing in the complaint of PwC's plans?
7      A   No.
8      MR. GOTTESDIENER: Objection.
9      MR. SMITH: Q   How did you -- What was your
10  understanding of how the RBAP worked when you first
11  started, you know, participating in the plan?
12      A   At that time I understood it to be a pension
13  plan.
14      Q   Okay.  And what -- Did you have any further
15  understanding?
16      A   No.
17      Q   Okay.  And when you say you understood it to be
18  a pension plan, what do you mean by that?
19      A   I understood it to be a typical defined benefit
20  plan where there was a hypothetical amount of money that
21  was calculated via a formula.
22      Q   And when you say a hypothetical amount of money,
23  what do you mean by that?
24      A   The account balance is hypothetical.

Page 54

1      Q   And why do you say it's hypothetical?
2      A   For a true legal defined benefit plan, the money
3  must be taken out to retirement age.
4      Q   So when you --
5      A   Accrued.
6      Q   When you started investing in the RBAP, did you
7  understand that you were selecting investment measures
8  and that those would be used to value your account
9  balance, but you weren't actually investing in the
10  funds?
11      MR. GOTTESDIENER: Objection, states a fact not in
12  evidence.
13      THE WITNESS: I did not understand that.
14      MR. SMITH: Q   Okay.  And why -- What was your
15  understanding of the investment measures?
16      MR. GOTTESDIENER: Objection.
17      THE WITNESS: I'll refer you to my last answer.  I
18  did not understand it.
19      MR. SMITH: Q   I mean, did you --
20      A   At that time.
21      Q   Did you ask anybody about investment measures to
22  try to get an understanding of how the plan worked?
23      A   It didn't seem important at the time.
24      Q   How did you choose the investment measures that

Page 55

1  you chose for the RBAP?
2      MR. GOTTESDIENER: Objection, states a fact not in
3  evidence.
4      THE WITNESS: I don't believe I selected.
5      MR. SMITH: Q   Oh, okay.  Did you just go with a
6  default investment measure under the RBAP?
7      MR. GOTTESDIENER: Same objection.
8      THE WITNESS: I didn't purposefully take the
9  default.  I was unaware that I could make a selection at
10  that time.
11      MR. SMITH: Q   Okay.  There would be participants
12  though that would be aware that you could select from
13  the investment measures; is that your understanding?
14      MR. GOTTESDIENER: Objection.  Go ahead.
15      THE WITNESS: Perhaps.
16      MR. SMITH: Q   And there would be participants who
17  actually did select different investment measures from
18  the options available?
19      MR. GOTTESDIENER: Calls for speculation.  Go ahead.
20      THE WITNESS: Probably.
21      MR. SMITH: Q   Are you seeking to represent
22  participants who chose different investment measures
23  than you did under the RBAP?
24      A   I'm seeking to represent everyone who

Page 56

1  participated in the plans.
2      Q   And so that would include people who chose
3  different investment measures?
4      A   Correct.
5      Q   And would -- Are you also seeking to represent
6  people who varied the types of investment measures that
7  they chose in the RBAP over time?
8      A   Changing your investment doesn't affect the
9  unlawfulness of all the accounts involved.
10      Q   Well, I know that's your position.  My
11  question's just whether --
12      MR. GOTTESDIENER: Just answer his questions.
13      MR. SMITH: Q   -- you're going to seek to represent
14  those people in your lawsuit who have changed their
15  investment measures over time.
16      A   Yes, I seek to represent them.
17      Q   Okay.
18      MR. GOTTESDIENER: Is this a good time for a break
19  maybe?
20      MR. SMITH: Yes, maybe.  I mean, he's got ten
21  minutes on the video.  Why don't I ask a few more
22  questions and then we'll change the video and take a
23  break.  Is that okay?
24      MR. GOTTESDIENER: That's fine with us.

TIMOTHY D. LAURENT

Page 57

1    MR. SMITH: Q   Okay. When did you start
2  participating in the Coopers & Lybrand plan?
3    MR. GOTTESDIENER: Objection. Which plan?
4    MR. SMITH: Q   Either the -- Did you participate in
5  more than one Coopers & Lybrand plan?
6    A  I believe there were two plans.
7    Q  Okay. And which Coopers & Lybrand plans did you
8  participate in?
9    A  I believe there was a 401-K plan, as well as a
10  typical defined benefit plan.
11    Q  And when did you start participating in the two
12  Coopers & Lybrand plans?
13    A  I don't recall the exact date.
14    Q  Okay. Would it have been around December 1995?
15    A  It could very well be.
16    Q  Okay. And did you start participating in the
17  two Coopers & Lybrand plans at the same time?
18    A  To my knowledge, yes.
19    Q  What was your understanding of how the pension
20  plan -- the Coopers & Lybrand pension plan worked?
21    MR. GOTTESDIENER: Then, at the beginning of his
22  participation?
23    MR. SMITH: Q   Yes, at the beginning of your
24  participation.

Page 58

1    A  My understanding is it was a typical pension
2  plan, an annuity plan.
3    Q  And what -- How were benefits calculated under
4  the Coopers & Lybrand pension plan?
5    A  I do not know the specifics of the formula. It
6  was a typical defined benefit plan.
7    Q  Can you tell me how the Coopers & Lybrand
8  pension plan differed, if at all, from the RBAP?
9    MR. GOTTESDIENER: You're asking for his knowledge
10  now?
11    MR. SMITH: Q   I would first -- Why don't I ask you
12  this question first. When there was a transition to the
13  RBAP, did you have any understanding of -- about whether
14  there were differences between the Coopers & Lybrand
15  pension plan and the RBAP?
16    A  At that time, no.
17    Q  Okay. Since that time do you have any
18  understanding about whether there are differences
19  between the RBAP and the Coopers & Lybrand pension plan?
20    A  One difference is the phony retirement date on
21  the RBAP plan.
22    Q  Do you know what the retirement date was on the
23  Coopers & Lybrand plan?
24    A  My understanding is it was a typical retirement

Page 59

1  age.
2    Q  Do you know what it was?
3    A  I do not know.
4    Q  So sitting here today --
5    A  Sitting here today, I do not know.
6    Q  Were there any other differences you're aware of
7  between the Coopers & Lybrand pension plan and the RBAP?
8    A  At that time, no.
9    Q  Sitting here today, though, are you aware of any
10  other differences between the Coopers & Lybrand plan and
11  the RBAP?
12    A  There are similar accounts in that complaint
13  that cover more than the bogus retirement age. So, yes.
14    Q  But can you tell me what they are sitting here
15  today, the differences, or you would have to look back
16  at the complaint?
17    A  Sitting here, right here, at this moment, I do
18  not remember.
19    Q  Okay. Did you have any role in drafting the
20  complaint in this case?
21    MR. GOTTESDIENER: I'm going to object to that.
22  Give me a second.
23    MR. SMITH: I just want a yes or no.
24    MR. GOTTESDIENER: Okay.

Page 60

1    MR. SMITH: I don't want to get into what it was.
2    MR. GOTTESDIENER: Okay. Then go ahead, give him a
3  yes or no to that.
4    THE WITNESS: I'm sorry, repeat the question please.
5    MR. SMITH: Q   Did you have any role in drafting
6  the complaint in this case?
7    A  A role in drafting -- I do not understand the
8  question.
9    Q  Did you have a role in writing the complaint
10  that was filed in this case?
11    A  I did not write the complaint.
12    Q  Did you review the complaint before it was
13  filed?
14    MR. GOTTESDIENER: Again, you're asking for a yes or
15  no?
16    MR. SMITH: Q   Yes, just a yes or no.
17    A  No.
18    Q  Okay. And when was --
19    A  I might have. I don't recall. I saw some
20  documents. I'm sorry, I don't remember.
21    Q  Right sitting here today, though, you can't
22  recall reviewing the complaint before it was filed?
23    A  That's correct.
24    Q  And did you -- I mean, is there a time

Page 61

1  subsequent to the filing where you recall seeing the
2  complaint? Have you reviewed it before your deposition
3  today?
4      A  I reviewed the current complaint, absolutely.
5      Q  Okay. Do you recall if you reviewed any
6  complaint that was filed in the Illinois case?
7      A  I did review that complaint.
8      Q  Okay. Did you review it before it was filed?
9      A  I don't recall.
10     MR. SMITH: Okay. And maybe this is a good time for
11 a break if you want to switch the video.
12     THE VIDEOGRAPHER: All right. This will now
13 conclude videotape No. 1. We are now going off the
14 record at 10:53 a.m.
15     (Recess was taken.)
16     THE VIDEOGRAPHER: We are now back on the video
17 record and the time is 11:13 a.m. This is videotape No.
18 2 of the deposition of Timothy D. Laurent taking place
19 on November 3rd in the year 2005. Counsel.
20     MR. SMITH: Q  And is it true that under the
21 Coopers pension plan your benefit depended on the length
22 of service you have with the company?
23     A  I believe that's true.
24     Q  Okay. And did you understand that when you were

Page 62

1  at Coopers & Lybrand?
2      A  The amount of the benefit depends on your length
3  of stay.
4      Q  Yes.
5      A  It also depends on the retirement age, yes.
6      Q  Yes. Now, did you take a loan against your
7  401-K plan at Coopers & Lybrand?
8      A  I believe I did.
9      Q  And why did you do that?
10     A  I don't recall.
11     Q  Okay. Do you recall what you did with the
12 money?
13     A  I don't remember what I did with the money.
14     Q  And did you continue to have that loan pending
15 against the PwC 401-K plan?
16     A  I believe I was making payments back to it.
17     Q  And did you finish making payments before you
18 terminated at PwC?
19     A  I don't think so.
20     Q  Okay. Are you seeking to represent participants
21 who didn't take loans out against their 401-K plan in
22 this lawsuit?
23     A  Every participant, yes.
24     Q  Did you tell anyone, including the people you

Page 63

1  mentioned today, that you were upset, depressed or angry
2  after your termination from PwC?
3      MR. GOTTESDIENER: I think that's been asked and
4  answered, but go ahead.
5      THE WITNESS: I believe I might have shared with
6  them some feelings.
7      MR. SMITH: Q  And what feelings did you share with
8  them?
9      A  I shared that I was a little disappointed.
10     Q  Okay. Did you ever tell anyone that you were
11 angry at PwC?
12     A  I'm not aware that I did.
13     Q  Did you ever tell anyone that you were angry at
14 anyone that worked at PwC?
15     A  I'm not aware that I did.
16     Q  And did you ever tell anyone that you were
17 depressed after your termination?
18     A  I was not depressed.
19     Q  Okay. There are participants who never enrolled
20 in any -- or participated in the Coopers & Lybrand plans
21 but did participate in PwC plans, you understand that?
22     A  Yes.
23     Q  Are you seeking to represent participants who
24 never -- in the PwC plans who never participated in the

Page 64

1  Coopers & Lybrand plans?
2      A  I'm seeking to have anyone who participated in
3  the PwC plan.
4      Q  And so that would include the people who were
5  former participants in the Coopers & Lybrand plans?
6      A  Correct, if they participated in the PwC plan.
7      Q  And it would also include people who weren't
8  former participants in the Coopers & Lybrand plan?
9      A  New hires, for example.
10     Q  And you want to represent them too?
11     A  Correct.
12     Q  How about -- Are you aware whether there are
13 other plans that as a result of the merger or other
14 circumstances some of the PwC plan participants may have
15 participated in before the PwC plan?
16     MR. GOTTESDIENER: Objection.
17     THE WITNESS: I'm aware of just the three plans of
18 PwC.
19     MR. SMITH: Q  But just like Coopers & Lybrand, do
20 you know whether there are other companies that may have
21 merged in and had plans where there was a former plan
22 and then participants switched over to the PwC plans?
23     A  I'm not aware of any mergers at PwC after.
24     Q  If there were people who were participants in

TIMOTHY D. LAURENT

Page 65

1  PwC plans who had previously participated in another
2  company's plan, would you seek to represent them in this
3  lawsuit as well?
4      MR. GOTTESDIENER: Asked and answered.
5      THE WITNESS: Yes.
6      MR. SMITH: Q  Do you recall what your lump sum
7  distributions were from the PwC plans?
8      A  My recollection is that RBAP was 20 some
9  thousand and that the 401-K was 50 something thousand.
10     Q  Okay.  And I think I asked you about the
11 specific dates you start and stopped in the plans, and
12 I'm not sure whether you gave me a specific date or not.
13     Do you recollect what the specific dates were
14 that you began and finished participating in the PwC
15 plans?
16     A  I do not remember the start dates.  However, I
17 am still a participant of the plan, so I have not not
18 participated.
19     Q  And are you claiming that you're still a
20 participant in the 401-K plan?
21     A  Yes, I'm a participant.
22     Q  And what's your basis for saying that?
23     A  I left money on the table when I received my
24 lump sum.

Page 66

1      Q  What money did you leave on the table from the
2  401-K plan?
3      A  Due to unlawful calculations, I received only
4  the hypothetical account balance.
5      Q  Well, you understand that there was an actual
6  account plan balance in the 401-K plan, right?
7      A  In the 401-K, yes, they defined contribution.
8      Q  Yes.  And so I'm just wondering what was the
9  money that you're claiming from the 401-K plan?
10     A  Mismanaged funds.
11     Q  And what were the mismanaged funds?
12     A  As I stated previous --
13     MR. GOTTESDIENER: Asked and answered.  Go ahead.
14 I'm sorry.
15     THE WITNESS: As I stated previously.
16     MR. SMITH: Q  And what were they?
17     A  I said previously that the funds were
18 mismanaged.  PwC had the wherewithal.
19     Q  And can you give me a dollar amount of the money
20 you're owed from the RBAP?
21     A  I cannot.
22     Q  Can you tell me a dollar amount of the money
23 you're owed from the 401-K plan?
24     A  I cannot.

Page 67

1      Q  Can you tell me the dollar amount that any
2  former or current participant is owed from the -- either
3  the PwC -- any of the three PwC plans?
4      A  My understanding is it will be up to the judge.
5      Q  But you can't tell me a specific dollar amount
6  any participant is owed under any of the PwC plans?
7      A  I don't have a specific number.
8      Q  Okay.  On the dates though, you do recall that
9  at least generally your participation in both plans
10 began in 1999, is that correct, of the PwC plans?
11     A  That sounds correct.
12     Q  What was your understanding about how the 401-K
13 plan worked when you started participating in it?
14     A  My understanding, it was a typical defined
15 contribution plan.
16     Q  And did you -- You selected the investments that
17 you put your money into in the 401-K plan?
18     A  I selected the investments where the -- from the
19 predefined list of opportunities.
20     Q  And did you research those investments before
21 you selected them in the 401-K plan?
22     A  I believe that I made a research, yes.
23     Q  Okay.  And did you ever voice any objection
24 while you were at PwC to the options you were given

Page 68

1  under the 401-K plan for investments?
2      A  No.
3      Q  Did you ever claim while you were at PwC that
4  the fees charged by any of the funds available under the
5  401-K plan were too high?
6      A  No.
7      Q  Can you identify any fund sitting here today
8  that you believe that PwC should have included in the
9  401-K plan that it didn't?
10     A  I cannot name a specific fund.
11     Q  Can you name any fund that PwC should have
12 included as an investment measure under the RBAP that it
13 didn't?
14     MR. GOTTESDIENER: Also sitting here today?
15     MR. SMITH: Q  Sitting here today.
16     A  I cannot name a specific fund sitting here
17 today.
18     Q  Can you identify any fund that had lower fees
19 than any of the funds that were in the 401-K plan PwC
20 offered?
21     A  I do not recall the specifics of the fees.
22     Q  So you can't identify any fund that would have
23 lower fees than the ones PwC selected?
24     A  PwC selected mutual funds and others that had

Page 69

1  fees associated with them.
2      Q  I'm asking you, can you identify any mutual
3  funds that would have lower fees than the ones that PwC
4  selected for the 401-K plan?
5      A  Any of them not at a retail rate, yes.  Any of
6  the mutual funds you had to choose from, not a retail
7  rate, you had the opportunity.
8      Q  Can you identify any fund that you would
9  recommend be substituted into the 401-K plan?
10     MR. GOTTESDIENER:  Objection.  Go ahead.
11     THE WITNESS:  At this moment, no.
12     MR. SMITH:  Q  Are you asking for any changes in
13  the -- or making any proposals regarding what fund
14  should be included in the 401-K plan?
15     A  I'm seeking to have the whole three plans
16  legalized under the ERISA laws.
17     Q  My question's more specific.  I'm asking you,
18  are you seeking to have any of the funds changed that
19  are currently available in the 401-K plan?
20     A  A proper management of the funds, yes.
21     Q  So you want some changes there?
22     A  To the management of the funds, yes.
23     Q  Who's responsible for management of the funds in
24  the 401-K plan?  Is it PwC or the actual companies that

Page 70

1  run those funds?
2      MR. GOTTESDIENER:  Objection.  Go ahead.
3      THE WITNESS:  PwC chooses which funds.  Then the
4  funds are run from the company.
5      MR. SMITH:  Q  And are you claiming that any
6  wrongdoing or illegality by any of the people at the
7  companies responsible for running the funds in any of
8  the PwC plans?
9      A  No.
10     Q  And you haven't named any of those funds as
11  defendants, have you?
12     A  No, not the funds.
13     Q  Okay.  But you're not sitting here today willing
14  to make any proposals about what funds should be
15  substituted in the 401-K plan; is that correct?
16     MR. GOTTESDIENER:  Objection.
17     THE WITNESS:  At the table today, no.
18     MR. SMITH:  Q  And you're not willing to make --
19  Well, on the RBAP do you want participants to continue
20  to be able to select from a range of investment
21  measures?
22     A  It's a high-level concept.  I see nothing wrong
23  with it.
24     Q  Okay.  Do you want to replace any of the current

Page 71

1  investment measures with different investment measures
2  in the RBAP?
3      A  Whatever measures need to be done to make the
4  plan legal is what I'd be in favor of.
5      Q  And so you would recommend some changes in the
6  particular investment measures in the RBAP?
7      MR. GOTTESDIENER:  Objection.
8      THE WITNESS:  As I've answered before, if the judge
9  declares that that's what needs to be touched, yes.
10     MR. SMITH:  Q  Well, I'm asking what you're -- I
11  want to find out what you want, you know.  Irrespective
12  of what the judge may do, you understand you have to ask
13  for, you know, what you want when you go into court,
14  right?
15     MR. GOTTESDIENER:  Objection.
16     MR. SMITH:  Q  And I'm just asking you, would you
17  like PwC to change any of the particular investment
18  measures that it's using in its RBAP?
19     MR. GOTTESDIENER:  Asked and answered.
20     THE WITNESS:  If the plan is legalized by that, yes.
21     MR. SMITH:  Q  Well, I'm just asking you, are you
22  asking for any changes in the investment measures?
23     MR. GOTTESDIENER:  Asked and answered.
24     THE WITNESS:  Yes.

Page 72

1      MR. SMITH:  Q  Okay.  Can you tell me what
2  alternative investment measures you're proposing for the
3  RBAP?
4      A  I'm not an expert in that field.
5      Q  Sitting here today, can you identify any
6  investment measure that you think should be substituted
7  for the ones that are currently used in the RBAP?
8      A  Not sitting here today.
9      Q  Do you have any understanding about why PwC
10  adopted the RBAP?
11     A  I do not know their understanding.
12     Q  Do you claim there's any difference in the way
13  the RBAP or 401-K plan worked for partners as compared
14  to employees?
15     A  My understanding is the partners get a
16  disproportionately large return.
17     Q  And what do you mean by disproportionately large
18  return?
19     A  An example, the 401-K plan and the segregated
20  normal plan.
21     Q  I'm not -- I didn't quite understand your
22  answer.  Could you explain --
23     MR. GOTTESDIENER:  Objection.
24     MR. SMITH:  Q  -- what exactly you mean by the

TIMOTHY D. LAURENT

Page 73

1  partners get a disproportionate return? How does that
2  work?
3      A  By using the segregated plan to foist off the
4  lower paid employees, it normalizes much differently.
5  Thus, a larger payout.
6      Q  Okay. You weren't a participant in the 401-K
7  plan that was segregated, right?
8      MR. GOTTESDIENER:  Asked and answered.
9      THE WITNESS:  Right.
10     MR. SMITH:  Q  Do you feel that partners got a
11 disproportionate payout compared to employees, such as
12 yourself, who were in the same 401-K plan that the
13 partners were in?
14     A  That's my understanding.
15     Q  And what's that based on?
16     A  It's based on the counts in the complaint.
17     Q  Well, why do you have -- why do you believe that
18 partners who participated in the exact same 401-K plan
19 that you did got a disproportionate amount of money?
20     MR. GOTTESDIENER:  Asked and answered and
21 argumentative. Go ahead.
22     THE WITNESS:  As per the complaint. The details are
23 in there.
24     MR. SMITH:  Q  Sitting here today, can you explain

Page 74

1  how the partners who have participated in the exact same
2  401-K plan you did got a disproportionate return?
3      MR. GOTTESDIENER:  Same objections.
4      THE WITNESS:  Sitting here today, my understanding
5  is that the complaint has all those details.
6      MR. SMITH:  Q  But you can't provide any explanation
7  or details sitting here today about why you believe the
8  partners received a disproportionate payout from the
9  same 401-K plan you participated in?
10     MR. GOTTESDIENER:  Asked and answered.
11     THE WITNESS:  Today I cannot support the details.
12     MR. SMITH:  Q  Okay. Do you claim that there's any
13 difference in the way that the RBAP worked for partners
14 as compared to employees?
15     A  My understanding is yes.
16     Q  Okay. What is the difference?
17     A  My understanding is the complaint has all that
18 information.
19     Q  Sitting here today, though, can you provide any
20 explanation for why you believe that the RBAP worked
21 differently for partners than employees?
22     A  Sitting here today, I don't have the details.
23     Q  Okay. Do you know anything about any of the
24 committees associated with PwC's plans?

Page 75

1      A  I'm not aware of any committee.
2      Q  Well, are you aware that you're suing some
3  committees?
4      A  Yes.
5      Q  Do you have any understanding about why you're
6  suing committees?
7      A  Someone is responsible.
8      Q  Do you know what the committees did that you
9  feel makes them responsible?
10     A  The committees have put together the plan.
11     Q  Anything else the committees did?
12     A  Put together and continued to operate the plan.
13     Q  Can you identify any specific action by any of
14 the committees that you believe was wrong or unlawful?
15     A  The answers are in the complaint.
16     Q  Sitting here today, though, can you identify any
17 specific action by any of the committees that you sued
18 that you believe was unlawful or wrong?
19     A  At this moment, I do not know the details.
20     Q  Do you understand that you sued some individuals
21 also?
22     A  Yes.
23     Q  Do you understand -- have any understanding of
24 what those individuals have to do with PwC's plans?

Page 76

1      A  They were a participant of building the plan.
2      Q  Okay. Can you identify any specific action by
3  any individual that was -- that you're suing that was
4  wrong or unlawful sitting here today?
5      A  I do not have the details of the specific
6  actions of the people.
7      Q  So the answer is you can't identify anything
8  like that?
9      A  I cannot identify, correct.
10     Q  When you were working at PwC, did you know what
11 the plan provision was regarding the normal retirement
12 age?
13     A  My understanding, the normal retirement age is
14 65.
15     Q  And was that your understanding throughout the
16 course of your employment at PwC?
17     A  That was my understanding.
18     Q  And where did you get that understanding from?
19     A  Just a general understanding.
20     Q  Can you point to any document or -- Nobody at
21 PwC told you that the normal retirement age was 65,
22 correct?
23     A  I don't believe anyone pulled me over to say
24 that statement.

TIMOTHY D. LAURENT

Page 77

1    Q   Okay.  And nobody from PwC ever gave you any
2  document that said the normal retirement age was 65, did
3  they?
4    A   I don't recall receiving a document.
5    Q   And there were people at PwC who understood that
6  the normal retirement age was not 65; wouldn't that be
7  true?
8    A   I do not know.
9    Q   Okay.  Are you seeking to represent participants
10  who understood that the normal retirement age was not
11  65?
12    A   Yes.
13    Q   And you agree that not everyone retires at age
14  65, right?
15    MR. GOTTESDIENER: Objection.
16    THE WITNESS: I agree that not everybody.
17    MR. SMITH: Q   And not everybody at PwC retired at
18  age 65, right?
19    A   I suppose not.
20    Q   And there were people that worked there less --
21  that retired before age 65, right?
22    A   They could have, yes, sure.
23    Q   And there are people that retired after age 65
24  at PwC?

Page 78

1    A   Sure.
2    Q   Do you agree that when people retire depends on
3  their individual circumstances?
4    MR. GOTTESDIENER: Objection. This really gets to
5  merits.  Are you taking his deposition --
6    MR. SMITH: No, it doesn't.
7    THE WITNESS: It's my understanding that people can
8  retire for any number of reasons.
9    MR. SMITH: Q   And the particular reasons why
10  people retire are individualized, right?
11    MR. GOTTESDIENER: Objection.
12    THE WITNESS: Everyone has a reason for retiring,
13  yes.
14    MR. SMITH: Q   And one factor that differs among
15  individuals for why they retire is their financial
16  condition, right?
17    A   That could be one factor.
18    Q   And another factor that differs among
19  individuals regarding why they retire is their health?
20    A   That could be one reason.
21    Q   And another reason that differs among
22  individuals for when or why they retire is their
23  family's condition and health?
24    A   True, but they've all participated in the plan.

Page 79

1    Q   Okay.  And you're seeking to represent people
2  who participated in the plans but retired after age 65?
3    A   At any age, as long as they participated in the
4  plan.
5    Q   Do you have any understanding now about how the
6  normal retirement age works in the RBAP?
7    A   My understanding now is it's a bogus five-year
8  duration, not an age.
9    Q   And when did you first learn that fact?
10    A   I don't recall the specific date.
11    Q   Did you first learn the fact regarding what the
12  normal retirement age was from Mr. Gottesdiener?
13    MR. GOTTESDIENER: Objection. I want to --
14    MR. SMITH: I just want to know yes or no.
15    MR. GOTTESDIENER: Go ahead.
16    THE WITNESS: I'm sorry, repeat the question.
17    MR. SMITH: Q   Did you first learn that the normal
18  retirement age was five years of service from
19  Mr. Gottesdiener?
20    A   Yes.
21    Q   Okay.  Did your -- the percentage that you
22  contributed to the PwC 401-K plan vary over time?
23    A   I believe so.
24    Q   And did you increase or decrease your

Page 80

1  contribution levels to the 401-K plan?
2    A   My recollection, it was an increase of
3  percentage.
4    Q   Okay.  And everybody's contribution plans who
5  were -- Everybody's contribution percentages who were
6  participants in the 401-K plan would differ depending on
7  their selection, right?
8    A   Depending on their selection.
9    Q   And the particular funds that participants
10  invested in in the 401-K plan would differ depended on
11  what they selected?
12    A   Yes.
13    Q   And the same is true of the RBAP?  Different
14  individual's investment measures would differ depending
15  on what they selected, correct?
16    A   Correct.
17    Q   And the choices of investment measures and what
18  funds you invested in the 401-K plan were all within
19  the control of the employees?
20    A   Yes.
21    MR. GOTTESDIENER: Objection.
22    MR. SMITH: Q   Now --
23    A   The selection of the mutual funds or other
24  investments were based upon a predetermined list that

Page 81

1  was provided to them by the employer.
2      Q  And within the predetermined list individuals
3  had the exclusive choice to determine what investment
4  measures in the RBAP they chose or what funds they
5  invested in the 401-K?
6      A  If they had that understanding, yes.
7      Q  Did you take any distributions from your 401-K
8  plan before you were terminated at PwC?
9      A  I do not believe so.
10     Q  Okay.  Is it true that you received tens of
11 thousands of dollars in your RBAP account from PwC?
12     A  I believe the total fictitious account balance
13 was somewhere around 25,000.
14     Q  And that was all money that PwC gave to you,
15 right?
16     A  I do believe so.
17     Q  And you also received several thousand dollars
18 in matching contributions PwC gave you to your 401-K
19 plan?
20     A  As per the plan, yes.
21     Q  Are you seeking to represent people who invested
22 solely -- or participated solely in the RBAP but not the
23 401-K plans?
24     MR. GOTTESDIENER:  Invested or participated?

Page 82

1      MR. SMITH:  Q  Why don't I rephrase the question.
2  Are you seeking to represent people who participated
3  only in the RBAP but not the 401-K plans?
4      A  I'm seeking to represent the people who
5  participated in one of the three plans or more than one
6  of the three plans.
7      Q  And would that include people who just
8  participated in the RBAP but no other plans?
9      A  Yes.
10     Q  And your RBAP account, unlike your 401-K
11 account, consisted of funds that were given to you
12 solely by PwC, right?
13     MR. GOTTESDIENER:  Objection.  Go ahead.
14     THE WITNESS:  As answered, yes.
15     MR. SMITH:  Q  Okay.  How did you go about choosing
16 the funds that you invested in in your PwC 401-K plan?
17     A  I reviewed the plan options, mutual funds,
18 equities, whatever the fund happened to be, and chose
19 upon a ratio that I felt was appropriate for my age at
20 that time.
21     Q  And when you say a ratio, what do you mean by
22 that?
23     A  Assessment -- Or excuse me.  An asset ratio.
24 Some higher returns.  Some lower non-risky.

Page 83

1      Q  And did you obtain any assistance from PwC in
2  selecting the funds in your 401-K or the investment
3  measures in your RBAP?
4      A  It's within the documents they supplied.
5      Q  But no assistance in making the choice between
6  what investment measures and -- or funds you actually
7  invested in in either of the plans came from PwC?
8      A  Correct.
9      Q  Were there people who could help you invest your
10 money in the 401-K plan or choose the investment
11 measures in the RBAP?
12     A  I do not know.
13     Q  Okay.  Did you look at any of the prospectuses
14 or any other documentation from the funds that you chose
15 in your 401-K plan?
16     A  I may have reviewed some of it.
17     Q  Okay.  Did you do that before you invested in
18 those funds?
19     A  Probably.
20     Q  Do you know what the fees were charged by any of
21 the funds you invested in in your 401-K plan?
22     MR. GOTTESDIENER:  Now or did he know then?
23     MR. SMITH:  Q  Now, at any time.
24     A  Now or any time I do not know the specifics of

Page 84

1  the fees.
2      Q  Okay.  For all you know, there may be some funds
3  there that charge almost no fees?
4      A  That very well could be.
5      Q  Okay.  And do you know the fees that were
6  charged by the funds used as investment measures in the
7  RBAP?
8      A  I do not.
9      Q  And, again, for all you know, the fees in the
10 funds that were chosen as investment measures could be
11 very low?
12     A  Sitting here today, it is possible.
13     Q  Did you choose your 401-K investments to balance
14 any outside investments you had or not?
15     A  I do not think so.
16     Q  Did you have any outside investments while you
17 were working at PwC other than your retirement plans?
18     A  Yes.
19     Q  And what did those consist of?  What kind of
20 investments did you have?
21     A  Mostly stocks.
22     Q  Okay.  Anything else?
23     A  I don't believe so.
24     Q  Okay.  And what was the total amount of your

TIMOTHY D. LAURENT

Page 85

1  investments outside of your retirement plans when you
2  were working at PwC?
3      A  I invested an initial $2,000.
4      Q  And did that amount continue to be about that
5  amount throughout your employment?
6      A  It did grow.
7      Q  And by the time you left PwC how much did you
8  have invested outside your retirement plans?
9      A  I don't recall the account balance.
10     Q  Would it have been around -- slightly more than
11  2,000 or --
12     A  As I left, it was more than 2,000.
13     Q  And would it be less than 3,000?
14     A  It was probably closer to 10 or 15.
15     Q  Okay.  Did you continue to add to your outside
16  investments while you were working at PwC?
17     A  Yes.
18     Q  Okay.  Did you ever talk to any other employees
19  of PwC when you were working there about what stocks --
20  stock funds or other funds in the 401-K plan to pick?
21     A  I don't recall a conversation regarding the
22  401-K plan.
23     Q  Okay.  How about the RBAP, did you ever have any
24  conversation about that?

Page 86

1      A  I don't recall that either.  Most likely not.
2      Q  Now, on the investment measures in the RBAP, are
3  you aware that one of the investment options was a fixed
4  income option?
5      A  At that time I was not aware.
6      Q  How about today, are you aware of that?
7      A  Today I'm aware there's a variety of options
8  there, from low risk to high risk.
9      Q  Okay.  And are you aware today that one of the
10  options in the RBAP is a fixed income option?
11     MR. GOTTESDIENER:  Asked and answered.
12     THE WITNESS:  I don't --
13     MR. GOTTESDIENER:  Go ahead.
14     THE WITNESS:  I believe there is a range that could
15  have been from very low to very high risk.
16     MR. SMITH:  Q  Okay.  I mean, and what -- what do
17  you know about what the investment measures are?  That's
18  all I'm trying to get at.
19     A  Sitting here today, I don't recall the specifics
20  of any of the options.
21     Q  Okay.  Do you know that one of the options was a
22  cash equivalent fund?
23     A  My understanding, that probably existed, yes.
24     Q  Okay.  And isn't it true that that's the option

Page 87

1  that you had for an investment measure, was a cash
2  equivalent fund?
3      A  I believe I was defaulted into that and wasn't
4  aware of at the time what I could do to move my moneys
5  around.
6      Q  Okay.  Are you claiming any wrongdoing or
7  illegal acts by the fund that was the investment measure
8  you selected for the RBAP?
9      MR. GOTTESDIENER:  Objection.
10     THE WITNESS:  I'm not suing that fund, no.
11     MR. SMITH:  Q  Okay.  You don't have any criticism
12  of that fund that was your investment measure for the
13  RBAP?
14     MR. GOTTESDIENER:  Objection.
15     THE WITNESS:  As a default, again, I wasn't fully
16  understanding how my investments worked with RBAP.  I
17  have no grief with the fund that my money was placed
18  into.
19     MR. SMITH:  Q  Okay.  And isn't it true that you
20  earned a positive return on the money that was in your
21  RBAP account?
22     A  That sounds correct.
23     Q  And have you looked to see what that return was?
24     A  I do not know the specific percentage.

Page 88

1      Q  Okay.  Isn't it true that you earned a negative
2  return on your 401-K account?
3      A  It was a bad time for the economy.  That's very
4  possible.
5      Q  And isn't it true that your RBAP account
6  actually did better than your 401-K plan?
7      A  That sounds --
8      MR. GOTTESDIENER:  At what period of time?
9      MR. SMITH:  Q  At throughout -- Over the whole
10  course of your employment.
11     A  I don't know the trending throughout the course
12  of employment, whether one did better than the other.
13     Q  Well, isn't it true that when you left PwC you
14  had made money on your RBAP account, right?
15     MR. GOTTESDIENER:  Objection, calls for a legal
16  conclusion.  Go ahead.
17     THE WITNESS:  The account balance -- The
18  hypothetical account balance, that is, did seem to have
19  a positive increase.
20     MR. SMITH:  Q  Okay.  And isn't it true that the
21  401-K plan when you left, that had a decrease in its
22  value when you --
23     A  That's very possible.
24     Q  And so all I'm trying to ask you is, it's true

TIMOTHY D. LAURENT

Page 89

1  that your RBAP account actually made money over the
2  course of your employment, whereas your 401-K account
3  you lost money?
4      MR. GOTTESDIENER: Objection. Go ahead.
5      THE WITNESS: I don't know the trending from start
6  to finish, but that very well could be true.
7      MR. SMITH: Q  Okay. Did you do anything to
8  monitor your two pension plan -- your pension plan and
9  your 401-K plan at PwC while you were there to see how
10  things were doing?
11      A  I received the 401-K plan at the very beginning,
12  made some choices. They seemed like reasonable choices,
13  again, with a lot more in the stocks on the high risk
14  side. It felt like appropriate choices, so I left it
15  there.
16      Q  Okay. But it turned out that those choices
17  ended up losing you money; isn't that true?
18      MR. GOTTESDIENER: Objection, argumentative.
19      THE WITNESS: It is very possible that they lost
20  money.
21      MR. SMITH: Q  In fact, they did, right?
22      A  Uh-huh.
23      MR. GOTTESDIENER: Objection, asked and answered.
24      THE WITNESS: It very well could, yes.

Page 90

1      MR. SMITH: Q  I mean, don't you know that you lost
2  money in your 401-K plan? That's all I'm asking.
3      MR. GOTTESDIENER: Asked and answered. It's been
4  asked and answered. It's argumentative.
5      MR. SMITH: Q  It's not that it's possible; you know
6  that you did lose money in your 401-K plan, right?
7      A  My understanding is I lost money.
8      Q  And in your RBAP plan, you did gain money in
9  that plan?
10      MR. GOTTESDIENER: Asked and answered. Also, calls
11  for a legal conclusion.
12      THE WITNESS: As I stated earlier, yes.
13      MR. SMITH: Q  Okay. Now, in the -- in both -- For
14  the investment measures in the RBAP and the funds in the
15  401-K plan, you had the option of picking from stock
16  funds, right?
17      A  My understanding at that time for the 401-K,
18  yes.
19      Q  And for the RBAP there were investment measures
20  that were stock funds?
21      A  At the time I did not understand that.
22      Q  Okay. But now, sitting here today, you know
23  that there are stock funds that you can choose in the
24  RBAP or the 401-K plan, right?

Page 91

1      A  A variety of options as predetermined by the
2  company, yes.
3      Q  And that would include stock funds?
4      A  Correct.
5      Q  And it would also include bond funds?
6      A  Correct.
7      Q  And also would it include index funds for
8  stocks?
9      A  I believe so.
10      Q  Okay. And, in fact, there were funds in -- that
11  were investment measures in the RBAP and funds in the
12  401-K that were S & P 500 index funds, right?
13      A  That's my understanding today.
14      Q  And there were also investment measures in the
15  RBAP and funds in the 401-K plan that were indices of --
16  broader indices of like the Russell 2000, right?
17      A  Very well could have been, yes.
18      Q  All right. Isn't it true that your
19  investment -- the investment measures that were
20  available under the RBAP were largely the same as those
21  available in your 401-K plan?
22      A  That is my understanding today.
23      Q  Okay. I think you mentioned you changed the
24  mix -- Did you change the actual mix of investments in

Page 92

1  your 401-K plan over time?
2      MR. GOTTESDIENER: Objection. Go ahead.
3      THE WITNESS: I don't recall that I changed the mix.
4      MR. SMITH: Q  Okay. Did you change -- just select
5  different funds in the 401-K plan over time or not?
6      A  That is possible.
7      Q  Are you seeking to represent participants who
8  did not change the mix of investments in their 401-K
9  plan while they were participants?
10      A  I'm seeking to represent all participants of the
11  three plans.
12      Q  And that would include those people?
13      A  Yes, it would.
14      Q  Are you seeking to represent participants who,
15  unlike you, lost money in their RBAP account?
16      MR. GOTTESDIENER: Objection.
17      THE WITNESS: I am seeking to represent them, yes.
18      MR. SMITH: Q  Okay. Are you seeking to represent
19  people who, unlike you, actually made money in their
20  401-K account?
21      MR. GOTTESDIENER: Objection.
22      THE WITNESS: As answered previously, I'm
23  representing everyone.
24      MR. SMITH: Q  Okay. And you agree that for any

TIMOTHY D. LAURENT

Page 93

1  individual participating in the RBAP or the 401-K plans
2  there would be differences among individuals in their
3  rate of returns from quarter to quarter?
4      MR. GOTTESDIENER: Asked and answered.
5      THE WITNESS: Depending on the illegal formula used,
6  they very well might have a different return.
7      MR. SMITH: Q  But just in the performance of their
8  investment measures they selected or the funds they
9  selected, there would be differences among individuals
10  in the rate of return they received on their PwC plans?
11      A  It's very conceivable, yes.
12      Q  Okay. Isn't it true that all of the firms that
13  were selected by PwC as funds in the 401-K plan were
14  reputable firms?
15      A  Very well could be.
16      Q  And isn't it true that all of the firms that --
17  whose funds served as investment measures for the RBAP
18  were all reputable?
19      A  That is my understanding.
20      Q  Okay. Do you have any idea how PwC itself
21  invested the money in its pension plan, the RBAP?
22      A  I do not know the specifics of how they invested
23  their pension funds.
24      Q  Do you have any criticism of how PwC invested

Page 94

1  its pension funds --
2      A  No.
3      Q  -- for the RBAP?
4      A  I have no criticism of the funds they invested
5  in.
6      Q  Okay.
7      A  Except from the fact they should have not chosen
8  retail value mutual funds if that's indeed where they
9  went.
10      Q  Okay. But you don't know whether they chose
11  retail value mutual funds or --
12      A  I don't know how many they chose.
13      Q  Okay. Were there any other reasons aside from
14  trying to balance the mix of risk that you used in
15  selecting your 401-K funds?
16      A  At that time and age, it seemed appropriate.
17      Q  Did you think at the time you were employed at
18  PwC that all the funds you selected for your 401-K plan
19  were good funds?
20      A  At that time, yes.
21      Q  Okay. And was that based on your review of
22  their literature?
23      A  It was based upon reviewing some literature, as
24  well as some research.

Page 95

1      Q  Okay. What kind of research did you do into the
2  funds you selected for your 401-K plan?
3      A  I did some research on basic investing.
4      Q  Did you look on the Internet or anything to find
5  out how the funds had performed or facts about the funds
6  that you selected?
7      A  Before selecting, yes, we looked for trending.
8      Q  And what did you look for when you were
9  selecting your 401-K funds?
10      A  Aside from a ratio of high risk to some low risk
11  bonds, for example, I believe that you just try to
12  balance it out in a modest way.
13      Q  Okay. Did you look for funds that were
14  increasing in value to select for your 401-K plan?
15      A  With a trend of increasing value, that seems
16  like a reasonable choice.
17      Q  Were there any changes in the investment
18  measures offered for the RBAP or the funds offered in
19  the 401-K plan while you were at PwC?
20      A  I don't recall that the funds changed in the
21  401-K. And the RBAP, as I explained, I did not
22  understand how that worked at the time.
23      Q  Oh, okay. Is it true that not all of your
24  benefits in your 401-K plan had vested when you left

Page 96

1  PwC?
2      A  I was at PwC over five years. I believed I was
3  fully vested.
4      Q  Wasn't there some money that was not vested in
5  your 401-K plan, or do you recall that? I mean, maybe
6  we can look at the documents later, but --
7      A  I don't recall.
8      Q  Okay. Are you seeking to represent participants
9  who did not have all of their funds vested when they
10  left PwC?
11      A  I'm seeking to represent everyone who
12  participated in the plan.
13      Q  And that would include the people that didn't
14  have all their money vested when they left PwC?
15      A  Correct.
16      Q  And it would also include all the participants
17  who had -- were fully vested when they left PwC?
18      A  Uh-huh, yes.
19      Q  Okay. We may have touched on this, but you were
20  aware when you left PwC that you had a variety of
21  options you could select from in how you received the
22  money from your RBAP?
23      A  There were several options to receive the funds
24  after leaving.

TIMOTHY D. LAURENT

Page 97

1    Q  And one was the lump sum distribution which you
2  chose, right?
3    A  True.
4    Q  But there were also a range of annuities you
5  could have chose?
6    A  That's my understanding.
7    Q  And why did you make the decision you did about
8  how to receive the payment from the RBAP?
9    A  I needed the money.
10   Q  Okay. Are you seeking to represent participants
11  who chose to have an annuity rather than lump sum
12  distribution when they left PwC?
13   A  I'm seeking to represent everyone who
14  participated in the plans.
15   Q  And that would include those people?
16   A  That's correct.
17   Q  Now, when you received your lump sum
18  distribution, you didn't assert that the amount you
19  received was incorrect, did you?
20   A  The hypothetical account balance looked and
21  appeared to be what was on the statements.
22   Q  Okay. So you didn't challenge that at the time
23  you received your lump sum distribution?
24   A  Correct.

Page 98

1    MR. SMITH:  You know, maybe this is a good time for
2  a break because I think our lunch is coming.
3    MR. GOTTESDIENER:  Okay.
4    THE VIDEOGRAPHER:  We are now going off the record.
5  The time is 11:58 a.m.
6        (Lunch recess was taken.)
7    THE VIDEOGRAPHER:  We are now back on the record.
8  The time is 12:41 p.m. Counsel.
9    MR. SMITH:  Q  Mr. Laurent, are you seeking to
10  represent participants who received information about
11  the PwC plans directly from verbal communications with
12  people at PwC?
13   A  I didn't understand the question.
14   Q  Are you seeking to represent participants in the
15  plans who received information directly through verbal
16  communications with people at PwC --
17   A  Yes.
18   Q  -- unlike yourself?
19   A  Yes.
20   Q  And are you seeking to represent people --
21  participants in the plans who got information about the
22  plans that was different than the information that you
23  received?
24   A  Yes.

Page 99

1    Q  Okay. What was your highest salary when you
2  were at PwC?
3    A  I believe it was 125, maybe 135K a year.
4    Q  Okay. 135,000?
5    A  (Nodding head).
6    Q  And what was your lowest salary when you were at
7  PwC?
8    A  I came in Coopers & Lybrand with 58,000 per
9  year.
10   Q  So over the time period that you were at PwC
11  your salary more than doubled; is that fair?
12   A  Sounds correct.
13   Q  And we discussed -- And we may have touched on
14  this before, but you haven't had any communications with
15  any of the defendants in this case regarding PwC's
16  plans, have you?
17   A  I've not spoken with any of them.
18   Q  Okay. Did you ever speak to any of your family
19  members or anyone else not associated with PwC who --
20  about the PwC plans or the substance of your claims in
21  this lawsuit?
22   A  No.
23   Q  Even when you were participating in the plans,
24  you never talked to your family members about your PwC

Page 100

1  plans at all?
2    A  I perhaps mentioned I was in one, but I don't
3  expect the detail to go much beyond that.
4    Q  Did you sign an agreement with Mr. Gottesdiener
5  to -- where he agreed to be your lawyer?
6    A  Yes.
7    Q  When did you sign that agreement?
8    A  I believe it was late July, early August.
9    Q  Of which year?
10   A  2004 I believe.
11   Q  Okay. And you believe you saw a CNN
12  presentation in 2003?
13   A  That's right.
14   Q  Why was there a gap between -- I mean, what
15  happened in the gap between when you saw the CNN
16  presentation in 2003 and when you signed the agreement
17  with Mr. Gottesdiener in July or August of 2004?
18   MR. GOTTESDIENER:  To some degree, asked and
19  answered, and then to another degree that answer would
20  reveal attorney-client. If you might take it from the
21  CNN thing step by step.
22   MR. SMITH:  Q  I'm just asking him what -- why was
23  there a gap between when you -- when you saw the CNN
24  thing in 2003 --

TIMOTHY D. LAURENT

Page 101

1    MR. GOTTESDIENER: Don't answer that.
2    MR. SMITH: What's your basis for that?
3    MR. GOTTESDIENER: Attorney-client privilege.
4    MR. SMITH: There's nothing privileged about why
5    there was a gap between 2003 when he saw CNN and when he
6    signed the agreement in 2004.
7    MR. GOTTESDIENER: Connected with his prior
8    testimony, yes, there is.
9    MR. SMITH: Okay. What is it? What is the basis of
10   the privilege?
11   MR. GOTTESDIENER: I don't have to explain that to
12   you.
13   MR. SMITH: Yes, you have to explain the basis
14   for --
15   MR. GOTTESDIENER: He testified he contacted --
16   MR. SMITH: -- the person asserting --
17   MR. GOTTESDIENER: -- he contacted me after he saw
18   that thing in 2003. You're not entitled to know why
19   something was signed or not.
20   MR. SMITH: Okay.
21   MR. GOTTESDIENER: And what the timing was. That
22   totally reveals our communications.
23   MR. SMITH: Well, I am entitled to find out what
24   your communications were before you signed that

Page 102

1    agreement.
2    MR. GOTTESDIENER: No, you're not. We had an
3    attorney-client privilege when he --
4    MR. SMITH: No, you didn't.
5    MR. GOTTESDIENER: -- contacted me. He contacted me
6    seeking legal advice. You went over all this.
7    MR. SMITH: Q Okay. What did you say to
8    Mr. Gottesdiener when you called him up?
9    MR. GOTTESDIENER: Wrong. That's privileged.
10   MR. SMITH: No, it's not. I mean, we may have to
11   seek attorney's costs and fees and continue the
12   deposition.
13   MR. GOTTESDIENER: Oh, I'm really worried about
14   that. Ask him when he called me was he seeking legal
15   advice. He's already testified about that.
16   MR. SMITH: No, you're coaching the witness now.
17   MR. GOTTESDIENER: I'm not coaching the witness.
18   You already established that.
19   MR. SMITH: No, I didn't.
20   MR. GOTTESDIENER: Great. What's your question?
21   MR. SMITH: Q You never signed any agreement with
22   Mr. Gottesdiener to be his lawyer in 2003, did you?
23   A  No.
24   Q  And you didn't for several months after that,

Page 103

1    correct?
2    A  Correct.
3    Q  Why didn't you sign an agreement initially?
4    MR. GOTTESDIENER: Don't answer that question,
5    attorney-client privilege. There was an attorney-client
6    in 2003. It doesn't require a signed retainer. You
7    know that, Doug.
8    MR. SMITH: There was no privilege, and you're
9    coaching the witness.
10   Now, back in 2003 when you contacted
11   Mr. Gottesdiener, did you ever contact any other lawyers
12   to seek representation regarding filing a lawsuit
13   against PwC?
14   MR. GOTTESDIENER: Objection. Before or after --
15   Your question was when you contacted Mr. Gottesdiener
16   did you contact other lawyers.
17   MR. SMITH: Q  Did you ever contact any lawyers at
18   any time other than Mr. Gottesdiener to -- regarding any
19   lawsuit against PwC?
20   MR. GOTTESDIENER: You can answer that.
21   THE WITNESS: When I saw Eli on the TV, he seemed
22   like a smart guy. I did some research, and then I
23   contacted him.
24   MR. SMITH: Q  But my question is --

Page 104

1    A  I'm sorry, no.
2    Q  -- did you ever contact anybody else?
3    A  No.
4    Q  Did you do any research into other law firms
5    regarding potential representation of you in this case?
6    A  No.
7    Q  What was said on the CNN broadcast that led you
8    to contact Mr. Gottesdiener?
9    A  There was some discussions on Enron and the
10   scandal, and it seemed like a reasonable conversation to
11   have.
12   Q  And what were those conversations?
13   A  There was an initial phone call --
14   MR. GOTTESDIENER: Wait. We're talking about the
15   CNN conversation?
16   MR. SMITH: CNN, yes.
17   MR. GOTTESDIENER: CNN. What did you see on CNN?
18   THE WITNESS: Saw Eli discussing some mutual fund
19   misappropriation and such with the Enron scandal.
20   MR. SMITH: Q  Did Mr. Gottesdiener mention PwC at
21   all in his CNN --
22   A  No.
23   Q  Okay. Now, at the time you saw the CNN
24   presentation did you hope to receive money from PwC?

Page 105

1    A  No.
2    Q  After you saw the CNN presentation and talked
3  with Mr. Gottesdiener, did you ever contact PwC to say
4  to them that they owed you any money?
5    A  No.
6    Q  Okay. Why didn't you do that?
7    MR. GOTTESDIENER: Objection. Don't answer that.
8    MR. SMITH: Why is that -- What's your basis for
9  instructing him not to answer?
10    MR. GOTTESDIENER: After -- We had an
11  attorney-client relationship.
12    MR. SMITH: I'm just asking him why he didn't
13  contact. I'm not asking him what your communications
14  were.
15    MR. GOTTESDIENER: You can ask him before he called
16  me and we established an attorney-client relationship.
17  After that it's totally revealing my thoughts and my
18  advice, which is reflecting back information he's given
19  me.
20    MR. SMITH: Q  And did Mr. Gottesdiener in fact
21  give you advice regarding whether you should contact
22  PwC --
23    MR. GOTTESDIENER: You can answer that yes or no.
24    MR. SMITH: Q  -- to ask them for benefits?

Page 106

1    A  No.
2    Q  So there was nothing stopping you from
3  contacting PwC back in 2003 to ask them for benefits?
4    A  Correct.
5    MR. GOTTESDIENER: Objection. Go ahead, you can
6  answer.
7    MR. SMITH: Q  And -- So why was it that you
8  decided not to ask PwC for benefits instead of going
9  forward with the lawsuit?
10    MR. GOTTESDIENER: Objection. Don't answer that.
11    MR. SMITH: You're instructing him not to answer?
12  He just said he had no communications with you about it.
13  What's your basis?
14    MR. GOTTESDIENER: It's so obvious that the answer
15  would reveal the nature of the advice he was receiving
16  from me and what information he was giving me and what
17  information I was giving him.
18    MR. SMITH: Again, there's no basis --
19    MR. GOTTESDIENER: If you want to ask it in another
20  way --
21    MR. SMITH: No, there's no --
22    MR. GOTTESDIENER: -- you can get whatever it is
23  that you want. But if you want his decision-making
24  process once we are in an attorney-client relationship

Page 107

1  about these issues, you're not entitled to that.
2    MR. SMITH: He already testified you gave him no
3  information or advice about going to PwC. So there's no
4  basis for your assertion --
5    MR. GOTTESDIENER: That's not what the question and
6  answer says.
7    MR. SMITH: Yes, it is.
8    MR. GOTTESDIENER: No, it's not. Why don't you read
9  it back. That's not what you got.
10    MR. SMITH: I'm not going to take time, but we may
11  have to reopen the deposition --
12    MR. GOTTESDIENER: Yes.
13    MR. SMITH: -- because of your frivolous assertions
14  of privilege.
15    MR. GOTTESDIENER: Right.
16    MR. SMITH: Q  Now, why did you not contact PwC
17  even before 2003, or when you saw the CNN show, why
18  didn't you contact them instead of Mr. Gottesdiener?
19    MR. GOTTESDIENER: That's fine. Answer that.
20    THE WITNESS: When I saw the show, I had no proof
21  one way or the other --
22    MR. SMITH: Q  Okay.
23    A  -- the plans were illegal.
24    Q  The only time you had any proof that there was

Page 108

1  any illegality was after you spoke with
2  Mr. Gottesdiener?
3    MR. GOTTESDIENER: Objection. Go ahead and answer
4  that question.
5    THE WITNESS: Yes.
6    MR. SMITH: Q  Okay.
7    A  Yes.
8    Q  And did all your proof of illegality come from
9  Mr. Gottesdiener?
10    MR. GOTTESDIENER: You can answer that.
11    THE WITNESS: Most of it did, yes.
12    MR. SMITH: Q  Didn't all of your proof about
13  illegality come from Mr. Gottesdiener?
14    A  Some research. Mostly Web research.
15    Q  Okay. What Web research?
16    A  Specifically, I looked at his website. He
17  seemed to know what he was doing in this.
18    Q  Okay. So I'm just asking, all of the proof of
19  illegality though that you're relying on in this case
20  came from Mr. Gottesdiener, right?
21    A  Yes.
22    Q  What did the written agreement say that you
23  signed with Mr. Gottesdiener?
24    MR. GOTTESDIENER: I'll let the witness answer the

TIMOTHY D. LAURENT

Page 109

1  general.
2  THE WITNESS:  There are some points in there on
3  class action.
4  MR. SMITH:  Q  And what points were those?
5  A  What makes a good class representative, for
6  example.
7  Q  Anything else?
8  A  Probably discussions of client/counsel
9  privileges.
10  Q  And what discussions were those?
11  A  There were some documents.  That was stated in
12  the document that I signed.
13  Q  And what was stated about privileges?
14  MR. GOTTESDIENER:  No, that --
15  THE WITNESS:  I don't --
16  MR. GOTTESDIENER:  Don't answer what's stated about
17  privileges.  If you want to know the basic retainer
18  terms, you can ask the guy the question then, but don't
19  try to get privileged --
20  MR. SMITH:  I'm asking about the terms.  Just so I
21  can, you know, not waste everybody's time, are you
22  asserting that the retainer agreement's privileged?
23  MR. GOTTESDIENER:  I'm asserting that the retainer
24  agreement is not relevant for us to produce, but I'll

Page 110

1  allow you to ask him the terms of the retainer
2  agreement.
3  MR. SMITH:  Are there any -- All right.  Can I ask
4  every single detail about the retainer?
5  MR. GOTTESDIENER:  Yes, everything he can remember.
6  MR. SMITH:  Q  Okay.  What did the retainer
7  agreement say about privileges?
8  A  That there was one.
9  Q  Okay.  And what kind of privilege was there or
10  how did it describe it?
11  MR. GOTTESDIENER:  Do we have an agreement that if I
12  allow him to answer, that that's not going to constitute
13  a waiver?
14  MR. SMITH:  Well, you just said you weren't
15  asserting a privilege.  I mean, if you want to --
16  MR. GOTTESDIENER:  But now you're asking the
17  questions --
18  MR. SMITH:  -- just produce the agreement -- Are you
19  objecting to producing that on privilege grounds?
20  MR. GOTTESDIENER:  I'm first and foremost objecting
21  on relevance grounds to producing a document that is not
22  relevant, but I will allow you to ask him the terms of
23  the retainer.
24  MR. SMITH:  I'm just trying to find out though

Page 111

1  whether you claim anything in the -- It sounded like you
2  weren't claiming anything in the retainer agreement
3  that's privileged.
4  MR. GOTTESDIENER:  We haven't reached that.  A court
5  hasn't said that it's relevant to produce the retainer.
6  If it's relevant, then I may.
7  MR. SMITH:  I'm just asking you right now whether
8  you're saying that it's privileged?
9  MR. GOTTESDIENER:  The question of like what does a
10  document say about privilege, that's what you're asking
11  for.
12  MR. SMITH:  Are there some portions of the retainer
13  agreement that you claim are subject to the
14  attorney-client privilege?
15  MR. GOTTESDIENER:  I believe so.
16  MR. SMITH:  Okay.
17  MR. GOTTESDIENER:  If beyond the basic terms of the
18  retainer agreement there are things in there that if a
19  judge looked at them, a judge would say, you know, you
20  don't have to turn this over.  There's discussion
21  between me and him about the case and so forth and so on
22  that has nothing to do with the terms of the retainer.
23  I'm happy to let you ask him the terms of the
24  retainer, but if you want to ask more detailed stuff

Page 112

1  about what he, sitting here today, remembers about those
2  areas, I just need you to tell me that you're not going
3  to later argue that we've waived something by me
4  allowing him to answer that if I'm sustained on my point
5  that those portions are indeed privileged.
6  MR. SMITH:  Well, that makes no sense.
7  MR. GOTTESDIENER:  It makes perfect sense and it
8  gives you everything that you --
9  MR. SMITH:  No, it doesn't.
10  MR. GOTTESDIENER:  Yes, it -- Let me finish.
11  MR. SMITH:  I mean, we would like you to produce the
12  retainer agreement.  Okay?
13  MR. GOTTESDIENER:  I would like to finish my
14  statement.  Okay?  It gives you everything you want.
15  You get the contents --
16  MR. SMITH:  I want a copy of the retainer agreement.
17  MR. GOTTESDIENER:  Well, right now there's no
18  request outstanding for it.
19  MR. SMITH:  I'm making a request now.
20  MR. GOTTESDIENER:  This is not the place for a
21  request for the retainer agreement.
22  MR. SMITH:  So I take it you're refusing to produce
23  it?
24  MR. GOTTESDIENER:  Absolutely not.

TIMOTHY D. LAURENT

Page 113

1    MR. SMITH: Okay. Then I'll make a copy of it.
2    MR. GOTTESDIENER: Ask your questions. This is a
3  deposition. What questions do you have?
4      If you're going to get into this area of what
5  might later be asserted as privilege, I'm telling you,
6  you can ask this witness now, for you who keeps invoking
7  this fees and costs, you can ask him now, as long as I
8  have an agreement -- You're going to claim that it's not
9  privileged. So why would it hurt you to say if it's
10  later deemed to be privileged, you can't assert a waiver
11  of the privilege? You have no answer to that. Okay?
12  You're saying it's not privileged.
13    MR. SMITH: And you have no answer to why would you
14  let me ask questions about a document that's privileged.
15    MR. GOTTESDIENER: I didn't -- You're wrong.
16    MR. SMITH: And it's not privileged.
17    MR. GOTTESDIENER: That's not what I'm saying.
18    MR. SMITH: That's the point.
19    MR. GOTTESDIENER: That's not what I'm saying.
20  You're mischaracterizing what I'm saying.
21      I'm saying the terms of the retainer I'm not
22  asserting any privilege as to. So you can ask him these
23  questions. So far you haven't asked these questions.
24      As to portions of the agreement that I believe

Page 114

1  if a court says are relevant enough to produce versus
2  allowing him to answer questions, that's a different
3  standard to relevance because here you can ask him
4  questions.
5      I believe we do not have to produce a copy of
6  that retainer agreement for reasons that have nothing to
7  do with privilege. If I'm deemed wrong after a motion
8  to compel, then there are portions of it as to which I
9  believe I would be required to assert privilege. You
10  would say those things aren't privileged or a judge
11  should look at them in camera and so forth.
12      If the court then says they're privileged, I do
13  not want to be in the position of you saying, oh, okay,
14  Judge, but he answered some questions about those
15  portions, so there's a waiver.
16    MR. SMITH: The fact that you're -- you would allow
17  me to ask questions about those portions means there's
18  no good faith basis for the assertion of privilege.
19    MR. GOTTESDIENER: No, it's not. It just means I
20  don't want to waste my time having some argument right
21  here now either.
22    MR. SMITH: Well, I agree. We don't have the
23  retainer agreement. Why don't I ask him questions and
24  we'll just see if he can answer them.

Page 115

1    MR. GOTTESDIENER: That's what I've --
2    MR. SMITH: Q What are the fees -- What's the fee
3  arrangement you have with Mr. Gottesdiener?
4    A I pay no fees.
5    Q You're not paying any costs in the lawsuit or
6  anything?
7    A That's correct.
8    Q What about if you win in the lawsuit, how's the
9  money split up?
10    A It's up to the judge.
11    Q There's no provision in the retainer agreement
12  that says Mr. Gottesdiener gets a certain percentage?
13    A There is a statement in there that says he would
14  get a certain percentage, but I believe it's up to the
15  judge to determine if that is in fact true.
16    Q What percentage is in the retainer agreement?
17    A I believe it's a third.
18    Q Okay. Do you expect to receive any additional
19  compensation that other plaintiffs or participants in
20  the plans don't get because you're serving as a class
21  representative?
22    A I don't expect to get anything extra.
23    Q Okay. What other provisions were there in the
24  retainer agreement aside from the fees provision?

Page 116

1    A I don't recall aside from that.
2    Q Did you retain a copy of the retainer agreement?
3    A Yes.
4    Q And you still have that in your possession?
5    A Yes.
6    Q I'd ask you to hold on to that.
7    MR. GOTTESDIENER: You don't have to comment on his
8  request that you hold on to it.
9    MR. SMITH: Q Are there any documents that you've
10  created since the litigation was filed relating to the
11  litigation?
12    A I've not created any documents.
13    Q No notes or e-mails or anything?
14    A No e-mails.
15    Q Okay. Or notes?
16    A I may have scribbled some scratch.
17    Q And what kind of things did you scribble down?
18    A I don't recall the specifics of the notes.
19    Q Yes. Were they things that were based on what
20  Mr. Gottesdiener -- communications with Mr. Gottesdiener
21  or were they things that you were writing down
22  independently?
23    A Mostly with conversations with Mr. Gottesdiener.
24    Q All right. But were there any portions that

TIMOTHY D. LAURENT

Page 117

1    were independent things you wrote down?
2    A  I don't think so.
3    Q  Have you ever communicated with anyone other
4    than your family or people who worked at PwC about your
5    work experience at PwC?
6    MR. GOTTESDIENER: Asked and answered. Go ahead.
7    THE WITNESS: I did speak with friends and family
8    about my working.
9    MR. SMITH: Q  Okay. Other than the people that
10   you had listed before, was there anybody additional you
11   haven't mentioned, family or friends, that you might
12   have talked with about your work at PwC or the plans?
13   A  It's very possible. I was there for six years.
14   Q  Can you identify any other names?
15   A  Not at this time.
16   Q  Have you ever seen the actual plan document for
17   the RBAP plan or the 401-K plans?
18   A  I have not seen the official plan document.
19   Q  Okay. And you never made a request for any of
20   the official plan documents while you were at PwC?
21   A  I did not make a request.
22   Q  Why didn't you do that?
23   A  It didn't seem important at the time.
24   Q  Okay. You knew that you could request the

Page 118

1    actual plan documents when you were at PwC?
2    A  I understood that, yes.
3    Q  All right. Have you ever seen any of the
4    summary plan descriptions for any of the plans?
5    A  Yes.
6    Q  Did you see any of them while you were at PwC?
7    A  I believe so.
8    Q  Okay. Do you remember which -- what years'
9    summary plan descriptions you saw?
10   A  I'm sure I would have looked at the 401-K
11   summary plan.
12   Q  Did you ever look at the RBAP's summary plan
13   description while you were at PwC?
14   A  I'm not aware that I did.
15   Q  Okay. Are you seeking to represent people who
16   did look at the summary plan description and
17   participated in the RBAP?
18   A  Yes.
19   Q  Have you subsequently looked at any of the SPDs?
20   A  I have looked at the summary plans, yes.
21   Q  Okay. And was that for purposes of this
22   lawsuit?
23   A  Yes.
24   Q  Do you contend that you were misled by the SPDs

Page 119

1    in any way?
2    A  No.
3    Q  Do you contend that any plan participates were
4    misled by the SPDs in any way?
5    A  I don't know.
6    Q  If there were people who were misled by the
7    SPDs, and I understand you don't know whether there
8    were, would you be seeking to represent them as well in
9    your lawsuit?
10   A  I'd like to see representation for everyone who
11   was a participant of the plans.
12   Q  And that includes people, if they exist, who
13   were misled by the SPDs?
14   A  Yes.
15   Q  Are you bringing -- Do you know if you're
16   bringing a claim on behalf of the class alleging that
17   the SPD misled participants?
18   A  I'm not aware of that.
19   Q  You don't believe that you are or you just don't
20   know?
21   A  Ask the question again, please.
22   Q  Are you bringing a claim on behalf of the class
23   alleging that the SPD misled participants in the class?
24   A  No.

Page 120

1    Q  Have you seen any newsletters or anything like
2    that relating to the PwC plans?
3    A  No.
4    Q  Have you ever seen any of the IRS Form 5500
5    submissions for any of the PwC plans?
6    A  I am not familiar with them.
7    Q  Have you seen any kind of regulatory submissions
8    regarding the PwC plans?
9    A  No.
10   Q  Have you seen any correspondence between PwC and
11   any regulators relating to the plans?
12   A  No.
13   Q  Before you filed your lawsuit you didn't
14   personally do any investigation into what regulators and
15   PwC had said about the PwC plans?
16   A  I did not.
17   Q  And have you ever seen any newspaper or other
18   articles about PwC's plans?
19   A  No.
20   Q  And you didn't do any investigation or search of
21   the literature to find out what had been said about
22   PwC's plans before you filed your lawsuit?
23   A  No.
24   Q  There's some publications you've cited in the

Page 121

1 complaint from Pensions and Investments and Tax Notes
2 and those kind of publications. Have you reviewed any
3 of those?
4 A I wish I was smart enough to.
5 Q So that you haven't reviewed those?
6 A Not those documents.
7 Q Excuse me?
8 A Not those articles. I wouldn't understand them
9 I'm sure.
10 Q Okay. Do you have a full understanding of all
11 the theories that you're bringing in this complaint that
12 you filed?
13 A I do not have an actuarial sense of what is
14 going on, no. It's very complicated.
15 Q Okay. Before investing in the RBAP -- or
16 participating in the RBAP and 401-K plans did you review
17 any literature about those plans to make sure you were
18 familiar with them before you started participating?
19 A With the 401-K plan it is very possible that I
20 did review the summary document before investing in it.
21 Q And did you review any documents relating to the
22 RBAP before you invested in them?
23 A Not that I'm aware of.
24 Q Did you ever access the Benefits Express website

Page 122

1 while you were at PwC?
2 A Yes.
3 Q Okay. And what did you see or use that for?
4 A The healthcare, vision care, dental care.
5 Q Did you ever review any material about the
6 retirement plans on the Benefits Express website?
7 A I don't recall that.
8 Q Were you aware that you could review information
9 about retirement plans on the Benefits Express website
10 when you were working at PwC?
11 A At that time, probably.
12 Q Okay. Have you done any independent
13 investigation about the laws that are cited in your
14 complaint, the provisions of ERISA or the tax code, to
15 try to get an understanding of what those mean and how
16 they've been interpreted?
17 A The ERISA law is beyond my understanding.
18 Q And you haven't done any investigation into the
19 tax code provisions that are cited in your complaint?
20 A The tax code is also beyond my understanding.
21 Q Okay. Are you relying on Mr. Gottesdiener's
22 expertise regarding the theories that you've advanced in
23 your complaint?
24 A He's a smart guy. I believe, yes.

Page 123

1 Q Are you relying on anybody else's expertise
2 regarding the theories that you've advanced in your
3 complaint other than your lawyer's?
4 A If I was presented with some interesting
5 information, I would read it.
6 Q Well, I'm just asking, are you relying on anyone
7 else's expertise, you know, like an independent expert's
8 expertise to -- regarding the theories you're advancing
9 in your complaint other than what Mr. Gottesdiener has
10 told you?
11 A No.
12 MR. GOTTESDIENER: Well -- Okay. Go ahead.
13 MR. SMITH: Q Did you ever at any point in time
14 request any additional information from PwC beyond --
15 regarding the plans beyond what they normally provide to
16 employees?
17 A No.
18 Q Okay. Can you tell me how you claim your
19 benefits should be calculated under the RBAP?
20 MR. GOTTESDIENER: Asked and answered.
21 THE WITNESS: I'd have to refer you to my previous
22 testimony.
23 MR. SMITH: Q Well, I'm just wondering -- I may
24 have asked you, but I'm just wondering if you can tell

Page 124

1 me what's the formula that should be used in calculating
2 your benefits under either of the plans?
3 A The RBAP formula is extremely complicated. I
4 couldn't begin to explain it.
5 Q Okay. Well, did you review the motion for class
6 certification that your lawyer filed in this case?
7 A Yes.
8 Q Okay. Can you tell me whether the formula for
9 calculating benefits that you're asking for would vary
10 according to, you know, which participant you're doing
11 the calculation for?
12 A I don't believe so.
13 Q Would the -- You know that in the RBAP there was
14 an investment crediting rate based on what investment
15 measures you selected?
16 A Uh-huh, I understand that now.
17 Q Yes, now. In the formula that you want
18 implemented through this lawsuit, would the investment
19 crediting rate be the same for all the participants or
20 would it differ for different participants?
21 MR. GOTTESDIENER: Objection, lacks foundation. Go
22 ahead, you can answer.
23 THE WITNESS: As long as the plan is legalized, I --
24 not more much than that.

TIMOTHY D. LAURENT

Page 125

1    MR. SMITH: Q  Well, can you tell me one way or the
2  other whether the investment crediting rate would be the
3  same for all the participants you're seeking to
4  represent in this class?
5    MR. GOTTESDIENER: Asked and answered.
6    THE WITNESS: I do not know.
7    MR. SMITH: Q  Okay. Can you tell me whether the
8  investment crediting rate would change over time in
9  calculating participants' benefits or would it be a
10 constant value?
11    A  I do not know.
12    MR. GOTTESDIENER: Asked and answered.
13    THE WITNESS: I do not know.
14    MR. SMITH: Q Okay. Does your lawyer have
15 information about that, about what investment crediting
16 rate should be used? Yes or no.
17    MR. GOTTESDIENER: Now wouldn't that --
18    MR. SMITH: I'm just asking yes or no.
19    MR. GOTTESDIENER: Even if he knows that, I mean,
20 what -- I mean, how is that not touching so closely, if
21 not right on, privilege?
22    MR. SMITH: It's not privileged. I'm just asking
23 him yes or no if he has information. I'm not asking
24 what it is.

Page 126

1    Does your lawyer have information about what
2  the investment crediting rate should be that you're
3  asking for in this lawsuit?
4    THE WITNESS: I do not know.
5    MR. SMITH: I'm going to mark as Exhibit 2 a copy of
6  the motion for class certification. Is that what's in
7  front of you?
8    (Document marked as Deposition
9    Exhibit 2 for identification.)
10    THE WITNESS: Yes.
11    MR. SMITH: Q  And you said you had reviewed this
12 before?
13    A  I've looked at it, yes.
14    Q  How long ago did you see this?
15    A  It could have been a month or so ago.
16    Q  Okay. If you turn to page 29, do you see the
17 first paragraph there?
18    A  The first full paragraph?
19    Q  The first partial paragraph. You see there's a
20 sentence that says, that of course perfectly describes
21 the monetary relief sought here: The requested monetary
22 relief here is incidental to the requested injunctive
23 and declaratory relief because the different amounts
24 participants will be due will be determined pursuant to

Page 127

1  simple mechanical calculations. Do you see that?
2    A  I see that.
3    Q  Can you tell me what the simple mechanical
4  calculations are that you're proposing to be used in
5  calculating participants' benefits in this lawsuit?
6    A  I cannot.
7    Q  Have you reviewed any other pleadings other than
8  the complaint and the motion for class certification?
9    MR. GOTTESDIENER: A motion is not a pleading.
10    MR. SMITH: Q  Or any other documents filed with
11 the court other than the complaint and the motion for
12 class certification. Have you reviewed any others?
13    A  Yes.
14    Q  What have you reviewed?
15    A  I reviewed your -- excuse me, the PwC's
16 response.
17    Q  Response to what, do you recall? Was it a
18 response to a motion for partial summary judgment that
19 the plaintiff filed or --
20    A  I don't recall the exact title.
21    Q  And do you recall reviewing a motion to dismiss
22 your complaint filed by PwC?
23    I mean, if you don't recall, that's okay. I'm
24 just wondering. I might show you some of the things

Page 128

1  that have been filed, but I'm wondering if you can
2  recall the names of any of the other things you might
3  have seen that were filed with the court?
4    A  At this moment, I don't recall that one
5  specifically, though I did review what I understood to
6  be most of them, if not all of them.
7    MR. GOTTESDIENER: You're running dangerously low on
8  tape.
9    MR. SMITH: Why don't we take a break then.
10    THE VIDEOGRAPHER: This will now conclude videotape
11 No. 2, and we are going off the record at 1:14 p.m.
12    (Recess was taken.)
13    THE VIDEOGRAPHER: We are now back on the video
14 record. The time is 1:15 p.m. And this is videotape
15 No. 3 of the deposition of Timothy Laurent taking place
16 on November 3rd in the year 2005. Counsel.
17    MR. SMITH: Q  And you were mentioning that you
18 don't know what the specific formula would be for
19 calculating the benefits under your proposal.
20    MR. GOTTESDIENER: Objection. Go ahead.
21    MR. SMITH: Q  Given that, can you tell me under
22 oath today that every participant would receive
23 additional sums from PwC if they use the formula that
24 you're asking for in this case?

Page 129

1    MR. GOTTESDIENER: Objection.
2    THE WITNESS: As a resultant of that formula, I do
3    not know if everyone will receive an increase or a
4    decrease.
5    MR. SMITH: Q  Okay. And you are saying that you
6    think that the formula should be the same for all
7    participants. Is that true --
8    MR. GOTTESDIENER: Objection. Go ahead.
9    MR. SMITH: Q  Is that true even though some
10   participants may have received -- may have actually had
11   large increases in their RBAP account and others may
12   actually had decreases in their RBAP account?
13   MR. GOTTESDIENER: Objection. Go ahead.
14   THE WITNESS: To be fair, everyone should have the
15   same formula as they do today.
16   MR. SMITH: Q  Are there any details of the formula
17   though that might differ? For example, in calculating
18   investment measures, somebody may have invested in one
19   kind of investment measure and another person invested
20   in another kind of investment measure.
21       Would there be details regarding each
22   individual's investment measures that might vary and be
23   plugged into this formula you're proposing?
24   A  That knowledge is beyond mine.

Page 130

1    Q  You can't tell me under oath that there wouldn't
2    be any differences in the implementation of a formula
3    you're proposing?
4    MR. GOTTESDIENER: Asked and answered. And the
5    second time now this reference to under oath is
6    argumentative, among other things.
7    THE WITNESS: I do not have the mathematical
8    intelligence to be able to respond to that with what
9    you're looking.
10   MR. SMITH: Q  Okay. Have you ever seen the
11   formula that you're proposing to use to calculate --
12   MR. GOTTESDIENER: Wrong.
13   MR. SMITH: Q  -- the benefits?
14   MR. GOTTESDIENER: Wrong.
15   MR. SMITH: I'm just asking for a yes or no answer.
16   MR. GOTTESDIENER: I still think that, you know,
17   it's not right. If you give me -- If you want that, it
18   should be easy for you, but you won't argue waiver, then
19   okay. But you can't have it both ways.
20   MR. SMITH: Then you've got to give us the formula
21   in this case, Eli.
22   MR. GOTTESDIENER: No.
23   MR. SMITH: You can't be saying it's privileged.
24   MR. GOTTESDIENER: Why should it be disclosed to you

Page 131

1    whether a client has seen this or not, unless you're
2    willing --
3    MR. SMITH: Because you have to produce it.
4    MR. GOTTESDIENER: Will you let me finish my
5    statement?
6    MR. SMITH: It's not privileged.
7    MR. GOTTESDIENER: Because -- I have to produce
8    what?
9    MR. SMITH: You have to tell us what you're asking
10   for in terms of damages in this case --
11   MR. GOTTESDIENER: I do?
12   MR. SMITH: -- and how they're calculated.
13   MR. GOTTESDIENER: When? When do I have to do that?
14   Before class certification?
15   MR. SMITH: Right now we've asked for it. We've
16   asked for it.
17   MR. GOTTESDIENER: You haven't asked for anything.
18   MR. SMITH: We've asked for it. You should look at
19   our discovery request.
20   MR. GOTTESDIENER: I'm aware that you're trying to
21   bifurcate discovery between class and merits.
22   MR. SMITH: So it's your position you're not going
23   to tell us the formula before we file our response to
24   your class certification motion?

Page 132

1    MR. GOTTESDIENER: You're too smart to not know this
2    is a deposition. This is not a discussion about what
3    the scope of discovery is going to be outside of a
4    deposition.
5        Can we please get back to the question you want
6    him to --
7    MR. SMITH: Well, I'm going to ask him that.
8    MR. GOTTESDIENER: Could you let me finish? You are
9    asking my client a question about whether he's seen
10   something. Clearly, it would be only from me.
11       I'm asking you, I'll tell you, and I'll tell
12   him to answer your question as long as you assure me on
13   the record that you will not later argue that my letting
14   him answer the question is a waiver of a privilege.
15   That's it.
16   MR. SMITH: There's no privilege that's
17   legitimate --
18   MR. GOTTESDIENER: Then why should it be some skin
19   off your nose to say I agree, I will not argue that
20   later? You have no answer to that, do you?
21   MR. SMITH: Well, you have no answer to asserting a
22   privilege on something that's clearly not privileged.
23   MR. GOTTESDIENER: What a client is shown by his
24   lawyer so touches on privilege and attorney-client work

TIMOTHY D. LAURENT

Page 133

1  product and what stage we are at in our case. It's none
2  of your business, okay?
3      MR. SMITH: Eli, I can go through the discovery
4  request with him. I'm just wondering if you're going to
5  give us responses to the discovery request, including
6  the formula --
7      MR. GOTTESDIENER: I'm not having a discussion with
8  you outside of this deposition.
9      MR. SMITH: Okay. Then I'll have to go through each
10  discovery request with Mr. Laurent, and I don't want to
11  take up his time unnecessarily.
12      MR. GOTTESDIENER: Listen, you've got one shot at
13  him. Take up as much time as you want under the rules.
14      MR. SMITH: Okay. So you're not willing to tell me
15  sitting here today whether you're going to give us that
16  formula before our certification response is due?
17      MR. GOTTESDIENER: Ask him questions.
18      MR. SMITH: You're not -- I can tell you're not
19  willing to tell me one way or the other, right?
20      MR. GOTTESDIENER: I'm sorry, could you cite me to
21  the rule under which counsel is allowed to question
22  another counsel as to what discovery objections and
23  responses are going to be made to materials --
24      MR. SMITH: The rule is -- You're objecting to my

Page 134

1  asking him questions about something.
2      MR. GOTTESDIENER: On a totally different basis.
3      MR. SMITH: And I want to know -- No, it's not on a
4  different basis.
5      MR. GOTTESDIENER: You have one shot at this
6  witness. You should ask him questions you want him to
7  answer as opposed to having a debate with me that we can
8  have any time.
9      MR. SMITH: Okay. Let's have a meet and confer
10  after this where you tell me whether you're going to
11  produce that formula before our response is due. Okay?
12  Will you agree to that?
13      MR. GOTTESDIENER: I don't have to answer your
14  questions on the record.
15      MR. SMITH: Okay, you're not willing to answer.
16      MR. GOTTESDIENER: I'm not willing to have you take
17  my deposition, that's correct.
18      MR. SMITH: Q  Can you tell me -- You can't tell me
19  that under this formula that you're asking for from the
20  court that you would actually receive an increase in
21  benefits from PwC?
22      MR. GOTTESDIENER: Objection, lack of foundation,
23  mischaracterizes his testimony, asked and answered.
24      THE WITNESS: This lawsuit seeks to modify the

Page 135

1  illegal calculations in these plans and if those
2  calculations once corrected, perhaps.
3      MR. SMITH: Q  But sitting here today, you can't
4  testify under oath that you're going to receive any
5  additional benefits under the formula that you're asking
6  the court to implement?
7      MR. GOTTESDIENER: Asked and answered.
8      THE WITNESS: I do not know the formula.
9      MR. SMITH: Q  And so you can't tell me that you
10  would receive any increase in benefits under the formula
11  you're asking for from the court?
12      MR. GOTTESDIENER: Argumentative, badgering.
13      THE WITNESS: No.
14      MR. SMITH: Q  And you can't tell me what specific
15  interest crediting rate you want implemented in
16  calculating your own benefits?
17      MR. GOTTESDIENER: Asked and answered.
18      THE WITNESS: Not at this time.
19      MR. SMITH: Q  Can you tell me whether you want a
20  fixed crediting rate or one that varies over time in
21  calculating your personal benefits--
22      MR. GOTTESDIENER: Literally, asked and answered.
23      MR. SMITH: Q  Let me ask the question first. I'll
24  try again.

Page 136

1          Can you tell me whether you want a fixed
2  crediting rate or one that varies over time in
3  calculating your personal benefits under the PwC plan?
4      MR. GOTTESDIENER: Asked and answered.
5      THE WITNESS: Not at this time.
6      MR. SMITH: Q  Okay. Can you tell me whether the
7  investment crediting rate that you're trying to have the
8  court implement would depend on the individual
9  investment measures that participants selected while
10  they were participating in the plans?
11      MR. GOTTESDIENER: Objection.
12      THE WITNESS: Not at this time.
13      MR. SMITH: Q  Okay. In your view, would it be
14  appropriate or acceptable to you if your formula that
15  you're asking the court to implement resulted in a
16  higher rate of return for you, but a lower rate of
17  return for other participants in the plan?
18      MR. GOTTESDIENER: Objection.
19      THE WITNESS: Whatever is best for the class is what
20  I seek.
21      MR. SMITH: Q  And so even if there's some members
22  of the class who would be disadvantaged by the relief
23  you're seeking from the court, that's okay as long as
24  the majority does better?

Page 137

1  MR. GOTTESDIENER: Objection, not what we seek,
2  mischaracterization, calls for a legal conclusion.
3  THE WITNESS: I don't see how they could get less,
4  but I'm seeking what is best for the class. So if I
5  take less, that's fine.
6  MR. SMITH: Q So it would be okay with you if
7  certain participants, including yourself, received less
8  if your relief was implemented as long as the class as a
9  whole benefited because some other people receive more?
10  MR. GOTTESDIENER: Asked and answered, badgering,
11  argumentative with the witness.
12  THE WITNESS: As long as the class was better off,
13  yes.
14  MR. SMITH: Q Okay. Can you tell me what the
15  investment projection rate should have been in
16  calculating your lump sum distribution?
17  MR. GOTTESDIENER: Objection.
18  THE WITNESS: I cannot.
19  MR. SMITH: Q Okay. Do you claim that your
20  experience with the RBAP and the 401-K plan is
21  representative of other participants' experience?
22  A I believe as a participant, everyone else is a
23  participant by participating, yes.
24  Q Are there any ways other than just the fact that

Page 138

1  you're a participant in which your experience would be
2  representative of other participants?
3  A I believe by participating is enough.
4  Q But nothing else?
5  A Not that I know of.
6  Q Do you agree that each participant was in
7  control of the return that they would earn on the -- on
8  their RBAP because they could choose the investment
9  measures?
10  A I don't know that they had control of the
11  return. They'd have control, as I understand now, of
12  where their investments went.
13  Q Okay. In fact, a return would depend on factors
14  independent of PwC and the participants, such as how the
15  market did, right?
16  MR. GOTTESDIENER: Objection.
17  THE WITNESS: It very well might.
18  MR. SMITH: Q How would you characterize the
19  investment measure that you selected -- or that was
20  implemented for your RBAP, as conservative or
21  aggressive?
22  A With RBAP I was defaulted to a fairly
23  conservative investment.
24  Q And there would have been other people who

Page 139

1  participated in the RBAP that had more aggressive
2  investment measures?
3  A It's very possible.
4  Q And you're seeking to represent them in this
5  lawsuit as well?
6  A Yes.
7  Q And there were -- Over the life of the RBAP
8  there were people who participated at different time
9  periods, correct?
10  A (Nodding head.)
11  Q Is that correct?
12  A Yes.
13  Q And you're seeking to represent people who
14  participated at different time periods in the RBAP?
15  A Yes.
16  Q And do you -- I think I asked you before whether
17  you knew whether there was a change in the RBAP since
18  you left. Do you know whether there were any changes
19  over the entire life of the RBAP in terms of how --
20  anything that might affect how benefits were calculated?
21  MR. GOTTESDIENER: Objection, vague.
22  THE WITNESS: I only know of the time period where I
23  was actively participating.
24  MR. SMITH: Q And were there any changes during

Page 140

1  that period?
2  A I don't recall.
3  Q Okay. If there were people who were
4  participants in the plan during the time period when
5  there were changes and then different investment
6  measures available or how benefits were calculated,
7  would you be seeking to represent them as well in your
8  lawsuit?
9  MR. GOTTESDIENER: Objection, calls for speculation.
10  THE WITNESS: I seek to represent anyone who
11  participated in the plans.
12  MR. SMITH: Q And would that include people who
13  participated in the plans when different investment
14  measures were available or different provisions of the
15  plan applied?
16  A Yes.
17  Q Do you agree that among participants in the RBAP
18  there would be different levels of understanding about
19  how the plan worked?
20  A Sounds right.
21  Q And are you seeking to represent people who were
22  participants who had all these different levels of
23  understanding regarding how the plan worked?
24  A Yes.

TIMOTHY D. LAURENT

Page 141

1    Q  You don't have any information, do you, about
2  how the plan has worked with participants since you left
3  PwC?
4    A  I do not have that knowledge.
5    Q  And you can't say that the experience of
6  participants in the plan since you left PwC is at all
7  the same as yours, can you?
8    A  I cannot categorically say yes.
9    Q  In fact, there may be a lot of differences in
10  the way the plan has been implemented since you left
11  PwC?
12    A  My understanding is it's still based on an
13  unlawful set of rules.
14    Q  You don't know what information though PwC has
15  provided to participants since you left regarding all
16  the aspects of the plan?
17    A  Correct.
18    Q  And there may be different information that's
19  been given to participants than what was available to
20  you when you were an employee?
21    A  I did not receive that information.
22    Q  But you're aware there may be differences in
23  what information's been given subsequent to when you
24  left?

Page 142

1    A  That's very possible.
2    Q  Do you agree that there are a number of people
3  that have participated in the RBAP that don't -- haven't
4  expressed any complaints?
5    A  Repeat the question.
6    Q  Do you agree that there are a number of people
7  who have participated in the RBAP that haven't expressed
8  any complaints about the plan?
9    A  That sounds right.
10    Q  And your coworkers, they never expressed any
11  complaints about the plan?
12    A  Correct.
13    Q  Now, given all these individual differences --
14    MR. GOTTESDIENER: Objection.
15    MR. SMITH: Q -- and what information's been given
16  to people and what their experience was on the plan,
17  don't you agree that each individual participant should
18  have an opportunity to provide individual information
19  about their claims that might help them in pursuing
20  their claims?
21    MR. GOTTESDIENER: Argumentative, objection.
22    THE WITNESS: No.
23    MR. SMITH: Q  So even if somebody had information
24  that made their claims better than your claims, they

Page 143

1  shouldn't be allowed to present that to the court?
2    A  Correct. It was all based on a formula.
3    MR. GOTTESDIENER: Better? Objection, I don't
4  understand the question. He may understand it, but I
5  don't, and I need to understand it too.
6    MR. SMITH: Q  If there are people who -- the facts
7  about what their investments were or the facts about
8  what information they received mean they have a more
9  viable claim against PwC or can assert additional
10  claims, should they be allowed to do that?
11    MR. GOTTESDIENER: This has nothing to do with our
12  suit. Objection, argumentative, irrelevant. Trickery
13  really. Go ahead.
14    THE WITNESS: Can you rephrase the question?
15    MR. SMITH: Q  If there are people who may have
16  additional claims against PwC or better claims because
17  of information they've been provided by PwC or because
18  of the nature of their investments in the plans, is it
19  your position that they should not be allowed to offer
20  that individualized proof to the court about their
21  claims?
22    MR. GOTTESDIENER: Same objection. Go ahead.
23    THE WITNESS: I believe that the basis of this
24  claims -- these claims are on the illegal calculations

Page 144

1  under the ERISA rules, and that should apply toward
2  everyone.
3    MR. SMITH: Q  Yes. But I'm asking if people -- in
4  addition to those general claims that apply to
5  everybody, if people have additional information that
6  would make their claims better, shouldn't they be
7  allowed to provide that to the court?
8    MR. GOTTESDIENER: Objection. Same objections. Go
9  ahead.
10    THE WITNESS: Yes.
11    MR. SMITH: Q  Okay. Are you going to be available
12  to testify at any trial?
13    A  Yes.
14    Q  How much time are you willing to spend on this
15  lawsuit?
16    MR. GOTTESDIENER: Objection. Go ahead.
17    THE WITNESS: I don't know.
18    MR. SMITH: Q  Is there any limitation on the
19  amount of time you can provide to work on this lawsuit?
20    A  I suppose everyone has a limitation.
21    Q  And what would the limitations be in your case?
22    A  Sitting here at the table, I don't know the
23  answer to that question.
24    Q  How much time would you estimate you've spent on

TIMOTHY D. LAURENT

Page 145

1  the lawsuit so far?
2  A  Several days, if not -- Several days.
3  Q  Okay. And is that since 2003?
4  A  Yes.
5  Q  All right. Sitting here today, do you have any
6  understanding about whether PwC's plans comply with the
7  definitely determinable benefit standard?
8  A  My understanding is that the plans do not.
9  Q  And --
10  A  They are not in compliance to the defined
11  benefit rules under ERISA.
12  Q  And what's your basis for saying though that the
13  plans don't comply with the definitely determinable
14  benefit standard?
15  A  I believe the details of that are contained
16  within the complaint.
17  Q  Can you tell me though -- Can you explain to me
18  though, sitting here today, what the basis is for your
19  understanding?
20  A  Not sitting here today.
21  Q  Can you explain to me sitting here today why or
22  why not the plans comply with ERISA's anti-cutback
23  standard?
24  A  No.

Page 146

1  Q  Can you tell me sitting here today why or why
2  not PwC's plans comply with the anti-backloading rules?
3  A  I understand the concept of backloading.
4  THE REPORTER: I'm sorry?
5  THE WITNESS: I understand the concept of
6  backloading.
7  MR. SMITH: Q  Okay. And why do you believe that --
8  A  It's based on a bogus five-year retirement
9  duration.
10  Q  How does the plan violate backloading rules, if
11  at all?
12  A  It's based upon the complaint. Sitting here
13  today, I cannot answer that.
14  Q  Okay. Can you explain to me how PwC's plans
15  would comply or not comply with ERISA's anti-forfeiture
16  provisions?
17  A  That's beyond my knowledge.
18  Q  Can you explain to me why or why not PwC's plans
19  comply with the tax code's anti-discriminations rules?
20  A  It's beyond my knowledge.
21  Q  Can you tell me why or why not PwC's plans
22  comply with ERISA's fiduciary standards?
23  A  It's all beyond my knowledge.
24  Q  Do you know what an IRS determination letter is?

Page 147

1  A  I have a basic understanding of that.
2  Q  Are you aware that the RBAP has received two
3  favorable determination letters from the IRS?
4  A  I understand that.
5  Q  Okay. And what's your understanding of the
6  significance of the determination letters?
7  A  Very little significance.
8  Q  Okay. And is that understanding from -- arrived
9  at from Mr. Gottesdiener or do you have any other basis
10  for that?
11  MR. GOTTESDIENER: Objection. He does not have to
12  identify -- that is privileged -- where he gets his
13  understanding from.
14  MR. SMITH: Q  Well, maybe I can rephrase. What I
15  was getting at is, other than anything that
16  Mr. Gottesdiener may have told you, do you have any
17  basis for any opinions regarding the implications of a
18  determination letter from the IRS?
19  A  No.
20  MR. SMITH: I'm going to mark as Exhibit 3 a copy of
21  the complaint, First Amended Class Action Complaint. Is
22  that what's in front of you?
23       (Document marked as Deposition
24       Exhibit 3 for identification.)

Page 148

1  THE WITNESS: Yes.
2  MR. SMITH: Q  And you've reviewed that complaint?
3  A  Yes.
4  Q  Okay. If you turn to page 5, you see there's a
5  series of lettered paragraphs there?
6  A  Okay.
7  Q  In the first paragraph, it says that the RBAP's
8  plan design violates the definitely determinable benefit
9  standard. Do you see that?
10  A  Letter A?
11  Q  Yes.
12  A  I do see that.
13  Q  What evidence do you have for that assertion?
14  A  I do not know.
15  Q  Okay. Do you know of any evidence that supports
16  your assertion in paragraph B that the RBAP violates
17  ERISA's anti-cutback rule?
18  MR. GOTTESDIENER: Is there any reason we can't have
19  a stipulation that outside of what's been filed that he
20  doesn't have any independent evidence?
21  MR. SMITH: I just want to ask him questions. It
22  will just take a minute.
23  MR. GOTTESDIENER: So there is a reason we can't do
24  that?

TIMOTHY D. LAURENT

Page 149

1  MR. SMITH: Yes.
2  MR. GOTTESDIENER: Go ahead.
3  THE WITNESS: Just repeat the question.
4  MR. SMITH: Q  Do you have any evidence to support
5  your assertion that the RBAP violates ERISA's
6  anti-cutback rule?
7  A  No.
8  Q  And do you have any evidence to support your
9  assertion in paragraph C that the RBAP violates ERISA's
10 fiduciary standards?
11 A  Not sitting at the table here, no.  Not sitting
12 here at the table, no.
13 Q  Over on page 13 you'll see there's a list of
14 individuals that you sued.
15 A  I see a list of individuals.
16 Q  Okay.  Can you tell me any evidence of any
17 wrongdoing by any of these individuals?
18 MR. GOTTESDIENER: You've asked and answered that.
19 You specifically asked this question.
20 MR. SMITH: Q  You filed a lawsuit.  It's not only
21 against a company, but it's against people.
22 MR. GOTTESDIENER: Asked and answered.
23 THE WITNESS: Correct.
24 MR. SMITH: Q  And do you know what your basis is

Page 150

1  for dragging these individuals into court?
2  MR. GOTTESDIENER: Oh, come on.  Stop with the
3  argumentative stuff.  Come on.  You've gone over this.
4  He says he doesn't have any independent knowledge beyond
5  what's in the complaint and in the papers that's been
6  filed.
7  MR. SMITH: Q  Do you have any basis for your
8  claims against these individuals?
9  A  Not here at the table.
10 Q  And before you filed your lawsuit did you do any
11 investigation personally to find out whether you had
12 legitimate claims against these people?
13 MR. GOTTESDIENER: You asked and answered this.  Go
14 ahead.
15 THE WITNESS: No.
16 MR. SMITH: Q  Okay.  Do you know any of these
17 people or know of them?
18 A  Some of the names look familiar.
19 Q  And like who do you recognize?
20 A  Letter C, William Bax.  I've seen his name
21 before.
22 Q  Anyone else?
23 A  Letter Q, Samuel DePiazza.  I've seen his name
24 before.

Page 151

1  Q  Anyone else?
2  A  Letter CCC, Gary Van Wagnen.  I've seen him
3  before, a name before.  That's it on this list.
4  Q  Okay.  Have you had any personal interaction
5  with any of the individuals that you identified as
6  having seen their name before?
7  A  Perhaps when I was working at PwC.
8  Q  Who did you have personal interaction with?
9  A  Impersonal reading e-mails.  Nothing in person.
10 Q  And who would that be with?
11 A  The three names I listed.
12 Q  Okay.  And what kind of interaction would you
13 have with them?
14 A  I don't recall the contents of the e-mails.
15 Q  Okay.  Do you have any reason to doubt that all
16 these people are honest individuals?
17 A  I don't doubt they have some level of honesty.
18 Q  Okay.  If you turn over to page 24, you've got a
19 statement there in paragraph 50 that says that
20 defendants purposefully designed the RBAP and 401-K
21 plans to discriminate in favor of high paid PwC partners
22 and deprive rank and file employees a roughly comparable
23 level of benefits.  Do you see that?
24 A  Yes.

Page 152

1  Q  Sitting here today, can you identify any
2  evidence to support that assertion?
3  A  Not sitting here today.
4  Q  Over on page 31, in paragraph 65, you've got a
5  statement saying that the RBAP was the first such
6  participant directed or second generation cash balance
7  plan in the country.  It is also just about the only
8  such plan still in existence.  Do you see that?
9  A  I do see that.
10 Q  Sitting here today, do you have any evidence to
11 support that position?
12 A  Not sitting here today.
13 Q  Before you filed this lawsuit did you do any
14 investigation to find out whether there were other plans
15 offered by other companies that were similar to the
16 plans you're listing in your lawsuit?
17 MR. GOTTESDIENER: Asked and answered.
18 THE WITNESS: No.
19 MR. SMITH: Q  All right.  And you also have a
20 statement there saying there are no other large plan
21 sponsored, plans with more than 50 million in assets,
22 besides PwC and Bank of America operating participant
23 directed cash balance plans today.  Do you see that?
24 A  I do see that.

Page 153

1    Q   Do you have any evidence sitting here today for
2    that assertion?
3        A   No.
4        MR. GOTTESDIENER: Is that wrong?  Is it wrong,
5    Doug?
6        MR. SMITH: I don't know.  Neither Mr. Laurent, nor
7    I, have done any investigation.
8        MR. GOTTESDIENER: Oh, you've not done any
9    investigation?
10       MR. SMITH: Well, somebody here has, but I haven't.
11       Page 39, in paragraph 85, it says that the vast
12   majority of large defined benefit pension plans and
13   virtually all large cash balance plans specify a normal
14   retirement age of age 65.  Do you see that?
15       A   I do.
16       Q   Do you have any evidence sitting here today for
17   that assertion?
18       A   No.
19       MR. GOTTESDIENER: Is that wrong, Doug?
20       MR. SMITH: Yes, it is.  Actually, you cited some
21   articles that mention other plans that don't have age
22   65.
23       Have you seen any of those--
24       MR. GOTTESDIENER: I'm sorry, don't misstate what

Page 154

1    you just read.  It didn't say all.  It said most, a
2    large majority.  That's true.  Do you have evidence that
3    it's wrong?
4        MR. SMITH: Well, it depends how you define vast
5    majority.
6        So, Mr. Laurent, you agree that there are
7    pension plans that are perfectly lawful that have normal
8    retirement ages that are less than age 65?
9        A   Conceptually, I believe so.
10       Q   Okay.  And you're aware of examples of those?
11       A   Sitting here today, I'm not aware of a specific
12   example.
13       Q   Okay.  But you don't dispute that there are
14   such?
15       A   Sounds right.
16       Q   Okay.  On page 44, paragraph 95, you assert that
17   although PwC had sought a determination letter for the
18   RBAP sometime after it went into effect and eventually
19   received one, PwC did nothing to draw the attention of
20   the IRS field agent assigned to review the application
21   to the existence of this one-of-a-kind normal retirement
22   age provision.  Do you see that?
23       A   Yes.
24       Q   Sitting here today, do you have any evidence to

Page 155

1    support that assertion?
2        A   No.
3        Q   In fact, there isn't any way that you or
4    Mr. Gottesdiener could know what was told to the IRS
5    field agent by PwC?
6        MR. GOTTESDIENER: Objection to the extent that it
7    includes me, which would cause him to reveal
8    attorney-client confidences, attorney work product.  If
9    you want to modify that to exclude me, he can answer the
10   question.
11       MR. SMITH: No, I don't.  You're directing him not
12   to answer?
13       MR. GOTTESDIENER: I'm directing him not to answer
14   like what he may have learned from me about what I know
15   and how I know it and all that, yes.
16       MR. SMITH: Q   Okay.  That's all I have for the
17   complaint.  Let's see where we were.
18       You're not aware of any other plaintiffs --
19   actual individuals who are plaintiffs that are assigned
20   on to this lawsuit, are you?
21       A   I'm not aware of any.
22       Q   Have you done any kind of investigation to find
23   out whether there are current or former PwC participants
24   who object to this lawsuit because they don't want the

Page 156

1    kind of changes you're asking for?
2        A   No.
3        Q   Have you done any -- engaged in any effort to
4    try to find additional plaintiffs to join this lawsuit?
5        A   No.
6        Q   Okay.  Now, we talked about the 2003 CNN show
7    that you were watching.  How was it that that caused you
8    to decide to file the lawsuit?
9        MR. GOTTESDIENER: Asked and answered.  I'm sorry --
10       MR. SMITH: Q   Or did it cause you -- Did the CNN
11   show cause you to file a lawsuit or was it something
12   that Mr. Gottesdiener said just so I know whether I can
13   ask these questions?
14       MR. GOTTESDIENER: You can ask that question.  You
15   can answer that question.
16       THE WITNESS: Watching the TV show wasn't in direct
17   correlation to submitting the lawsuit.
18       MR. SMITH: Q   Was or was not?
19       A   Was not.
20       Q   Okay.  So it was Mr. Gottesdiener -- The
21   conversations you've had with Mr. Gottesdiener was what
22   caused you to file a lawsuit?
23       A   Yes.
24       MR. SMITH: Okay.  And you're going to direct him

TIMOTHY D. LAURENT

Page 157

1  not to answer any of those questions relating --
2      MR. GOTTESDIENER: You have to ask your questions.
3      MR. SMITH: Q  Okay.  What were the conversations
4  with Mr. Gottesdiener that caused you to file this
5  lawsuit?
6      MR. GOTTESDIENER: Don't answer that.
7      MR. SMITH: Okay.  And the ground is it's
8  privileged; is that what you're saying?
9      MR. GOTTESDIENER: Yes.
10     MR. SMITH: Q  Okay.  And did those conversations
11 occur in 2003, the ones that caused you to file the
12 lawsuit?
13     MR. GOTTESDIENER: Well, I mean, if you want to ask
14 him -- I think you've already established when those
15 things were, but --
16     MR. SMITH: Well, I just want the date.  Can you
17 give me the date of that --
18     MR. GOTTESDIENER: I just think it's improper for
19 you to be asking like when did you decide to -- You
20 know, these junction points are just nothing other than
21 like stuff that's just not -- It's privileged stuff.
22 It's reflective of privileged stuff.  It's reflecting of
23 our thought processes.
24     MR. SMITH: So you're objecting -- you're directing

Page 158

1  him not to answer when he had the conversation that
2  caused him to file the lawsuit?  I just want to know the
3  year.
4      MR. GOTTESDIENER: Why don't you ask the predicate
5  question because we may not even need to reach that,
6  which is like, you know --
7      MR. SMITH: Q  All right.  Well, when did you
8  decide -- when did you decide that you --
9      MR. GOTTESDIENER: Well, how about if?
10     MR. SMITH: Q  -- wanted to file a lawsuit?
11     MR. GOTTESDIENER: You know, if you're just --
12     MR. SMITH: Well, I'll ask my questions and then you
13 can object if you don't like them.
14         When did you decide to file the lawsuit?
15     A  I believe it was in 2004.
16     Q  Okay.  So you didn't make that decision in 2003?
17     A  Correct.
18     Q  Okay.  Before you filed your lawsuit did you
19 consult with any independent ERISA expert other than
20 Mr. Gottesdiener to figure out whether you had
21 legitimate claims?
22     MR. GOTTESDIENER: That's been asked and answered.
23     THE WITNESS: No.
24     MR. SMITH: Q  Okay.  Before you met

Page 159

1  Mr. Gottesdiener did you ever tell anyone that PwC's
2  plans were illegal?
3      A  No.
4      Q  And I might have asked this before, but you
5  haven't talked with anyone other than your lawyer about
6  any of the problems that you're alleging with PwC's
7  plans?
8      A  That's correct.
9      Q  Okay.  And why is that?  Why haven't you tried
10 to talk to anyone other than your lawyer?
11     MR. GOTTESDIENER: Well, objection.  Go ahead and
12 answer the question.
13     THE WITNESS: He's a smart guy.  I believe what he's
14 saying.  He has a very compulsive case.
15     MR. GOTTESDIENER: I think the word is compelling as
16 opposed to compulsive.
17     MR. SMITH: I don't know.  I like compulsive.
18     THE WITNESS: Compelling case.
19     MR. SMITH: Q  Did you attend -- Have you attended
20 any of the hearings -- I haven't been at all of them.
21 But have you attended any hearings with the court -- you
22 know, at the court?
23     A  No.
24     Q  Okay.  Do you intend to attend any of the

Page 160

1  hearings in the future?
2      A  It's very possible.
3      Q  Okay.  Have you ever threatened or talked about
4  filing a lawsuit against PwC for any reason, you know,
5  other than the reasons in your complaint here?
6      A  No.
7      Q  How frequently do you have contact with
8  Mr. Gottesdiener?
9      A  Fairly frequently.
10     Q  And how often would that be?  Every month or
11 every week or --
12     A  A couple times a month.
13     Q  Okay.  Now, you're aware that if the court
14 appoints you as class representative you'll have some
15 important responsibilities?
16     A  Yes.
17     Q  And what's your understanding of what your
18 responsibilities will be?
19     A  One of the responsibilities is actively
20 participating in the case.
21     Q  And what does that mean to you?
22     A  Staying abreast of the knowledge where I can.
23     Q  And it's important in your view for a class
24 representative to stay abreast of what's going on with

Page 161

1  the case?
2  A  As much as possible.
3  Q  And what other responsibilities would you have?
4  A  A responsibility I can fire my lawyer if I need
5  to.
6  Q  Fire your lawyer?
7  A  I certainly could.
8  Q  Any other responsibilities?
9  A  A responsibility to take the class as a whole.
10  It's important that we're represented as a class, not
11  me.
12  Q  And any other important responsibilities you'd
13  have as class representative?
14  A  Not that I can think of at this moment.
15  Q  And are you aware that you might have to give
16  notice to potential members of the class?
17  A  I'm aware of that.
18  Q  And do you know what that means?
19  A  Give notice of the class action lawsuit, yes.
20  Q  And do you know what the mechanics of that would
21  be?
22  A  I don't know the specifics of all the mechanics.
23  Q  Who do you expect to pay for sending the notice
24  to all these potential class members?

Page 162

1  A  I don't know.
2  Q  You haven't done any investigation of that?
3  A  I haven't really thought about that.
4  Q  Okay. Are you aware that you'll have a duty to
5  answer written requests for information?
6  A  Yes.
7  Q  Have you been provided any written requests for
8  information to answer?
9  A  Not yet.
10  Q  And have you been provided any requests for
11  documents yet to answer?
12  MR. GOTTESDIENER:  You mean from -- Not from me?
13  MR. SMITH:  Q  Yes, not from you, but from the
14  defendants.
15  A  I'm not aware of any.
16  Q  Okay. Did you spend any time preparing for your
17  deposition?
18  A  Yes.
19  Q  And how long did you spend?
20  A  Over the course of the last three, four weeks.
21  Q  Can you give me an estimate of the number of
22  hours or --
23  A  Somewhere a couple days worth.
24  Q  Okay. Was that just with Mr. Gottesdiener or

Page 163

1  was there anyone else present?
2  A  Mr. Gottesdiener and private time.
3  Q  And who?
4  A  And private time.
5  Q  Oh, and private time. Have you ever had any
6  conversation with Mr. Gottesdiener where somebody else
7  was present?
8  A  No.
9  Q  Or on the phone with him or anything like that?
10  A  Not aware of that.
11  Q  Okay. Are you relying on your lawyer's judgment
12  regarding whether PwC's plans are illegal?
13  A  At this moment, yes.
14  Q  Okay. Now, we already talked about how you
15  didn't look for other law firms. I'm wondering if there
16  was anything else you did to investigate
17  Mr. Gottesdiener to find out whether he would be a good
18  lawyer to hire?
19  MR. GOTTESDIENER:  Misstates his testimony. Go
20  ahead.
21  THE WITNESS:  I did research his website carefully.
22  MR. SMITH:  Q  Anything else?
23  A  I did a cursory search on the Web.
24  Q  Anything else?

Page 164

1  A  I believe that's it.
2  Q  Did you ever try to contact any references or
3  anything like that to -- who may have been clients of
4  Mr. Gottesdiener's before?
5  A  No.
6  Q  Are you aware that you dropped certain claims
7  out of your lawsuit after you filed in Illinois and it
8  was dismissed?
9  A  I was aware of that.
10  Q  Okay. And do you have any understanding about
11  why that happened?
12  MR. GOTTESDIENER:  That's just a yes or no.
13  THE WITNESS:  No.
14  MR. SMITH:  Q  No? You never inquired about -- of
15  Mr. Gottesdiener to find out why he dropped claims from
16  your lawsuit?
17  A  It didn't seem important at the time.
18  Q  I had some questions about what was marked as
19  Exhibit 1. That's those documents you produced. Do you
20  have those in front of you?
21  A  Yes.
22  Q  And there are a number of statements in here you
23  received regarding your plans and how they were doing,
24  right, within these documents?

TIMOTHY D. LAURENT

Page 165

1    A  Within these documents, yes, there are a variety
2  of statements.
3    Q  And I just wanted to ask you -- You know, just
4  by way of example, if you turn to page -- it's got TDL62
5  on it.
6    A  Yes.
7    Q  Okay.  And if you look over at the last page of
8  this document, TDL65.  Are you on TDL65?
9    A  Yes, I see that.
10    Q  And you've got a statement there about activity
11  in your RBAP account.  Do you see that?
12    A  I see that.
13    Q  And isn't it true that periodically you would
14  get statements from PwC, such as the one in front of
15  you, where it would report activity in your RBAP
16  account?
17    A  That's true.  I may not have gotten this one
18  though.
19    Q  I mean, didn't you produce that to us or --
20  These were the documents that we got from
21  Mr. Gottesdiener that purportedly came from you.
22    A  They all came from my file.  What I meant was, I
23  was out of country for a period of time.
24    Q  Oh, okay.  But you're not disputing that you got

Page 166

1  all these documents in Exhibit 1?
2    A  These are my documents.
3    Q  Okay.  But you would periodically though get
4  these reports?  There's a whole series of them in here
5  talking about activity in your RBAP account and 401-K
6  account; is that right?
7    A  My understanding is they came periodically.
8    Q  Okay.  And if we look at TDL65, it shows a range
9  of investment funds or investment measures under the
10  RBAP.  Do you see that?
11    A  I do see that.
12    Q  And the RBAP had funds that were cash
13  equivalence you could use as investment measures,
14  correct?
15    A  Yes.
16    Q  And they also had funds -- a few choices for
17  funds who were fixed income funds that you could use as
18  investment measures?
19    A  That's correct.
20    Q  And they also had balanced funds, you know,
21  different selections that you could use as investment
22  measures?
23    A  That is stated here, yes.
24    Q  And they also had large cap funds that you could

Page 167

1  use as investment measures?
2    A  Yes.
3    Q  Including index funds that tracked indices like
4  the S & P 500?
5    A  Yes.
6    Q  That's correct?
7    A  Uh-huh.
8    Q  And then they also had small cap funds, stock
9  funds that you could choose as investment measures?
10    A  Yes.
11    Q  And including funds that track the Russell 2000?
12    A  Correct.
13    Q  And they also had international stock funds?
14    A  Yes.
15    Q  And periodically you would receive a report from
16  PwC that listed all these choices of funds you could use
17  for investment measures, correct?
18    A  Periodically these did come I'm sure.
19    Q  Okay.  And it reports here that your account
20  balance was invested entirely in the cash equivalent
21  fund; is that correct?
22    MR. GOTTESDIENER:  Objection.  Go ahead.
23    THE WITNESS:  That's what it does say on this
24  sheet.

Page 168

1    MR. SMITH:  Q  Okay.  And that was the Northern
2  Trust short-term investment fund?
3    A  I believe that was the default fund from the
4  previous pension plan.
5    Q  Okay.  And so periodically you would get
6  statements from PwC telling you that your RBAP account
7  was using as an investment measure the cash equivalent
8  fund?
9    A  You know, as stated before, I was overseas for a
10  period of time and these weren't a priority.  I did not
11  understand that I could move my investments around.
12    Q  Yes, I understand -- I understand that, but I'm
13  just asking you, isn't it a fact that -- you're not
14  disputing that PwC sent you these reports that told you
15  that all your money was being valued according to the
16  cash equivalent investment measure?
17    MR. GOTTESDIENER:  Asked and answered.
18    THE WITNESS:  It is here, yes.
19    MR. SMITH:  Q  Okay.  And you're not disputing that
20  PwC periodically sent you reports that listed all the
21  different investment measures you could use for the
22  RBAP?
23    A  I'm not disputing that.
24    Q  Now, if we turn over to --

TIMOTHY D. LAURENT

Page 169

1    MR. GOTTESDIENER: I don't want to break up your
2  flow, but --
3    MR. SMITH: Do you want to have a break now?
4    MR. GOTTESDIENER: We've been going for an
5  hour-and-a-half.
6    MR. SMITH: That would be fine. I don't think I
7  have any -- I mean, I think we should take a break.
8    MR. GOTTESDIENER: I've been drinking stuff, so.
9    MR. SMITH: That's fine.
10    MR. GOTTESDIENER: Is this a good time to break?
11    MR. SMITH: That's fine. Any time you want to take
12  a break by the way, just let me know. Any time is fine.
13  Whatever is convenient for you. Like I said, I don't --
14  Are we off the record yet?
15    THE VIDEOGRAPHER: No.
16    MR. SMITH: We might want to go off the record.
17    THE VIDEOGRAPHER: Okay. We are now going off the
18  record. The time is 2:05 p.m.
19    (Recess was taken.)
20    THE VIDEOGRAPHER: We are now back on the record.
21  The time is 2:15 p.m. Counsel.
22    MR. SMITH: Q  And if you could turn in that
23  Exhibit 1 to TDL170. You got that in front of you?
24  It's one of the reports you received from the period

Page 170

1  ending June 30, 2002. Do you see that?
2    A  Yes.
3    Q  And there's some information there about
4  investment results in the lower right-hand corner.
5    A  I see that.
6    Q  And it gives some returns from your RBAP and
7  your 401-K for the one-year period and three-year
8  period.
9    A  Yes.
10    Q  And you see that the return on your RBAP account
11  was -- for over one year was 2.99 percent and you had a
12  24.69 percent loss on your 401-K.
13    A  That's what it says, yes.
14    Q  So the one-year performance of your RBAP was
15  significantly better than your 401-K performance?
16    A  True.
17    Q  You made money in the RBAP while you lost money
18  in your 401-K?
19    MR. GOTTESDIENER: Objection. Go ahead.
20    THE WITNESS: Yes, that's what it looks like.
21    MR. SMITH: Q  And then over the three-year period
22  you see that your RBAP account had a three-year return
23  of 4.95 percent?
24    A  Yes.

Page 171

1    Q  And your 401-K had a negative 10.08 percent
2  return for that three-year period?
3    A  Yes.
4    Q  So over the three-year period also your RBAP did
5  significantly better than your 401-K plan?
6    A  The RBAP did better, yes.
7    Q  And this report is basically at the end of the
8  period when you were employed. So at the end of your
9  employment your total return on your RBAP was positive,
10  while -- whereas, your 401-K return was negative; is
11  that correct?
12    MR. GOTTESDIENER: Objection. Go ahead.
13    THE WITNESS: It looks like that from this document.
14    MR. SMITH: Q  Okay. Now, I also wanted to ask you
15  about the Coopers plan and how that worked with the
16  RBAP.
17    I'm wondering whether when you left PwC you
18  were aware that because you have been participating in
19  the Coopers pension plan you had a right to receive the
20  higher of what you would have gotten under the Coopers
21  plan or what you received under the RBAP? Were you
22  aware of that?
23    A  I was not aware of that. Was not aware of that.
24    Q  Okay. Since that time have you become aware of

Page 172

1  that at all?
2    A  I guess I'm not aware of that now either.
3    Q  Okay. Maybe if you could turn to what's been
4  marked here -- It's the document starting with TDL151.
5    A  Okay.
6    Q  And if you turn to -- First, it's got a list of
7  all the different ways you could receive your money on
8  page TDL156. Do you see that?
9    A  Yes.
10    Q  And do you recollect looking at this document at
11  all?
12    A  Yes.
13    Q  And on this page it listed the number of
14  different ways we discussed that you could receive your
15  money from the RBAP when you left?
16    A  Looks right.
17    Q  And you reviewed that in preparing to leave your
18  employment at PwC?
19    A  Correct.
20    Q  Okay. Then if you turn over to TDL158.
21    A  Okay.
22    Q  And do you recall looking at this page at all?
23    A  It looks vaguely familiar.
24    Q  And then it's entitled RBAP Pension Calculation

Page 173

1  Statements for Legacy C & L Participants.
2     A  Correct.
3     Q  You would be a legacy C & L participant?
4     A  That's correct.
5     Q  And it talks about your accrued benefit formula.
6  And it says since you were employed by Coopers & Lybrand
7  on June 30, 1998 and you were employed by
8  PricewaterhouseCoopers, LLP on July 1, 1998, and you
9  were a participant in the Coopers & Lybrand retirement
10  plan on July 1, 1998, your RBAP benefit is determined
11  based on the greater of A or B below.  Do you see that?
12     A  I do see that.
13     Q  And there are two ways your benefit could be
14  calculated.  One is unfrozen career average benefit
15  based on the career average benefit formula reflecting
16  all of your accredited service through your separation
17  date.  And the other way is a hybrid career average
18  benefit, plus your cash balance plus -- balance account
19  from the RBAP based on the sum of the career average
20  benefit formula, and your accredited service determined
21  as of June 30, 1998, plus the value of your cash balance
22  account accumulated since July 1, 1998.  Do you see
23  that?
24     A  I do see that.

Page 174

1     Q  And so now do you see that you were entitled to
2  either the -- you were entitled to receive the greater
3  of your career average benefit based on the career
4  average benefit formula under the Coopers plan or the
5  amount you had received under that career average
6  benefit formula until you started the RBAP and then the
7  RBAP sums in your cash balance account, and you were
8  entitled to the greater of those two.  Do you understand
9  that?
10     A  Yes.
11     Q  Okay.  And do you know -- Well, I mean, it
12  sounds like you weren't aware of how your benefit was
13  really calculated when you left under the RBAP, which
14  one of those two options you got; is that correct?
15     A  That's correct.
16     Q  If you turn over to the next page, it has some
17  calculations there.  Do you see that?
18     A  I do see the calculations.
19     Q  And it's got a calculation for option A, which
20  is under the Coopers formula.  Do you see that?
21     A  Uh-huh.
22     Q  And it's got a value of -- an annual benefit
23  accrued as of August 31, 2001 and payable as single life
24  annuity as -- At April 30, 2002 it's got a sum of

Page 175

1  623.64.  Do you see that --
2     A  Yes, I do see that.
3     Q  -- for the annuity amount?
4        Then if you look, it's also got a sum for the
5  second way of calculating your benefit where you would
6  be getting the cash balance account value under the
7  RBAP.
8     A  I see that.
9     Q  And you see that your RBAP payment is greater
10  than what you would have received if you had just
11  continued under the Coopers formula?
12     A  Yes.
13     Q  And, in fact, isn't it true that your lump sum
14  distribution was based on your RBAP account balance?
15     A  I believe it was based on the hypothetical
16  account balance, yes.
17     Q  Okay.  And that's because the RBAP formula gave
18  you greater benefits than you would have received if you
19  had just had your benefits calculated under the Coopers
20  & Lybrand benefit formula, correct?
21     A  That appears so, yes.
22     Q  And before you filed your lawsuit you didn't do
23  any investigation to find out about that?
24        MR. GOTTESDIENER:  Objection.  To find out about

Page 176

1  that period?
2        MR. SMITH:  Q  Yes, to find out about how your -- I
3  mean, how your RBAP benefit was actually calculated when
4  you left.
5     A  I did not inquire on the specifics of the
6  calculation.
7     Q  Okay.  Are you seeking to represent participants
8  who may have had higher benefits under the Coopers
9  formula when they left under the RBAP and had their benefits calculated
10  under option A and not based on the RBAP cash account
11  balance?
12        MR. GOTTESDIENER:  Objection.  Go ahead.
13        THE WITNESS:  I'm seeking to represent everyone who
14  was a participant of the RBAP plan and 401-K plan of
15  PwC.
16        MR. SMITH:  Q  Okay.  So that would include people
17  who had their benefits calculated under option A that
18  used the Coopers formula?
19     A  Yes.
20     Q  Okay.  Now, I just wanted to ask you, if you
21  turn to TDL167, it looks like this may be a record
22  relating to your lump sum distribution under the RBAP.
23  Do you recognize that?
24     A  That does look correct.

TIMOTHY D. LAURENT

Page 177

1    Q  Okay. And does that value of $24,432.65
2  represent the amount that was your account balance value
3  under the RBAP?
4    A  That does represent the hypothetical account
5  balance, yes.
6    Q  And then from that you add some federal income
7  taxes withheld?
8    A  Correct.
9    Q  And so you ultimately received a net value of
10  $19,546.12?
11    A  Yes.
12    Q  Let's see if there's anything else on here.
13       If you could turn to TDL130.
14    A  Okay.
15    Q  You remember I was asking you about your 401-K
16  plan and whether all your money had vested. Basically I
17  was looking to records like this and seeing that it
18  looked like you had a vested balance of $52,186.53 and
19  then a closing balance of an additional amount that was
20  $68,081.74.
21       I mean, does that jog your recollection about
22  whether there was any portion of your 401-K amount that
23  was not vested when you left or why that might be?
24    MR. GOTTESDIENER: Objection, compound.

Page 178

1    THE WITNESS: I seem to recall that there was a
2  vesting of the amount of money in the 401-K as was put
3  in. So it was a five-year vesting period when the money
4  was contributed.
5    MR. SMITH: Q  Okay. So if there was some money
6  contributed within five years before you left, that
7  wouldn't be vested?
8    A  That's what I'm recalling at this moment.
9    Q  Okay. So there were some sums that were not
10  vested in your 401-K account when you left?
11    A  That's my recollection right now.
12    Q  Okay. Are you seeking to represent participants
13  who had all their funds vested when they left PwC?
14    MR. GOTTESDIENER: Literally asked and answered.
15    THE WITNESS: I'm seeking to represent all
16  participants of the plans under PwC.
17    MR. SMITH: Q  And including the people who, unlike
18  you, had all their benefits vested when they left?
19    A  Yes.
20    Q  Okay. And then if you turn over to TDL125, this
21  looks like a record of your rollover amount from the
22  401-K.
23    A  Yes.
24    Q  Okay. And you see that there's an amount of

Page 179

1  $58,122.30?
2    A  That's what it says.
3    Q  And based on your recollection is that the
4  amount that you received from your 401-K plan when you
5  left PwC?
6    A  Yes.
7    Q  Okay. And then if you turn over to TDL54. Do
8  you remember I had asked you some questions about
9  distributions and loans and things like that?
10    A  154?
11    Q  Just 54, TDL 54. Sorry.
12    A  All right.
13    Q  You see that there's a check for $10,000 that
14  was payable to you. It looks like you got some kind of
15  distribution there. Do you remember what that was?
16    A  I don't remember why. I do remember receiving
17  it.
18    Q  But you don't know -- I mean, was that a loan or
19  was that -- Do you have any idea what that was?
20    MR. GOTTESDIENER: Objection.
21    THE WITNESS: It appears to be a loan.
22    MR. SMITH: Q  Do you have any idea why you took
23  that loan out or what you did with the money?
24    A  I don't recall what I used the money for. On

Page 180

1  page 56 it describes it as a loan.
2    Q  Okay. And is that loan in addition to a loan
3  that you previously took out under the Coopers plan?
4    A  It could be.
5    Q  I mean, if you look over at TDL22, there seems
6  to be a record here of a loan from the Coopers plan.
7    A  Yes.
8    Q  And does that jog your recollection about what
9  loans you had taken out from the various plans?
10    A  I understand there's this one for 3,000 and the
11  one we just spoke of for 10,000.
12    Q  But do you recall why you took out any of those
13  loans or any of the circumstances?
14    A  I do not, no.
15    Q  Okay. If you turn over to TDL43.
16    A  Okay.
17    Q  And it's got a notice that beginning in the
18  third quarter of 1999 you will receive quarterly
19  statements from the new PricewaterhouseCoopers 401-K
20  savings plan. Do you see that? It's the last sentence.
21    A  Yes.
22    Q  And do you recall receiving quarterly statements
23  such as we've looked at in this pack of documents from
24  PwC outlining what you were invested in the PwC

Page 181

1  plans?
2     A  It says they sent them.  I guess I have no
3  reason to say they did not send them.
4     Q  And, in fact, there are a number of the
5  statements in this stack of documents here.
6     A  Indeed.
7     Q  Okay.  I mean, if you were aware of the ability
8  to select different investment measures in the RBAP,
9  what would you have chosen, you know, from the
10  investment measures that we've seen here?
11     A  Hypothetically, if I knew then what I know now,
12  it would have been much closer to what the 401-K was,
13  kind of a somewhat aggressive, but relatively modest
14  distribution in higher risk versus lower risk.
15     Q  And so -- And if you had known back then that
16  you could select investment measures, chances are you
17  would have had a negative return on your RBAP; is that
18  correct?
19     A  It's possible.
20     MR. GOTTESDIENER:  Objection.  Over what period of
21  time?
22     MR. SMITH:  Q  Over the course of your employment
23  at PwC it's certainly possible you would have had a
24  negative return on your RBAP if you had done investment

Page 182

1  options --
2     MR. GOTTESDIENER:  Objection.  Anything is possible.
3  Go ahead.
4     THE WITNESS:  I don't know.  I just don't know.  I
5  suppose it is possible.
6     MR. SMITH:  Okay.  Let's see what else I had here.
7     Exhibit 4.  I'm going to mark another stack of
8  documents, which are documents we've produced in this
9  case that have Bates numbers on the bottom ranging from
10  PwCL000001 to PwCL000149.  Is that what's in front of
11  you?
12     (Document marked as Deposition
13     Exhibit 4 for identification.)
14     THE WITNESS:  Yes.
15     MR. SMITH:  Q  And have you seen these documents
16  before?
17     A  Yes.
18     Q  And when -- I mean, when did you see these?  Was
19  it -- Did you see this exact set produced in the
20  litigation with the Bates numbers on it or are these
21  documents you saw before?
22     MR. GOTTESDIENER:  Objection.
23     THE WITNESS:  Both.
24     MR. SMITH:  Q  Okay.  And were these documents --

Page 183

1  Did Mr. Gottesdiener give you these documents?
2     MR. GOTTESDIENER:  Objection.  I mean, it's so
3  obvious, but --
4     MR. SMITH:  Q  He must have.  I mean, he gave you
5  the documents sometime before your deposition today?
6     MR. GOTTESDIENER:  You didn't send him a personal
7  set.  If you're asking about the Bates numbered ones,
8  you know --
9     MR. SMITH:  Q  You got them from Mr. Gottesdiener?
10     MR. GOTTESDIENER:  Can't we just avoid that because,
11  you know, you're not willing to say that you're not
12  going to argue waiver later on?
13     MR. SMITH:  Q  When did you receive the Bates
14  numbered documents?
15     MR. GOTTESDIENER:  Yes, you can answer that.  Just
16  say when.
17     THE WITNESS:  I believe it was last week.
18     MR. SMITH:  Q  Okay.  And if you look over at
19  PwCL 000016, you've got a number of statements like you
20  had in your packet of documents regarding activity in
21  your accounts.  Do you see that?
22     MR. GOTTESDIENER:  Objection.
23     MR. SMITH:  Q  Do you see those?
24     A  Yes.

Page 184

1     Q  And they tell you what investment options and
2  investment measures are available and what you're
3  invested in, right?
4     A  They appear to.
5     Q  And did you receive copies of this type of
6  document while you were at PwC?
7     A  I see no reason why I did not receive them.  I
8  don't know if I looked at them, but I most have received
9  them.
10     Q  Okay.  By the way, where were you out of the
11  country just out of curiosity?
12     A  I was in Europe.
13     Q  Okay.  And what were you doing over there?
14     A  Consulting work.
15     Q  Okay.  And that was for PwC?
16     A  Correct.
17     Q  And how -- what period of time were you out of
18  the country?
19     A  Late summer, early fall of '99 through winter of
20  2001.
21     MR. SMITH:  Okay.  I don't have any other questions
22  about that stack of documents.  5.
23     (Documents marked as Deposition
24     Exhibits 5 and 6 for identification.)

TIMOTHY D. LAURENT

Page 185

1     MR. SMITH: Q  I'm going to hand you what's been
2  marked as Exhibits 5 and 6.
3        And, Eli, I've got a hand-signed copy for you
4  because there's some issue about -- you want that served
5  on you. So those are for you.
6     MR. GOTTESDIENER: I don't want anything other than
7  what the rules provide.
8     MR. SMITH: Yes, I know, but we can take that up at
9  a later time.
10        But, at any rate, Mr. Laurent --
11     MR. GOTTESDIENER: You have a desire to have these
12  things served.
13     MR. SMITH: Actually, we did serve them in the
14  manner you requested, but there's a disputed issue about
15  that.
16     MR. GOTTESDIENER: It's not a disputed issue.
17  There's a question --
18     MR. SMITH: It's disputed by you, not by us.
19     MR. GOTTESDIENER: And where was that that I agreed
20  and we had an agreement that I would --
21     MR. SMITH: It was in our e-mail correspondence.
22     MR. GOTTESDIENER: Yes, and that's why I hand-served
23  my stuff on you because we had such an agreement.
24     MR. SMITH: We didn't have any agreement to

Page 186

1  hand-serve.
2     MR. GOTTESDIENER: No, exactly. We didn't have any
3  agreement to do anything by e-mail. Why then ask me --
4     MR. SMITH: You asked for them.
5     MR. GOTTESDIENER: No, I didn't.
6     MR. SMITH: Well, we can take that up later if
7  necessary.
8     MR. GOTTESDIENER: Oh, but I thought you use these
9  depositions to have conversations with counsel about
10  things that are not in a deposition?
11     MR. SMITH: Okay. Well, if you want to have a
12  conversation --
13     MR. GOTTESDIENER: No, I don't.
14     MR. SMITH: We say we served them on you. You say
15  you're not. You can tell me whether you're going to
16  answer them before our response is due. My
17  understanding is you're refusing to, right?
18     MR. GOTTESDIENER: Your understanding as formulated
19  is not accurate.
20     MR. SMITH: Q  Oh, okay.
21        Have you ever seen these before, Mr. Laurent,
22  Exhibits 5 and 6?
23     A  I don't believe so.
24     Q  And maybe you can take a look at the document

Page 187

1  request, the one labeled First Request for the
2  Production of Documents.
3     A  Okay.
4     Q  And maybe take a look at that. You know,
5  actually look at what we're asking -- you know, what
6  documents we're asking for in here.
7     MR. GOTTESDIENER: You want him to read the document
8  request?
9     MR. SMITH: Sure, he can read the document request
10  starting on page 4 here.
11     MR. GOTTESDIENER: Is there a question, because
12  you're only entitled to ask him questions?
13     MR. SMITH: Well, I'm just going to ask him if he
14  has -- Well, I want to give him an opportunity to read
15  it, and then I will ask him, do you have any additional
16  documents beyond what you've produced that would be
17  responsive to these?
18     MR. GOTTESDIENER: Okay. Well, we'll construe that
19  as him asking that question. Now read them. He has to
20  do the reading and --
21     THE WITNESS: So the document request on page 4?
22     MR. SMITH: Yes.
23     MR. GOTTESDIENER: Would it be fair, Doug, to say
24  that he wants you to read these with in mind do you have

Page 188

1  anything else in your possession that you haven't
2  already produced that we've labeled as Exhibit 1?
3     MR. SMITH: Exhibit 1.
4     THE WITNESS: Okay. I do not believe I have any
5  further documents at this time at this table.
6     MR. SMITH: Q  Well, I mean, not at this -- not in
7  the room. Anywhere. Anywhere you have access to do you
8  have any more documents?
9     A  What I'm meaning is, sitting here right now, I
10  don't think I have anything additional.
11     Q  Well, I know, but do you have anything at home
12  or in your office --
13     MR. GOTTESDIENER: He means that. He's just saying
14  he can't-- He's not saying absolutely a thousand
15  percent. That's all he's saying. I'm not trying to
16  coach him.
17     THE WITNESS: I believe that the voluntary Exhibit
18  No. 1 was where I ran through my file folder and was
19  able to come up with.
20     MR. GOTTESDIENER: And he wants you to -- And I
21  don't know how far you got, but he wants you to read
22  this. Could I just do this for a second?
23     MR. SMITH: Yes. We're just asking for --
24     MR. GOTTESDIENER: You didn't have this when I asked

Page 189

1   you to get me all your documents that have anything to
2   do with PwC, et cetera.
3       MR. SMITH: Right.
4       MR. GOTTESDIENER: He wants you, now that he's
5   formulated this, to read it and, you know, is there
6   something in here that, oh, you know, I have in my
7   possession somewhere that I didn't already produce?
8       THE WITNESS: Okay.
9       MR. GOTTESDIENER: So did you read the whole thing
10  already?
11      THE WITNESS: I read the number 1A through H right
12  now.
13      MR. GOTTESDIENER: Yes, go through --
14      MR. SMITH: Keep going through all of them.
15      MR. GOTTESDIENER: Yes, go through the end, because
16  you're going to have to do it one way or the other.
17  Either you're going to have to do it sitting here or
18  you're going to have to do it, you know, when we leave.
19      MR. SMITH: You want to go off the record for a
20  second so he can switch the videotape?
21      MR. GOTTESDIENER: Sure.
22      THE VIDEOGRAPHER: This will now conclude videotape
23  No. 3. We are going off the record at 2:43 p.m.
24      (Recess was taken.)

Page 190

1       THE VIDEOGRAPHER: We are now back on the video
2   record. The time is 2:45 p.m. And this is videotape
3   No. 4 of the deposition of Timothy Laurent taking place
4   on November 3rd in the year 2005. Counsel.
5       THE WITNESS: I've reviewed the document. I will
6   take a last look through my file folders to make sure
7   I've not missed anything with the voluntary documents.
8       MR. SMITH: Q  And by that, sitting here today,
9   nothing comes to mind additional?
10      A  That's correct.
11      Q  Now, are there any documents that you would
12  consider privileged other than potentially some of the
13  retainer agreement that you haven't turned over that --
14  but you have in your possession?
15      A  I don't believe I have anything that's
16  privileged.
17      Q  Other than the retainer agreement?
18      A  (Nodding head.)
19      Q  No e-mail correspondence with Mr. Gottesdiener
20  or anything like that?
21      A  No.
22      MR. SMITH: I'm going to hand you what's marked as
23  Exhibit 7 I think we're on. It's a copy of Defendant's
24  Memorandum of Points and Authorities in Support of Their

Page 191

1   Motion to Dismiss.
2       Have you ever seen that document before?
3       THE WITNESS: Yes.
4       (Document marked as Deposition
5       Exhibit 7 for identification.)
6       MR. SMITH: Q  Okay. And when did you see that?
7       A  Probably within the last couple of months. I
8   don't know the specific date that I received it.
9       Q  Okay. It's not within the last week or so?
10      A  No.
11      Q  Have you read through this at all?
12      A  I've glanced through it.
13      Q  Okay. I want to ask you, if you look on page 2,
14  it's got a series of paragraphs there, you know, labeled
15  first, second and third. Do you see that?
16      And the first one says counts 1 through 9, all
17  of which allege plaintiff received too small a lump sum
18  payment of his vested benefits when he left PWC are
19  barred by the applicable three-year statute of
20  limitations.
21      A  I see that.
22      Q  And then if you -- Well, first, let me ask you,
23  do you have any understanding of what the statute of
24  limitations is?

Page 192

1       A  I understand it, and I also understand that I'm
2   still a participant in the plans. Therefore, it doesn't
3   affect me.
4       Q  Okay. And where did you get that understanding?
5       MR. GOTTESDIENER: Why do we want to do this?
6       MR. SMITH: Q  Is there anyone other than
7   Mr. Gottesdiener that gave you that understanding?
8       A  No.
9       Q  Okay. Now, if we turn over to page 9, do you
10  see that there's a paragraph there, first full
11  paragraph, it says in the District of Columbia, the
12  statute of limitations for breach of contract claims is
13  three years. Plaintiff alleges he left his employment
14  with PwC in 2002, and, at his election, received a
15  single lump sum distribution of this entire accrued
16  benefit from both the RBAP and 401-K plan.
17      He further alleges he received that lump sum
18  payment on May 20, 2002 in the amount of $24,432.65, an
19  amount equal to the nominal balance in plaintiff's cash
20  balance account. And payment of this amount, he claims,
21  violated ERISA.
22      Accordingly, plaintiff's complaint demonstrates
23  on its face that any claim for improper payment of
24  benefits accrued no later than May 20, 2002, when

TIMOTHY D. LAURENT

Page 193

1  plaintiff received his final -- and allegedly
2  inadequate -- payment of benefits under the RBAP. Since
3  plaintiff filed this action on June 28th, 2005, more
4  than three years after this date, his claim is barred as
5  a matter of law. Do you see that?
6      MR. GOTTESDIENER: Objection.
7      THE WITNESS: I see that.
8      MR. GOTTESDIENER: That wasn't completely read.
9  Mischaracterizes what it even says there. Go ahead.
10     MR. SMITH: Q  Okay. Now, you recall you filed an
11 initial action in the Southern District of Illinois
12 court?
13     A  Yes.
14     Q  And that case was dismissed, right?
15     A  For change of venue, yes.
16     Q  And that was dismissed before May 20th of 2005?
17     A  I believe so.
18     Q  And then there were several months that elapsed
19 before you refiled your lawsuit?
20     MR. GOTTESDIENER: Wrong.
21     MR. SMITH: Q  Well, there was -- More than a month
22 elapsed before you refiled your lawsuit? There was a
23 gap there.
24     A  There was a gap.

Page 194

1      Q  And during that gap you passed the May 20th,
2  2005 cut-off point that we're mentioning?
3      MR. GOTTESDIENER: Wrong. Objection. Cut-off
4  point?
5      MR. SMITH: Q  You filed your -- Your second
6  complaint in the District of Columbia was filed after
7  May 20th, 2005, right?
8      A  Correct.
9      Q  There's no reason you couldn't have had your
10 complaint filed earlier than that in the District of
11 Columbia that you're aware of, is there?
12     MR. GOTTESDIENER: Objection. That calls for
13 attorney-client privilege.
14     MR. SMITH: Are you instructing him not to answer?
15     MR. GOTTESDIENER: Yes.
16     MR. SMITH: Q  You recognize that you have a duty
17 to pay attention as a class representative with what's
18 happening in your lawsuit, right?
19     A  Correct.
20     Q  And what steps did you take to monitor your
21 lawyer to ensure that he would file your -- refile your
22 lawsuit within the statute of limitation period?
23     MR. GOTTESDIENER: Objection, falsely states the
24 state of affairs and the law. You can answer the

Page 195

1  question without disclosing anything that I told you.
2  What steps did you take to monitor, that's the aspect of
3  the question that you can answer.
4      THE WITNESS: We've had several phone calls.
5      MR. SMITH: Q  Okay. Are you aware that at the --
6  at a hearing in the -- in Illinois that defendants
7  proposed transferring your case to another court instead
8  of having it dismissed, in which case the statute of
9  limitations would continue to run, and then having it
10 refiled later on?
11     MR. GOTTESDIENER: Objection, compound. If you want
12 to ask him if he's aware of what happened publicly,
13 that's one thing.
14     MR. SMITH: That's what I'm asking.
15     MR. GOTTESDIENER: You're mixing it -- Stop it,
16 Doug. You're mixing in clearly stuff that he and I
17 spoke about.
18     He's already explained to you that he had
19 conversations with me. You're mixing in what he and I
20 discussed, what I explained to him. If you want to ask
21 him is he aware what happened in court, that's one
22 thing.
23     MR. SMITH: That's what I want to know.
24     MR. GOTTESDIENER: No, your question is compound in

Page 196

1  that sense.
2      MR. SMITH: Q  Well, why don't I ask that question
3  then, which is what I thought I had asked.
4      Are you aware that at this hearing in Illinois
5  there was a discussion with the court about whether your
6  case should be dismissed or whether it could just be
7  transferred to another court?
8      MR. GOTTESDIENER: Objection. Go ahead and answer
9  if you know.
10     MR. SMITH: Q  Were you aware of that?
11     A  My understanding is there was a discussion, but
12 I don't know the specifics of that discussion.
13     Q  Okay. Have you ever asked for any of the
14 transcripts of the hearings in your case?
15     A  No.
16     Q  I mean, what steps are you taking in general to
17 monitor -- to make sure that your lawyer is diligently
18 prosecuting your claims and is filing things by the
19 deadlines?
20     A  I have frequent conversations with him.
21     Q  Anything else?
22     A  Nothing I can think of at this moment.
23     Q  And are you aware that there's a local rule in
24 the District of Columbia that requires a motion for

TIMOTHY D. LAURENT

Page 197

1  class certification be filed within 90 days of the
2  complaint?
3      A  I do.
4      Q  Are you aware that your motion for class
5  certification was filed after that deadline?
6      A  I don't think so.
7      Q  And you haven't done anything to monitor to
8  determine one way or the other or you believe it wasn't
9  filed after 90 days?
10     A  I don't know.
11     Q  Okay.  Well, if we take a look at your
12  complaint, I think there's probably a date on there.
13     A  Okay.
14     Q  And what's the date on your complaint?
15     MR. GOTTESDIENER:  July 5th.  The date of the class
16  motion was October 5th.
17     MR. SMITH:  That's right, but there happened to be
18  31 days in some of those months in between.
19     MR. GOTTESDIENER:  This is great, Doug.  Have you
20  read the transcript of what Bob twice said to Judge --
21  Chief Judge Murphy when I was not given any opportunity
22  to respond, that I relied on him saying we have no
23  objection to transcript?
24     MR. SMITH:  Is that an objection?  Speaking

Page 198

1  objections are inappropriate.
2      MR. GOTTESDIENER:  No, I'm having a conversation
3  with you separately because what you guys are doing is
4  just so absurd.  You ask us --
5      MR. SMITH:  It's not absurd.  It goes to adequacy, a
6  class counsel -- inadequacy of the class representative.
7  And I just -- He just told me he believes that his class
8  motion was filed within 90 days.
9      MR. GOTTESDIENER:  Objection.  He said what he said.
10  Ask questions.
11     MR. SMITH:  Q  Was your class motion --
12     MR. GOTTESDIENER:  You haven't handed -- You know,
13  you were asking --
14     MR. SMITH:  No, it's an exhibit here.  You want to
15  look at it?
16     MR. GOTTESDIENER:  So find it.  Tell him which one
17  to look at.
18     MR. SMITH:  Q  Can you find the class motion in
19  your exhibit stack?  I think it might be 2, but I'm not
20  sure.
21     A  Okay.  What is the question?
22     Q  Yes.  Now that you've looked at the class motion
23  and the complaint, do you know whether or not your class
24  motion was filed within 90 days of your complaint?

Page 199

1      MR. GOTTESDIENER:  Asked and answered.
2      THE WITNESS:  I believe it was 90 days.  I don't see
3  the specific dates here.
4      MR. SMITH:  Oh.
5      MR. GOTTESDIENER:  Are you looking for establishment
6  of the fact that there's 31 days?  We stipulate to that.
7      MR. SMITH:  I know, but I want him to find the date
8  on --
9      MR. GOTTESDIENER:  You want to establish it's a big
10  failing of his because he didn't know the rule --
11     MR. SMITH:  No, I'm not.  And you're coaching the
12  witness.  I'm not -- I just want to ask him --
13     MR. GOTTESDIENER:  Oh, yes, this is a real coaching
14  of the witness.  This is a very crucial point.
15     MR. SMITH:  Let's see whose name is on the bottom.
16  Is this Tim Laurent or is it Eli Gottesdiener?
17         I'm asking you, you see that the date on the
18  last page is October 5th, 2005, right?
19     MR. GOTTESDIENER:  He's looking at a different
20  document, because you never told him what exhibit to
21  look at.  You made the witness --
22     MR. SMITH:  What exhibit are you looking at?
23     THE WITNESS:  No. 3.
24     MR. SMITH:  Q  Okay.  Let me see what you've got

Page 200

1  there.  That's the complaint.  Okay.  And Exhibit 2, if
2  you look at the last page, you see the date there is
3  October 5th, 2005?
4      A  Yes, it is dated October 5th, 2005.
5      Q  Okay.  And Mr. Gottesdiener was just talking
6  about how there were 31 days in some of those months in
7  between.
8      MR. GOTTESDIENER:  I was?  I wasn't talking about
9  that.
10     MR. SMITH:  Q  Well, at any rate, I'll just ask you
11  the question.  Isn't it true that your class motion was
12  filed outside the 90-day time period under the local
13  rules?
14     MR. GOTTESDIENER:  If you know.
15     THE WITNESS:  I don't know those rules.  Someone
16  could construe 90 days as three months.  I don't know
17  how to answer the question.
18     MR. SMITH:  Q  Okay.  Is that something as a class
19  representative you would want to investigate --
20     A  Yes.
21     Q  -- as part of your monitoring activities?
22         And do you intend to do that?
23     A  Yes.
24     Q  Okay.  Are you going to take any actions to

TIMOTHY D. LAURENT

Page 201

1  ensure that deadlines under the rules or statutes are
2  complied with to protect not only your interest but the
3  interest of other class members?
4      A  Yes.
5      Q  Okay. And do you feel that any steps are
6  necessary regarding the statute of limitations issue?
7      A  Could you please rephrase that?
8      Q  The statute of limitations. Do you think
9  there's any steps you need to take given that that was
10  filed outside of three years?
11      MR. GOTTESDIENER: Objection, false.
12      THE WITNESS: I believe that because I'm still a
13  participant of the plan the statutory effect hasn't
14  started yet.
15      MR. SMITH: Q  Okay. And if you're wrong about
16  that, then what will your view be?
17      A  I'll have to look into that.
18      MR. SMITH: Okay. No further questions at this
19  time. Thanks for your time.
20      THE WITNESS: Thank you, sir.
21      MR. GOTTESDIENER: No questions.
22      THE VIDEOGRAPHER: This will now conclude videotape
23  No. 4 and it will conclude today's testimony. We are
24  going off the record at 2:59 p.m.

Page 202

1  STATE OF ILLINOIS  )
                       ) Ss:
2  COUNTY OF C O O K  )
3
4      The within and foregoing deposition of the
5  aforementioned witness was taken before NADINE J. WATTS,
6  CSR, RPR, and Notary Public, at the place, date and time
7  aforementioned.
8      There were present during the taking of the
9  deposition the previously named counsel.
10      The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the questions
12  and answers were taken down in shorthand by the
13  undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the aforementioned witness, at the time
17  and place hereinabove referred to.
18      The signature of the witness was not waived,
19  and the deposition was submitted, pursuant to
20  Rules 30 (e) and 32 (d) of the Rules of Civil Procedure
21  for the United States District Court, to the deponent
22  per copy of the attached letter.
23      The undersigned is not interested in the within
24  case, nor of kin or counsel to any of the parties.

Page 203

1      Witness my official signature and seal as
2  Notary Public in and for Cook County Illinois on this
3  _____ day of _____, A.D. 2005.
4
5
       _____
6      NADINE J. WATTS, CSR, RPR
       License No. 084-002736
       Notary Public
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 204

1      IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE DISTRICT OF COLUMBIA
2
3  TIMOTHY D. LAURENT, on behalf   )
   of himself and on behalf of all  )
4  others similarly situated,      )
       Plaintiff,         )
5                          ) Civil Action
       -vs-               ) No. 05-1291 (PLF)
6                          )
   PRICEWATERHOUSECOOPERS, LLP,   )
7  et al.,              )
       Defendants.       )
8
9      I, TIMOTHY D. LAURENT, being first duly sworn,
10  on oath say that I am the deponent in the aforesaid
11  deposition taken on November 3, 2005; that I have read
12  the foregoing transcript of my deposition, consisting of
13  pages 1 through 204 inclusive, and affix my signature to
14  same.
15
16
17      _____
          TIMTOHY D. LAURENT
18
19  SUBSCRIBED AND SWORN TO
    before me this __ day of
20  _____
    A.D. 2005.
21
22  Notary Public
23
24

204

1      IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE DISTRICT OF COLUMBIA

2

3    TIMOTHY D. LAURENT, on behalf      )
     of himself and on behalf of all    )
4    others similarly situated,         )
           Plaintiff,                   )
5                                       ) Civil Action
        -vs-                            ) No. 05-1291 (PLF)
6                                       )
     PRICEWATERHOUSECOOPERS, LLP,       )
7    et al.,                            )
           Defendants.                  )
8

9         I, TIMOTHY D. LAURENT, pursuant to 28 U.S.C.

10    § 1746, say that I am the deponent in the aforesaid

11    deposition taken on November 3, 2005; that I have read

12    the foregoing transcript of my deposition, consisting of

13    pages 1 through 204 inclusive, and affix my signature to

14    same and that I declare under penalty of perjury under the

15    laws of the United States of America that the foregoing is true

16    and correct.

17
                    TIMOTHY D. LAURENT
18

19

20

21

22

205

CASE: Laurent vs. PricewaterhouseCoopers
DEPONENT: Timothy D. Laurent, taken 11-3-05

| PAGE | LINE | | ERRATA SHEET |
|------|------|--------|--------------|
| 6 | 9 | CHANGE:<br>REASON: | "Four" instead of "three"<br>Witness misspoke |
| 17 | 17 | CHANGE:<br>REASON: | "Forrester" instead of "Forester"<br>Misspelling |
| 17 | 18 | CHANGE:<br>REASON: | "Rainer Mehl" instead of "Ed Himermeal"<br>Misspelling |
| 17 | 19 | CHANGE:<br>REASON: | "Chau" instead of "Chow"<br>Misspelling |
| 28 | 12 | CHANGE:<br>REASON: | "Craig" instead of "Fred"<br>Transcription error |
| 29 | 2 | CHANGE:<br>REASON: | "Chau" instead of "Chow"<br>Misspelling |
| 29 | 4 | CHANGE:<br>REASON: | "Forrester" instead of "Forester"<br>Misspelling |
| 29 | 10 | CHANGE:<br>REASON: | To "Forrester" and "Chau," as above<br>Misspelling |
| 30 | 11 | CHANGE:<br>REASON: | "John" instead of "Sean"<br>Misspelling |
| 32 | 15 | CHANGE:<br>REASON: | Insert "what" between "not" and "was"<br>Transcription error or witness misspoke |
| 33 | 19 | CHANGE:<br>REASON: | "benefit" instead of "fund"<br>Witness misspoke |
| 46 | 19 | CHANGE:<br>REASON: | "briefs instead of "plans"<br>Witness misspoke |
| 46 | 20 | CHANGE:<br>REASON: | Insert "making some" before "on"<br>Transcription error or witness misspoke |

206

CASE: Laurent vs. PricewaterhouseCoopers
DEPONENT:  Timothy D. Laurent, taken 11-3-05

PAGE    LINE              ERRATA SHEET (continued)

46    21         CHANGE:   "compelling" instead of "compulsive"
                 REASON:   Witness misspoke

46    21         CHANGE:   "arguments" instead of "discussions"
                 REASON:   Witness misspoke

47    17         CHANGE:   "ERISA" instead of "reseller tax"
                 REASON:   Transcription error

87    17         CHANGE:   "grievance" instead of "grief"
                 REASON:   Transcription error or witness misspoke

197   23         CHANGE:   "transfer" instead of "transcript"
                 REASON:   Transcription error

(signed) _____  DATE 10 Nov 2005

REPORTER:  Nadine J. Watts, C.S.R., R.P.R.