# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TIMOTHY D. LAURENT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 05-1291 (PLF) |
| vs. | ) |
| | ) Judge Paul L. Friedman |
| PRICEWATERHOUSECOOPERS LLP, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Patrick James Attridge (357973)
KING & ATTRIDGE
39 West Montgomery Avenue
Rockville, MD  20850
(301) 279-0780 (phone)
(301) 279-2988 (fax)

*Counsel for Defendants Donald T. Nicolaisen
and Walter G. Ricciardi*

David E. Mendelson (471863)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
(202) 879-5000 (phone)
(202) 879-5200 (fax)
dmendelson@kirkland.com

Robert J. Kopecky
Douglas G. Smith
Lauren O. Casazza
Jason W. Callen
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Counsel for all defendants
except Nicolaisen and Ricciardi*

Dated:  November 29, 2005

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Page(s)

COUNTERSTATEMENT OF FACTS ..................................................................................2

ARGUMENT ...............................................................................................................13

    I.      Plaintiff Lacks Standing To Assert The Claims Of The Proposed Class. ............14

    II.     Plaintiff Has Not Met His Burden Of Establishing That He Meets The
          Criteria Of Rule 23(a)(3) And 23(a)(4). ................................................18

          A.     Plaintiff Does Not Satisfy The Typicality Requirement Of Rule
               23(a)(3). ..........................................................................18

          B.     Plaintiff Does Not Satisfy The Adequacy Requirement Of Rule
               23(a)(4). ..........................................................................23

    III.    The Proposed Class Is Not Appropriate For Certification Under Rule
          23(b)(1) Or 23(b)(2). ......................................................................26

          A.     Plaintiff Has Not Established That Certification Is Appropriate
               Under Rule 23(b)(1). ..........................................................26

          B.     Plaintiff Has Not Established That Certification Is Appropriate
               Under Rule 23(b)(2). ..........................................................29

CONCLUSION ...........................................................................................................34

Plaintiff, who left PwC and received a lump-sum distribution of his accrued pension benefits in May 2002, seeks to represent a disparate class of participants in PwC's retirement plans from 1994 through the present.  The predominant form of relief plaintiff seeks, on behalf of himself and other former participants in the plans, is damages – *i.e.*, additional benefits.  In addition, although he is no longer a participant in any PwC plan, plaintiff seeks prospective relief with respect to the PwC plans, including injunctions against defendants' future conduct and reformation of the plans.

Plaintiff has moved to certify a single unified class pursuant to Rules 23(b)(1) and 23(b)(2).  Thus, even though he is seeking predominantly (if not exclusively) damages relief for himself and a significant portion of the proposed class, plaintiff asks the Court to certify this proposed class without affording any member of the class a right to opt-out.  Moreover, while plaintiff seeks an order "reforming" the PwC plans under which current participants are now accruing benefits, he does not even propose to provide notice to members of the putative class who would be affected by such an order.

The Supreme Court has made clear that a court should certify a class only after conducting a rigorous analysis of whether plaintiff has met his burden of establishing each of the criteria under Rule 23(a) and at least one section of Rule 23(b).  The Court has also emphasized that courts should be vigilant of the due process rights of absent class members.  Here, plaintiff has not met his burden for several reasons.  First, he has not sufficiently demonstrated that he meets the typicality and adequacy requirements of Rule 23(a)(3) and (a)(4).  Second, because this action seeks predominantly monetary relief, certification of a non-opt-out, no-notice class under Rule 23(b)(1) or 23(b)(2) is not appropriate.  And plaintiff has not even attempted to demonstrate that he meets the criteria for certification under Rule 23(b)(3).  Accordingly, plaintiff's motion should be denied.

## COUNTERSTATEMENT OF FACTS

**PwC's Benefit Plans**

Plaintiff purports to represent a class of individuals that includes current and former participants of three separate PwC benefit plans: The Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP ("RBAP"), the Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP ("SPEP"), and the Savings Plan for Employees of PricewaterhouseCoopers LLP ("SPE"). Plaintiff is a former participant in only two of the three plans: the RBAP and the SPEP. (*See* Cmplt. ¶ 17)

**The RBAP**

The RBAP is the result of a merger of two separate plans that existed for the benefit of employees of Coopers & Lybrand LLP ("C&L") and Price Waterhouse LLP ("PW") before those two firms merged to form PricewaterhouseCoopers LLP. Beginning in 1954, C&L offered its employees and partners the Coopers & Lybrand Retirement Plan ("C&L Plan"), which was a "traditional" defined benefit pension plan. (*See* Ex. A, RBAP at 1) Benefits under the C&L Plan were determined based on a pension formula that factored in participants' years of service and salary.[1] (*See* Ex. A, RBAP Appendix B) Beginning on July 1, 1994, PW offered its employees and partners a "cash balance" pension plan. (*See* Cmplt. ¶ 37) Under that plan, as with the current RBAP, individual participants' benefits were calculated based on two separate components: (1) periodic credits made to a hypothetical account of each eligible participant, and

---

[1] Participants' benefits were calculated and expressed as a monthly annuity beginning at age 65. (*See* Ex. A, RBAP Appendix B, § 3) Under the C&L Plan's most recent traditional pension formula, an employee's monthly benefit was essentially equal to the sum of 1% of the first $21,000 of the employee's compensation and 1.5% of the remainder of the employee's compensation for each of the participant's years of service. (*See* Ex. B, RBAP SPD (2001) at 5-6) And for employees employed by PwC on July 1, 1998 and June 1, 1999 and November 1, 1999 the benefit was updated to consider compensation for the three consecutive calendar year prior to July 1, 1999. (*See* Ex. A, RBAP Appendix B, § 1(a)(ii)(A))

(2) additional adjustments to the account reflecting the performance of investment measures selected by participants.  (*See id.*, RBAP §§ 2.14, 2.15)

On July 1, 1998, C&L merged with PW and effective as of that same date the C&L Plan was amended to allow participants to simultaneously accrue benefits in the C&L Plan under both the existing defined benefit formula and a cash balance formula with interest credited at the rate of 30-year Treasury Bonds.  (*See* Ex. A, RBAP Appendix B, §§ 1, 12(e); Ex. B, RBAP SPD (2001) at 5)  On July 1, 1999, the existing PW cash balance Plan merged into the C&L Plan to form the RBAP.  (Ex. B, RBAP SPD (2001) at 5)

Following the merger of the two plans, the RBAP preserved the C&L Plan's traditional defined benefit formula and gave all eligible participants the opportunity to accrue benefits under the cash balance formula.  For former C&L employees, the cash balance formula of the RBAP is relevant only if, when added to the pre-July 1, 1998 C&L Plan pension benefit, it would yield a benefit to that individual participant *greater* than the benefit that would have been accrued under the traditional formula of the C&L Plan, both before and after July 1, 1998.  (*Id.* at 5-6)  The application of the RBAP's two primary benefit formulas therefore hinges on each individual's employment, compensation and accrual history.

In addition, there are variations within the RBAP accrual formulas for different categories of participants.  The major distinctions depend on whether: (1) the participant is an employee, director, managing director, principal, or partner; and (2) the individual was employed by or a partner of C&L.

**PWC Partners, Principals, Managing Directors, Directors, and Employees**

Although all current participants in the RBAP earn credits to their cash balance accounts, the rate or formula used to determine the amount of credits varies from participant to participant.  The benefit actually payable by the RBAP to a participant who was an employee or

a partner also varies from participant to participant based on a number of additional factors.[2] Employees of PwC currently receive every pay period a credit equal to 5% of their compensation.  (*See* Ex. A, RBAP § 2.15)  But employees who were classified as directors  or managing directors on October 31, 2004, generally receive a pay credit of 7% of their compensation, and those newly classified as managing directors after October 31, 2004, currently receive pay credits totaling 8% of their compensation.[3]  (*See id.,* Amendment to RBAP § 2.15 effective October 1, 2004)  Partners' and principals' credits are calculated under a separate formula based on a target benefit that may not exceed that partner's or principal's "earned income," defined by reference to Internal Revenue Code § 401(c)(2), for the plan year.[4] (*See id.*, RBAP § 2.15)

Upon departing the Plan, employees in most cases are also entitled to a minimum benefit of $7,000 (plus interest) if this amount is greater than that of their account balance, or in the case of a former C&L participant, their benefit under either applicable formula.  (*See id.*, RBAP § 2.13)  This provision does not apply to partners or principals.  (*See id.*)

---

[2] These factors could include whether the participant's benefits must be limited based on the limitations placed on benefits payable by qualified plans pursuant to the Internal Revenue Code (s*ee* Ex. A, RBAP § 2.11 and Article 7), whether the participant had an age and service combination that would entitle him or her to a subsidized early retirement benefit under the C&L Plan, preserved in the RBAP through Appendix B (*see id.*, RBAP Appendix B, § 4; Ex. B, RBAP SPD at pg. 9), and whether he or she was a former C&L partner or principal that participated in the Coopers & Lybrand Target Benefit Plan or in an individual defined benefit plan sponsored by C&L (*see id.*, RBAP Appendix B, § 2(C))

[3] These general rules regarding credits are also subject to numerous exceptions that create further distinctions among participants.  For example, if a managing director was a participant on October 31, 2004, that individual receives credits equal to 7% of his or her compensation.  But if that managing director subsequently terminates employment and is then later rehired, in a position other than that of a managing director, that individual would receive credits of 5%.  (*See* Ex. A, RBAP, Amendment to RBAP § 2.15 effective October 1, 2004)

[4] There are a number of special rules that apply to partners' benefits accruing under the RBAP for certain specified years, such as the 1998 merger of C&L and PW, the 1999 transition year, and the 2002 divestiture of a PwC consulting business.  (*See, e.g.*, Ex. A, RBAP § 2.15)

**Former C&L Employees and Partners**

Whether the RBAP's cash balance formula governs the determination of the benefit payable to a RBAP participant depends on whether the participant is a former employee or partner of C&L. Former C&L employees and partners who left C&L before its 1998 merger with PW but who are still receiving, or entitled in the future to receive, benefit payments are covered by the RBAP. Yet the benefits for this group of RBAP participants are calculated based solely on the old C&L Plan's traditional defined benefit formula. (*See id.*, RBAP Appendix B § 1(a))

Former C&L employees and partners who went on to work for PwC after June 1998 have their benefits calculated under both the traditional defined benefit formula and the cash balance formula. Former C&L employees are entitled to receive the greater of two benefits: (1) what they would have received under the C&L Plan's traditional pension formula, including employment and compensation after the merger of PW and C&L; or (2) their accrued benefit under that formula as of June 30, 1998 plus the value of their RBAP cash balance account accumulated since June 30, 1998. (*See* Ex. A, RBAP Appendix B, § 1; Ex. B, RBAP SPD (2001) at 5-6)

**401(k) Plans – The SPEP and SPE**

PwC sponsors two "401(k)" plans: the SPEP and the SPE (collective the "401(k) Plans"). The SPEP was established on October 1, 1985 by PW, and was merged with the Coopers & Lybrand LLP Multi-Investment Accumulation Plan and the Kwasha Lipton Savings Plan in April 1999. The SPE was first established by PW on October 1, 1994.

The two 401(k) plans generally have the same benefit formula, but the amount of contributions an individual may receive to their Plan account depends on each individual participant's job status and whether they are an employee, partner, or principal. Employee

participants may generally contribute up to 100% of their compensation – whether pre-tax or after-tax – to the plan.[5]  (*See* Ex. C, SPEP §§ 4.1, 4.2; Ex. D, SPE §§ 4.1, 4.2)  The first 6% of the employee participant's contribution is eligible for PwC's matching contribution.  (*See* Ex. C, SPEP § 4.4; Ex. D, SPE § 4.4)  PwC's matching contribution is 25% of the employee's contribution to the Plan, limited to 6% of the employee's compensation. (*See id.*)  For example, if the employee participant contributes 4% of his or her compensation to the Plan, the firm will make a matching contribution of 1% of his or her compensation to the Plan.

But certain employee participants also receive a matching contribution equal to 200% of the first 6% of compensation that the participant contributes to the plan during their first period of participation in the Plan.  (*See* Ex. C, SPEP § 4.4; Ex. D, SPE § 4.4)  And certain participants who are partners or principals may also receive a matching contribution equal to 200% of the first 6% of compensation that they contribute to the Plan during each year they are eligible to participate in the Plan.  (*See* Ex. C, SPEP § 4.4; Ex. D, SPE § 4.4)  Certain former C&L partners were not eligible for any matching contributions under the Plan during certain years after PW and C&L merged.  (*See* Ex. C, SPEP § 4.4; Ex. D, SPE § 4.4)  Matching contributions are also not available for the remainder of a plan year to PwC employees who become PwC partners or principals during the year, or individuals who are directly engaged from outside PwC as partners or principals after June 30 of a plan year.  (*See* Ex. C, SPEP § 4.4; Ex. D, SPE § 4.4)

**Plaintiff's Employment History And Participation In The RBAP**

Plaintiff Timothy Laurent began working at C&L on November 8, 1995.  (Ex. E, Pl. Interrog. Resp. at 3)  While employed by C&L, he participated in the C&L Plan as well as the

_____

[5] "Compensation" is defined differently for partners and employees due to the requirement under Internal Revenue Code § 401(c)(2) that a partner's compensation is his or her "earned income".

Coopers & Lybrand Multi-Investment Accumulation Plan. (*Id.*) Plaintiff worked for PwC following the merger of the PW and C&L in July 1, 1998, and until his departure from the firm on September 1, 2001. (*See id.*) As an employee of PwC, plaintiff participated in both the RBAP and SPEP, but was not a participant in the SPE. (*See id.*; Pl. Mem. at 18 n.10) Plaintiff has not worked for PwC since 2001 and is not currently accruing any benefits under the RBAP.

Plaintiff requested and received lump sum distributions from the RBAP and SPEP in February and May 2002, respectively. (Ex. E, Pl. Interrog. Resp. at 3) As a former C&L employee, plaintiff was entitled under the RBAP to the greater of: (1) what he would have received under the C&L Plan's traditional defined benefit pension formula based on service and compensation both before and after June 30, 1998; or (2) the balance in his RBAP account plus his accrued benefit under the C&L Plan traditional defined benefit pension formula as of June 30, 1998. (*See id.* at 28) In plaintiff's case, the sum of the RBAP's cash balance formula and his pre-July 1, 1998 C&L Plan benefit produced a greater benefit than the C&L Plan's traditional defined benefit formula (considering both C&L and PwC service and compensation), so plaintiff's lump sum payment from the RBAP was based on his hypothetical account balance plus his accrued benefit under the C&L Plan as of June 30, 1998. (*See id.*)

**Plaintiff's Claims**

Plaintiff filed his Complaint on June 28, 2005 against PwC, PwC's Board of Partners and Principals, the RBAP, the 401(k) Plans, the administrative committees for the Plans, and 76 individuals who allegedly serve or served at some time during the past 11 years as members of PwC's Board of Partners and Principals and/or as fiduciaries to the RBAP or 401(k) Plans. Plaintiff filed an Amended Complaint on July 5, 2005. Plaintiff alleges various violations

of ERISA as well as provisions of the Internal Revenue Code allegedly incorporated into the Plans.[6]

In Counts One through Nine of his Complaint, plaintiff articulates a variety theories of how the RBAP and 401(k) Plans violate ERISA. Counts One through Three all rest on the assertion that the RBAP's five-year normal retirement age is invalid. In Counts Six and Seven, plaintiff claims that the Plans discriminated against rank-and-file-employees by providing disproportionate benefits to partners. (*See* Cmplt. ¶¶ 172-173, 177-179; Pl. Mem. at 14) All of the various theories espoused in the first nine counts boil down to the claim that plaintiff received benefits in an amount less than he was otherwise entitled to under ERISA.

In Counts Ten and Eleven, plaintiff asserts that defendants breached their fiduciary duties under the Plans. Plaintiff claims in Count Ten that such breaches occurred when defendants allegedly selected as investment measures for the RBAP high-priced mutual funds that failed to optimize participant benefits. (*See* Cmplt. ¶¶ 79, 200) While plaintiff admittedly never selected such mutual funds as investment measures for his RBAP account (*see* Ex. F, Laurent Dep. at 55-56), he claims that the menu of funds offered somehow led him to earn lower benefits under the Plan. And in Count Eleven plaintiff alleges that defendants breached their fiduciary duties by investing plan assets into these same "excessively costly" mutual funds, thereby causing losses to the Plans themselves. (*See* Cmplt. ¶ 205)

Plaintiff asks that the Court remedy these alleged violations by issuing a series of orders compelling defendants to recalculate and pay benefits allegedly due to him under the

---

[6] As described in greater detail in defendants' motion to dismiss and opposition to plaintiff's motion for partial summary judgment, defendants challenge the legal sufficiency of each count of plaintiff's Complaint. In particular, as discussed in these memoranda, the text of ERISA and a long line of IRS Rulings establishes the propriety of the five-year normal retirement age. Defendants accordingly dispute plaintiff's statements in the "Factual Background" section of his brief in support of class certification that suggest that his claims are valid. (*See, e.g.*, Pl. Mem. at 4 (stating that "forfeitures of accrued benefits, age discrimination and excessive backloading are the inevitable result" of the RBAP's normal retirement age))

Plans.  Plaintiff first seeks a declaration that the Plans' terms are unlawful.  (*Id.* Prayer for Relief ¶ D)  Plaintiff also asks for an order enjoining defendants from violating ERISA and requiring defendants to recalculate and pay the benefits due to him under "reformed" versions of the Plans, as well as an order compelling defendants to make the Plans whole for any losses they have suffered as a result of alleged breaches of fiduciary duty.  (*Id.* ¶¶ E, F, G)

**Plaintiff's Motion  For Class Certification**

On October 5, 2005, 99 days after the filing of his Complaint, plaintiff filed his motion for class certification and supporting memorandum.[7]  Plaintiff asks the Court to certify a class for all his various claims and to appointment him representative of the following:

> All persons participating in the Retirement Benefit Accumulation
> Plan for Employees of PricewaterhouseCoopers LLP ("RBAP"),
> the Savings Plan for Employees and Partners of
> PricewaterhouseCoopers LLP (the "401(k) Plan") or the Savings
> Plan for Employees of PricewaterhouseCoopers LLP (the
> "Segregated 401(k) Plan") (collectively, the "Plans") at any time
> after June 30, 1994, and the beneficiaries and estates of such
> persons, who at any point became vested or may become vested in
> their benefits under one of those Plans; but excluding any
> Defendant and excluding any partner (or beneficiary thereof) who
> would be liable under any form of injunctive, declaratory or
> monetary order, relief or award that might result from the instant
> suit.

(*See* Cmplt. ¶ 208)  Thus, as defined by plaintiff, the class broadly encompasses present and former Plan participants, including present and former PwC employees and partners.[8]

---

[7] Plaintiff did not seek an extension of the 90-day period provided by Local Rule 23.1 in which to file his motion for class certification.

[8] The class definition excludes only those partners who "would be liable" for any relief awarded in this suit.  But PwC is a Delaware limited liability partnership.  (Ex. G, T. Senger Declaration ¶ 3)  Under Section 15-306(c) of the Delaware Revised Uniform Partnership Act, with regard to obligations the limited liability partnership incurs "arising in contract, tort or otherwise," an individual partner "is not personally liable, directly or indirectly, by way of indemnification, contribution, assessment or otherwise . . . solely by reason of being or so acting as a partner." *See* Del. Code. Ann. Tit. 6, § 15-306(c).  As a result, both past and present PwC partners (other than the defendants) fall within the proposed class.

The class plaintiff asks the Court to certify includes various subgroups that in some cases have significantly different circumstances and interests and in which plaintiff himself is not a member. These include:

1. former partners of the firm who are currently receiving payments of pension benefits accrued under the RBAP;

2. former partners of the firm who received lump sum distributions of their RBAP benefits;

3. former partners of the firm who participated in the RBAP, but accrued benefits entirely under the C&L Plan;

4. current partners of the firm who are participants in the RBAP;

5. current partners whose benefits may be calculated under the C&L Plan formula pursuant to Appendix B of the RBAP;

6. current non-partner employees of PwC who will become partners during the pendency of this litigation;

7. former non-partner employees who took lump sum distributions of their RBAP benefits;

8. former non-partner employees who are currently receiving payments of pension benefits accrued under the RBAP;

9. former non-partner employees of the firm who participated in the RBAP, but accrued benefits entirely under the C&L Plan;

10. current employees or partners who are participants in the RBAP but also have not yet vested;

11. current non-partner employees whose benefits may be calculated under the C&L Plan formula pursuant to Appendix B of the RBAP.

Plaintiff's motion and brief do not address the interests and circumstances of these various groups.

Plaintiff did not request an extension of the deadline for filing his motion in order to take class discovery, or state that any such discovery was necessary to support his motion for class certification. Only after filing this motion and supporting memorandum did plaintiff serve 81 discovery requests ostensibly directed to class certification issues.

**Class Discovery**

Defendants took plaintiff's deposition on November 3, 2005, as part of their class discovery. Defendants asked plaintiff specific questions regarding the scope of the class he purports to represent as well as details concerning the formula he believes should be used to calculate participants' benefits. With respect to the scope of the putative class, plaintiff stated that while he is generally seeking to represent all participants in the Plans, he does not wish to represent any partners who are or were Plan participants, even though they are included in the proposed class definition. (*See* Ex. F, Laurent Dep. at 21) Indeed, plaintiff testified he seeks to remedy what he regards as discrimination in favor of partners under the Plans. (*See id.* at 47)

And as for details regarding the remedies he is seeking, plaintiff stated that he was unable to provide any specifics about benefits that he contends he (or any member of the putative class) is owed from the Plans. (*See id.* at 66-67) Plaintiff also stated that he was unable to describe the formula he contends should be used to calculate participants' benefits under the RBAP. (*See id.* at 123-124, 127) And when asked whether he could confirm that all RBAP participants would receive additional benefits based on the benefits formula he believes the Plan should use to calculate benefits, plaintiff answered that he did "not know if everyone will receive an increase or a decrease" in benefits. (*See id.* at 129) In particular, plaintiff testified that he was unable to confirm that he personally would receive any increased benefits based on the changes he believes should be made to the RBAP benefits formula. (*See id.* at 135) Plaintiff further testified that "[a]s long as the class was better off," he did not mind if the relief he is seeking would lead some participants to receive reduced benefits. (*See id.* at 137)

In his initial responses and objections to defendants interrogatories, plaintiff similarly declined to provide any details regarding the amendments he claims should be made to the Plans. Plaintiff served his initial responses and objections on defendants on November 18,

2005.  (*See* Ex. E, Pl. Interrog. Resp. at 9)  In their interrogatories, defendants had asked plaintiff

to state the basis for his assertion in his class certification motion, that if he prevailed in his

claims "the different amounts participants will be due will be determined pursuant to simple,

mechanical calculations."  (*See id.* at 6 (citing Pl. Mem. at 29)) Plaintiff objected on numerous

grounds to this interrogatory and further stated that "Defendants have ample information from

the Complaint and other multiple submissions made by Plaintiff from which to understand the

relief he seeks for himself and the proposed Class."  (*See id.*)

   Four days after serving these objections and responses, plaintiff served amended

responses on November 22, 2005, providing for the first time a description of the amendments he

believes should be made to the RBAP's and SPEP's benefit formulas in order to address his

claim in each count of the Complaint.  For example,

- With regard to plaintiff's claim in Counts One through Five, plaintiff contends that the RBAP's normal retirement age should be changed to age 65 and that the Plan should be amended to require forward-looking projections to age 65 for each participant at an interest rate of 9.0%.  (*See* Ex. H, Revised Interrog. Resp. at 4-6)

- With regard to plaintiff's claim in Count Six, plaintiff contends the Plan should be amended to provide participants additional pay credits he claims they were required to receive in order to comply with Internal Revenue Code requirements.  (*See id.* at 6-7)

- With regard to plaintiff's claim in Count Seven that the SPEP and SPE discriminate against employees in favor of partners, plaintiff proposes a series of amendments, including a requirement that the two plans be combined together for testing purposes under the Internal Revenue Code's income discrimination rules.  (*See id.* at 8-9)

- Finally, with regard to plaintiff's claim in Count Eight plaintiff contends that the Plan should be amended retroactively to include a list of investment fund choices for participants along with a provision limiting the ability plan fiduciaries to replace these investment choices.  (*See id.* at 7)

Plaintiff contends that all of the various amendments he proposes should be made retroactively

applicable to both the RBAP and SPEP as of July 1, 1994.  (*See id.* at 4, 8)

## **ARGUMENT**

Plaintiff bears the burden of demonstrating that he satisfies all four of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *See, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002). Before certifying a class, the court must engage in a "rigorous analysis" of whether plaintiff has demonstrated that the proposed class action meets the requirements of Rule 23. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).

Accordingly, it is well settled that "some inspection of the circumstances of the case is essential to determine whether the prerequisites of Federal Civil Rule 23 have been met." *Wagner v. Taylor*, 836 F.2d 578, 587 & n.59 (D.C. Cir. 1987) (affirming denial of class certification). Thus, "the court must examine both the claims presented and the showing in support of class certification for their adherence to the requirements of Rule 23." *Id.* For example, the court may properly consider the elements of plaintiff's claims and likely defenses thereto in determining whether plaintiff has satisfied the typicality requirement. *Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622, 627 n.8 (D.D.C. 1991); s*ee also Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 179 (D.D.C. 1999) (court "cannot presume that [plaintiff's] claim is typical" absent sufficient showing that his claims are in fact common to entire class). Similarly, the court may examine the plaintiff's particular circumstances to determine if he is an adequate class representative or whether his claims pose conflicts with members of the putative class.

Relying on *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), plaintiff asserts that, in considering this motion for class certification, "the court should not consider the underlying merits of the plaintiff's claims" and that "the allegations in the complaint are accepted as true." (Pl. Mem. at 9) As reflected in the decisions cited above, these assertions are true only up to a point. *Eisen* establishes that a court should not base a class certification ruling

on its determination that the substantive claims asserted on behalf of the class lack merit. *See* 417 U.S. at 177-78. But a court considering a motion for class certification is not required to accept as true plaintiff's allegations with respect to the Rule 23 criteria. To the contrary, as the Court made clear in *General Telephone*, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" because "actual, not presumed, conformance with Rule 23(a)" is required. 457 U.S. at 160; s*ee also Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001) (noting that protection of both absent class members and defendants precludes court from accepting plaintiff's class allegations as true).

## I.    Plaintiff Lacks Standing To Assert The Claims Of The Proposed Class.

Before determining whether a proposed class meets the requirements of Rule 23, the Court must be satisfied that plaintiff has standing to assert his claims. *Does I Through III v. District of Columbia*, 216 F.R.D. 5, 9 (D.D.C. 2003) (rejecting plaintiffs' contention that standing arguments are "inapplicable to class certification"). If the named plaintiff fails to establish standing, he may not seek relief on behalf of the proposed class. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Moreover, where as here the complaint contains multiple claims, seeks multiple forms of relief, and alleges a class comprising variously-situated groups (*e.g.*, former and present employees, partners and non-partners), the named representative must establish his standing to raise *each claim* of each sub-group. *See*, *e.g.*, *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

This principle is equally applicable in ERISA cases. *See, e.g.*, *Piazza v. EBSCO Indus., Inc.*, 273 F.3d 1341 (11th Cir. 2001) (vacating order certifying class for claims plaintiff lacked standing to assert); *Fisher v. J.P. Morgan Chase & Co.*, 230 F.R.D. 370 (S.D.N.Y. 2005) (denying class certification because, *inter alia*, plaintiff lacked standing to assert claims of proposed subclass of participants). A proposed class representative who lacks standing to pursue

a particular form of relief under one of ERISA's remedial sections is not a proper class representative whether or not members of the proposed class might have such standing to seek such relief. *See Hall v. LHACO, Inc.*, 140 F.3d 1190, 1197-98 (8th Cir. 1998).

Here, plaintiff cannot represent a class seeking prospective equitable relief for current participants on any claims because he lacks standing to obtain such relief. To assert claims for prospective injunctive relief, a plaintiff must demonstrate, "not only that she has been harmed in the past," but also "that [s]he is realistically threatened by a repetition of [the violation]." *Does I-III,* 216 F.R.D. at 10, quoting *City of Los Angeles v. Lyons,* 461 U.S. 905, 109 (1983). Past participants therefore generally lack standing to sue for injunctive relief under ERISA since they no longer face any threat of injury and would therefore obtain no relief from such an injunction. *Impress Communications v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1060 (C.D. Cal. 2003) (past participants cannot seek to enjoin defendants from making future misrepresentations because "they would obtain no relief from such an injunction and would thus have no standing to pursue it"); *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 64 (S.D.N.Y. 2000) (past participants "lack standing" to prohibit use of boilerplate language in denial letters since "they do not stand to benefit from this remedy").

Additionally, plaintiff lacks standing to assert claims for any relief at all in Counts Ten and Eleven, which purport to seek relief for breach of fiduciary duty based on (1) the selection of investment measures for RBAP participants that fail to "optimize" participants' benefits, and (2) investment of Plan assets in allegedly "inappropriate and excessively costly investment vehicles." (Cmplt. ¶¶ 200, 204, 205) Among other things, plaintiff alleges that Plan fiduciaries invested in "retail-priced mutual funds" rather than negotiating for assets management at much lower fees. (*Id.* ¶¶ 113, 114) He also alleges that mutual funds had other "disadvantages" when compared to "dedicated, separately managed accounts" (*id.* ¶ 115),

although he does not allege the Plans actually suffered any harm as a result of those other "disadvantages." As discussed more fully in defendants' motion to dismiss, plaintiff lacks standing to assert either claim.

The only potential basis for the relief sought in Count Ten is Section 502(a)(3), 29 U.S.C. § 1132(a)(3), which authorizes a participant to sue for "appropriate equitable relief." A plaintiff suing under Section 502(a)(3) may not obtain money damages or any other form of relief that seeks "to impose personal liability on the defendant." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214-15 (2002); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255, 262 (1993). Any prospective change in the RBAP's investment measures can only affect current participants with accounts that are continuing to accrue investment credits. Plaintiff cashed out of the RBAP in 2002, and thus is not such a participant. (Cmplt. ¶ 128) Having ceased participating in the RBAP over three years ago, plaintiff has no standing to seek prospective injunctive or other equitable relief against any of the defendants under Count Ten.[9]

As for Count Eleven, Section 502(a)(2) of ERISA authorizes a "participant" to sue for breach of fiduciary duty to recover damages for the benefit of the plan. 29 U.S.C. § 1132(a)(2). A plaintiff's status as a participant is determined as of the time he files suit, not the time of the alleged breach. *See, e.g., Adamson v. Armco, Inc.*, 44 F.3d 650, 654 (8th Cir. 1995) (fact that plaintiff was a participant in the past does not support standing); *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1534-35 (10th Cir. 1993) (ERISA "does *not* permit a civil action by

---

[9] Although the relief available under Section 502(a)(3), 29 U.S.C. § 1132(a)(3), includes "equitable restitution," plaintiff has no such claim for relief. Courts have repeatedly held that equitable restitution under ERISA may be awarded only "to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity*, 534 U.S. at 214-15. The Complaint does not allege that any defendant misappropriated RBAP assets. Rather, the claim is that the RBAP's fiduciaries selected "investment measures" – "mutual funds" and the like – that "failed to optimize benefits" for plan participants. (Cmplt. ¶¶ 79, 200) This does not state a claim for equitable restitution, and plaintiff as a past participant has no standing.

someone who *was* a participant" at the time of alleged violation) (emphasis in original); *Nahigian v. Leonard*, 233 F. Supp. 2d 151, 165, 165 (D. Mass. 2002) (same).

Generally, employees cease to be "participants" in a plan when they leave employment and accept payment of everything due them in a lump sum and are no longer earning any right to future benefits. *See, e.g., Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947, 952 (6th Cir. 1990). Courts have applied a narrow exception to that rule where a former participant can allege that he has a "colorable claim to vested benefits." *See, e.g., Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790-91 (7th Cir. 1996). That exception, however, does not give plaintiff standing to assert the claim set forth in Count Eleven.

Even if plaintiff could assert that he has a "colorable claim to vested benefits," his standing would be limited to any claim *seeking to recover such benefits*, which Count Eleven does not seek to do. While courts have recognized standing of former participants to sue seeking to recover damages for the benefit of a plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), such standing rests on allegations that the challenged conduct resulted in a direct reduction in the plaintiff's benefits.[10] Here, plaintiff does not allege that the Plan fiduciaries' investment of plan assets in mutual funds had any impact on plaintiff's benefits due under the RBAP or 401(k) Plans. Accordingly, he lacks standing to assert this claim and cannot sue on behalf of the proposed class. *See Crawford v. Lamantia*, 34 F.3d 28, 31-33 (1st Cir. 1994) (former employee lacked standing to bring fiduciary duty claim for benefit of plan under Section 502(a)(2) because complaint failed to show that alleged breach of fiduciary duty had "a direct and inevitable effect on *his* benefits") (emphasis in original).

---

[10] *See, e.g., Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 350 (5th Cir. 1989) (plaintiffs claimed lump sum payments were less than amounts due because trustees sold retirement trust stock for less than fair market value); *Rankin v. Rots*, 220 F.R.D. 511, 522 (E.D. Mich. 2004) (any recovery for plan "would likely affect the amount of Rankin's benefit").

## II.    Plaintiff Has Not Met His Burden Of Establishing That He Meets The Criteria Of Rule 23(a)(3) And 23(a)(4).

Defendants do not dispute that the proposed class would satisfy the threshold requirements of Rules 23(a)(1) and 23(a)(2).  Even if limited to those participants with whom plaintiff could be deemed to share a common interest, the proposed class is sufficiently large to meet the numerosity requirement of Rule 23(a)(1).  And the Complaint arguably raises at least one issue of fact or law common among some (but not necessarily all) participants, which is all that is required to meet the minimal "common issues" test of Rule 23(a)(2).  For the reasons stated below, however, defendants do dispute that plaintiff has met his burden with respect to the typicality requirement of Rule 23(a)(3) and the adequacy requirement of Rule 23(a)(4).

### A.    Plaintiff Does Not Satisfy The Typicality Requirement Of Rule 23(a)(3).

While the typicality requirement of Rule 23(a)(3) does not require absolute identity of claims, the named plaintiff's claim and the class claims must be "so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co.*, 457 U.S. at 157 n.13.  "The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).  Thus, the typicality requirement is not satisfied where the class representative cannot advance the interests of each member of the class he purports to represent.  Moreover, significant variations within the class will defeat typicality. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 34 (4th Cir. 1998).  Here, the members of the class do not have identity of claims, and plaintiff faces too many obstacles of his own for his claim to be typical of the claims of the proposed class.

As a threshold matter, if the Court grants defendants' motions to dismiss regarding their standing and statute of limitations defenses, those determinations will be fatal to

plaintiff's typicality under Rule 23(a)(3). As noted above, without standing to assert a claim individually, a named plaintiff does not meet the typicality requirement. *See, e.g.*, *Prado-Steinman*, 221 F.3d at 1279. Similarly, a class representative whose claim is time-barred cannot assert the claim on behalf of the proposed class. *See, e.g.*, *Piazza*, 273 F.3d at 1347 (reversing grant of class certification where plaintiff's claim was time-barred); *Great Rivers Coop. of S.E. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 899 (8th Cir. 1997).

Even if the Court does not rule definitively on these defenses before considering class certification, they still prevent plaintiff from satisfying Rule 23(a)(3). A named plaintiff's claim is not typical of the proposed class where he is subject to unique defenses, or when it is predictable that a major focus of the litigation will be on an arguable defense unique to him. *See, e.g.*, *Fleck*, 763 F. Supp. at 625-26; *Kas v. Financial Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C. 1985). As the court explained in *Kas*, "it is not necessary that the defense asserted against the putative class representative ultimately succeed." 105 F.R.D. at 461. Rather, the presence of even an "arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class" may destroy typicality. *Id*. Accordingly, the Court does not decide or prejudge the merits of the defense in undertaking this analysis. *See Fleck*, 763 F. Supp. at 626 n.8.

At least two threshold defenses unique to plaintiff (or a subset of the class) undermine the typicality of his claim. As discussed in more detail in defendants' response to plaintiff's motion for partial summary judgment, plaintiff is subject to a standing defense to his claims attacking the five-year normal retirement age because there is substantial doubt he can establish injury-in-fact, a prerequisite to Article III standing. (Dkt. No.25, Defs. Opp. to Summary Jdgmt. at 12-17). In Count One, for example, plaintiff alleges defendants failed to perform a so-called "whipsaw calculation" when determining the amount of his lump sum distribution. Specifically, plaintiff claims defendants were required to determine his benefit

amount by "projecting his hypothetical account balance to age 65 using the RBAP's investment crediting rate" and then converting the projected account balance into an annual benefit.  (*See* Cmplt. ¶ 130) The conversion back to an "annual benefit" requires using the discount rate mandated by the statute the 30-year treasury rate.  29 U.S.C. § 1055(g)(3)(A)(ii)(II).  A participant will be entitled to a payment in addition to his account balance only if the crediting rate exceeds the discount rate.  See IRS Notice 96-8, 1996 WL 17901; *Esden v. Bank of Boston*, 229 F.3d 154, 159 (2d Cir. 2000).

Plaintiff alleges defendants failed to make a projection to age 65 "using the RBAP's investment crediting rate," and thus impermissibly paid him in a lump sum equal to the nominal balance in his cash balance account.  (Cmplt. ¶¶ 128, 130)  The problem with this claim is that, as plaintiff acknowledges, the RBAP "does not have a guaranteed positive crediting rate." (*Id.* ¶ 139)   Under the RBAP, participants may receive additional credits to their account balances based on the performance of investment measures they select, but are not assured any particular rate of return.  Plaintiff's brief does not explain how this variable, individualized rate of performance could be used for class-wide "whipsaw" calculation purposes.  Nor has he discussed how the investment measures he selected performed while he was a participant under the RBAP.

There is good reason why plaintiff does not discuss his own personal experience under the RBAP.  While he was participating in the Plan, plaintiff never selected any investment measure other than the money market fund option.  (*See* Ex. F, Laurent Dep. at 54-56)  Plaintiff cannot show that if PwC were required to project his account to age 65 using the investment crediting rate he selected, a greater benefit would result.  The law is clear that if the interest crediting rate is equal to (or less than) the statutory discount rate, the plan is obligated to pay a

lump sum recipient only his current account balance, which is exactly what plaintiff received.[11] *See Esden*, 229 F.3d at 165.  Without individual standing, a named plaintiff does not have the requisite typicality to assert the claim.

Similarly, the statute of limitations defense poses a problem for plaintiff, as well as a subset of the proposed class.  Putative class members who received lump-sum distributions of benefits earlier in the class period will be subject to dispositive statute of limitations defenses inapplicable to those who cashed out later or are current participants.  *See Kas*, 105 F.R.D. at 461 (noting that defense applicable to plaintiff and a small subset of the class will defeat typicality of plaintiff as a class representative).

Variations within the proposed class also preclude certification.  Plaintiff asserts that all "questions of both liability and relief" raised by his Complaint are "identical to every member of the proposed Class." (Pl. Mem. at 2, 17-18)  But plaintiff cannot plausibly contend that the relief he seeks will be identical for every one of the subgroups included in the proposed class.  His argument asks the Court to ignore the various subgroups that comprise the proposed class and the differing interests and factual issues among them.  For example, and most glaring, plaintiff seeks reformation of the Plan to reduce partner benefits.  Plainly, this relief does not have the same effect on the entire class which includes past, present and future PwC partners.  Similarly, the interests of non-partner employees who currently participate in the Plans, and thus are subject to any amendments to the Plans that would affect the accrual of future benefits, do

---

[11] Plaintiff has recently submitted an interrogatory answer in which he contends that he is entitled to have the RBAP "reformed" to provide him a guaranteed 9% rate of return, which would then form the basis of a whipsaw calculation.  (*See* Ex. H, Revised Interrog. Resp. at 4)  Plaintiff has no legal basis for this arbitrary rewriting of the Plan's terms.  Indeed, the Supreme Court has made clear that "ERISA does not mandate that employees provide any particular benefits." *Shaw v. Delta AirLines, Inc.*, 463 U.S. 85, 91 (1983).  All this contention does is establish that, at a minimum, there will be a vigorously litigated issue concerning plaintiff's individual standing, which is precisely the kind of unique defense that defeats typicality.

not coincide with those of past participants who took lump sum distributions, whose only interest is in obtaining more money for their past service.

Other differences within the broadly-defined class also undermine the cohesiveness required by the typicality requirement. For example, at least some members of the proposed class (though apparently not plaintiff) signed releases of all ERISA claims when they received their distributions. (*See* Ex. I, Defs. Discovery Resp. at 38-39) Because plaintiff will have no stake in the enforceability of these releases, this issue further undermines typicality. *See*, *e.g.*, *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 319, 320 (S.D.N.Y. 2003) (noting that existence of releases signed by some putative class members precluded satisfaction of both typicality and adequacy requirements). In addition, plaintiff alleges that the RBAP's Summary Plan Descriptions ("SPDs") misled participants about certain terms of the Plan. (Cmplt. ¶¶ 88, 108) Plaintiff acknowledged in his deposition that he never looked at any of the SPDs but nevertheless seeks to represent participants who did and claim they were misled by it. (*See* Ex. F, Laurent Dep. at 118-19) Similarly, he testified he seeks to represent participants who (unlike himself) received verbal communications from PwC regarding the Plans and who were privy to different information about the Plans than he was. (*Id.* at 98) *See Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (vacating class certification in ERISA case because, *inter alia*, plan sponsor made different communications to members of putative class).

Plaintiff's claims also are not typical of those participants who were former participants in the C&L pension plan who had their benefits calculated using the traditional C&L pension formula alone. Former C&L participants who left PwC and who would have received greater benefits under the C&L pension plan had it remained in effect had their benefits calculated using the traditional formula in the *C&L* pension plan -- *not* the formula specified in the RBAP. Similarly, there are former C&L participants who are still employed by PwC who

will not know whether their benefits will be calculated according to the C&L formula rather than the RBAP formula until their employment is terminated and the comparison is done to determine which formula provides them with a greater level of benefits.  As a result, there is a significant segment of the participant population that plaintiff seeks to represent comprised of individuals who either have not had or will not have their benefits calculated using the formula specified in the RBAP.  The allegations in plaintiff's Complaint, which challenge the formula for calculating benefits under the RBAP, are simply inapplicable to these participants.

Finally, there are 76 individual defendants who allegedly served as Plan fiduciaries at some point during the 11-year class period.  Similarly, not all class members were participants throughout the class period.  Accordingly, the individual defendants will be liable, if at all, to different separate subsets of the class.

**B.      Plaintiff Does Not Satisfy The Adequacy
        Requirement Of Rule 23(a)(4).**

As with the other requirements of Rule 23, plaintiff has the burden of demonstrating that he complies with Rule 23(a)(4).  One element of the adequacy requirement in Rule 23(a)(4) is the lack of antagonism (or potential conflict) between the class representative and members of the proposed class.  *See, e.g.*, *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 499 (D. Md. 1998); *Waters v. Barry*, 711 F. Supp. 1125, 1131 n. 12 (D.D.C. 1989).  Indeed, the Supreme Court has emphasized that the primary purpose of the adequacy requirement of Rule 23(a)(4) is to "uncover conflicts of interest between named parties and the class they represent."  *Amchem Prods.*, 521 U.S. at 594.  *See also General Tel. Co.*, 446 U.S. at 331. Conflicts with respect to claims, interests, or appropriate relief among class members preclude class certification.  *See Wagner*, 836 F.2d at 595 (holding that court properly denied class certification based on antagonism between interests of supervisory and non-supervisory employee class members).  And the problem of actual and potential conflicts is particularly acute

in a case such as this where plaintiff seeks to certify a mandatory class with no notice and no right to opt out. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).

Here, there are several conflicts and antagonisms within the proposed class that render plaintiff an inadequate class representative. First, and most stark, is the antagonism between partner and non-partner members of the class. In his motion, as in his Complaint, plaintiff directly attacks both present and former partners, claiming that the RBAP and 401(k) Plans provide disproportionately large benefits to partners. (Ex. F, Laurent Dep. at 47, 72; Pl. Mem. at 4; Cmplt. ¶¶ 172-73; 177-79) And plaintiff, in his deposition, disavowed any intention of protecting the interests of present or former firm partners. (Ex. F, Laurent Dep. at 21) But, as discussed above, the class definition includes partners, to whose interests plaintiff is plainly antagonistic. Such antagonism is fatal to class certification. *See Wagner*, 836 F.2d at 595; *United Indep. Flight Officers v. United Airlines, Inc.*. 756 F.2d 1274, 1284 (7th Cir. 1985) (affirming denial of class certification due to conflicts between members of proposed class in ERISA case).

Second, plaintiff has stated that he is not concerned whether the relief he seeks will actually benefit all members of the proposed class (even excluding partners). In connection with his claim that benefits of Plan participants should be recalculated, he affirmed that it was "okay" with him if some members of the class received reduced benefits, as long as "the class" was better off. (Ex. F, Laurent Dep. at 137) Indeed, plaintiff's last-minute assertion that the Court should rewrite the Plan to include an arbitrary 9% fixed crediting rate (apart from lacking any legal support whatsoever) ignores that some participants may have earned a higher rate of return on their personally selected investment measures. Similarly, plaintiff's recent interrogatory answer states that he seeks to replace retroactively the menus of various investment

measures that have been available to participants over the past 11 years. (Ex. H, Revised Interrog. Resp. at 4) Again, plaintiff is apparently unconcerned that such relief could result in *reducing* the accrued benefits of these participants who earned favorable rates of return under investment measures that would be retroactively stripped away.

Third, plaintiff is seeking to "reform" the Plan in order to provide increased benefits to himself and other former participants. (*See* Ex. H, Revised Interrog. Resp. at 2-4) Putting aside the legal flaw in this effort – that there is no basis in ERISA to require rewriting a plan to provide guaranteed benefits not contained in the original plan – it creates an obvious conflict with current participants. As plan sponsor, PwC retains the right to amend the RBAP at any time to alter or eliminate benefits prospectively. (*See* Ex. A., RBAP § 15.2) Plaintiff seeks retroactive amendments to the RBAP that could render it uneconomical for PwC to continue offering the Plan to its employees. But plaintiff seeks this relief oblivious to (or unconcerned about) the adverse impact it would have on all current participants who wish to continue earning benefits under the existing Plan.

One of the cases plaintiff repeatedly cites in support of his motion demonstrates plaintiff's failure to meet the adequacy requirement. *Cooper v. IBM Personal Pension Plan*, Civ. No. 99-829-GPM (S.D. Ill. Sept. 17, 2001) (Pl. Ex. 6). In *Cooper*, plaintiffs proposed three distinct subclasses of differently-situated participants in the IBM plans at issue, and three different named plaintiffs were designated as representatives of each proposed subclass. *Id.* slip op at 2-3. In addressing the question of adequacy, the court deferred for "another day" defendant's concerns about potentially conflicting remedies for these three subclasses, finding that the adequacy requirement was satisfied, at least initially, "[a]s long as each subclass is adequately represented during the effort to determine whether Plaintiffs are entitled to anything

at all." *Id*. at 9.  Here, plaintiff is the sole class representative, and he cannot possibly protect adequately the interests of the disparate groups within the proposed class.

**III.    The Proposed Class Is Not Appropriate For
Certification Under Rule 23(b)(1) Or 23(b)(2).**

Rule 23(b) provides three separate mechanisms for class certification.  Plaintiff seeks certification under two of these: Rules 23(b)(1) and 23(b)(2).  A class action may be certified under section (b)(1) based on potential difficulties arising from separate actions by members of the putative class, and under section (b)(2) where final injunctive or corresponding declaratory relief may be appropriate for the class as a whole.  For classes certified under these provisions, Rule 23(c)(2) provides that "the court may direct appropriate notice to the class," but does not require that class members be given notice or an opportunity to opt out.  A class may also be certified under Rule 23(b)(3) if the court determines that common questions of fact and law predominate over individualized issues and that a class action is superior to other available methods for resolution of the controversy.  For classes certified under Rule 23(b)(3), which generally include actions seeking monetary relief for the class, Rule 23(c)(2) requires that the class receive notice and be afforded an opportunity to opt out.

For the reasons stated below plaintiff has not met his burden of showing that the proposed class may properly be certified as a non-opt-out, no-notice class under either Rule 23(b)(1) or 23(b)(2), and he does not seek certification under Rule 23(b)(3).  Accordingly, plaintiff's motion should also be denied because he has also failed to comply with the requirements of Rule 23(b).

**A.    Plaintiff Has Not Established That Certification
Is Appropriate Under Rule 23(b)(1).**

Certification is not appropriate under Rule 23(b)(1)(A), which is designed to protect defendants against the risk that they will be held to inconsistent or incompatible standards

of conduct in multiple lawsuits.  In order for a case to fall within Rule 23(b)(1)(A), "there must obviously be a risk that separate actions will in fact be brought if a class action is not permitted." 7AA Wright & Miller, *Federal Practice & Procedure*, § 1773 at 11 (2005).  Where plaintiff fails to demonstrate a risk of separate actions, courts will not certify a class under this section of the rule.  *See, e.g.*, *Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 106-07 (E.D. Va. 1980); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 163 (D.D.C. 1976).  Moreover, Rule 23(b)(1)(A) is designed to protect defendants, and courts accordingly have held that certification is inappropriate under this provision where defendant opposes it.  *See, e.g.*, *Pettco Enters., Inc. v. White*, 162 F.R.D. 151, 155 (M.D. Ala. 1995); *Pruitt*, 85 F.R.D. at 106-07.

Here, there is no realistic risk that defendants will be held to incompatible standards of conduct in multiple actions.  The PwC Plan at issue has been in place since 1994 and as of 2004 had over 40,000 participants.  (*See* Pl. Mem. at 7)  Many former participants like plaintiff have left the firm and taken lump-sum distributions of their accrued benefits.  Until plaintiff filed his suit, however, no other participant had commenced litigation regarding the design of the RBAP or the issues in this case.  Nor has any present or former participant filed any litigation since plaintiff commenced this suit and began generating publicity for what he claims to be defendants' violations of ERISA.[12]  *See Berlin*, 410 F. Supp. at 163 (noting that Rule 23(b)(1)(A) certification was inappropriate where, despite press coverage, no other members of putative class had filed separate action).  In his deposition, plaintiff testified that he was unaware of any other current or former PwC employee who thinks there is anything wrong with the PwC

---

[12] *See* Ex. J, Ellen E. Schultz, *Suit Claims Pricewaterhouse Used 401(k) to Enrich Partners*, Wall St. Journal, Nov. 18, 2004, at C1; Ex. K, Vineeta Anand, *The courts:  PwC sued over cash balance, 401(k); Class-action filing says partners manipulated plans for their benefit*, Pensions and Investments, February 21, 2005, at pg. 3; Ex. L, *Letters To The Editor*, Pensions and Investments, March 7, 2005, at pg. 13; Ex. M, Gottesdiener Law Firm, PLLC, *Description of Laurent v. PricewaterhouseCoopers , LLP, available online at*
http://www.gottesdienerlaw.com/cash_balance/pwc_pricewaterhouse_coopers.html (downloaded on Nov. 20, 2005).

Plans.  (Ex. F, Laurent Dep. 42, at 52-53)  In short, there is simply no reason for the Court to believe defendants will face any other suits regarding these issues and no concrete danger they would be confronted with inconsistent judicially-mandated standards of conduct.[13]

Nor is certification appropriate under Rule 23(b)(1)(B), which is designed to protect the interests of absent class members against a determination that would have an adverse effect on their interests without being represented.  Here, as discussed above, there are substantial risks that *certifying* the proposed class would have adverse effects on at least significant subsets of the class, especially given that plaintiff is pursuing a class that would provide such class members neither notice nor a right to opt out.  In particular, it is difficult to see how certifying the proposed class would provide any benefit to PwC partners or current members of the RBAP, when plaintiff has no incentive to either consider or protect their interests.

Furthermore, Rule 23(b)(1)(B) is not an appropriate basis for certifying a class because plaintiff has not demonstrated how an adverse adjudication of his claim will, as a practical matter, be dispositive of the interests of other class members.  Plaintiff argues that "the *stare decisis* effect" of a ruling on his claim is "likely to have a compelling impact on future litigation by persons similarly situated."  (Pl. Mem. 24)  The law is well-settled, however, that potential *stare decisis* effect is not sufficient to support class certification under Rule 23(b)(1)(B).  *Larionoff v. U.S.*, 533 F.2d 1167, 1182 (D.C. Cir. 1976) (if only practical effect of action would be *stare decision* effect on other potential actions, "the suit would not qualify as a

---

[13] A number of the cases plaintiff cites in support of his argument with respect to Rule 23(b)(1) certification have little, if any, probative value because the issue was not contested.  For example, in *In re Amsted Ind. ERISA Litig.*, 2002 WL 31818964 at *2 (N.D. Ill. 2002),  defendants did not dispute the appropriateness of certification under Rule 23(b)(1)(A).  Similarly, in *Wagener v SBC Benefit Plan - Nonbargained Program*, No. 03-769 (RCL), slip op. at 1 (D.D.C. Sept. 21, 2005), the parties jointly submitted an agreed order certifying a class.

class action pursuant to Rule 23(a)(1)(B)"); *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 n.7 (11th Cir. 2000); *Bowe Bell + Howell Co. v. Immco Employees' Ass'n*, 2005 WL 1139645 at *5 (N.D. Ill. May 11, 2005); *Peoples*, 179 F.R.D. at 500; 7AA Wright & Miller, *Federal Practice & Procedure* § 1774 at 25-26 ("party seeking class certification must be able to allege more than an individual adjudication will be given stare-decisis effect;" otherwise "certification [under Rule 23(b)(1)(B)] must be denied").

Finally, courts have noted that certification under Rule 23(b)(1) is inappropriate where plaintiff is seeking substantial monetary relief.  For example, in *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1078 n.7 (11th Cir. 2000), the court stated that because plaintiff's suit "seeks compensatory damages, it cannot be certified as a (b)(1)(A) class."  Similarly, the Supreme Court has ruled that due process concerns precluded use of a mandatory class certified under Rule 23(b)(1)(B) to resolve damage claims by asbestos victims.  *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 846-48 (1999), citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).  Here, as discussed in more detail in the following section, plaintiff's claim for relief, and that asserted on behalf of many members of the purported class, is predominantly, if not exclusively, one for monetary relief, making certification of a mandatory class under Rule 23(b)(1) inappropriate.

**B.     Plaintiff Has Not Established That Certification
          Is Appropriate Under Rule 23(b)(2).**

Rule 23(b)(2) generally provides for certification of a mandatory class where plaintiff seeks declaratory or injunctive relief for class-wide injury.  The lack of class members' right to receive notice or to opt out of a class certified under Rule 23(b)(2) reflects certain presumptions about the nature of class members' interests.  *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998).  Such classes are assumed to be homogeneous and cohesive groups with few conflicting interests among their members.  *Id.* at 413.  But this underlying premise "begins to break down when the class seeks to recover back pay or other

forms of monetary damages to be allocated based on individual injuries." *Eubanks v. Billington*, 110 F.3d 87, 95 (D.C. Cir. 1997). This breakdown in cohesion raises due process concerns underlying the notice and opt-out provisions of Rule 23(b)(3). *See id.*

Accordingly, "[i]t is universally held, although with differences from circuit to circuit, that Rule 23(b)(2) certification is inappropriate where claims for money damages predominate." *Love v. Veneman*, 224 F.R.D. 240, 245 (D.D.C. 2004). Thus, where a suit seeks declaratory relief, but "the gravamen of the complaint is a prayer for monetary relief," certification under Rule 23(b)(2) is inappropriate. *Peoples*, 179 F.R.D. at 500. That is precisely the situation here. The relief plaintiff seeks in Counts One through Nine of the Complaint is monetary. In each count, he alleges that the benefit he received was less than what he would have received had his benefit been calculated as required by ERISA (*see* Cmplt. ¶¶ 132, 142, 151, 161, 169, 173, 179, 187, 195), and he seeks to recover additional benefits. Thus, while plaintiff attempts to couch his claim in the language of equitable relief, he is after one thing: money.

When a plaintiff seeks monetary relief on behalf of the class, Rule 23(b)(2) may be used only when the claimed damages are "incidental" to the injunctive or declaratory relief sought. *See, e.g., In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005); *Allison*, 151 F.3d at 415; *Love*, 224 F.R.D. at 245.[14] By "incidental" the courts mean that damages payable to each member of the class "should at least be capable of computation by means of objective standards"

---

[14] This interpretation is consistent with the Advisory Committee Notes to Rule 23(b)(2), which state that certification is not appropriate under this provision where "the appropriate final relief relates exclusively or predominantly to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee note. Were this not the rule, then Rule 23(b)(3) would be rendered irrelevant since a plaintiff could simply file a claim for a declaratory judgment of liability in every damage action. Indeed, even the "incidental damages" rule is hard to square with the text of Rule 23(b)(2), which by its terms applies only to actions seeking "final injunctive relief or corresponding declaratory relief." The term "corresponding plainly refers to injunctive relief, not to any claim for damages. The Advisory Committee Note states that declaratory relief "corresponds" to injunctive relief "when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief."

and should not require additional hearings to resolve each class member's claim. *Allison*, 151 F.3d at 415; *Allstate*, 400 F.3d at 507 (damages incidental where computation is "mechanical" and does not require individual calculation).

The Seventh Circuit addressed this issue recently in another case involving a challenge to calculations of lump sum distributions under a cash balance pension plan. *Berger v. Xerox Corp.*, 338 F.3d 755, 763-64 (7th Cir. 2003). The court concluded that the damages sought – payment of additional benefits – were "incidental" to the requested declaratory relief because the declaration "established the right of each of the class members, and the computation of damages due each followed mechanically." *Id*. at 764. The basis for this conclusion was that the Xerox cash balance plan at issue expressly provided that each participant's account balance received guaranteed annual interest credits fixed at the one-year Treasury bill rate for the prior year plus one percent. *Id*. at 758. The court determined that the plan violated ERISA by using a lower rate for projecting benefits to normal retirement age because applicable regulations required using the guaranteed crediting rate set forth in the plan. As a result, the calculation of additional benefits owed was *__identical__* – and purely mechanical – for each class member, and the court therefore determined certification under Rule 23(b)(2) was appropriate.[15]

Here, in contrast, the damages plaintiff seeks on behalf of the class are not "incidental" to the requested declaratory and injunctive relief. As plaintiff's Complaint acknowledges unequivocally, unlike *Berger*, the RBAP "does not have a guaranteed positive

---

[15] In contrast to the proposed class here, the class in *Berger* was limited to participants in the cash balance plan "who left Xerox's employ between 1990 and 2000 and elected to take a lump sum when they left in lieu of a pension commencing when they reached 65." 338 F.3d at 759. Similarly, in *Esden v. Bank of Boston*, 229 F.3d 154, 165-68 (2d Cir. 2000), the court held that employees who left before normal retirement age and received lump sum distributions from the cash balance plan had a claim for additional, and readily calculable, benefits because projections were made at less than the 5.5% interest crediting rate guaranteed for all Plan participants. As in *Berger*, all participants' accounts were credited at the same rate. In that case, the class was limited too all participants in the plan at issue "who received a lump sum distribution of his or her cash balance account." *Id*. at 157 n.1.

interest crediting rate." (Cmplt. ¶ 139) Instead, accretions (if any) to each participant's account balance beyond the basic pay credits made by PwC are based on the performance of one or more "investment measures" selected from a menu of over a dozen potential choices. Moreover, the choices of investment measures under the RBAP have changed numerous times since 1994. (*See* Ex. N, M. Burnham Declaration, ¶ 2)

As a result, even assuming that the performance of a participant's investment measures could be the basis of a "whipsaw" calculation, that calculation would be both factually complex and potentially unique for each class member. Furthermore, as described above, the method for calculating benefits under the Plans differs substantially depending on whether a participant is (or was) a non-director employee, director, managing director, principal, or partner, as well as whether the participant was an employee or partner of C&L before the merger. The damages portion of the claims asserted on behalf of former RBAP participants thus plainly predominates over the declaratory relief sought, which is meaningless to such class members unless it forms the basis of a claim for additional benefits.

Recognizing the obvious problem with his damages claim, plaintiff's solution apparently is to make up a guaranteed 9% crediting rate, assert that he will ask the Court to rewrite the RBAP to include this term, then use it as the basis for a "mechanical calculation" of every participant's lump sum benefit.[16] (*See* Ex. H at 10) The most glaring problem with this approach is that plaintiff has alleged defendants violated ERISA by failing to project a departing employee's account balance to age 65 "*using the RBAP's investment crediting rate*." (Cmplt.

---

[16] Defendants say "apparently" because plaintiff has not made this argument in support of his motion for class certification. In his revised interrogatory answers, however, plaintiff asserts that it would be a "simple, mechanical process for Defendants to substitute the legal for the illegal formulae," and that it would also be a "simple, mechanical process to re-use the same data points applicable to each individual participant's circumstances that were used to calculate participants' benefits initially to recalculate those benefits in a lawful manner." (See Ex. H at 10) Defendants anticipate plaintiff will unveil this argument for the first time in his reply brief.

¶¶ 128, 130) (emphasis added)  As plaintiff recognizes, the RBAP has no fixed or guaranteed "investment crediting rate" -- 9% or otherwise.  There is no basis in ERISA, or in the precedent on which plaintiff relies for his "whipsaw" claim, for retroactively writing this fixed rate of return into the RBAP.[17]  This purported "remedy" is nothing more than camouflage to avoid the fact that calculation of damages for past participants would not in any sense be "incidental" or "mechanical."

Even if the Court were to determine that money damages did not predominate, certification under Rule 23(b)(2) would still be inappropriate.  As the Seventh Circuit noted in *Allstate*, "the fact that declaratory or injunctive relief is sought (and no, or only incidental damages) should not automatically entitle the class to proceed under Rule 23(b)(2)."  400 F.3d at 507.  Since a (b)(2) class "is, by its very nature, assumed to be a homogeneous and cohesive group with few conflicting interests," *Allison*, 151 F.3d at 413, where the proposed class is not homogeneous and cohesive, the requested relief will not have the same effect on all class members.  This lack of cohesiveness, in turn, eliminates the basis for a Rule 23(b)(2) class.  Thus, in *Allstate*, the court held that differences among the circumstances of various class members made certification appropriate, if at all, only under Rule 23(b)(3).  400 F.3d at 508.  The same is true of the highly variegated class plaintiff proposes here.

Plaintiff has proposed no workable alternative to the inappropriate Rule 23(b)(2) class he asks the Court to certify.  Courts faced with putative (b)(2) classes seeking non-incidental monetary damages have sometimes used one of three possible methods to resolve the problem:  (1) certifying the action under Rule 23(b)(3) to preserve class members' right to notice

---

[17] In neither *Berger* nor *Esden* did the courts rewrite the plans at issue to impose crediting rates proposed by plaintiffs.  Rather, the courts said that the plan in each case was required to project benefits to normal retirement age at the rates guaranteed *by the terms of the plans*. *See Esden*, 229 F.3d at 165-68; *Berger*, 338 F.3d at 760-63.

and to opt out; (2) creating subclasses, with a (b)(2) class for injunctive relief and a (b)(3) class for the damages; and (3) certifying the class under Rule 23(b)(2), but ordering notice and a right to opt out pursuant to Rule 23(d)(2).  *See Lemon v. International Union of Operating Eng'rs*, 216 F.3d 577, 581-82 (7th Cir. 2000).  The D.C. Circuit stated in *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997), that a court could properly consider either of the latter two approaches – *i.e.*, providing notice and opt-out rights or creating a "hybrid" (b)(2)(b)(3) class.

Here, plaintiff has not asked the Court, alternatively, to certify a class under Rule 23(b)(3), or to certify a hybrid class as suggested by decisions such as *Lemon* and *Eubanks*.  Nor has he made any effort to show that he complies with the requirements of Rule 23(b)(3) to justify such an approach.  In particular, plaintiff has not demonstrated that common issues would predominate over individualized issues, that trial of the case as a class action would be manageable, and that a class action is superior to other potential methods of adjudication.  Accordingly, there is no basis for the Court to certify the class under Rule 23(b)(3) or to certify a hybrid class.[18]

## **CONCLUSION**

For the reasons stated above, plaintiff's motion for class certification should be denied.

---

[18] The D.C. Circuit has also cast substantial doubt on the validity on the manner in which some courts have employed the hybrid certification procedure.  *See In re Veneman*, 309 F.3d 789, 794-95 (D.C. Cir. 2002).  In that decision, the court questioned whether it would ever be appropriate to conditionally certify a Rule 23(b)(2) class limited to injunctive relief without first determining whether monetary relief predominates over plaintiff's requested equitable relief.  *Id*. at 795.  The court further questioned whether the Advisory Committee Notes to Rule 23(b)(2), which state that the rule does not extend to *cases* in which monetary relief predominates, could be squared with partial certification under Rule 23(b)(2).  *Id*.  Finally, the court stressed the importance of due process considerations in certifying mandatory classes where plaintiffs seek monetary relief.  *Id*. at 795-96.

Dated:  November 29, 2005                    Respectfully submitted,


                                             ____s/ David E. Mendelson____
                                             David E. Mendelson (471863)
                                             KIRKLAND & ELLIS LLP
                                             655 Fifteenth Street, N.W.
                                             Washington, D.C.  20005-5793
                                             (202) 879-5000 (phone)
                                             (202) 879-5200 (fax)
                                             dmendelson@kirkland.com

                                             Robert J. Kopecky
                                             Douglas G. Smith
                                             Lauren O. Casazza
                                             Jason W. Callen
                                             KIRKLAND & ELLIS LLP
                                             200 East Randolph Drive
                                             Chicago, IL  60601
                                             (312) 861-2000 (phone)
                                             (312) 861-2200 (fax)

                                             *Counsel for all defendants except Nicolaisen
                                             and Ricciardi*


                                             ____s/ Patrick James Attridge____
                                             Patrick James Attridge (357973)
                                             KING & ATTRIDGE
                                             39 West Montgomery Avenue
                                             Rockville, MD  20850
                                             (301) 279-0780 (phone)
                                             (301) 279-2988 (fax)

                                             *Counsel for defendants Nicolaisen and
                                             Ricciardi*


35