No. 05-3588

# United States Court of Appeals
## For the Seventh Circuit

KATHI COOPER, BETH HARRINGTON
and MATTHEW HILLESHEIM,
*Plaintiffs - Appellees,*

v.

IBM PERSONAL PENSION PLAN
and IBM CORPORATION,
*Defendants - Appellants.*

**On Appeal from the United States District Court
for the Southern District of Illinois
In No. 99-cv-00829-GPM, Chief Judge G. Patrick Murphy**

**BRIEF OF APPELLANTS AND
REQUIRED SHORT APPENDIX**

Of Counsel:
Glen D. Nager
Brian J. Murray
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Donald J. Rosenberg
Douglas G. Vetter
IBM Corporation
1133 Westchester Avenue
White Plains, New York 10604

Jeffrey G. Huvelle
Robert A. Long, Jr.
Robert D. Wick
Eric R. Sonnenschein
Michael E. Paulhus
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000

*Attorneys for Defendants-Appellants*

**Oral Argument Requested**

## AMENDED DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1 and Fed. R. App. P. 26.1, the undersigned

counsel hereby provides the following amended disclosure statement:

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

International Business Machines Corporation
IBM Personal Pension Plan

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Covington & Burling (1201 Pennsylvania Avenue, N.W.,
        Washington, D.C. 20004-2401),
Jones Day (51 Louisiana Avenue, N.W., Washington, D.C. 20001-2113),
Lewis, Rice & Fingersh (325 South High Street, Belleville, IL 62220).

(3)     If the party or amicus is a corporation:

i)      Identify all of its present corporations, if any; and
        None.

ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:
        None.

Jeffrey G. Huvelle

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

TABLE OF ABBREVIATIONS AND GLOSSARY ....................................viii

JURISDICTIONAL STATEMENT..........................................................1

ISSUES PRESENTED FOR REVIEW ......................................................1

INTRODUCTION................................................................................1

STATEMENT OF THE CASE ................................................................3

STATEMENT OF FACTS .....................................................................4

     A.    ERISA And The Regulation Of Retirement Plans.....................4

         1.    The Statutory Scheme.............................................4

         2.    The OBRA 1986 Amendments.....................................5

         3.    Defined Benefit Plans, Defined Contribution Plans, and Cash Balance Plans. ........................................8

         4.    Treasury Department Guidance Concerning § 204(b)(1)(H) And Cash Balance Plans. ......................9

     B.    The IBM Plan. ....................................................11

         1.    The Cash Balance Formula. ...................................11

         2.    The Always Cash Balance Formula. ..........................13

     C.    Proceedings And Disposition Below. ..............................14

         1.    The District Court's Summary Judgment Order Regarding The CBF And The ACBF. ...........................14

         2.    The Partial Settlement. ......................................17

SUMMARY OF ARGUMENT...................................................................18

STANDARD OF REVIEW .....................................................................23

ARGUMENT.....................................................................................23

I.    The Cash Balance Formula Complies With ERISA § 204(b)(1)(H). ...............24

A. The Cash Balance Formula Does Not "Reduce[ ]" The "Rate Of An Employee's Benefit Accrual" "Because Of The Attainment Of Any Age." ................................................. 24

B. The District Court's Holding That The Cash Balance Formula Violates § 204(b)(1)(H) Is Unfounded And Erroneous. ........................ 29

 1. The district court's interpretation of "benefit accrual" violates settled rules of statutory construction.......................... 30

 2. The district court misinterpreted the statute's "because of" age requirement...................................... 36

 3. The district court's interpretation of § 204(b)(1)(H) leads to absurd and unreasonable results................................. 37

 4. Adoption of the district court's interpretation would be devastating to the pension system. ........................... 40

 5. The district court's interpretation of § 204(b)(1)(H) conflicts with the Treasury Department's authoritative interpretations of the statutory scheme..................................... 44

II. The Always Cash Balance Formula Also Complies With ERISA § 204(b)(1)(H). ................................................................. 47

A. The Always Cash Balance Formula Did Not "Reduce" "The Rate Of An Employee's Benefit Accrual" "Because Of The Attainment Of Any Age." ................................................. 47

B. The District Court Erred In Concluding That The Always Cash Balance Formula Violated § 204(b)(1)(H). .................................... 48

CONCLUSION .............................................................................. 49

# TABLE OF AUTHORITIES

<u>Page</u>

## CASES

*Achor v. Riverside Golf Club*, 117 F.3d 339 (7th Cir. 1997).......................26, 37

*Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981)............................4, 5

*Allied Color Corp. v. Mfrs. Hanover Trust Co.*, 484 F.Supp. 881
    (S.D.N.Y. 1980).........................................................................................31

*American Tobacco Co. v. Patterson*, 456 U.S. 63 (1982)..................................37

*Bailey v. United States*, 516 U.S. 137 (1995).....................................................32

*Bellas v. CBS, Inc.*, 221 F.3d 517 (3d Cir. 2000) ..............................................34

*Berger v. Xerox Corp. Ret. Income  Guar. Plan*, 338 F.3d 755
    (7th Cir. 2003).........................................................................................46

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) .........................................31

*Boyd v. Ill. State Police*, 384 F.3d 888 (7th Cir. 2004) .....................................23

*Call v. Ameritech Mgmt. Pension Plan*, No. Civ. 01-717-GPM,
    2004 WL 483199 (S.D. Ill. 2004)............................................................31

*Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)................................44

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995)............................38

*Eaton v. Onan Corp.*, 117 F. Supp. 2d 812 (S.D. Ind. 2000) ..............29, 43, 46

*Engers v. AT&T Corp.*, No. 98-3660, letter op. (D.N.J. 2001).........................43

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .........................................................................35, 37, 43

*FDIC v. Meyer*, 510 U.S. 471 (1994) ...........................................................24, 30

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)............................................26

*Hickey v. Chi. Truck Drivers, Helpers & Warehouse Workers Union*,
    980 F.2d 465 (7th Cir. 1992) ...................................................................31

*In re Merchants Grain Inc.*, 93 F.3d 1347 (7th Cir. 1996) .........................24, 30

*In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845 (7th Cir. 1997) ...................27

*In the Matter of Chi., Milwaukee, St. Paul & Pac. R.R. Co.*,
    658 F.2d 1149 (7th Cir. 1981) ....................................................33

*Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205 (7th Cir. 1986) .............38

*Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income*
    *Trust,* 134 F. Supp. 2d 189 (D. Mass. 2001) ...................................34

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996).........................................4

*Lunn v. Montgomery Ward*, 166 F.3d 880 (7th Cir. 1999) .......................passim

*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993).........................................4, 31

*NBD Bank, N.A. v. Bennett*, 67 F.3d 629 (7th Cir. 1995)...............................38

*Old Ben Coal Co. v. Director, Office of Workers' Comp. Programs*,
    292 F.3d 533 (7th Cir. 2002) ................................................44, 47

*Peele v. Country Mut. Ins. Co.*, 288 F.3d 319 (7th Cir. 2002)...........................26

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ....................27

*Russello v. United States*, 464 U.S. 16 (1983)...............................................30

*Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534 (7th Cir. 2003) ...............38

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997)...........26, 37

*Tootle v. ARINC, Inc.*, 222 F.R.D. 88 (D. Md. 2004)........................................43

*Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971
    (7th Cir. 2004) ..................................................................38

*United States v. Healy*, 376 U.S. 75 (1964).......................................33

*United States v. Jarrett*, 133 F.3d 519 (7th Cir. 1998)....................................30

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .........................................44

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ......................................43

*Von Aulock v. Smith*, 720 F.2d 176 (D.C. Cir. 1983) .......................................5

*Wells v. Gannett Ret. Plan*, 385 F. Supp. 2d 1101 (D. Col. 2005) ...................43

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) .....................................43

## STATUTES

26 U.S.C. § 411(b)(1)(A) ................................................................11

26 U.S.C. § 411(b)(1)(B) ................................................................11

26 U.S.C. § 411(b)(1)(C) ................................................................11

26 U.S.C. § 411(b)(1)(H) ...............................................6, 7, 9, 11, 45

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

29 U.S.C. § 623(i) .....................................................................6, 10

29 U.S.C. § 1001(a) .......................................................................4

29 U.S.C. § 1002(19) ....................................................................31

29 U.S.C. § 1002(23) ...........................................................20, 30, 33

29 U.S.C. § 1002(24) ......................................................................5

29 U.S.C. § 1002(31) ....................................................................31

29 U.S.C. § 1002(33) ....................................................................31

29 U.S.C. § 1002(34) ......................................................................8

29 U.S.C. § 1002(35) ..................................................................8, 11

29 U.S.C. § 1023(d)(6)(D) ...............................................................31

29 U.S.C. § 1052(a)(1)(B) ...............................................................31

29 U.S.C. § 1052(b)(4)(C) ...............................................................31

29 U.S.C. § 1053 .......................................................................4, 31

29 U.S.C. § 1054(b)(1)(A) .............................................................5, 31

29 U.S.C. § 1054(b)(1)(B) .........................................................5, 31, 32

29 U.S.C. § 1054(b)(1)(C) .............................................................5, 31

29 U.S.C. § 1054(b)(1)(D) ...............................................................31

29 U.S.C. § 1054(b)(1)(E) ................................................................... 31

29 U.S.C. § 1054(b)(1)(F) ................................................................... 31

29 U.S.C. § 1054(b)(1)(G) ................................................................... 31

29 U.S.C. § 1054(b)(1)(H) ........................................................... passim

29 U.S.C. § 1054(b)(3)(B) ................................................................... 31

29 U.S.C. § 1054(c) .......................................................... 31, 35, 36. 40, 41

29 U.S.C. § 1054(d) ........................................................................... 31

29 U.S.C. § 1054(e) ........................................................................... 31

29 U.S.C. § 1054(g) ........................................................................... 31

29 U.S.C. § 1055 ............................................................................... 31

29 U.S.C. § 1056 ............................................................................... 31

29 U.S.C. § 1202 ........................................................................ 10, 45

## REGULATIONS AND OTHER ADMINISTRATIVE GUIDANCE

26 C.F.R. § 1.401-1(b) ....................................................................... 31

26 C.F.R. § 1.401(a)(4)-3 .................................................................... 45

26 C.F.R. § 1.401(a)(4)-8 ................................................ 8, 10, 11, 44, 45

26 C.F.R. § 1.401(a)(4)-9 .................................................................... 45

26 C.F.R. § 1.401(a)(4)-12 .................................................................. 45

26 C.F.R. § 1.401(a)(4)-13 ............................................................ 10, 13, 45

26 C.F.R. § 1.401(a)(9)-6 .................................................................... 35

26 C.F.R. § 1.401(l)-3 ........................................................................ 46

26 C.F.R. § 1.411(d)-3 ....................................................................... 34

26 C.F.R. 1.411(a)-7(a) ...................................................................... 31

IRS Notice 96-8 1996-1 C.B. 359, 1996 WL 17901 ....................................... 11, 46

Nondiscrimination Requirements for Qualified Plans,
56 Fed.Reg. 47,524 (Sept. 19, 1991) ..........................................10, 11, 44, 45

Nondiscrimination Requirements for Qualified Plans,
57 Fed.Reg. 35,536 (Aug. 10, 1992) ................................................................10

Rev. Rul. 53-185, 1953-2 C.B. 202 ...................................................................41

Rev. Rul. 71-446, 1971-2 C.B. 187 ...................................................................41

Rev. Rul. 76-47, 1976-1 C.B. 109 ...................................................................41

## LEGISLATIVE HISTORY

H.R. Rep. No. 93-533 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639.................4

H.R. Rep. No. 99-1012 (1986) (Conf. Rep.), *reprinted in* 1986
U.S.C.C.A.N. 3868..................................................................5, 6, 7, 27, 28

## FEDERAL RULES

Federal Rule of Civil Procedure 23 ....................................................................3

## ARTICLES AND OTHER PUBLICATIONS

Geoffrey N. Calvert, *Cost-of-Living Pension Plans*, 32 Harv.
Bus. Rev., Sept.-Oct. 1954..........................................................................41

Maureen B. Cavanaugh, *Social Security: Can The Promise Be Kept?*,
58 Wash. & Lee L. Rev. 1197, 1200 n.18......................................................8

Albert Crenshaw, *Putting the Pinch on Pensions*, Wash. Post,
Aug, 19, 2004. ..........................................................................................42

Julie Kosterlitz, *Pinched Promises*, Nat'l J., 2650, 2651-52
(Sept. 9, 2005) ..........................................................................................42

Pension Benefit Guaranty Corp., *Pension Insurance Data Book 2004*,
(2005) .....................................................................................................9, 42

*Webster's Third New Int'l Dictionary* (1993) ...........................................24, 25

## TABLE OF ABBREVIATIONS AND GLOSSARY

| <u>Term</u> | <u>Description</u> |
| --- | --- |
| ACBF | The Always Cash Balance Formula, one of two alternative formulas used by the IBM Plan to calculate the opening account balance of an employee transitioning to the CBF. |
| ADEA | The Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 602, codified as amended in 29 U.S.C. §§ 621-634. |
| CBF | The Cash Balance Formula, one of the IBM Plan's benefit formulas since July 1, 1999. |
| EEOC | The U.S. Equal Employment Opportunity Commission. |
| Employee | Generally, an employee who participates in a pension plan and earns benefits under the plan's benefit formula. |
| ERISA | The Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829, codified as amended in scattered sections of 29 U.S.C. |
| IBM | The IBM Corporation. |
| IBM Plan or Plan | The IBM Personal Pension Plan. |
| IRC | The Internal Revenue Code, codified in 26 U.S.C. |
| OBRA 1986 | The Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874, codified in scattered sections of U.S.C. |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, because plaintiffs alleged that defendants IBM and the IBM Plan violated ERISA. (Docket Nos. 1, 3, 41.) This Court has jurisdiction under 28 U.S.C. § 1291, because the district court entered a final judgment that disposed of all claims between all parties on August 16, 2005 (Docket No. 360), and defendants filed a timely notice of appeal on August 30, 2005 (Docket No. 363).

## ISSUES PRESENTED FOR REVIEW

1.    Whether the IBM Plan's cash balance formula, which credits interest at the same rate for all employees regardless of age, "reduce[s]" "the rate of an employee's benefit accrual . . . because of the attainment of any age," in violation of ERISA § 204(b)(1)(H)(i)?

2.    Whether the Plan "reduce[d]" "the rate of an employee's benefit accrual . . . because of the attainment of any age," in violation of § 204(b)(1)(H)(i), by providing each employee who made the transition from the Plan's prior benefit formulas to the cash balance formula with an opening account balance that was at least as large as the approximate account balance that the employee would have had if the cash balance formula had been in effect for the employee's entire IBM career?

## INTRODUCTION

ERISA § 204(b)(1)(H) states that "an employee's benefit accrual" in a pension plan may not be "ceased," nor may the "rate of an employee's benefit accrual [be] reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i). The

IBM Plan's Cash Balance Formula ("CBF") complies with this provision because all employees accrue benefits in exactly the same way at all ages: all employees earn benefits at a rate of five percent of pay, plus interest at a rate based on the yield on U.S. Treasury securities. The Plan's Always Cash Balance Formula ("ACBF"), one of two formulas used to calculate employees' opening account balances under the CBF, satisfies § 204(b)(1)(H) for the same reason: it treated all employees exactly the same regardless of age.

The district court nonetheless held that the CBF and the ACBF violate § 204(b)(1)(H). The court did not find that defendants had varied pay credits, interest credits, or opening account balances on the basis of age. Rather, the district court held that the CBF and ACBF violated § 204(b)(1)(H) simply because younger employees have more time than older employees to accumulate interest on their account balances before they reach age 65. The court arrived at this conclusion by reading into § 204(b)(1)(H) a defined term that the provision does not use and by disregarding settled rules of statutory construction, Seventh Circuit precedent, and the Treasury Department's interpretation of the statute.

Under the district court's interpretation of § 204(b)(1)(H), *all* cash balance plans (not just the IBM Plan) would be unlawful because all such plans credit interest on an employee's account balance. The district court's erroneous interpretation of ERISA would therefore strike down over a thousand cash balance plans across the country, as well as several other long-accepted types of defined benefit plans that use interest-like features.

## STATEMENT OF THE CASE

Plaintiffs filed this action on November 1, 1999. (Docket No. 1.) Their Second Amended Complaint, filed on October 20, 2000, alleges (among other things) that the IBM Plan violates ERISA § 204(b)(1)(H). (Docket No. 41.)

On September 17, 2001, the district court certified a class consisting of all individuals who have participated in the Plan since December 31, 1994. (Docket No. 70.) The district court divided the class into three subclasses: (1) subclass I, represented by plaintiff Kathi Cooper, challenging the lawfulness of the Plan's Pension Credit Formula (a claim not at issue in this appeal), (2) subclass II, represented by plaintiff Beth Harrington, challenging the lawfulness of the Plan's CBF and ACBF, and (3) subclass III, represented by plaintiff Matthew Hillesheim, alleging that adoption of the CBF effected a "partial termination" of the Plan (also a claim not at issue in this appeal). (*Id.*) Defendants filed a petition for immediate review of the class certification order under Federal Rule of Civil Procedure 23(f), which this Court denied on November 19, 2001. (7th Cir. Docket No. 01-8034.)

On July 31, 2003, the district court granted plaintiffs' motions for partial summary judgment that three of the benefit formulas used by the Plan – the CBF, the ACBF, and the Pension Credit Formula – violate § 204(b)(1)(H), and denied defendants' cross-motions on these claims. (A 25-26.)[1] After additional proceedings on the question of remedy, the parties entered into a partial settlement agreement that resolves all claims between the parties other than the claims that the CBF and

---

[1]    "A ___" refers to materials in Appellants' Appendix.

ACBF violate § 204(b)(1)(H).  On August 16, 2005, the district court approved the partial settlement and entered a final judgment consistent with its terms.  (A 1-3.)

## STATEMENT OF FACTS

**A.    ERISA And The Regulation Of Retirement Plans.**

**1.    The Statutory Scheme.**

Enacted in 1974, ERISA comprehensively regulates employee pension plans. Aptly described as "an enormously complex and detailed statute," *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993), ERISA established "minimum standards" for pension plans that would "assur[e] the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001(a). In enacting ERISA, Congress was careful not to "mandate what kind of benefits employers must provide if they choose to have" a retirement plan. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Congress recognized that providing employers with the freedom to design their own pension plans was "vital" to the willingness of employers to provide such plans, and therefore sought to preserve "flexibility in the design and operation of . . . pension programs." H.R. Rep. No. 93-533 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4647. Accordingly, "[r]ather than imposing mandatory pension levels or methods for calculating benefits," ERISA merely creates a set of "outer bounds" on permissible pension practices. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981).

In light of Congress's concern that "many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans," 29 U.S.C. § 1001(a), ERISA imposed mandatory vesting requirements on all pension plans. *See* 29 U.S.C. § 1053. ERISA also enacted a set

of "anti-backloading rules" – rules that prohibit plans from concentrating most of an employee's benefit accruals in the last few years of service before an employee reaches "normal retirement age." *See* 29 U.S.C. §§ 1054(b)(1)(A)-(C). ERISA allows each pension plan to specify the "normal retirement age" under the plan, but generally prohibits a plan from specifying an age later than 65. *See* 29 U.S.C. § 1002(24). Taken together, the vesting rules and the anti-backloading rules assure that employees will not forfeit their benefits if they stop working for the sponsor of the plan prior to normal retirement age; rather, employees will receive "at least portions of their normal pension benefits even if they leave their positions prior to retirement." *Alessi,* 451 U.S. at 510.

### 2. The OBRA 1986 Amendments.

As originally enacted, ERISA did not require that a pension plan allow employees who work *beyond* normal retirement age to continue earning pension benefits. *See* H.R. Rep. No. 99-1012 (1986), at 378 (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4023 (A 646); *Von Aulock v. Smith,* 720 F.2d 176, 177-80 (D.C. Cir. 1983). There was "disagreement," however, about whether the ADEA prohibited plans from denying additional pension accruals to such employees. H.R. Rep. No. 99-1012, at 378. A 1978 Department of Labor bulletin had concluded that the ADEA permitted pension plans "to cease benefit accruals and allocations to an employee's account with respect to employees working beyond the normal retirement age under the plan." *Id.* When responsibility for administering the ADEA was later transferred to the EEOC, however, the EEOC announced an intention – never formally acted upon – "to rescind the Department of Labor's

-5-

interpretation and require employers to continue benefit accruals" for employees who work past normal retirement age. *Id.*

OBRA 1986 resolved this disagreement by simultaneously amending ERISA, the ADEA, and the IRC. The ERISA amendment appears in ERISA § 204(b)(1)(H), which states in pertinent part that

> [a] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i). The amendments simultaneously made to the IRC and the ADEA use virtually identical language. *See* 26 U.S.C. § 411(b)(1)(H) (IRC); 29 U.S.C. § 623(i) (ADEA). The Conference Report states that all three provisions "are to be interpreted in a consistent manner." H.R. Rep. No. 99-1012, at 378.

Under the heading "Reasons for Change," the Conference Report explains that the OBRA provisions were adopted in order to resolve the ongoing uncertainty over whether it was lawful to cut off further pension accruals for employees who work past normal retirement age. *Id.* The Conference Report states that the OBRA provisions ended this uncertainty by requiring that "benefit accruals or continued allocations to an employee's account under either a defined benefit plan or a defined contribution plan may not be reduced or discontinued on account of the attainment of a specified age." *Id.*

The Conference Report illustrates the application of the new provisions with an example that involves a pension plan with a normal retirement age of 65 and a benefit formula that provides a retirement annuity of $10 per month multiplied by

the employee's years of service to the employer. *Id.* at 381. As the Conference

Report explains, an employee who participates in such a plan from ages 55 to 65

would earn a retirement benefit of $100 per month – $10 per month multiplied by

ten years of service. *Id.* Before OBRA 1986 was enacted, if the employee had

continued working past age 65, the plan could have refused to provide him with

anything more than the $100 monthly benefit that he had already earned by the

time he reached age 65. *Id.* at 375, 378. Under § 204(b)(1)(H) and the parallel IRC

and ADEA provisions, however, the employee must be allowed to continue earning

benefits *after* age 65 in the same manner he was earning benefits *before* he attained

that age. Thus, as the Conference Report explains, the employee in the example

must receive a benefit of $100 per month if he retires at age 65, $110 per month if

he retires at age 66, $120 per month if he retires at age 67, and so on. *Id.* at 381.

The Conference Report also suggests that § 204(b)(1)(H) was intended to

apply only to benefit accruals earned *after* normal retirement age:

> Under the conference agreement, the rules preventing the
> reduction or cessation of benefit accruals on account of the
> attainment of age *are not intended to apply in cases in
> which a plan satisfies the normal benefit accrual
> requirements for employees who have not attained normal
> retirement age.*

*Id.* at 379 (emphasis added). This understanding of the scope of § 204(b)(1)(H) is

also reflected in the title of the counterpart provision in the IRC, which states that

the provision addresses "Continued accrual *beyond normal retirement age.*" 26

U.S.C. § 411(b)(1)(H) (emphasis added).

### 3.    Defined Benefit Plans, Defined Contribution Plans, and Cash Balance Plans.

ERISA regulates two basic types of retirement plans: "defined contribution plans" and "defined benefit plans." *See* 29 U.S.C. §§ 1002(34)-(35). In a defined contribution plan, each employee's retirement benefit is based on the balance in a bookkeeping account maintained for the employee. An employee's account balance reflects the employee's share of the contributions that are made to the plan from time to time by the employer and/or employees. The employee's account balance is also adjusted to reflect the employee's share of the plan's investment experience; thus, the risk of the plan's investment performance falls on plan participants. *See* 29 U.S.C. § 1002(34); Maureen B. Cavanaugh, *Social Security: Can The Promise Be Kept?*, 58 Wash. & Lee L. Rev. 1197, 1200 n.18 (2001).

ERISA classifies all retirement plans other than defined contribution plans as defined benefit plans. *See* 29 U.S.C. § 1002(35). An employee's benefit under a defined benefit plan is generally based on a benefit formula set forth in the plan rather than on the amounts contributed to the plan. *See Cavanaugh,* 58 Wash. & Lee L. Rev. at 1200 n.17. The plan is responsible for paying a defined benefit regardless of its investment performance; thus, the risk of the plan's investment performance falls on the employer that funds the plan. *Id.*

A "cash balance plan" is a type of defined benefit plan that expresses an employee's benefit as an account balance. *See* 26 C.F.R. § 1.401(a)(4)-8(c)(3); *see also* A 121. An employee's account in a cash balance plan is *not* an asset-based account of the kind maintained under a defined contribution plan, however; it is a

formula-based account that reflects the retirement benefit that an employee is entitled to receive under the plan's benefit formula. (A 122.)

A cash balance plan simulates the operation of an ordinary savings account. An employee's account balance is made up of two types of credits – "pay credits" and "interest credits." (A 122, 183.) Pay credits generally are credited to an employee's account at a rate equal to a percentage of the employee's pay, and interest is credited to the account by applying an interest rate to the accumulated account balance. (A 122, 183.)

The first cash balance plan formally known by that name was adopted in 1985, but plans that share the key features of cash balance plans have existed far longer. (A 183, 451-52.) Cash balance plans are commonplace, accounting for approximately 25 percent of all participants in defined benefit plans and 40 percent of the assets invested in such plans. (A 183.) According to the Pension Benefit Guaranty Corporation, over 1,500 cash balance plans and other similar plans were in existence as of 2003. *See* Pension Benefit Guaranty Corp., *Pension Insurance Data Book 2004*, at 59 (2005), at http://www.pbgc.gov/docs/2004databook.pdf (last visited Oct. 25, 2005).

### 4. Treasury Department Guidance Concerning § 204(b)(1)(H) And Cash Balance Plans.

The Treasury Department has issued regulations and other guidance explaining how cash balance plans may comply with the IRC. Congress also gave Treasury the task of "provid[ing] by regulation for the coordination" of IRC § 411(b)(1)(H), the IRC counterpart to ERISA § 204(b)(1)(H), with other IRC provisions that regulate defined benefit plans. *See* 26 U.S.C. § 411(b)(1)(H)(v).

-9-

Congress specified that any regulations issued by the Treasury Department under IRC § 411(b)(1)(H) would apply to the parallel amendments of the ADEA and ERISA "in the same manner and to the same extent" as to the IRC provision. 29 U.S.C. § 1054(b)(1)(H)(vi); 29 U.S.C. § 623(i)(7); *see also* 29 U.S.C. § 1202(c) (providing that regulations prescribed by the Secretary of the Treasury under § 411 of the IRC shall also apply to the corresponding provisions of ERISA).

The Treasury Department issued final regulations in the early 1990's that specified, among other things, a number of ways in which cash balance plans may comply with the IRC's "nondiscrimination rules" pertaining to highly compensated employees. *See* Nondiscrimination Requirements for Qualified Plans, 56 Fed. Reg. 47,524, 47,583-86 (Sept. 19, 1991).[2] The regulations establish a "safe harbor" that is available to cash balance plans that allow employees to continue earning interest on their account balances through normal retirement age even if they do not work until that age. 26 C.F.R. § 1.401(a)(4)-8(c)(3)(iv)(A). The Preamble to the regulations states that providing interest in the manner described in the regulations does not constitute an age-based reduction in an employee's rate of benefit accrual:

---

[2]    The regulations were initially scheduled to become effective in 1992; that date was extended to 1994, following amendments to other portions of the regulations. *See* Nondiscrimination Requirements for Qualified Plans, 57 Fed. Reg. 35,536, 35,536 (Aug. 10, 1992); 26 C.F.R. § 1.401(a)(4)-13(a).

> The fact that interest adjustments through normal
> retirement age are accrued in the year of the hypothetical
> allocation [*i.e.*, the year a pay credit is accrued] will not
> cause a cash balance plan to fail to satisfy the
> requirements of § 411(b)(1)(H) [the IRC counterpart to
> ERISA § 204(b)(1)(H)], relating to age-based reductions in
> the rate at which benefits accrue under a plan.

56 Fed. Reg. at 47,528. The regulations also coordinate the nondiscrimination rules

with the age discrimination provision in IRC § 411(b)(1)(H) by providing that, in

order to qualify for the "safe harbor," a cash balance plan must continue to provide

interest after normal retirement age if the employee begins receiving benefits after

that age. 26 C.F.R. § 1.401(a)(4)-8(c)(3)(ix).

In 1996, the Treasury Department provided guidance on lump-sum

distributions from cash balance plans and set forth approved interest crediting

rates that cash balance plans may use if they offer employees the option of receiving

their benefits in a lump-sum payment equal to their account balances. *See* IRS

Notice 96-8, 1999-1 C.B. 359, 1996 WL 17901, part IV-A (A 643). Treasury also

stated in the Notice that, in order to comply with the IRC's anti-backloading rules, a

cash balance plan must continue to credit interest on an employee's account balance

through normal retirement age even if an employee stops working before that age.

*Id.*

**B.    The IBM Plan.**

**1.    The Cash Balance Formula.**

The IBM Personal Pension Plan is a defined benefit plan within the meaning

of 29 U.S.C. § 1002(35). The Plan adopted the CBF as the benefit formula for a

portion of the IBM work force effective July 1, 1999. (A 387.)

-11-

The CBF has all the features of a typical cash balance plan. Each employee has an account balance made up of pay credits and interest credits. (A 122; A 240-43.) Pay credits are credited each month at the rate of five percent of an employee's pay, and interest is credited at an interest rate equal to the yield on one-year Treasury securities plus one percent. (A 242-43, §§ 11.3, 11.4; A 221, § 2.31.) The CBF continues to provide pay credits and interest credits at the same rate to employees who work beyond age 65, the normal retirement age specified in the Plan. (A 242-44, §§ 11.3-11.5; A 222, § 2.37.) The CBF thus treats all employees equally, regardless of age: all employees earn benefits at an identical rate of five percent of pay, plus interest based on the yield on one-year Treasury securities. (A 123.) Under this formula, any two employees with the same pay and service history will end up with the same account balance, regardless of their age. (*Id.*)

When an employee stops working for IBM, the employee may choose between receiving benefits immediately and deferring the receipt of benefits until as late as normal retirement age. (A 244, § 12.1(a).) If an employee elects to defer receiving benefits, interest will continue to accrue on the employee's account balance until benefit payments begin. (A 243, §§ 11.4, 11.5.) Benefits generally may be taken in the form of either a lump-sum payment equal to an employee's account balance or a life annuity of equivalent value. (A 245-47, § 12.2.)

If one employee elects to defer the receipt of benefits after he stops working for IBM, and another employee elects to receive his benefits immediately, the one who defers the receipt of benefits will continue to receive interest on his account balance, and will therefore receive more interest than the one who takes his

-12-

benefits immediately.  (A 124.)  The extra interest that accrues during the deferral period offsets the economic cost associated with *waiting* to receive a benefit. (A 88-92.)  Put differently, the interest compensates employees for the "time value of money" during the period that they defer the receipt of benefits.  (A 90-94.)

### 2.    The Always Cash Balance Formula.

When IBM adopted the CBF, employees who had already attained age forty and completed at least ten years of service, or who were within five years of eligibility for retirement, were permitted to choose between the CBF and the Plan's prior benefit formulas.  (A 387-88.)  All other employees were automatically transitioned to the CBF.  (*Id.*)  Moreover, all employees who made the transition to the CBF, whether automatically or by choice, received an opening account balance under the CBF equal to the *greater* of the amounts produced by two formulas:  (1) the Present Value Formula, which provided an account balance equal to the present value of the benefit that an employee had earned under the Plan's prior benefit formulas, or (2) the ACBF, which provided an approximation of the account balance that an employee would have had if the CBF had "always" been in effect – hence the name "Always Cash Balance Formula."  (A 268, § 17.5(b).)

This "greater of" approach to creating opening account balances was patterned after a Treasury Regulation that creates a safe harbor method of converting a plan to a cash balance plan for purposes of the nondiscrimination rules.  *See* 26 C.F.R. § 1.401(a)(4)-13(f)(2)(iii)(B).  Under the safe harbor method, a *plan must provide employees* with an opening account balance equal to the greater of (1) the present value of the benefit that the employee had earned under the pre-

existing benefit formula, or (2) the account balance that the employee would receive if the new cash balance formula were "applied to the employee's total years of service" – *i.e.,* the account balance that the employee would have earned if the cash balance formula had always been in effect. *Id.* The only difference between the safe harbor method and the approach followed by the IBM Plan is that, whereas the safe harbor regulation refers to the *actual* account balance that an employee would have accrued if a cash balance formula had always been in effect, the Plan used an approximation of that account balance. (A 448.)

The ACBF approximated the account balance that an employee would have had if the CBF had always been in effect by providing an opening account balance equal to (i) five percent of an employee's final average salary as of the transition date, multiplied by (ii) the employee's years of service. (A 268, § 17.5(b)(1)(B).) This formula treated all employees equally without regard to age: no matter what their ages, any two employees with the same salary and service record received exactly the same opening account balance under the ACBF. (A 449.)

### C.    Proceedings And Disposition Below.

#### 1.    The District Court's Summary Judgment Order Regarding The CBF And The ACBF.

The district court granted plaintiffs' motions for partial summary judgment and denied defendants' cross-motions. In pertinent part, the district court held that the CBF and the ACBF violate ERISA § 204(b)(1)(H). (A 25-26.)

In so holding, the district court equated the phrase "benefit accrual" in § 204(b)(1)(H), which is not defined in ERISA, with the phrase "accrued benefit," which is a defined term used throughout ERISA but which does not appear in

§ 204(b)(1)(H). (A 14-15.) ERISA defines an employee's "accrued benefit" as "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Based on its conclusion that "benefit accrual" and "accrued benefit" have equivalent meanings, the court held that an employee's "rate of . . . benefit accrual" under § 204(b)(1)(H) consists of "the rate at which an employee accrues a benefit payable in the form of an annuity that commences at age 65." (A 14-15.)

The district court offered a "simple" explanation of why Congress might have used the undefined term "benefit accrual" rather than the defined term "accrued benefit" in § 204(b)(1)(H). (A 15.) It would have been grammatically awkward, the district court posited, for the statute to refer to the "rate of an employee's accrued benefit" or the "rate of an employee's accumulated benefit" instead of the "rate of an employee's benefit accrual." (A 15, 24.) The court illustrated its reasoning with the following example:

> [C]onsider the word popcorn. Popcorn is the word used to describe the product created by exposing corn kernels to extreme heat. If asked to draft a phrase related to the speed of this process, one would not say "rate of popcorn." Rather, to be grammatically correct, one would say, "the rate corn pops."

(A 15, n.2.) The court thus concluded that § 204(b)(1)(H) should be read to have the same meaning that it would have if it had used the defined term "accrued benefit." (Id.)

From this premise and on this understanding, the district court determined that it was "inevitable" that the CBF violates § 204(b)(1)(H), since younger employees have more time than similarly-situated older employees to earn interest

on their account balances before reaching age 65. (A 23.) The district court explained:

> Interest credits are a part of the accrued benefit specified in IBM's [CBF], and these count in determining whether the benefit accrual requirements of section 204(b)(1) are met. And, like in any defined plan, the interest credits must be valued as an age 65 annuity. At this point in the analysis, the result is inevitable. In terms of an age 65 annuity, the interest credits will always be more valuable for a younger employee as opposed to an older employee.

(A 23; *see also* A 24 (noting that "when the age 65 annuity is included in the analysis," the "rate of a participant's benefit accrual diminishes as the participant closes in on the age 65 target").)

The court illustrated its reasoning by describing a hypothetical participant in the CBF. The court stated that its hypothetical participant would earn an annuity of $8,093 per year beginning at age 65 if he worked for IBM from ages 29 through 49; that his annuity would increase by $622 if he provided an additional year of service at age 50; and that his annuity would increase by another $282 if he provided an additional year of service at age 59. (A 24.) After reciting these figures, the district court concluded, without further analysis, that "[t]his 49 year old employee's benefit accrual has been reduced for each year he has aged, and this reduction violates ERISA § 204(b)(1)(H)." (*Id.*)

In reaching these conclusions, the district court acknowledged that "ERISA does not explicitly answer th[e] question" whether the rate of an employee's benefit accrual is to be determined by reference to an age 65 benefit. (A 14.) The court also acknowledged IBM's argument that it is "economically nonsensical" to use an age-65-based test to measure the "rate of an employee's benefit accrual," because an

-16-

age-65-based test fails to account for the time value of money.  (A 14.)  "A dollar today," the court agreed, "is worth more than the promise of a dollar a year from now" – so "[f]rom an economist's perspective, Defendants have a good argument." (*Id.*)  The court also recognized that its age-65-based interpretation of § 204(b)(1)(H) leads to "startling anomalies and absurdities."  (A 22.)  The court nonetheless concluded that the "literal and unambiguous" text of § 204(b)(1)(H) required it to adopt an age-65-based interpretation of the statute.  (A 25.)

The district court went on to hold that the ACBF violates § 204(b)(1)(H) for the same reason that it found the CBF unlawful.  (A 4, ¶7.)  Although the ACBF provided older employees and similarly-situated younger employees with identical opening account balances, the court found that the ACBF violated § 204(b)(1)(H) because a younger employee would have an opportunity to earn more interest on his account balance before reaching age 65 than would an older employee.  (*See id.*; A 26.)

### 2.    The Partial Settlement.

After the district court entered its partial summary judgment order on the CBF and ACBF claims, the parties proceeded to litigate remedial issues.  Plaintiffs proposed two alternative remedies that would result in all employees receiving the same amount of interest by the time they reach age 65 as would be received by the very youngest employee in the Plan.  (Docket Entry 201.)  Thus, if the youngest employee in the Plan were 18 years old, and would therefore receive 47 years of compound interest under the CBF by the time he reached age 65, plaintiffs' proposed remedies would require the Plan to provide a 64-year-old employee with

-17-

the equivalent of 47 years of compound interest after just one year, when he too reached age 65. (A 504-05.) The Plan Actuary calculated that the less expensive of plaintiffs' proposed remedies would have cost approximately six billion dollars to implement. (A 513.)

Before the district court ruled on the question of remedy, the parties entered into a partial settlement that (1) resolves all claims between them except for plaintiffs' claims that the CBF and the ACBF violate § 204(b)(1)(H), and (2) provides for a stipulated remedy for the CBF and ACBF claims in the event that plaintiffs prevail on them at the conclusion of the appellate process. Under the settlement, the Plan will provide the class with additional pension benefits that, together with attorneys' fees, have an approximate value of $314 million if plaintiffs do not prevail on either issue on appeal, and that have an approximate value of $1.7 billion if plaintiffs prevail on both issues. (A 597-98, 635-36.)

The district court approved the settlement and entered final judgment in accordance with the terms of the settlement and its prior summary judgment order. (A 1-2.) This appeal followed.

## SUMMARY OF ARGUMENT

1.a.    Section 204(b)(1)(H) provides that a defined benefit plan does not comply with ERISA if "an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." The ordinary meaning of this provision is that it prohibits plans from providing that an employee's benefit accruals will cease, or the rate of an employee's benefit accruals will be reduced, once the employee attains a particular age. The CBF complies with

-18-

the ordinary meaning of the provision because it provides employees with a *constant rate of benefit accrual* that remains the same at all ages: five percent of pay, plus interest at a rate based on the yield on U.S. Treasury securities. There is no age at which an employee begins earning pay or interest credits at a new and less favorable rate.

There can be no genuine dispute that the CBF accords equal treatment to employees who are similarly situated in all material respects. Any two employees who work for IBM for the same number of years, earn the same salary, and wait an equal length of time *between the date they stop working for* IBM *and the date they* elect to begin receiving benefits will end up with identical account balances. The only way two employees with the same salary and service history can end up with a different account balance is if one of them *waits* longer than the other before electing to begin receiving benefits. Such differences do not occur because of an employee's attainment of a given age; they occur because of the length of time an employee waits to begin receiving benefits.

This Court's decisions, including *Lunn v. Montgomery Ward*, 166 F.3d 880 (7th Cir. 1999), reinforce this straightforward reading of § 204(b)(1)(H). *Lunn* makes clear that where, as here, a pension plan treats employees "exactly the same way" at all ages, the plan complies with § 204(b)(1)(H). This understanding is further confirmed by the Conference Report that accompanied § 204(b)(1)(H), which explains that the purpose of the provision was simply to prohibit plans from cutting off additional pension accruals for employees who work past normal retirement age.

b.    The district court's contrary interpretation of § 204(b)(1)(H) is erroneous. <u>First</u>, the district court's interpretation violates settled rules of statutory construction. Most fundamentally, the district court read into § 204(b)(1)(H) the defined term "accrued benefit," which ERISA defines as a benefit "expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). Congress used the term "accrued benefit" in numerous provisions in ERISA, but omitted the term from § 204(b)(1)(H). When Congress uses a term in one section of a statute but omits it from another section, it is presumed to act intentionally and purposefully. That principle applies with special force where, as here, the term in question is a defined term in a comprehensive and reticulated statute such as ERISA. The district court's approach of reading "accrued benefit" into the statute would also render meaningless an entire subsection of § 204(b)(1)(H), in violation of the rule that statutes should not be construed in a manner that renders a statutory provision superfluous.

The district court disregarded these rules of construction, asserting that the only reason that § 204(b)(1)(H) uses the undefined term "benefit accrual" instead of the defined term "accrued benefit" is because it would have been grammatically awkward to use the defined term. But Congress easily could have used the defined term in § 204(b)(1)(H), and expressed the meaning that the district court attributed to that provision, without transgressing the rules of grammar. Indeed, Congress did just that in a neighboring provision. For all of these reasons, the district court's approach of reading "accrued benefit" into the statute should be rejected.

Second, the district court erred in concluding that the CBF reduces benefit accruals "because of the attainment of any age." The district court wholly failed to account for the amount of time an employee waits between the date a benefit is earned and the date it is actually received. When these differences are taken into account, it becomes clear that any variance between the accruals of older and younger employees does not occur "because of the attainment of any age," but because of the amount of time an employee waits to receve a benefit payment.

Third, as the district court acknowledged, its interpretation of § 204(b)(1)(H) leads to "startling anomalies and absurdities." Under the district court's reasoning, a pension plan can be struck down as age discriminatory merely because it uses an interest rate to adjust an employee's benefit for the passage of time. It strains common sense to suggest that Congress intended to classify the use of interest as a form of age discrimination when it occurs in a pension plan, when no one regards interest as discriminatory in any other facet of the economy. Furthermore, under the district court's interpretation of § 204(b)(1)(H), cash balance plans would be required to provide enormous windfalls to older employees. The pay credits of certain older employees would have to be increased ten-fold or more – and would have to be ten or more times larger than those of younger employees earning the same salary and doing the same job – in order to bring the CBF into conformity with the district court's interpretation of the law. ERISA should not be interpreted in a manner that requires this type of massive reverse age discrimination. *See Lunn*, 166 F.3d at 883 ("Reverse age discrimination is not the theory" of § 204(b)(1)(H)).

Fourth, the district court's interpretation would wreak havoc on the pension system. The district court's interpretation would invalidate more than 1,000 cash balance plans across the country, since all cash balance plans provide interest credits and, as the district court acknowledged, a plan that provides interest credits will "inevitably" violate the district court's interpretation of § 204(b)(1)(H). The district court's interpretation would also invalidate several other long-accepted types of pension plans that use interest-like features. Conforming all such plans to the district court's interpretation of the law would cost hundreds of billions of dollars, likely bankrupting the sponsors of numerous plans and triggering an exodus from the defined benefit system. The Court should reject an interpretation of ERISA that would have such needless and destructive consequences for the pension system.

Finally, authoritative interpretations by the Treasury Department refute the district court's interpretation of § 204(b)(1)(H). The Treasury Department has issued regulations providing a "safe harbor" method of determining whether cash balance plans comply with the nondiscrimination rules. The regulations provide that the "safe harbor" applies *only* to cash balance plans that permit an employee to earn interest credits through normal retirement age whether or not the employee actually works until that age. The Treasury Department has made clear that such interest credits – precisely the type provided by the CBF – will not cause a cash balance plan to fail to satisfy the parallel age discrimination provisions of the IRC, the ADEA, or ERISA. Treasury has also approved interest crediting rates that cash balance plans may use if they offer employees the option of receiving their benefits

in a lump sum. Interest rates that Treasury has expressly approved for certain purposes under the statutory scheme cannot plausibly be said to render cash plans essentially per se unlawful, as the district court erroneously concluded.

2.      For the same reasons, the district court erred in concluding that the ACBF violated § 204(b)(1)(H). Each employee who transitioned to the CBF received an opening account balance equal to the greater of (i) the present value of the benefit the employee had earned under the Plan's prior benefit formulas or (ii) the amount produced by the ACBF, which approximated the account balance the employee would have had if the CBF had been in effect throughout the employee's IBM career. Both alternatives were provided to all transitioning employees, regardless of age. Moreover, the ACBF, like the CBF, treated all employees without regard to age. Any two IBM employees with the same salary and service record received exactly the same opening account balance under the ACBF, regardless of their age. Accordingly, the ACBF complies with § 204(b)(1)(H).

## STANDARD OF REVIEW

The district court granted summary judgment for plaintiffs on a question of statutory interpretation. Review is therefore de novo. *Boyd v. Ill. State Police*, 384 F.3d 888, 896 (7th Cir. 2004).

## ARGUMENT

The district court's decision is plainly wrong. Neither the CBF nor the ACBF uses age as a basis for ceasing or reducing a benefit; on the contrary, they calculate pay credits and interest credits, and create account balances, without regard to age. In nevertheless holding that the CBF and ACBF violate § 204(b)(1)(H), the district

court ignored the plain language of the statute, directly relevant legislative history, and dispositive guidance from the Treasury Department. Moreover, the district court's interpretation of § 204(b)(1)(H) is contrary to fundamental principles of economics and would invalidate all cash balance plans and several other long-accepted types of pension plans. The district court's judgment should accordingly be reversed.

I.    **The Cash Balance Formula Complies With ERISA § 204(b)(1)(H).**

Section 204(b)(1)(H) provides that a defined benefit plan does not comply with ERISA if "an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." The CBF satisfies this provision.

A.    **The Cash Balance Formula Does Not "Reduce[ ]" The "Rate Of An Employee's Benefit Accrual" "Because Of The Attainment Of Any Age."**

ERISA does not define the terms used in § 204(b)(1)(H). Accordingly, these terms presumptively should be given their ordinary meaning. *See FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *In re Merchants Grain Inc.*, 93 F.3d 1347, 1353 (7th Cir. 1996).

The ordinary meaning of the terms in § 204(b)(1)(H) is very different from the district court's interpretation of those terms. The term "benefit" ordinarily means, among other things, "a cash payment or service provided for under an annuity, pension plan, or insurance policy." *Webster's Third New Int'l Dictionary* 204 (1993). The term "accrual" ordinarily means "the action or process of accruing" or "something that accrues," "esp. an amount of money that periodically accumulates

for a specific item (as taxes, interest, or anticipated expenses)." *Id.* at 13. And the phrase "because of" ordinarily means "by reason of" or "on account of." *Id.* at 194. Thus, under the ordinary meaning of its terms, § 204(b)(1)(H) is satisfied when a *pension* plan does not cease the "periodic accumulation" of the "payment" provided by the plan, or reduce the rate at which an employee "periodically accumulates" that payment, "by reason of" the employee's attainment of any age.

The CBF complies with this ordinary understanding of § 204(b)(1)(H). Under the CBF, an employee's benefit always accumulates at exactly the same rate, regardless of his age. Whether an employee is 18, 80, or any age in between, his rate of benefit accrual is always five percent of pay, plus interest at an interest rate based on U.S. Treasury securities. (A 242-43, §§ 11.3, 11.4.) There is no age at which the CBF ceases to provide pay credits or interest credits or begins to provide those credits at a less favorable rate.

One does not even need to *know* an employee's age in order to calculate the employee's account balance under the CBF. Moreover, once an employee stops working, interest continues to accrue on his account balance at exactly the same rate until benefit payments begin. (A 243-44, §§ 11.4, 11.5, 12.1(a).) Indeed, even if an employee dies, interest continues accruing on the account until the account balance is converted into benefit payments to the employee's beneficiary. (A 243, 251, 253-54, §§ 11.4, 13.1, 13.5, 13.7.) A benefit formula like this one, which does not take into account an employee's age – or even whether the employee is still alive – cannot be said to reduce an employee's rate of benefit accrual "because of the attainment of any age."

-25-

Moreover, there can be no dispute that the CBF provides equal treatment to all employees who are similarly situated. To be similarly situated, employees must (1) work for IBM for the same number of years, (2) earn the same salary during those years, and (3) wait an equal length of time between the date they stop working for IBM and the date they begin receiving benefits under the Plan. Any two employees who are thus similarly situated will end up with identical account balances under the CBF. (A 123.) Employees who are not so similarly situated may end up with different account balances, but the difference will be "because of" non-age variables, not "because of" their age. For this reason, too, the CBF complies with § 204(b)(1)(H). *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("because of" age means that age "had a determinative influence on the outcome"); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326, 330 (7th Cir. 2002) (to establish discrimination "because of such individual's age" under § 4(a) of the ADEA, courts must compare the treatment of older employees and younger employees who are similarly situated "in all material respects" except their age); *Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997) (to show discrimination "because of" age, employee must show that "the effect of age, isolated from other influences," was the cause of adverse treatment); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (courts must correct for "potentially explanatory variables other than age" when determining whether discrimination was "because of" age).

Certainly, an older employee could end up with a smaller benefit than a younger employee with the same salary and service record if he waited a shorter amount of time than the younger employee to receive his benefits. (A 124.)

Conversely, an older employee who waited *longer* than a younger employee to receive his benefits could receive a *larger* benefit than a younger employee with the same salary and service record. (*Id.*) Any such differences would not be "because of the attainment of any age," however, but because of the interest provided by the CBF to account for the "universally accepted principle of the time value of money," which holds that "[a] dollar today is worth more than a dollar tomorrow." (A 90-94); *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002) ("[A] dollar today is worth a great deal more than a dollar ten years from now."); *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997) ("Compensation deferred is compensation reduced by the time value of money.") The cause of any disparity between older and younger employees in such circumstances is the different amounts of time that the employees wait to receive their benefit payments, not their age.

The legislative history of § 204(b)(1)(H) further confirms both this understanding of the statute and that the CBF fully complies with it. The Conference Report indicates that the OBRA 1986 amendment to ERISA was intended to end a specific practice – the practice of cutting off additional pension accruals for employees who work beyond "normal retirement age." *See* H.R. Rep. No. 99-1012, at 375, 378. The Report further explains, by way of example, that a pension plan that (1) has a normal retirement age of 65, and (2) provides employees with a retirement annuity of $10 per month multiplied by the employee's years of service to the employer, satisfies § 204(b)(1)(H) if it continues crediting employees with an additional $10 per month for each year of service after age 65 – just as it

did for years of service before that age – but would violate § 204(b)(1)(H) if it did not do so. *Id.* at 381. The key to compliance with § 204(b)(1)(H) is therefore Streating employees consistently at all ages. The CBF does just that: there is no age at which the CBF begins providing employees with pay credits or interest credits at a reduced rate.

This Court's precedents further confirm that the terms of § 204(b)(1)(H) should be given their ordinary meaning – and that the CBF complies with that ordinary meaning. In *Lunn v. Montgomery Ward*, 166 F.3d 880 (7th Cir. 1999), this Court considered an "offset plan" that subtracted the balance in an employee's defined contribution account from an employee's benefit under the company's defined benefit plan. The plaintiff in *Lunn* argued that this arrangement produced a reduction in accruals under the defined benefit plan as employees aged, because an employee's defined contribution account – which grows by ever increasing amounts over time as a result of compound investment returns – reduces an employee's defined benefit by an increasing amount each year. *Id.* at 882. The plaintiff therefore asserted that the offset arrangement violated § 204(b)(1)(H) by reducing his accruals under the defined benefit plan *on account of increasing age.* This Court disagreed, explaining that:

> [Montgomery] *Wards could not say to Lunn, if you insist on working after you reach the age of 65, we're going to cut down your normal retirement benefits.* But Wards did not say (or do) that. Lunn remained in the retirement plan(s), *accruing benefits in exactly the same way he had been doing before he turned 65, until he retired.* He was *treated the same as all other workers;* there was no forfeiture. *Reverse age discrimination is not the theory of ERISA.*

*Id.* at 883.

Like the plan considered in *Lunn*, the CBF does not say to an employee, "if you insist on working after you reach the age of 65, we're going to cut down" your rate of benefit accrual. *Lunn*, 166 F.3d at 883. To the contrary, employees in the CBF earn benefits "in exactly the same way" from the day they are hired until the day they retire. *Id.* The *Lunn* decision therefore confirms that the CBF complies with § 204(b)(1)(H). *See also Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 832-34 (S.D. Ind. 2000) (holding that a cash balance plan that did not reduce the rate at which amounts were credited to an employee's account at any age complied with § 204(b)(1)(H)). Indeed, this case is easier than *Lunn* because there is no complicated offset to consider – only constant, consistent treatment of employees, who accumulate benefits in exactly the same way throughout their careers.

### B.    The District Court's Holding That The Cash Balance Formula Violates § 204(b)(1)(H) Is Unfounded And Erroneous.

The district court opinion does not discuss the ordinary meaning of the terms of § 204(b)(1)(H), the legislative history, or this Court's decision in *Lunn*. Without addressing that authority, the district court adopted an interpretation of § 204(b)(1)(H) that equates the statutory reference to the "rate of an employee's benefit accrual" with the "rate at which th[e] [employee's] age 65 annual benefit accrues." (A 15.) This interpretation should be rejected because it violates established rules of statutory construction, leads to absurd and destructive consequences for the pension system, and ignores the Treasury Department's interpretation of the statutory scheme.

### 1. The district court's interpretation of "benefit accrual" violates settled rules of statutory construction.

The district court initially erred by reading into § 204(b)(1)(H) a defined term that the provision does not use – the ERISA term of art "accrued benefit." ERISA defines an "accrued benefit" as a benefit "expressed in the form of an annual benefit commencing at normal retirement age," 29 U.S.C. § 1002(23)(A), an age that is generally defined in the IBM Plan as age 65. (A 222, § 2.37.) Although the defined term "accrued benefit" does not appear in § 204(b)(1)(H), the district court concluded that the undefined term "benefit accrual," which appears in the statutory phrase "rate of an employee's benefit accrual," should be given the same meaning as the defined term. (A 15, 24.) According to the district court, Congress used the undefined term "benefit accrual" instead of the defined term "accrued benefit" solely in order to be "grammatically correct." (A 15.)

This reasoning violates several rules of statutory construction. To begin with, where a statutory term is not defined, the presumption is that the term should be given its ordinary meaning, not a specialized one. *See Meyer*, 510 U.S. at 476; *In re Merchants Grain*, 93 F.3d at 1353. Moreover, "'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted); *see also United States v. Jarrett*, 133 F.3d 519, 539-40 (7th Cir. 1998).

This presumption applies with particular force in this case. The term "accrued benefit" is widely used throughout ERISA – including in ERISA

-30-

§§ 204(b)(1)(A), (B), (C), (D), (F), and (G) – but does not appear in § 204(b)(1)(H).[3]

Moreover, ERISA is a "comprehensive and reticulated statute," *Mertens*, 508 U.S. at

251, and "accrued benefit" has a specialized meaning within the statutory scheme.

*See Hickey v. Chi. Truck Drivers, Helpers & Warehouse Workers Union*, 980 F.2d

465, 468 (7th Cir. 1992) ("The term 'accrued benefit' has a statutory meaning . . . .");

*Call v. Ameritech Mgmt. Pension Plan*, No. Civ. 01-717-GPM, 2004 WL 483199, at

*5 (S.D. Ill. Mar. 10, 2004) (Murphy, C.J.) ("[T]echnical words like 'accrued benefit'

. . . have special meaning and significance" under ERISA.).[4]  When Congress uses a

specialized term like "accrued benefit" in *one section* of a statute and omits it from

another, courts are even more inclined to conclude that Congress acted

"intentionally and purposely."  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537

(1994); *see also Allied Color Corp. v. Mfrs. Hanover Trust Co.*, 484 F. Supp. 881, 883

(S.D.N.Y. 1980) ("In an area of the law replete with terms of art, the failure to use

such a term is not likely to be inadvertent.").

---

[3]    *See, e.g.*, 29 U.S.C. § 1002(19) (using "accrued benefit" in the definition of "nonforfeitable"); § 1002(31) (using the term in the definition of "advance funding actuarial cost method"); § 1002(33)(c)(v)(I) (definition of "church plan"); § 1023(d)(6)(D) (annual report requirements); §§ 1052(a)(1)(B) & (b)(4)(C) (minimum participation requirements); § 1053 (minimum vesting standards); § 1054(b)(1)(A)-(C) (anti-backloading rules); § 1054(b)(1)(G) (prohibition of reduction of accrued benefit on account of age or service); § 1054(b)(3)(B) (accounting in defined contribution plans); § 1054(c) (determining benefit attributable to employee contributions); §§ 1054(d) & (e) (disregarding certain service); § 1054(g) (anti-cutback rule); § 1055 (requirement for joint and survivor annuity); § 1056 (form and payment of benefits).

[4]    "Accrued benefit," for example, does not encompass all of the benefits that a pension plan may provide, such as certain early retirement, disability, medical, and death benefits.  *See* 26 C.F.R. 1.411(a)-7(a)(1); *see also* 26 C.F.R. § 1.401-1(b)(1)(i).

-31-

The district court's invocation of the rules of grammar provides no reason to disregard these rules of construction. The court offered only its own unsubstantiated assertion in support of its holding that Congress omitted the term "accrued benefit" from § 204(b)(1)(H) merely because it wanted to be grammatically correct. Moreover, the court's grammar-based reasoning is plainly flawed: if Congress had wanted to refer in § 204(b)(1)(H) to the rate of accrual of a benefit payable at age 65 or at "normal retirement age," it easily could have done so in a manner consistent with good grammar. Congress did just that in a nearby provision that refers to the "annual rate at which any individual . . . can accrue the retirement benefit payable at *normal retirement age . . . .*" ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B) (emphasis added).[5] Congress could have used similar language in § 204(b)(1)(H) if it had intended that provision to refer to benefits payable at normal retirement age. *See Bailey v. United States,* 516 U.S. 137, 146 (1995) ("[H]ad Congress meant to broaden application of the statute beyond actual 'use' [in 18 U.S.C. § 924(c)(1)], Congress could and would have so specified, as it did

---

[5]    The district court's own opinion identifies several other ways in which Congress could have referred, in grammatically correct fashion, to the rate of accrual of a benefit payable at age 65 or "normal retirement age." The court's opinion refers to "the rate at which th[e] age 65 annual benefit accrues," "the rate at which an employee accrues a benefit payable in the form of an annuity that commences at age 65," "the rate at which a participant's age 65 benefit accrues," and the "rate of age 65 annual benefit accrual." (A 14-16.) Congress could have used any of these phrases in § 204(b)(1)(H) if it had intended to convey the meaning that the district court ascribed to the statute. Alternatively, in order to cover plans that define "normal retirement age" as an age other than age 65, Congress need only have substituted the words "normal retirement benefit," "benefit payable at normal retirement age" or "accrued benefit" for the district court's reference to an age 65 benefit in any of the quoted phrases.

in § 924(d)(1)."); *United States v. Healy*, 376 U.S. 75, 84 (1964) ("Congress knew how to choose words to refer solely to commercial airliners when it wished to do so.").

Finally, in asserting that "grammar" must have been the reason for Congress's decision not to use "accrued benefit" in § 204(b)(1)(H), the district court failed to recognize that using the term "accrued benefit" would have undercut the purpose of § 204(b)(1)(H). Section 204(b)(1)(H) was enacted to forbid the practice of reducing an employee's accruals if an employee continues to work *after* normal retirement age. *See supra* at 5-7. This purpose would not have been achieved by enacting a provision that applies to the rate of accrual of a benefit payable *at* normal retirement age. This, however, is exactly what § 204(b)(1)(H) would have done if it had incorporated the defined term "accrued benefit," which refers to the benefit payable "at normal retirement age." 29 U.S.C. § 1002(23)(A).

The district court's interpretation also violates other canons of statutory construction. For instance, by reading the defined term "accrued benefit" into § 204(b)(1)(H), the district court turned subsection (v) of the statute into surplusage, contrary to the "well-known principle of statutory construction that all provisions within a statute are to be interpreted as meaningful and are not to be considered as mere surplusage." *In the Matter of Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 658 F.2d 1149, 1160 (7th Cir. 1981).

Subsection (v) of § 204(b)(1)(H) provides:

> A plan shall not be treated as failing to meet the requirements of [§ 204(b)(1)(H)(i)] solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals.

-33-

29 U.S.C. § 1054(b)(1)(H)(v) (emphases added). An "early retirement benefit" is a benefit that commences earlier than "normal" retirement age. *See Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Trust*, 134 F. Supp. 2d 189, 201 (D. Mass. 2001). Early retirement benefits are considered "subsidized" to the extent that they are more valuable than the benefits that an employee could receive by waiting until *normal* retirement age to begin receiving benefits. *See* 26 C.F.R. § 1.411(d)-3(g)(6)(v); *Bellas v. CBS, Inc.*, 221 F.3d 517, 538 n.18 (3d Cir. 2000). An employee's "accrued benefit" – *i.e.*, the benefit payable at his *normal* retirement age – by definition is not an *early* retirement benefit, and therefore cannot contain an early retirement subsidy. *See Laurenzano*, 134 F. Supp. 2d at 201 (plans may not "characterize any part of the 'annual benefit commencing at normal retirement age' as a 'subsidy'").

If the district court were correct that § 204(b)(1)(H)(i) refers to the rate at which an employee earns an "accrued benefit," there would be no need for the provision in subsection (v) that early retirement subsidies may be disregarded under § 204(b)(1)(H)(i), because an "accrued benefit" by definition does not contain an early retirement subsidy. Thus, the only way to avoid turning subsection (v) into surplusage is to reject the district court's equation of the rate of an employee's "benefit accrual" in § 204(b)(1)(H)(i) with the rate of growth of an employee's "accrued benefit."

The district court decision also conflicts with the rule that courts should construe complex statutes such as ERISA "as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *FDA v.*

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotations and citations omitted).  The district court held that the CBF fails to comply with § 204(b)(1)(H) merely because it uses an interest rate to adjust an employee's benefit.  (A 24.)  But § 204(b)(1)(H) itself *mandates* interest adjustments to an employee's benefit in certain circumstances.  Specifically, if an employee continues working beyond normal retirement age, a plan must make an "adjustment" to the employee's benefit to reflect the fact that benefit distributions will begin after normal retirement age, unless the plan complies with one of the other options listed in ERISA § 204(b)(1)(H)(iii).  *See* 29 U.S.C. § 1054(b)(1)(H)(iii)(II); 26 C.F.R. § 1.401(a)(9)-6, Q&A-9.  This "adjustment" includes an interest component to reflect the delay in the commencement of benefit payments.  *See* 26 C.F.R. § 1.401(a)(9)-6, Q&A-9 ("actuarial adjustment" required).  Other provisions of ERISA likewise require defined benefit plans *to provide interest in certain circumstances.*[6]  Given that ERISA permits and even *requires* interest adjustments to an employee's benefit in certain circumstances, it is not plausible that Congress intended § 204(b)(1)(H) to invalidate pension plans merely for using interest to adjust an employee's benefits to account for the passage of time.

---

[6]    For example, contributory defined benefit plans – a type of defined benefit plan in which employees *contribute to the plan* – are *required to credit interest on* an employee's contributions to the plan.  *See* 29 U.S.C. §§ 1054(c)(1) & (2).  These mandatory interest credits can cause contributory defined benefit plans to violate the district court's interpretation of § 204(b)(1)(H) for precisely the same reasons as cash balance plans.  (A 135.)

2.    **The district court misinterpreted the statute's "because of" age requirement.**

The district court also erred in concluding that the CBF reduces the rate of an employee's benefit accrual "because of the attainment of any age." The court did not explicitly construe this statutory language, but instead indirectly construed this language in its discussion of a hypothetical example. (A 24.) The example recites the size of the age 65 benefit that a hypothetical employee could earn under the CBF at various ages. (*Id.*) The court observed, in particular, that its hypothetical employee would earn an age 65 benefit of $622 per year for a year of service at age 50, but only $282 per year for a year of service at age 59 – a difference that the court attributed to the employee's increasing age. (*Id.*)

Contrary to the district court's assumption, it is not the hypothetical employee's *age* that causes the results observed in the hypothetical, but the period of time the employee *waits* before his benefits are paid. An employee who waits until age 65 to start receiving benefits will earn more interest on a benefit earned at age 50 than on a benefit earned at age 59. This is because he waits fifteen years to receive the benefit earned at age 50 but only six years to receive the benefit earned at age 59. The resulting difference in age 65 accruals is not based on the employee's age; it is based on the amount of time the employee waits between the date he earns a given benefit and the time he receives that benefit. *See supra* at 12-13, 26-27.

The district court made no attempt to distinguish between the effects of age and the effects of the passage of time in discussing its hypothetical. In order to distinguish between those separate factors, the court should have discounted the age 65 benefits earned by the hypothetical employee at various ages to their present

-36-

value on the date that they were earned. (A 91-92, 130-33.) If the court had done so, it would have observed no difference in the age 65 benefits earned at different ages. (A 90-94, 130-33.) This shows that the timing of an employee's benefit payment, not age, "causes" the results observed in the hypothetical. The district court reached a contrary conclusion only by neglecting to consider "the effects of age, isolated from other influences," *Achor*, 117 F.3d at 341, and by failing to account for "potential explanatory variables other than age," *Sheehan*, 104 F.3d at 942.

### 3.    The district court's interpretation of § 204(b)(1)(H) leads to absurd and unreasonable results.

The district court asserted that the "literal and unambiguous provisions" of § 204(b)(1)(H) compelled it to adopt an age-65-based interpretation of the statute. (A 25.) But *the court did not actually apply the* "literal and unambiguous provisions" *of the statute; rather, it substituted the defined term* "accrued benefit" *for the undefined term* "benefit accrual." Indeed, the district court acknowledged that the statute does not "explicitly" answer the question whether "rate of benefit accrual" *refers to the age 65 annuity.* (A 14.) Since the literal language of § 204(b)(1)(H) did not *compel* an age-65-based interpretation of the statute, the court should have considered whether such an interpretation produces absurd and unreasonable results.

The Supreme Court has cautioned that, when interpreting statutes, courts "must be guided to a degree by common sense . . . ." *Brown & Williamson Tobacco*, 529 U.S. at 133. Courts should therefore avoid, wherever possible, constructions of a statute that produce results that are "unreasonable," *American Tobacco Co. v.*

*Patterson*, 456 U.S. 63, 71 (1982), "improbable," *Curtiss-Wright Corp. v.*

*Schoonejongen*, 514 U.S. 73, 81 (1995), "absurd," *Treadway v. Gateway Chevrolet*

*Oldsmobile, Inc.*, 362 F.3d 971, 976 (7th Cir. 2004) or "odd," *Schlosser v. Fairbanks*

*Capital Corp.*, 323 F.3d 534, 537-38 (7th Cir. 2003). "[E]conomic reality," too,

should be considered. *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1207

(7th Cir. 1986) (per curiam); *see also NBD Bank, N.A. v. Bennett*, 67 F.3d 629, 631

(7th Cir. 1995). Here, rather than applying these established rules of construction,

the district court adopted an interpretation of § 204(b)(1)(H) that resulted, by the

court's own admission, in "startling anomalies and absurdities." (A 22.)

The district court held, in essence, that the CBF violates § 204(b)(1)(H)

because a younger employee will have more time than a similarly-situated older

employee to earn interest on his account balance before reaching age 65. (*See* A 23-

24; 132-33.) But it defies common sense to hold that the mere provision of interest

can cause a plan to violate § 204(b)(1)(H). Interest is a ubiquitous feature of a

modern economy. It is routinely used by banks, insurance companies, the United

States Treasury and other institutions to compensate individuals for the economic

effects of the passage of time. It simply is not plausible that Congress intended to

strike down pension plans as age discriminatory merely because they use interest to

adjust an employee's benefit for the passage of time.

An example illustrates the "startling anomalies and absurdities" that follow

from the district court's conclusion that the mere use of interest can render a

pension plan age discriminatory. Consider two employees in the CBF in the year

2005, one of them age 21 and the other age 64, both of whom earn a salary of

$100,000 per year. Since both employees earn pay credits at a rate of five percent of pay, both of them will receive $5,000 in pay credits for a single year of service. (A 242-43, § 11.3(d).) Both employees likewise will earn interest at a rate tied to the yield on U.S. Treasury securities. (A 243, § 11.4; A 221, § 2.31.) At an annual interest rate of 5.5 percent, the 64-year-old's pay credit will grow to $5,275 by the time he attains age 65 in 2006 ($5,000 x $1.055^1$ = $5,275). By the time the 21-year-old reaches age 65 in the year 2049, her pay credit will have grown to $52,730 ($5,000 x $1.055^{44}$ = $52,730). Although the younger employee's age 65 benefit is much larger than the older employee's benefit in nominal terms ($52,730 compared to $5,275), in economic terms, the two benefits are equivalent, because the younger employee has to wait much longer – over forty years longer – to receive her payment. (A 90-96.)

Under the district court's age-65-based interpretation of § 204(b)(1)(H), both of these employees must be able to receive the "same" benefit at age 65. In other words, since the 21-year-old can receive a benefit of $52,730 if she waits over forty years until 2049 to collect a benefit, the 64-year-old would have to be given a benefit of $52,730 payable in 2006 after waiting only *one* year to receive a benefit – a ten-fold increase in the age 65 benefit that he would otherwise earn under the Plan. (A 130-31, 135-36.) The district court's interpretation would thus require cash balance plans to provide enormous windfalls to older employees in order to compensate for the effects of interest on the benefits of younger employees. (*Id.*) Such a requirement would transform § 204(b)(1)(H) from a provision that prohibits age discrimination into one that mandates *reverse* age discrimination on a massive

-39-

scale, *contrary to* this Court's admonition that "[r]everse age discrimination is not the theory" of § 204(b)(1)(H). *Lunn*, 166 F.3d at 883.

> **4.    Adoption of the district court's interpretation would be devastating to the pension system.**

The district court's interpretation of § 204(b)(1)(H) is also unreasonable because it would wreak havoc on the pension system, subjecting plan sponsors to hundreds of billions of dollars in liability. Under the district court's reasoning, the interest credits provided by the CBF "inevitabl[y]" violate § 204(b)(1)(H), because younger employees have more time to earn interest on their account balances than similarly-situated older employees before reaching age 65. (A 23.) If this reasoning were correct, *all* cash balance plans would be unlawful, because all such plans provide interest on an employee's account balance. (A 122, 135-36, 513-14.)

The district court's analysis also would invalidate several other well-known and long-accepted types of defined benefit plans that use an interest rate or interest-like features to adjust an employee's benefit over time. Such plans include:

- Contributory defined benefit plans. Contributory defined benefit plans are plans to which employees are required to make periodic contributions and which are required by ERISA to credit interest on employee contributions. *See* 29 U.S.C. §§ 1054(c)(1) & (2). The *statutory interest required* by such plans would often cause them to fail the district court's interpretation of § 204(b)(1)(H) for the same reasons as cash balance plans. (A 135, 427-28, 513-14.)

- Indexed career pay plans. Indexed career pay plans are defined benefit plans that use an index such as the Consumer Price Index to increase an employee's retirement benefit between the time an employee earns a benefit and the time the benefit begins to be paid. (A 427-28.) Such plans fail the district court's interpretation of § 204(b)(1)(H) because a younger employee will receive the benefit of more years of indexing before turning age 65 than will an older employee. (*Id.*)

- Variable annuity plans. A variable annuity plan is a defined benefit plan, usually funded by either a trust or a group annuity contract administered by an insurance company, that increases benefits based on the investment returns on the assets set aside to fund the plan. (A 427-28.) These plans violate the district court's interpretation of § 204(b)(1)(H) because younger employees have more time than older employees to receive benefit increases based on investment returns before reaching age 65. (A 427-28.)

- Pension equity plans. A close cousin of cash balance plans, pension equity plans are defined benefit plans in which an employee's benefit grows at an interest rate between the date the employee ceases working for the plan sponsor and the date he begins receiving benefits. (A 514-15; see also A 137-38.) Such plans would fail the district court's interpretation of § 204(b)(1)(H) for the same reason as cash balance plans. (Id.)

With the exception of pension equity plans, which first appeared in the early 1990s, each of these types of plans was widely known and accepted long before the adoption of § 204(b)(1)(H) in 1986.[7] What each of these plans has in common is that they adjust an employee's benefit for the passage of time – regardless of whether the employee continues working for the plan sponsor – to prevent the benefit from eroding in value between the time the benefit is earned and the time it is paid.

Holding all of these kinds of plans unlawful under § 204(b)(1)(H) would devastate the pension system. Cash balance plans alone account for approximately 25 percent of all employees in defined benefit plans and an estimated 40 percent of

---

[7]    See, e.g., Revenue Ruling 76-47, 1976-1 C.B. 109 (discussing interest crediting and variable annuity forms in contributory defined benefit plans); Rev. Rul. 71-446, § 18, 1971-2 C.B. 187 (plans that are permitted to integrate benefits with social security benefits include variable annuity plans and plans that vary benefits before retirement based on a cost-of-living index); Rev. Rul. 53-185, 1953-2 C.B. 202 (concerning plans that index benefits according to the investment experience of plan assets or a cost-of-living index); Geoffrey N. Calvert, Cost-of-Living Pension Plans, 32 Harv. Bus. Rev., Sept.-Oct. 1954, at 101-109 (discussing pension plans that index benefits in various ways); see also A 427-29.

the assets invested in such plans. (A 183.) According to the Pension Benefit

Guaranty Corporation, over 1,500 cash balance plans and other similar plans were

in existence as of 2003. *See* Pension Benefit Guaranty Corp., *Pension Insurance*

*Data Book 2004*, at 59 (2005), at http://www.pbgc.gov/docs/2004databook.pdf (last

visited Oct. 25, 2005). Other affected plans account for large numbers of additional

employees and assets. (A 514-16; *see also* A 427-28.)

　　　　The cost of conforming all such plans to the district court's interpretation of

§ 204(b)(1)(H) would be staggering. For IBM alone, the cost of conforming the Plan

to the district court's interpretation – solely with respect to benefits earned through

the end of 2003 – would be approximately six billion dollars. (A 513.) Similarly, the

YWCA, which has operated a cash balance plan since 1925, has estimated that

conforming its plan to the district court's ruling would more than triple the plan's

liabilities, causing the plan to become underfunded by approximately a billion

dollars.[8] The estimated cost of bringing *all* cash balance plans into conformity with

the district court's order is in the *hundreds* of billions of dollars. (A 513-16.)

Hundreds of billions more would likely be required to achieve conformity on the

part of other affected types of plans. (*Id.*) This massive liability would descend on a

pension system that is already dangerously underfunded,[9] likely bankrupting

---

[8]　　　Albert Crenshaw, *Putting the Pinch on Pensions*, Wash. Post, Aug, 19, 2004, at E1.

[9]　　　"[T]he nation's pension-funding shortfall has grown so large that it is even threatening to overwhelm the PBGC [Pension Benefit Guaranty Corporation] . . . In just five years, from 1999 to 2004, the amount of underfunding in PBGC-insured plans went from $23 billion to $450 billion." Julie Kosterlitz, *Pinched Promises*, Nat'l J., 2650, 2651-52 (Sept. 9, 2005).

numerous plan sponsors and spurring a wave of departures from the pension system. (*See* A 518-19.)

There is no indication in the text or legislative history of § 204(b)(1)(H) that Congress expected the provision to have such dramatic and far-reaching consequences. To the contrary, the available evidence indicates that § 204(b)(1)(H) was merely intended to end the practice of cutting off benefit accruals at normal retirement age. *See supra* at 5-7. Indeed, three district courts have held that § 204(b)(1)(H) does not even apply to accruals earned prior to normal retirement age. *See Eaton*, 117 F. Supp. 2d at 827-29; *Tootle v. ARINC, Inc.*, 222 F.R.D. 88, 92 (D. Md. 2004); *Engers v. AT&T Corp.*, No. 98-3660, letter op. at 6-11 (D.N.J. June 6, 2001) (A 660, 665-70); *but see Wells v. Gannett Ret. Plan*, 385 F. Supp. 2d 1101, 1102-03 (D. Col. 2005). This reasoning provides an additional basis for reversing the judgment of the court below, since no one contends that the CBF violates § 204(b)(1)(H) with respect to accruals *after* normal retirement age.

Whether or not § 204(b)(1)(H) applies to accruals prior to normal retirement age, it is well settled that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 467-68 (2001). Courts have therefore rejected interpretations of statutes that would have far-reaching economic consequences when there is no express indication that Congress intended such consequences. *See id.; Brown & Williamson Tobacco*, 529 U.S. at 160. Likewise, the courts reject interpretations of ERISA that would have destructive consequences for the pension system absent a clear indication that this was Congress's intent. *See Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (ERISA

should not be interpreted to impose burdens that "unduly discourage employers from offering welfare benefit plans in the first place."); *Lunn,* 166 F.3d at 884 (rejecting an interpretation of § 204(b)(1)(H) that would "burden arbitrarily an accepted form of retirement package"). For these additional reasons, the district court's construction of § 204(b)(1)(H) should be rejected.

5.   **The district court's interpretation of § 204(b)(1)(H) conflicts with the Treasury Department's authoritative interpretations of the statutory scheme.**

Even if § 204(b)(1)(H) were deemed ambiguous, and even if the district court's interpretation of the statute were just as plausible as defendants' interpretation, the deference required to the Treasury Department's interpretation of the IRC and ERISA would establish that the CBF complies with § 204(b)(1)(H). Where a statute's meaning is ambiguous, courts should defer to reasonable interpretations of the statute by the responsible administrative agency, rather than construing the statute without regard to the agency construction. *Old Ben Coal Co. v. Director, Office of Workers' Comp. Programs,* 292 F.3d 533, 542 & n.8 (7th Cir. 2002); *see also United States v. Mead Corp.,* 533 U.S. 218, 227-28 (2001); *Chevron U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844-45 (1984). Here, the Treasury Department is the agency charged with coordinating the parallel provisions that OBRA 1986 added to the IRC, the ADEA and ERISA, *see supra* at 9-10, and it has twice issued interpretations which make clear that cash balance plans like the CBF are lawful.

Treasury's nondiscrimination regulations provide a "safe harbor" method of determining whether cash balance plans comply with the nondiscrimination rules of the IRC relating to highly-compensated employees. *See* Nondiscrimination

-44-

Requirements for Qualified Plans, 56 Fed. Reg. 47,524, 47,583-86 (Sept. 19, 1991); 26 C.F.R. § 1.401(a)(4)-8(c)(3). The regulations *require* a cash balance plan that seeks the benefit of the safe harbor to allow an employee to continue to earn interest credits even if the employee stops working for the plan sponsor. *See* 26 C.F.R. § 1.401(a)(4)-8(c)(3)(iv)(A). Moreover, the Preamble to the regulations explains that the crediting of interest is entirely consistent with the age discrimination provision in Code § 411(b)(1)(H): "The fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation [*i.e.*, the year a pay credit is accrued] *will not cause a cash balance plan to fail to satisfy the requirements of section 411(b)(1)(H) . . . .*" 56 Fed. Reg. 47,524, 47,528 (emphasis added). In so interpreting § 411(b)(1)(H), Treasury carried out its statutory duty to "coordinat[e]" that provision with the nondiscrimination rules of the IRC, *see* 26 U.S.C. § 411(b)(1)(H)(v), and Treasury's "coordinated" interpretation applies equally to § 204(b)(1)(H) of ERISA. *See* 29 U.S.C. § 1054(b)(1)(H)(vi); 29 U.S.C. § 1202.[10]

---

[10]    The Treasury regulations coordinate the nondiscrimination rules with 26 U.S.C. § 411(b)(1)(H) in numerous respects. *See, e.g.*, 26 C.F.R. §§ 1.401(a)(4)-3(b)(2)(ii), 1.401(a)(4)-(b)(5)(v), 1.401(a)(4)-(f)(3) (regulating accruals after normal retirement age and explicitly coordinating with the requirements of IRC § 411(b)(1)(H)); 1.401(a)(4)-8(b)(3)(iii) & (iv)(D) (*regulating stated accruals in target benefit plans after normal retirement age and explicitly coordinating with the requirements of 26 U.S.C. § 411(b)(1)(H)*); 1.401(a)(4)-8(c)(3)(ii) & (ix) (regulating accruals in cash balance plans after normal retirement age); 1.401(a)(4)-9(b)(2)(iv)(A) (establishing testing rules for accruals after normal retirement age when a defined benefit plan is combined with a defined contribution plan, and cross-referencing provision that explicitly coordinates with the requirements of IRC § 411(b)(1)(H)); 1.401(a)(4)-12 (paragraph (4) of definition of "testing age") (establishing testing rules for accruals after normal retirement age); 1.401(a)(4)-13(e)(1)(i) (transition method for accruals in target benefit plans after normal (continued...)

Treasury's IRS Notice 96-8, too, confirms that the interest credits provided by the CBF are lawful. This Court has described Notice 96-8 as an "authoritative" interpretation of the rules in ERISA and the IRC that govern lump-sum payments of pension benefits. *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 762 (7th Cir. 2003). The Notice sets forth approved interest crediting rates that cash balance plans may use if they wish to offer employees the option of receiving their benefits in the form of a lump-sum payment equal to their account balances. *See* IRS Notice 96-8, 1996-1 C.B. 359, 1996 WL 17901, part IV-A (A 648-49). The Notice further explains that cash balance plans *must* allow an employee to continue earning interest credits even if the employee ceases working for the plan sponsor in order to comply with the anti-backloading rules of the Code and ERISA. *Id.* at part III-A (A 645). The Notice thus confirms that, far from violating the law, providing *interest credits in this manner* – as the CBF does – enables a cash balance plan to *comply* with the law.

Treasury's nondiscrimination regulations and IRS Notice 96-8 both confirm that the CBF complies with § 204(b)(1)(H). Treasury would not have established safe harbors for cash balance plans under the nondiscrimination rules and the lump-sum payment rules if it subscribed to the district court's view that such plans are "essentially per se illegal" under § 204(b)(1)(H). *Onan*, 117 F. Supp. 2d at 815. Indeed, if Treasury agreed with the district court's view, it would have been violating its statutory duty to coordinate the age discrimination provisions in the

retirement age); 1.401(l)-3(e)(2)(ii) & (iv) (adjustment in permitted disparity factor for purposes of section 401(a)(4) for accruals after social security retirement age).

IRC, ERISA, and the ADEA with other IRC provisions by issuing guidance that requires continuing interest credits. Accordingly, to the extent that this Court finds § 204(b)(1)(H) to be ambiguous, the ambiguity should be resolved in the CBF's favor in light of the deference owed to the Treasury Department's interpretation of the statutory scheme. *See Old Ben Coal Co.*, 292 F.3d at 542 & n.8.

## II. The Always Cash Balance Formula Also Complies With ERISA § 204(b)(1)(H).

For much the same reasons, the district court erred in concluding that IBM's use of the ACBF in transitioning to the CBF violated § 204(b)(1)(H).

### A. The Always Cash Balance Formula Did Not "Reduce" "The Rate Of An Employee's Benefit Accrual" "Because Of The Attainment Of Any Age."

As explained above, § 204(b)(1)(H) is satisfied so long as a plan does not reduce the rate at which an employee periodically accumulates the benefit provided by the plan by reason of the employee's attainment of any age. *See supra* at 24-29. Here, *each* employee who moved from the Plan's prior benefit formulas to the CBF received an opening account balance under the CBF equal to the greater of the amounts produced by two formulas: (1) the Present Value Formula, which provided an account balance equal to the present value of the benefit that an employee had earned under the Plan's prior benefit formulas, or (2) the ACBF, which provided an approximation of the account balance that an employee would have had if the CBF had "always" been in effect – *i.e.*, if it had been in effect for the employee's entire IBM career. (A 268-69, §§ 17.5(b)(1)(A) & (B).) These alternatives were provided to all employees who moved from the Plan's prior benefit formulas to the CBF, regardless of the employee's age. Moreover, the ACBF *itself* treated all such

transitioning employees without regard to age: no matter what their ages, any two employees with the same salary and service record received exactly the same opening account balance under the ACBF. (A 447-48.) There was no age at which the ACBF calculated an employee's benefit in a less favorable way. Thus, the ACBF fully complied with § 204(b)(1)(H).

**B.    The District Court Erred In Concluding That The Always Cash Balance Formula Violated § 204(b)(1)(H).**

The district court granted summary judgment for plaintiffs on their claim that the ACBF violates § 204(b)(1)(H) for the same reasons that it found that the CBF violates that statute. (A 4, ¶7, A 27.) As set out above, however, those reasons are in error; thus, the district court's summary judgment regarding the ACBF should be reversed for the same reasons as its summary judgment on the CBF.

## CONCLUSION

The judgment for plaintiffs on the CBF and ACBF claims should be reversed, and judgment entered for defendants on those claims.

Dated:  October 27, 2005                    Respectfully submitted,


Of Counsel:                                 Jeffrey G. Huvelle
Glen D. Nager                               Robert A. Long, Jr.
Brian J. Murray                             Robert D. Wick
JONES DAY                                   Eric R. Sonnenschein
51 Louisiana Avenue, N.W.                   Michael E. Paulhus
Washington, D.C. 20001-2113                 COVINGTON & BURLING
                                            1201 Pennsylvania Avenue, N.W.
Donald J. Rosenberg                         Washington, D.C. 20004-2401
Douglas G. Vetter                           202-662-6000
IBM Corporation
1133 Westchester Avenue                     *Attorneys for Appellants-Defendants*
White Plains, New York 10604

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

    1.   Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), this brief includes 13,710 words.

    2.   This brief has been prepared in proportionately-spaced typeface using Microsoft Word in 12 point Century Schoolbook font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certificate.

Jeffrey G. Huvelle

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the Required Short Appendix or Appendix.

Jeffrey G. Huvelle

## CIRCUIT RULE 31(e) CERTIFICATION

Pursuant to Seventh Circuit Rule of Appellate Procedure 31(e)(1), the undersigned counsel hereby certifies that the appendix materials required by Circuit Rules 30(a) and (b) are not all available in searchable digital format. Those materials available digitally have been provided on the accompanying diskette. Counsel further certifies that the diskette on which the electronic documents are being produced is virus-free.

Jeffrey G. Huvelle

No. 05-3588

# *United States Court of Appeals*
### For the Seventh Circuit

---

KATHI COOPER, BETH HARRINGTON
and MATTHEW HILLESHEIM,
*Plaintiffs - Appellees,*

v.

IBM PERSONAL PENSION PLAN
and IBM CORPORATION,
*Defendants - Appellants.*

---

**On Appeal from the United States District Court
for the Southern District of Illinois
In No. 99-cv-00829-GPM, Chief Judge G. Patrick Murphy**

---

**APPELLANTS' CIRCUIT RULE 30(a)
REQUIRED SHORT APPENDIX**

---

Of Counsel:
Glen D. Nager
Brian J. Murray
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113

Donald J. Rosenberg
Douglas G. Vetter
IBM Corporation
1133 Westchester Avenue
White Plains, New York 10604

Jeffrey G. Huvelle
Robert A. Long, Jr.
Robert D. Wick
Eric R. Sonnenschein
Michael E. Paulhus
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000

*Attorneys for Defendants-Appellants*

**Oral Argument Requested**

# APPELLANTS' CIRCUIT RULE 30(a)
## REQUIRED SHORT APPENDIX

## Table of Contents

<u>Document</u>                                                                          <u>Page</u>

District Court's Order Entering Final Judgment for Plaintiffs
Concerning Subclasses 1 and 2 (August 16, 2005) ......................    A-1

District Court's Memorandum and Order (August 16, 2005)........    A-3

District Court Memorandum and Order Granting Partial
Summary Judgment for Plaintiffs on Liability Issues (July 31,
2003)................................................................................................    A-6

<u>Relevant Authorities</u>

ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H) .....................    A-30
ADEA § 4(i), 29 U.S.C. § 623(i) .................................................    A-32
IRC § 411(b)(1)(H), 26 U.S.C. § 411(b)(1)(H) ...........................    A-34
Treas. Reg. § 1.401(a)(4)-8, 26 C.F.R. § 1.401(a)(4)-8 ..............    A-36
Treas. Reg. § 1.401(a)(4)-13(f), 26 C.F.R. § 1.401(a)(4)-13(f) ....    A-43

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

KATHI COOPER, BETH HARRINGTON,　　)
and MATTHEW HILLESHEIM,　　　　　　)
Individually and on Behalf of All Those　)
Similarly Situated,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　)　　CIVIL NO. 99-829-GPM
　　　　　　　　　　　　　　　　　　)
THE IBM PERSONAL PENSION PLAN　)
and IBM CORPORATION,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　)

## <u>JUDGMENT IN A CIVIL CASE</u>

**DECISION BY COURT.** This matter came before the Court on cross motions for summary judgment and a Class Action Settlement Agreement with Respect to Subclasses 1 and 2 ("Settlement Agreement"). The issues having been duly heard and a decision having been duly rendered,

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of the members of Subclasses 1 and 2 on their claim that the Cash Balance Formula violates ERISA § 204(b)(1)(H). These Class Members are entitled to relief for the violation as provided in the Settlement Agreement.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment is entered in favor of the members of Subclasses 1 and 2 on their claim that the Always Cash Balance Formula violates ERISA § 204(b)(1)(H). These Class Members are entitled to relief for the violation as provided in the Settlement Agreement.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Plan shall pay Class Counsel fees as an administrative cost of the Plan in accordance with the Settlement Agreement and calculated on a

decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $250 million; (2) an amount equal to 25% of the amount of any Settlement Benefits recovered in excess of $250 million up to the amount of $750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $750 million up to the amount of $1,250 million; and (4) an amount equal to 17% requested of any Settlement Benefits recovered in excess of $1,250 million. Class Counsel shall pay incentive awards of $40,000 to Ms. Cooper and $20,000 to Ms. Harrington out of the attorneys' fees paid by the Plan and shall also reimburse themselves for any expenses they already have incurred or will incur in the future out of the attorneys' fees awarded by this Court.

**IT IS FURTHER ORDERED AND ADJUDGED** that the claims of Subclass 3 were dismissed pursuant to a Rule 54(b) judgment entered on January 10, 2005. All other claims asserted by Plaintiffs in this action are now **DISMISSED with prejudice** pursuant to the terms of the Settlement Agreement and in exchange for the consideration provided therein.

**DATED:** 08/16/2005

NORBERT G. JAWORSKI, CLERK


By: s/ Linda M. Cook
Deputy Clerk


APPROVED: s/ G. Patrick Murphy
G. PATRICK MURPHY
CHIEF U.S. DISTRICT JUDGE

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

KATHI COOPER, BETH HARRINGTON, )
and MATTHEW HILLESHEIM, )
Individually and on Behalf of All Those )
Similarly Situated, )
 )
   Plaintiffs, )
 )
vs. )  CIVIL NO. 99-829-GPM
 )
THE IBM PERSONAL PENSION PLAN )
and IBM CORPORATION, )
 )
   Defendants. )

## MEMORANDUM AND ORDER

Pursuant to this Court's Order dated July 31, 2003 (*see* Doc. 193), and the **Class Action Settlement**

Agreement with Respect to Subclasses 1 and 2 ("Settlement Agreement"), the Court finds as follows:

 1. This action satisfies the requirements of Rule 23 for the reasons set forth in its prior

certification order (*see* Doc. 70). The members of Subclasses 1 and 2 ("the Class") have at all times been

adequately represented by the Class Representatives and Class Counsel.

 2. The Notice approved by the Court was sent by first class mail, postage prepaid, to the last

known address of each individual identified as a potential Class Member. In addition, follow-up efforts

were made to provide the Notice to individuals whose original Notice was returned as undeliverable, and

the Notice was posted on a website. The Notice adequately described the relevant and necessary terms of

the proposed Settlement Agreement. *In the Matter of VMS Ltd. Partnership Sec. Litig.*, 26 F.3d 50, 51-52

(7th Cir. 1994); *In the Matter of VMS Ltd., Partnership Sec. Litig.*, No. 89-C-9448, 1992 WL 203832, at

*4 (N.D. Ill. Aug. 13, 1992); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993).

 3. The Notice provided to the Class fully complied with Rule 23, was the best notice

Page 1 of 3

practicable, satisfied all constitutional due process requirements, and provides the Court with jurisdiction

over the Class Members. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177-78 (1974); *Phillips Petroleum

v. Shutts*, 472 U.S. 797 (1985).

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

28 U.S.C. § 1367.

5.      The Court has considered and applied the factors set forth in *Armstrong v. Board of School

Directors of the City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980), *overruled on other grounds, Felzen

v. Andreas*, 134 F.3d 873 (7th Cir. 1998), for evaluating the settlement and has concluded that the

settlement is fair, reasonable, and adequate with respect to the members of Subclasses 1 and 2. *Armstrong*,

616 F.2d at 312.

6.      For the reasons stated in the Court's Order dated July 31, 2003, the Court concludes that

the cash balance formula set forth in Article 11 of the Plan Document ("Cash Balance Formula") violates

ERISA § 204(b)(1)(H). Therefore, the Clerk is directed to enter judgment for the members of Subclasses

1 and 2 on their claim that the Cash Balance Formula violates § 204(b)(1)(H) and further enter judgment

that these Class Members are entitled to relief for the violation as provided in the Settlement Agreement.

7.      For the reasons stated in the Court's Order dated July 31, 2003, with respect to the Cash

Balance Formula, the Court concludes that the alternative formula for calculating an eligible employee's

opening cash balance account set forth in Article 17.5(b)(1)(B) of the Plan Document ("Always Cash

Balance Formula") violated ERISA § 204(b)(1)(H). The Clerk is directed to enter judgment for the

members of Subclasses 1 and 2 on their claim that the Always Cash Balance Formula violates

§ 204(b)(1)(H) and further enter judgment that these Class Members are entitled to relief for the violation

as provided in the Settlement Agreement.

8.      Apart from the Cash Balance Claim and the Always Cash Balance Claim as defined in the

Settlement Agreement, all other claims asserted by Plaintiffs in this action are **DISMISSED with prejudice** pursuant to the terms of the Settlement Agreement and in exchange for the consideration provided therein.

9.     This Court retains jurisdiction over the interpretation, implementation, and enforcement of the Settlement Agreement, as well as any and all matters arising out of, or related to, the interpretation, implementation, and enforcement of the settlement or the Settlement Agreement. Without regard to the previous sentence, however, any court may dismiss a Released Claim if such a claim is asserted in such a court.

10.     By separate Order, the Court has awarded attorneys' fees and costs. Any attorneys' fees and costs awarded by the Court will be paid by the Plan as an administrative cost of the Plan in accordance with (and to the extent provided in) the Settlement Agreement. Incentive awards approved by the Court will be paid by Class Counsel from their fees. Any other fees or costs incurred by a party will be paid by such party.

**IT IS SO ORDERED.**

DATED: 08/16/05

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KATHI COOPER, BETH HARRINGTON, )
and MATTHEW HILLESHEIM, )
Individually and on Behalf of All Those )
Similarly Situated, )
          )
         Plaintiffs, )
          )
vs. )      CIVIL NO. 99-829-GPM
          )
THE IBM PERSONAL PENSION PLAN )
and IBM CORPORATION, )
          )
         Defendants. )

FILED
JUL 31 2003
G. PATRICK MURPHY
DISTRICT JUDGE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS, ILLINOIS

## MEMORANDUM AND ORDER

MURPHY, Chief District Judge:

        The Cooper class challenges IBM's pension plan ("Plan") as violative of the age discrimination prohibitions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. All pending motions are listed in the appendix to this Memorandum and Order. (*See* Appendix A.)

### I. Factual Background

        Plaintiff Cooper has been a Plan participant since May 21, 1979, the day she began her employment with IBM. Plaintiff Harrington was a Plan participant from 1990 to August 2000, when she terminated her employment with IBM. Towards the end of Harrington's employment, her pension benefits accrued pursuant to a Plan amendment made effective July 1, 1999. Plaintiff Hillesheim began employment with IBM in 1996 and terminated his employment in March 2000.

i 93

He is a Plan participant, but because he was employed for fewer than five years, the benefits he accrued under the Plan did not vest.

## IBM PLAN AMENDMENTS

The IBM Plan is a defined benefit pension plan[1] that provides benefits for IBM employees. Since 1995, the Plan has been amended twice. The changes created by these amendments are the basis of Plaintiffs' lawsuit.

### A. The January 1, 1995 Amendment

Before 1995, the IBM Plan provided benefits in the form of a lifetime annuity and a cash balance accumulation. On January 1, 1995, IBM's Board of Directors enacted an amendment to the Plan which adopted a plan design known as a pension equity plan. IBM coined its new design the Pension Credit Formula ("PCF").

PCF participants accrue a normal retirement benefit payable in the form of a life annuity commencing at age 65. Each year, a participant earns a specific number of "base points," which is determined by the employee's age in the year worked. Additionally, a participant can earn "excess points" if his or her five year average earnings are above social security compensation. Under this framework, however, a participant is permitted to accumulate no more than 425 base points and 75 excess points.

A participant's base points and excess points are applied to a five step formula to determine the monthly retirement benefit at age 65. Under this formula, a participant's base points are added,

---

[1]     Under a conventional defined benefit plan, an employee is credited with a specific percentage of his or her salary for each year of employment. *See Esden v. Bank of Boston,* 229 F.3d 154, 158 n.4 (2nd Cir. 2000). This differs from a defined contribution plan in which funds are actually deposited into an employee's account.

Page 2 of 24

A-7

divided by 100, and multiplied by the average of his or her highest consecutive five year earnings. Then, after accounting for the participant's excess points, that number is divided by a "benefit conversion factor."

The class claims that the PCF violates ERISA because it is age discriminatory. This claim is based on the PCF's benefit conversion factor which increases in direct correlation to an employee's age. According to the class, this increase causes an older employee to receive a lower rate of benefit accrual and to have a smaller accrued benefit at age 65 than a younger employee, despite having worked the same number of years at the same salary as the younger employee.

### B. The July 1, 1999 Amendment

Effective July 1, 1999, IBM again amended its Plan to create its Cash Balance Formula ("CBF"). Under the CBF, a participant's benefit is determined by reference to a hypothetical account known as a Personal Pension Account ("PPA"). Every month, a participant's PPA accumulates "pay credits" at a rate of 5% of the employee's salary and "interest credits" at a rate one percentage point higher than the rate of return on one year treasury securities. When a participant's employment with IBM ends, he may withdraw his account balance as a lump sum, convert the account balance into an immediate life annuity, or defer the receipt of a lump sum payment or a life annuity until a later date. While a former employee is unable to earn additional pay credits, he continues to accumulate interest credits until his PPA balance is withdrawn or converted into a life annuity.

The class alleges that the CBF also violates ERISA's laws against age discrimination. This claim is based on how interest credits accrue on a participant's PPA balance until he reaches normal retirement age.

Page 3 of 24

A-8

## II. Standard of Review

All but one of the motions before the Court are motions for summary judgment. The standard applied to summary judgment motions filed under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. The evidence must create more than some metaphysical doubt as to the material facts. A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (internal citations and quotations omitted).

## III. Analysis

The Court's analysis will be divided into two sections: (1) all motions related to IBM's 1995 Pension Credit Formula; and (2) all motions related to IBM's 1999 Cash Balance Formula.

### 1995 PENSION CREDIT FORMULA

The class alleges that the terms of the IBM Plan, as amended January 1, 1995, violate ERISA § 204(b)(1)(G) & (H). Specifically, the class claims that under the PCF, benefits are reduced on account of *increases in age or service* in violation of § 204(b)(1)(G) and that the benefits accrue at a *rate which is reduced because of age or the attainment of any age* in violation of § 204(b)(1)(H). The class seeks to have Plan benefits determined in a manner consistent with these ERISA

Page 4 of 24

A-9

provisions and to enjoin IBM from continuing these violations.

Defendants move to dismiss the § 204(b)(1)(H) claim on the grounds that the ERISA age discrimination provisions apply only to employees who have reached normal retirement age (age 65), arguing that the younger Plaintiffs lack standing to sue. Defendants are wrong.

ERISA § 502(a) provides that "[a] civil action may be brought ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a). The plain language of this provision confers statutory standing to plan participants, such as the named Plaintiffs, who seek to protect their employee benefit rights. Because Congress is entitled to enact statutes which create standing where it would otherwise not exist, *see Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990), Defendants' motion to dismiss (Doc. 103) is denied.

### A. § 204(b)(1)(G) Claim

Cooper filed a motion for partial summary judgment (Doc. 87) on July 18, 2002, seeking, in part, a determination that the PCF violates the age discrimination provision of ERISA § 204(b)(1)(G) because the amount of an employee's accrued benefit under the Plan decreases on account of the employee's age. Defendants have likewise filed a motion for summary judgment on the § 204(b)(1)(G) claim, arguing that no participant in the IBM Plan has ever experienced a reduction in his or her accrued benefit on account of an increase in age or service and, therefore, the named Plaintiffs lack standing to assert this claim.

Section 204(b)(1)(G) has been part of ERISA since its inception in 1974 and provides that

"a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of any increase in his age or service." 29 U.S.C. § 1054(b)(1)(G). In the context of a defined benefit plan, such as the IBM Plan, the term "accrued benefit" means "'the individual's accrued benefit determined under the plan and ... *expressed in the form of an annual benefit commencing at normal retirement age*.'" 29 U.S.C. § 1002(23)(A). "Normal retirement age" is 65. *See* 29 U.S.C. § 1002(24); *see also Esden v. Bank of Boston,* 229 F.3d 154, 162 (2nd Cir. 2000).

The PCF adopted by IBM in the January 1, 1995, amendment to its Plan violates ERISA. The following examples illustrate the violation.

A participant's retirement benefit is computed under the PCF by a five step formula: **(1)** the total number of base points earned at that time, up to a maximum of 425, are added and then divided by 100; (2) the number from the first step is multiplied by the average of the employee's highest consecutive five year earnings to determine what the Plan denominates as the "Base Point Benefit Value at Normal Retirement Age;" (3) if the employee's five year average earnings exceed social security compensation, the excess points earned are similarly added, up to a maximum of 75, divided by 100, and then multiplied by the dollar amount by which the employee's five year average exceeds social security compensation, to determine the employee's "Excess Point Benefit Value at Normal Retirement Age;" (4) the employee's Base Point Benefit Value at Normal Retirement Age and any Excess Point Benefit Value at Normal Retirement Age are added together to yield the employee's "Pension Credit Value at Normal Retirement Age;" and (5) this Pension Credit Value is then divided by a "Benefit Conversion Factor" specified in the Plan. The result is the dollar amount of the employee's annual annuity commencing at age 65, which can be divided by twelve to determine the

Page 6 of 24

A-11

monthly annuity.

Suppose an employee begins working for IBM at age 35 and earns an annual salary of $60,000.00 until his employment ends at age 50. During this fifteen year period, he will accumulate 215 base points. *See* App. B. After dividing by 100, and multiplying by $60,000.00, the employee is assigned a "Base Point Benefit Value at Normal Retirement Age" of $129,000.00. Because termination occurs when this employee is 50 years old, his benefit conversion factor (which is divided into his $129,000.00 base point value) is 8.537. *See* App. C. Therefore, his age 65 accrued benefit is equal to $15,110.69 per year or $1,259.22 per month.

Now, change only the age – our hypothetical employee starts his employment with IBM at age 50 instead of age 35. This employee will accumulate more base points than his younger counterpart; a total of 240. *See* App. B. After dividing by 100, and multiplying by $60,000.00, he is assigned a higher "Base Point Benefit Value at Normal Retirement Age" of $144,000.00. However, this 65 year old employee is also assigned a higher benefit conversion factor equal to 10.918. *See* App. C. After his $144,000.00 base point value is reduced by this conversion factor, he is left with an age 65 accrued benefit equal to only $13,189.23 per year or $1,099.10 per month.

Finally, consider an employee who begins working at age 25 and earns $60,000.00 each year until he retires at age 65. By age 58, this employee has 423 base points and a benefit conversion factor of 10.543. *See* Apps. B & C. Applying the PCF's five step analysis, he has an age 65 accrued benefit of $24,072.84 per year or $2,006.07 per month. For an additional year of service, this same employee will receive only two (as opposed to sixteen) base points because he will have reached the 425 point cap. Notwithstanding, the employee's benefit conversion factor continues to rise to 10.596. *See* App. C. After applying the IBM formula, his age 65 accrued benefit has *decreased* to

Page 7 of 24

A-12

$24,065.69 or $2,005.47 per month. Each additional year he works, this employee will accumulate zero base points because of the cap. Still, as his years of service continue to increase, so does the benefit conversion factor. By age 65, this employee's benefit conversion factor will be 10.918. *See* App. C. Under the PCF, this will yield an accrued benefit of only $23,355.93 or $1,946.00 per month.

The benefit conversion factor contained in the PCF reduces a participant's accrued benefit solely on increases in age or service. Accordingly, the 1995 PCF violates ERISA § 204(b)(1)(G). *See* 29 U.S.C. § 1054(b)(1)(G). Defendants' argument that no specific employee has actually suffered a reduction in his or her accrued benefit is rejected because it relates to damages as opposed to liability and because Congress has conferred statutory standing to all "participants" in an ERISA plan. *See* 29 U.S.C. § 1132(a)(3). Plaintiffs' motion for partial summary judgment on Count I (Doc. 87) is granted, and Defendants' motion for partial summary judgment on Count I (Doc. 105) is denied.

   **B.  § 204(b)(1)(H)**

Cooper's motion for partial summary judgment on Count I also seeks a determination that the PCF in the 1995 IBM Plan violates ERISA § 204(b)(1)(H) because the rate of an employee's benefit accrual under the Plan decreases on account of the employee's age. Defendants have also filed a motion for summary judgment on the § 204(b)(1)(H) claim.

Section 204(b)(1)(H) was enacted as part of the Omnibus Budget Reduction Act of 1986 and provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H).

Page 8 of 24

A-13

accrued benefit, as it appears in § 204(b)(1)(G), must be measured by reference to the amount of an employee's annual benefit at age 65. *See* 29 U.S.C. § 1002(23)(A); *see also Esden*, 229 F.3d at 163. The language at issue – "rate of benefit accrual" – is found in the very next subchapter, § 204(b)(1)(H). The best interpretation of this phrase is that it also refers to an employee's age 65 annual benefit and the rate at which that age 65 annual benefit accrues.

Defendants question why Congress would use different language in succeeding subparagraphs (accrued benefit and benefit accrual) unless it intended the subparagraphs to cover different types of benefits. The answer is simple. Congress chose to be grammatically correct. The term accrued benefit in § 204(b)(1)(G) means an employee's age 65 *accumulated benefit*. If Congress had used the term accumulated benefit in § 204(b)(1)(G), instead of the term accrued benefit, it would not have used the clumsy phrase "rate of accumulated benefit" in § 204(b)(1)(H). Presumably, Congress would have opted for standard English and used the phrase "rate of benefit accumulation," even though it intended to cover the same type of benefit in both subparagraphs.[2]

Congress intended § 204(b)(1)(H) to cover the rate at which a participant's age 65 benefit accrues under a defined benefit plan. So, is the rate of a participant's benefit accrual under the PCF reduced because of the participant's age? The answer is yes, as illustrated by the previous hypotheticals.

A participant who works at IBM from age 35 to age 50 earning a salary of $60,000.00 will accrue an age 65 annual benefit under the PCF of $15,110.69. On the other hand, an employee who

---

[2]     For a simpler example, consider the word popcorn. Popcorn is the word used to describe the product created by exposing corn kernels to extreme heat. If asked to draft a phrase related to the speed of this process, one would not say "rate of popcorn." Rather, to be grammatically correct, one would say "the rate corn pops."

Page 10 of 24

A-15

works for IBM from age 50 to age 65, also earning an annual salary of $60,000.00, will accrue an age 65 annual benefit under the PCF of only $13,189.23. To determine the "rate of benefit accrual" for these hypothetical employees, their age 65 annuity is divided by the product of their average compensation ($60,000.00) and years of service (15). *See* Doc. 88, App. C, p. 11. Thus, the 50 year old employee accrues an age 65 annual benefit at a rate of 1.68%.[3] In contrast, the 65 year old employee accrues an age 65 annual benefit at a rate of only 1.47%.[4]

The decrease in rate of age 65 annual benefit accrual is also demonstrated by reference to the sharp yearly reduction in percentage that occurs to employees who have reached the 425 base point cap under the PCF. As previously noted, an employee who begins working for IBM at age 25 will reach the 425 base point maximum between ages 58 and 59. At age 59, after 35 years of service, he has accrued an age 65 annual benefit of $24,065.69[5] under the PCF. Therefore, his rate of benefit accrual is 1.15%.[6] At age 60, with an annual benefit of $23,945.91, his rate of benefit accrual drops to 1.11%.[7] This employee's rate of benefit accrual continues to decrease each year, leaving him with

---

[3]     $15,110.68/($60,000.00 x 15).

[4]     $13,189.23/($60,000.00 x 15).

[5]     This employee has accumulated 425 base points and has a benefit conversion factor of 10.596. *See* Apps. B and C. Because his highest five year average salary is $60,000.00, the PCF would be applied as follows:

(425/100) = 4.25     4.25 x $60,000.00 = $255,000.00     $255,000.00/10.596 = $24,065.69.

[6]     Again, rate of benefit accrual is calculated by dividing an employee's age 65 annual benefit by (years of service x average compensation):

$24,065.69/(35 x $60,000.00) or $24,065.69/($2,100,000.00) = 1.15%.

[7]     $23,945.91/(36 x $60,000.00) or $23,945.91/($2,160,000.00) = 1.11%.

Page 11 of 24

A-16

a rate of 0.95%[1] by age 65.

These examples illustrate that under the PCF, a participant's rate of benefit accrual decreases because of the attainment of a certain age. For this reason, the PCF violates ERISA § 204(b)(1)(H). Plaintiffs' motion for partial summary judgment on Count I (Doc. 87) is granted, and Defendants' motion for partial summary judgment on Count I (Doc. 130) is denied.

### C. § 204(b)(1)(A)(B) & (C) (Anti-backloading)

The class also claims that, effective January 1, 1995, benefits accruing under the terms of the IBM Plan do not satisfy any of the three "anti-backloading" rules found in subparagraphs (A), (B), or (C) of ERISA § 204(b)(1). *See* 29 U.S.C. § 1054(b)(1). Defendants seek summary judgment on this claim. Defendants cannot comply with either the 3% rule or the 133⅓% rule and must comply with the anti-backloading rules, if at all, by satisfying the fractional rule of § 204(b)(a)(C).

The issue is whether the Plan's PCF satisfies subparagraph (C) during its "phase-in" period from January 1, 1995 (the date of the PCF's enactment) to December 31, 1999.

ERISA § 204(b)(1)(C) states:

> [a] defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which any participant is entitled upon his separation from the service is not less than a fraction of the annual benefit commencing at normal retirement age to which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan, determined as if he had attained normal retirement age on the date any such determination is made (but taking into account no more than the 10 years of service immediately preceding his separation from service). Such fraction shall be a fraction, not exceeding 1, the numerator of which is the total number of his years of participation in the plan (as of the date of his

---

[1]    $23,355.93/(41 x $60,000.00) or $23,355.93/(2,460,000.00) = 0.95%.

> separation from the service) and the denominator of which is the total
> number of years he would have participated in the plan if he separated
> from the service at the normal retirement age. For purposes of this
> subparagraph, social security benefits and all other relevant factors
> used to compute benefits shall be treated as remaining constant as of
> the current year for all years after such current year.

29 U.S.C. § 1054(b)(1)(C).

A 40 year old employee starts working for IBM on January 1, 1995, with an annual salary of $60,000.00 and quits one year later. His accrued annual benefit is **$311.80.**[9] To satisfy § 204(b)(1)(C), his "fractional rule benefit" (the age 65 annual accrued benefit to which he would be entitled under the PCF if he continued to earn $60,000.00 annually until he attained age 65, multiplied by the applicable fraction) must be less than or equal to $311.80. His annual accrued benefit is $21,707.27[10] if he continues working until age 65. The fraction used to reduce this amount is 1/25.[11] Thus, his fractional rule benefit is $868.29,[12] an amount greater than the benefit accrued

---

[9]    Under the terms of the IBM Plan, the PCF uses compensation averaged over a five year period. However, compensation earned before 1995 cannot be used in this average. Therefore, from January 1, 1995, to December 31, 1999, a participant's average compensation is determined by adding together his total compensation and dividing by five. In the hypothetical above, the employee earning $60,000.00 per year has an average compensation of only $12,000.00 after his first year of service. The employee accumulated 15 base points and has a conversion factor of 5.773. *See* Apps. B & C. Using these figures, the analysis under the PCF is as follows:

(15/100) = .15        .15 x $12,000.00 = $1,800.00        $1,800.00/5.773 = <u>$311.80</u>.

[10]    This employee would accumulate 395 base points and would have a conversion factor of 10.918 if he continues working until age 65. *See* Apps B and C. Because under § 204(b)(1)(C) it is presumed that he continues earning $60,000.00 until age 65, the PCF would be applied as follows:

(395/100) = 3.95        3.95 x $60,000.00 = $237,000.00        $237,000.00/10.918 = <u>$21,707.27</u>.

[11]    Total # of years of participation in the plan (as of date of separation from service)
--------------------------------------------------------------------------------------
       Total # of years he would have participated in the plan if separated from the

Page 13 of 24

on the date he stopped working for IBM. This violation continues until the fourth year (1998) of the PCF's "phase-in" period.[13]

But Defendants argue that § 204(b)(1)(C)'s language "as if he had attained normal retirement age on the date any such determination is made" should be interpreted to mean that the fractional rule benefit should be calculated as though the employee turned age 65 on the date his service ended. This is wrong.[14] Section 204(b)(1)(C) provides that the fractional rule benefit is the "annual benefit commencing at normal retirement age to which [an employee] would be entitled ... if he *continued to earn annually until normal retirement age* the same rate of compensation upon which his normal retirement benefit would be computed under the plan." (emphasis added). The words *continued to earn annually until normal retirement age* means that the employee's benefit must be calculated as though he remained employed until age 65.

---

service at the normal retirement age.

[12]     $21,707.27 x (1/25) = $868.29.

[13]     1996:  Benefit on date of separation = $1,187.73  [(30/100 x $24,000.00)/6.062]
                Fractional rule benefit        = $1,736.58  ($21,707.27 x 2/25)

         1997:  Benefit on date of separation = $2,545.17  [(45/100 x $36,000.00)/6.365]
                Fractional rule benefit        = $2,604.87  (21,707.27 x 3/25)

         1998:  Benefit on date of separation = $4,309.44  [(60/100 x $48,000.00)/6.683]
                Fractional rule benefit        = $3,473.12  (21,707.27 x 4/25)

[14]     For the reasons that follow in the text of this Order, § 204(b)(1)(C), when read as a whole, does not call for a fractional rule benefit calculated as though an employee turned age 65 on the date his service ended. The Court reads the phrase "as if he had attained normal retirement age on the date any such determination is made" as referring solely to an employee's rate of compensation, and is included to ensure that the salary that an employee is earning when his service ends is used as the employee's salary at age 65 when his fractional rule benefit is determined.

*Page 14 of 24*

A-19

Moreover, if Defendants' interpretation is correct, § 204(b)(1)(C) is rendered meaningless. The 40 year old hypothetical employee used in the last example would have a fractional rule benefit of $7.03[15] at the end of his first year of employment as Defendants apply the statute. Congress did not intend § 204(b)(1)(C) to invalidate only those plans that produce less than $7.03 in pension benefits for a 40 year old employee earning $60,000.00.

Defendants argue that it is unfair to compare a partially phased in benefit with a fully phased in fractional rule benefit. But this is exactly the situation that § 204 is intended to cover. *See Jones v. UOP*, 16 F.3d 141, 144-45 (7th Cir. 1999). The PCF directs that a first year participant's salary be divided by five and accordingly that participant's benefits are "backloaded," *i.e.*, five years of employment are required before the participant can ratably accrue pension benefits. Defendants'

---

[15]    If the employee retired in 1996, after working only one year, he would be treated as having turned age 65 in 1996 for fractional rule purposes if Defendants have correctly interpreted § 204(b)(1)(G). Therefore, he would have accumulated 16 base points during this year of employment and would have a conversion factor of 10.918 under the PCF. *See* Apps. B and C. Thus, his fractional rule benefit would be calculated as follows:

(16/100) = .16        .16 x $12,000.00 = $1,920.00        $1,920.00/10.918 = $175.86
$175.86 x 1/25 = $7.03

In determining the applicable fraction, the Court uses a denominator that is determined by subtracting the employee's age when participation in the Plan began from age 65. Defendants may assume that based on their theory – a fractional rule benefit is calculated as though an employee turned age 65 on the date his service ended – the denominator in the applicable fractions should be determined by counting to age 65 as though the employee reached such age on the date employment was terminated. This assumption is unsupportable. If the applicable fraction used a denominator that counted forward only to the date that an employee's service ended, the fraction would always be one, a result that cannot be supported by § 204(b)(1)(C)'s language. To illustrate that the fraction would always be one (and thus there would be no reason for § 204(b)(1)(C) to instruct the usage of a fraction), again consider the hypothetical forty year old. If his service ends in 1998, the numerator will be three (number of years of participation in the Plan). The denominator would also be three because, by treating the employee as if he turned 65 at termination, there are no more years to add by assuming the employee continued working to normal retirement age.

Page 15 of 24

A-20

motion for summary judgment on the § 204(b)(1)(C) claim (Doc. 128) is denied.

## THE CASH BALANCE PLAN

The 1995 PCF was intended to provide a rapid build up of plan value for young and mid-career hires while reducing generous early retirement subsidies. The PCF worked well, and by 1998 IBM had over 20,000 employees between 35 and 55 years of age who had fewer than five years of service. So, in 1998 IBM faced rising pension costs and diminishing pension income as a result of the benefits the company would be paying to their middle aged employees. But, the Plan was not strapped for cash, as there was a surplus of $8 billion at the close of 1997, and the Plan's assets were generating a return greater than what was required to cover the annual costs of providing benefits. Although IBM had not contributed to the Plan for several years, in 1997, 7% of IBM's total reported net earnings was pension income in the amount of $420 million.

In 1999 IBM again amended the Plan and opted for a "cash balance formula" whereby a participant's benefit is determined by reference to a hypothetical account. The Plan's actuaries projected that this CBF would produce annual savings of almost $500 million by 2009. These savings would result from reductions of up to 47% in future benefits that would be earned by older IBM employees.

IBM was aware of the age discrimination issues that would come with the new CBF. Indeed, the Plan's actuaries projected the age 65 annuity benefit earned by a younger employee for a year of service exceeded the benefit earned by an older employee for the same service. And, the actuaries calculated that the amount of an age 65 annuity earned each year by an employee under the CBF decreased as the employee aged. Nevertheless, the new CBF went into effect July 1, 1999. Due to negative reaction from employees, the Plan was amended a second time in September 1999 to permit

Page 16 of 24

A-21

more employees to choose between being covered by the new formula or the previous formula.

The CBF had its intended effect. Plan income increased from $395 million in 1998 to $638 million in 1999. Astonishingly, Plan income was over $1 billion in 2001, and this accounted for 13% of IBM's overall net income.

The parties agree that the 1999 Plan as amended is a defined benefit plan. Therefore, the Plan must comply with the many and complex statutory strictures that apply to all defined benefit plans. IBM presents startling anomalies and absurdities that result from pushing the logic that Plaintiffs develop in their argument. But these anomalies and absurdities occur only because the CBF doesn't work within the longstanding statutory framework regarding defined benefit plans. The 1999 Plan looks like a defined contribution plan trying to pass for a defined benefit plan. It doesn't make the cut.

Before testing the CBF under ERISA § 204(b)(1)(H), it is helpful to compare the two types of pension plans authorized by ERISA. A defined contribution plan is easy to describe and understand. The sponsoring employer contributes a specified amount into a separate account for each employee. The risks and rewards of the investment are borne by the employee. The employer does not guarantee a particular result and is off the hook. However, there is no opportunity for the employer to earn pension income or reduce the real costs of the contributions specified in the plan. In this type of plan, the sponsoring employer's performance is measured by what it puts into the plan. A defined benefit plan is a different creature. The sponsoring employer promises a certain result based upon a formula specified in the plan. The employer must deliver on the promise irrespective of how the funds set aside for this purpose fare in the financial markets. Here, the employer is literally on the hook but has the opportunity to earn pension income and reduce the real costs of

Page 17 of 24

A-22

funding a pension for employees. In this type of plan, the sponsoring employer's performance is measured by what comes out of the plan in terms of benefits.

## A. Section 204(b)(1)(H)

The CBF adopted by the 1999 amendment to the Plan creates a hypothetical account referred to as a personal pension account ("PPA") for each participant. Benefits accrue by the addition of "pay credits" and "interest credits" made to the participant's PPA. Future interest payments are guaranteed by the Plan irrespective of a participant's continued employment with IBM.

It is settled that a cash balance plan such as the IBM Plan is held to the same requirements regarding vesting and accrual of benefits as any defined benefit plan. *Esden*, 229 F.3d at 162-63. For each year of qualifying service, such a plan must provide for a definitely determinable, non-forfeitable, "accrued benefit." ERISA § 203(a). The accrued benefit must be expressed in the form of an annual benefit commencing at normal retirement age. 29 U.S.C. § 1002(23). Moreover, the interest credits that are projected and valued as an age 65 annuity must also be taken into account in determining whether a cash balance plan complies with the benefit accrual requirements under ERISA § 204(b)(1). *Esden*, 229 F.3d at 166, n.18. This is where the CBF runs afoul of ERISA's age discrimination proscriptions.

Interest credits are a part of the accrued benefit specified in IBM's 1999 Plan, and these count in determining whether the benefit accrual requirements of § 204(b)(1) are met. And, like in any defined plan, the interest credits must be valued as an age 65 annuity. At this point in the analysis, the result is inevitable. In terms of an age 65 annuity, the interest credits will always be more valuable for a younger employee as opposed to an older employee. A noted pension expert summarized matters:

Page 18 of 24

*A-23*

> There is no dispute about the underlying arithmetic of cash balance
> arrangements: each year, as a cash balance participant ages, the same
> contribution made for her in the previous year declines in value in
> annuity terms. Moreover, cash balance arrangements are defined
> *benefit* plans and, therefore, measure accrued benefits in terms of
> annuities, not in terms of the contributions themselves.

Edward A. Zelinsky, The Cash Balance Controversy, 19 Virginia Tax Rev. 4, 733 (Spring 2000).

The 1999 CBF violates the literal terms of ERISA § 204(b)(1)(H). IBM's own age discrimination analysis illustrates the problem: a 49 year old employee with 20 years of service accrues an age 65 annuity of $8,093 in the year 2000. The following year, he accrues an additional $622, and by 2010, his additional annual accrual is only $282. This 49 year old employee's benefit accrual has been reduced for each year he has aged, and this reduction violates ERISA § 204(b)(1)(H).

IBM's argument that this example merely illustrates the time value of money at work collapses when the age 65 annuity is included in the analysis. The rate of a participant's benefit accrual diminishes as the participant closes on the age 65 target. And, age 65 is normal retirement age, and Congress did not intend the term "benefit accrual" to mean something different from "accrued benefit." The syntax differs ever so slightly so as to comport with the requirements of good English usage, but the concept is exactly the same.

ERISA does not require an employer to provide a pension plan at all, nor does it favor one type of plan over another. The question is not whether a CBF is a "good" thing. IBM could have accomplished what it has to date by terminating the defined benefit plan and moving to a defined contribution plan According to IBM, this was impractical as the Plan surplus could not have been "tax effectively" withdrawn; but, the point stands. There is nothing in ERISA to prevent IBM from

moving to a defined contribution plan that functions like the CBF. There may be policy reasons why Congress should specifically authorize CBFs in the context of defined benefit plans. But the narrow question here is whether the 1999 Plan comports with the literal and unambiguous provisions of ERISA § 204(b)(1)(H), and it does not.

In short, IBM's argument goes to the wisdom of the statutory requirements that Congress adopted regarding defined benefit plans. These requirements were in effect before IBM considered adopting the CBF. IBM, like many other corporate plan sponsors, proceeded with open eyes and was fully informed of the consequences of the litigation that was sure to come. This Court will not perform legal legerdemain by dodging the detail requirements of ERISA in order to save IBM's 1999 Plan. Plaintiffs' cross motion for summary judgment regarding the CBF adopted by the IBM Plan by an amendment effective July 1, 1999 (Doc. 124) is granted. IBM's cross motion for summary judgment on Plaintiffs' age discrimination claim (Doc. 105) is denied.

### B. Partial Termination

Defendants' motion for summary judgment on the issue of partial termination is denied because there is a genuine question of material fact (1) whether the July 1, 1999, amendment to the Plan resulted in a decrease in future benefit accruals, and (2) whether any such decrease increased the potential for a reversion. The effects of the subsequent amendment to the Plan which was adopted October 1, 1999, as IBM argues, may make the measurement of the effects of the change unreliable, but this itself constitutes a disputed material fact.

### IV. Conclusion

Accordingly, Plaintiffs' motion for partial summary judgment on Count I (Doc. 87) is **GRANTED.** Defendants' motion to dismiss for lack of standing (Doc. 103) is **DENIED.**

Page 20 of 24

A-25

Defendants' motion for summary judgment on the age discrimination claim (Doc. 105) is **DENIED**. Defendants' motion for summary judgment on the § 204(b)(1)(G) claim (Doc. 107) is **DENIED**. Plaintiffs' motion for summary judgment on the cash balance formula (Doc. 124) is **GRANTED**. Plaintiffs' motion for summary judgment on the opening account balance under the cash balance formula (Doc. 127) is **GRANTED**. Defendants' motion for summary judgment on the anti-backloading claim (Doc. 128) is **DENIED**. Defendants' motion for summary judgment regarding the pension credit formula (Doc. 130) is **DENIED**. Defendants' motion for summary judgment regarding partial termination is **DENIED**. Plaintiffs' appeal of the Magistrate's November 1, 2002, Order granting in part and denying in part the motion to compel discovery (Doc. 152) is **DENIED** *as moot* with leave to reinstate.

There is a triable issue of fact regarding Plaintiffs' anti-backloading claim as well as the partial termination claim. The parties will promptly proceed to develop the issue of what relief the Court should order.

**IT IS SO ORDERED.**

ENTERED this 31st day of July, 2003.

_G. Patrick Murphy_

G. PATRICK MURPHY
Chief United States District Judge

Page 21 of 24

A-26

## APPENDIX A

The following motions are before the Court:

(1)    Plaintiffs' motion for partial summary judgment on Count I (Doc. 87);

(2)    Defendants' motion to dismiss Plaintiffs' § 204(b)(1)(H) claim for lack of standing (Doc. 103);

(3)    Defendants' motion for partial summary judgment on Plaintiffs' age discrimination claim (Doc. 105);

(4)    *Defendants' motion for summary judgment on Plaintiffs' § 204(b)(1)(G) claim (Doc. 107);*

(5)    Plaintiffs' cross motion for partial summary judgment on Plaintiffs' age discrimination claim with respect to Cash Balance Formula (Doc. 124);

(6)    Plaintiffs' motion for partial summary judgment on Count I – comparison formula for opening balances under 1999 cash balance formula (Doc. 127);

(7)    Defendants' motion for summary judgment on anti-backloading claim (Doc. 128);

(8)    Defendants' motion for summary judgment on Plaintiffs' § 204(b)(1)(H) claim with respect to pension credit formula (Doc. 130);

(9)    Defendants' motion for summary judgment on Plaintiffs' horizontal partial termination claim (Doc. 133), and

(10)   Plaintiffs' appeal of the Magistrate's November 1, 2002, Order granting in part and denying in part the motion to compel discovery (Doc. 152).

## APPENDIX B

| Age in Each Year Worked | Base Points Earned Each Year | Excess Points Earned Each Year |
|---|---|---|
| Younger than 30 | 7 | 0 |
| 30-34 | 9 | 1 |
| 35-39 | 12 | 2 |
| 40-44 | 15 | 2 |
| 45 and Older | 16 | 3 |

Page 23 of 24

## APPENDIX C

| Age at Termination | Benefit Conversion Factors |
|---|---|
| 40 | 5.498 |
| 41 | 5.773 |
| 42 | 6.062 |
| 43 | 6.365 |
| 44 | 6.683 |
| 45 | 7.017 |
| 46 | 7.298 |
| 47 | 7.590 |
| 48 | 7.893 |
| 49 | 8.209 |
| 50 | 8.537 |
| 51 | 8.879 |
| 52 | 9.234 |
| 53 | 9.603 |
| 54 | 9.987 |
| 55 | 10.387 |
| 56 | 10.439 |
| 57 | 10.491 |
| 58 | 10.543 |
| 59 | 10.596 |
| 60 | 10.649 |
| 61 | 10.702 |
| 62 | 10.756 |
| 63 | 10.810 |
| 64 | 10.864 |
| 65 | 10.918 |

Page 24 of 24

## APPENDIX A

The following motions are before the Court:

(1)    Plaintiffs' motion for partial summary judgment on Count I (Doc. 87);

(2)    Defendants' motion to dismiss Plaintiffs' § 204(b)(1)(H) claim for lack of standing (Doc. 103);

(3)    Defendants' motion for partial summary judgment on Plaintiffs' age discrimination claim (Doc. 105);

(4)    Defendants' motion for summary judgment on Plaintiffs' § 204(b)(1)(G) claim (Doc. 107);

(5)    Plaintiffs' cross motion for partial summary judgment on Plaintiffs' age discrimination claim with respect to Cash Balance Formula (Doc. 124);

(6)    Plaintiffs' motion for partial summary judgment on Count I – comparison formula for opening balances under 1999 cash balance formula (Doc. 127);

(7)    Defendants' motion for summary judgment on anti-backloading claim (Doc. 128);

(8)    Defendants' motion for summary judgment on Plaintiffs' § 204(b)(1)(H) claim with respect to pension credit formula (Doc. 130);

(9)    Defendants' motion for summary judgment on Plaintiffs' horizontal partial termination claim (Doc. 133), and

(10)    Plaintiffs' appeal of the Magistrate's November 1, 2002, Order granting in part and denying in part the motion to compel discovery (Doc. 152).

## APPENDIX B

| Age in Each Year Worked | Base Points Earned Each Year | Excess Points Earned Each Year |
|---|---|---|
| Younger than 30 | 7 | 0 |
| 30-34 | 9 | 1 |
| 35-39 | 12 | 2 |
| 40-44 | 15 | 2 |
| 45 and Older | 16 | 3 |

## APPENDIX C

| Age at Termination | Benefit Conversion Factors |
|:---:|:---:|
| 40 | 5.498 |
| 41 | 5.773 |
| 42 | 6.062 |
| 43 | 6.365 |
| 44 | 6.683 |
| 45 | 7.017 |
| 46 | 7.298 |
| 47 | 7.590 |
| 48 | 7.893 |
| 49 | 8.209 |
| 50 | 8.537 |
| 51 | 8.879 |
| 52 | 9.234 |
| 53 | 9.603 |
| 54 | 9.987 |
| 55 | 10.387 |
| 56 | 10.439 |
| 57 | 10.491 |
| 58 | 10.543 |
| 59 | 10.596 |
| 60 | 10.649 |
| 61 | 10.702 |
| 62 | 10.756 |
| 63 | 10.810 |
| 64 | 10.864 |
| 65 | 10.918 |

Page 24 of 24

ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H)

(i) Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

(ii) A plan shall not be treated as failing to meet the requirements of this subparagraph solely because the plan imposes (without regard to age) a limitation on the amount of benefits that the plan provides or a limitation on the number of years of service or years of participation which are taken into account for purposes of determining benefit accrual under the plan.

(iii) In the case of any employee who, as of the end of any plan year under a defined benefit plan, has attained normal retirement age under such plan--

(I) if distribution of benefits under such plan with respect to such employee has commenced as of the end of such plan year, then any requirement of this subparagraph for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of the actuarial equivalent of in-service distribution of benefits, and

(II) if distribution of benefits under such plan with respect to such employee has not commenced as of the end of such year in accordance with section 1056(a)(3) of this title, and the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to section 1053(a)(3)(B) of this title, then any requirement of this subparagraph for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of any adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age.

The preceding provisions of this clause shall apply in accordance with regulations of the Secretary of the Treasury. Such regulations may provide for the application of the preceding provisions of this clause, in the case of any such employee, with respect to any period of time within a plan year.

(iv) Clause (i) shall not apply with respect to any employee who is a highly compensated employee (within the meaning of section 414(q) of Title 26) to the extent provided in regulations prescribed by the Secretary of the Treasury for purposes of precluding discrimination in favor of highly compensated employees within the meaning of subchapter D of chapter 1 of Title 26.

(v) A plan shall not be treated as failing to meet the requirements of clause (i) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals.

(vi) Any regulations prescribed by the Secretary of the Treasury pursuant to clause (v) of section 411(b)(1)(H) of Title 26 shall apply with respect to the requirements of this subparagraph in the same manner and to the same extent as such regulations apply with respect to the requirements of such section 411(b)(1)(H).

**ADEA § 4(i), 29 U.S.C. § 623(i)**

(i) Employee pension benefit plans; cessation or reduction of benefit accrual or of allocation to employee account; distribution of benefits after attainment of normal retirement age; compliance; highly compensated employees

(1) Except as otherwise provided in this subsection, it shall be unlawful for an employer, an employment agency, a labor organization, or any combination thereof to establish or maintain an employee pension benefit plan which requires or permits--

(A) in the case of a defined benefit plan, the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age, or

(B) in the case of a defined contribution plan, the cessation of allocations to an employee's account, or the reduction of the rate at which amounts are allocated to an employee's account, because of age.

(2) Nothing in this section shall be construed to prohibit an employer, employment agency, or labor organization from observing any provision of an employee pension benefit plan to the extent that such provision imposes (without regard to age) a limitation on the amount of benefits that the plan provides or a limitation on the number of years of service or years of participation which are taken into account for purposes of determining benefit accrual under the plan.

(3) In the case of any employee who, as of the end of any plan year under a defined benefit plan, has attained normal retirement age under such plan--

(A) if distribution of benefits under such plan with respect to such employee has commenced as of the end of such plan year, then any requirement of this subsection for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of the actuarial equivalent of in-service distribution of benefits, and

(B) if distribution of benefits under such plan with respect to such employee has not commenced as of the end of such year in accordance with section 1056(a)(3) of this title and section 401(a)(14)(C) of Title 26, and the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to section 1053(a)(3)(B) of this title or section 411(a)(3)(B) of Title 26, then any requirement of this subsection for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of any adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age.

The provisions of this paragraph shall apply in accordance with regulations of the Secretary of the Treasury. Such regulations shall provide for the application of the preceding provisions of this paragraph to all employee pension benefit plans subject to this subsection and may provide for the application of such provisions, in the case of any such employee, with respect to any period of time within a plan year.

(4) Compliance with the requirements of this subsection with respect to an employee pension benefit plan shall constitute compliance with the requirements of this section relating to benefit accrual under such plan.

(5) Paragraph (1) shall not apply with respect to any employee who is a highly compensated employee (within the meaning of section 414(q) of Title 26) to the extent provided in regulations prescribed by the Secretary of the Treasury for purposes of precluding discrimination in favor of highly compensated employees within the meaning of subchapter D of chapter 1 of Title 26.

(6) A plan shall not be treated as failing to meet the requirements of paragraph (1) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals or it is a plan permitted by subsection (m) of this section.

(7) Any regulations prescribed by the Secretary of the Treasury pursuant to clause (v) of section 411(b)(1)(H) of Title 26 and subparagraphs (C) and (D) of section 411(b)(2) of Title 26 shall apply with respect to the requirements of this subsection in the same manner and to the same extent as such regulations apply with respect to the requirements of such sections 411(b)(1)(H) and 411(b)(2).

(8) A plan shall not be treated as failing to meet the requirements of this section solely because such plan provides a normal retirement age described in section 1002(24)(B) of this title and section 411(a)(8)(B) of Title 26.

(9) For purposes of this subsection--

(A) The terms "employee pension benefit plan", "defined benefit plan", "defined contribution plan", and "normal retirement age" have the meanings provided such terms in section 1002 of this title.

(B) The term "compensation" has the meaning provided by section 414(s) of Title 26.

**IRC § 411(b)(1)(H), 26 U.S.C. § 411(b)(1)(H)**

(H) Continued accrual beyond normal retirement age.--

(i) In general.--Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

(ii) Certain limitations permitted.--A plan shall not be treated as failing to meet the requirements of this subparagraph solely because the plan imposes (without regard to age) a limitation on the amount of benefits that the plan provides or a limitation on the number of years of service or years of participation which are taken into account for purposes of determining benefit accrual under the plan.

(iii) Adjustments under plan for delayed retirement taken into account.--In the case of any employee who, as of the end of any plan year under a defined benefit plan, has attained normal retirement age under such plan--

(I) if distribution of benefits under such plan with respect to such employee has commenced as of the end of such plan year, then any requirement of this subparagraph for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of the actuarial equivalent of in-service distribution of benefits, and

(II) if distribution of benefits under such plan with respect to such employee has not commenced as of the end of such year in accordance with section 401(a)(14)(C), and the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to subsection (a)(3)(B), then any requirement of this subparagraph for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of any adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age.

The preceding provisions of this clause shall apply in accordance with regulations of the Secretary. Such regulations may provide for the application of the preceding provisions of this clause, in the case of any such employee, with respect to any period of time within a plan year.

(iv) Disregard of subsidized portion of early retirement benefit.--A plan shall not be treated as failing to meet the requirements of clause (i) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals.

(v) Coordination with other requirements.--The Secretary shall provide by regulation for the coordination of the requirements of this subparagraph with the requirements of subsection (a), sections 404, 410, and 415, and the provisions of this subchapter precluding discrimination in favor of highly compensated employees.

**Treas. Reg. § 1.401(a)(4)-8, 26 C.F.R. § 1.401(a)(4)-8**

(a) Introduction. This section provides rules for testing defined benefit plans on the basis of equivalent employer provided contributions and defined contribution plans on the basis of equivalent employer-provided benefits under § 1.401(a)(4)-1(b)(2). Paragraphs (b)(1) and (c)(1) of this section provide general tests for nondiscrimination based on individual equivalent accrual or allocation rates determined under paragraphs (b)(2) and (c)(2) of this section, respectively. Paragraphs (b)(3), (c)(3), and (d) of this section provide additional safe-harbor testing methods for target benefit plans, cash balance plans, and defined benefit plans that are part of floor-offset arrangements, respectively, that generally may be satisfied on a design basis.

*      *      *

(c)(3) Safe harbor testing method for cash balance plans--

(i) General rule. A cash balance plan is a defined benefit plan that defines benefits for each employee by reference to the employee's hypothetical account. An employee's hypothetical account is determined by reference to hypothetical allocations and interest adjustments that are analogous to actual allocations of contributions and earnings to an employee's account under a defined contribution plan. Because a cash balance plan is a defined benefit plan, whether it satisfies section 401(a)(4) with respect to the equivalent amount of contributions is generally determined under paragraphs (c)(1) and (c)(2) of this section. However, a cash balance plan that satisfies each of the requirements in paragraphs (c)(3)(ii) through (xi) of this section is deemed to satisfy section 401(a)(4) with respect to an equivalent amount of contributions.

(ii) Plan requirements in general. The plan must be an accumulation plan. The benefit formula under the plan must provide for hypothetical allocations for each employee in the plan that satisfy paragraph (c)(3)(iii) of this section, and interest adjustments to these hypothetical allocations that satisfy paragraph (c)(3)(iv) of this section. The benefit formula under the plan must provide that these hypothetical allocations and interest adjustments are accumulated as a hypothetical account for each employee, determined in accordance with paragraph (c)(3)(v) of this section. The plan must provide that an employee's accrued benefit under the plan as of any date is an annuity that is the actuarial equivalent of the employee's projected hypothetical account as of normal retirement age, determined in accordance with paragraph (c)(3)(vi) of this section. In addition, the plan must satisfy paragraphs (c)(3)(vii) through (xi) of this section (to the extent applicable) regarding optional forms of benefit, past service credits, post-normal retirement age benefits, certain uniformity requirements, and changes in the plan's benefit formula, respectively.

(iii) Hypothetical allocations--(A) In general. The hypothetical allocations provided under the plan's benefit formula must satisfy either paragraph (c)(3)(iii)(B) or (C) of this section. Paragraph (c)(3)(iii)(B) of this section provides a design-based safe harbor that does not require the annual comparison of hypothetical allocations under the plan. Paragraph (c)(3)(iii)(C) of this section requires the annual comparison of hypothetical allocations.

(B) Uniform hypothetical allocation formula. To satisfy this paragraph (c)(3)(iii)(B), the plan's benefit formula must provide for hypothetical allocations for all employees in the plan for all plan years of amounts that would satisfy § 1.401(a)(4)-2(b)(3) for each such plan year if the hypothetical allocations were the only allocations under a defined contribution plan for the employees for those plan years. Thus, the plan's benefit formula must provide for hypothetical allocations for all employees in the plan for all plan years that are the same percentage of plan year compensation or the same dollar amount. In determining whether the hypothetical allocations satisfy § 1.401(a)(4)-2(b)(3), the only provisions of § 1.401(a)(4)-2(b)(5) that apply are § 1.401(a)(4)-2(b)(5)(ii) (section 401(l) permitted disparity, (iii) (entry dates), (vi) (certain limits on allocations), and (vii) (dollar allocation per uniform unit of service). Thus, for example, the plan's benefit formula may take permitted disparity into account in a manner allowed under § 1.401(l)-2 for defined contribution plans.

(C) Modified general test. To satisfy this paragraph (c)(3)(iii)(C), the plan's benefit formula must provide for hypothetical allocations for all employees in the plan for the plan year that would satisfy the general test in § 1.401(a)(4)-2(c) for the plan year, if the hypothetical allocations were the only allocations for the employees taken into account under § 1.401(a)(4)- 2(c)(2)(ii) under a defined contribution plan for the plan year. In determining whether the hypothetical allocations satisfy § 1.401(a)(4)-2(c), the provisions of § 1.401(a)(4)-2(c)(2)(iii) through (v) apply. Thus, for example, permitted disparity may be imputed under § 1.401(a)(4)-2(c)(2)(iv) in accordance with the rules of § 1.401(a)(4)-7(b) applicable to defined contribution plans.

(iv) Interest adjustments to hypothetical allocations--(A) General rule. The plan benefit formula must provide that the dollar amount of the hypothetical allocation for each employee for a plan year is automatically adjusted using an interest rate that satisfies paragraph (c)(3)(iv)(B) of this section, compounded no less frequently than annually, for the period that begins with a date in the plan year and that ends at normal retirement age. This requirement is not satisfied if any portion of the interest adjustments to a hypothetical allocation are contingent on the employee's satisfaction of any requirement. Thus, for example, the interest adjustments to a hypothetical allocation must be provided through normal

retirement age, even though the employee terminates employment or commences benefits before that age.

(B) Requirements with respect to interest rates. The interest rate must be a single interest rate specified in the plan that is the same for all employees in the plan for all plan years. The interest rate must be either a standard interest rate or a variable interest rate. If the interest rate is a variable interest rate, it must satisfy paragraph (c)(3)(iv)(C) of this section.

(C) Variable interest rates--(1) General rule. The plan must specify the variable interest rate, the method for determining the current value of the variable interest rate, and the period (not to exceed 1 year) for which the current value of the variable interest rate applies. Permissible variable interest rates are listed in paragraph (c)(3)(iv)(C)(2) of this section. Permissible methods for determining the current value of the variable interest rate are provided in paragraph (c)(3)(iv)(C)(3) of this section.

(2) Permissible variable interest rates. The variable interest rate specified in the plan must be one of the following--

(i) The rate on 3-month Treasury Bills,

(ii) The rate on 6-month Treasury Bills,

(iii) The rate on 1-year Treasury Bills,

(iv) The yield on 1-year Treasury Constant Maturities,

(v) The yield on 2-year Treasury Constant Maturities,

(vi) The yield on 5-year Treasury Constant Maturities,

(vii) The yield on 10-year Treasury Constant Maturities,

(viii) The yield on 30-year Treasury Constant Maturities, or

(ix) The single interest rate such that, as of a single age specified in the plan, the actuarial present value of a deferred straight life annuity of an amount commencing at the normal retirement age under the plan, calculated using that interest rate and a standard mortality table but assuming no mortality before normal retirement age, is equal to the actuarial present value, as of the single age specified in the plan, of the same annuity calculated using the section 417(e) rates applicable to distributions in excess of $25,000 (determined under § 1.417(e)-1(d)), and the same mortality assumptions.

A-38

(3) Current value of variable interest rate. The current value of the variable interest rate that applies for a period must be either the value of the variable interest rate determined as of a specified date in the period or the immediately preceding period, or the average of the values of the variable interest rate as of two or more specified dates during the current period or the immediately preceding period. The value as of a date of the rate on a Treasury Bill is the average auction rate for the week or month in which the date falls, as reported in the Federal Reserve Bulletin. The value as of a date of the yield on a Treasury Constant Maturity is the average yield for the week, month, or year in which the date falls, as reported in the Federal Reserve Bulletin. (The Federal Reserve Bulletin is published by the Board of Governors of the Federal Reserve System and is available from Publication Services, Mail Stop 138, Board of Governors of the Federal Reserve System, Washington DC 20551.) The plan may limit the current value of the variable interest rate to a maximum (not less than the highest standard interest rate), or a minimum (not more than the lowest standard interest rate), or both.

(v) Hypothetical account--(A) Current value of hypothetical account. As of any date, the current value of an employee's hypothetical account must equal the sum of all hypothetical allocations and the respective interest adjustments to each such hypothetical allocation provided through that date for the employee under the plan's benefit formula (without regard to any interest adjustments provided under the plan's benefit formula for periods after that date).

(B) Value of hypothetical account as of normal retirement age. Under paragraph (c)(3)(vi) of this section, the value of an employee's hypothetical account must be determined as of normal retirement age in order to determine the employee's accrued benefit as of any date at or before normal retirement age. As of any date at or before normal retirement age, the value of an employee's hypothetical account as of normal retirement age must equal the sum of each hypothetical allocation provided through that date for the employee under the plan's benefit formula, plus the interest adjustments provided through normal retirement age on each of those hypothetical allocations for the employee under the plan's benefit formula (without regard to any hypothetical allocations that might be provided after that date under the plan's benefit formula). If the interest rate specified in the plan is a variable interest rate, the plan must specify that the determination in the preceding sentence is made by assuming that the current value of the variable interest rate for all future periods is either the current value of the variable interest rate for the current period or the average of the current values of the variable interest rate for the current period and one or more periods immediately preceding the current period (not to exceed 5 years in the aggregate).

(vi) Determination of accrued benefit--(A) Definition of accrued benefit. **The plan** must provide that at any date at or before normal retirement age **the accrued** benefit (within the meaning of section 411(a)(7)(A)(i)) of each employee in the **plan** is an annuity commencing at normal retirement age that is the actuarial equivalent of the employee's hypothetical account as of normal retirement age (as determined under paragraph (c)(3)(v)(B) of this section). The separate benefit that each employee accrues for a plan year is an annuity that is the actuarial equivalent of the employee's hypothetical allocation for that plan year, including the automatic adjustments for interest through normal retirement age required under paragraph (c)(3)(iv) of this section.

(B) Normal form of benefit. The annuity specified in paragraph (c)(3)(vi)(A) of this section must provide an annual benefit payable in the same form at the same uniform normal retirement age for all employees in the plan. The annual benefit must be the normal retirement benefit under the plan (within the meaning of section 411(a)(9)) under the plan.

(C) Determination of actuarial equivalence. For purposes of this paragraph (c)(3)(vi) and paragraph (c)(3)(ix) of this section, actuarial equivalence must be determined using a standard mortality table and either a standard interest rate or the interest rate specified in the plan for making interest adjustments to hypothetical allocations. If the interest rate used is the interest rate specified in the plan, and that rate is a variable interest rate, the assumed value of the variable interest rate for all future periods must be the same value that would be assumed for purposes of paragraph (c)(3)(v)(B) of this section. The same actuarial assumptions must be used for all employees in the plan.

(D) Effect of section 415 and 416 requirements. A plan does not fail to satisfy this paragraph (c)(3)(vi) merely because the accrued benefits under the plan are limited by section 415, or merely because the accrued benefits under the plan are the greater of the accrued benefits otherwise determined under the plan and the minimum benefit described in section 416(c)(1) (regardless of whether the plan is top-heavy).

(vii) Optional forms of benefit--(A) In general. The plan must satisfy the uniform subsidies requirement of § 1.401(a)(4)-3(b)(2)(iv) with respect to all subsidized optional forms of benefit.

(B) Limitation on subsidies. Unless hypothetical allocations are determined under a uniform hypothetical allocation formula that satisfies paragraph (c)(3)(iii)(B) of this section, the actuarial present value of any QJSA provided under the plan must not be greater than the single sum distribution to the employee that would satisfy paragraph (c)(3)(vii)(C) of this section assuming that it was distributed to the employee on the date of commencement of the QJSA.

(C) Distributions subject to section 417(e). Except as otherwise required under section 415(b), if the plan provides for a distribution alternative that is subject to the interest rate restrictions under section 417(e), the actuarial present value of the benefit paid to an employee under the distribution alternative must equal the nonforfeitable percentage (determined under the plan's vesting schedule) of the greater of the following two amounts--

(1) The current value of the employee's hypothetical account as of the date the distribution commences, calculated in accordance with paragraph (c)(3)(v)(A) of this section.

(2) The actuarial present value (calculated in accordance with § 1.417(e)-1(d)) of the employee's accrued benefit.

(D) Determination of actuarial present value. For purposes of this paragraph (c)(3)(vii), actuarial present value must be determined using a reasonable interest rate and mortality table. A standard interest rate and a standard mortality table are considered reasonable for this purpose.

(viii) Past service credit. The benefit formula under the plan may not provide for hypothetical allocations in the current plan year that are attributable to years of service before the current plan year, unless each of the following requirements is satisfied--

(A) The years of past service credit are granted on a uniform basis to all current employees in the plan.

(B) Hypothetical allocations for the current plan year are determined under a uniform hypothetical allocation formula that satisfies paragraph (c)(3)(iii)(B) of this section.

(C) The hypothetical allocations attributable to the years of past service would have satisfied the uniform hypothetical allocation formula requirement of paragraph (c)(3)(iii)(B) of this section, and the interest adjustments to those hypothetical allocations would have satisfied paragraph (c)(3)(iv)(A) of this section, if the plan provision granting past service had been in effect for the entire period for which years of past service are granted to any employee. In order to satisfy this requirement, the hypothetical allocation attributable to a year of past service must be adjusted for interest in accordance with paragraph (c)(3)(iv) of this section for the period (including the retroactive period) beginning with the year of past service to which the hypothetical allocation is attributable and ending at normal retirement age. If the interest rate specified in the plan is a variable interest rate, the interest adjustments for the period prior to the current plan year

either must be based on the current value of the variable interest rate for the period in which the grant of past service first becomes effective or must be reconstructed based on the then current value of the variable interest rate that would have applied during each prior period.

(ix) Employees beyond normal retirement age. In the case of an employee who commences receipt of benefits after normal retirement age, the plan must provide that interest adjustments continue to be made to an employee's hypothetical account until the employee's benefit commencement date. In the case of an employee described in the previous sentence, the employee's accrued benefit is defined as an annuity that is the actuarial equivalent of the employee's hypothetical account determined in accordance with paragraph (c)(3)(v)(A) of this section as of the date of benefit commencement.

(x) Additional uniformity requirements. In addition to any uniformity requirements provided elsewhere in this paragraph (c)(3), the plan must satisfy the uniformity requirements in § 1.401(a)(4)-3(b)(2)(v) (uniform vesting and service requirements) and (vi) (no employee contributions). A plan does not fail to satisfy the uniformity requirements of this paragraph (c)(3)(x) or any other uniformity requirement provided in this paragraph (c)(3) merely because the plan contains one or more of the provisions described in § 1.401(a)(4)- 3(b)(8)(iv) (prior vesting schedules), (v) (certain conditions on accruals), or (xi) (multiple definitions of service).

(xi) Changes in benefit formula, allocation formula, or interest rates. A plan does not fail to satisfy this paragraph (c)(3) merely because the plan is amended to change the benefit formula, hypothetical allocation formula, or the interest rate used to adjust hypothetical allocations for plan years after a fresh-start date, provided that the accrued benefits for plan years beginning after the fresh-start date are determined in accordance with § 1.401(a)(4)- 13(c), as modified by § 1.401(a)(4)-13(f).

(3) Current value of variable interest rate. The current value of the variable interest rate that applies for a period must be either the value of the variable interest rate determined as of a specified date in the period or the immediately preceding period, or the average of the values of the variable interest rate as of two or more specified dates during the current period or the immediately preceding period. The value as of a date of the rate on a Treasury Bill is the average auction rate for the week or month in which the date falls, as reported in the Federal Reserve Bulletin. The value as of a date of the yield on a Treasury Constant Maturity is the average yield for the week, month, or year in which the date falls, as reported in the Federal Reserve Bulletin. (The Federal Reserve Bulletin is published by the Board of Governors of the Federal Reserve System and is available from Publication Services, Mail Stop 138, Board of Governors of the Federal Reserve System, Washington DC 20551.) The plan may limit the current value of the variable interest rate to a maximum (not less than the highest standard interest rate), or a minimum (not more than the lowest standard interest rate), or both.

(v) Hypothetical account--(A) Current value of hypothetical account. As of any date, the current value of an employee's hypothetical account must equal the sum of all hypothetical allocations and the respective interest adjustments to each such hypothetical allocation provided through that date for the employee under the plan's benefit formula (without regard to any interest adjustments provided under the plan's benefit formula for periods after that date).

(B) Value of hypothetical account as of normal retirement age. Under paragraph (c)(3)(vi) of this section, the value of an employee's hypothetical account must be determined as of normal retirement age in order to determine the employee's accrued benefit as of any date at or before normal retirement age. As of any date at or before normal retirement age, the value of an employee's hypothetical account as of normal retirement age must equal the sum of each hypothetical allocation provided through that date for the employee under the plan's benefit formula, plus the interest adjustments provided through normal retirement age on each of those hypothetical allocations for the employee under the plan's benefit formula (without regard to any hypothetical allocations that might be provided after that date under the plan's benefit formula). If the interest rate specified in the plan is a variable interest rate, the plan must specify that the determination in the preceding sentence is made by assuming that the current value of the variable interest rate for all future periods is either the current value of the variable interest rate for the current period or the average of the current values of the variable interest rate for the current period and one or more periods immediately preceding the current period (not to exceed 5 years in the aggregate).

(vi) Determination of accrued benefit--(A) Definition of accrued benefit. The plan must provide that at any date at or before normal retirement age the accrued benefit (within the meaning of section 411(a)(7)(A)(i)) of each employee in the plan is an annuity commencing at normal retirement age that is the actuarial equivalent of the employee's hypothetical account as of normal retirement age (as determined under paragraph (c)(3)(v)(B) of this section). The separate benefit that each employee accrues for a plan year is an annuity that is the actuarial equivalent of the employee's hypothetical allocation for that plan year, including the automatic adjustments for interest through normal retirement age required under paragraph (c)(3)(iv) of this section.

(B) Normal form of benefit. The annuity specified in paragraph (c)(3)(vi)(A) of this section must provide an annual benefit payable in the same form at the same uniform normal retirement age for all employees in the plan. The annual benefit must be the normal retirement benefit under the plan (within the meaning of section 411(a)(9)) under the plan.

(C) Determination of actuarial equivalence. For purposes of this paragraph (c)(3)(vi) and paragraph (c)(3)(ix) of this section, actuarial equivalence must be determined using a standard mortality table and either a standard interest rate or the interest rate specified in the plan for making interest adjustments to hypothetical allocations. If the interest rate used is the interest rate specified in the plan, and that rate is a variable interest rate, the assumed value of the variable interest rate for all future periods must be the same value that would be assumed for purposes of paragraph (c)(3)(v)(B) of this section. The same actuarial assumptions must be used for all employees in the plan.

(D) Effect of section 415 and 416 requirements. A plan does not fail to satisfy this paragraph (c)(3)(vi) merely because the accrued benefits under the plan are limited by section 415, or merely because the accrued benefits under the plan are the greater of the accrued benefits otherwise determined under the plan and the minimum benefit described in section 416(c)(1) (regardless of whether the plan is top-heavy).

(vii) Optional forms of benefit--(A) In general. The plan must satisfy the uniform subsidies requirement of § 1.401(a)(4)-3(b)(2)(iv) with respect to all subsidized optional forms of benefit.

(B) Limitation on subsidies. Unless hypothetical allocations are determined under a uniform hypothetical allocation formula that satisfies paragraph (c)(3)(iii)(B) of this section, the actuarial present value of any QJSA provided under the plan must not be greater than the single sum distribution to the employee that would satisfy paragraph (c)(3)(vii)(C) of this section assuming that it was distributed to the employee on the date of commencement of the QJSA.

(C) Distributions subject to section 417(e). Except as otherwise required under section 415(b), if the plan provides for a distribution alternative that is subject to the interest rate restrictions under section 417(e), the actuarial present value of the benefit paid to an employee under the distribution alternative must equal the nonforfeitable percentage (determined under the plan's vesting schedule) of the greater of the following two amounts--

(1) The current value of the employee's hypothetical account as of the date the distribution commences, calculated in accordance with paragraph (c)(3)(v)(A) of this section.

(2) The actuarial present value (calculated in accordance with § 1.417(e)-1(d)) of the employee's accrued benefit.

(D) Determination of actuarial present value. For purposes of this paragraph (c)(3)(vii), actuarial present value must be determined using a reasonable interest rate and mortality table. A standard interest rate and a standard mortality table are considered reasonable for this purpose.

(viii) Past service credit. The benefit formula under the plan may not provide for hypothetical allocations in the current plan year that are attributable to years of service before the current plan year, unless each of the following requirements is satisfied--

(A) The years of past service credit are granted on a uniform basis to all current employees in the plan.

(B) Hypothetical allocations for the current plan year are determined under a uniform hypothetical allocation formula that satisfies paragraph (c)(3)(iii)(B) of this section.

(C) The hypothetical allocations attributable to the years of past service would have satisfied the uniform hypothetical allocation formula requirement of paragraph (c)(3)(iii)(B) of this section, and the interest adjustments to those hypothetical allocations would have satisfied paragraph (c)(3)(iv)(A) of this section, if the plan provision granting past service had been in effect for the entire period for which years of past service are granted to any employee. In order to satisfy this requirement, the hypothetical allocation attributable to a year of past service must be adjusted for interest in accordance with paragraph (c)(3)(iv) of this section for the period (including the retroactive period) beginning with the year of past service to which the hypothetical allocation is attributable and ending at normal retirement age. If the interest rate specified in the plan is a variable interest rate, the interest adjustments for the period prior to the current plan year

either must be based on the current value of the variable interest rate for the period in which the grant of past service first becomes effective or must be reconstructed based on the then current value of the variable interest rate that would have applied during each prior period.

(ix) Employees beyond normal retirement age. In the case of an employee who commences receipt of benefits after normal retirement age, the plan must provide that interest adjustments continue to be made to an employee's hypothetical account until the employee's benefit commencement date. In the case of an employee described in the previous sentence, the employee's accrued benefit is defined as an annuity that is the actuarial equivalent of the employee's hypothetical account determined in accordance with paragraph (c)(3)(v)(A) of this section as of the date of benefit commencement.

(x) Additional uniformity requirements. In addition to any uniformity requirements provided elsewhere in this paragraph (c)(3), the plan must satisfy the uniformity requirements in § 1.401(a)(4)-3(b)(2)(v) (uniform vesting and service requirements) and (vi) (no employee contributions). A plan does not fail to satisfy the uniformity requirements of this paragraph (c)(3)(x) or any other uniformity requirement provided in this paragraph (c)(3) merely because the plan contains one or more of the provisions described in § 1.401(a)(4)- 3(b)(8)(iv) (prior vesting schedules), (v) (certain conditions on accruals), or (xi) (multiple definitions of service).

(xi) Changes in benefit formula, allocation formula, or interest rates. A plan does not fail to satisfy this paragraph (c)(3) merely because the plan is amended to change the benefit formula, hypothetical allocation formula, or the interest rate used to adjust hypothetical allocations for plan years after a fresh-start date, provided that the accrued benefits for plan years beginning after the fresh-start date are determined in accordance with § 1.401(a)(4)- 13(c), as modified by § 1.401(a)(4)-13(f).

Treas. Reg. § 1.401(a)(4)-13(f), 26 C.F.R. § 1.401(a)(4)-13(f)

(f) Special fresh-start rules for cash balance plans--

(1) In general. In order to satisfy the optional testing method of § 1.401(a)(4)-8(c)(3) after a fresh-start date, a cash balance plan must apply the rules of paragraph (c) of this section as modified under this paragraph (f). Paragraph (f)(2) of this section provides an alternative formula that may be used in addition to the formulas in paragraphs (c)(2) through (c)(4) of this section. Paragraph (f)(3) of this section sets forth certain limitations on use of the formulas in paragraph (c) or (f)(2) of this section.

(2) Alternative formula--

(i) In general. An employee's accrued benefit under the plan is equal to the greater of--

(A) The employee's frozen accrued benefit, or

(B) The employee's accrued benefit determined under the plan's benefit formula applicable to benefit accruals in the current plan year as applied to years of service after the fresh-start date, modified in accordance with paragraph (f)(2)(ii) of this section.

(ii) Addition of opening hypothetical account. As of the first day after the fresh-start date, the plan must credit each employee's hypothetical account with an amount equal to the employee's opening hypothetical account (determined under paragraph (f)(2)(iii) of this section), adjusted for interest for the period that begins on the first day after the fresh-start date and that ends at normal retirement age. The interest adjustment in the preceding sentence must be made using the same interest rate applied to the hypothetical allocation for the first plan year beginning after the fresh-start date.

(iii) Determination of opening hypothetical account--(A) General rule. An employee's opening hypothetical account equals the actuarial present value of the employee's frozen accrued benefit as of the fresh-start date. For this purpose, if the plan provides for a single sum distribution as of the fresh-start date, the actuarial present value of the employee's frozen accrued benefit as of the fresh-start date equals the amount of a single sum distribution payable under the plan on that date, assuming that the employee terminated employment on the fresh-start date, the employee's accrued benefit was 100-percent vested, and the employee satisfied all eligibility requirements under the plan for the single sum distribution. If the plan does not offer a single sum distribution as of the fresh-start date, the actuarial present value of the employee's frozen accrued benefit as

A-43

**Treas. Reg. § 1.401(a)(4)-13(f), 26 C.F.R. § 1.401(a)(4)-13(f)**

(f) Special fresh-start rules for cash balance plans--

(1) In general. In order to satisfy the optional testing method of § 1.401(a)(4)-8(c)(3) after a fresh-start date, a cash balance plan must apply the rules of paragraph (c) of this section as modified under this paragraph (f). Paragraph (f)(2) of this section provides an alternative formula that may be used in addition to the formulas in paragraphs (c)(2) through (c)(4) of this section. Paragraph (f)(3) of this section sets forth certain limitations on use of the formulas in paragraph (c) or (f)(2) of this section.

(2) Alternative formula--

(i) In general. An employee's accrued benefit under the plan is equal to the greater of--

(A) The employee's frozen accrued benefit, or

(B) The employee's accrued benefit determined under the plan's benefit formula applicable to benefit accruals in the current plan year as applied to years of service after the fresh-start date, modified in accordance with paragraph (f)(2)(ii) of this section.

(ii) Addition of opening hypothetical account. As of the first day after the fresh-start date, the plan must credit each employee's hypothetical account with an amount equal to the employee's opening hypothetical account (determined under paragraph (f)(2)(iii) of this section), adjusted for interest for the period that begins on the first day after the fresh-start date and that ends at normal retirement age. The interest adjustment in the preceding sentence must be made using the same interest rate applied to the hypothetical allocation for the first plan year beginning after the fresh-start date.

(iii) Determination of opening hypothetical account--(A) General rule. An employee's opening hypothetical account equals the actuarial present value of the employee's frozen accrued benefit as of the fresh-start date. For this purpose, if the plan provides for a single sum distribution as of the fresh-start date, the actuarial present value of the employee's frozen accrued benefit as of the fresh-start date equals the amount of a single sum distribution payable under the plan on that date, assuming that the employee terminated employment on the fresh-start date, the employee's accrued benefit was 100-percent vested, and the employee satisfied all eligibility requirements under the plan for the single sum distribution. If the plan does not offer a single sum distribution as of the fresh-start date, the actuarial present value of the employee's frozen accrued benefit as

of the fresh-start date must be determined using a standard mortality table and the applicable section 417(e) rates, as defined in § 1.417(e)-1(d).

(B) Alternative opening hypothetical account. Alternatively, the employee's opening hypothetical account is the greater of the opening hypothetical account determined under paragraph (f)(2)(ii)(A) of this section and the employee's hypothetical account as of the fresh-start date determined in accordance with § 1.401(a)(4)-8(c)(3)(v)(A) calculated under the plan's benefit formula applicable to benefit accruals in the current plan year as applied to the employee's total years of service through the fresh-start date in a manner that satisfies the past service credit rules of § 1.401(a)(4)-8(c)(3)(viii).

(3) Limitations on formulas--(i) Past service restriction. If the plan does not satisfy the uniform hypothetical allocation formula requirement of § 1.401(a)(4)-8(c)(3)(iii)(B) as of the fresh-start date, under § 1.401(a)(4)- 8(c)(3)(viii) the plan may not provide for past service credits, and thus may not use the formula in paragraph (c)(3) of this section (formula with wear-away), the formula in paragraph (c)(4) of this section (formula with extended wear-away), or the alternative determination of the opening hypothetical account in paragraph (f)(2)(iii)(B) of this section.

(ii) Change in interest rate. If the interest rate used to adjust employees' hypothetical allocations under § 1.401(a)(4)-8(c)(3)(iv) for the plan year is different from the interest rate used for this purpose in the immediately preceding plan year, the plan must use the formula in paragraph (c)(2) of this section (formula without wear-away).

(iii) Meaningful benefit requirement. A plan is permitted to use the formula provided in paragraph (f)(2) of this section only if the plan satisfies paragraphs (d)(3) through (d)(5) of this section (regarding coverage as of fresh-start date, current benefit accruals, and minimum benefit adjustment, respectively).