No. 05-3588

# United States Court of Appeals
## For the Seventh Circuit
_____

**KATHI COOPER, BETH HARRINGTON
and MATTHEW HILLESHEIM,**
*Plaintiffs - Appellees,*

v.

**IBM PERSONAL PENSION PLAN and IBM CORPORATION,**
*Defendants - Appellants.*

_____

**On Appeal from the United States District Court
for the Southern District of Illinois
In No. 99-cv-00829-GPM, Chief Judge G. Patrick Murphy**

_____

**BRIEF
OF PLAINTIFFS-APPELLEES**

_____

**Douglas R. Sprong**
**Steven A. Katz**
**Korein Tillery, LLC**
**Gateway One on the Mall**
**701 Market Street, Suite 300**
**St. Louis, Missouri  63101**
**314-241-4844**

**William K. Carr**
**Law Offices of William K. Carr**
**2222 East Tennessee Avenue**
**Denver, Colorado  80209**
**303-296-6383**

**Lee A. Freeman, Jr.**
**James T. Malysiak**
**Freeman, Freeman & Salzman, P.C.**
**401 North Michigan Avenue**
**Suite 3200**
**Chicago, Illinois  60611**
**312-222-5100**

**Robert F. Hill**
**John H. Evans**
**Hill & Robbins, P.C.**
**100 Blake Street Building**
**1441 Eighteenth Street**
**Denver, Colorado  80202**
**303-296-8100**

*Counsel for Plaintiffs-Appellees*

_____

**Oral Argument Requested**

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ISSUES PRESENTED FOR REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

        Defined Contribution Plans, Defined Benefit Plans
        and Cash Balance Formulas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

        IBM's Cash Balance Conversion  . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        Always Cash Balance Enhancement  . . . . . . . . . . . . . . . . . . . . . . . .  12

    Proceedings Below  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

I.    "RATE OF BENEFIT ACCRUAL" IN ERISA SECTION
    204(b)(1)(H)(i) UNAMBIGUOUSLY REFERS TO "ACCRUED
    BENEFIT"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

    A.    "Rate of Benefit Accrual" Incorporates the Defined Term
        "Accrued Benefit" from Preceding Subparagraphs  . . . . . . . . . . .  19

    B.    IBM Improperly Tries to Substitute the Defined Contribution
        Test for the Defined Benefit Test  . . . . . . . . . . . . . . . . . . . . . . . . .  22

    C.    Other Provisions in Section 204 Strongly Support Construing
        "Rate of Benefit Accrual" to Refer to "Accrued Benefit"  . . . . . . . .  25

    D.    Under *Berger*, a Participant's Pension Entitlement Is to
        the ERISA-Mandated Accrued Benefit at Normal Retirement
        Age  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

    E.    An Irrelevant and Inconclusive Legislative History Cannot
        Change the Meaning of an Unambiguous Statute  . . . . . . . . . . . . .  29

i

**Page**

F.    No Conflict with Other ERISA Provisions Arises from
Applying Subparagraph (H)(i) to "Accrued Benefits" . . . . . . . . . . .  30

G.    Agency Statements Provide No Support for IBM's Distor-
tion of Subparagraph (H)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

H.    This Court's *Lunn* Decision Has No Relevance in this Case  . . . . .  35

II.    "ATTAINMENT OF ANY AGE" IN SECTION 204(b)(1)(H)(i)
MEANS "ANY AGE," NOT "BEYOND NORMAL RETIREMENT
AGE"    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

A.    "Attainment of Any Age" is Unambiguous  . . . . . . . . . . . . . . . . . .  37

B.    Provisions Closely Related to Subparagraph (H)(i) Confirm
Its Clear Meaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

C.    The House Conference Report Does Not Evidence Clear
Congressional Intent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

D.    The Treasury Department and EEOC Construe Sub-
paragraph (H)(i) as Covering Employees of Any Age  . . . . . . . . . .  43

III.    IBM INSERTS "PRESENT VALUE" INTO ERISA SECTION
204(b)(1)(H)(i) WITHOUT JUSTIFICATION  . . . . . . . . . . . . . . . . . . .  44

IV.    IBM WAIVED ALL REMEDIAL ARGUMENTS AND MUST
DIRECT ITS POLICY ARGUMENTS TO CONGRESS  . . . . . . . . . . . . .  46

V.    THE ACBE VIOLATED ERISA SECTION 204(b)(1)(H)(i) BY
ITS DISCRIMINATORY INCREASE IN YOUNGER EMPLOYEES'
ACCRUED BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

CONCLUSION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

CERTIFICATE OF COMPLIANCE

CIRCUIT RULE 31(e) CERTIFICATION

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**                                              **Page**

*Abrahamson v. Board of Educ. of Wappingers Falls Cent. Sch. Dist.*,
    374 F.3d 66 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*American Ass'n of Retired Persons v. EEOC*, 823 F.2d 600 (D.C. Cir.
    1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Arizona Governing Comm. v. Norris*, 463 U.S. 1073 (1983) . . . . . . . . . . . . . . . . 44

*Arnett v. California Public Employees Retirement System*, 179 F.3d
    690 (9th Cir. 1999), *vacated and remanded on other grounds*,
    *California Public Employees Retirement System v. Arnett,*
    528 U.S. 1111 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d
    755 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 16-18, 23, 27-28, 35

*Brogan v. United States*, 522 U.S. 398 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Bronk v. Mountain States Telephone & Telegraph, Inc.*, 140 F.3d
    1335 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Dow Corning Corp. v. United States*, 984 F.2d 416 (Fed. Cir. 1993) . . . . . . . . . . . 41

*Eaton v. Onan Corp.*, 117 F. Supp. 2d 812 (S.D. Ind. 2000) . . . . . . . . . . . . . . . . 43

*Engers v. AT&T Corp.*, No. 98-3660 (D.N.J. June 6, 2001) . . . . . . . . . . . . . . . . 43

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000) . . . . . . . . . 2, 3, 21, 27, 31, 49

*General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581
    (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gilliland v. E. J. Bartells Co., Inc.*, 270 F.3d 1259 (9th Cir. 2001) . . . . . . . . . . . 45

*Helvering v. Reynolds*, 313 U.S. 428 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) . . . . . . . . . . . 41

*Lockheed Corp. v. Spink*, 517 U.S. 882 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Page**

*Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978) . . . . . 24, 49

*Lunn v. Montgomery Ward & Co. Retirement Sec. Plan*, 1998 U.S. Dist. LEXIS 2370 (N.D. Ill. Feb. 25, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*Lunn v. Montgomery Ward & Co., Inc.*, 166 F.3d 880 (7th Cir. 1999) . . . . . . . 35-36

*Lyons v. Georgia-Pacific Corp. Salaried Employees' Retirement Plan*, 221 F.3d 1235 (11th Cir. 2000), *cert. denied sub nom., Georgia-Pacific Corp. Salaried Employees' Retirement Plan v. Lyons*, 532 U.S. 907 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246 (10th Cir. 2004) . . . . . . . 47

*NBD Bank, N.A. v. Bennett*, 67 F.3d 629 (7th Cir. 1995) . . . . . . . . . . . . . . . . . 22

*Register v. PNC Fin. Serv. Group, Inc.*, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Russello v. United States*, 464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sinclair (In re)*, 870 F.2d 1340 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Texports Stevedores Co. v. Director, Office of Workers' Compensation Programs, OWCP*, 931 F.2d 331 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 45

*Tootle v. ARINC, Inc.*, 222 F.R.D. 88 (D. Md. 2004) . . . . . . . . . . . . . . . . . . . . . 43

*Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519 (1947) . . . . . . . . . . . . . . . 41

*UAW v. Johnson Controls*, 886 F.2d 871 (7th Cir. 1989) (*en banc*), *rev'd*, 499 U.S. 187 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Nordbrock*, 38 F.3d 440 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . 22

*United States v. Oregon*, 366 U.S. 643 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Wells v. Gannett Ret. Plan*, 385 F. Supp. 2d 1101 (D. Colo. 2005) . . . . . . . . . . . 43

*Wise v. Ruffin*, 914 F.2d 570 (4th Cir. 1990), *cert. denied, sub nom. Almont Shipping Co. v. Ruffin*, 498 U.S. 1126 (1991) . . . . . . . . . . . . . 34, 51

# OTHER AUTHORITIES

**Statutes**                                                                    **Page**

Internal Revenue Code ("IRC")

25 U.S.C. § 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 34

26 U.S.C. § 411
      IRC Section 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
      IRC Section 411(b)(1)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 12, 43
      IRC Section 411(b)(1)(H)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
      IRC Section 411(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41,43
      IRC Section 411(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Age Discrimination in Employment Act of 1967 ("ADEA")

29 U.S.C. § 623
      ADEA Section 4(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
      ADEA Section 4(f)(2)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
      ADEA Section 4(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 40
      ADEA Section 4(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
      ADEA Section 4(i)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Employee Retirement Income Security Act ("ERISA")

29 U.S.C. § 1002
      ERISA Section 3(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
      ERISA Section 3(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

29 U.S.C. § 1052
      ERISA Section 202(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39-40

29 U.S.C. § 1054
      ERISA Section 204(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
      ERISA Section 204(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 26
      ERISA Section 204(b)(1) . . . . . . . . . . . . . . . . . . . . . . .  19, 20-22, 40, 45
      ERISA Section 204(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      ERISA Section 204(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      ERISA Section 204(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      ERISA Section 204(b)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      ERISA Section 204(b)(1)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      ERISA Section 204(b)(1)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
      ERISA Section 204(b)(1)(G) . . . . . . . . . . . . . . . . . . . . . .  15, 19, 21, 38
      ERISA Section 204(b)(1)(H)(i) . . . . . . . . . . . . .  1, 2, 5, 6-8, 12, 14-19, 21-53

Page

ERISA Section 204(b)(1)(H)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
ERISA Section 204(b)(1)(H)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 38, 40
ERISA Section 204(b)(1)(H)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27, 39
ERISA Section 204(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 23, 24
ERISA Section 204(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
ERISA Section 204(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
ERISA Section 204(c)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32
ERISA Section 204(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
ERISA Section 204(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
ERISA Section 204(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29 U.S.C. § 1055
ERISA Section 205(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 45

Consolidated Appropriations Act of 2004,
P.L. 108-199, Section 205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 34

Longshore and Harbor Workers' Compensation Act ("LHWCA"),
33 U.S.C. § 933(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Omnibus Budget Reconciliation Act of 1986,
P.L. 99-509, 100 Stat. 1874 ("OBRA 1986") . . . . . . 5-6, 18, 25, 29, 32, 38-40

Omnibus Budget Reconciliation Act of 1989,
P.L. 101-239, Section 7881(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## Legislative History

H.R. Rep. No. 99-1012 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3868 . . . . . 6, 28-29
a/k/a House Conference Report (accompanying OBRA 1986)

## Proposed Legislation

National Employee Savings & Trust Equity Act, S. 219, 109th Cong.,
1st Sess. (2005), 2005 CONG US S 219 (Westlaw) . . . . . . . . . . . . . . . . . . . . 8

Pension Protection Act, H.R. 2830, 109th Cong., 1st Sess. (2005),
2005 CONG US HR 2830 (Westlaw) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Regulations**                                                      **Page**

Code of Federal Regulations

26 C.F.R. § 1.401(a)(9)-6  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
26 C.F.R. § 1.401(a)(4)-8(c)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 33
26 C.F.R. § 1.401(a)(4)-13(f)(2)(iii)(B)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
26 C.F.R. § 54.4980F-1 (Apr. 9, 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
26 C.F.R. § 1.411(a)-7(c)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
26 C.F.R. § 1.411(b)-1(d)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
26 C.F.R. § 1.411(b)-2(b)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
26 C.F.R. § 1.411(b)-2(b)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Federal Register

52 F.R. 45360 (Nov. 27, 1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44
53 F.R. 11876 (Apr. 11, 1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43
56 F.R. 47524 (Sept. 19, 1991)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
60 F.R. 66532 (Dec. 22, 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
63 F.R. 68678 (Dec. 14, 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
67 F.R. 76123 (Dec. 11, 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  8-9, 34, 43
68 F.R. 17277 (Apr. 9, 2003)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26, 34

**Agency Materials**

IRS Memorandum dated June 6, 2002,
    http://www.irs.gov/pub/irs-tege/memo_060602.pdf  . . . . . . . . . . . . . . . . . . .  4

IRS Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996)  . . . . . . . . . . . . . . . . . . . . . . .  35

IRS Revenue Ruling 76-259  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

GAO, Report to Congressional Requesters, *Private Pensions–
    Information on Cash Balance Pension Plans* (Oct. 2005),
    http://www.gao.gov/new.items/d0642.pdf  . . . . . . . . . . . . . . . . . . . . . . . . .  47

Treasury Dept., Announcement 2004-57 (June 15, 2004),  . . . . . . . . . . . . . . . .  9, 34
    http://www.treas.gov/press/releases/reports/announcement200457.pdf.

Treasury Dept., Revenue Proposals for 2005 and 2006,  . . . . . . . . . . . . . . . . . . . .  47
    http://www.treas.gov/offices/tax-policy/library/bluebk04.pdf;
    http://www.treas.gov/offices/tax-policy/library/bluebk05.pdf

**Articles and Other Publications**                                      **Page**

D'Souza, Jacob & Lougee, *Why do Firms Convert to Cash Balance
    Pension Plans?  An Empirical Investigation* (Dec. 2004),
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=546843 . . . . . . . . . .  47

H. Forcier & D. Heffernan, *A Practitioner Discussion Memorandum*,
    Oct. 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

H. Forcier, *Guide to Cash Balance Plans* (2005 Cum. Supp.) . . . . . . . . . . . . . . . .  8

Sheppard, *The Down-Aging of Pension Plans, Tax Notes Today*
    (Jan. 11, 1999) (LEXIS, FEDTAX lib., TNT file, elec. cit.
    1999 TNT 6-6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Paul V. Strella, *Specialized Qualified Plans–Cash Balance, Target,
    Age-Weighted and Hybrids*, 352-2nd Tax Mgmt. (BNA) (1994) . . . . . . . . .  7

Paul V. Strella, *Specialized Qualified Plans–Cash Balance, Target,
    Age-Weighted and Hybrids*, 352-3rd Tax Mgmt. (LEXIS 2005) . . . . . . . .  24

*Tax Notes Today*, Sept. 20, 1999, in LEXIS, 1999 TNT 181-60 . . . . . . . . . . . . . . .  8

Zelinsky, *The Cash Balance Controversy*, 19 Va. Tax Rev. 683 (2000) . . . . . . . . .  8

## JURISDICTIONAL STATEMENT

The Jurisdictional Statement in the brief filed by defendants-appellants IBM Corporation and IBM Personal Pension Plan (referred to collectively as "IBM") is complete and correct.

## ISSUES PRESENTED FOR REVIEW

1.     Whether IBM's cash balance benefit formula violates ERISA Section 204(b)(1)(H)(i) because a participant's rate of benefit accrual is reduced on account of age.

2.     Whether IBM's "Always Cash Balance Enhancement" violated ERISA Section 204(b)(1)(H)(i) by providing younger employees a one-time increase in their accrued benefit but older employees received either no benefit accrual or a reduced benefit accrual due solely to their age.

## STATEMENT OF THE CASE

### Statement of Facts

**Defined Contribution Plans, Defined Benefit Plans
and Cash Balance Formulas**

ERISA requires a choice between two fundamentally different plan designs for employers who take advantage of the tax incentives provided for "qualified" pension plans. One option is to create *a defined contribution* plan, in which the employer allocates an amount to an account created for the employee. The employee's pension entitlement is the value of his account, comprised of the employer's annual contributions plus any earnings flowing from the employee's

investment of those deposits. *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 758 (7th Cir. 2003). Because an employer's obligation under such a plan extends only to the annual allocation to the employee's account, ERISA's age discrimination prohibition for defined contribution plans merely requires that an employer allocate an equal amount to each employee's account regardless of age. ERISA Section 204(b)(2)(A); 29 U.S.C. § 1054(b)(2)(A).

The second option is to create *a defined benefit* plan in which the employer provides an employee with a guaranteed benefit at "normal retirement age." This benefit is typically calculated as a percentage of the employee's compensation times his years of service. *Berger*, 338 F.3d at 757-758. The pension entitlement provided by the plan is the "accrued benefit" at normal retirement age (which the plan selects but cannot be later than age 65). *Id.* at 759. ERISA requires that the accrued benefit be provided in the form of an annuity at normal retirement age. ERISA Section 204(c)(3); 29 U.S.C. § 1054(c)(3). A plan may offer optional benefit forms, such as a lump sum, but they cannot be less than the actuarial equivalent of the annuity at normal retirement age. *Berger*, 338 F.3d at 759; *see also Esden v. Bank of Boston*, 229 F.3d 154, 162-164 (2d Cir. 2000). Consistent with the requirement that an employee's pension entitlement is the accrued benefit, the age discrimination rule applicable to defined benefit plans prohibits any cessation or reduction in the rate at which an employee accrues this benefit on account of age. ERISA Section 204(b)(1)(H)(i); 29 U.S.C. § 1054(b)(1)(H)(i).

Despite the strict dichotomy between defined benefit and defined contribution plans, some employers, beginning with Bank of America in 1985, have amended their defined benefit plans to adopt a "cash balance formula." The formula describes the employee's benefit in terms designed to resemble a defined contribution plan even though the plan legally remains a defined benefit plan. *Berger*, 338 F.3d at 757-758; IBM Br. 9. The typical cash balance formula purports to compute an employee's "accrued benefit" as a hypothetical account balance, to which putative "pay credits" and "interest credits" are added each year. In reality, "the employee has no actual account, the employer makes no contributions to an employee account, and so there is no account balance to which interest might be added." *Id.* at 758. Rather, the employee's pension entitlement under such a plan remains the accrued benefit earned each year, which equals the amount of both that year's pay credit and the value of the future "interest credits" on that amount through the date of the employee's normal retirement age, divided by an annuity factor specified in the plan. *Id.* at 758-759; *Esden*, 229 F.3d at 158-159.

In short, the cash balance formula differs from other defined benefit formulas only by injecting new terms and fictional steps into the calculation of the accrued benefit. Under most defined benefit plans, for each year of service the employee earns an accrued benefit based upon a stated percentage of his salary. Under a cash balance plan, the rate of benefit accrual used in computing the accrued benefit is not clearly apparent from the face of the plan, and must be calculated using the components of a more complicated formula. *Berger*, 338 F.3d at 757-758. As *Berger*

3

instructs, the accrued benefit earned each year must be calculated by first adding together the annual pay credit and the value of all future interest credits to normal retirement age. *Id.* at 760-761. This amount is then divided by an annuity factor to determine the annuity at normal retirement age, *i.e.*, the non-forfeitable "accrued benefit," to which the employee is entitled for that year's service. To express this accrued benefit earned for the year as a percentage of pay, *i.e.*, its rate of accrual, as typically provided in a defined benefit plan, it must be divided by the employee's salary for the year. *See* IRS Memorandum dated June 6, 2002, http://www.irs.gov/pub/irs-tege/memo_060602.pdf, explaining the methodology for calculating the cash balance benefit accrual rate. Supplemental Appendix ("SA") at 2-3. *See also* SA-182.

The following chart applies those steps to show the annual accrued benefit earned each year under a cash balance formula providing a 5% pay credit and a 5% interest credit for differently aged employees earning $50,000 per year, using a typical annuity conversion factor of 10.

| Age | Pay Credit Protected to 65 | Annual Accrued Benefit at 65 | Accrued Benefit as % of Pay |
|-----|-----|-----|-----|
| 25 | 17600 | 1760 | 3.52% |
| 35 | 10800 | 1,080 | 2.16% |
| 45 | 6633 | 663 | 1.33% |
| 50 | 5197 | 520 | 1.04% |
| 55 | 4072 | 407 | 0.81% |
| 60 | 3191 | 320 | 0.64% |
| 64 | 2625 | 262 | 0.53% |

4

The result of this formula is that as an employee advances a year in age the accrued benefit earned each year, *i.e.*, the rate of benefit accrual, decreases, both as a dollar amount and as a percentage of pay, because the value at normal retirement age of the putative "pay credit" decreases. For the same reason, the projected pay credit used to compute the accrued benefit, and the actual amount of the accrued benefit, for an older employee is always smaller than the projected pay credit, and resulting accrued benefit, for a younger employee with the same salary and service history. *See* IBM Appendix ("A") at 380-381.[1] This accrual pattern is identical to what would result from a conventional defined benefit plan that expressly provided that the accrued benefit equals a declining percentage of each year's pay for each year that an employee ages (*i.e.*, a 25-year-old employee accrues a benefit equal to 3.52% of pay, while a 45-year-old accrues a benefit equal to 1.33% of pay and a 64-year-old accrues a benefit equal to .53% of pay).

Congress prohibited just such age-based reductions in the accrual rates of defined benefit plans in the Omnibus Budget Reconciliation Act of 1986, P.L. 99-509, 100 Stat. 1874 ("OBRA 1986"). The test applicable to defined benefit plans is ERISA Section 204(b)(1)(H)(i); 29 U.S.C. § 1054(b)(1)(H)(i) (referred to hereafter as "Subparagraph (H)(i)"):

> Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

---

[1]The record citation is to a portion of the expert report of Claude Poulin, FSA, EA. Mr. Poulin's report gives more detailed analyses and charts on the issue.

Parallel provisions were adopted for the Internal Revenue Code ("IRC"), 26 U.S.C. § 411(b)(1)(H), and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(i). Not surprisingly, given the fact that the first cash balance plan was adopted the year before OBRA was enacted, neither the text of Subparagraph (H)(i) nor its legislative history refers to cash balance plans. *See* H.R. Rep. No. 99-1012 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3868; A-651-659.

The illegality of cash balance formulas like IBM's was immediately apparent to pension professionals. As early as October 1990, a consortium of pension professionals known as the cash balance practitioners group concluded that while "we believe arguments can be made supporting the conclusion that Code § 411(b)(1)(H) is not violated [by a typical cash balance formula], a number of practitioners quite strongly believe that this type of plan does not comply with a literal reading of the provision." H. Forcier & D. Heffernan, *A Practitioner Discussion Memorandum*, Oct. 1990, at 2; SA-12. Because the IRS might "not be willing to ignore a literal reading of Code § 411(b)(1)(H)," the group concluded that employers with cash balance plans had substantial exposure absent a "legislative fix." *Id*.

In 1996, this same group expressed its concern directly to the IRS:

> In developing regulations for cash balance plans, it is crucial that the Service and Treasury take into account that existing defined benefit qualification rules (including regulations) did not contemplate cash balance designs and that a rigid application of such rules could be harmful to, rather than protective of, cash balance plan participants. SA-151.

A prominent benefit consultant, Judith P. Mazo, made a similar point in a 1995 memorandum to the Treasury Department, suggesting that imposing defined benefit rules on cash balance plans "is a bit like dropping a herd of kangaroos into the Amazon rain forest." SA-53. Despite acknowledging that cash balance plans had "evolved outside the penumbra" of the statutory constraints Congress had imposed on defined benefit plans, Mazo stated that corporate sponsors of cash balance plans did not feel obligated to comply with "statutory constraints" they believed made no policy sense. In Mazo's opinion, cash balance plans had grown "too big to fail." SA-53.

Other leading pension experts echoed the practitioner group's views throughout the 1990's. For example, Paul Strella, an attorney with William M. Mercer, Inc. who assisted IBM with its 1999 Plan amendments,[2] noted in a 1994 analysis of cash balance formulas that:

> If employees accrue benefits that are based on a hypothetical contribution plus future interest credits, and if that contribution (expressed as a percentage of pay) is the same for an employee regardless of the employee's age, then the contribution results in a smaller benefit (expressed as a percentage of current pay, payable as an annuity commencing at normal retirement age) as the employee gets older.

Strella, *Specialized Qualified Plans–Cash Balance, Target, Age-Weighted and Hybrids*, 352-2nd Tax Mgmt. (BNA) (1994) at 1; SA-58.

In a 1993 speech to a session of the Enrolled Actuaries Meeting, Strella noted Subparagraph (H)(i)'s prohibition of reductions in the rate of benefit accrual and

---

[2]SA-169-177. Mr. Strella was also a member of the cash balance practitioners group. SA-9.

opined "[t]hat's exactly, arguably, what a cash balance plan does–if you take the
position that the future interest is the part of the current accrued benefit. A serious
issue." SA-72.[3]

No legislative or regulatory "fix" has been adopted.[4]  To the contrary,
beginning in 1999 the IRS has declined to approve any defined benefit plan
converting to a cash balance formula because of questions about its legality under
Subparagraph (H)(i). *See Tax Notes Today*, Sept. 20, 1999, in LEXIS, 1999 TNT
181-60; H. Forcier, *Guide to Cash Balance Plans* (2005 Cum. Supp.) at xxix; SA-167.
Cash balance sponsors have lobbied Congress to amend ERISA to exempt cash
balance plans from Subparagraph (H)(i), but no legislation has been enacted. To the
contrary, Congress enacted legislation in 2004 that barred the Treasury
Department from spending appropriations to finalize its proposed cash balance
rules that would have prospectively authorized certain cash balance designs. *See* 67
F.R. 76123 (Dec. 11, 2002) (proposed cash balance rules);[5] Section 205, Consolidated

---

[3]Academic commentators reached the same conclusion. *See* Zelinsky, *The
Cash Balance Controversy*, 19 Va. Tax Rev. 683, 733 (2000) ("[M]ost cash balance
plans, as they exist today, violate the literal terms of . . . Erisa Section
204(b)(1)(H). . ."); Sheppard, *The Down-Aging of Pension Plans, Tax Notes Today*
(Jan. 11, 1999) (LEXIS, FEDTAX lib., TNT file, elec. cit. 1999 TNT 6-6) at 6.

[4]Bills addressing cash balance issues have been introduced in Congress, but
none has been passed. *See, e.g.,* National Employee Savings & Trust Equity Act,
S. 219, 109th Cong., 1st Sess. (2005), 2005 CONG US S 219 (Westlaw); Pension
Protection Act, H.R. 2830, 109th Cong., 1st Sess. (2005), 2005 CONG US HR 2830
(Westlaw).

[5]The proposed regulations created special prospective rules for "qualified"
cash balance plans that met certain conditions. They confirmed Treasury's view
that the Subparagraph (H)(i) phrase "rate of an employee's benefit accrual"

Appropriations Act of 2004, P.L. 108-199. Following that legislation, Treasury

withdrew its proposed rules and has taken no formal action with respect to the

issue. Treasury Dept., Announcement 2004-57 (June 15, 2004),

http://www.treas.gov/press/releases/reports/announcement200457.pdf .

**IBM's Cash Balance Conversion**

IBM's Plan adopted a cash balance formula effective July 1, 1999. A-213.[6]

The formula purports to allocate "pay credits" of 5% of each year's salary to a

participant's hypothetical Personal Pension Account ("PPA") as well as annual

"interest credits" on its dollar amount at the rate of the one-year Treasury bill rate

plus 1% to the PPA. A-242-243. The Plan states that the resulting account balance

constitutes a participant's accrued benefit. A-240, § 11.1. Like the cash balance

formula of certain other plans, such as the Xerox plan in *Berger*, the Plan declares

that the accumulation of interest credits in the PPA ceases when a participant

begins receiving benefits. A-243, § 11.4. If a participant defers the receipt of benefits

---

applicable to defined benefit plans for "any plan year that ends before the
participant attains normal retirement age" means the year-to-year change in a
"participant's accrued normal retirement benefit," § 1.411(b)-2(b)(2), and that a
reduction in that rate of accrual because of the attainment of any age occurs
whenever "any participant's rate of benefit accrual would be higher if the
participant were younger." § 1.411(b)-2(b)(3).

[6]The record before the Trial Court and its findings show that IBM's adoption
of the cash balance formula was largely motivated by a desire to report so-called
"phantom" pension income to the investing public. A-21-22; Docket No. 124,
Exhibits 18, 19, 32, 35. This is possible because FASB 87 permitted IBM to include
in reported net income amounts by which the annual earnings on pension fund
assets exceeded the annual costs of providing benefits.

until normal retirement age, the participant is entitled to an annuity, which is the "default" benefit form, calculated by dividing the hypothetical PPA by an annuity factor provided in the Plan. A-245, § 12.2(b).

IBM's actuaries undertook an "Age Discrimination Analysis" of the cash balance formula prior to its adoption. SA-76. Part of the Analysis focused on the age-65 annuities that would be earned by employees with the same salary and years of service but with different ages. The results showed that the increase in the age-65 annuity earned each year under the cash balance formula, *i.e.*, the rate of benefit accrual, for the younger employee exceeded the rate for the older employee. In addition, the amount of the annuity earned each year by an employee decreased as the employee aged. SA-79-86.

The following chart illustrates these effects of IBM's cash balance formula. It shows the annual rate of benefit accrual for differently aged employees receiving a 5% pay credit and a 5.5% interest credit (the initial applicable rate under IBM's formula, A-391).[7]

---

[7]Derived from the formula $= 5\%/11.3002 \times (1 + 5.50\%)^{(65 - n)}$, where $n$ is the employee's age and 11.3002 is the age-65 annuity factor used by the IBM Plan to convert the employee's hypothetical account balance to an annuity.

| Age | Accrual Rate | Age | Accrual Rate | Age | Accrual Rate |
|-----|--------------|-----|--------------|-----|--------------|
| 21 | 4.667% | 36 | 2.090% | 51 | 0.936% |
| 22 | 4.423% | 37 | 1.981% | 52 | 0.887% |
| 23 | 4.193% | 38 | 1.878% | 53 | 0.841% |
| 24 | 3.974% | 39 | 1.780% | 54 | 0.797% |
| 25 | 3.767% | 40 | 1.687% | 55 | 0.756% |
| 26 | 3.571% | 41 | 1.599% | 56 | 0.716% |
| 27 | 3.384% | 42 | 1.516% | 57 | 0.679% |
| 28 | 3.208% | 43 | 1.437% | 58 | 0.644% |
| 29 | 3.041% | 44 | 1.362% | 59 | 0.610% |
| 30 | 2.882% | 45 | 1.291% | 60 | 0.578% |
| 31 | 2.732% | 46 | 1.224% | 61 | 0.548% |
| 32 | 2.589% | 47 | 1.160% | 62 | 0.520% |
| 33 | 2.454% | 48 | 1.099% | 63 | 0.492% |
| 34 | 2.327% | 49 | 1.042% | 64 | 0.467% |
| 35 | 2.205% | 50 | 0.988% | 65 | 0.442% |

As the chart shows, and the District Court found, participants in IBM's plan have a steeply declining rate of benefit accrual. The oldest participant's benefit accrual rate is less than 10% of a 21-year-old participant's benefit accrual rate. In short, the Plan's cash balance formula provides participants the same declining rate of benefit accrual based on age as would a traditional defined benefit plan that simply stated in its text the above accrual rates without any formula. IBM's own consultant, Paul Strella, pointed out in 1993 that if he structured a conventional defined benefit final pay plan to provide decreasing benefit accruals each year as an employee

approaches normal retirement age the way a cash balance formula does, "I think everyone would agree that violates 411(b)(1)(H) [the Internal Revenue Code version of Subparagraph (H)(i)]." SA-73.

**Always Cash Balance Enhancement**

As part of the 1999 conversion to the cash balance formula, IBM chose to provide a one-time additional accrued benefit to younger employees based solely on age. To implement the instant accrual of this benefit for younger workers, IBM used a "comparison formula" to determine the dollar amount of each employee's opening PPA. A-268-269, § 17.5(b); A-391. Each participant was deemed to have an opening balance equal to the greater of the amount calculated under (a) a basic, or "present value," formula, or (b) an "Always Cash Balance enhancement" formula ("ACBE"). The present value formula calculated the opening balance as the single sum of the participant's accrued benefit under IBM's existing Plan, based on a mortality table and a discount rate of 6%. A-268-269, § 17(b)(2)(A). The ACBE calculated 5% of the participant's average compensation over the five years prior to June 30, 1999, and multiplied that amount by the participant's number of service years completed as of June 30, 1999.[8] A-268, § 17.5(b)(1); SA-87-90.

The results produced by the ACBE depended entirely on an employee's age at June 30, 1999. For employees under a certain age, the ACBE provided a larger

---

[8]Although IBM suggests otherwise (IBM Br. 13), the conversion formula was not designed to, and did not, meet the "safe harbor" requirements for cash balance conversions established in the IRS non-discrimination regulations. *See* 26 C.F.R. § 1.401(a)(4)-8(c)(3).

amount–up to twice as much–than the present value of their existing benefit. For most older employees, the present value of their existing benefit exceeded the ACBE amount, so the conversion formula provided them no additional benefit solely because of their age. Thus, younger employees received an instantaneous increase in their pension benefit while older workers received no increase at all. SA-87.

The following chart demonstrates the discriminatory treatment of an older employee compared to a younger employee with the same salary and service history (based on Table G from Poulin Supplemental Report A-434, 438-439):

| Line # | | | |
|---|---|---|---|
| 1 | Age at 6/30/99 | 38 | 46 |
| 2 | Service at 6/30/99 | 9 | 9 |
| 9 | Age 65 Annuity at 6/30/99 | 7,140 | 7,041 |
| 14 | Present Value Formula at 7/1/99 | 15,762 | 24,775 |
| 15 | ACBE at 7/1/99 | 19,757 | 19,757 |
| | ACBE Increase in Opening Balance [15 - 14] | 3,995 | 0 |
| 26 | CB Age 65 Annuity at 7/1/99 | 7,572 | 6,187 |
| | ACBE Increase in Age 65 Annuity [26 - 9] | 432 | 0 |

IBM management understood that these differences in additional benefits totally depended upon employees' ages on June 30, 1999. In a May 4, 1999 e-mail to senior IBM managers, the Plan's enrolled actuary explained that:

> Due to the nature of the IBM Retirement Plan vs. the Personal Pension Account, younger employees will benefit the most from this Always Cash Balance enhancement. On average, very young employees (in their 20's), could see their benefit double due to the enhancement, while a person who is in their early 40's might only see a 10% increase due to the Always Cash

13

Balance enhancement. Older employees (over 45) will generally not be covered by the Always Cash Balance enhancement. SA-87.

He concluded that "[a]s you can see, the excess percentage of the ACB over the basic opening account balance is directly related to age." SA-88.

This "one-day" benefit enhancement for younger employees affected both the amount of the immediate benefit to which employees were entitled as a lump-sum distribution and, to an even greater extent, the age-65 accrued benefit derived from that opening account balance projected forward to normal retirement age at the Plan's interest crediting rate. Thus, participants "covered by" the ACBE who terminated employment on July 1, 1999, would have received accrued benefits significantly higher (as much as double) than they were entitled to on June 30, 1999.

## Proceedings Below

The District Court concluded that under IBM's cash balance formula, the rate of an employee's benefit accrual was reduced every year because of the increase in his age, in violation of Subparagraph (H)(i). A-13-17. The District Court also ruled that the ACBE violated that statute because it provided an immediate accrual of additional benefits for younger employees but no increase for older workers solely due to the employee's age. A-4, ¶ 7. IBM has appealed both rulings.

IBM mis-characterizes the District Court's summary judgment decision by using incomplete quotations to portray its reasoning as "economically nonsensical" and as leading to"startling anomalies and absurdities." (IBM Br. 16-17) The actual crux of the District Court's decision was its conclusion that:

14

. . . IBM's argument goes to the wisdom of the statutory requirements that Congress adopted regarding defined benefit plans. . . . IBM, like many other corporate plan sponsors, proceeded with open eyes and was fully informed of the consequences of the litigation that was sure to come. This Court will not perform legal legerdemain by dodging the detail requirements of ERISA in order to save IBM's 1999 Plan. A-25.

The District Court considered IBM's contention that it is "economically nonsensical" to compare the age-65 benefits of a 25-year-old and a 64-year-old employee when interpreting the phrase "rate of benefit accrual" in Section 204(b)(1)(H)(i). The District Court acknowledged that "[f]rom an economist's perspective, Defendants have a good argument"–but not under the law. Given ERISA's definition of "accrued benefit" as the age-65 benefit and the use of "accrued benefit" in the preceding, parallel Subparagraph (b)(1)(G), the District Court held that "rate of benefit accrual" in Subparagraph (H)(i) must also refer to "accrued benefit" and was phrased as "benefit accrual" rather than "accrued benefit" to fit the syntax of the Subparagraph. A-14-15.

The District Court's reference to "startling anomalies and absurdities" referred to IBM's effort to force the cash balance formula into the legal requirements of a defined benefit plan:

> [T]hese anomalies and absurdities occur only because the CBF [cash balance formula] doesn't work within the longstanding statutory framework regarding defined benefit plans. The 1999 Plan looks like a defined contribution plan trying to pass for a defined benefit plan. It doesn't make the cut. A-22.

IBM's description of the parties' settlement (IBM Br. 17-18) is incomplete. It fails to state that IBM waived for purposes of this appeal all issues pertaining to

remedies, including its contentions regarding the alleged impact an affirmance in this case would have on certain other pension plans. A-616, § 2.07.

## SUMMARY OF ARGUMENT

IBM's cash balance formula uses terminology intended to resemble a defined contribution plan. Under the formula, an employee is deemed to earn an annual "pay credit" equal to 5% of his pay, which is tracked in a hypothetical "account." The pay credit putatively earns annual "interest" at a variable rate tied to a market index. The accumulation of these "interest credits" purportedly ceases when an employee receives a distribution of benefits. A-243, §§ 11.4 and 11.5. According to the Plan, at any point in time the hypothetical account balance calculated for each employee, without any projection to normal retirement age, constitutes the employee's accrued benefit. A-240, § 11.1. Because the Plan formula supposedly contributes the same percentage of pay and interest to each participant's hypothetical account for any one year, IBM contends that each participant has the same rate of benefit accrual, and consequently there is no age discrimination. (IBM Br. 25)

This Court, consistent with the positions taken by the IRS and decisions of other Courts of Appeals on the subject, concluded in *Berger* that this purported structure of a cash balance formula is both fictional and unlawful. The Court determined that in a cash balance plan "the employee has no actual account, the employer makes no contributions to an employee account, and so there is no account balance to which interest might be added." 338 F.3d at 758. Instead, the employee's

16

"pension entitlement" is the "accrued benefit" in the form of an annuity at normal retirement age that includes all of the guaranteed "interest credits" on each year's pay credit allocated to his "account balance" from the current date to normal retirement age. *Id*. at 761. The employee's right to the full value of the future "interest" accrues immediately and is not forfeited if he terminates employment or takes a distribution of benefits before normal retirement age. *Id*.

In *Berger*, this Court held that the Xerox plan violated ERISA because Xerox ignored the participant's future interest credits in calculating the normal retirement benefit prior to making a distribution. The Court rejected Xerox's argument that "the only benefit that [a participant] accrues is the benefit on the date of distribution, which is to say the hypothetical cash balance on that date." *Id*. at 761.

In this case, IBM claims that it complies with Subparagraph (H)(i) by relying on effectively the same argument that this Court rejected in *Berger*, *i.e.*, that the interest accrues a year at a time on the hypothetical account balance and that the entitlement to interest terminates upon benefit distribution.[9] It is only by focusing entirely on this fictional account balance, and ignoring the actual increment to the accrued benefit at normal retirement age earned each year by participants, that IBM can contend that no participant suffers a reduction in the rate of benefit accrual and that all employees are treated the same regardless of age. Once the

---

[9]IBM repeatedly ignores *Berger* and recites that under its Plan interest credits do not accrue until each year passes without the employee receiving a distribution. *See* IBM Br. 12, 12-13, 13, 17, 25, 36, 45, 46, 47.

focus correctly returns to the accrued benefit–the annuity at normal retirement age–it is indisputable that participants' rate of benefit accrual decreases with age.

IBM ignores *Berger's* holding and attempts to escape liability by misconstruing key ERISA provisions and relying on a legislative history that does not even mention the cash balance formula. IBM's main argument is that, for the hypothetical contributions and accounts in its cash balance formula, the proscriptions in Subparagraph (H)(i) should be interpreted to employ the test for defined contribution plans also adopted in OBRA 1986. Under ERISA Section 204(b)(2)(A), a defined contribution plan satisfies the benefit accrual requirements as long as "allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." However both logic and the fundamental rules of statutory construction preclude inserting a materially different test into the detailed rules for defined benefit plans created by a statute as technical and highly reticulated as ERISA.

In addition to ruling that IBM's ongoing cash balance formula violates Subparagraph (H)(i), the District Court concluded that the ACBE violated the statute. That violation arose because the ACBE provided an instant accrual of benefits, on both an immediate and a normal retirement basis, for younger employees and either no accrual or a reduced benefit accrual for older employees. Although IBM knew that the differences in the rate of this one-time increase in

accrued benefits was directly related to the participant's age, it simply ignores the facts and has no defense to such a clear violation of the law.

## ARGUMENT

**I.    "RATE OF BENEFIT ACCRUAL" IN ERISA SECTION 204(b)(1)(H)(i) UNAMBIGUOUSLY REFERS TO "ACCRUED BENEFIT."**

### A.    "Rate of Benefit Accrual" Incorporates the Defined Term "Accrued Benefit" from Preceding Subparagraphs.

IBM bases its ambiguity argument on a contorted analysis of Section 204 that relies primarily on the fact that the term "accrued benefit" is used in Subparagraph 204(b)(1)(G) but not in adjacent Subparagraph (H)(i). A full analysis of Section 204(b)(1), however, shows that "accrued benefit" and "rate of benefit accrual" are used multiple times and on each occasion, unless expressly stated otherwise, the "rate of accrual" refers to the "accrued benefit." Furthermore, Subparagraph (H)(i) begins with a transitional phrase that refers to the preceding subparagraphs and necessarily incorporates the term "accrued benefit" used in them.

Section 204 is entitled "Benefit Accrual Requirements." Section 204(a) sets out an overall requirement: "(a) Each pension plan shall satisfy the requirements of subsection (b)(3), and . . . in the case of a defined benefit plan, shall satisfy the requirements of subsection (b)(1)." Subsection (b) is, consequently, entitled "Enumeration of plan requirements." Subsection (b)(1) starts out with specific affirmative "instructions" about how a plan meets the (b) requirements (emphasis added):

(b)(1)(A):  A defined benefit plan satisfies the requirements of this paragraph if the *accrued benefit* to which each participant is entitled upon his separation is not less than [specified amounts]. . . .

(b)(1)(B):  A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the *accrued benefit* payable at normal retirement age is equal to the normal retirement benefit and the *annual rate* at which any individual . . . can accrue the retirement benefits payable at normal retirement age. . . .

(b)(1)(C):  A defined benefit plan satisfies the requirements of this paragraph if the *accrued benefit* to which any participant is entitled upon his separation from the service is not less than a fraction of *the annual benefit commencing at normal retirement age* to which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan. . . .

Thus, there are three ways for a plan to satisfy the accrual requirements, all of which are based on the age-65 accrued benefit, and one of which specifically involves the "annual rate" at which participants "accrue the retirement benefits."

Section 204(b)(1) then provides a number of qualifications concerning these requirements. The first three are essentially exemptions from the (A), (B), and (C) requirements:

(b)(1)(D):  Subparagraphs (A),(B), and (C) shall not apply [to years of participation before they went into effect, if certain requirements are met with respect to the "*accrued benefits*" for those years].

(b)(1)(E):  Notwithstanding subparagraphs (A), (B), and (C) of this paragraph, a plan shall not be treated as not satisfying the requirements of this paragraph solely because the *accrual of benefits* under the plan does not become effective until the employee has two continuous years of service.

(b)(1)(F):  Notwithstanding subparagraphs (A), (B), and (C), a defined benefit plan satisfies the requirements of this paragraph . . . [if it meets certain requirements with respect an employee's "*accrued benefit*"].

The availability of each of these three exceptions therefore depends upon some aspect of the "accrued benefit."

Then Section 204(b)(1) sets out two negative provisions regarding satisfaction of the basic accrued benefit requirements:

> (b)(1)(G): Notwithstanding the preceding paragraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's *accrued benefit* is reduced on account of any increase in his age or service.

> (b)(1)(H)(i): Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's *benefit accrual* is ceased, or the *rate of an employee's benefit accrual* is reduced, because of the attainment of any age.

In summary, Section 204(b)(1) sets out three requirements for a defined benefit plan with respect to the "accrued benefit," then provides three exceptions to those requirements that also depend upon the "accrued benefit," and then declares those accrued benefit requirements are violated if a plan reduces the "accrued benefit," ceases benefit accrual, or reduces the rate of benefit accrual on account of age. Congress clearly was referring to the "accrued benefit" in these interrelated provisions. Indeed, without a benchmark, these requirements become incoherent. *See, e.g., Esden*, 229 F.3d at 167 n.18.

The introductory phrase in Subparagraph (H)(i) (which is the same phrase used in immediately preceding Subparagraph (G))–"Notwithstanding the preceding subparagraphs"–means that even if all the preceding requirements with respect to the "accrued benefit" and its accrual rate are satisfied, a defined benefit plan will still be illegal if the rate by which that benefit accrues is reduced because of age.

Indeed, Subparagraph (H)(i) specifically refers back to all other requirements of Section 204(b) by providing that if an employee's rate of benefit accrual is reduced because of age, the plan "shall be treated as not satisfying the requirements of this paragraph. . . ," all of which are requirements applicable to accrued benefits.

Under IBM's reading of these provisions, a plan satisfying all of Section 204(b)(1)'s other rigorous requirements relating to the "accrued benefit" can, in applying Subparagraph (H)(i), completely ignore the accrual rate of that benefit and instead measure the accrual rate by looking at a hypothetical "account" that has absolutely no relevance to any of the other requirements of Section 204(b)(1). That reading violates common sense as well as standard rules of statutory construction. "Interpretation is a contextual enterprise. Statutory words take color from their many contexts–often neighboring sentences and sections, and frequently the economic transactions the words are designed to affect." *NBD Bank, N.A. v. Bennett*, 67 F.3d 629, 631 (7th Cir. 1995). *See also United States v. Nordbrock*, 38 F.3d 440, 444 (9th Cir. 1994) (adhering to "the maxim of statutory construction that similar terms appearing in different sections of a statute should receive the same interpretation").

### B.    IBM Improperly Tries to Substitute the Defined Contribution Test for the Defined Benefit Test.

Despite this textual analysis establishing that "rate of benefit accrual" in Subparagraph (H)(i) is measured by reference to an employee's actual pension entitlement, IBM contends the phrase refers to the fictional "contributions" and "interest credits" it supposedly allocates to the hypothetical account balance. IBM

Br. 25. In essence, IBM contends that ERISA's Subparagraph (H)(i) test for defined benefit plans, which is expressly based upon the rate of benefit accrual, should be supplanted for a cash balance plan by the quite different test for defined contribution plans Congress created in Subparagraph 204(b)(2)(A).

This contention–that when applied to cash balance plans Subparagraph (H)(i) should be read to mean the same thing as Subparagraph (b)(2)(A)–violates the very principle of statutory construction that IBM purports to espouse: "[where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 24 (1983) (citation omitted). *See* IBM Br. 30.

IBM's argument also fails for a different but no less fundamental reason. Under *Berger*, a participant's hypothetical "account balance" cannot be equated to a "benefit" under ERISA. Instead, a defined benefit plan participant has a non-forfeitable right to an accrued benefit in the amount of all pay credits received and all interest credits on those pay credits through normal retirement age. The IBM Plan provision (A-243, § 11.4) purporting to cut off interest credits once a participant receives payment of his or her benefits is identical to the limitation *Berger* held to violate ERISA.

IBM's argument that the defined contribution test should apply to cash balance plans is tantamount to the "equal cost" defense to age discrimination under ADEA Section 4(f)(2)(B)(i); 29 U.S.C. § 623(f)((2)(B)(i). However, Congress provided

23

in ADEA Section 4(f)(2); 29 U.S.C. § 623(f)(2), that the equal cost defense does not

apply to Section 4(i)(1); 29 U.S.C. § 623(i)(1), the ADEA counterpart to

Subparagraph (H)(i). Given that Congress has ruled that the ADEA equal cost

defense does not apply to a rate of benefit accrual violation, the equivalent defined

contribution plan test also cannot apply.[10] *See UAW v. Johnson Controls*, 886 F.2d

871, 910 (7th Cir. 1989) (*en banc*) (Easterbrook, dissenting), *rev'd*, 499 U.S. 187

(1991) ("that equal treatment of employees as persons will lead to higher costs of

employing persons of a given sex is no defense. An obligation to pay men and

women equal amounts per month after retirement . . . means that the employer

must contribute greater sums per month during women's working years . . . this is

part of the idea of an anti-discrimination law. Women may have higher pension

costs or higher medical insurance costs (because of pregnancy). . . . Title VII

excludes these as reasons for preferring men"), and *Johnson Controls*, *supra*, 886

F.2d at 908 (Posner, dissenting) (if it was "enough that an employer has some

reason for adopting a policy that discriminates against women . . . *Manhart* . . .

which struck down gendered annuity tables, would have come out the other way").

    Finally, Congress adopted Subparagraph (b)(2)(A)'s test for defined

contribution plans at the same time as the Subparagraph (H)(i) benefit accrual

reduction prohibition for defined benefit plans. The defined contribution rule

---

[10]Paul Strella confirms in his current Portfolio on these issues that "the equal cost/equal benefit analysis generally does not apply to retirement plans." Paul V. Strella, *Specialized Qualified Plans–Cash Balance, Target, Age-Weighted and Hybrids*, 352-3rd Tax Mgmt. (LEXIS 2005) at 9.

depends upon the rate at which an employer makes actual allocations to an employee's account. Had Congress intended that compliance with the defined benefit plan prohibition against age-based reductions in benefit accruals be measured by fictional allocations to a hypothetical account, rather than to the age-65 annuity, it would have expressly said so in Subparagraph (H)(i).

### C.    Other Provisions in Section 204 Strongly Support Construing "Rate of Benefit Accrual" to Refer to "Accrued Benefit."

Other provisions in Section 204 provide further reasons why "rate of benefit accrual" in Subparagraph (H)(i) refers to "accrued benefit." Section 204(h), for example, requires a plan to provide notice to participants if a plan amendment will significantly reduce the "rate of future benefit accrual." This provision, which uses language nearly identical to that in Subparagraph (H)(i), was adopted by the same Congress a mere six months prior to the passage of OBRA 1986. In issuing regulations under this provision, the Treasury Department explained that "[t]he statutory phrase 'rate of future benefit accrual' implies, on its face, that Section 204(h) is limited to changes in the accrued benefit." 63 F.R. 68678, 68680 (Dec. 14, 1998). In April 2003, Treasury issued regulations to implement amendments to Section 204(h) which again provided that "rate of future benefit accrual" refers to the benefit in the form of a single life annuity commencing at normal retirement age. 68 F.R. 17277, 17282-83; 26 C.F.R. § 54.4980F-1, Q&A-6(b) and Q&A-8(b) (Apr. 9, 2003).[11] The regulations include an example for a conversion of a traditional

---

[11]The preamble to this regulation states that its rules "do not indicate any possible outcome" with respect to Subparagraph (H)(i) because the Treasury Department and the IRS were still considering cash balance regulations that would

defined benefit plan to one using a cash balance formula. The notice of a reduction in the accrued benefit resulting from the conversion must be provided in terms of the change in the annuity accruing at normal retirement age. *Id.*, Q&A-11, Ex. 4. Thus, for the crucial purpose of warning participants that their rate of future benefit accrual is being reduced, the notice must explain the impact on the benefit to be received at normal retirement age.

In addition, Section 204(b)(1)(H)(v) states that "the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals." According to IBM, if "rate of benefit accrual" refers to "accrued benefit," there would be no need to exclude any early retirement benefit. IBM Br. 33-34. To the contrary, Subparagraph (H)(v) confirms that (H)(i)'s test for age discrimination is focused on the accrued benefit in the form of an annuity commencing at normal retirement age. It eliminates a potential confusion between "normal retirement benefit" and "accrued benefit."

ERISA defines "normal retirement benefit" as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." ERISA Section 3(22); 29 U.S.C. § 1002(22). Thus, an employee's "normal retirement benefit" potentially includes the subsidized portion of an early retirement benefit. The accrual standards of Section 204(b) appearing in

_____

govern that provision. 68 F.R. at 17278. Nevertheless, there is no logical or policy reason why the test for a reduction in the rate of benefit accrual and the test for whether notice of such a reduction by plan amendment is required would differ in the form of benefit used as the benchmark.

the statute prior to Subparagraph (H)(i) refer to "normal retirement benefit" in defining some of the required accrual rates for accrued benefits. Thus, without Subparagraph (H)(v)'s clarification, "rate of benefit accrual" in Subparagraph (H)(i) could have been read to refer to subsidized early retirement benefits as well as benefits commencing at early retirement age. In that case, the loss or erosion of the subsidized portion of early retirement benefits by an employee continuing to work beyond early retirement age could have been held to violate Subparagraph (H)(i) as a reduction in the rate of benefit accrual compared to the accrual rate of those employees who took the subsidy at the earliest possible age.[12] Subparagraph (H)(v) thus limits (H)(i)'s "rate of benefit accrual" to benefits commencing at normal retirement age and protects plans that provide subsidized early retirements from violating Subparagraph (H)(i) on that basis.

### D.   Under *Berger*, a Participant's Pension Entitlement Is to the ERISA-Mandated Accrued Benefit at Normal Retirement Age.

Given this Court's decision in *Berger*, which IBM basically ignores,[13] it is clear that under ERISA a participant's accrued benefit at normal retirement age must be the measure for age-based reductions in the rate of benefit accrual for a defined benefit plan with a cash balance formula. *See also Esden*, 229 F.3d at 164, 167 n. 18. *Berger* reaffirmed that a plan with a cash balance formula cannot be

---

[12]*See* 26 C.F.R. § 1.411(a)-7(c)(6), Example (4), which depicts a plan in which the early retirement benefit exceeds the benefit available at normal retirement age (assumed to be age 65).

[13]IBM's brief cites *Berger* only once, on page 46, and does not discuss its holding.

treated as though it is a defined contribution plan. As is the case with every defined benefit plan, a participant's pension entitlement is the accrued benefit at normal retirement age, the only form of benefit which every defined benefit plan must provide. The annual accrual of the accrued benefit includes the value of the "interest credits" on each year's putative pay credits projected to normal retirement age. Accordingly, *Berger* ruled that the Xerox cash balance formula could not eliminate an employee's right to those future interest credits in determining the accrued benefit if he takes a distribution of his benefit before normal retirement age. *Berger* flatly rejected the contention that the amount of an employee's pension entitlement, his accrued benefit, could be dependent upon when or how his benefit is distributed:

> The employee who defers receiving benefits until he reaches his normal retirement age "receives a distribution" then, and thus his accrued benefits include future interest credits to that date. Any distribution that he receives earlier is the commutation of those accrued benefits to their present-value lump-sum equivalent. 338 F.3d at 761.

This conclusion defeats IBM's repeated assertion that interest credits accrue on a year-by-year basis until distribution.

In this case, each participant's pension entitlement is his accrued benefit at normal retirement age, including the value of future interest credits through that age. The rate at which employees accrue this entitlement is the only conceivable measure of whether the Plan reduced the rate of benefit accrual on the basis of age. It would be perverse logic, as well as inconsistent with *Berger's* holding, to determine whether a participant's benefit accrual rate has been illegally reduced by

28

reference to a supposed "benefit," such as the hypothetical account balance, that the Plan cannot provide to a participant (if at all) without first determining the participant's accrued benefit at normal retirement age, including interest credits to that age.

### E.    An Irrelevant and Inconclusive Legislative History Cannot Change the Meaning of an Unambiguous Statute.

IBM tries to escape the meaning of Subparagraph (H)(i)'s "rate of benefit accrual" by relying on the House Conference Report accompanying OBRA 1986. H.R. Conf. Rep. 99-1012 (Oct. 17, 1986) (A-651-659). However, the Report focused on other issues, principally an employee's right to continued benefit accrual after reaching normal retirement age. *See American Ass'n of Retired Persons v. EEOC*, 823 F.2d 600 (D.C. Cir. 1987). Because there is no ambiguity in the statute, the Report cannot change its clear meaning:

> Which prevails in the event of conflict, the statute or its legislative history? The statute was enacted, the report just the staff's explanation. Congress votes on the text of the bill, and the President signed that text. Committee reports help courts understand the law, but this report contradicts rather than explains the text. So the statute must prevail. *In re Sinclair*, 870 F.2d 1340, 1341 (7th Cir. 1989).

Here, nothing in the Report contradicts the clear meaning of Subparagraph (H)(i) as referring to the rate by which the "accrued benefit" accrues. Because cash balance plans did not become prominent until after OBRA's 1986 enactment, the Report says nothing at all about them. Ironically, the only commentary in the Report dealing with the rate of benefit accrual for participants who have not yet reached normal retirement age explains that younger participants will have no

claim if they have a reduced rate of benefit accrual compared to older employees under a defined benefit plan with a "fractional" accrual formula. A-656. The Report was thus concerned that Subparagraph (H)(i) not render illegal provisions of traditional defined benefit plans through reverse discrimination. The commentary throws no light on the legality of cash balance plans that were not discussed and were virtually unknown in 1986.

Statements in the Report relating to benefit accrual rights of employees older than normal retirement age do not support IBM's construction of Subparagraph (H)(i) for employees who have not reached normal retirement age. The Report includes an example referring to a post-65 employee who receives a $10 increase in his normal retirement benefit for each additional year of service. A-657. The Report does not say that the rate of benefit accrual violates (H)(i) even though it declines with age, but that is because the benefit accrual rights of employees beyond normal retirement age are addressed separately in Section 204(b)(1)(H)(iii); *see* A-30.

## F.    No Conflict with Other ERISA Provisions Arises from Applying Subparagraph (H)(i) to "Accrued Benefits."

IBM defends its proposed use of the age discrimination test for defined contribution plans by contending that otherwise contributory defined benefit plans, authorized by ERISA Section 204(c)(2)(B), would violate Subparagraph (H)(i). Subparagraph 204(c)(2)(B) provides that:

> the accrued benefit derived from contributions made by an employee as of any applicable date is the amount equal to the employee's accumulated contributions expressed as an annual benefit commencing at normal retirement age, using an interest rate which would be used under the plan under section 205(g)(3).

IBM argues that this provision authorizes interest crediting through normal retirement age, just as its cash balance formula does.

However, IBM ignores the basic difference between a cash balance plan and a contributory defined benefit plan. A defined benefit plan in which the employee makes mandatory contributions resembles a defined contribution plan in that the employee contributes and owns those funds. However, the employee earns no return on his or her investment except as it is provided through the accrued benefit at normal retirement age. Section 204(c)(2)(A) ensures that the employer will not manipulate the employee's contributions to his or her detriment by eliminating the employer's discretion as to the rate of interest ascribed to the employee's contributions. *Esden*, 229 F.3d at 171 (Subparagraph 204(c)(2) focuses on "proper valuation . . .of employees' *actual* past contributions, not the present valuation of accrued benefits promised by the employer") (emphasis in original). That is significant because Section 204(c)(1) defines the amount of the employee's accrued benefit in such a plan that is derived from the employer's contributions as "the excess (if any) of the accrued benefit for such employee . . . over the accrued benefit derived from contributions made by such employee. . . ."

31

In addition, the current form of Subparagraph 204(c)(2)(A) was not enacted until 1989.[14] Therefore, Congress plainly did not intend to affect the meaning of Subparagraph (H)(i) through a provision that was not contemporaneous with it.

Finally, the requirement, cited by IBM, in Treasury regulation 26 C.F.R. § 1.401(a)(9)-6, Q&A-9, that an employee working beyond normal retirement age receive interest as an actuarial adjustment on deferred benefits is irrelevant to the rate of benefit accrual for employees who have not yet reached normal retirement age. As discussed above, Congress created a special provision in Subparagraph (H)(iii) for employees working beyond normal retirement age, and therefore regulations implementing that unique provision have no bearing on Subparagraph (H)(i) for employees younger than normal retirement age.

### G. Agency Statements Provide No Support for IBM's Distortion of Subparagraph (H)(i).

IBM's reference (IBM Br. 44-47) to IRS statements as grounds for ignoring the clear meaning of "rate of benefit accrual" in Subparagraph (H)(i) is invalid. For example, the 1991 preamble to non-discrimination regulations (ensuring that a plan does not discriminate in favor of higher-income employees) contained one sentence

---

[14] At the time OBRA 1986 was enacted, ERISA Section 204(c)(2) limited the accrued benefit derived from employee contributions to the greater of the accrued benefit under the plan or the accrued benefit derived from employee contributions determined as though the interest rate was zero. Congress removed the cap on accrued benefits derived from employee contributions in 1989, creating an exception from Section 204(b)(1)(H) for contributory defined benefit plans. Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, Section 7881(m). See the explanation contained in preamble to proposed Treasury regulations implementing IRC § 411(c)(2), 60 F.R. 66532 (Dec. 22, 1995).

stating that a cash balance plan provision requiring "interest adjustments through
normal retirement age" would not fail to satisfy the requirements of Subparagraph
(H)(i). 56 F.R. 47524 (Sept. 19, 1991). The regulations in question did not deal with
age discrimination,[15] and there was no analysis of the issue.[16] Moreover, these
regulations were subsequently withdrawn and reproposed, and when the amended
nondiscrimination regulations were issued in 1993 the sentence referring to
Subparagraph (H)(i) was omitted without explanation.[17]

 The preamble sentence provoked a dispute between the Treasury
Department and the Equal Employment Opportunity Commission ("EEOC"). The
EEOC objected to the sentence because it had not been consulted on the issue. In a
letter dated May 21, 2001, the Government Accountability Office ("GAO") reported

---

[15]These regulations were promulgated pursuant to Internal Revenue Code
Section 401, not Section 411 (the parallel to ERISA Section 204). The
nondiscrimination rules of IRC Section 401, and related regulations have no
counterpart in ERISA, pertain solely to the question whether a plan is tax-
qualified, and therefore have no bearing on the construction of ERISA provisions.
*See Bronk v. Mountain States Telephone & Telegraph, Inc.*, 140 F.3d 1335, 1338-
1339 & n. 6 (10th Cir. 1998).

[16]Paul Strella in 1993 discounted reliance on one sentence that was supported
by "[n]o explanation, no analysis," was not included in a regulation, and was in a
preamble to regulations that did not even deal with age discrimination. SA-72-73.

[17]Ironically, the regulations in question require a cash balance plan's
"accrued benefit" to be determined as an annuity commencing at normal retirement
age that is the actuarial equivalent of the employee's hypothetical account as of
normal retirement age, including "automatic adjustments for interest through
normal retirement age." 26 C.F.R. § 1.401(a)(4)-8(c)(3)(vi), in effect in 1991. Thus,
the substance of the nondiscrimination regulations is contrary both to the
anomalous sentence and to IBM's arguments.

to Congress on the interagency dispute. The GAO concluded that the Treasury

Department was not required to consult with the EEOC to issue a regulation under

IRC Section 401, but criticized Treasury for not doing so:

> The agencies are continuing to analyze whether cash balance plans are age
> discriminatory. The continuing regulatory uncertainty surrounding cash
> balance plans, resulting in part from the preamble sentence, continues to be
> problematic for employers and plan participants. SA-125.

Under these circumstances, a one-sentence preamble statement to

regulations issued (and withdrawn) for a different purpose hardly constitutes a

considered agency construction of Subparagraph (H)(i). *See Wise v. Ruffin*, 914 F.2d

570, 581 (4th Cir. 1990), *cert. denied, sub nom. Almont Shipping Co. v. Ruffin*, 498

U.S. 1126 (1991) ("one terse conclusory sentence" by agency conflicting with

statutory provisions not entitled to deference).[18]

The Treasury Department subsequently addressed cash balance age

discrimination issues in proposed rules, 67 F.R. 76123 (Dec. 11, 2002), but withdrew

them when challenged by Congress. Treasury Dept. Announcement 2004-57, cited

on p. 9 above. Indeed, Congress enacted legislation in 2004 that prohibited

Treasury from making any expenditures in an effort to put the proposed cash

balance regulations into effect, in part because of concern that such regulations

might attempt to invalidate the District Court's decision in this case. Section 205,

P.L. 108-199.

---

[18] *See also* footnote 11, *supra*, quoting 68 F.R. at 17278 to the effect that the
IRS has not concluded its consideration of Subparagraph (H)(i).

Lastly, IBM relies on IRS Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996) (A-643-650), which addresses the payment of cash balance benefits in a single sum. IBM argues that IRS's failure in Notice 96-8 to invalidate the use of cash balance formulas under Subparagraph (H)(i) means that the IRS believed such formulas did not violate it. IBM Br. 46. However, the Notice did not even mention subparagraph (H)(i), let alone express any views regarding the applicability of the Notice's benefit accrual rules to it. IRS's silence on the issue cannot change the clear meaning of the statute.

Statements in the Notice in fact weigh against IBM's construction of Subparagraph (H)(i). First, the IRS emphasized that ERISA requires that the "accrued benefit" for a cash balance plan must be the benefit payable at normal retirement age. A-643-644. As this Court stressed in *Berger*, "[t]he Notice makes clear that the future interest credits provided by such [cash balance] plans are part of the employee's accrued benefit: 'benefits attributable to interest credits are in the nature of accrued benefits . . . and thus, once accrued, must become non-forfeitable.'" 338 F.3d at 762, *quoting from* Notice 96-8. In addition, the IRS stressed that defined benefit plans using a cash balance formula are subject to a different "benefit and accrual structure" than a defined contribution plan:

> These provisions limit the extent to which a cash balance plan can mimic the benefit and accrual structure of a defined contribution plan. A-645.

### H.    This Court's *Lunn* Decision Has No Relevance in this Case.

IBM gains no support from *Lunn v. Montgomery Ward & Co., Inc.*, 166 F.3d 880, 883 (7th Cir. 1999). *Lunn* dealt with the legitimacy of a floor-offset pension

arrangement with respect to an employee who continued to work after reaching normal retirement age. The employee contended that his accrued benefit after normal retirement age should be increased compared to younger workers to compensate him for the fact that he was deferring the receipt of his retirement benefits and his growing offset was "reducing" the value of his age-65 benefit. This Court held that there was no age discrimination because  (1) the accrued benefit at any age had to be measured without reference to the offset, as provided in IRS Revenue Ruling 76-259,  (2) the older employee's rate of benefit accrual prior to the offset was the same as any younger employee's accrual rate, and  (3) the older employee was not entitled to a special subsidy to compensate for the fact that he would have the use of the benefit for a shorter period of time, which would amount to "reverse age discrimination." Thus, *Lunn* has nothing to do with the issues in this case.

IBM claims that this Court found no age discrimination under Subparagraph (H)(i) even though Lunn received no actuarial adjustment to his accrued benefit because he was deferring his receipt of benefits beyond normal retirement age. IBM's argument is refuted by the fact that Lunn's benefits were suspended by his employer when he continued to work after reaching age 65. *See Lunn v. Montgomery Ward & Co. Retirement Sec. Plan*, 1998 U.S. Dist. LEXIS 2370 (N.D. Ill. Feb. 25, 1998), at *20-21. Under Subparagraph (H)(iii), an exception is created for Subparagraph (H)(i)'s required rate of benefit accrual if an employer suspends benefit payments to an employee working after reaching normal retirement age.

The employer is only required to provide the annual benefit accrual provided under the plan for all employees, not an additional actuarial adjustment for the deferral of benefit payments.

## II.    "ATTAINMENT OF ANY AGE" IN SECTION 204(b)(1)(H)(i) MEANS "ANY AGE," NOT "BEYOND NORMAL RETIREMENT AGE."

IBM contends that Subparagraph (H)(i) protects only employees working beyond normal retirement age. However, the statute expressly prohibits the reduction of an employee's rate of benefit accrual "because of the attainment of any age," a term that is clear on its face and is not limited to employees beyond normal retirement age.

### A.    "Attainment of Any Age" Is Unambiguous.

The phrase "attainment of any age" on its face raises no ambiguity concerning its application to employees who have not reached normal retirement age. That is clear from the Supreme Court's construction of the term "age" in the ADEA. In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581 (2004), the Court decided whether a change in retiree health insurance benefits that disfavored younger workers gave them a claim under ADEA for "discrimination . . . because of [an] individual's age." In deciding that ADEA authorized age discrimination claims only by older workers because of a change in the terms of employment that disfavored them compared to younger workers, the Court noted that "age," when viewed alone without an "express modifier," could have two meanings: an expansive meaning "pointing to any number of years lived, or as common shorthand for the

longer span and concurrent aches that make youth look good." *Id.* at 586, 596 (emphasis added). Here, Subparagraph (H)(i) has an "express modifier"–the broad term "any"–that unquestionably points to the expansive meaning. However, even if "age" in (H)(i) referred alternatively to employees of greater years, there is no definition of "age" that would limit the term, particularly in conjunction with the modifier "any," to employees beyond age 65.

## B. Provisions Closely Related to Subparagraph (H)(i) Confirm Its Clear Meaning.

Subparagraph (H)(i) parallels the prohibition in Subparagraph 204(b)(1)(G), enacted as part of ERISA in 1974, which forbids the reduction of a participant's accrued benefit "on account of any increase in his age or service." Treasury regulations issued in 1977 under Subparagraph (b)(1)(G) confirm that it prohibits a reduction in benefit on the basis of "any increase" in a participant's age, not just beyond normal retirement age. 26 C.F.R. § 1.411(b)-1(d)(3). It would be irrational to construe "any age" in the next subparagraph differently without any textual support.

Additionally, as discussed above with respect to this Court's decision in *Lunn*, Subparagraph (H)(iii) governs the benefit accrual for employees working beyond normal retirement age. Thus, OBRA 1986 created an exception to Subparagraph (H)(i) for employees beyond normal retirement age, which necessarily means that Subparagraph (H)(i) applies to employees who have not yet reached normal retirement age. Otherwise, it would be a nullity.

38

Third, Subparagraph (H)(v) provides that subsidized early retirement benefits are to be disregarded under Subparagraph (H)(i). If Subparagraph (H)(i) applied only to employees beyond normal retirement age, there would be no reason to exempt early retirement benefits from violating Subparagraph (H)(i).

Fourth, Subparagraph 4(i)(4) of ADEA's prohibition of age-based reductions in the rate of benefit accrual was enacted in OBRA 1986 along with Subparagraph (H)(i). Subparagraph (4)(i)(4) provides that "[c]ompliance with the requirements of this subparagraph with respect to an employee benefit plan shall constitute compliance with the requirements of this section relating to benefit accruals." 29 U.S.C. § 623(i)(4). Consequently, if Subparagraph (H)(i) and its ADEA parallel only applied to employees beyond normal retirement age, a plan could decrease older employees' rates of benefit accrual or eliminate their benefit accrual entirely in the years just before normal retirement age without violating ERISA or even ADEA's general prohibition of age discrimination in employment.

Finally, prior to OBRA 1986, ERISA Section 202(a)(2) permitted a plan to exclude employees who began employment within five years of the plan's normal retirement age. OBRA 1986 eliminated that exception, and Section 202(a)(2) now prohibits the exclusion from plan participation of "employees who have attained a specified age." On IBM's reading of Subparagraph (H)(i), a plan could use it to achieve what a companion OBRA 1986 provision, Section 202(a)(2), prohibits merely by ceasing benefit accruals for employees who had not yet reached normal retirement age rather than denying them formal participation.

The Supreme Court addressed the amendment of Section 202(a)(2) and its relationship to Subparagraph (H)(i) in *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996). When Spink was reemployed by Lockheed at age 61 in 1979, Lockheed's plan excluded from participation any employee hired less than five years prior to the plan's normal retirement age of 65. The Court held that the 1986 OBRA amendment of Section 202(a)(2) and enactment of Subparagraph (H)(i) did not apply retroactively to Spink. *Id*. at 896-897. That issue was irrelevant if Subparagraph (H)(i) only applied to employees beyond normal retirement age. The Supreme Court's decision confirms what is clear on the face of the statute: Subparagraph (H)(i) applies to employees who have not attained normal retirement age.

IBM does not cite anything in ERISA related to Subparagraph (H)(i) that even suggests that "attainment of any age" actually means "attainment of any age beyond normal retirement age." Instead, IBM relies on a caption–"Continued accrual beyond normal retirement age"–that appears in 26 U.S.C. § 411(b)(1)(H)(i),the IRC counterpart to ERISA Section 204(b)(1)(H)(i), but not in ERISA Section 204(b)(1) or in ADEA Section 4(i). There is no heading to ERISA Subparagraph (H)(i), and the caption in the ADEA makes the distinction between (H)(i)'s broad coverage and (H)(iii)'s application to employees beyond normal retirement age: "Employee pension benefit plan; cessation or reduction of benefit

accrual or of allocation to employee account; distribution of benefits after attainment of normal retirement age. . . ."[19]

Under these circumstances, the erroneous heading can have no effect on the meaning of the statutory provision. "Congressional inaction regarding an existing title is far too thin a reed to support a construction of a statutory provision that would effectively write out of it the very changes that Congress amended the provision to include." *Lyons v. Georgia-Pacific Corp. Salaried Employees' Retirement Plan*, 221 F.3d 1235, 1246 (11th Cir. 2000), *cert. denied sub nom., Georgia-Pacific Corp. Salaried Employees' Retirement Plan v. Lyons*, 532 U.S. 907 (2001). Here, the erroneous caption was from an earlier bill, not from the statute prior to amendment. In any event, "headings in the Internal Revenue Code do not have substantive effect." *Dow Corning Corp. v. United States*, 984 F.2d 416, 420 (Fed. Cir. 1993). *See also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) ("the caption of a statute . . . 'cannot undo or limit that which the [statute's] text makes plain'"), *quoting from Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947).

Congress clearly intended to protect employees working beyond normal retirement age from denial of continuing benefit accrual. But that does not mean that the broad statutory language covers only such persons. Indeed, the caption

---

[19]The error in placing the heading in the IRC is further demonstrated by the fact that it does not accompany Subparagraph (H)(i)'s counterpart for defined contribution plans set out in the IRC in Section 411(b)(2), 26 U.S.C. § 411(b)(2), enacted at the same time as (H)(i). Plainly "attainment of any age" has the same meaning whether it applies to defined benefit or defined contribution plans.

itself does not say that *only* persons beyond normal retirement age are protected by Subparagraph (H)(i). As the Supreme Court has stated: "[T]he reach of a statute often exceeds the precise evil to be eliminated." *Brogan v. United States*, 522 U.S. 398, 403 (1998).

### C.    The House Conference Report Does Not Evidence Clear Congressional Intent.

IBM cites statements in a House Conference Report that it claims show Congress' intent to limit Subparagraph (H)(i) to employees beyond normal retirement age, but ignores contradictory commentary. The Report emphasizes the exemption of certain early retirement subsidies, which would be nonsensical if (H)(i) applies only to employees beyond normal retirement age. A-653. *See United States v. Oregon*, 366 U.S. 643, 648 (1961) ("inconclusive" legislative history cannot change meaning of "clear and unequivocal" statutory provisions).

IBM cites a statement in the Report that the prohibition against cessation or reduction in the rate of benefit accrual is not intended to apply where a plan meets the "normal benefit accrual rules" for employees who have not reached normal retirement age. A-656; IBM Br. 7. However, the Report's next sentence states that under the "fractional" accrual rules, "the rate of benefit accrual for an employee may vary depending on the number of years of service an employee may complete between the date of hire and the attainment of normal retirement age." *Id.* The following paragraph then explains that a younger employee will not have an age discrimination claim based on the fact that an older employee accrues, under the "fractional benefit accrual rule," the same normal retirement benefit based on fewer

42

years of service. Thus, the statement upon which IBM relies was limited to a
concern about "reverse age discrimination" claims by younger employees.

### D.    The Treasury Department and EEOC Construe Subparagraph (H)(i) as Covering Employees of Any Age.

Soon after Subparagraph (H)(i) was enacted, the Treasury Department
issued proposed regulations addressing its coverage. The proposed regulations
repeated the statutory language, "attainment of any age," without any suggestion
that it meant "beyond normal retirement age." 53 F.R. 11876 (Apr. 11, 1988). In its
proposed (but withdrawn) cash balance regulations, the Treasury Department
stated that:

> Some commentators have suggested that only cessations or reductions after
> attainment of normal retirement age are prohibited by [Sections 411(b)(1)(H)
> and 411(b)(2)]. This interpretation is not consistent with the language of the
> statute, which does not specify any minimum age at which the rule applies,
> and is not adopted under these proposed regulations. 67 F.R. 76123, 76124
> (Dec. 11, 2002).[20]

_____

[20]IBM cites three district court decisions holding that Subparagraph (H)(i) is
limited to employees working beyond normal retirement age. IBM Br. 43. *See Eaton
v. Onan Corp.*, 117 F. Supp. 2d 812, 827-829 (S.D. Ind. 2000); *Tootle v. ARINC, Inc.*,
222 F.R.D. 88, 92 (D. Md. 2004); *Engers v. AT&T Corp.*, No. 98-3660, letter op. at 6-
11 (D.N.J. June 6, 2001). However, Judge Matsch disagreed with *Onan* and *Tootle*
and held that "the term ['any age'] is unambiguous, and there is no need to resort to
legislative history or other sources for its interpretation. This provision applies to
the attainment of 'any age' and not just to the attainment of normal retirement
age." *Wells v. Gannett Ret. Plan*, 385 F. Supp. 2d 1101, 1102 (D. Colo. 2005). *See
also Register v. PNC Fin. Serv. Group, Inc.*, 2005 WL 3120268 (E.D. Pa. Nov. 21,
2005), at *6-8 & n. 15 (rejecting *Onan's* holding that Subparagraph (H)(i) applies
only to employees beyond normal retirement age but following *Onan* on "rate of
benefit accrual").

Similarly, the EEOC issued proposed regulations in 1987 to implement Subparagraph (H)(i) that applied to all employees regardless of their age. 52 F.R. 45360, 45362 (Nov. 27, 1987).

## III.    IBM INSERTS "PRESENT VALUE" INTO ERISA SECTION 204(b)(1)(H)(i) WITHOUT JUSTIFICATION.

IBM contends that its cash balance formula does not violate Subparagraph (H)(i) once the "time value of money" is considered and benefits are reduced to their "present value."[21]   In other words, IBM contends that it is permissible to provide an older employee with a smaller normal retirement benefit because he will receive it sooner and further argues that its actuarial "present value" is equal to that of a younger employee who must "wait" longer to receive his normal retirement benefit. In a case closely analogous to this one, the Supreme Court rejected the contention that lower *monthly payments* for women were not discriminatory because they had "approximately the same present actuarial value" as higher monthly payments for men. *Arizona Governing Comm. v. Norris*, 463 U.S. 1073, 1082-1083 (1983).

In addition, the term "present value" is defined in ERISA Section 3(27); 29 U.S.C. § 1002(27): "The term 'present value', with respect to a liability, means the value adjusted to reflect anticipated events." However, the term "present value," which is the concept that reflects the "time value of money" in IBM's arguments, while appearing numerous times elsewhere in ERISA, is notably absent from

---

[21]Although these terms appear many times in IBM's brief, they do not appear once in Subparagraph (H)(i).

Subparagraph (H)(i), and from all of Paragraph 204(b)(1). In the instances where Congress intended for it to apply, ERISA provides instructions with respect to determining the present value of benefits. *See* Section 205(g)(3).

The necessary conclusion from the absence of a "present value" provision in both Subparagraph (H)(i) and paragraph (b)(1) as a whole, is that Congress intended to have Subparagraph (H)(i)'s benefit accrual requirements applied without regard to the accrued benefit's present value, as courts have held under analogous circumstances. In *Texports Stevedores Co. v. Director, Office of Workers' Compensation Programs, OWCP*, 931 F.2d 331 (5th Cir. 1991), one provision of the Longshore and Harbor Workers' Compensation Act ("LHWCA") required use of present value in determining how much of an employer's tort recovery from a third party must be retained in trust to pay benefits to the injured worker. However, the related provision governing tort recoveries did not contain any reference to "present value." The Fifth Circuit rejected the argument that "present value" should be read into the second provision because "[f]irst and foremost, the relevant statute does not provide for discounting to accrued compensation to present value." *Id*. at 333.

*Texports* was followed in *Gilliland v. E. J. Bartells Co., Inc.*, 270 F.3d 1259 (9th Cir. 2001), which held that:

> [W]hen Congress intended an amount to be reduced to present value for the purpose of a computation under the LHWCA, it specifically required that reduction. Its failure to mandate a present-value computation in 33 U.S.C. § 933(f) suggests that it did not intend an award of a stream of payments to be discounted to present value." *Id*. at 1263.

IBM refashions the same "time value of money" contention when it argues that there can be no age discrimination in the rate of benefit accrual even if a younger employee is credited with greater age-65 benefits, because the younger employee must "wait" longer than older employees to obtain the benefits. IBM Br. 36. IBM's effort to distinguish "the effects of age" from "the passage of time," *id.*, is futile. Given ERISA's benchmark of the "accrued benefit" at "normal retirement age," age 65 in IBM's plan, the "passage of time" from the date a participant earns a benefit until his normal retirement age is directly dependent on age. If one employee must "wait" 20 years to receive his accrued benefit at age 65 and a second employee must "wait" 30 years, the first is obviously 45 years old and the second 35. Thus, IBM's "wait" factor is not a function of a non-discriminatory fact such as years of service, but instead is a direct function of age. *See Arnett v. California Public Employees Retirement System*, 179 F.3d 690, 695 (9th Cir. 1999), *vacated and remanded on other grounds*, *California Public Employees Retirement System v. Arnett,* 528 U.S. 1111 (2000); *Abrahamson v. Board of Edic. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 73 (2d Cir. 2004).

## IV.    IBM WAIVED ALL REMEDIAL ARGUMENTS AND MUST DIRECT ITS POLICY ARGUMENTS TO CONGRESS.

IBM and its *amici* argue that if the District Court's liability ruling is affirmed, the corporate pension system in the United States will be "devastated." They also argue that the cash balance formula is a desirable pension option that this Court should preserve. These contentions are not properly raised in this appeal.

First, the impact of the application of Subparagraph (H)(i) to cash balance

plans is a policy issue for Congress. Corporate lobbying for Congressional action to

validate the use of cash balance formulas has been vigorous, yet Congress has taken

no such action. In fact, Congress recently was advised by a Government

Accountability Office study that the cash balance format, while most severely

affecting older employees, generally reduces benefits for all employees compared to

the prior plans.[22] Another recent study refutes one of the cash balance proponents'

main arguments–that cash balance plans respond to an allegedly more mobile

workforce.[23] These issues continue to be debated in Congress and present political

questions, not legal issues this Court can resolve. Consequently, IBM's and its

*amici's* "policy arguments are better addressed to Congress." *Millsap v. McDonnell*

*Douglas Corp.*, 368 F.3d 1246, 1259-1260 (10th Cir. 2004) (rejecting plaintiffs' policy

argument for construing ERISA remedial provision in a manner that "protects

jobs").[24]

---

[22]GAO, Report to Congressional Requesters, *Private Pensions–Information on Cash Balance Pension Plans* (Oct. 2005), http://www.gao.gov/new.items/d0642.pdf .

[23]The largest research study of conversions to cash balance plans "found no support for claims that CB conversions are a response to labor markets with more mobile employees." D'Souza, Jacob & Lougee, *"Why do Firms Convert to Cash Balance Pension Plans? An Empirical Investigation"* (p. 2) (Dec. 2004), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=546843 .

[24]In its Revenue Proposals for 2005 and 2006, the Treasury Department stated that "cash balance plans and cash balance conversions are not inherently age-discriminatory," but that "current law does not provide adequate protection for older workers in every conversion." *See* http://www.treas.gov/offices/tax-policy/library/bluebk04.pdf; http://www.treas.gov/offices/tax-policy/library/bluebk05.pdf .

Second, the parties settled all remedial and related policy issues before the District Court made any ruling on monetary relief. Ironically, the only specific remedy rejected by the District Court before the settlement was the theory that the accrual rate of the youngest plan participant should set the benchmark for all other participants. Hearing Tr., Jan. 22, 2003, at 8-9; SA-130-131. Nevertheless, IBM and its *amici* still premise their parade of horribles on this theory. IBM Br. 38-39; *Amici* Br. 15-16.[25]

Third, because remedies were settled, there is no factual record on which this Court could determine what monetary relief might have resulted from the liability finding. Thus, IBM's and its *amici's* argument concerning the supposedly large monetary liability faced by certain cash balance plan sponsors is utter speculation. Moreover, the increased benefits to which IBM agreed, although large, are small in proportion to the value of the Plan's assets and the amount it pays out in benefits

_____

(footnote 24 continued)

Plaintiffs agree that a cash balance plan could meet Subparagraph (H)(i)'s requirements if the declining benefit accrual rates were tied to service regardless of age, as provided in Subparagraph (H)(ii). It is unclear why IBM did not structure its Plan in this fashion.

[25]The $6 billion cost figure IBM cites (Br. 42) was an unsubstantiated estimate of the accounting cost of complying with *all* of plaintiffs' claims and not just the ongoing cash balance formula claim. This included costs associated with a prior plan formula, the ACBE, and a subsidized early retirement claim.

each year.[26]  IBM makes no claim that the settlement will have any impact on the viability of its plan.

Fourth, after the District Court issued its liability decision, IBM moved the Court to limit plaintiffs to prospective relief because a retroactive award would allegedly be devastating to the nation's pension system. IBM relied upon *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978), and its progeny, Docket Nos. 216, 218. The District Court denied the motion. Docket No. 246. The parties included this issue within their Settlement Agreement, A-616, and IBM waived any argument that it should prevail on appeal because of the effect an affirmance would have on it or any other cash balance plan.

In addition, *Manhart* was premised on the Supreme Court's conclusion that its holding that public pension plans had violated Title VII of the 1964 Civil Rights Act by using sex-based annuity tables was not foreseeable and that the change in the governing legal rule was "drastic." *Manhart*, 435 U.S. at 721. That is unquestionably not the case here because there has been no change in the law. *See Esden*, 229 F.3d at 171-172. Indeed, as the District Court found, IBM and other corporations adopted the cash balance format despite the controversy and legal uncertainty surrounding cash balance plans. *Id*. at 172 n. 22, citing *Helvering v. Reynolds*, 313 U.S. 428, 433 (1941).

---

[26]If plaintiffs prevail, IBM will pay the class $1.4 billion in increased benefits. That will increase IBM's pension liabilities by approximately 3%, from approximately $45 billion to $46.4 billion. IBM Annual Report 2004, SA-138.

## V.    THE ACBE VIOLATED ERISA SECTION 204(b)(1)(H)(i) BY ITS DISCRIMINATORY INCREASE IN YOUNGER EMPLOYEES' ACCRUED BENEFITS.

IBM ignores the fact that it knew the ACBE provided increases in younger employees' opening accounts that were not given to older workers due to their age. IBM Br. 47-48. IBM credited older employees' opening accounts with the present value of their accrued benefits under the existing plan, but it gave younger employees' opening accounts that were dramatically higher than the present value of their existing accrued benefits. As a result, older employees' rate of benefit accrual was reduced compared to younger employees.

To defend these age-based increases, IBM suggests that the same terms governed all participants. However, IBM knew that its adoption of the ACBE was valueless for older workers. The IBM Plan's enrolled actuary noted in a May 4, 1999 e-mail to IBM management: "[Y]ounger employees will benefit the most from this Always Cash Balance enhancement. On average, very young employees (in their 20's), could see their benefit double due to the enhancement," while older "employees over 45) will generally not be covered by the Always Cash Balance enhancement." SA-87. In case there was any doubt, he informed IBM management that "[a]s you can see, the excess percentage of the ACB over the basic opening balance is directly related to age." *Id.*

Not only does the one-time increase in younger employees' opening account balances result in larger accrued benefits at normal retirement age, it also increases the amount of the optional benefit forms available under IBM's Plan. The

initial one-time increase in younger employees' opening account balance immediately was worth on average thousands of additional dollars if they took their benefits as lump sum benefits, whereas the present value of older employees' accrued benefits remained unchanged. For that reason, IBM does not even attempt to assert either its "contributions" or "time value" contentions in support of the ACBE. The ACBE would not pass the defined contribution plan test for age discrimination that IBM attempts to use for the ongoing cash balance formula.

IBM claims that the ACBE was modeled upon inapposite Treasury Department nondiscrimination regulations for opening cash balance account balances, which provided a safe harbor for plan qualification purposes under the rules covering discrimination in favor of highly compensated employees. 26 C.F.R. 1.401(a)(4)-13(f)(2)(iii)(B). Under this safe harbor, the opening account must be equal to the greater of the present value, determined using the statutory discount rate, of the benefit that the employee earned under the prior plan or the amount that the new cash balance formula would have provided if it had been in effect for the employee's total years of service. The ACBE did not meet these safe harbor provisions due to the modifications adopted by IBM in "approximating" the cash balance formula. In any event, the safe harbor regulation does not address the application of Subparagraph (H)(i) to cash balance conversions, and agency approval cannot be inferred from its silence on the issue. *See Wise v. Ruffin*, 914 F.2d at 580-581.

Finally, IBM does not claim that liability arising from its use of the ACBE will have any impact on other pension plans. That is because both IBM's expert and its enrolled actuary testified that they did not know of any other plans using a similar conversion formula. SA-96-97, 147.

Therefore, even if the Court were to hold that the ongoing cash balance formula does not violate Subparagraph (H)(i), IBM cannot escape liability for its use of the patently discriminatory ACBE since it fails the very test advanced by IBM in defense of its cash balance formula.

# CONCLUSION

The Court should affirm the District Court's decision that IBM's cash balance

formula and the ACBE violate ERISA Section 204(b)(1)(H)(i).

Dated:  December 2, 2005                              Respectfully submitted,


                                                     _____

Douglas R. Sprong                                    Lee A. Freeman, Jr.
Steven A. Katz                                       James T. Malysiak
Korein Tillery, LLC                                  Freeman, Freeman & Salzman, P.C.
Gateway One on the Mall                              401 North Michigan Avenue #3200
701 Market Street, Suite 300                         Chicago, IL 60611
St. Louis, Missouri  63101                           312-222-5100
314-241-4844
                                                     Robert F. Hill
                                                     John H. Evans
William K. Carr                                      Hill & Robbins, P.C.
Law Offices of William K. Carr                       100 Blake Street Building
2222 East Tennessee Avenue                           1441 Eighteenth Street
Denver, Colorado  80209                              Denver, Colorado  80202
303-296-6383                                         303-296-8100

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for plaintiffs-appellees hereby certifies that this brief satisfies the type-volume requirements of Rule 32(a)(7)(B). This brief, excluding those portions identified in Rule 32(a)(7)(B)(iii), contains 13,995 words, as determined by the word counting feature of WordPerfect 10, the word processing program used to prepare this brief. The text and footnotes of this brief are in 12-point Century Schoolbook typeface.


Dated:  December 2, 2005

                                                    _____

                                                    James T. Malysiak
                                                    Counsel for Plaintiffs-Appellees

## CIRCUIT RULE 31(e) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 31(e), the undersigned counsel for plaintiffs-appellees hereby certifies that all material available to plaintiffs-appellees in searchable digital format has been provided on the accompanying CD-ROM. Counsel further certifies that the CD-ROM on which the electronic material is being produced is virus-free.


Dated:  December 2, 2005

_____
James T. Malysiak
Counsel for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2005, two true and correct copies of the

foregoing BRIEF OF APPELLEES and SUPPLEMENTAL APPENDIX, along with

an electronic version of the brief on a virus-free CD-ROM, were served as follows:

**Via Federal Express**

Jeffrey G. Huvelle
Robert A. Long, Jr.
Robert D. Wick
Eric R. Sonnenschein
Michael E. Paulhus
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC  20004

**Via First Class Mail**

Glen D. Nager
Brian J. Murray
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113

Donald J. Rosenberg
Douglas G. Vetter
IBM Corporation
1133 Westchester Avenue
White Plains, NY 10604

Kent A. Mason
Jason K. Bortz
Davis & Harman LLP
1455 Pennsylvania Avenue, NW
Washington, DC 20004

_____
James T. Malysiak
Counsel for Plaintiffs-Appellees