# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TIMOTHY D. LAURENT** | : | |
| | : | |
| **On behalf of himself and all others similarly situated,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 05-1291 (PLF)** |
| **v.** | : | |
| | : | |
| **PRICEWATERHOUSECOOPERS LLP,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HIS MOTION FOR CLASS CERTIFICATION <u>AND APPOINTMENT OF CLASS COUNSEL</u>

Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20036
Phone: (202) 243-1000
Fax:    (202) 243-1001

December 20, 2005                    Attorney for the Plaintiff and the proposed Class

## INTRODUCTION

Some cases present difficult or close questions regarding class certification, but this is not one of them. Mr. Laurent asks the Court to interpret and apply ERISA to an undisputed set of facts, declare that PwC's cash balance pension plan and 401(k) plan design is illegal in one or more respects, and enter final injunctive relief compelling Defendants to calculate his benefits and those of the proposed Class in a lawful manner. Plaintiff's claims and PwC's defenses present the Court with questions of law as to both liability and relief that have nothing to do with Mr. Laurent's individual characteristics or those of proposed Class members, and everything to do with the uniformly-applicable terms of the Plans and Defendants' conduct in implementing them. Only by carefully weaving misstatements of law and fact concerning Plaintiff's claims and ignoring virtually all of the discussion and case law contained in Plaintiff's opening brief can PwC even begin to challenge the suitability of this case for class treatment.

PwC has two main defenses, neither of which stand up to scrutiny. First, PwC argues that certification under Rule 23(b)(1) or (b)(2) is improper because this is simply an action for "money damages." *E.g.,* Opp. at 1. It is not. **What Plaintiff seeks is a declaration that the RBAP's and 401(k) Plans' benefit formulas are illegal on their face.** Compl., Prayer D. Once the Court so declares, PwC will have no choice but to reform the Plans to comply with ERISA. The fact that, following such a declaration, the Plans will owe Plaintiff and other members of the Class additional benefits – calculated mechanically under the terms of the legalized Plans – does not change the essential nature of this case as one seeking declaratory and injunctive relief. *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005) (Posner, J.) ("The present case is one of incidental damages because if the plaintiffs get the declaration they are seeking, the benefits to which the ERISA plan entitles them will simply be read off from the plan").

That is consistent with this Court's reading of Rule 23(b)(2) in *Pigford v. Glickman*, 182 F.R.D. 341 (D.D.C. 1998) – **a case that Defendants do not even cite** – and precisely what the Seventh Circuit

held in *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003), a case PwC agrees was an appropriately certified Rule 23(b)(2) case. Opp. at 31. *Berger* involved the same "whipsaw" issue that is presented here in Count One. There, Judge Posner, writing for the Seventh Circuit, rejected an argument substantially similar to the one the government made in *Pigford,* 182 F.R.D. at 351, and identical to PwC's here:

> Xerox contends that this suit does not seek injunctive or declaratory relief, but really just damages equal to the difference between the lump sums to which ERISA entitled the members of the class and the smaller lump sums that they actually received. . . . [But w]hat is sought is a declaration that Xerox's **method of computing** the lump sums to which withdrawing employees are entitled is unlawful. . . . [A] declaratory judgment is *normally* a prelude to a request for other relief, whether injunctive or monetary; so there is nothing suspicious about the characterization of the suit as one for declaratory relief. The hope that motivates casting a request for relief in declaratory terms is that if the declaration is granted, the parties will be able to negotiate the concrete relief necessary to make the plaintiffs whole without further judicial proceedings. No one wants an empty declaration. As long as the concrete follow-on relief that is envisaged will if ordered (that is, if negotiations for relief consistent with the declaration break down) be the direct, anticipated consequence of the declaration, rather than something unrelated to it, the suit can be maintained under Rule 23(b)(2).

*Berger,* 338 F.3d at 763-64 (first emphasis added).

PwC's second set of "arguments" consists largely of it piling up lists of factual distinctions among Class members in the hope that the Court will find Mr. Laurent atypical of other Class members and/or inadequate to represent them. In its zeal to draw distinctions, PwC makes a number of misrepresentations. For example, Defendants present the following subset of RBAP participants whose interests purportedly are different from Plaintiff's and other RBAP participants: "Former C&L [Coopers & Lybrand] employees and partners who left C&L before its 1998 merger with PW [Price Waterhouse] but who are still receiving, or entitled in the future to receive, benefit payments are covered by the RBAP." Opp. at 5, 10, 22. But *these former C&L employees are not participants in the RBAP at all*, and thus are not within the proposed Class that Plaintiff seeks to have certified.[1]

---

[1] RBAP § 1.2 states that the RBAP only applies to "persons employed by the Employer." RBAP § 2.22 defines the term "Employer" as referring to the "Firm," which in turn is defined in § 2.27 as meaning Price Waterhouse and, effective July 1, 1998, PricewaterhouseCoopers. A former C&L employee who left C&L before its 1998 merger with Price Waterhouse never worked for Price Waterhouse or PricewaterhouseCoopers – and therefore, such an employee is not a participant in the RBAP. *See also* RBAP §§ 2.34 and 3.3(12).

As another example, in an effort to show that Plaintiff purportedly has interests that conflict with non-Defendant PwC partners, PwC contends that under Counts Six and Seven "plaintiff seeks reformation of the Plan to *reduce* partner benefits." Opp. at 21 (emphasis added). PwC cites nothing to back up this contention – because it is simply untrue: Plaintiff does not seek to reduce partner benefits, nor could he do so under ERISA. *See* ERISA § 204, 29 U.S.C. § 1054.[2]

Other distinctions among members of the proposed Class described by PwC may be real – but none of them make any *legal* difference. For example, it is simply irrelevant to Plaintiff's claims that different sets of participants earn pay credits under the RBAP at different rates – the legal issue is how pay credits are **used** to calculate benefits owed under the Plan, an issue common to all participants. Factual variations among class members do not destroy typicality so long as the claims arise from the same course of conduct and are brought under the same legal theories. *See Pigford,* 182 F.R.D. at 349. Here there is one uniform course of conduct and one set of legal theories by which Plaintiff challenges that conduct on behalf of himself and tens of thousands of other persons, a situation tailor-made for class treatment.

PwC all but acknowledges this when it concedes commonality. Opp. at 18. Commonality, typicality, and adequacy (the two Rule 23(a) requirements PwC contests) all tend to merge, *see, e.g.,* Pl. Class Mem. (Doc. 32) at 16, – so, while they do not admit it, what Defendants have really acknowledged in conceding commonality is the indisputable fact, borne out by the parties' briefing on the pending cross-motions, that this case presents *nothing but* common questions of law or fact. Because these common questions arise in the context of Plaintiff's claim seeking declaratory and injunctive relief, the proposed Class should be certified under Rule 23(b)(1) and/or (b)(2).

---

[2] Plaintiff's draft proposed corrective plan amendments – which spell out the changes needed to make the RBAP and 401(k) Plans legal under ERISA – explicitly provide that any benefit adjustments will be in an *upward* direction only. **They specify that "[i] no event shall the Accrued Benefit or the Normal Retirement Benefit of any Participant in the Plan (or any other accrued benefit under the Plan or any other pension plan subject to ERISA) be reduced as a result of the amendments above."** Ex. 1, Revised Interrog. Resps. at 4. It is also simply untrue that Plaintiff seeks to "reduce[e] the accrued benefits of these participants who earned favorable rates of return under investment measures that would be retroactively stripped away." Opp at 25. Quite to the contrary: see Count Nine.

## THE PROPOSED CLASS

With the Court's permission, Plaintiff would edit slightly the proposed Class definition to eliminate surplusage. PwC points out that under the Delaware Revised Uniform Partnership Act, the only partners who would be liable if Plaintiff is successful here are those partners that the Complaint names as Defendants. Opp. at 9 n.8. In other words, only the partners who are named Defendants in this case have interests that are legally adverse to those of the Class. Thus, the language in the original proposed Class definition that "exclude[ed] any Defendant and exclude[ed] any partner (or beneficiary thereof) *who would be liable* under any form of injunctive, declaratory or monetary order, relief or award that might result from the instant suit" can be limited to "excluding any Defendant" (meaning Defendant-partners, of which there are some 76 named in the Complaint). The reason is because, according to PwC, any *non-Defendant* "partner (or beneficiary thereof) who would be liable" under the instant suit **describes a null set**. With this clarification, the Class definition can be expressed more simply as:

> All persons participating in the Retirement Benefit Accumulation Plan for Employees of PricewaterhouseCoopers LLP, the Savings Plan for Employees and Partners of PricewaterhouseCoopers LLP, or the Savings Plan for Employees of PricewaterhouseCoopers LLP at any time after June 30, 1994, and the beneficiaries and estates of such persons; but excluding any Defendant.

## ARGUMENT

Defendants' points in opposition ultimately converge on the contention that class certification is not appropriate because of variations among different categories of Plan participants. Some participants receive pay credits at 5%, others at 7%; some are employees, others are partners; some used to work for Coopers & Lybrand, others for Price Waterhouse; some chose one kind of investment measure under the RBAP, others chose another kind. None of these distinctions are relevant.

This case is about two things: (1) Whether the **terms of the Plans** at issue violate ERISA and the Internal Revenue Code on their face and as implemented (Counts One through Nine); and (2) whether the **behavior of the Defendant fiduciaries** in their administration of plan investments, both hypothetical and

real, violated their fiduciary obligations (Counts Ten and Eleven). Here are the questions posed by each Count:

Count One:  Do the terms of the RBAP that define the benefit payable to a participant by reference to the *current* balance of his hypothetical account rather than the *projected* balance of that account at age 65 violate ERISA and the Tax Code? Just as in the *Berger* case certified in the Seventh Circuit, "[w]hat is sought is a declaration that [PwC's] **method of computing** the lump sums to which withdrawing employees are entitled is unlawful." *Berger,* 338 F.3d at 763 (emphasis added). This is a calculation-of-benefits *process* issue that is common to all participants in the RBAP, regardless of their employment history, salary, or rank, and regardless of whether a participant's cash balance benefit is his only benefit under the RBAP or whether the cash balance benefit is one of many possible alternative benefits based on a "greater of" calculation (*e.g.*, certain C&L participants).

Count Two:  Do the terms of the RBAP that fail to guarantee that each RBAP participant's projected benefit at age 65 will not be reduced merely because a participant grows older violate the age discrimination standard set forth in ERISA § 204(b)(1)(G) and Tax Code § 411(b)(1)(G)?

Count Three:  Does the "rate of benefit accrual" under the RBAP that is subject to age discrimination testing under ERISA § 204(b)(1)(H) and Tax Code § 411(b)(1)(H) refer to the rate at which the projected benefit at age 65 accrues – which would mean that the terms of the RBAP impermissibly reduce the rate of benefit accrual for each participant on account of age – or the rate at which the account balance grows. In other words, does the Court agree with the holding in *Cooper v. IBM Personal Pension Plan,* 274 F. Supp. 2d 1010 (S.D. Ill. 2003), regarding the **legal standard** that applies for purposes of testing age discrimination?

Count Four:  Do the terms of the RBAP that in some cases provide for significant increases in the rate of participants' benefit accruals from one year to the next violate ERISA's and the Tax Code's anti-backloading rules?

<u>Count Five</u>:  Do the terms of the RBAP that result in a reduction in each RBAP participant's projected benefit after normal retirement age that occurs as a participant grows older constitute an unlawful reduction in a participant's normal retirement benefit in violation of ERISA § 204(c)(3) and Tax Code § 411(c)(3)?

<u>Count Six</u>:  Do the terms of the RBAP and 401(k) Plans that provide for disproportionately larger benefit accruals for partners than for rank-and-file employees violate the lawful terms of the Plan that incorporate the nondiscrimination requirements of Tax Code § 401(a)(4)?

<u>Count Seven</u>:  Do the terms of the RBAP and 401(k) Plans that provide for disproportionately larger benefit accruals for partners than for rank-and-file employees unlawfully discriminate against non-partner employees within the meaning of ERISA § 510?

<u>Count Eight</u>:  Do the terms of the RBAP that give PwC discretion over a critical piece of the pension formula – the menu of investment options that determines the investment crediting rate under the RBAP – violate the lawful terms of the Plan that require the Plan to provide "definitely determinable" benefits?

<u>Count Nine</u>:  Do the terms of the RBAP that permitted PwC to change the menu of investment options without preserving the accrued right of participants to enjoy potentially higher returns under any discarded options violate the "anti-cutback" rule under ERISA § 204(g) and Tax Code § 411(d)(6)?

<u>Count Ten</u>:  Did the Defendant fiduciaries violate ERISA when they selected investment measures to serve as the RBAP's actuarial assumptions that failed to increase benefits to the extent permissible under the RBAP as required, under the circumstances, by fiduciary law?

<u>Count Eleven</u>:  Did the Defendant fiduciaries violate ERISA by investing Plan assets in inappropriate and excessively costly investment vehicles when identical or superior asset management services were readily available for a fraction of the cost?

These are all **Plan-wide issues that in no way implicate or depend on individual**

**characteristics of any Plan participant.**  The Plan terms and fiduciary behavior at issue are common to all Plan participants and have the exact same qualitative impact on each and every participant in the Plans.  The quantitative differences are mere details, to be established and then remedied according to uniform methodologies based on undisputed facts and computerized data readily at hand and routinely used by Defendants in their day-to-day administration of the Plans.

**I.    Defendants' Standing Objections Are Meritless.**

PwC's "standing" objections are easily dismissed.  PwC argues that "plaintiff cannot represent a class seeking *prospective* equitable relief for current participants on any claims because he lacks standing to obtain such relief."  Opp. at 14 (emphasis added).  The reason that is, according to PwC, is because "[t]o assert claims for prospective injunctive relief, a plaintiff must demonstrate, 'not only that she has been harmed in the past,' but also 'that [s]he is realistically threatened by a repetition of [the violation].' *Does I-III [*v. *District of Columbia],* 216 F.R.D. [5] at 10 [(D.D.C. 2003)], quoting *City of Los Angeles v. Lyons,* 461 U.S. 905, 109 (1983)."  *Id.* at 14-15.

Defendants will get no quarrel from Plaintiff regarding the legal principle – but as to whether Plaintiff satisfies its requirements there can be no doubt, and Defendants' inapposite cases help show why.  In *Does I-III*, plaintiffs were mentally retarded patients institutionalized at the by-then-closed Forest Haven facility who had been subjected to invasive non-emergency medical procedures including forced sterilizations and abortions.  Their request for injunctive relief fell short, Judge Kennedy held, because it targeted a *discontinued* policy.  216 F.R.D. at 10.  So too in *Lyons,* plaintiff lacked standing to raise an individual claim for injunctive relief against any application of police chokehold policies because there was insufficient probability shown that the conduct complained of would ever be repeated *against the plaintiff.  Lyons,* 461 U.S. at 109.  The key to both cases was that an injunction would have been pointless because there was nothing the court could order the defendants to do or stop doing – the complained of conduct had already stopped.

That is not the case here.  What Plaintiff challenges in this suit is the legality of PwC's retirement Plans.  Plaintiff's allegations apply to Plan terms (and implementation thereof) that have remained substantially unchanged throughout the relevant period covered by this suit and that remain in place today.  Thus, the alleged violations occurred in the past, present, and will continue to occur in the future for as long as the allegedly illegal Plan terms remain in place.  The fact that an order by the Court requiring PwC to reform the Plans will benefit current participants who have not yet requested distributions (including but not limited to current employees who are continuing to accrue new pay credits) – and not merely former and current participants (like Plaintiff) who requested distributions but who were not paid the full amount they are owed – simply **confirms** that Plaintiff's claims are typical of the Class and that he would be an adequate class representative.  If Mr. Laurent had been paid everything he were due, as in the cases Defendants cite, Opp. at 14-17, then there might be some question as to his standing (or typicality or adequacy), but that is obviously not the case according to the well-pled allegations of the Complaint.[3]

## II.    **Defendants' Typicality Objections Are Meritless.**

Defendants' typicality objections are of two basic varieties.  First, Defendants say they have unique defenses against Mr. Laurent that make him or his claims atypical of the Class.  Opp. at 17-21. Second, Defendants say that there are significant variations within the Class.  Opp. at 21-23.  Both contentions are unavailing.

### A.    **Defendants Do Not Have Unique Defenses to Mr. Laurent's Claims.**

The "unique" defenses Defendants assert here are not unique at all because they are the same defenses that many members of the proposed Class will or could face (to the extent those defenses are still available after the substantive cross-motions have been decided).  *E.g., LaFlamme v. Carpenters*

---

[3] Defendants' other "standing" arguments relate solely to Counts Ten and Eleven are also, at best, effectively "merits" arguments and have been rebutted elsewhere.  *See* Pl. Opp. to Mtn. to Dismiss (Doc. 20) at 40-43.  Of note, however: *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341 (11th Cir. 2001), cited to support PwC's "prospective injunctive relief" standing argument in fact single-handedly refutes PwC's Count Ten and Eleven "standing" arguments.

*Local No. 730 Pension Plan*, 212 F.R.D. 448, 454 (N.D.N.Y. 2003) (unique defense theory "untenable"; purported defense applied "to many, if not all prospective class members").

That is the case with respect to PwC's supposed statute of limitations defense (which posits the existence of a federal accrual rule for ERISA actions that is contrary to controlling authority and has been endorsed by no court, Pl. Opp. to Mtn. to Dismiss (Doc. 20) at 44-45; Pl. SJ Reply (Doc. 34) at 2-5). The notion that this defense makes Plaintiff *atypical* gets it exactly backwards: Every Class member, including currently active participants (*i.e.,* participants accruing new benefits) or participants who are inactive but have not yet requested a distribution, has a keen and identical interest in having the Court rule as a matter of law on Plaintiff's contention that the universally recognized "clear repudiation" standard should apply here. Far from "pos[ing] a problem for plaintiff," Opp. at 21, the fact that Defendants seek to interpose a (spurious) limitations defense strongly *favors* certification: Whether the standard the Court will apply is the "clear repudiation" standard or something more along the lines suggested by Defendants is a question of law common to all class members.[4]

In any event, even if some of PwC's defenses were in fact unique to Plaintiff (none of which are), this would not disqualify him from representing the proposed Class. *See Johns v. Rozet,* 141 F.R.D. 211 (D.D.C. 1992). Take Defendants' "no injury" defense. This defense is not merely "highly questionable," *Johns,* 141 F.R.D. at 216 – it is utterly fanciful. Defendants argue that Plaintiff cannot show under Count One that his benefit would have been larger had PwC performed the "whipsaw" calculation PwC seems to acknowledge should have been performed, because "[w]hile he was participating in the Plan, plaintiff never selected any investment measure other than the money market fund option." Opp. at 20. In other words, PwC's defense is that even though it might not have performed the proper calculation, there was no harm, so no foul.

Defendants are wrong, in two ways. First, Plaintiff alleges under each of Counts One through

---

[4] *See* Ex. 2, for an example of a stipulation as to class certification in another ERISA pension benefit case where the parties reserved for additional briefing the issue of the proper accrual rule for statute of limitations purposes – an issue the parties implicitly conceded was also common to all class members. *Id.* at 4 n.*.

Ten that he was injured because he was a participant in two retirement plans that failed to comply with ERISA. To the extent a plan does not comply with ERISA, the individual rights of every participant in the plan have been violated, resulting in personal injury to each participant and giving every participant standing to challenge the allegedly illegal plan provisions.[5] Thus, alleged monetary loss is not a prerequisite for standing.

Second, Plaintiff clearly will be entitled to significant additional benefits if he is successful under any of the Counts in the Complaint. Take Count One, for example (because it is the only count Defendants purport to address in any detail). The IRS has long required that lump sums payable from a "frontloaded" cash balance plan (such as the RBAP) cannot be less than the discounted value of the participant's account balance projected to normal retirement age at a rate that does not understate the anticipated value of future interest (or "investment") credits under the rates provided by the plan, whether those rates are variable or fixed. Ex. 3, IRS Notice 96-8, 1996 WL 17901. This means that a cash balance plan like the RBAP that offers participants equity-based rates of return will have to pay lump sums in excess of current account balances because the future anticipated equity returns offered by the plan invariably will exceed the 30-year Treasury rate (the discount rate mandated by IRC § 417(e)).

PwC contends that because the RBAP "does not have a guaranteed positive crediting rate," it is impossible to predict what the future rate of return would have been for any participant had he left his money in the Plan – with the result that it is impossible to prove that a whipsaw calculation would produce a benefit greater than a participant's current account balance. Opp. at 20-21   As an example, they point out that Plaintiff may have continued to "invest" his account in the money market fund, which earned a rate lower than 30-year Treasuries. *Id.* [6]

---

[5] *Berger v. Nazametz,* 2001 U.S. Dist. Lexis 10222, *7-8 (S.D. Ill. June 26, 2001) ("Each member of the class has standing to bring an action to challenge an allegedly illegal plan provision, 29 U.S.C. § 1132(a)(3), regardless of whether it resulted in actual damages to a particular class member"), *aff'd, Berger v. Xerox*, 338 F.3d 755; *Cooper*, 274 F.Supp.2d at 1014 (same). *See also* Pl. SJ Reply (Doc. 34) at 6-12 (discussing Plaintiff's standing).
[6] Note that even if otherwise accepted, Defendants' argument here is also merits-based: it assumes Plaintiff will **lose** Counts Eight and Ten and thus unable to challenge the rate the Plan credited to his account.

This is clever, but wishful thinking at best.  As Judge Posner explained in *Berger*, "determining the present lump-sum equivalent of a pension benefit swelled by [future interest] credits **requires estimating their value** as of the date at which the employee left Xerox's employment."  *Berger,* 338 F.3d at 760. (emphasis added).  Unless the interest crediting rate is fixed, the process of calculating future returns *always* involves estimation, not certainty.  Thus, future investment rates must be estimated under the RBAP just as they do under any other plan that has a variable rate of return.  This was the case in Berger – "It is estimation rather than determination that is required because the T-bill rate fluctuates," *id.* – and it is the case for the RBAP.

As far as *how* the estimate must be made consistent with ERISA and the Tax Code, the IRS sets forth a clear standard:  If the interest (or "investment") crediting rate under a plan is variable, **the plan** is required to set forth the methodology for determining what rate is to be used to project the value of a participant's benefit at age 65:

> A frontloaded interest credit **plan** that specifies a variable outside index for use in determining the amount of interest credits **must prescribe the method for reflecting future interest credits** in the calculation of an employee's accrued benefit.

IRS Notice 96-8.  Furthermore, the rate specified by the plan must be objectively determinable and reasonably reflect an estimate of the value of the projected future interest credits, had participants left their benefits in the plan until age 65 and beyond:

> In order to comply with [Tax Code] section 401(a)(25), the method, including actuarial assumptions, if applicable, must preclude employer discretion.  Further, in determining the amount of an employee's accrued benefit, a forfeiture . . . will result if the value of future interest credits is projected using a rate that understates the value of those credits.

*Id. Accord Esden v. Bank of Boston*, 229 F.3d 154, 166-67 (2d Cir. 2000).

**The problem for PwC is that, flouting the IRS and ERISA, the RBAP does not by its terms set forth a projection methodology that complies with these standards.**  This Court, then, must determine what the rate should be.  Plaintiffs have from the start suggested the estimation method that tracks the method used by the court in *Berger*.

Plaintiff's proposed uniform 9% rate is based on the approximate long-term market rate of return of a portfolio invested 70% in equities and 30% in debt securities, an investment mix commonly recommended by experts for individual retirement savings. Plaintiff's experts will demonstrate that this rate (or something substantially similar) best reflects the predicted future rate of return under a plan in the nature of the RBAP that permits individual "investment" choice among a mix of equity and debt securities or mutual funds. A blended rate based on historical averages is the standard estimation tool for future market-based returns over long periods, which is the goal here. In the words of Judge Posner, it the best "unbiased estimator" of future returns. *Berger*, 338 F.3d at 760.[7]

Thus, far from an "arbitrary rewriting of the Plan's terms," Opp. at 21 n.11, the 9% projection rate proposed by Plaintiff is what is required to bring the illegal RBAP into compliance with ERISA and the Tax Code. Only a uniform, blended rate of this nature can satisfy IRS Notice 96-8's requirement that the Plan calculate benefits based on its best estimate of the rate of return participants would have achieved had they left their assets in the plan.

## B.   Factual Variations Among Class Members Do Not Defeat Typicality.

Defendants complain that there are "various subgroups that comprise the proposed class and the differing interests and factual issues among them" and assert that "significant variations within the class will defeat typicality." Opp. at 19, 21. But "there is nothing in Rule 23(a)(3) which requires the named plaintiffs to be clones of each other or clones of other class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002). Typicality, which "has been liberally construed by courts," *id.*, is

---

[7] PwC does itself no credit by portraying the 9% figure as something Plaintiff just dreamed up in time for this motion. Opp. at 24, 32 & n.16, 33. The 9% rate is virtually the same projection rate explicitly proposed in June 2005 in Compl. ¶ 139 (though here the historical average has been rounded down to 9% instead of up to 10% as in the Complaint). PwC's repeated representation of Plaintiff's proposed projection rate as some sort of quackery is particularly ironic. Defendants themselves have already implicitly endorsed that rate or a rate like it as the projection rate for other analogous RBAP purposes. **When PwC performs calculations for purposes of estimating projected benefits under the RBAP for accounting and funding purposes, it uses a uniform rate based on a blended average of projected investment returns for each participant's account.** *See, e.g.,* Ex. 4, RBAP 2003 Valuation Rpt. extracts. Moreover, *as a matter of law,* the RBAP also uses a uniform projection rate for purposes of projecting benefits to demonstrate (purported) compliance with Tax Code income nondiscrimination standards set forth under Tax Code § 401(a)(4) and the regulations thereunder. *See* Treas. Reg. § 1.401(a)(4)-3(d)(2)(i) and -12 (requiring that benefits be normalized by projecting benefits to age 65 using a standard interest rate).

satisfied when "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford,* 182 F.R.D. at 349. Typicality has been found in ERISA cases even when the plaintiff is seeking to represent persons who are not even a member of his plan but are rather participants in different plans so long as they have been subjected to the same allegedly improper practice.[8]

As explained above, the variations about which Defendants seem to be most concerned are among the most irrelevant: differing pay credits under the RBAP have no bearing on any issue presented by this case, whether claim or defense. So too the fact that, using uniform methodologies, there ultimately will be benefit recalculations to be performed by the Plans does not impair typicality: results would differ not based on subjective criteria but on objective data such as participants' salary level, age, years of service and other objective factors currently used to calculate benefits – none of which are in dispute here.[9]

Defendants say the fact that "at least some members of the proposed class (though apparently not Plaintiff) signed releases of all ERISA claims when they received their distributions," undermines typicality. Opp. at 22. They support this assertion with a citation to their objections and responses to Plaintiff's discovery requests. *Id.* There Defendants state: "some RBAP participants have signed forms releasing *PwC* from claims based on alleged violations of ERISA." Defs. Ex. I at 39 (emphasis added). Defendants there also say they will provide, as requested, samples of such releases, *id.*, but they attach none to their opposition and have yet to produce any such examples to Plaintiff.

The existence of a handful (or more) of participants signing releases whose terms are not disclosed to the Court is no basis for concluding typicality is undermined. There are likely several different class-wide challenges that can be brought to the applicability and validity of those releases vis-à-

---

[8] *See, e.g., Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir. 1993); *Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 424 (6th Cir. 1998).

[9] *E.g., Bittinger v. Tecumseh Products Co.,* 123 F.3d 877, 885 (6th Cir.1997) (differing degrees of injury among class members does not necessarily defeat typicality if the basic injury each class member asserts is the same); *Forbush.,* 994 F.2d at 1106 ("the necessity for even somewhat complex individual calculations" does not defeat typicality).

vis the claims raised in the Complaint, all of which would raise questions of law that can be determined without the need for individualized inquiry.  *See, e.g., Korn v. Franchard Corp.,* 456 F.2d 1206, 1210 (2d Cir. 1972) (reversing district court's denial of class certification; validity of release could be determined on broad basis and might call for creation of sub-class).[10]

If, after PwC produces the documents they said they were going to produce and advises Plaintiff and the Court that it takes the position that the above-described releases should bar an individual Class member's recovery here, the Court finds that a subclass of participants who have signed such releases should be carved out and represented by someone other than Plaintiff, such an additional plaintiff can be promptly added to the Complaint.  *See In re Williams Cos. ERISA Litigation,* 231 F.R.D. 416, 423-24 (N.D. Okl. 2005); *cf. Pigford,* 182 F.R.D. at 350.  Numerous Class members (including participants that even PwC would view as "current") have contacted Plaintiff's counsel indicating support for this action and a willingness to serve as named representatives, including at least one participant who states that she signed the kind of release to which PwC alludes.[11]

### III.    **Defendants' Adequacy Objections Are Meritless.**

It is well-settled that asserted conflicts of interest are pertinent to adequacy of representation only if they go to the very subject matter of the lawsuit.  *Jones,* 141 F.R.D. at 217.  Defendants do not claim,

---

[10] The easiest challenge is one suggested by Defendants themselves when they say that the forms signed purport to release **PwC**, *i.e.,* the employer, and not the RBAP or the 401(k) Plans.  Numerous court have recognized that where a release agreement references the plaintiff's employer but did not reference the employee benefit plan, the release agreement did not release the plan because the employer and the plan are separate legal entities.  *E.g., Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 315-16 (4th Cir. 2001). Releases of this sort also frequently fail to pass muster under ERISA's anti-alienation provision, ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1), which permits settlements of only *actually disputed* pension claims. *Lynn v. CSX Transportation,* 84 F.3d 970 (7th Cir. 1996).  Such releases can also be attacked class-wide on other grounds. Moreover, because Count Eleven is raised on behalf of the Plans as a whole, that claim cannot be waived by an individual. *See Bowles v. Reade,* 198 F.3d 752, 759-61 (9th Cir. 1999).

[11] Defendants' remaining typicality objections are equally unsound.  This case does *not,* as PwC suggests, Opp. at 22, involve claims premised in whole or in part on misrepresentations contained in the Summary Plan Description or elsewhere, or allegations about faulty investment advice.  PwC also mistakenly suggests that former C&L employees who are – or in the future may be – paid under the "greater of" formula, where C&L benefit wins, should not be included in the proposed Class. Opp. at 22-23.  These participants' benefits under the RBAP's cash balance formula must be calculated correctly to determine which formula actually is the "greater of."  Nor is there any typicality problem presented by the fact that the 76 fiduciary Defendants may be liable to different Class members depending in part on the years they actively served as fiduciaries.  Opp. at 23.  Sorting which Defendants are liable to which Class members is a simple, ministerial task to be performed during the relief stage of the proceedings.

nor could they, that any proposed Class member has a legitimate interest in condoning the illegal

calculation of benefits, breaches of fiduciary duty, or imprudent management of Plan assets.  To the

contrary, all Class members share an absolute unity of interest with respect to the subject matter of the

lawsuit: *ensuring the Plans are written and operated in full compliance with ERISA and the Tax Code*.

No amount of PwC speculation can change this fundamental fact.  There is no conflict.[12]

Defendants' claim that there is a conflict between Mr. Laurent and active participants (*i.e.,*

participants accruing new benefits), because this lawsuit might lead to the termination of the Plans in their

present form, Opp. at 25, is both speculative and misleading.  If the Plans are illegal by design as Mr.

Laurent alleges, active participants who continue to accrue benefits under the Plans **are already living on**

**borrowed time** – the IRS, which Defendants refuse to admit or deny is auditing PwC and the Plans,[13]

could effectively shut them down at any time.  The sooner the alleged illegalities are corrected, the better

for all concerned because the costs, especially to rank-and-file participants, of tax disqualification would

be ruinous and far outweigh any current benefit currently active participants might be enjoying.[14]

Similarly, PwC's threat that it might shut down the Plans *as legalized* (if Mr. Laurent's claims are

found to have merit) because they will then supposedly be "uneconomical," Opp. at 25, cannot create a

cognizable conflict between active participants and Mr. Laurent (who is an inactive participant).[15]  That is

in part because, as PwC itself notes, it can shut down the Plans any time for any reason.  Opp. at 25.

Moreover, active participants do not have a cognizable interest in the continuation of unlawful plans, so

the "argument" is doubly faulty.

Although Defendants allege (without proof) antagonism between Plaintiff and the non-Defendant

---

[12] Defendants ignore Plaintiff's contention that they, not Plaintiff, bear the burden of proof on the adequacy-of-representation issue.  *See Johns,* 141 F.R.D. at 217 ("The burden is on the defendants to demonstrate that the representation will be inadequate," *citing Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir. 1982).  *Accord* 3 *Newberg on Class Actions* § 7.24 (4th ed. 2002) ("the burden shifts to the defendant once the plaintiff has made a *prima facie* showing of adequate representation in its complaint") (collecting cases from various other Circuits)..

[13] *See* Ex. 5, Ltr. to defense counsel, December 13, 2005.

[14] *See* John D. Colombo, *Paying for Sins of the Master:  An Analysis of the Tax Effects of Pension Plan Disqualification and a Proposal for Reform,* 34 Ariz. L. Rev. 53, 73 (1992).

[15] Mr. Laurent is an inactive participant with benefits still due under the Plans, not a *former* participant in the Plans.  The premise of this action is that, as he testified, "he left money on the table," Tr. 32, 33.

PwC partners, Opp. at 24, Plaintiff and non-Defendant PwC partners in fact share precisely the same legal and economic interests:  as participants in the Plans, all employees and partners have an acute interest in ensuring that the benefits to which they are legally entitled under the Plans are paid, and in maintaining the legality of the Plans under ERISA and the Tax Code.  As noted, tax disqualification of the Plans – the potential result of failure to correct the Plans to comply with ERISA standards and their Tax Code counterparts once the failures have come to PwC attention – would be very costly to all participants in the Plans, partners included, *see supra* n.14.  There is no cognizable conflict.  *E.g., Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 562 (2nd Cir. 1968) ("all members of the class, including those who would otherwise prefer to abide by the status quo, will be helped" if plaintiffs' allegations are sustained); *White v. Sunstrand Corp.*, 1999 WL 787455, at *7 (N.D. Ill. Sept. 30, 1999) (no conflicts between present and former employees where "[i]t is in all the class members' interest to prove a statutory violation and to obtain maximum relief"); *In re Amsted Indus., Inc. "ERISA" Litig*., 2002 U.S. Dist. LEXIS 24144, at * 8 (N.D. Ill. Dec. 16, 2002) ("While Plaintiffs may have differing desires to the future financial stability of Amsted, their interests in this litigation are not in conflict.  In filing this suit Plaintiffs seek to right alleged wrongs committed by the plan administrators in order to receive the full value of their retirement accounts").[16]

While two of Plaintiff's eleven claims are focused on the disparity between the benefits provided under the Plans between partners and rank-and-file employees, *e.g.*, Counts Six and Seven – a disparity of which Plaintiff quite pointedly complains – the remedy sought by Plaintiff is not, as PwC wrongly asserts, Opp. at 21, a reduction in partner benefits, but rather an increase in rank-in-file benefits to match proportionately, as required by law.  *See* Pl. Opp. to Mtn. to Dismiss (Doc. 20) at 43 n.70.  Thus, again, there is no legal antagonism between Plaintiff's position and the interests of non-Defendant partners.

---

[16] The one case from this Circuit cited by Defendants to support their contention that purported antagonism between employees and partners is fatal to class certification, *Wagner v. Taylor*, 836 F.2d 578 (D.C. Cir. 1987), is distinguishable for the reasons identified by Judge Huvelle in *McReynolds v. Sodexho Marriott Servs., Inc.,* 208 F.R.D. 428, 447-48 (D.D.C. 2002), all of which reasons, transposed to this benefit context, apply here fully.

Any and all allegations of illegality by partners are directed solely at the partners who are named as Defendants – which partners are specifically excluded from the proposed Class. Any *personal* antagonism felt toward Mr. Laurent as a result of this lawsuit is irrelevant as well as speculative.[17]

Defendants make much of Mr. Laurent's response to a question at his deposition that he did not seek to represent any partners who were or are Plan participants even though they are included in the proposed Class definition. Opp. at 21. But as Defendants themselves note, "plaintiff stated that . . . he is generally seeking to represent all participants in the Plans" and Plaintiff testified that he seeks to remedy what he regards as discrimination in favor of partners under the Plans. Tr. (Doc. 39, Ex. 1) at 47. That he may not at that moment in the deposition have been able to articulate to Defendants' satisfaction the exact contours of a multi-count, detailed complaint is of course of no moment.[18] Mr. Laurent, whose personal qualifications to serve have no been challenged nor could they be, repeatedly testified that he was challenging the legality of the Plans and was relying on counsel to articulate the details, *see, e.g.,* Tr. 24, 32-33, 46-48, 56, and Defendants have not questioned counsel's competence to do so.

## IV.     Defendants' Rule 23(b) Objections Are Meritless.

Nothing PwC offers in its opposition undermines the showings Plaintiff has made under Rule 23(b)(1)(A), (b)(1)(B) or (b)(2).

### A.     The Proposed Class Is Properly Certified Under Rule 23(b)(2).

Plaintiff begins with Rule 23(b)(2) because PwC concedes that the class the Seventh Circuit approved in *Berger v. Xerox Corporation Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir.

---

[17] If personal (or even professional) antagonism were enough to defeat certification, it is difficult to see how the classes in *Berger* and *Cooper* could have been certified, given the presence of the CEOs and other top officers of Xerox and IBM in the respective classes. That said, Plaintiff has no objection if, following certification, PwC wishes to request leave to give all non-Defendant partners (defined for this purpose to mean persons who were at any time partners or principals during the Class period, June 30, 1994 to the present) court-approved notice of a right to "disassociate" themselves from – but not opt-out of – the Class, akin to the notice approved in *Atwood v. Burlington Indus. Equity,* 164 F.R.D. 177, 180-81 (M.D. N.C. 1995) ("Members of the class who choose to disassociate themselves are still bound by the results of this litigation for *res judicata* purposes and will be entitled to choose at a later date whether they wish to share in any recovery which the class may ultimately achieve").

[18] *E.g., McPhatter v. Sweitzer*, 2005 WL 3150245, *7 n.15 (M.D.N.C., Nov. 18, 2005) (rejecting argument that named plaintiff's deposition testimony "changed the allegations"; "The Amended Complaint (not Smith's Deposition transcript and not Defendants' characterization of those documents) contains the official allegations of the Plaintiffs").

2003) – which Plaintiff argued in his opening brief was indistinguishable in all significant respects from the proposed Class here – *was* indeed properly certified under Rule 23(b)(2). Opp. at 31. The problem for PwC is that the only distinction it can muster between this case and *Berger* is an illusory one.

The declaratory relief sought in *Berger* is identical to that sought here under Count One. However, PwC argues, the monetary relief sought here predominates, whereas in *Berger* it did not, because the Xerox cash balance plan "provided that each participant's account balance received guaranteed annual interest credits fixed at the one-year Treasury bill rate for the prior year plus one percent" whereas the RBAP provides no such positive interest credit guarantee. Opp. at 31-32. Thus, whereas here the whipsaw calculation "would be both factually complex and potentially unique for each class member," in *Berger* the declaratory relief predominated over the monetary relief "because the declaration 'established the right of each of the class members, and the computation of damages due each followed mechanically.'" Opp. at 31 (*quoting Berger,* 338 F.3d at 764).

But the result here should be the same as in *Berger.* "The basis for th[e] conclusion" in *Berger* that the additional monetary benefits "were 'incidental' to the requested declaratory relief," *id.* at 764, did not have *anything* to do with the T-bill plus one percent interest crediting rate promised by the Xerox plan. As explained above, guaranteed positive interest credit or no, the Xerox plan was just like the RBAP in that it too failed to establish a uniform projection rate to be used when calculating lump sum distributions. Thus, to bring the Xerox plan into compliance with ERISA, the work that the district court had to perform was no different than what this Court would be asked to do here in coming up with its best estimate of the value of the right to receive future investment credits under RBAP.

PwC therefore is being disingenuous when it attempts to draw a distinction between the Xerox plan on the one hand and the RBAP on the other by suggesting that "the rate[] guaranteed by the terms of the [Xerox] plan[]," Opp. at 33 n.17, was some kind of pension panacea that made all the difference to the Seventh Circuit for purposes of its Rule 23(b)(2). It played no role in the outcome of that question

whatsoever, as a review of the page cites to *Berger* Defendants supply further confirm.  Judge Posner quite clearly explained his reasons for finding (b)(2) certification appropriate in *Berger*:  because he agreed with plaintiffs that "[w]hat is sought is a declaration that Xerox's **method of computing** the lump sums to which withdrawing employees are entitled is unlawful.  That is a ground common to all the members of the class."  338 F.3d at 764 (emphasis added).  The same is true here, not just for Count One but *all* counts of the Complaint.

The lesson to be derived from *Berger* is thus the opposite from the one PwC would have the Court draw.  Here, as in *Berger*, the projection methodology to be used for Class members' whipsaw calculations would be applied *across-the-board* and would flow from the declaratory relief Plaintiff has requested.  This would be the case whether the *rate* used for the required projection is the uniform one suggested by Plaintiff or some other rate – *even one based on each participant's **individual** rate of return*.  The fact of the matter is, no matter what the projection rate, "[t]he present case is one of incidental damages because if the plaintiffs get the declaration they are seeking, the benefits to which the ERISA plan entitles them will simply be read off from the plan."  *In re Allstate Ins. Co.*, 400 F.3d at 507.

Defendants' Rule 23(b)(2) analysis is flawed in other fundamental respects.  First and most fundamentally, PwC intentionally confuses the "monetary relief" that Plaintiff and the Class may *eventually* need the Court's assistance to obtain (which assistance will only be needed if Defendants refuse to properly recalculate and pay benefits even after being so ordered by the Court) with "money damages," the term the Advisory Committee Notes to Rule 23(b)(2) uses and which Plaintiff and the Class decidedly do *not* seek.  The whole notion that this case presents *any* kind of Rule 23(b)(2) "problem" crumbles once the facts in this regard are clarified.  That is because not all monetary relief is "money damages."  *Bowen v. Massachusetts,* 487 U.S. 879, 893 (1988) ("[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'").

Money damages can be problematic for Rule 23(b)(2) class treatment because they often require inquiry into individual subjective claims of emotional distress or pain and suffering – this, because they are "intended to provide a victim with monetary compensation for an injury to the person, property, or reputation." *Id.* An equitable action for specific relief, on the other hand, "may include an order providing for . . . the recovery of specific property or monies," but this does not mean the relief is properly characterized as "money damages." *Id.* The difference lies in the purpose behind the payment sought. "[M]oney damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost; specific relief in contrast represents an attempt to restore to the plaintiff that to which it was entitled from the beginning." *America's Comm. Bankers v. FDIC,* 200 F.3d 822, 829 (D.C. Cir. 2000). But where "a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages." *Id.*[19]

Here, unquestionably, if Plaintiff and the Class prevail, Defendants would effectively be compelled to make additional monetary payments above those they have made to date. These payments, however, would not be made as compensation for the injury Plaintiff and the Class suffered as a result of Defendants' actions (indeed, ERISA forbids consequential and punitive damage claims). Rather, they are payments that Defendants would have been obligated to make all along had they honored their statutory duties and easily determinable via objective formulae. Accordingly, none of the relief Plaintiff and the Class may someday need the Court's assistance to obtain raises any of the "due process" concerns presented in, most notably, Title VII cases where individuals' *damages* differ sometimes widely.

Here, however classified, monetary relief would not and should be not be considered to predominate because, as in *Berger*, it would flow directly from the declaratory and injunction relief

---

[19] Defendants' implicit error is to falsely equate substitutionary relief with damages. While all money damages are indeed substitutionary, not all substitutionary relief constitutes money damages. The key determinant is what, if anything, the money is substituting for. Damages involve only the substitution of money for an injury or loss. Restitution of money illegally withheld does not substitute money for anything -- it is the very thing improperly withheld. *Great West Life & Ann. Ins. Co. v. Knudson,* 534 U.S. 204 (2002) is not to the contrary. The issue there was the equitable versus legal nature of a remedy, not whether damages were involved. *Id.* at 212-14.

sought and is subject to ready calculation on the basis of a formula or principles uniformly applicable to the class. *See In re Allstate Ins. Co.*, 400 F.3d at 507. Indeed, the Court should find here, like it did in *Pigford,* that the injunctive and declaratory relief Plaintiff seeks on behalf of the proposed Class is of such importance to the Class taken as a whole that, however substantial to some Class members the immediate monetary benefits may be, it cannot be said that monetary relief predominates. In *Pigford,* where plaintiffs admittedly sought "money damages" (and not just "monetary relief"), this Court rejected the government's argument that the damages remedy predominated because it deemed the requested injunctive and declaratory relief to be "significant."[20] Here, there is no denying the extensive, comprehensive nature of the injunctive and corresponding declaratory relief Plaintiff seeks. In fact, every chance they get, Defendants complain that Plaintiff wants to re-write the Plans.

The changes Plaintiff has identified as legally necessary, and more recently embodied in draft proposed Plan amendments, are thus just the type of "final injunctive . . . [and] declaratory injunctive relief with respect to the class as a whole" envisioned by Rule 23(b)(2). Defendants would have the Court consider only whether Plaintiff's *personal* requests for injunctive and declaratory relief predominate over his request for monetary relief. Opp. at 32. But that is clearly not the proper focus of Rule 23(b)(2) – the relief sought on behalf of the *Class* is what matters. Even cases PwC cites in support of its position, like *Peoples v. Wendover Funding, Inc.,* 179 F.R.D. 492 (D. Md. 1998), make that clear.[21]

**B.    The Proposed Class Is Properly Certified Under Rule 23(b)(1)(A).**

PwC's attempt to avoid certification under Rule 23(b)(1)(A) also is unavailing. Rule 23(b)(1)(A)

---

[20] 182 F.R.D. at 351 ("While plaintiffs also seek monetary relief for the alleged acts of discrimination, the requested injunctive and declaratory relief, if granted, would have a significant impact on how the USDA processes its complaints and how it handles discrimination complaints currently proceeding through the administrative mechanism"). *Accord Thomas v. Albright*, 139 F.3d 227, 235 (D.C. Cir. 1998) (affirming (b)(2) certification where the plaintiffs sought monetary relief as well as "'extensive injunctive and systemic relief'"; also holding that decision to permit opt-outs was an abuse of discretion).

[21] Although PwC cites to it at key points in its argument as if it were an ERISA pension benefit case, *Peoples* is inapposite in the extreme. It was a Fair Debt Collection Practices Act case seeking actual money damages and the $1,000 statutory damages available under the FDCPA for a one-time negligent mailing to some 2,000 participants in a HUD low-income mortgage assignment program of a standard notice of foreclosure those participants should never have been sent. The court properly found that the case fit under Rule 23(b)(3), rather than (b)(2) because although the complaint sought a declaration of illegality, the avowed purpose of the suit was to collect *damages. Id.* at 500.

permits a class action where "the prosecution of separate actions by or against individual members of the class would create a risk of . . . inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class."  It is tailor-made for situations like this, where the class seeks to change an alleged ongoing course of conduct that is either legal or illegal as to all members of the class.  *Adair v. England*, 209 F.R.D. 5, 12 (D.D.C. 2002) (*citing* 5 Moore's *Federal Practice* § 23.41[4] (3rd ed. 2000).

PwC raises three objections to certification under this subdivision.  First, PwC contends that Rule 23(b)(1)(A) is not available where plaintiffs seek money damages.  Opp. at 29.  Putting aside that Plaintiff does not seek for himself or the Class "money damages," nothing in the text of the Rule or the Advisory Committee Notes supports confining (b)(1)(A) solely to situations in which no significant monetary relief is sought.  That was the conclusion of the Fourth Circuit in *In re A.H. Robins Co.*, 880 F.2d 709 (4th Cir. 1989), where the Fourth Circuit certified a products liability class action under Rule 23(b)(1)(A) to avoid the risk of inconsistent adjudications, forcefully rejecting the notion that Rule 23(b)(1)(A) was not designed to encompass class suits seeking monetary relief.  *Id.* at 730 n.28. Numerous district courts in this Circuit have since followed *Robins* in certifying ERISA class actions under Fed. R. Civ. P. 23(b)(1)(A).  *See* Pl. Class Mem. at 21-23 & n.12 (collecting cases).

Defendants also contend that Rule 23(b)(1)(A) was designed to protect *their* interests and that because *they* are willing to risk incompatible judgments, Plaintiff cannot invoke it.  Opp. at 27.  Although some courts admittedly interpret Rule 23(b)(1)(A) this way, *id.,* there is no basis in the text of the Rules or Advisory Committee Notes for this interpretation.  *See* 1 *Newberg on Class Actions* § 4.04, at 16-17 ("[t]he party opposing the class probably does not possess a veto power over class certification under subdivision (b)(1)(A)").  Nor is it at all sensible because it subjects the courts and other litigants to the whim or unwise unilateral veto of cases that might be otherwise be well-suited for class treatment.  *See, e.g., Ingles v. City of New York,* 2003 U.S. Dist. LEXIS 2453, * 21 (S.D.N.Y., Feb. 20, 2003) (rejecting

defendant's veto claim for such reasons); 1 *Newberg on Class Actions* § 4.07 ("[T]he needs of the judicial system to avoid inconsistent adjudications of a single controversy must be respected, despite the willingness of a litigant to assume th[e] risk").

In any event, giving Defendants in this ERISA action such a veto power would be inappropriate. Plaintiff has previously demonstrated that under *Wagener v. SBC Pension Benefit Plan,* 407 F.3d 395, 403-05 (D.C. Cir. 2005) and other authorities, the Plans are required by law to treat all similarly situated participants alike. Pl. Class Mem. at 20-21 & n.11. Defendants do not challenge that showing. Thus, Defendants – or at least the Defendants Plans, which remain under PwC's control – should not be permitted to avoid a ruling that can only clarify the legal status of those Plans in the way that is clearly the most efficient, definite and comprehensive manner possible. As fiduciaries or neutral trusts, Defendants' obligations are to the Plans' participants and to comply with the law. As such, they should all *welcome* certification -- or at least not be *the* obstacle to it if a court finds certification otherwise appropriate. That Defendants do not explain *why* they oppose certification without reference to arguments that they *can* oppose certification, simply further confirms this is a power, if conferred, likely to be abused.

PwC's final argument against Rule 23(b)(1)(A) certification is that certification is unnecessary because there is no risk that anyone else (other than Plaintiff) will file suit if this case is denied class action status. Opp. at 27. However, the idea that Rule 23(b)(1)(A) requires a showing of likelihood of additional individual actions is an extra-statutory gloss on Rule 23(b)(1)(A), without foundation in the text of the Rule or even the Advisory Committee Notes. *See also* 1 *Newberg on Class Actions* §§ 4.07, 4.08 (stating that "[t]he actual likelihood of separate suits is not a valid threshold consideration for determining the applicability of Rule 23(b)(1)(A)"; "speculation that other suits will not be filed is not generally supportable as a reason for denying a Rule 23(b)(1)(A) class"). There is good reason for this: throughout the time a putative class action is pending, and until such time as class certification is denied, the law *encourages* class members to *not* file additional suits and indeed tolls the statute of limitations as

to their potentially class certifiable claims. *Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553 (1974).

In any event, other than the one case Defendants cite, *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C 1976), a true anomaly, *see* n. 24, virtually every other case Plaintiff could locate from this Circuit addressing the requirements of Rule 23(b)(1)(A) implicitly rejects this reading of Rule 23(b)(1)(A).[22]

Factually speaking, even if this were the rule, Defendants should not be heard to invoke it. The Complaint amply details Defendants' years-long fraudulent concealment of their complex ERISA violations: that few came forward earlier is no surprise and Defendants should not be thus rewarded with the success of their cover-up. Moreover, Defendants refused during class discovery to provide Plaintiff with any documents or information concerning Plan participants who have challenged their benefit calculations under the Plans (and who are thus prime candidates for filing suit if they were to learn that this action will not be certified a class action). *See* Defs. Ex. I at 40-41; Ex. 5. Having taken that position, Defendants cannot now opine on the likelihood of other Class members coming forward.

## C.      **The Proposed Class Is Properly Certified Under Rule 23(b)(1)(B).**

A class action may be certified under Rule 23(b)(1)(B) because multiple lawsuits would create the risk that the judgment with respect to some members of the proposed class would, "as a practical matter, be dispositive of the interests of . . . other members . . . or otherwise impair or impede their ability to protect their interests." Here, Defendants only *appear* to oppose certification under this provision. They do not provide a single articulated *reason* for their opposition.[23]

---

[22]  That includes In *Larionoff v. U.S.*, 533 F.2d 1167 (D.C. Cir. 1976), *aff'd*, 431 U.S. 864 (1977): when the Court of Appeals said that that case "would appear to qualify for class action status under Rule 23(b)(1)(A)," it made no reference to the possible existence of other new suits. *Id.* at 1181 n.36. *Accord Franklin v. Barry*, 909 F. Supp. 21, 31 (D.D.C. 1995) ("specter of inconsistency . . . is sufficient to satisfy Rule 23(b)(1)(A)"); *Kjeldahl v. Block*, 579 F. Supp. 1130 (D.D.C. 1983); *Cooperative Servs., Inc. v. HUD*, 410 F. Supp. 865 (D.D.C. 1976). *Berlin Democratic Club* is anomalous because *plaintiffs* made explicit statements to the Court such as "probably no other members of the class . . . could mount the sort of challenge to the defendants' activities which the plaintiffs are carrying on." 410 F. Supp. at 163. Denial under Rule 23(b)(1)(A) under those unusual circumstances thus made sense.

[23]  Defendants do not articulate even the *position* that they are opposed to certification of Count Eleven, the asset mismanagement count pertaining to the inappropriate use of retail mutual funds in the multi-billion dollar Plans, brought on behalf of the Plans as a whole under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). A case Defendants inject into the mix,

Defendants' discussion of Rule 23(b)(1)(B) here at first *looks* to be three paragraphs long, but the first paragraph discusses something altogether different (namely, that *certification,* as opposed to a *failure to certify*, which is what Rule 23(b)(1)(A) is concerned about, will have adverse impacts on Class members). *Id.* at 28  The second paragraph is deceptively circular and succeeds only in joining issue with a complete strawman.[24]

The third and final paragraph of Defendants' "opposition" to Rule 23(b)(1)(B) certification is much like the first:  half of it is devoted to discussing a matter explicitly pertaining solely to Rule 23*(b)(1)(A).*  Opp. at 28.  In the one remaining sentence of Defendants' "argument," they conclude with this complete *non sequitur*:  "Similarly, the Supreme Court has ruled that due process concerns precluded use of a mandatory class certified under Rule 23(b)(1)(B) to resolve damage claims by asbestos victims. *Ortiz v. Fiberboard Corp*., 527 U.S. 815, 846-48 (1999), *citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)."

In a way, this says it all:  this is *not* a case about asbestosis or race discrimination or the effects of second-hand smoke.  **It is about pension benefit formulas** –and Defendants' attempts to draft their way around a rigidly binary statutory framework and its mathematical consequences.   If this case is not suited for class certification, then no case is.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court certify this action as a class action pursuant to Rule 23(b)(1)(A), 23(b)(1)(B) and/or 23(b)(2) and appoint undersigned as class counsel.

---

*Piazza, supra,* n. 3, in fact reversed a district court order certifying a similar claim under Rule 23(b)(3) instead of the mandatory, no-opt-out provisions of Rule 23(b)(1).

[24] Defendants state in conclusory fashion that (b)(1)(B) certification is not appropriate because "[P]laintiff has not demonstrated how an adverse adjudication of his claim will, as a practical matter, be dispositive of the interests of other class members," Opp. at 28, but then Defendants omit any reference to the fact that Plaintiff explicitly gives two detailed examples of precisely how that could easily occur here.  Pl. Class Mem. at 24-25.  The strawman follows:  Defendants "rebut" the statement that the potential *stare decisis* effect is sufficient to support class certification under Rule 23(b)(1)(B), Opp. at 28, as if Plaintiff contested that and knowing full well that, to the contrary, Plaintiff's examples **assume** that in the ordinary case *stare decisis* is indeed insufficient.

Dated:  December 20, 2005

_____/s/ Eli Gottesdiener_____

Eli Gottesdiener

**GOTTESDIENER LAW FIRM, PLLC**

1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C.  20036
Phone: (202) 243-1000
Fax:     (202) 243-1001

Attorney for Plaintiff and the proposed Class