# EXHIBIT J

Ellen E. Schultz, *Suit Claims Pricewaterhouse Used 401(k) to Enrich Partners*, Wall St. Journal, Nov. 18, 2005, at C1

1 of 6 DOCUMENTS

Copyright 2004 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

(Copyright (c) 2004, Dow Jones & Company, Inc.)
The Wall Street Journal

November 18, 2004 Thursday

SECTION: Pg. C1

HEADLINE: Suit Claims Pricewaterhouse Used 401(k) to Enrich Partners

BYLINE: By Ellen E. Schultz

BODY:

A FORMER EMPLOYEE of PricewaterhouseCoopers LLP is suing the professional-services firm, saying it used its pension and 401(k) plans to enrich its partners at the expense of regular employees.

Among other things, the complaint says Pricewaterhouse provided partners with a 200% matching contribution in their 401(k)s, compared with 25% matches to other employees, and provided partners with outsize contributions to their so-called cash-balance pension accounts. Such disparate treatment, the suit alleges, runs afoul of federal pension guidelines.

The suit, filed early this month, follows a similar suit involving Pricewaterhouse and Bank of America Corp. It comes amid broader concerns about how companies deploy their pension plans, with some employers being accused of using plans to enhance their bottom lines or fatten the wallets of already well-compensated executives. It also comes in the wake of heightened government scrutiny of decisions made by employers and consultants regarding the management of benefits plans.

David Nestor, a spokesman for Pricewaterhouse, said the firm believes its plans are lawful and fair to employees. "It's also important to note that this lawsuit does not claim any loss of employee benefits, because there were none," he said.

The suit, filed by Timothy D. Laurent in federal court in the Southern District of Illinois in East St. Louis, Ill., Nov. 5, seeks class-action status. Mr. Laurent, a managing consultant, worked at Pricewaterhouse from 1995 to 2001.

According to Mr. Laurent's complaint, Price Waterhouse LLP, a predecessor of Pricewaterhouse, in July 1994 froze its traditional pension plan and set up a cash-balance plan. Four years later, when Price Waterhouse and Coopers & Lybrand merged to create the current firm, Coopers & Lybrand's traditional pension plan was converted into a cash-balance plan, and the two firms' plans merged in July 1999.

Traditional pension plans calculate benefits by multiplying years on the job by average salary, so benefits grow rapidly in employees' later years. In a cash-balance plan, employees instead have hypothetical accounts that grow with annual credits based on a percentage of current pay, plus interest.

According to Mr. Laurent's suit, instead of crediting employee cash-balance accounts with a preset interest formula pegged to returns on Treasury bills, plus 1% to 2%, as is common with cash balance plans, Pricewaterhouse instead required employees to "invest" the value of their accounts in hypothetical portfolios tracking the returns of investment funds similar to ones available in the 401(k) plan also available to employees.

This arrangement shifted investment risk to employees and created a conflict of interest, the suit claims: "The worse the rank-and-file performed in their account balances, the smaller the (plan) benefits would be." Meanwhile, Pricewaterhouse could invest the pension money for potentially higher returns. This violated fiduciary duty rules, the

Page 2

Suit Claims Pricewaterhouse Used 401(k) to Enrich Partners The Wall Stre

suit says, because if the firm's own professional money managers believed there was a better way to invest the money, it should have told the participants in the plan.

Mr. Nestor said there were no breaches of fiduciary duty and that "each employee may do better or worse than the firm did through its investments." He said employees could choose among 16 investment options, including stable-value vehicles or riskier equity and fixed-income choices. "We believe the plans offer PwC employees benefits of flexibility and independent choice, through the ability to self-direct their investments," he added.

The suit also alleges that Pricewaterhouse took steps to provide the top-paid employees with an unfair share from the retirement savings plans.

While most employees receive annual "credits" to their cash-balance accounts ranging from 5% to 8% of their annual pay, partners can receive an amount necessary to generate a benefit equal at retirement to $140,000 to $165,000 a year for life, depending on the returns in the investment options the partners select, people familiar with the matter said.

Meanwhile, the suit says, partners also got a better deal in the 401(k). They could defer as much as the maximum allowed by law, $13,000 a year, and receive a 200% matching contribution, for a total annual accumulation of $39,000. By contrast, other employees receive a matching contribution of 200% only for the first month of participation in the plan, after which the amount falls to 25%.

To qualify for tax breaks, retirement plans such as 401(k)s aren't permitted to include only highly-paid employees, but also must provide a certain level of benefits for a broad swath of line managers and rank-and-file employees. To prove that they do this, companies must pass a "nondiscrimination" test that compares the percentages being accumulated by higher-paid and lower-paid workers.

The complaint says Pricewaterhouse was able to pass these tests by, among other things, providing lower-paid employees with the 200% match for the first month in which they participated in the 401(k) -- which, under the plan's rules, they weren't allowed to join until the last month of the year in which they are hired. This practice had the effect of making the contributions for lower-paid employees appear higher in December, which is when the firm "tested" the plan for discrimination.

The suit is related to another case pending in that court, Pothier v. Bank of America Corp., in which Pricewaterhouse is a co-defendant. That suit alleges that Bank of America forced employees to invest their pension accounts in hypothetical funds whose "returns" mirror those of proprietary investment funds managed by the bank.

Bank of America has said its actions were legal and that it will vigorously defend the suit. Last week, it disclosed that the Internal Revenue Service, which oversees pensions, has been conducting an audit of its pension plan. Bank of America is an audit client of Pricewaterhouse, which designed the bank's pension plan.

NOTES:
PUBLISHER: Dow Jones & Company Inc.

LOAD-DATE: December 6, 2004

**EXHIBIT K**

Vineeta Anand,
*The courts: PwC sued over cash balance, 401(k); Class-action filing says partners manipulated plans for their benefit*, **Pensions and Investments**, February 21, 2005, at pg. 3

2 of 2 DOCUMENTS

Copyright 2005 Crain Communications, Inc.
Pensions and Investments

**February** 21, 2005, Monday

**SECTION:** Pg. 3

**LENGTH:** 1488 words

**HEADLINE:** The courts: PwC **sued over cash balance,** 401(k); Class-action filing says partners manipulated plans for their benefit

**BYLINE:** Vineeta Anand

**BODY:**

EAST ST. LOUIS, Ill. – PricewaterhouseCoopers LLC might have been named earlier this year as one of the 100 best companies to work for by Fortune magazine, but its pension plan participants don't necessarily agree.

PwC and partners overseeing the pension and retirement plans have been hit with a class-action lawsuit alleging that they misused pension and retirement plans as tax shelters for well-heeled partners – at the expense of rank-and-file employees.

The suit was filed in federal district court in East St. Louis.

PwC's cash balance plan, with $1.4 billion in assets at the end of June 2003, and a 401(k) plan, with $1.6 billion in assets for the fiscal year ended Sept. 30, 2003, are at the heart of the suit. (A separate profit-sharing plan for partners is not affected.)

In amended documents filed on Jan. 28, the suit charges PwC and its partners with masterminding "a brazen, unlawful scheme ... to game the tax and pension laws in order to improperly pad the partners' retirement benefits and take-home pay at the expense of both rank-and-file PwC employees and the public."

The suit, brought by Timothy D. Laurent, a former employee, alleges that the firm – for years synonymous with creative cash-balance pension plans – deliberately violated age-and income-discrimination provisions of federal pension law. By "engaging in multiple layers of deception," the suit alleges, PwC and its partners reduced "benefits to the paid rank-and-file employees down to the bare minimum thought need(ed) to keep the shelter afloat."

A ruling in favor of Mr. Laurent and other participants could cost the firm hundreds of millions of dollars.

'Plans are lawful'

"For all the reasons that are discussed in the briefs, we believe that our plans are lawful and fully compliant with ERISA and we deny all the allegations in the lawsuit," said David Nestor, a PwC spokesman in New York.

Eli Gottesdiener, the Washington-based lawyer representing the plaintiffs, declined to comment.

Most cash balance plans permit employees, on paper, to "earn" returns linked to the interest rate on a Treasury bill or another conservative bond index. PwC contributed between 5% and 7% of pay to the rank-and-file employees' hypothetical accounts. The returns on these accounts were linked to 17 investment options, mirroring the choices available to them in their 401(k) plan (Pensions & Investments, May 17, 1999).

But according to the suit, PwC did not inform participants that their accounts existed only on paper and that their "investments" were not real. Employees were unaware that the underlying assets, like other defined benefit plans, were managed by investment management firms hired by the plan sponsor.

"The purpose was, among others, to conceal that the firm – the participants' fiduciary – was actually attempting to

capitalize on the participants' perceived inability to wisely invest, in order to make money or reduce pension expenses for the partners," the lawsuit charges.

Thus, the lower the returns employees earned on their paper investments, the more money the partners could split among themselves, the lawsuit alleges.

While federal pension law shields employers from liability for the investment performance of participants' 401(k) plan options, it does not apply to defined benefit plans.

The suit alleges that the plan used a different formula for determining benefits for partners.

Working backwards

Using the maximum annual pension benefit permitted under the tax law – $170,000 in 2005 – as the starting point for the calculations, each partner's annual pay credit was then determined by working backwards to come up with the discounted present value of the benefit, which became the annual employer contribution, the suit claimed. The suit said partners would accrue this maximum benefit over 10 years, so the employer contribution each year would amount to one-tenth of the target benefit.

"In fact, partners are guaranteed a benefit that approximates the maximum permitted by law, regardless of investment performance," the lawsuit alleges.

The PwC plan pegs the "normal retirement age" at five years of service, not at age 65. In theory, this would permit a 25-year-old to collect retirement benefits at age 30. But company documents stated the retirement age was 65, according to the suit.

The lawsuit charges that the real motive for using a contrived normal retirement age of five years of service – which coincides with the vesting period under the plan – is that it permits employers to pay departing employees a lump sum equal only to their hypothetical account balances, instead of performing tortuous calculations to determine the present value of benefits at age of 65.

Moreover, the Employee Retirement Income Security Act pegs so-called backloading to the accrual rate at "the normal retirement age." So, a short normal retirement age, such as five years of service, permits employers to give inordinately high benefits to employees with longer tenure.

'Normal retirement age'

Perhaps the most unique aspect of the five-year normal retirement age is that it permits older, longer-tenured partners to collect their retirement benefits and roll them over into individual retirement accounts. Federal pension law forbids employees from collecting retirement benefits while still working but allows payouts after "normal retirement age." That permitted the partners to collect lump sums from the pension plan and roll them over into IRAs, as if they had quit working.

There is no ceiling on rollover IRAs. The five-year normal retirement age provision of the PwC plan permitted the partners to circumvent the ceilings on IRA contributions and roll over millions of dollars in benefits while continuing to work at the firm.

The IRS has only recently begun to crack down on this practice.

In a proposed regulation issued last November, the IRS said: "Normal retirement age cannot be set so low as to be a subterfuge to avoid the requirements of Section 401(a) – which regulates non-discrimination – and, accordingly, normal retirement age cannot be earlier than the earliest age that is reasonably representative of a typical retirement age for the covered work force."

The problem is, the proposed regulation contradicts a provision in the tax law that permits employers to set normal retirement age as simply that designated under the terms of the pension plan, or age 65, whichever is earlier. And that would suggest the PwC plan fully complied with the law.

Paul T. Shultz, director, employee plans determinations redesign in the IRS' tax-exempt and government entities division, wouldn't say whether the IRS is investigating the PwC plan.

He did say IRS officials believe the regulator has the authority to clarify the definition of normal retirement age

through regulations, but he conceded that employers may challenge the IRS' authority to do so without legislation.

The maximum

Meanwhile, the suit alleges that PwC and some partners misused the 401(k) plan to ensure partners stashed the maximum permitted under the law - $14,000 in 2005. They did so by artificially boosting participation by new, low-paid employees, the suit said. Because the non-discrimination tests require participation by a large proportion of low-paid workers compared with the top executives, PwC let new employees participate only in the last month of the company's fiscal year. To induce participation, the company paid these new employees a 200% match, but only during that first month of participation. After that, the employer match dropped to 25%. The high percentage of participation by rank-and-file employees permitted the partners to contribute the maximum allowable to the plan.

Since the first month of participation by the new employees was also the last month of the company's fiscal year, the plan could pay partners a 200% match for the entire year and still pass the non-discrimination test. That means each partner who contributes $14,000 in 2005 will get a company match of $28,000.

It seems clear plaintiffs picked the U.S. District Court for the Southern District of Illinois because presiding Judge G. Patrick Murphy is widely viewed as sympathetic toward participants.

But PwC has asked him to dismiss the case on the grounds that the lawsuit should have been filed either in New York, where the company is based, or in Florida, where the plans are administered. PwC also seeks dismissal on the grounds that the lawsuit attempts a broad stretch to include alleged violations of the non-discrimination rules that are part of tax rules enforceable by the IRS for which participants cannot sue.

"I'm not aware of any lawsuits out there that have made this leap by reference," said Paul Strella, a consultant at Mercer Human Resource Consulting, Washington. "That is a big hurdle to get over."

**LOAD-DATE:** February 25, 2005